35

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 1 9 2003

Michael N. Milby
Clerk of Court

| | |
|---|---|
| MARY E. CARRANZA, Individually and §<br>As Next Friend of ANGEL MATTHEW §<br>GONZALEZ, GUSTAVO GONZALEZ, §<br>JR., and ALYSSA LAUREN GONZALEZ, §<br>Minor Children, et.al. §<br>　　　　*Plaintiffs* §<br>　　　§<br>VS. §<br>　　　§<br>CITY OF LA FERIA, TEXAS, §<br>LA FERIA POLICE DEPARTMENT, §<br>OFFICER GERARDO "JERRY" §<br>RAMIREZ, Individually and in his §<br>Official Capacity; and §<br>VALLEY BAPTIST MEDICAL CENTER §<br>　　　　*Defendant* §<br>　　　§<br>　　　§<br>GUSTAVO GONZALEZ, Individually §<br>Pursuant to the Texas Wrongful Death Act §<br>for the death of GUSTAVO GONZALEZ, §<br>Deceased §<br>　　　　*Intervenor* §<br>　　　§<br>VS. §<br>　　　§<br>CITY OF LA FERIA, TEXAS, §<br>OFFICER GERARDO "JERRY" §<br>RAMIREZ, Individually and in his §<br>Official Capacity; and §<br>VALLEY BAPTIST MEDICAL CENTER §<br>　　　　*Defendant* § | CIVIL ACTION NO. B-02-180<br>(JURY REQUESTED) |

---

**DEFENDANTS CITY OF LA FERIA, TEXAS, LA FERIA POLICE DEPARTMENT,
AND OFFICER GERARDO "JERRY" RAMIREZ' MOTION FOR SUMMARY
JUDGMENT**

---

## TABLE OF CONTENTS

**TABLE OF CONTENTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF CITATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS** . . . . . . . . vi

**STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT** . . . . . . . . . . . vii

**SUMMARY OF THE ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

      **1.  La Feria Police Department is not a proper party to this suit.**

      **2.  Gerardo Ramirez in His Official Capacity is not a proper party.**

      **3.  The City of La Feria has no official policy, custom, or practice of  excessive force**

      **4.  The City of La Feria cannot be held liable under a lack of training  argument raised by the Plaintiffs and Intervenor**

      **5.  Gerardo Ramirez is entitled to Qualified Immunity.**

      **6.  Plaintiffs and Intervenor cannot maintain an action under the Fourth  Amendment to the United States Constitution**

      **7.  Defendants are immune from Plaintiffs' and Intervenor's claims as they do not trigger a waiver of immunity under the Texas Tort Claims Act.**

**SUMMARY JUDGMENT EVIDENCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ARGUMENTS AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     **A.  Standard for Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     **B.  All Claims Against the La Feria Police Department Should be Dismissed** . . . . 7

**C.  Plaintiffs and Intervenor Cannot Maintain a Separate Cause of Action Against Defendant Ramirez in his Official Capacity** . . . . . . . . . . . . . . . . . . . . . . . . . 8

**D.  Plaintiffs and Intervenor Cannot Prove a Policy, Practice, or Custom Claim Against the City of La Feria** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**E.  Plaintiffs' and Intervenor's Causes of Action For Lack of Training** . . . . . . . 10

**F.   Defendant Gerardo Ramirez is Entitled to Qualified Immunity** . . . . . . . . . 11

**G.  Plaintiffs' and Intervenor's claim under the Fourth Amendment Are Not Viable** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**H.  Plaintiffs' and Intervenor's claims under the Texas Tort Claims Act Must Fail** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**CERTIFICATE OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF CITATIONS

*Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bennett v. City of Slidell,* 728 F.2d 762 768 (5th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . 9

*Brothers v. Klevenhagen*, 28 F.3d 452 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 7, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Dalllas County Mental Health & Mental Retardation v. Bossley,*

968 S.W.2d 339, 343 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Darby v. Pasedena Police Department*, 939 F.2d 311, 313 (5th Cir. 1991). . . . . . . . . . . . . . 7

*Elliot v. Perez*, 751 F.2d 1472, 1479 (5th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992). . . . . . . . . . . . . . . . . . . . . 11

*Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865 (1989). . . . . . . . . . . . . . . . . 11, 12

*Johnson v Morel*, 876 F.2d 477, 480 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hafer v. Melo*, 502 U.S. 21, 25 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). . . . . . . . . 11

*Hererra v. Valentine*, 653 F.2d 1220 (8th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Huong v City of Port Arthur*, 961 F.Supp. 1003, 1007 (E.D. Texas 1997). . . . . . . . . . . . . . 11

*International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Johnson v Morel*, 876 F.2d 477, 480 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Languirand v. Hayden,* 717 F.2d 220, 227-28 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). . . . . . . . . . . . 7

*Monell v. New York City Dep't of Social Services*, 436 U.S. 685, 690 (1978). . . . . . . . . . . . 8

*Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . 7, 11

*Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986).. . . . . . . . . . . . . . . . . . . . 6

*Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988). . . . . . . . . . . . . . . . 6

*Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). . . . . . . . . . . . . . . 12

## <u>STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS</u>

This case is currently in the discovery phase.  Depositions of Officer Gerardo Ramirez, La Feria police Chief Donato Garcia, and Valley Baptist Representative Blake Hubbard have been taken by Plaintiffs' and Intervenor's counsel.  Subsequent to the completion of the depositions, Plaintiffs and Intervenor filed their First Amended Original Complaints with the court.  This matter has been set for jury selection on March 8, 2004.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

1.    Whether or not Plaintiffs and Intervenor can maintain an action against the La Feria Police Department;

2.    Whether or not Plaintiffs and Intervenor can maintain an action against Defendant Gerardo Ramirez in His Official Capacity;

3.    Whether or not the City of La Feria has an official policy, custom, or practice of excessive force that caused the alleged constitutional violations raised in this case;

4.    Whether or not the City of La Feria can be held liable under a lack of training argument raised by the Plaintiffs and Intervenor

5.    Whether or not Gerardo Ramirez is entitled to Qualified Immunity;

6.    Whether or not Plaintiffs and Intervenor can maintain an action under the Fourth Amendment to the United States Constitution; and

7.    Whether or not Plaintiffs and Intervenors have viable claims trigger a waiver of immunity under the Texas Tort Claims Act.

## SUMMARY OF THE ARGUMENT

**1.  La Feria Police Department is not a proper party to this suit.**

The La Feria Police Department is not recognized under the law as a separate entity from the City of La Feria, but rather is simply a department of the City of La Feria.  It cannot sue or be sued under the law.

**2.  Gerardo Ramirez in His Official Capacity.**

Plaintiffs and Intervenor have sued the City of La Feria for the alleged constitutional violations they contend were committed in this case.  Case law has held that a suit against an officer in his official capacity is the equivalent of suing the entity the officer works for.  Accordingly, suit against Gerardo Ramirez in his Official Capacity is improper.

**3.    The City of La Feria has no official policy, custom, or practice of excessive force.**

To hold the City of La Feria liable under a Section 1983 claim, Plaintiffs and Intervenor must prove that the city has some official policy, custom, or practice of excessive force that caused the constitutional violations complained of.  No such evidence exists.  Plaintiffs and Intervenor have no evidence of a pattern of similar incidents that is general or widespread.

**4.    The City of La Feria cannot be held liable under a lack of training argument raised by the Plaintiffs and Intervenor**

Defendants' summary judgement establishes that Officer Ramirez, and all other officers of the City of La Feria are trained in the areas of use of force, restraint techniques, and the use of firearms.  Proof of a single incident of violence is insufficient to hold a municipality liable for

inadequate training under the law. Plaintiffs and Intervenor have no evidence of any pattern of similar incidents that have occurred due to an alleged failure to train.

**5.      Gerardo Ramirez is entitled to Qualified Immunity;**

The use of deadly force by Officer Ramirez was objectively reasonable considering the totality of the circumstances he faced. Defendants' summary judgement evidence shows Officer Ramirez was being violently assaulted by a psychotic detainee who was striking him with leg shackles when he discharged his weapon. Officer Ramirez employed various verbal and physical techniques prior to resorting to discharging his weapon at Gonzalez. Finally, it is clear from the evidence that Officer Ramirez was in imminent danger and feared for his life when he discharged his weapon.

**6.      Plaintiffs and Intervenor cannot maintain an action under the Fourth  Amendment to the United States Constitution**

At the time of the altercation at issue, Gustavo Gonzalez was a pre-trial detainee. His arrest had been completed and he was in police custody when the shooting occurred. Pre-trial detainees are protected by the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs and Intervenor's claims under the Fourth Amendment are improper.

**7.      Defendants are immune from Plaintiffs' and Intervenor's claims as they do not trigger a waiver of immunity under the Texas Tort Claims Act.**

Plaintiffs' and Intervenor's claims of negligence are an attempt to circumvent the soverign immunity bar against intentional torts. Plaintiffs and Intervenor cannot and have not asserted proper

claims against Defendants that trigger a waiver of immunity under the Texas Tort Claims Act. Further, Plaintiffs' and Intervenor's claims are conditioned upon whether or not Defendant City of La Feria claims the actions of Ramirez were unintentional, unknowing, reckless or merely negligent. The City of La Feria has taken no such position in this case.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARY E. CARRANZA, Individually and §
As Next Friend of ANGEL MATTHEW §
GONZALEZ, GUSTAVO GONZALEZ, §
JR., and ALYSSA LAUREN GONZALEZ, §
Minor Children, et.al. §
      *Plaintiffs* §
§
VS. §
§
CITY OF LA FERIA, TEXAS, §
LA FERIA POLICE DEPARTMENT §

OFFICER GERARDO "JERRY" §
RAMIREZ, Individually and in his §
Official Capacity; and §
VALLEY BAPTIST MEDICAL CENTER §
      *Defendant* §
§
§      CIVIL ACTION NO. B-02-180
§      (JURY REQUESTED)
GUSTAVO GONZALEZ, Individually §
Pursuant to the Texas Wrongful Death Act §
for the death of GUSTAVO GONZALEZ, §
Deceased §
      *Intervenor* §
§
VS. §
§
CITY OF LA FERIA, TEXAS, §
OFFICER GERARDO "JERRY" §
RAMIREZ, Individually and in his §
Official Capacity; and §
VALLEY BAPTIST MEDICAL CENTER §
      *Defendant* §

---

**DEFENDANTS CITY OF LA FERIA, TEXAS, LA FERIA POLICE DEPARTMENT, AND OFFICER GERARDO "JERRY" RAMIREZ' MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE UNITED STATES DISTRICT COURT:

NOW COME DEFENDANTS CITY OF LA FERIA, TEXAS, LA FERIA POLICE DEPARTMENT AND OFFICER GERARDO "JERRY" RAMIREZ, Individually and in his Official Capacity in the above styled and numbered matter, and file this their Motion for Summary and in support thereof would show as follows:

## I.
## SUMMARY JUDGMENT EVIDENCE

Exhibit A:    Deposition Testimony of Gerardo Ramirez

Exhibit B:    Excerpt from Deposition of Blake Hubbard

Exhibit C.    Medical Records of Gerardo Ramirez

Exhibit D:    Valley Baptist Medical Records on Gustavo Gonzalez          .

Exhibit E:    Excerpt from Deposition of Donato Garcia

Exhibit F:    Sworn Statements of Gerardo Ramirez taken from Plaintiffs' Exhibit 8 to
              Donato Garcia's Deposition bate stamped Gonzalez, Celia 1306-000544 to
              1306-00550.

## II.
## STATEMENT OF THE CASE

This is an excessive force case brought under 42 U.S.C § 1983. Plaintiffs and Intervenor have brought this action against Gerardo Ramirez, Individually and in is Official Capacity, the La Feria Police Department, and the City of La Feria, Texas under 42 U.S.C. § 1983 and § 1988 et. seq for alleged violations of constitutional rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, under the Texas Tort Claims, and under the Texas Wrongful Death Act alleging that Defendant Ramirez used excessive force against Gustavo Gonzalez, deceased, by firing shots into him, thereby causing his death. Plaintiffs and Intervenor also allege that a "policy,

2

custom, or practice" of the City of La Feria and the La Feria Police Department caused the injuries

of which they complain. Plaintiffs and Intervenor seek compensatory damages, attorneys fees, and

costs.

## III.
## STATEMENT OF FACTS

It is undisputed that on or about September 17, 2000, Gustavo Gonzalez, Deceased was

arrested by members of the La Feria Police Department for evading arrest and that during the arrest

he was injured and subsequently taken to the Valley Baptist Medical Center for treatment. On or

about September 18, 2000, Defendant Officer Gerardo "Jerry" Ramirez was assigned to be an armed

guard in Gonzalez' room at Valley Baptist Hospital. (See Exhibit A, pg 88 lines 3-16, 24-25, pg 89

lines 1-3). Gonzalez was handcuffed to his hospital bed by one hand. (See Exhibit A, pg 92 line 25,

pg 93 lines 1-11). Unbeknownst to Ramirez, Gustavo Gonzalez was evaluated by psychiatrist Dr.

Tomas Gonzalez at the hospital who considered Gustavo to be paranoid and fearful, psychotic, and

subject to hallucinations. (See Exhibit A, pg 99 lines 4-22 and Exhibit B, pg 19-23). Medical

information in Gustavo Gonzalez' records from Valley Baptist for September 18, 2000 indicating

that Gonzalez demonstrated a degree of confusion and/or disorientation prior to the shooting, seemed

to be out of touch with reality, and stated the officer was trying to kill him was not shared with

Ramirez by anyone at the hospital. (See Exhibit A, pg 100 lines 4-25, pg 101 lines1-8, lines 18-24,

See also Exhibit B, pg 64 lines 7-20).

While in custody and under armed guard at Valley Baptist, Gustavo Gonzalez awoke from

his sleep at about 3:00 a.m. and got up out from his hospital bed. (See Exhibit A, pg. 116 lines 14-

25, pg. 117 lines 1-25, pg 118 lines 1-5). After Gonzalez refused Ramirez' verbal commands to lay

back down in his bed, Gonzalez proceeded to attempt to call security for backup by using the phone

in the hospital room. (See Exhibit A, pg 126 lines 4-18). While handcuffed to the rail of his hospital

bed, Gonzalez climbed across the to get closer to Ramirez and began reaching for Ramirez as

Ramirez was attempting to dial security on the phone. (See Exhibit A, pg 138 lines 7-15, pg 139

lines 15-21). Ramirez was shouting commands to Gonzalez to get back, but Gonzalez ignored the

commands and dragged his bed towards Ramirez reaching for him. (See Exhibit A, pg141 lines 1-

18, pg 142 lines 2-24). Ramirez feared Gonzalez was going to grab hold of him, strike him, or get

a hold of the weapons Ramirez carried as an officer. (See Exhibit A, pg145 lines 20-25, pg 146

lines 1-2). Ramirez began striking Gonzalez with his ASP baton while yelling verbal commands at

used in the event that Gonzalez needed to use the restroom and had to leave his bed. (See Exhibit A, pg 93 lines 12-18, 94 lines 3-9). Gonzalez began to strike Ramirez with the leg shackles despite being struck with an ASP baton, and being pepper sprayed. (See Exhibit A, pg 159 lines 15-25, pg 171 lines 7-21, pg 172 lines 19-25, pg 173 lines 1-15). Prior to the time that Ramirez was required to use his weapon, his exit to the room was blocked by the hospital bed Gonzalez had turned over, and Gonzalez himself. (See Exhibit A, pg 178 lines 3-20, pg 186 lines 12-23). Ramirez was struck on the face, forehead, and back, resulting in a nasal fracture, head contusion, facial abrasions, and lacerations. (See Exhibit A, pg174 lines 1-23 and Exhibit C). Ramirez was in fear of his life, was almost losing consciousness, and was thinking to himself "I can't go down, I can't go down." (See Exhibit F, pg 000545, 000549).   In fear for his life, Ramirez drew his weapon and yelled at Gonzalez "put it down...don't do it." (See Exhibit A, pg 176 lines 1-22). Gonzalez was yelling "mata me mata me" as Ramirez was shouting verbal commands at him. (See Exhibit A, pg176 lines 17-18, pg 178 line 25, pg 179 lines 1-7). During this confrontation, Ramirez was shouting orders at Gonzalez and yelling in fear for assistance from security. (See Exhibit A, pg 132 lines 24-25, pg 133 lines 1-10, 19-25, pg 134 lines 1-3, pg 230 lines 8-18). Ramirez fired 4-5 rounds at Gonzalez and paused, but Gonzalez stayed on his feet, lunged at Ramirez, and attempted to strike Ramirez again with the leg shackles. (See Exhibit A, pg 181, lines 8-11, pg 183 lines 6-17, pg 185 lines 16-25, pg 186 lines 1-16). At that point, Ramirez emptied his weapon firing at Gonzalez for approximately two seconds. (See Exhibit A, pg183 lines 6-7, pg 190 lines 17-24). At that time, the pepper spray Ramirez had sprayed was beginning to spread and neutralize the room, and Ramirez

5

had blood in his eyes from his injuries. (See Exhibit A, pg 191 lines 5-20).

Gonzalez died as a result of the gunshot wounds. Ramirez conceded that the altercation angered him, but he was adamant in stating that when the decision to fire his weapon was made, fear superceded his anger and fear was his only motivation in firing his weapon. (See Exhibit A, pg192 line 25, pg 193 lines 1-23).

## IV.
## ARGUMENTS AND AUTHORITIES

### A. Standard for Summary Judgment.

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *accord Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, the defendant is entitled to summary judgment when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the plaintiff's case, and on which [the plaintiff], will bear the

burden of proof at trial." *Celotex*, 477 U.S. at 322; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party . . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

**B. All Claims Against the La Feria Police Department Should be Dismissed**

Plaintiffs and Intervenor have brought suit against the La Feria Police Department. This Honorable Court dismissed all claims against the La Feria Police Department with prejudice on February 10, 2003. However, in Plaintiffs' and Intervenor's First Amended Original Complaints, the La Feria Police Department is named as a party. Defendant would ask that the court clarify its prior ruling to reflect a dismissal with prejudice as to all claims against the La Feria Police Department.

To the extent that such claims are recognized by the court as being viable at this time, Defendant would submit that the La Feria Police Department is not recognized under the law as a separate entity from the City of La Feria, and has no capacity to sue or be sued. *See Hutchinson v Brookshire Brothers, Inc.*, 222 F.Supp 2d. 809, 825 (E.D. Tex. 2002). The Fifth Circuit has held that without a showing that Texas state law has granted a police department an independent legal existence, the police department is not a proper party to a suit. *Darby v. Pasedena Police Department*, 939 F.2d 311, 313 (5th Cir. 1991). Since the La Feria Police Department is nothing

7

more than a department of the City of La Feria with no independent capacity to be sued, it is not a proper defendant. Accordingly, Defendant La Feria Police Department is entitled to summary judgment as a matter of law.

### C. Plaintiffs and Intervenor Cannot Maintain a Separate Cause of Action Against Defendant Ramirez in his Official Capacity

Plaintiffs and Intervenor have brought suit against Defendant Ramirez in his Official Capacity. This Honorable Court dismissed all claims against Gerardo Ramirez, in his Official Capacity with prejudice on February 10, 2003. However, in Plaintiffs' and Intervenor's First Amended Original Complaints, Gerardo Ramirez in his Official Capacity is named as a party. Defendant would ask that the court clarify its prior ruling to reflect a dismissal with prejudice as to all claims against Gerardo Ramirez in his Official Capacity.

To the extent that such claims are recognized by the court as being viable at this time, Defendant would submit that a section 1983 suit against a governmental official in his or her official capacity is the equivalent of bringing suit against the governmental entity itself. *Hafer v. Melo*, 502 U.S. 21, 25 (1991); see also *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996). Plaintiffs and Intervenor have brought their section 1983 claims against the City of La Feria. Therefore, Plaintiffs and Intervenor cannot recover any damages from officer Ramirez in his Official Capacity, since such claims are already being brought against the City of La Feria. For these reasons Defendant Gerardo Ramirez, in his Official Capacity is entitled to summary judgment as a matter of law.

### D. Plaintiffs and Intervenor Cannot Prove a Policy, Practice, or Custom Claim Against the City of La Feria

The Plaintiffs and Intervenor have brought suit against the City of La Feria under 42 U.S.C. § 1983. The City of La Feria can only be held liable under § 1983 if an official policy, custom or practice caused the alleged constitutional violation. *Monell v. New York City Dep't of Social*

8

*Services*, 436 U.S. 685, 690 (1978).   In order to establish a policy, custom, or practice, the plaintiffs must show a "pattern of similar incidents" that is "general or widespread." *Languirand v. Hayden,* 717 F.2d 220, 227-28 (5th Cir. 1983); *cert. denied* 467 U.S. 1215, 104 S.Ct. 2656 (1984).   Such a pattern is evident if there are "numerous prior incidents" showing a "systematic violation of constitutional rights. *Hererra v. Valentine*, 653 F.2d 1220 (8th Cir. 1981); see also *Bennett v. City of Slidell,* 728 F.2d 762 768 (5th Cir. 1984); *cert. denied* 472 U.S. 1016, 105 S.Ct. 3476 (1985) (en banc).

    Plaintiffs and Intervenor have no evidence of a policy, custom, or practice of the City of La Feria that caused the alleged constitutional violation, of which Plaintiffs and Intervenor complain.   The Plaintiffs and Intervenor merely make conclusory allegations in their First Amended Original Complaints, and they cannot support these conclusory allegations with competent summary judgment evidence. In order to prevail on a claim pursuant to 42 U.S.C. § 1983, plaintiffs must allege and prove specific facts, not mere conclusory allegations of such a pattern. *Elliot v. Perez*, 751 F.2d 1472, 1479 (5th Cir. 1985). Plaintiffs' and Intervenor's conclusory allegations lack any evidence supporting same, and as such have insufficient to prove a "pattern of similar incidents" that is "general or wide spread." On the contrary, Defendants' summary judgement evidence establishes that in over sixteen years, there have been no complaints, lawsuits, or grievances filed against a City of La Feria police officer for excessive force aside from this lawsuit.   (See Exhibit E, pg 32 lines 19-25, pg 33 lines 1-7).   A complaint of an alleged unlawful arrest occurred in 1989, but it did not involve any use of force.   (See Exhibit E, pg 34 lines 1-25, pg 35 lines 1-18).   Therefore, since Plaintiffs and Intervenor cannot establish that an official policy, custom or practice caused the alleged constitutional violation, Defendant City of La Feria is entitled to summary judgment as a matter of law.

**E.  Plaintiffs' and Intervenor's Causes of Action For Lack of Training**

Plaintiffs and Intervenor allege that the City of La Feria should be held liable in this case because Ramirez was allegedly inadequately trained to safely secure, guard or restrain mentally ill pre-trial detainees.  However, plaintiffs have no evidence of any alleged pattern of similar incidents to the one at issue in this case that would constitute or support a finding of liability against a municipality such as the City of La Feria.  The Plaintiffs and Intervenor identify only one incident which they contend constitutes sufficient evidence to support their lack of training claims.  The Fifth Circuit has held that "proof of a single violent incident ordinarily is insufficient to hold a municipality liable for inadequate training." *Snyder v Trepaginer*, 142 F.3d 791, 798 (5th Cir. 1998); *Rodriguez v Avita*, 871 F.2d 552, 554-55 (5th Cir. 1989).  The Fifth Circuit has further stated "the plaintiff must demonstrate at least a pattern of similar incidents in which the citizens were injured...to establish the official policy requisite to municipal liability under section 1983." *Id.* (internal quotation omitted).  No pattern of similar incidents exists, and as such, Plaintiffs' and Intervenor's claims for lack of training must fail.

Additionally, Defendants' summary judgement evidence establishes that Ramirez was in fact trained in the areas of use of force and restraint, and that all officers for the city of La Feria receive the same type of training.  (See Exhibit E, pg 16 lines 3-20, pg 17 lines 17-22).  Ramirez attended and completed police academy training at the Lower Rio Grande Development Council Police Academy in Harlingen. (See Exhibit A, pg 18 lines 13-25,  pg 19 lines 1-8).  Ramirez was trained in the use of force, the limits on the use of force, and the use of firearms while at the academy.  (See Exhibit A, pg 25 lines 21-24, pg 27 lines 6-12, pg 28 lines 2-21, pg 34 lines 10-17, pg 36 lines 11-25, pg 37 lines 1-6).  Ramirez was also trained at the academy in the use of various restraint techniques and the application of verbal restraints, commands, presence, and the physical application of restraint.  (See Exhibit A, pg 30 lines 6-24).  All La Feria police officers are trained at the police

10

academy Ramirez attended, all are trained in the use of deadly force, and all participate in continued training that is mandated by TECLOSE. (See Exhibit E, pg 71 lines 19-25, pg 72 lines 1-25, pg 73 lines 1-7). Defendants' summary judgement evidence consisting of the sworn testimony of Gerardo Ramirez and Chief Donato Garcia further conclusively establishes that Ramirez and other officers from the City of La Feria have received adequate training with respect to dealing with suspects and use of force principles and techniques. Accordingly, Defendants are entitled to summary judgement as a matter of law.

**F.    Defendant Gerardo Ramirez is Entitled to Qualified Immunity**

Police officers are entitled to qualified immunity unless their conduct violates a clearly established constitutional right.    *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The plaintiff has the burden of proof to overcome the defendant's defense of qualified immunity. *Stroik v. Ponseti*, 35 F.3d 155, 158 (5th Cir. 1994). To overcome an officer's qualified immunity, a plaintiff must show the defendant violated a clearly established constitutional right through conduct that was objectively unreasonable. *Fraire v. City of Arlington*, 957 F.2d 1268, 1273 (5th Cir. 1992). In the present case, the Plaintiffs cannot establish that Defendant Ramirez' conduct was objectively unreasonable.

"The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865 (1989); *Stroik v Ponseti*, 35 F3d 155, 157 (5th Cir. 1994); *See also Huong v City of Port Arthur*, 961 F.Supp. 1003, 1007 (E.D. Texas 1997). Specifically, the plaintiff must show an injury that resulted directly and only from the use of force that was clearly excessive, and the excessiveness was objectively unreasonable. *Reese v. Anderson*, 926 F.2d 494, 500 (5th Cir. 1991); *Johnson v Morel*, 876 F.2d 477, 480 (5th Cir. 1989). The "reasonableness" of the force used

11

"must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Graham* at 396. In determining whether the police officer acted reasonably under the totality of the circumstances, the court is required to consider the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham* at 396. Furthermore, The United States Supreme Court held that it must also be taken into consideration that "police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation." *Graham* at 397.

Use of deadly force is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officers or others. *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Considering the totality of the circumstances surrounding the present case, the use of deadly force by Officer Ramirez was objectively reasonable, and therefore, he is entitled to qualified immunity. Officer Ramirez was presented with a situation where a violent suspect in custody refused to obey commands and used deadly force in the form of striking him repeatedly with a pair of leg shackles. Defendants summary judgment evidence establishes that Officer Ramirez used verbal commands, an ASP baton, and pepper spray prior to resorting to the use of deadly force. It was only after Gonzalez began severely beating Ramirez with leg shackles that Ramirez drew and fired his weapon out of fear for his life. Officer Ramirez made reasonable attempts to diffuse the situation by repeatedly ordering Gonzalez to get back into bed, to get back, and to drop the leg shackles, but Gonzalez never complied. Ramirez fired at Gonzalez only after shouting warnings to him, and giving him a chance to surrender.

Applying the "reasonableness" standard promulgated by the Supreme Court in *Graham,* Officer Ramirez' use of deadly force was clearly objectively reasonable. Officer Ramirez was assaulted by

12

a suspect who was mentally unstable, violent, paranoid, and psychotic, and was repeatedly striking him with a pair of leg shackles. Defendants' summary judgement establishes that Gonzalez posed an immediate threat to Ramirez' safety and life, as well as the safety of other citizens in the hospital and community. Accordingly, Officer Ramirez is entitled to qualified immunity and summary judgement as a matter of law.

### G. Plaintiffs' and Intervenor's claim under the Fourth Amendment Are Not Viable

Based on Plaintiffs' and Intervenor's First Amended Original Complaints, at the time of Gustavo Gonzalez' death, he was a pretrial detainee in police custody at a hospital, not an arrestee. While the Fourth Amendment protects arrestees, once an arrest is complete, pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment. *Brothers v. Klevenhagen*, 28 F.3d 452 (5th Cir. 1994); *Gutierrez v. City of San Antonio*, 139 F.3d 441(5th Cir. 1998). Gustavo Gonzalez was clearly a pretrial detainee who had left the custody of the arresting officer and was being detained at the hospital. (See Exhibit A, pg 88 lines 3-16, 24-25, pg 89 lines 1-3). Gonzalez was not an arrestee at the time of the shooting, and Plaintiffs and Intervenor have no evidence that would trigger the protections of the Fourth Amendment. Accordingly, defendants are entitled to summary judgement with respect to Plaintiffs' and Intervenor's Fourth Amendment claims.

Defendant would further submit to the court that on February 10, 2003, this Honorable Court granted Defendants' motion to dismiss regarding Plaintiffs' and Intervenor's claims under the Fourth Amendment. Despite Plaintiffs' and Intervenor's amendment of their pleadings, Defendant contends that they are still entitled to dismissal of these claims as a matter of law as determined by the court

13

in its order of February 10, 2003.

### H. Plaintiffs' and Intervenor's claims under the Texas Tort Claims Act Must Fail

The Plaintiffs and Intervenor have alleged a cause of action under the Texas Tort Claims Act

claiming negligence. However, their cause of action does not fall within the strict requirement of

the Texas Tort Claims Act, and as such Defendants are immune from such allegations. In order to

waive the immunity of the defendants, Plaintiffs and Intervenor must prove that the injuries claimed

were caused by a condition or use of tangible personal property. *Dallas County Mental Health &*

*Mental Retardation v Bossley*, 968 S.W.2d 339, 343 (Tex. 1998); Tex. Civ. Prac & Rem. Code sec

101.021(2). Plaintiffs and Intervenor assert that their claims arise out of an alleged failure of Ramirez

to enforce the laws of the state of Texas, his observance of a policy which allegedly encouraged

inadequate or unsafe detention of mentally ill patients, and his observance of a policy encouraging

allegedly unreasonably use of deadly force. Plaintiffs and Intervenor also specifically allege that

Ramirez fired his weapon at Gonzalez in anger and that he used unreasonable, unnecessary and

excessive force in shooting and killing Gustavo Gonzalez. The allegations of the Plaintiffs and

Intervenor in this case constitute intentional tort allegations phrased as negligence claims. In fact,

intentional tort allegations were specifically incorporated by Plaintiffs and Intervenor into the cause

of action brought pursuant to the Texas Tort Claims Act.

As noted by this Honorable Court in its order of February 10, 2003, Plaintiffs and

Intervenors cannot circumvent the intentional tort exception to the limited waiver of sovereign

immunity by asserting their claims in the form of a negligence action. *See Holland v City of*

*Houston*, 41 F. Supp.2d 678, 712 (S.D. Tex. 1999); *Drain v Galveston County*, 979 F. Supp. 1101, 1104-5 (S.D. Tex. 1997).   Further, Plaintiffs and Intervenor assert that their alternative pleading theories under the Texas Tort Claims Act are conditioned upon whether or not Defendant City of La Feria claims the actions of Ramirez were unintentional, unknowing, reckless or merely negligent. Defendant City of La Feria has maintained no such claim and has taken no such position making these allegations under the Texas Tort Claims Act and a theory of negligence is moot.   Accordingly, Defendants are entitled to summary judgement as a matter of law with respect to Plaintiffs' and Intervenor's claims alleging a cause of action under the Texas Tort Claims Act.

## IV.
## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendants, CITY OF LA FERIA, TEXAS, LA FERIA POLICE DEPARTMENT AND OFFICER GERARDO "JERRY" RAMIREZ, Individually and in his Official Capacity, request that all of Plaintiffs' and Intervenor's claims against them be dismissed with prejudice, that Plaintiffs and Intervenor take nothing by this lawsuit, that Defendants recover all costs incurred herein, and that Defendants recover such other and further relief, at law and in equity, to which they may show themselves to be justly entitled.

15

Singed on this 19 day of September, 2003.

Respectfully submitted,

WILLETTE & GUERRA, L.L.P.
International Plaza, Ste. 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521
Telephone: (956) 541-1846
Facsimile: (956) 541-1893

By: *Charles Willette f/w/p EG*
    Charles Willette, Jr.
    State Bar No. 21509700
    USDC Adm. No. 1937
    Eduardo Garza
    State Bar No. 00796609
    USDC Adm. No. 3399
    Attorneys for Defendants

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing Defendants' Motion for Summary Judgment has on this 19 day of September, 2003, been forwarded via certified mail, return receipt requested.

**VIA CMRRR 7003 0500 0001 0981 2796**
Mr. Joseph Barrientos
Watts Law Firm, L.L.P.
555 N. Carancahua, Ste. 1400
Corpus Christi, Texas 78478

**VIA CMRRR 7003 0500 0001 0981 2802**
Mr. Phillip J. Stein
The Law Office of Phillip J. Stein, P.C.
14-A Palm Village Center
Brownsville, Texas 78520

**VIA CMRRR 7002 2030 0007 0997 3751**
Mr. William Pope
Mr. Scott Clark
Adams & Graham, L.L.P.
P.O. Drawer 1429
Harlingen, TX 78551-1429

Charles Willette, Jr.

17

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARY E. CARRANZA, Individually      *
and as Next Friend of ANGEL         *
MATTHEW GONZALEZ, GUSTAVO           *
GONZALEZ, JR., and ALYSSA           *
LAUREN GONZALEZ, Minor Children     *
and on Behalf of All of Those       *
Entitled to Recover for Death of    *
GUSTAVO GONZALEZ, Deceased, Under   *
the Texas Wrongful Death Act,       *
and CELIA MUNIZ GONZALEZ,           *
Individually and as Personal        *
Representative of the ESTATE OF     *
GUSTAVO GONZALEZ, Deceased,         *
                    Plaintiffs,     *
vs.                                 *
                                    *
CITY OF LA FERIA, TEXAS, LA         *
FERIA POLICE DEPARTMENT, OFFICER    *
GERARDO "JERRY" RAMIREZ,            *
Individually and in his Official    *
Capacity; and VALLEY BAPTIST        *
MEDICAL CENTER,                     *
                    Defendants,     *
                                    *   CIVIL ACTION NO. B-02-180
GUSTAVO GONZALEZ, Individually      *
Pursuant to the Texas Wrongful      *
Death Act for the Death of          *
GUSTAVO GONZALEZ, Deceased,         *
                    Intervenor,     *
                                    *
vs.                                 *
                                    *
CITY OF LA FERIA, TEXAS, OFFICER    *
GERARDO "JERRY" RAMIREZ,            *
Individually and in his Official    *
Capacity; and VALLEY BAPTIST        *
MEDICAL CENTER,                     *
                    Defendants.     *
*****************************************************************

VIDEOTAPED ORAL DEPOSITION OF
GERARDO RAMIREZ
APRIL 10, 2003
++***************************************************************

GERARDO RAMIREZ                                                    April 10, 2003

Page 2

1           ORAL DEPOSITION OF GERARDO RAMIREZ, produced as a witness
2     at the instance of the Plaintiff and duly sworn, was taken in
3     the above-styled and numbered cause on the 10th day of April
4     2003, from 10:30 a.m. to 6:00 p.m., before Katherine J.
5     Brookbank, CSR in and for the State of Texas, reported by
6     method of machine shorthand, at the office of Willette &
7     Guerra, 3505 Boca Chica Boulevard, Brownsville, Texas, 78521,
8     pursuant to the United States District Court Procedure and the
9     provisions stated on the record hereto.
10                            APPEARANCES
      FOR THE PLAINTIFF(S)
11          Mr. Joseph Barrientos
            WATTS LAW FIRM
12          555 N. Carancahua, Suite 1400
            Corpus Christi, Texas  78478
13
      FOR THE INTERVENOR
14          Mr. Phillip Stein
            THE LAW OFFICES OF PHILLIP J. STEIN, P.C.
15          14-A Palm Village Center
            Brownsville, Texas  78520
16
      FOR THE DEFENDANT(S)
17          Mr. Scott Clark and Mr. William Pope
            ADAMS & GRAHAM, L.L.P.
18          222 E. Van Buren, West Tower
            P. O. Drawer 1429
19          Harlingen, Texas  78551
20          Mr. Eduardo Garza
            WILLETTE & GUERRA
21          International Plaza, Suite 460
            3505 Boca Chica Boulevarde
22          Brownsville, Texas  78521
23    ALSO PRESENT:  Tele Video and Audio Productions
24    (Note by reporter:  Exhibits were not available to validate
      quoted material.  No quotes used around quoted material)
25

GERARDO RAMIREZ                                          April 10, 2003

Page 4

1                          GERARDO RAMIREZ,

2            having been duly sworn, testified as follows:

3                        E X A M I N A T I O N

4       Q    (BY MR. BARRIENTOS) Good morning.  Would you please

5  tell us your name, sir?

6       A    Yes, sir.  My name is Officer Gerardo Javier

7  Ramirez.

8       Q    Officer Ramirez, we had a chance to meet

9  yesterday --

10      A    Yes, sir.

11      Q    -- during the -- Chief Garcia's deposition.  Is that

12 correct?

13      A    Yes, sir.

14      Q    And let me ask you, is -- have you ever given a

15 deposition before?

16      A    No.

17      Q    Okay.  You -- you -- after being here for several

18 hours yesterday, I guess you probably picked up on how to --

19 how the procedure is?

20      A    Somewhat, yes.

21      Q    Okay.  The only thing I will tell you, is once in a

22 while with Chief Garcia, he would answer with an uh-huh or

23 huh-uh.  And I need you to answer with a yes or no, whatever

24 the appropriate answer is, so that the court reporter will be

25 clear about what -- what your response is.

GERARDO RAMIREZ                                                    April 10, 2003

Page 18

1    months.  And then you left there?

2        A    Yes.

3        Q    How did you leave?  Under what circumstances?

4        A    To -- basically, fine circumstances.  It was

5    usually -- it was basically to complete my -- my schooling at

6    at the academy.

7        Q    Did you resign or were you let go?

8        A    I was -- I resigned.

9        Q    Okay.  All right.  And then after the two to three

10   months there, you went where?

11       A    I was unemployed and attending the academy full

12   time.

13       Q    All right.  And, again, so that I get it correctly,

14   what is name of the academy you attended and the place where

15   it is located?

16       A    The Lower Rio Grande Development Council Police

17   Academy in Harlingen.

18       Q    Lower Rio Grande Development Council --

19       A    Police Academy.

20       Q    -- Police Academy in Harlingen.  Okay.  Did you

21   apply for admission to the academy?

22       A    Yes, sir.

23       Q    Did you -- how many times did you apply?

24       A    It only took one application.

25       Q    All right.  And do you remember what month and year

GERARDO RAMIREZ                                                    April 10, 2003

Page 19

1    you would have began your academy training?

2         A    No, I do not.  I am sorry.

3         Q    Do you remember what year?  If not the month, do you

4    remember what year?

5         A    Not the month.  I believe sometime in '99.  I don't

6    recall the exact month, but in '99.  It had to have been

7    sometime during the spring, because it -- the academy, itself,

8    was a six-month program, and I completed it in August.

9         Q    Officer Ramirez, let me go back and ask you a couple

10   -- before we talk about the academy.  When you graduated from

11   high school, had you taken any courses in -- in law

12   enforcement or criminal justice or anything like that in high

13   school?

14        A    Yes, sir.

15        Q    How many courses did you take?

16        A    Two.  Two.  They were --

17        Q    I am sorry.

18        A    I am sorry.  Go ahead.

19        Q    Do you remember what the names of the courses were?

20        A    Yes.  Law Enforcement 1 and 2.

21        Q    All right.  Do you remember the name of the teacher

22   you had?

23        A    Yes.

24        Q    Who(sic) was the name of the teacher?

25        A    Ms. Arcute.  I don't recall her first name.

GERARDO RAMIREZ                                                April 10, 2003

Page 25

1        A    Yes, sir.

2        Q    What types had you used?

3        A    Mostly for hunting.  When me and my father would go

4    hunting, it would be either a .12 gauge or a small arms rifle,

5    .22 caliber weapon.

6        Q    Prior to going into the police academy, had you ever

7    fired a handgun?

8        A    Yes, sir.  Yes, sir.

9        Q    Was it a handgun that was owned by your father or

10   someone in your family?

11       A    My -- yeah, my uncle.  My father's brother.

12       Q    What type of -- of handgun was it?

13       A    A .45 -- .45 Yama.  It is like a 1911, a pistol.

14   That type of model.

15       Q    Okay.  Was that -- that -- was that particular model

16   a revolver or semi-automatic?

17       A    Semi-automatic.

18       Q    How many times do you think you have had the

19   opportunity to fire that weapon?

20       A    I would say about maybe three times, three times.

21       Q    Okay.  When you went into the academy, were you,  as

22   part of your training, given courses or trained in the use of

23   force?

24       A    Yes, sir.

25       Q    In what situations, if you can remember, were you

Page 27

1        A    Yes, sir.

2        Q    And is it also correct that police officers are

3    trained that once a threat is removed that their application

4    of force is to cease?

5        A    Yes, sir.

6        Q    The -- let me ask you first.  Do -- was there a

7    course, a part of the course that taught use of force to --

8        A    Yes, sir.

9        Q    Did it have a name?

10       A    Yes, sir.

11       Q    What was the name?

12       A    Use of force.

13       Q    Do you remember who your -- who your teacher or

14   instructor was?

15       A    Yes.  It was Ray Wisdom.

16       Q    Okay.  Was -- and is Ray Wisdom a -- currently a

17   peace officer?

18       A    I would not know.  I wouldn't know.  At the time,

19   yes, he was.

20       Q    Do you know what department he was with at the time?

21       A    No, sir.

22       Q    Do you know if he was from the Valley or this area?

23       A    I believe he was from the Cameron County area.

24       Q    Was he the only instructor you had in the -- on the

25   subject of use of force?

GERARDO RAMIREZ                                                April 10, 2003

Page 28

1        A    If I recall, yes.

2        Q    All right.  What was the duration of the -- of the

3    class or the part of the training on the use of force?  How

4    long did it last?

5        A    (No response)

6        Q    In other words, did it -- did it start at the six

7    months -- did it start at the beginning of the six months and

8    last until the end or was it a shorter period of time within?

9        A    Actually, it -- it fell in the -- it was through the

10   duration of the entire program.  We would use and cover

11   certain areas at different time -- points in time.  When --

12   usually with use of force, the -- the curriculum would come

13   into play in other parts or other areas of the lessons.  And

14   they would tie in with other --

15       Q    I guess what I am trying to find out is -- maybe if

16   I ask, was there a time period each day which was devoted to

17   training in the use of force?

18       A    Yes.

19       Q    Okay.  How long was that period each day?

20       A    Anywhere from an hour to maybe to 15 minutes,

21   depending on the topic.

22       Q    Okay.  All right.  Officer Ramirez, with regard to

23   the -- to the use of force, can you tell me what it is you

24   were taught at the police academy with regard to the use of

25   deadly force?

GERARDO RAMIREZ                                                          April 10, 2003

Page 30

1       Q     So you were taught that, if there was some chance or

2    some possibility that you might be injured in any way, that

3    that would be an appropriate circumstance for you to use

4    deadly force?

5       A     Yes, sir.

6       Q     All right.  Okay.  Chief Garcia mentioned that he

7    did not believe that you had received or that cadets who had

8    gone to the police academy at the time that you would have

9    received any training in the -- in restraint techniques beyond

10   the use of handcuffs.  Do you remember that testimony

11   yesterday?

12      A     Yes, sir.

13      Q     Is that correct or do you agree with that or --

14      A     No.

15      Q     Okay.  You have a different recollection?

16      A     Yes, sir.

17      Q     Okay.  What training were you given in the use of

18   restraints?

19      A     Basically, we have an area of training, what is

20   called mechanics of arrest.  And in that we use -- and are

21   trained in scenarios on how to place handcuffs on the suspect,

22   use other options besides restraints.  We have verbal

23   restraints, commands, your presence, physical applications as

24   well.

25      Q     Were you given any training on -- on the -- when I

GERARDO RAMIREZ                                                      April 10, 2003

Page 34

1          Q     -- that you use with your body?

2          A     Yes.

3          Q     I am not talking about that for the moment.  I am

4     talking about equipment?

5          A     Equipment?  No.

6          Q     Okay.  All right.  Were you given any instruction,

7     for example, if you were to be detaining a suspect or a

8     prisoner or detainee, on the -- let me strike that.  Let me go

9     back.

10               With regard to training at the police academy, did

11    you also receive firearm training?

12         A     Yes, sir.

13         Q     And what or with what weapons were you trained?

14         A     Smith & Wesson revolver and a .12 gauge Remington

15    shotgun.

16         Q     What caliber of revolver?

17         A     It varied from .357 and .38 caliber.

18         Q     All right.  At the police academy, were you given

19    any training for use with a 9 millimeter pistol -- handgun of

20    the type that you were using when you were on duty on the date

21    this happened?

22         A     No, sir.

23         Q     Were you taught the distinction of whether there was

24    any distinction between ammunition that could be used by

25    police officers?

GERARDO RAMIREZ                                                    April 10, 2003

Page 36

1    mechanism --

2         A    Anything --

3         Q    -- target?  Anything like that between

4    semi-automatic weapons and the revolver that were used at the

5    police academy?

6         A    I believe it was lightly touched upon, but not

7    specifically presented in a class or lesson.

8         Q    Is there anything that you can recall about that at

9    this point today?

10        A    No.  No.  Not accurate.

11        Q    All right.  At -- at the police academy, did you

12   have any courses on -- on laws that might affect directly your

13   work as a police officer?

14        A    Yes.

15        Q    Were you given any training at all on the limits on

16   police officers and the use of force, deadly or otherwise?

17        A    Yes, sir.

18        Q    Okay.  What -- what do you recall having been

19   taught?  And I know that you may have been taught several

20   things.  But in terms of application of force, not deadly

21   force, just plain force, what is it that you were taught in

22   terms of the appropriate application of force in general?

23        A    Basically, whenever a threat or some type of a

24   danger posed to the officer, you know, which is myself, the

25   application of force would be necessary to control the

GERARDO RAMIREZ                                                    April 10, 2003

Page 37

1    situation.

2        Q    What were you taught about -- well, let me ask this.

3    You were not -- it is true that you were not taught that a

4    police officer is -- is allowed to use force or should use

5    force in every situation?

6        A    Yes, sir, that's true.

7        Q    Would you agree that a person has a right to be free

8    from, for example, excessive force?

9        A    Yes, sir.

10       Q    And would you agree that a person has a right, even

11   a person who is under arrest, has a right to be free from

12   force that is applied in a way that is not designed to obtain

13   some police objective?

14       A    Yes, sir.

15       Q    For example, a person shouldn't be subjected to

16   unnecessary pain or injury or force even if they are in

17   custody or being detained by the police?

18       A    Yes, sir.

19       Q    And they shouldn't be subjected to pain or injury or

20   force that is applied to them merely for the purpose of

21   punishing them.  Is that correct?

22       A    Yes, sir, that's correct.

23       Q    Punishment, that's something that the courts should

24   do and judges and juries do?

25       A    Exactly.

GERARDO RAMIREZ                                          April 10, 2003

Page 88

1      Q     Did whatever you were doing during the day?

2      A     Yes, sir.

3      Q     Okay.  All right.  Let me ask you.  On -- can you

4    tell me what you recall -- when you recall first being

5    notified or asked to come to the Valley Baptist Medical

6    Center?

7      A     Sometime in the mid-morning, like you stated.  I

8    don't recall the exact time, you know.  It has been a while.

9    But sometime toward mid-morning when I received the call.

10     Q     And who called you?

11     A     My sergeant of communications.

12     Q     And what did he tell you?

13     A     He stated that there was a subject that had been

14   detained, a suspect in a murder, and that they needed some

15   assistance in guarding him at the -- the Valley Baptist

16   Medical Center.

17     Q     Okay.  And he told you this was a person who was a

18   suspect in a homicide?

19     A     Uh-huh.  Yes, sir.

20     Q     Okay.  Did he tell you anything else?

21     A     No, sir.

22     Q     And what did you tell him in response?

23     A     I would be right there.

24     Q     Did you go to the police department first or did you

25   go straight to the hospital?

GERARDO RAMIREZ                                              April 10, 2003

Page 89

```
 1        A      Straight to the hospital.

 2        Q      What time did you arrive there?

 3        A      About 3 o'clock.

 4        Q      Were you briefed by anyone when you got there?

 5        A      My senior officer at the time.

 6        Q      Who was that?

 7        A      Ysidra Delgado.

 8        Q      Officer Delgado?

 9        A      Yes, sir.

10        Q      Okay.  Is that the same Officer Delgado whose -- who

11   had been standing guard with Mr. Gonzalez during the day?

12        A      Yes, sir.

13        Q      Did you meet with any officials from the hospital?

14        A      No, sir.

15        Q      Did you meet with any of the security personnel from

16   the hospital?

17        A      Yes, sir.

18        Q      Who did you meet with?

19        A      I believe one of the security guards there.  I don't

20   recall his name.  But he -- he was -- when I arrived at the

21   hospital, I was escorted by security to the room.

22        Q      Okay.  So the security personnel that you met, was

23   this someone who you were directed specifically to talk to or

24   was it just --

25        A      Somebody --
```

GERARDO RAMIREZ

April 10, 2003

Page 92

```
 1    your -- your handgun or the ammunition that you had?

 2         A    No, sir.

 3         Q    Do you know what kind of weapon Officer Delgado had?

 4         A    Yes.

 5         Q    What kind?

 6         A    It is a model 96 Barretta similar to the 92F.  The

 7    only thing is that it utilizes a 40 caliber round rather than

 8    a 9 millimeter.

 9         Q    And is it also a semi-automatic weapon?

10         A    Yes, sir, it is.

11         Q    All right.  Any other information you get from

12    Officer Delgado other than what you have just told us about?

13         A    No, sir.

14         Q    Did any of the hospital staff, the personnel,

15    doctors, nurses, anyone like that, come and give you any other

16    information about Mr. Gonzalez when you arrived?

17         A    No, sir.

18         Q    Officer Ramirez, did you have, at that time, an

19    understanding as to who was in charge of deciding what level

20    of restraint Mr. Gonzalez was supposed to have while he was

21    there in the hospital?

22         A    I am sorry.  Can you rephrase that?

23         Q    Sure.

24         A    Ask it again.

25         Q    Let me back up with another question.  When you
```

GERARDO RAMIREZ                                                    April 10, 2003

1    arrived, was Mr. Gonzalez restrained?

2         A    Yes, sir.

3         Q    How?

4         A    He had one handcuff on, which would be my -- my

5    right, his left arm.

6         Q    And he was handcuffed to what?

7         A    The bed rail.

8         Q    And the bed was a hospital bed?

9         A    Yes, sir.

10        Q    Any other restraint at that time?

11        A    No, sir.

12        Q    Okay.  Were there any other restraints available?

13        A    Yes, sir.

14        Q    What were -- what else was available?

15        A    The leg shackles.

16        Q    All right.  And when you came into the room when you

17   first got there, where were the leg shackles?

18        A    On the countertop.

19        Q    Okay.  Whose cuffs -- whose handcuffs were on Mr.

20   Gonzalez at the time?

21        A    Mr. Delgado's, Officer Delgado's.

22        Q    Did those remain on him or did you-all switch them

23   out?

24        A    They remained on him.

25        Q    Okay.  And the leg shackles that you mentioned that

Page 94

1    were on the counter, who did those belong to?

2        A    The police department.

3        Q    All right.  When you -- when you came in, did

4    Officer Delgado tell you that Mr. Gonzalez was supposed to

5    remain restrained with the handcuffs?

6        A    Yes, sir.

7        Q    Did he tell you anything else about restraining you?

8        A    No, sir.  Other than if he had to utilize the

9    restroom, he was to be restrained with the leg shackles.

10       Q    Now, did you have an understanding at that time as

11   to who was supposed to decide the level of restraint for Mr.

12   Gonzalez?

13       A    No, sir.

14       Q    Okay.  Did you know whether that was a decision you

15   were supposed to make or whether that was up to someone else?

16       A    No, sir.  No.

17       Q    Were you given any other information by any -- by

18   anyone at the police department about -- about his level of

19   restraint?

20       A    No.

21       Q    When you were sent to go and guard Mr. Gonzalez,

22   what were you told, if anything, about what you were supposed

23   to do there?

24       A    To watch him and notify the agency if anything else

25   would occur or any other news about his health had changed.

GERARDO RAMIREZ                                                        April 10, 2003

Page 99

1    in your shift?

2         A    Doctors, but I don't know if they were other than

3    physicians or. . .

4         Q    Part of what Dr. Gonzalez writes here is that the

5    patient is paranoid and fearful, saying things such as "Can I

6    just cut my throat?"  Let me ask you, did you hear Mr.

7    Gonzalez say that?

8         A    No, sir.

9         Q    He also gives an impression here that Mr. Gonzalez

10   is psychotic as evidenced by paranoia and hallucinations.

11   Did -- did anyone share that with you during the time that you

12   were there?

13        A    No, sir.

14        Q    The last part of this note, Dr. Gonzalez writes -- I

15   am going to read this and you can look at it yourself.  It

16   says:  Patient under strict police surveillance there at his

17   bedside and they assure me they will not allow him to hurt

18   himself or anyone else.

19             That is the last thing he writes in this note.  Do

20   you remember having any conversation with any doctor while you

21   were there?

22        A    No, sir.

23        Q    Okay.  Are you -- now, what I want to ask you is,

24   are you telling me that you made no assurances to anyone or if

25   this happened, if you made some comment to Dr. Gonzalez, you

GERARDO RAMIREZ                                                    April 10, 2003

Page 100

1    just don't remember it at this point?

2        A    At this point, I don't recall speaking with a doctor

3    at that point.

4        Q    Okay.  In any case, you don't remember him coming to

5    you and telling you this patient is psychotic and paranoid?

6        A    No, sir.

7        Q    Were you ever made aware of what medications he had

8    been -- he had been taking prior to his admission?

9        A    No, sir.

10       Q    Okay.  At page 71 of the -- of this exhibit there is

11   a computerized typed item that looks like different notes that

12   were made by either nurses or other people who did consults

13   with Mr. Gonzalez.  On September 18th, at 0232, which I

14   believe is 2:32 in the morning, there is a note here from

15   someone with the initials MMC that states:  Demonstrates a

16   degree of confusion and/or disorientation.  Seems to be out of

17   touch with reality.  Stating that the officer is trying to

18   kill him and all of us.

19            First of all, at September 18th at 2:32 in the

20   morning, you were -- you were not there at that time?

21       A    No, sir.

22       Q    That would have been one of the other officers?

23       A    Yes, sir.

24       Q    Okay.  Did anyone share that information with you

25   when you came in?

GERARDO RAMIREZ                                          April 10, 2003

Page 101

1        A    No, sir.

2        Q    There is another note by the same person at the same

3    time, which indicates patient is confused and irrational.  And

4    that they demonstrate a degree of confusion or disorientation,

5    as we mentioned, and that there is a consult ordered for a --

6    psychological consult ordered for the morning.  No one shared

7    that information with you either, probably?

8        A    No, sir.

9        Q    Do you know if any of this information was shared

10   with Officer Delgado?

11       A    No, sir, I do not.

12            MR. POPE:  Objection.  Form.

13       Q    (BY MR. BARRIENTOS) Well, let me ask it this way.

14   Did -- did Officer Delgado indicate to you that he had

15   received any of this information?

16       A    No, sir, he did not.

17            MR. POPE:  Objection.  Form.

18       Q    (BY MR. BARRIENTOS) All right.  There is another

19   note here at 2:43 a.m. on September 18th from MMC.  It

20   indicates patient is disoriented and uncooperative with care,

21   refusing to answer questions, stating that the officer

22   guarding him is trying to kill him and that he needs to leave.

23   Did you ever receive this information from any source?

24       A    No, sir.

25       Q    Another note, the same time by the same person, the

1      A    Yes, sir.

2      Q    Okay.  There was no time that you took a nap or

3  perhaps dozed off?

4      A    No, sir.

5      Q    Are you sure of that?

6      A    Yes, sir.

7      Q    All right.  The -- when Mr. Gonzalez woke up at

8  about 3 in the morning, did he say anything to you?

9      A    No.

10     Q    As I read the notes from the hospital record, the

11  first indication, at least that is in those notes, is that the

12  disturbance is first noticed at about 3:22 a.m.

13     A    (Witness nods head affirmatively)

14     Q    So what I want to ask you is can you tell me how

15  long after Mr. Gonzalez woke up was it that this set of -- set

16  of incidents began?

17     A    Around the same time frame.  About 3 a.m., 3, around

18  that area.  Beginning of 3 a.m. and on.  It is -- I couldn't

19  say a specific time, but it was around that time when

20  everything began to happen.  Immediately after a noise was

21  heard out in the hallway, he woke up.  And that's when the

22  chain of events began to occur.

23     Q    Okay.  Well, let me ask you.  He was asleep?

24     A    Yes, sir.

25     Q    He woke up.  Did he immediately start to do

```
 1    something which you asked him not to do or did some time pass

 2    before that occurred?

 3         A    Maybe about a few seconds.

 4         Q    Okay.  All right.  He wakes up.  And did you see him

 5    when he woke up?

 6         A    Yes, sir.

 7         Q    What did he do that -- well, tell me, when he woke

 8    up, what did he do?

 9         A    What he did was he basically just looked around and

10    asked he, you know, what had -- what was the noise.  I told

11    him, I said, "Well, it is just somebody in the hallway, you

12    know.  Go back to bed.  It is all right."

13         Q    Okay.  I am going to ask you to a speak up a little

14    more.  I am sitting two feet from you and I am having a little

15    problem hearing you.

16         A    I am sorry.  Sorry.

17         Q    Okay.  He woke up and there was a noise outside.

18         A    Yes, sir.

19         Q    Outside the room.  And you -- and he asked -- he

20    asked you what that was?

21         A    About what the noise was.

22         Q    You told him to go back to sleep.

23         A    I said, "yeah, it was nothing."

24         Q    What happened after that?

25         A    He continues to look around.  And then all of a
```

Page 118

1    sudden he stood up.

2         Q    All right.  When you say stood up --

3         A    To the side of the bed.

4         Q    To the side.  All right.  His left hand is

5    handcuffed to the bed.

6         A    Uh-huh.

7         Q    And his right hand has an I.V. attached to it.

8    Correct?

9         A    Uh-huh.

10        Q    Is that a yes or a no?

11        A    Yes, sir.  I am sorry.

12        Q    Is the I.V. stand on the right side of the bed where

13   his right hand is or --

14        A    Yes, sir.

15        Q    Which side of the bed did he stand up on?

16        A    It would be on the left side.

17        Q    So he stood up on the side of the bed that had his

18   handcuffed hand?

19        A    Yes, sir.

20        Q    What did he do after he stood up?

21        A    He began looking around and looking at the side of

22   the bed, looking at me.  And I said, "You know, just go to

23   bed.  Get back into bed."

24        Q    Did he say anything to you at this time?

25        A    No.  He just said, "Let me go."

GERARDO RAMIREZ                                                    April 10, 2003

Page 126

1    between the time you told him you were going to call someone

2    and any action that you might have taken to actually do that?

3         A    No, sir.

4         Q    Did you-all have any further discussion or

5    conversation?

6         A    Yes, sir.

7         Q    Okay.  Tell me what happened?

8         A    I advised him that I would give him five seconds to

9    get into bed or I would notify security.

10        Q    Okay.  All right.  And you gave him his five

11   seconds?

12        A    Yes, sir.

13        Q    Did he comply?

14        A    No.

15        Q    What did you do next?

16        A    I went around to the other side of the room where

17   the phone was located and I began dialing for security to

18   come -- to come to the room.

19        Q    Okay.  Let me -- I want to -- I want to ask you to

20   do a couple of things with Exhibit Number 16.  First of all,

21   with this yellow marker, because I don't want to obliterate

22   what is on the diagram, can you draw in for me the position

23   where Mr. Gonzalez' bed was prior to the time of the --  of

24   the altercation and the shooting.

25             MR. GARZA:  We agree it is not to scale,

GERARDO RAMIREZ                                                April 10, 2003

Page 132

1    something.

2        Q    Okay.  Well, it is correct, isn't it, that you could

3    have summoned help from one of the other hospital personnel or

4    security without having to leave him?

5        A    I called out.  I called out.  I called out toward

6    the hallway area, but I don't believe anybody heard me.

7        Q    Okay.  Now let me ask you.  You say you called out

8    for help.  Were you calling out for help during this initial

9    period where he was talking to you standing beside his bed?

10       A    I am sorry.  Say it again.

11       Q    When was the first time you called out for

12   assistance?

13       A    Okay.  That was when -- before I had gone over to

14   use the phone, I had made that decision to go out and go by

15   the doorway, because, see, I wasn't sitting at the time when I

16   -- when I began to instruct Mr. Gonzalez to get back into bed.

17   I wasn't sitting in that area.  I had placed myself just a few

18   feet prior, in front of the bed area when I had advised him

19   that he needed to stay, get back into bed, I moved from that

20   seat position.  And then when the -- he failed to comply, I

21   went back to that area by the doorway and called out for

22   somebody to call security.  When nobody or I received no

23   response from anybody outside, I went and used the phone.

24       Q    Okay.  So before you went and used the phone, you

25   called out in the hallway for some help?

1       A    Yes, sir.

2       Q    Do you recall what you said?

3       A    I see -- I said, "I need security in here.  Please

4  get me some security."

5       Q    And --

6       A    In that tone.

7       Q    I am sorry.  When you were yell -- when you say you

8  were yelling, where were you when you were yelling out into

9  the hallway for assistance?

10      A    By the doorway.

11      Q    Okay.  Why don't you make an X there with this pen?

12      A    (So done)

13      Q    Okay.  And there you were -- you were in a position

14  where you could watch him, keep your eye on him, and at the

15  same time --

16      A    Yes, sir.

17      Q    -- call out to the hallway?

18      A    Yes, sir.

19      Q    When I say -- when I asked you when you -- when you

20  called or asked for assistance, how did you do that?

21      A    I called out by stating, "I need security in here."

22      Q    Okay.  But did you call out in the same way that you

23  just told me, "I need security"?

24      A    Yes, sir.

25      Q    Or did -- did you yell or did you speak?

GERARDO RAMIREZ                                                    April 10, 2003

Page 134

```
 1        A    I yelled.

 2        Q    How many times?

 3        A    I would say about maybe two or three.

 4        Q    Could you see any other hospital personnel from

 5   where you were?

 6        A    No, sir.

 7        Q    There is a door on that room.  Is that correct?

 8        A    Yes, sir.

 9        Q    Do you know whether the door could be locked?

10        A    No.

11        Q    The door has a handle on the outside of it, does it

12   not?

13        A    I believe so.

14        Q    Okay.  The door can be held shut from the outside?

15        A    Yes, sir.

16        Q    Do you know the dimensions of the door?

17        A    No.

18        Q    Do you know whether the hospital bed fits inside the

19   room?

20        A    Yes.

21        Q    I mean, fits -- fits through the door.  Excuse me.

22        A    Yes.

23        Q    Obviously it fits in the room.  Do you know whether

24   the hospital bed can fit through the door?

25        A    Yes, sir.
```

Page 138

1      A    I don't recall.  I am sorry.  I am sorry.

2      Q    Okay.  All right.  And, if you would, with -- with

3  this pen also, if would you kind of do, maybe with a dot or a

4  dotted line or something, the path you took to go use the

5  phone?

6      A    (So done)

7      Q    All right.  And what -- what happened after you

8  walked across the room to use the telephone?

9      A    When I went and reached for the phone, Mr. Gonzalez

10  came across the bed as I was dialing and attempted to reach

11  for me.

12     Q    Okay.  When you say he came across the bed --

13     A    To the right side.

14     Q    To the right side of the bed?

15     A    Right side of the bed.

16     Q    Okay.  So that would have been the side of the bed

17  where his IV was?

18     A    Yes, sir.

19     Q    So, if I understand that maneuver correctly, then,

20  his left arm -- can you hold up your left hand?

21     A    Yes.

22     Q    That hand would have been handcuffed to the opposite

23  side of the bed?

24     A    Yes, sir.

25     Q    Will you extend it?

GERARDO RAMIREZ                                                    April 10, 2003

Page 139

1          A     Yes, sir.

2          Q     So his hand was handcuffed to the opposite side of

3     the bed.  The bed was up next to him?

4          A     Yes, sir.

5          Q     And you would have been in a position over to Mr.

6     Gonzalez -- over to your right?

7          A     Yes, sir.

8          Q     And did you say anything else to him during the time

9     that you were walking over to use the telephone?

10         A     No, sir.

11         Q     Did he say anything else to you?

12         A     No, sir.

13         Q     He rolled back over the bed?

14         A     Yes, sir.

15         Q     And you said he reached -- what did you say again?

16    He reached for you?

17         A     He reached for me.

18         Q     All right.  When you say he reached for you, can you

19    tell me specifically what you mean by that?

20         A     He reached out his hand and tried to either grab me,

21    just grab me, in a sense.

22         Q     Okay.  Now, did he have anything in his hand?

23         A     No, sir.

24         Q     When you say he reached out to you, I want to make

25    sure I understand.  He didn't swing at you or strike you?

GERARDO RAMIREZ                                                    April 10, 2003

Page 141

1      Q    Okay.  All right.  Now, if he reached towards you,

2   and, as you say, he didn't actually touch you, what did you do

3   in response?

4      A    I ordered him to get back and move -- move back,

5   move away.

6      Q    All right.  And did you do anything else besides

7   tell him to do that?

8      A    I continued to give verbal commands and he continued

9   to reach.  And then he began dragging the bed toward me.  And

10  in that sense, I pulled my -- my impact weapon.

11     Q    Okay.

12     A    And I ordered him back.

13     Q    All right.  So the -- how many times did you tell

14  him to get back?

15     A    I don't recall.  But numerous.

16     Q    Okay.  And your testimony is at this point, he did

17  not comply with that?

18     A    No, sir.

19     Q    At this point, if you had chosen to or wanted to,

20  could you have moved further away from him?

21     A    I could have.

22     Q    Okay.  And at this point, if you had chosen to, it's

23  correct that you could you have -- have gotten out of the

24  room.

25              MR. GARZA:  Objection.  Form.

GERARDO RAMIREZ                                          April 10, 2003

Page 142

1                THE WITNESS:  Yes, sir.

2        Q    (BY MR. BARRIENTOS) All right.  Now, if you say he

3   reached for you but -- did not actually touch you, and then he

4   began to drag the bed.

5        A    Yes, sir.

6        Q    Is that correct?  Did you remain in the same place

7   while all of this was occurring or were you moving at all?

8        A    I was somewhat moving, yes.

9        Q    I believe you told us at this point or at some point

10  during this -- this time period, you took out your impact

11  weapon?

12       A    Yes, sir.

13       Q    The ASP.  All right.  And did you strike Mr.

14  Gonzalez with the ASP?

15       A    Yes, I did.

16       Q    Did you tell him before you struck him that you were

17  going to strike him?

18       A    I don't recall.

19       Q    Where did you strike him?

20       A    On his arm.

21       Q    Which arm?

22       A    His -- I believe it was his -- the right arm.

23       Q    Okay.

24       A    The right arm.

25       Q    Can you show us the area of the right arm you

1        Q     Would you have been able to leave the room to get
2    out?
3        A     At what point?  I am sorry.
4        Q     At the time you began striking him with the ASP?
5        A     Yeah.  Yes, sir.
6        Q     Is there some reason you chose not to do that?
7        A     No.  It was just the fact that I was going to
8    attempt to -- to subdue him and control the situation so that
9    he no longer posed a threat to himself or myself.
10       Q     Okay.  And when you said you perceived a threat from
11   Mr. Gonzalez, what is it that you believe that he could do to
12   you given the condition on the partial restraints that he had
13   at the time?
14       A     At what point?
15       Q     At -- at the point where you begin using the ASP.
16       A     I am sorry.  Can you --
17       Q     Yeah.  At the point where you -- where you took out
18   the ASP and began to hit him with it --
19       A     Okay.
20       Q     -- what threat did you perceive from Mr. Gonzalez?
21   What is it that you thought that he could or would do to you?
22       A     Grab hold of me.  Grab hold of me.  Strike me.  It
23   -- it varied.  But, basically, he could have struck me.  He
24   could have grabbed me.  And that would put me closer in
25   contact with him where he could have reached me.  And once he

GERARDO RAMIREZ                                                    April 10, 2003

Page 146

1    got ahold of me, I have other weapons that are available to

2    him to utilize.

3         Q    When -- let me ask this.  Before using the ASP, did

4    you consider or think about using any of the training, the

5    self defense or hand-to-hand combat, or Tae Kwan Doe from your

6    black belt training?  Did you consider using any of those

7    techniques or training to try to subdue him before going for

8    the -- the ASP?

9         A    Yes, it was considered.

10        Q    Okay.  Did you actually try that?

11        A    No, sir.

12        Q    All right.  Now, while using the ASP, did you

13   believe that the threat that Mr. Gonzalez presented -- you

14   have described it as his -- his being able to strike you and

15   grab you?

16        A    Yes.

17        Q    So at that point, you believed that he might -- he

18   might be able to cause you some bodily injury?

19        A    Yes, sir.

20        Q    Did you believe that he might be able to cause you

21   death or serious bodily injury?

22        A    No, sir.

23        Q    All right.  After using the ASP, did you use any of

24   other equipment that you had available to you?

25        A    Yes, sir.

GERARDO RAMIREZ                                                April 10, 2003

Page 147

1       Q    What did you use?

2       A    My pepper spray.

3       Q    What was it that caused you to be able to go to use

4   your pepper spray in favor of -- instead of the ASP or did you

5   continue to use both?

6       A    I utilized both, both.

7       Q    Okay.  So you are striking him with the ASP?

8       A    I discontinued the use of the ASP after I went to my

9   second option.  And then after the second one failed, which

10  was the pepper spray, I began to utilize my baton once again.

11      Q    Okay.  What did you do with the baton -- with the

12  baton while you took out the -- the mace, the pepper spray?

13      A    I placed it on the ground.  I dropped it.

14      Q    You dropped it?

15      A    Yes.

16      Q    Okay.

17      A    Alongside me.

18      Q    All right.  Well, let me ask a little bit about

19  that.  Did you -- did you intend to drop it?  In other words,

20  did you put it down so you could get the pepper spray out or

21  did you drop it accidentally during the -- during the action

22  of swinging it at him?

23      A    No.  I dropped it in order to get my other -- my

24  pepper spray out.

25      Q    All right.  Did getting your pepper spray out

GERARDO RAMIREZ                                                    April 10, 2003

Page 148

1    require two hands?

2         A    No, sir.

3         Q    If it doesn't require it, did you happen to use two

4    hands on this occasion?

5         A    No, sir.

6         Q    Is there some reason you dropped the ASP in order to

7    get the pepper spray?

8         A    Yes, sir.

9         Q    What is that?

10        A    I was holding off the bed that he was trying to push

11   on to me.

12        Q    Okay.  Mr. Gonzalez was pushing the bed towards you?

13        A    Yes, sir.

14        Q    And what area of the room were you in when this

15   occurred?

16        A    I would say about right here.

17        Q    Okay.  I tell you what I am going to do.  Where you

18   first marked your path to go use the telephone, would you put

19   an A at the end of that, you know, and circle it?

20        A    (So done)

21        Q    So we know that is where you were when you went to

22   use the phone?

23        A    Yes, sir.

24        Q    When you initially started to use the ASP?

25        A    Yes, sir.

GERARDO RAMIREZ                                                     April 10, 2003

Page 150

1      Q    And Mr. Gonzalez -- where is Mr. Gonzales at this

2    point?

3      A    He is at the far corner by the door side area,

4    toward the end of the couch.

5      Q    Okay.  So Mr. Gonzalez is on the side of the bed

6    between the -- the east wall and the side of the bed?

7      A    Yes.  Right over here by the couch area.

8      Q    Okay.

9      A    Toward the end of the couch.

10     Q    So he is between the couch and the couch that is

11   marked as B?

12     A    Yes, sir.

13     Q    And he is trying to push the bed towards you?

14     A    Yes, sir.

15     Q    And during this time, did he continue to try and get

16   closer to you or was he -- let me ask you.  He was trying to

17   push the bed towards you?

18     A    Yes, sir.

19     Q    Where along the bed was he located when he was

20   trying to do this?

21     A    On the other end.

22     Q    When you say the other end, can you be more

23   specific?

24     A    Yes.  By the railing, but toward the other end of

25   the -- the bed area.

GERARDO RAMIREZ                                                April 10, 2003

Page 151

```
 1        Q    Toward the head of the bed?

 2        A    Yes, towards the head of the bed.

 3        Q    And you were at the foot of the bed?

 4        A    Yes, sir.

 5        Q    And you-all were, generally speaking, on opposite

 6   sides of the bed lengthwise?

 7        A    Yes, sir.  Somewhat.

 8        Q    And obviously at that end of the bed it would -- it

 9   would be impossible for him to reach you?

10        A    No.

11        Q    No?

12        A    No.  Because he was not exactly at the head of the

13   bed.  He was on the corner side of the bed by the railing, by

14   the railing.

15        Q    Well, let me ask you.  At that location while he was

16   pushing the bed towards you, was he still trying to get close

17   to you or was he just pushing the bed towards you?

18        A    He was still trying to get close to me.

19        Q    All right.  And so you made a decision at that point

20   to put your ASP down?

21        A    Yes, sir.

22        Q    Where did you put it?

23        A    Alongside -- along my side.  Just along my right

24   side, I believe.

25        Q    Okay.  And did you put it on the ground --
```

Page 152

1        A    Yes, sir.

2        Q    -- or on some other object?

3        A    On the ground.

4        Q    And at that point, you took out your pepper spray?

5        A    Yes, sir.

6        Q    All right.  And the pepper spray, did you tell him

7   you were going to use it at that point?

8        A    No, sir.

9        Q    Did you use it?

10        A    Yes, sir.

11        Q    Where did you spray?

12        A    Directly on the facial area of Mr. Gonzalez.

13        Q    Okay.  Did you hit him in the face?

14        A    Yes, sir.

15        Q    Okay.  How many times did you spray?

16        A    Twice.

17        Q    And did you hit him in the face both times?

18        A    Once on the -- the first time yes, I did strike him

19   full in the face.  The second time, along the side, I believe,

20   the side.  He turned.

21        Q    How long between the application of the pepper

22   spray?

23        A    I would say maybe more than a brief two seconds.

24        Q    What was his reaction to the pepper spray?

25        A    At first no change in his -- in his direction as far

Page 153

1    as, you know, stopping, complying.  After a brief -- more

2    times, seconds -- a couple of seconds afterwards, he began

3    to --  the effects of the OC, the pepper spray, began to take

4    effect.  He began to clench his eyes and try to rub his eyes

5    with his free hand and attempted to -- to just wipe it off.

6    And, at that point, he stated, "Okay.  Okay.  I give up.  I

7    will stop.  You know, just don't -- don't hit me no more.  I

8    will get on the ground."  And that was it.

9         Q    All right.  During -- during the altercation where

10   -- at this point where he is at the -- towards the head of the

11   bed and you sprayed him with the pepper spray, from what you

12   told me, it sounds like that debilitated him for some period

13   of time.

14        A    Yes, sir.

15        Q    At that time, did you hear or have any conversation

16   with anyone, any other hospital personnel or security person?

17        A    No, sir.

18        Q    Do you remember anybody yelling in to you?

19        A    I could hear people in the -- in the background in

20   the hallway area stating, "The officer needs security."

21   Because during that whole time, I was calling out for security

22   and for assistance, attempting to get somebody's attention to

23   send me some security help.  Around that time, when he was

24   sprayed, I could hear a nurse, or it could have been somebody,

25   one of the  employees, in the hallway area telling somebody

GERARDO RAMIREZ                                              April 10, 2003

Page 155

1            Let me ask, you sprayed him twice with the pepper

2    spray and he said, "Okay.  Okay.  I will give up. I will --"

3        A    He --

4        Q    -- I will sit down"?

5        A    "I will get on the ground."

6        Q    Get on the ground.  Okay.  And did he do that?

7        A    No.

8        Q    What happened at that point after he made that

9    statement?

10       A    At that point, I reholstered my pepper spray, or I

11   was trying to, and then he began pushing the bed once again on

12   top of me trying to get over as well, over the bed toward me.

13   And that's when I -- I dropped my pepper spray.  I don't know

14   exactly where.  And then reached again for my baton that was

15   on the floor.

16       Q    And did you get your baton?

17       A    Yes, sir.

18       Q    And then what did you do then?

19       A    As he continued to try to reach for me and climb

20   over the bed, I struck him several times.

21       Q    Where?  What area of the body?

22       A    The arm, same arm area.

23       Q    All right.  And how long did this -- how long did

24   this continue?

25       A    Maybe a small brief period, a window of a couple of

Page 158

1    wall.

2         A    Yes.  Okay.

3         Q    It is of some width?

4         A    Yes, sir.

5         Q    Now, you understand or do you agree that the couch

6    and the bed cannot occupy the same space?

7         A    Yes.

8         Q    So that if you wheel the bed over to the couch, at

9    some point the bed or the wheels of the bed is going to bump

10   into the couch.

11        A    Oh, yes, sir.

12        Q    And will not make it all the way to the wall.

13        A    Yes, sir.

14        Q    And so the distance between the edge of the couch

15   and the wall is an area in which the bed cannot reach or

16   block?

17        A    Yes, sir.

18        Q    And that area is an area that is wide enough for a

19   person to pass through.

20             MR. GARZA:  Objection.  Form.

21             THE WITNESS:  Yes, sir.

22        Q    (BY MR. BARRIENTOS) All right.  How -- how long --

23   is there anything that occurred during the second time that

24   you used the ASP that -- that caused you to stop using the

25   ASP?

GERARDO RAMIREZ                                                    April 10, 2003

Page 159

1        A    Yes.

2        Q    What happened?

3        A    Basically, when -- the bed at that point became

4    overturned.  When he reached underneath it and grabbed it,

5    tossed it on its side.  He looked at me and I looked at him.

6    I said -- I continued to give orders to get on the ground and

7    cease.  And he refused.

8             Then he caught eye of the -- of the shackles.  They

9    were across the room right by the bed, you know, where it was

10   overturned.  And then he once again looked at me.  I looked at

11   him.  And I knew that he was going to go for the shackles.

12   So, basically, it was more of a, you know, at that point, I

13   had to go -- I knew I had to go and reach for those shackles

14   before he did.  But I -- but I could not.

15       Q    All right.

16       A    So -- I am sorry.  So at that point he began to --

17   after grabbing the shackles, he began to climb over the other

18   side of the bed and continued to lunge for me.  I -- I

19   continued to put in a few strikes at that point on his upper

20   shoulders area -- shoulder area where the bicep is and

21   continued to give my final strikes.  When I see that he was

22   getting closer and started to swing the shackles at me, I

23   immediately just dropped my baton and went to the corner of

24   the room to unholster my weapon, because that's when I started

25   feeling the blows.

```
 1        A     Yes, sir.

 2        Q     To prevent his escape?

 3        A     Yes, sir.

 4        Q     All right.  You testified that he got to the

 5   shackles.  Is that correct?

 6        A     Yes, sir.

 7        Q     After he reached the shackles, what happened then?

 8        A     He climbed over the bed and then he continued on to

 9   attempt to strike me.

10        Q     Okay.  Now, when you say he climbed over the bed,

11   earlier the bed was upright with the mattress on top, the way

12   it is when you lay down on the bed?

13        A     Yes, sir.

14        Q     You -- you indicated that he rolled over the top of

15   the bed.

16        A     Yes, sir.

17        Q     Once the bed was turned over, how did he get to the

18   other side?

19        A     He jumped and climbed over the side.

20        Q     He climbed over?

21        A     Yes, sir.

22        Q     Okay.  Can you demonstrate or explain for me how it

23   was that he climbed over?

24        A     He climbed over from this point of the bed and he

25   crossed over -- climbed over it toward me.
```

1              THE COURT REPORTER:  I am sorry.  And he

2    climbed what?

3              THE WITNESS:  He climbed over and crossed over.

4        Q    (BY MR. BARRIENTOS) When you say he climbed over it,

5    did he hop over the bed completely?  Did he turn his back to

6    you and lift one leg over --

7        A    Yes, sir.

8        Q    -- and then bring the other back?

9        A    Yes, sir.  That was the point.

10       Q    Okay.  Did he do this with ease or with some

11   difficulty?

12       A    With ease.

13       Q    Now, at some point in time there there is a period

14   where he is climbing over the bed where he again has his back

15   to you center a second time?

16       A    Yes, sir.

17       Q    This would have been after he obtained the shackles?

18       A    Yes, sir.

19       Q    What did you do when you first saw that he was going

20   to obtain -- that he was going to get to the shackles before

21   you?

22       A    I began to continue to give verbal commands to stop,

23   get on the ground, continue to cease.  That was about all that

24   I could do at that time in my perception, you know.  I

25   continued to advise him to get on the ground.  He refused.

GERARDO RAMIREZ                                              April 10, 2003

Page 173

1    And what I recall, he reached, crossed over, and then I

2    continued to give verbal commands to -- to stop and cease, get

3    on the ground.  He continued to refuse.  And I believe -- I

4    believe he was struck once in the shoulder.

5         Q    With the ASP?

6         A    Yes.

7         Q    Okay.  So --

8         A    As he crossed over.

9         Q    All right.  And after he crossed over to the other

10   side of the bed, did you strike him anymore?

11        A    Yes, sir.

12        Q    How many more times?

13        A    I would say about three or four.

14        Q    What areas of the body?

15        A    Bicep area.

16        Q    When you say bicep area, which arm are you talking

17   about?

18        A    His free one, which was the right arm, the one with

19   the shackles.

20        Q    Did he strike you with the shackles?

21        A    Yes, sir.

22        Q    Do you know whether Mr. Gonzalez is left-handed or

23   right-handed?

24        A    No, I do not.

25        Q    How many -- the first time you were struck with the

GERARDO RAMIREZ                                           April 10, 2003

Page 174

1    shackle -- well, let me ask.  How many times were you struck

2    with the shackles?

3        A    I don't recall.

4        Q    Do you recall being hit -- the first time you were

5    hit?

6        A    In a sense, I do.  But I just recall the -- feeling

7    the blow.  But I don't -- there is no -- it happened so fast

8    that I could not perceive the time or remember --

9        Q    What area of the body were you struck?

10       A    I believe the upper part of the area of the

11   forehead.

12       Q    At that time, did you still have the ASP in your

13   hand?

14       A    Yes, sir.

15       Q    Okay.  Do you remember any other blows -- blows

16   specifically besides the one you just mentioned?

17       A    After that, I remember feeling another blow toward

18   the -- this part of the facial area.  And then I attempted to

19   block some of the -- and block some of the blows and dodge a

20   couple of the others, but I just continued to feel strikes

21   toward my facial area.  And, in that sense, I turned around to

22   try to deflect the blows.  And I could feel some on my -- on

23   my back.

24       Q    How long did this part of the altercation last where

25   he had the shackles and you had the ASP?

GERARDO RAMIREZ                                                April 10, 2003

Page 176

1        Q    And let me ask you.  Did you decide at that point to

2    take it out and use it or did you decide to take it out and

3    threaten to use it to see if that would stop Mr. Gonzalez?

4        A    To threaten to use it.

5        Q    All right.  Tell me what you did exactly when you

6    got to that point.

7        A    I remember at that point I turned around and I

8    unholstered by weapon -- well, actually, I unholstered my

9    weapon and turned around.  And then I pointed it at Mr.

10   Gonzalez and I advised him to get on the ground and stop and

11   cease what he was doing and drop the weapon, continuously

12   telling him drop the weapon.  Mr. Gonzalez refused and

13   continued to try to strike me.  I tried to turned around and

14   deflect the blows.  I remember getting hit maybe one more

15   time.  And I -- I ordered him to stay back and he would not.

16   At that point, Mr. Gonzalez attempted to strike me one more

17   time.  And I -- I remember stepping back.  And he was stating

18   "mata me, mata me."  And I said, "I am not going to kill you."

19   I go, "Put it down.  Drop your weapon.  Put it down."  I

20   continued to give verbal commands.  And he raised his arm one

21   more time.  I said, "Don't do it."  And he lunged towards me.

22   And that's when I fired.

23       Q    Let me go back, go through that sequence.  When you

24   took out your -- your handgun, did you point it at him?

25       A    Yes, sir, I did.

Page 178

1    A    Yes.  But a little bit further over here from the

2    telephone area, from what I remember.

3    Q    All right.  Now, would he have been on the side of

4    the bed where the mattress would have been?  Understanding the

5    bed is on the side.  Would he have been on the side where the

6    mattress was or on the side of the wheels of the bed?

7    A    Mattress.

8    Q    All right.  So to correct it, then, the bed on its

9    side would have been between Mr. Gonzalez and the door to the

10   room?

11   A    Yes, sir.

12   Q    So that if you had moved towards the door of the

13   room and made the choice to either leave the room or go

14   towards the door, the bed was between you and -- would have

15   been between him and you?

16   A    Yes, sir.

17   Q    And he would have had to climb back over the bed or

18   get around it or something like that in order to get closer to

19   you?

20   A    Yes, sir.

21   Q    Okay.  Now, at the point where you took your gun out

22   and pointed it at him and told him to stop, he said -- you

23   said he said something to you.

24   A    Yes.

25   Q    Tell me again what he said.

Page 179

```
1        A      "Mata me.  Mata me."

2        Q      Okay.  Which in Spanish -- and in English means

3   what?

4        A      "Kill me.  Kill me."

5        Q      Kill me.  This is a statement that Mr. Gonzalez was

6   making to you?

7        A      Yes, sir.

8        Q      Did he say anything else to you?

9        A      Not that I can recall.

10       Q      All right.  All right.  And you indicated that he

11  made that statement to you and then he continued to try and

12  strike you?

13       A      Yes, sir.

14       Q      How long was it between the time you drew your

15  weapon until the time you fired the first shot?

16       A      I would say more -- no more than a brief couple of

17  seconds.  I can't give an exact amount of time.

18       Q      How many times did you tell him to stop or to get

19  back?

20       A      Numerous.  I don't recall.  It was just a continuous

21  number of times that I told him to -- to cease and stop and

22  get back.  And at that point it was no longer -- it was just a

23  last final option that I was throwing forward that I could not

24  give you a specific number of times that I told him to get

25  back.
```

Page 181

1      Q    The pole?

2      A    The pole.  The needle.  Anything that could have

3  been at his immediate reach to use.  A chair.  At that point

4  in time.  I don't recall.

5      Q    But the only thing he had and that he went for and

6  had was the set of shackles?

7      A    Yes, sir.

8      Q    All right.  When you -- when you fired the first

9  shot at him, did you -- did you take deliberate aim at any

10  particular part of his body?

11     A    Center mass.

12     Q    Okay.  Did you consider firing a shot in any other

13  area of his body other than what you call and have shown the

14  jury as the center mass?

15     A    No, sir.

16     Q    Is the center mass of a person's body also is what

17  is known as the kill zone?

18     A    At times it is, yes.

19     Q    Okay.  And that is because the infliction of a wound

20  from a firearm in that area of the body is likely to lead to

21  death.

22     A    Yes, sir.

23     Q    And if I remember your previous testimony, you were

24  not trained at all at the police academy about how to disable

25  someone without shooting into the kill zone?

GERARDO RAMIREZ                                                    April 10, 2003

Page 183

1    all 16 rounds that you had in your handgun at the time were

2    used during this incident?

3         A    Yes, sir.

4         Q    Did you fire all of them at once?

5         A    No, sir.

6         Q    All right.  Can you tell me in what sequence you

7    fired them?

8         A    There was a -- there was a set of four to five

9    rounds the first time.  A brief pause, anywhere from maybe a

10   millisecond to a second.  It seemed like a very fast time.  I

11   can't recall.  There was a brief pause.  At that point, Mr.

12   Gonzalez lunged at me again and attempted to strike me.  And

13   so I continued to follow through with another couple of shots,

14   which emptied my weapon.

15        Q    All right.  You indicated the first, I guess,

16   sequence of rounds, shots, was four to five?

17        A    Yes, sir.

18        Q    And when you fired each of these shots, each of them

19   was a -- well, let me ask.  Were any of them accidental

20   firings?

21        A    No, sir.

22        Q    Okay.  So every round that was squeezed off was a

23   round that you made the decision and fully intended to -- to

24   make?

25        A    Yes, sir.

Page 185

1    five shots?

2         A    I would say about maybe less than a second or two.

3         Q    Less than a second or two?

4         A    Yes, sir.

5         Q    Did any of the shots -- did Mr. Gonzalez say

6    anything as you fired those shots?

7         A    No, sir.

8         Q    Did he indicate to you that he was in pain?

9         A    I believe he was.

10        Q    Okay.  What -- what is it that made you believe

11   that?

12        A    He just -- he would -- he would make noise like

13   grunts, like in a sense that he -- there was noise coming from

14   him in the form of pain like anybody who would make noise, you

15   know.

16        Q    All right.  You said you squeezed off four to five

17   rounds, some of which hit him and that there was a brief

18   pause.

19        A    Yes, sir.

20        Q    Is that correct?

21        A    Yes, sir.

22        Q    When -- when the pause occurred and when you

23   finished the first set of rounds, where was Mr. Gonzalez?  Was

24   he still standing in the same position?

25        A    No, sir.

GERARDO RAMIREZ                                                   April 10, 2003

Page 186

1        Q    Where was he?  Can you tell me?

2        A    He was just a little bit farther off.  I would say

3   maybe less than half a foot from where he was.  It hadn't

4   changed much --

5        Q    Okay.

6        A    -- from where he was.

7        Q    Okay.  Did he move closer to you or farther away

8   from you or --

9        A    Farther away.

10       Q    He moved back?

11       A    Yes, sir.

12       Q    Did any of the shots that you fired in the first

13   four to five rounds knock him down?

14       A    No, sir.

15       Q    They knocked him back but not down?

16       A    Exactly.

17       Q    At this point, was he still on the mattress side of

18   the bed?

19       A    Yes, sir.

20       Q    And at this point, all right, he still would have

21   had to have gotten over the mattress of the bed in order to --

22   in order to prevent you from getting to the door.

23       A    Yes, sir.

24       Q    All right.  You said there was a brief pause.  How

25   long of a pause?

GERARDO RAMIREZ                                                      April 10, 2003

Page 190

1                    THE WITNESS:  No.  No, sir.

2          Q    (BY MR. BARRIENTOS) Okay.  You didn't know that?

3          A    No, sir.

4          Q    Okay.  Would you disagree with it if you saw some

5     photographs that show that?

6          A    No, sir.

7          Q    Did you at any time make a conscious decision when

8     you were consciously squeezing off the rounds to shoot Mr.

9     Gonzalez in the back?

10         A    No, sir.

11         Q    So your testimony here is if he had turned his back

12    you would have stopped firing?

13         A    Not in that sense, no.

14         Q    No?

15         A    No.  Because the threat is still there.

16              (Short break)

17         Q    (BY MR. BARRIENTOS) All right.  Officer Ramirez, I

18    think when we -- before we took a break, when we were talking

19    about the second set of shots you fired, they discharged all

20    of the -- all the ammunition from your weapon in the second

21    set?

22         A    Yes, sir.

23         Q    How long did it take you to fire those shots?

24         A    Anywhere from one to two.

25         Q    One to two?

GERARDO RAMIREZ                                        April 10, 2003

Page 191

1        A    Seconds.

2        Q    Seconds.

3              THE COURT REPORTER:  Will you speak up, please.

4              THE WITNESS:  I am sorry.

5        Q    (BY MR. BARRIENTOS) Did you fire the rounds -- well,

6    let me ask you.  Did you -- did you keep your eyes on Mr.

7    Gonzalez the entire time that you were firing the weapon?

8        A    To the best of my ability.  There was pepper spray

9    in the air.  There was blood in my eyes.  It was a little

10   difficult at the time because of that factor.

11       Q    Okay.  Difficult for you to see?

12       A    Yes.  To some extent.  It was starting to take

13   effect and neutralize the room and it was starting to spread.

14       Q    All right.  So then you squeezed off those last 11

15   rounds one after the other?

16       A    Yes, sir.

17       Q    Without hesitation?

18       A    Yes, sir.

19       Q    And in -- in the span of a couple of seconds?

20       A    Yes, sir.

21       Q    Okay.  And your testimony is that you did not --

22   well, let me ask you.  During that span of time, would you

23   have been able to assess whether Mr. Gonzalez had stopped

24   coming towards you or if the threat had been removed?

25       A    No.

GERARDO RAMIREZ                                                            April 10, 2003

Page 192

1      Q    So your decision at that point was to fire and keep

2    firing until you had no more ammunition?

3      A    Yes, sir.

4      Q    So, effectively, you, by making that choice, were

GERARDO RAMIREZ                                              April 10, 2003

1    shots at him, were you still angry at him?

2         A    No, sir.

3         Q    When during the sequence of events did your anger

4    towards Mr. Gonzalez subside?

5         A    When the -- that -- that determination was made to

6    fire my weapon.  At that point, it more -- it feared me more

7    than -- than actually made me angry.  Fear -- fear took over

8    my anger or superseded my anger.

9         Q    All right.  So you were still angry with him, you

10   were just more scared than angry?

11        A    Yes, sir.

12        Q    Well, let me ask you this, then, would it be fair to

13   say that, then, that to some extent your anger was a

14   motivation for your deciding to use your handgun and fire the

15   shots at him?

16                   MR. GARZA:  Objection.  Form.

17                   THE WITNESS:  No, sir.

18        Q    (BY MR. BARRIENTOS) And that's your testimony under

19   oath, that it was not a motivating factor in any way in your

20   decision to shoot him?

21        A    Well, it is a broad question as far as that.  I

22   mean, it -- it is there.  It is definitely there, but it is

23   not a major factor.  Fear was my motivation.

24        Q    You are sitting here telling me today under oath

25   that your anger at him played no part in your decision to fire

GERARDO RAMIREZ                                                    April 10, 2003

Page 230

1    at the bottom?

2         A    Yes, sir.

3         Q    Okay.  And the date is 9/19/2000.  Correct?

4         A    Yes, sir.

5         Q    And the first entry on this particular page is at

6    0322, which would be 3:22 in the morning.  Correct?

7         A    Yes, sir.

8         Q    All right.  And the notation here, apparently by

9    this nurse, M. Lucio, is:  Heard cry for help.  Coming from

10   south side of hall.  Heard loud rattling thumping sound.  Saw

11   patient in 503 standing at doorway yanking on handcuff to the

12   left hand attached to bed.

13             And it says here:  Witnessed by M.Lucio, RN,

14   M.Valdez, LVN, and L.Vega, LVN.

15             At this time, the officer yelled "Get down.  Get

16   down.  I sprayed mace.

17             Does that sound like an accurate statement to you?

18        A    Yes, sir.

19        Q    All right.  The next notation here is at 03:24,

20   which would be 3:24 in the morning.  Correct?

21        A    Yes, sir.

22        Q    It says: Security paged stat, loud banging sound

23   heard, nurses come back to nurses station for protection.

24             Then it goes on, next entry is at 0325, which would

25   be 3:25 in the morning.  Correct?

Page 247

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

                      SOUTHERN DISTRICT OF TEXAS

 2                        BROWNSVILLE DIVISION

 3    MARY E. CARRANZA, ET AL,          *

                          plaintiffs,  *

 4                                       *

      VS.                                *   C. A. NO. B-02-180

 5                                       *

      CITY OF LA FERIA, TEXAS, ET AL,   *

 6                        defendants    *

 7    ------------------------------------------------------------

                      REPORTER'S CERTIFICATION

 8         VIDEOTAPED DEPOSITION OF GERARDO RAMIREZ

                         APRIL 11, 2003

 9    ------------------------------------------------------------

10         I, KATHERINE J. BROOKBANK, Certified Shorthand Reporter

11    in and for the State of Texas, hereby certify to the

12    following:

13         That the witness, GERARDO RAMIREZ, was duly sworn by the

14    officer and that the transcript of the oral deposition is a

15    true record of the testimony given by the witness;

16         That the deposition transcript was submitted on

17    _____ to the witness or to the attorney for

18    witness for examination, signature, and return to me by

19    _____;

20         I further certify that I am neither counsel for, related

21    to, nor employed by any of the parties or attorneys in the

22    action in which this proceeding was taken, and further that I

23    am not financially or otherwise interested in the outcome of

24    the action.

25
```

GERARDO RAMIREZ                                                    April 10, 2003

Page 248

1       Certified to by me this ___1st___ day of _May_ , 2003.

2

        Costs: _____

3   Due and owing by Plaintiff

4                       _Katherine J. Brookbank_
                        KATHERINE J. BROOKBANK, Texas CSR 2060

5                       Expiration Date:  12/31/03

                        7800 IH-10 West, Suite 100

6                       San Antonio, Texas  78230

                        (210) 377-3027

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

BLAKE HUBBARD                                                    April 29, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARY E. CARRANZA, Individually      *
and as Next Friend of ANGEL          *
MATTHEW GONZALEZ, GUSTAVO            *
GONZALEZ, JR., and ALYSSA            *
LAUREN GONZALEZ, Minor Children      *
and on Behalf of All of Those        *
Entitled to Recover for Death of     *
GUSTAVO GONZALEZ, Deceased Under     *
the Texas Wrongful Death Act,        *
and CELIA MUNIZ GONZALEZ,            *
Individually and as Personal         *
Representative of the ESTATE OF      *
GUSTAVO GONZALEZ, Deceased,          *
                    Plaintiffs,      *
vs.                                  *
                                     *
CITY OF LA FERIA, TEXAS, LA          *
FERIA POLICE DEPARTMENT, OFFICER     *
GERARDO "JERRY" RAMIREZ,             *
Individually and in his Official     *
Capacity; and VALLEY BAPTIST         *
MEDICAL CENTER,                      *
                    Defendants,      *
                                     *   CIVIL ACTION NO. B-02-180
GUSTAVO GONZALEZ, Individually       *
Pursuant to the Texas Wrongful       *
Death Act for the Death of           *
GUSTAVO GONZALEZ, Deceased,          *
                    Intervenor,      *
                                     *
vs.                                  *
                                     *
CITY OF LA FERIA, TEXAS, OFFICER     *
GERARDO "JERRY" RAMIREZ,             *
Individually and in his Official     *
Capacity; and VALLEY BAPTIST         *
MEDICAL CENTER,                      *
                    Defendants.      *
************************************************************
VIDEOTAPED ORAL DEPOSITION OF
BLAKE HUBBARD
APRIL 29, 2003
************************************************************

BLAKE HUBBARD                                                    April 29, 2003

```
 1          ORAL DEPOSITION OF BLAKE HUBBARD, produced as a witness
 2     at the instance of the Plaintiff and duly sworn, was taken in
 3     the above-styled and numbered cause on the 29th day of April
 4     2003, from 2:05 p.m. to 6:40 p.m., before Katherine J.
 5     Brookbank, CSR in and for the State of Texas, reported by
 6     method of machine shorthand, at the office of Adams & Graham,
 7     222 E. Van Buren, Harlingen, Texas, 78550, pursuant to the
 8     United States District Court Procedure and the provisions
 9     stated on the record hereto.
10                              APPEARANCES
       FOR THE PLAINTIFF(S)
11          Mr. Joseph Barrientos
            THE WATTS LAW FIRM
12          555 N. Carancahua, Suite 1400
            Corpus Christi, Texas  78478
13
       FOR THE INTERVENOR
14          Mr. Phillip Stein
            THE LAW OFFICES OF PHILLIP J. STEIN, P.C.
15          14-A Palm Village Center
            Brownsville, Texas  78520
16
       FOR THE DEFENDANT(S)
17          Mr. William Pope
            ADAMS & GRAHAM, L.L.P.
18          222 E. Van Buren, West Tower
            P. O. Drawer 1429
19          Harlingen, Texas  78551
20          Mr. Eduardo Garza
            WILLETTE & GUERRA
21          International Plaza, Suite 460
            3505 Boca Chica Boulevard
22          Brownsville, Texas  78521
23     ALSO PRESENT:  Tele Video and Audio Productions
                       Cecila Gonzalez
24                     Denise Jackson, Claims Manager, VBMC
25
```

BLAKE HUBBARD                                                    April 29, 2003

```
 1                      INDEX

 2                                              PAGE

 3   Appearances ------------------------------   2

 4   Stipulations (Attached hereto) --------------  N/A

 5   BLAKE HUBBARD

 6        Examination by Mr. Joseph Barrientos ---------   4

          Examination by Mr. Eduardo Garza ------------- 131

 7        Examination by Mr. Joseph Barrientos --------- 155

          Examination by Mr. Eduardo Garza ------------- 168

 8

     Changes and Signature --------------------------- 169

 9

     Reporter's Certificate -------------------------- 170

10

                         EXHIBITS

11   NO. DESCRIPTION                            PAGE

12   18 - VBMC security department documents    100

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 19

1    something that you established once you arrived there?

2         A    I was -- it was an established practice.

3         Q    All right.  Let me go back, because I wanted to

4    ask you another question about the -- about the shift.

5    Assuming there are six officers on staff, that it is a fully

6    staffed shift, who is -- what is the hierarchy or the chain of

7    command that is in place at -- at any given time when those

8    people are on duty?

9         A    We would have a department supervisor on the shift.

10   He would be one of the -- usually one of the officers

11   assigned to one of the rove -- the roving units that can move

12   about.  In the absence of a department supervisor, we would

13   assign usually one of the more senior officers to be an acting

14   supervisor for the shift.  In the absence of administrative

15   security personnel, that -- we have a house supervisor who

16   supervises the hospital.  And they can use that person as

17   well.

18        Q    Okay.  Now, the house supervisor is not actually

19   within the security --

20        A    No.

21        Q    -- division.  Does the house supervisor, then, have

22   authority over security personnel in the absence of someone,

23   say, like yourself?

24        A    They have authority to -- to make decisions for the

25   hospital as necessary.  Typically related to security, if a

Page 20

1    decision needed to be made off duty -- if it was very

2    emergent, like an incident, a disaster recall, or something

3    like that, the house supervisor might make that call.  But if

4    it was specific to security, they would usually call me at

5    home.

6        Q    And that's what I meant.  For example, if you were

7    out of town or unavailable for some particular reason and

8    something came up at a -- at a time other than regular

9    business hours and you are not available, they would go to the

10   house supervisor.

11       A    If --

12       Q    They could go to the house supervisor?

13       A    They could go to the house supervisor.  It would be

14   primarily for security purposes if no one else was available.

15   If they could not locate somebody, another supervisor here,

16   administrative personnel responsible for security.

17       Q    Okay.  Anyone else in the chain of command other

18   than the officers that you -- you have mentioned yourself, the

19   house supervisor?  In other words, were there any other

20   intermediate levels of management who security personnel could

21   go to for instruction or assignment in your absence?

22       A    Mr. Zimmerman, the assistant director I spoke of

23   earlier.

24       Q    Anyone else in the department outside security such

25   as the house supervisor?

BLAKE HUBBARD                                                              April 29, 2003

Page 21

1      A    They could go to the vice-president that I would --

2    that I had reported to if -- in my absence.

3      Q    Okay.  And who would that person have been at that

4    time?

5      A    At that time, it was Robert Haggarty.

6      Q    As a practical matter, Mr. Hubbard, would -- I know

7    we have talked about who -- other people that security

8    personnel could have gone to.  Did that -- did that ever in

9    your experience actually have to happen or were you or one of

10   these other people usually available?

11     A    I was usually available.

12     Q    Okay.  So, if I understand correctly, then you and

13   or Mr. Zimmerman, or the house supervisor -- did I ask that

14   person's name.  I don't think I did.  Who would have been the

15   house supervisor at the time in September of 2000, if you

16   remember?

17     A    Was it Stella?  I believe it was Estella Maricio.  I

18   would probably have to go back and check to verify that.  But

19   I believe she was the supervisor.

20     Q    Okay.  I won't -- I won't hold you to it.  But --

21   all right.  Okay.  So, if I understand correctly, yourself,

22   Mr. Zimmerman, the house supervisor, perhaps Ms. Maricio,

23   perhaps someone else, and the vice-president, Mr. Haggarty,

24   were all people who would have been able to direct security

25   personnel on behalf of the hospital.  Direct them in terms of

BLAKE HUBBARD                                                April 29, 2003

Page 22

1    assignment.

2         A    Well, not necessarily -- I mean, Mr. Haggarty and

3    Ms. Maricio would not probably have gotten involved in terms

4    of assignment.  If they would be in a situation, you know,

5    some sort of an emergency situation where further higher

6    guidance was needed, they might seek those.  If there was a --

7    in terms of an assignment that would -- that would stop at

8    probably Mr. Zimmerman and myself.

9         Q    Okay.  All right.  So in an emergency situation or

10   the situation where you or Mr. Zimmerman were not available

11   immediately, then these people could be looked to for

12   guidance?

13        A    Sure.

14        Q    Okay.  Normally, I could see they would want to go

15   to you or Mr. Zimmerman because you are familiar with the

16   security procedures and, you know, the things that are

17   directly related to it.

18        A    That's correct.

19        Q    All right.  All right.  The -- all right.  In

20   terms -- and, Mr. Hubbard, I am going to ask you to tell me,

21   because, quite honestly, I am not familiar with the

22   certification that -- that -- the security -- excuse me --

23   with the training security officers who were working for the

24   hospital at that time would have gone through.  So let me ask

25   you.  Let me ask you this.  Is there or was there in place at

BLAKE HUBBARD                                                                    April 29, 2003

1    the time a set of procedures or guidelines with regard to

2    prisoner patients or patients who happen to be in custody of a

3    law enforcement agency?

4        A    Can you repeat that?

5        Q    Sure.  I tell you what.  Let me just try and ask a

6    better question.  Was there a policy in place at the time by

7    the Valley Baptist Medical Center with regard to the security

8    of patients who happened to be in the custody of law

9    enforcement agencies?

10       A    There was not one specific to security of what we

11   call forensic patients, which are the patients in the custody

12   of law enforcement.  There is a policy that deals with the

13   interaction between the forensic staff and the hospital.  I

14   don't -- it spoke to several issues, not specifically just to

15   security of a patient.

16       Q    Well, let me -- let me show you -- I don't know if

17   you have copies of these or not.  In the last deposition that

18   we took in this case we marked as Exhibits 11, 12, and 13,

19   some documentation that was provided by -- by the hospital's

20   counsel.  And what I want to ask you is can you take a moment

21   to look at those and then we will -- we will proceed from

22   there.

23            (Brief pause)

24       Q    Have you had a chance to review them?

25       A    Yes, I am familiar.

BLAKE HUBBARD                                                    April 29, 2003

Page 64

1      Q    Well --

2      A    He was being guarded by a police officer.

3      Q    The restraint used by the -- by the law enforcement

4   agency, though, is based upon their knowledge of whatever the

5   forensic body of information is.  Correct?

6      A    Correct.

7      Q    They are, by design, not going to have access to

8   whatever the medical body of information is.  Is that correct?

9               MR. POPE:  Objection.  Form.

10              THE WITNESS:  The -- the medical chart -- the

11  medical information would not be typically shared with the --

12  with the law enforcement officer.  The patient's medical

13  condition is confidential and is typically not shared without

14  -- outsiders.

15     Q    It -- it could be shared with medical personnel

16  and/or the security department as hospital staff if --

17     A    If there was a need.  I mean, the security

18  department, I would not go into a patient's medical record

19  unless there was a strong legitimate need for that, for me to

20  do that.

21     Q    Sure.  And I understand that.  And I think what I am

22  trying to make sure that I understand is the hospital has

23  information that, by design, is not going to be available to

24  the law enforcement agency.  And so I guess the question I

25  have for you is would you -- would you expect that that

BLAKE HUBBARD                                                              April 29, 2003

Page 170

1                    IN THE UNITED STATES DISTRICT COURT FOR THE
                            SOUTHERN DISTRICT OF TEXAS
2                              BROWNSVILLE DIVISION
3    MARY E. CARRANZA, ET AL,           *

                              plaintiffs,  *
4                                          *
     VS.                                   *    C. A. NO. B-02-180
5                                          *
     CITY OF LA FERIA, TEXAS, ET AL, *
6                              defendants   *
7    ------------------------------------------------------------
                        REPORTER'S CERTIFICATION
8            VIDEOTAPED DEPOSITION OF BLAKE HUBBARD
                            APRIL 29, 2003
9    ------------------------------------------------------------
10        I, KATHERINE J. BROOKBANK, Certified Shorthand Reporter
11   in and for the State of Texas, hereby certify to the
12   following:
13        That the witness, BLAKE HUBBARD, was duly sworn by the
14   officer and that the transcript of the oral deposition is a
15   true record of the testimony given by the witness;
16        That the deposition transcript was submitted on
17   _____5-12-03_____ to the witness or to the attorney for
18   witness for examination, signature, and return to me by
19   _____6-13-03_____;
20        I further certify that I am neither counsel for, related
21   to, nor employed by any of the parties or attorneys in the
22   action in which this proceeding was taken, and further that I
23   am not financially or otherwise interested in the outcome of
24   the action.
25

BLAKE HUBBARD                                                              April 29, 2003

Page 171

1        Certified to by me this ___4th___ day of ___Aug___, 2003.

2

    Costs: _1028.25_____

3   Due and owing by Plaintiff

4                    _Katherine Brookbank CSR_
                     KATHERINE J. BROOKBANK, Texas CSR 2060

5                    Expiration Date:  12/31/04

                     7800 IH-10 West, Suite 100

6                    San Antonio, Texas   78230

                     (210) 377-3027

7   _Costs Was not Returned on Time_

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

VALLEY BAPTIST MEDICAL CENTER  HARLINGEN, TX.  78550  MR#  00380855

NAME:  RAMIREZ, GERARDO    AGE: 22  ROOM: ER    ACCOUNT# 984594721

EMERGENCY ROOM ASSESSMENT      DATE: 09/17/00        DR:  DAVIS

DATE OF BIRTH: 08/06/78

TIME OF TRIAGE: 4:13

TIME SEEN BY EMERGENCY ROOM PHYSICIAN: 4:25

HISTORY:  (SUBJECTIVE)
    CHIEF COMPLAINT:  Facial contusions.
    HISTORY OF PRESENT ILLNESS: This patient was guarding a prisoner inpatient here in the hospital when he was attacked with the leg shackles which were not on the prisoner inpatient. The prisoner used the shackles as a weapon. The patient was struck in the nose, the forehead, and right side of his lip, and the right side of his cheek with the shackles twice. The patient did not lose consciousness, but felt he was going to lose consciousness. Apparently, the patient fired his weapon after the prisoner had come at him. He told him to back off, the prisoner did not, and this patient fired and has killed the inpatient prisoner.
    REVIEW OF SYSTEMS: The patient did not lose consciousness. He has had no nausea or vomiting. No change in mentation, change in vision, or change in his walk.
    ALL OTHER SYSTEMS NEGATIVE.
    PAST HISTORY:
    MEDICAL:  No medical diseases.
    MEDICATIONS: He is on no medications.
    ALLERGIES: No known allergies.
    PREVIOUS SURGERIES: No previous surgeries.
    IMMUNIZATIONS: His Tetanus is not up to date.  He will receive one tonight.
    FAMILY HISTORY:  Negative.
    SOCIAL HISTORY: The patient is here with other officers.  He denies smoking or alcohol.

PHYSICAL EXAMINATION:

    GENERAL APPEARANCE: He is a well-developed, well-nourished, white male, looking his stated age.  He is in no acute distress.

    VITAL SIGNS: Temperature 98.3, pulse of 113, respirations 20, blood pressure 141/68.  The O2 saturation is 98% on room air.

    HEAD: Normocephalic.   There is large hematoma on the left forehead.

    EYES: Clear.  The pupils are equal and reactive to light.  Fundi are benign.

    EARS: Clear.  No blood or Battle's sign.

    NOSE: Swollen.  There is some blood on the nose, as well as the

Gonzalez, Celia
1306-000617

VALLEY BAPTIST MEDICAL CENTER  HARLINGEN, TX.  78550  MR#  00380855

NAME: RAMIREZ, GERARDO    AGE: 22  ROOM: ER    ACCOUNT#  984594721

EMERGENCY ROOM ASSESSMENT    DATE: 09/17/00    DR: DAVIS

PAGE 2

skin avulsion near the tip of the nose.

**FACE:** Reveals an abrasion on the right cheek and a small superficial laceration on the right upper lip.

**NECK:** Supple.  There is no muscular tenderness or spasm.

**LUNGS:** Clear.

**HEART:** Normal sinus rhythm.

**ABDOMEN:** Soft and nontender.  The bowel sounds are normoactive.

**EXTREMITIES:** Within normal limits.

**NEUROLOGICAL:** Cranial nerves II-XII are normal.  Grips are equal and lower extremity strength is equal.

MEDICAL DECISION:
    COURSE IN EMERGENCY DEPARTMENT: This patient had an uneventful course in the emergency room.  He is obviously quite emotionally shocked.
    REVIEW OF DIAGNOSTIC TESTS:  The patient had a CT of the head without contrast which showed only soft tissue swelling.  Bone windows were negative as well.  He had an x-ray of the nasal bones which shows a small, nondisplaced fracture near the tip of the nasal bone.

DIAGNOSTIC IMPRESSION:
1.  Nasal fracture.
2.  Head contusion.
3.  Facial abrasions and lacerations.
4.  Possible post-traumatic stress disorder.

TREATMENT: The patient's wounds were cleansed.  He received Tetanus. The little wound on the right lip will receive some steri's and I am going to put him on a prescription for cephalexin 500 mg with the first dose now just to prevent infection since he does have some rather deep abrasions and skin avulsions over top of the area of the nasal fracture, although it is not communicating with the fracture. The patient is going to be discharged from the emergency room in stable condition at about 5:45.

HAD/efd76
00/09/19/09/19
J0K00914.ED                              HARRY A. DAVIS, M.D.

                                         *H. Davis*

                                              **Gonzalez, Celia**
                                              **1306-000618**

# EXHIBIT D

STYLE OF
CASE :


vs.


CASE NO. :

PERTAIN TO :    **Gustavo Muniz Gonzalez**

FROM :    **Valley Baptist Medical Center (Medical Records Dep**
**Medical**

DELIVER TO :    **G. Joseph Barrientos**
**WATTS & HEARD, L.L.P.**
**555 N. Carancahua Tower II Suite 1400**
**Corpus Christi, TX 78478**

**EXHIBIT**
15



Gonzalez, Celia
1306-000001



**Marshall's Business Records**

STYLE OF
CASE :

vs.

CASE NO. :

PERTAIN TO :   **Gustavo Muniz Gonzalez**

FROM :   **Valley Baptist Medical Center (Medical Records Dept.)**
**Medical**

DELIVER TO :   **G. Joseph Barrientos**
**WATTS & HEARD, L.L.P.**
**555 N. Carancahua Tower II Suite 1400**
**Corpus Christi, TX 78478**

**Judicial District Court**
**County, Texas**

**The taxable cost of $222.40 was charged to Attorney for**
**TBA # 01816495**

Order No. **04-40677-001**

Record Retrieval  •  Written Depositions  •  Witness Location

802 N. Carancahua, Suite 670  •  Corpus Christi, Texas 78470-0800  •  Phone: 361-884-1736  •  Fax: 361-882-9249  •  Toll Free: 1-800-880-1736
E-mail: mbrecords@att.net  •  Website: mbrecords.net

# AFFIDAVIT

Records Pertaining To:  **Gustavo Muniz Gonzalez**

Type of Records:  **MEDICAL RECORDS DATED FROM 09/19/00 TO PRESENT, INCLUDING reports, notes, tests, test results, diagnosis, prognosis, office records, clinic records, therapy records, patient information form, correspondence**

Before me, the undersigned authority, personally appeared ____Deborah I.S. Valle, RHIA____

_____, who, being by me duly sworn, deposed as follows:
(Custodian of Records)

My name is _____Deborah I.S. Valle, RHIA_____, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of records for:

**Valley Baptist Medical Center (Medical Records Dept.)**

Attached hereto are records from this facility.  These records are kept in the regular course of business, and it was the regular course of business  for an employee or representative of this facility, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter.  The records attached hereto are the original or exact duplicates of the original.

_____
AFFIANT (Custodian of Records)

Sworn to and subscribed before me on the ____10th____ day of ____July____, 2001.

_____
NOTARY PUBLIC

My Commission Expires: ____06-24-04____

NORMA D. CANO
Notary Public
STATE OF TEXAS
My Comm. Exp. 06-24-2004

Order No.  **04-40677-001**

# VALLEY BAPTIST MEDICAL CENTER

(VBLFACEI)

**ADMISSION FORM**
18Sep00    02:35

**PRINCIPAL DIAGNOSIS**

THE CONDITION WHICH AFTER STUDY IS DETERMINED TO BE THE REASON FOR ADMISSION TO THE HOSPITAL

CHART 000001

**EXPIRED**

(Problem w/ Beta
Stamp - skipped
a number)

**SECONDARY DIAGNOSIS**

ANY COMORBIDITY AND/OR COMPLICATION THAT PROLONGS THE LENGTH OF STAY

**PROCEDURE(S)**

DATE/SURGEON    (PROCEDURE(S) WHICH ARE THERAPEUTIC AND MOST RELATED TO PRINCIPAL DIAGNOSIS)

DRG
20

DISP
10.3.W

I CERTIFY THAT THE NARRATIVE DESCRIPTIONS OF THE PRINCIPAL AND SECONDARY DIAGNOSES AND THE MAJOR PROCEDURES PERFORMED ARE ACCURATE AND COMPLETE TO THE BEST OF MY KNOWLEDGE

Possible Drug Allergies:

**ATTENDING PHYSICIAN LEGAL SIGNATURE**

**EXPIRED**

DATE    SEP 19 2000

| CASE NUMBER | CC | ADMISSION DATE TIME | CLERK | UNIT | ROOM BED | AC | TYP | SRV | ADM RATE SRC | SMKR | VAL | PUB | MEDICAL RECORD UNIT N |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 984589192 | | 18Sep00 02:30 | MONTEMA | 5ST | 503-01 | S | | S | STO | 7 | | | 00249469 |

| NAME NEE ADDRESS PHONE | EMPLOYER OCCUPATION PHONE | DOB |
|---|---|---|
| GONZALEZ, Gustavo . | UNEMPLOYED | 30Dec72 Hispanic ORIGIN |
| ******NEED ADDRESS******** | | AGE 27    SEX M    MS S |
| ALAMO, TX  78516 | | |
| (956)782-0296    (956)782-0296 | | SSN 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 |

| NAME PERMANENT ADDRESS PHONE SS* | EMPLOYER PERMANENT ABOVE | BIRTHPLACE |
|---|---|---|
| GONZALEZ    Gustavo | UNEMPLOYED | |
| ******NEED ADDRESS******** | | CHURCH TO NOTIFY |
| ALAMO    TX  78516 | | Other |
| (956)782-0296    465169882 | | |

| SPOUSE PARENT, ADDRESS PHONE RELATIONSHIP | RELATIVE PHONE RELATIONSHIP | DATES OF SERVICE | TYPE OF SERVICE |
|---|---|---|---|
| | | 17Sep00    E E | |
| | | V:    L:    I: | |

| CARRIER | POLICY NUMBER | CONTRACT | INSURED's NAME | INSURED PATIENT REL |
|---|---|---|---|---|
| SELF PAY | | | | |

| ADMITTING DIAGNOSIS | ADMITTING PHYSICIAN | PRE ADMIT DATE NUMBER CLERK | |
|---|---|---|---|
| STO/STAB WOUND | 89    LAWLER, MARION | | 1 |

000002

Account#: 984589192
GONZALEZ       Gustavo
Start Dt: 09/17/00

MedRec#: 00249469

2

**VALLEY BAꟷ ꟷ ꟷ ꟷMEDICAL CENTER**
Harlingen, Texas     000004

**CONDITIONS TO ADMISSION I**

**AUTHORIZATION FOR TREATMENT**

I give consent to Valley Baptist Medical Center (VBMC), Valley Baptist Medical Center Physician Services, Inc., the medical staff and/or emergency staff, and resident physicians to perform any medical/surgical treatment and to administer anesthetic medications necessary for diagnosis and treatment. I realize that medicine is not an exact science and that guarantees have not been made to me about these medical/ surgical treatments. I also understand that this is a teaching hospital and all physician residents are under the supervision of a physician.

The Medical Center promotes its mission of education and has affiliations with several educational institutions. It includes, but is not limited to training of nursing students, nurse anesthetists, medical students, interns, residents and specified professional personnel. The intent of this association is to allow students the opportunity to gain clinical experience. Further, it is my understanding that members of Valley Baptist Medical and Dental Staff may employ specified professional personnel who have been credentialed to assist in the patient's care.

**INDEPENDENT CONTRACTOR STATUS**

I understand that the physicians practicing in this hospital, including the emergency room physicians, radiologists, pathologists, anesthesiologists, and other physicians are independent ontractors and are NOT agents, servants or employees of this ospital. I understand that the hospital cannot admit or control the healthcare or services rendered by any physician. I understand that I will be billed separately for physician services .

**EMPLOYEE EXPOSURE TO BLOOD AND BODY FLUIDS**

I understand that in the event an employee or physician is exposed to patient's blood or body fluids, a blood sample for HIV (AIDS) and Hepatitis B antibodies will be obtained. I understand that if patient is to undergo a surgical or invasive procedure, a blood sample for detection of the HIV antibody will be obtained as ordered by the physician. I understand that I will be notified of testing. I understand that the results are confidential and will not be released to a third party without my permission.

**WAIVER FOR VALUABLES**

I understand VBMC is not responsible for personal effects such as purses, dentures, bridges, partial plates, eyeglasses, property, medications, valuables, including rings, watches, jewelry, money, etc. unless same has been checked into VBMC's safe and receipt issued. Property checked into the safe will not be surrendered without VBMC's receipt.

**AUTORIZACIÓN PARA TRATAMIENTO**

Doy mi consentimiento a Valley Baptist Medical Center (VBMC), Valley Baptist Medical Center Physicians Services, Inc., al personal médico o de urgencias y a los médicos residentes para que realicen cualquier tratamiento médico o quirúrgico y para administrar anestesia cuando sea necesario para el diagnóstico y tratamientos. Entiendo que la medicina no es una ciencia exacta y que no se me han garantizado estos tratamientos médicos o quirúrgicos. También se que este hospital da instrucción médica y todos los médicos residentes están bajo la supervisión de un doctor.

El centro médico promueve su misión educativa y tiene filiales con varias instituciones educacionales. Entre otras disciplinas que se imparten están las de enfermería, anestesia, medicina, internistas, residentes y personal profesional especificado. La intención de esta asociación es la de permitir a los estudiantes la oportunidad de la experiencia clínica. Además se que miembros del personal de Valley Baptist Medical and Dental puede emplear personal profesional especifico que ha sido certificado para participar en la atención al paciente.

**CONTRATANTES INDEPENDIENTES**

Entiendo que los médicos practicando en el hospital, incluyendo a los médicos de la sala de urgencias, radiólogos, patólogos, anestesistas y otros son contratados independientemente y NO SON agentes o empleados sirviendo en el hospital, también sé que el hospital no admite o controla los cuidados o servicios médicos que da cualquiera de los doctores. Tengo conocimiento de que se me cobrará independientemente por los servicios específicos de los doctores.

**EXPOSICIÓN DE EMPLEADOS A LA SANGRE Y FLUIDOS DEL CUERPO**

Se si un empleado o doctor se expone a fluídos o sangre del cuerpo del paciente, se obtendrá muestra de sangre para investigar sobre el HIV(SIDA) y hepatitis B, así como también sé que si un paciente es sometido a operación o procedimientos invasivo, se obtendrá muestra del SIDA por órdenes médicas. Me aseguraron que se me avisará de la prueba, que todo es confidencial y que no se dará informacion sin mi autorización.

**DESCARGO DE RESPONSABILIDAD POR VALORES**

Entiendo que VBMC no se hace responsable por efectos personales, como bolsas de mano, dentaduras, puentes removibles, paladares parciales, lentes, propiedades, medicamentos, ni de valores como anillos, relojes, joyería, dinero etc. a menos que se hayan guardado en la caja fuerte de VBMC y haya obtenido su recibo. Propiedades que se hayan registrado en la caja fuerte no serán entregadas sin su respectivo recibo.

---

I have read, understand and agree to all of the above information.
*He leído, entendido y estoy de acuerdo con todo en la información.*

Date / *Fecha*     9/ 18/ ω

SS

Signature of patient or legal representative
*rma del paciente o representante legal)*

Witness, as applicable *(Testigo(a), si es necesita.)*

3

PRINT FULL NAME, ADDRESS & PHONE NUMBER *(Nombre, dirección y teléfono (con letra de molde)*     VBMC 1600-098-052k

GONZALEZ  Gustavo

9545 EG 192

00 245469          503-1

# VALLEY BAPTIST MEDICAL CENTER
### Harlingen, Texas          000005

## CONDITIONS TO ADMISSION II

**ASSIGNMENT OF BENEFITS / INSURANCE REQUIREMENTS**

In consideration of services rendered or to be rendered, I hereby irrevocably assign and transfer to VBMC all right, title and interest in all benefits/monies payable for services/supplies rendered, including but not limited to group medical/ indemnity/ self-insured/ERISA benefits/coverage UIM/UM/PIP , auto/home-owner insurance, benefits, payable for services/ supplies rendered, and in all causes of action against any party or entity that may be responsible for payment of benefits/monies. I fully understand that in the event VBMC files a claim on my behalf that the same does not impose any contractual obligation or otherwise upon VBMC and that I remain fully responsible for instituting suit within the applicable statute of limitations regardless of the assignment of causes of action. I authorize VBMC to appeal any denial under my appeal rights provision. It is hereby agreed and understood that any condition precedent, subsequent or otherwise, including, but not limited to, pre-certification, pre-authorization, or second opinions shall remain the sole responsibility of patient and/or the patient's family, legal guardian, representative or agent. I understand that failure to pre-certify could result in reduced payments from patient's insurance company, leaving the undersigned financially responsible for the non-reimbursed portion of patient's bill. It is agreed and understood that the obtaining of verification of benefits and/or pre-certification does not in any form or fashion relieve patient or patient's family, other individual or entity signing on behalf of patient of any liability for the financial responsibility for goods and services provided or to be provided to patient VBMC and any physician.

I hereby authorize Valley Baptist Medical Center to appeal on my behalf any of my claim(s) with Wal-Mart, if applicable, Blue Cross and Blue Shield, if applicable, Humana, if applicable, and/or any payor which denies and/or delays payment of my claim(s). I, further, authorize that the payors listed herein and any other payors release any and all information requested and/or related to my claim(s) to Valley Baptist Medical Center. This authorization is irrevocable upon execution by me hereinbelow and any appeal brought by VBMC shall be as if it was brought by me personally. I fully understand and agree that hospital shall be entitled to full payment where a third-party accident is involved notwithstanding any benefits payable by a managed care payor on my behalf as third-party bears primary responsibility.

**FINANCIAL RESPONSIBILITY**

In consideration of services rendered or to be rendered to patient, the undersigned, whether he/she is the patient, patient's

relative, patient's legal guardian, representative, agent, other individual or entity, hereby obligates himself/herself individually, to the hospital, physicians, surgeons, radiologists, pathologists, anesthesiologists and consultants involved in patient's care and agrees to pay for any and all charges and expenses incurred or to be incurred. It is agreed and understood that regardless of any and all assigned benefits, I, as the designated responsible party, am responsible for the total charges for services rendered, and I agree that all amounts are due upon request and are payable to VBMC, Harlingen, Texas, and the appropriate physicians, surgeons, radiologists, pathologists, anesthesiologists and consultants involved in the patient's care and agrees to pay for any and all charges and expenses incurred or to be incurred. It is agreed and understood that should this account become delinquent and it becomes necessary for the account to be referred to an attorney or collection agency for collection or suit, I , as the designated responsible party or entity, shall pay all patient charges, reasonable attorney's fees and collection expenses. I agree that if this account results in a credit balance, the credit amount will be applied to any outstanding accounts, either current or bad debt. I agree to pay any additional patient portion of the bill.

**ASSIGNMENT OF CAUSE OF ACTION AND BENEFITS**

I, the undersigned, for good and valuable consideration receipt of which is hereby acknowledged, assign and transfer, irrevocably, to Valley Baptist Medical Center, any and all claims, demands, suits, remedies, guarantees, liens and/or causes of action, at law or in equity, either in contract or in tort, statutory or otherwise, as well as any other claim, in whole or in part, which I may now have or may hereafter hold or possess, known or unknown, on account of, growing out of, relating to or concerning, whether directly or indirectly, proximately or remotely, any acts, omissions, events, transactions or occurrences that have occurred or failed to occur, which resulted in my injuries for which Valley Baptist Medical Center has provided and/or will provide medical goods and services to me. This Assignment of Cause of Action and Benefits shall be effective against any and all parties or entities that may bear or appear to bear liability for my injuries, including but not limited to, my employer, its direct and indirect subsidiaries, all of its officers, directors, agents, servants, successors, assigns and employees.

I assign and transfer to Valley Baptist Medical Center, any and all rights (including appeal rights), title and interest in any and all benefits, monies or other form of compensation paid or to be paid on my behalf as a result of this injury/illness. I understand and agree that this Assignment does not relieve me of my liability or responsibility for any and all charges incurred as a result of medical goods and services provided to me by Valley Baptist Medical Center.

I have read, understand and agree to all of the above information.
*He leído, entendido y estoy de acuerdo con todo en la información.*)

_____
Signature of patient or legal representative
(*Firma del paciente o representante legal*)

Date/Fecha _____ 5/15/03 _____

_____
Witness, as applicable (*Testigo(a), si es necesario*)

**4**

PRINT FULL NAME, ADDRESS & PHONE NUMBER (*Nombre, dirección y teléfono (con letra de molde)*)                    VBMC 1600-099-0999

## VALLEY BAr ... r MEDICAL CENTER
Harlingen, Texas    000007

### RELEASE OF INFORMATION / MEDICAL RECORDS
### Liberación De Información De Expedientes Médicos

I hereby consent and authorize VBMC and any practitioner providing medical goods and services to patient to release information contained in any financial records and/or medical records, including diagnosis and treatment at VBMC or by any practitioner providing medical goods and services to patient, including, but not limited to, information concerning communicable diseases such as Human Immuno-deficiency Virus (HIV), and Acquired Immune Deficiency Syndrome (AIDS), drug/alcohol abuse, psychiatric diagnosis and treatment records and/or laboratory tests results, medical history, treatment progress, and/or any other such related information to: (1)  insurance company, self-funded or health plan, its agents, representatives, attorneys or independent contractors. (2) Medicare; (3) Medicaid; (4) any other person or entity that may be responsible for paying or processing for payment any portion of my hospital bill; (5) to any person or entity affiliated with or representing VBMC and any practitioner providing medical goods and services to patient for the purpose of administration, billing, and quality and risk management; or (6) to any other hospital, nursing home, or other healthcare institution or organization (e.g., home health, hospice) to which I am transferred; or (7) physicians, regulatory agencies, accrediting organizations, manufacturer representatives, or other health care providers related to my care. This consent and authorization applies to medical and/or financial records created in the course of and relating to this hospitalization. I understand that this information may be required to be released in order to obtain payment for my medical expenses incurred for treatment at VBMC and by any practitioner providing medical goods and services to patient. The consent to release medical information is subject to revocation at any time, except to the extent that action has been taken.

Por este conducto, doy mi consentimiento y autorizo al VBMC y a cualquier practicante que esté dando los servicios y artículos médicos al paciente para que libere la información de los expedientes médicos o financieros, incluyendo el diagnóstico y tratamiento en el VBMC o a cualquier practican te que provea artículos médicos y servicios al paciente, incluyendo pero que no se limita a la información concerniente con enfermedades contagiosas como (HIV) virus de inmunodeficiencia humana o del (SIDA) síndrome de inmunodeficiencia adquirida, abuso de drogas, o del alcohol, expedientes de diagnósticos, tratamientos psiquiátricos o resultados de laboratorio, historial medico, progreso de los tratamientos y/o cualquier infor-mación relacionada con (1) compañía aseguradora, pago independiente o de plan de gastos médicos, sus agentes, representantes, abogados o contratantes independientes; (2) Medicare, (3) Medicaid, (4) cualquier otra persona o entidad que pudiera tener la responsabilidad de pagar o de procesar pagos o porciones de mi pago al hospital; (5) a cualquier persona entidad afiliada con o representación de VBMC y a cualquier doctor que provea artículos o servicios médicos al paciente con el propósito de administración, cobros y manejo de calidad y riesgos o (6) cualquier otro hospital, centro de atención médica o otra institución de la salud a la cual se me transfiera o (7) médicos, agencias gobernantes, organizaciones acreditadas, representantes del fabricante u otros proveedores que se relacionan con mi atención médica. Este consentimiento y autorización es para expedientes médicos o financieros que se relacionan y que se originaron a raíz de la hospitalización. Entiendo que se tiene que dar esta información para que se pueda obtener el pago por los gastos médicos en que incurrí durante el tratamiento en el VBMC y con los doctores que proveyeron los artículos y servicios médicos al paciente. El consentimiento para liberar información médica está sujeta a revocación en cualquier momento, excepto cuando la acción ya ha tomado su curso.

---

I have read, understand and agree to all of the above information.
*He leído, entendido y estoy de acuerdo con todo en la información.*

Date / Fecha _____

_____
Signature of patient or legal representative
*Firma del paciente o representante legal)*

_____
Witness, as applicable *(Testigo(a), si es necesita.)*

PRINT  FULL NAME, ADDRESS & PHONE NUMBER *(Nombre, dirección y teléfono (con letra de molde)*    VBMC 1600-123-1099

Harl___y    _mmunity Emergency Care Foundation, Inc.    Page 1 of 3
P. O. Box 533668
1705 Vermont
Harlingen, TX  78553-3668

Incident#: 000004

**000008**

| | | | |
|---|---|---|---|
| Dispatch: 244717 | Location: WHITE RANCH RD | Disposition: TRANSPORT | Rcvd: 20:20 |
| Report#: 1 of 1 | City: LA FERIA | Destination: VALLEY BAPTIST HOSPITAL | Disp: 20:20 |
| Date: SEP-17-2000 | LocType: OTHER | Reason: PATIENT REQUEST | Enrt: 20:22 |
| Station: STATION 3 | RespMode: 3-LIGHTS, SIREN | TxptMode: 1-NO LIGHTS, NO SIREN | AtScn: 20:35 |
| Zone: ZONE 3 | CngdTo: | CngdTo: | |
| Shift: A SHIFT 24 HOUR | | | |
| Unit Type: GROUND AMBULANC | | | |
| Unit: 705 | RespWith: NO FIRST RESPONDER | Call Type: NORMAL | AtPt: : |
| Crew: ESCAREÑO, ROBER | AssistBy: CAMERON COUNTY SO | RespMileage: 133.3 – 119.6 = 13.7 | Txptd: 21:51 |
| | Assist#2: LAFERIA PD | | |
| | Assist#3: LAFERIA PD | | |
| Crew: GALVAN, JUAN | Nature: OTHER | TxptMileage: 142.9 – 133.3 = 9.6 | AtDest: 22:08 |
| Crew: | RespDlayBy: NO DELAYS | TxptDlayBy: NO DELAYS | Clrd: 22:34 |
| FromZone: ZONE 1 | ToZone: CAMERON, COUNTY | CarryToZone: HARLINGEN, CITY OF | Base: : |
| TxptAgcy: | TxptType: | TxptUnit: | TxptAr: : |
| | | | TxptDe: : |

---

**PATIENT INFORMATION**

Name: GONZALEZ, GUSTAVO
Address:
ALAMO, TX 78516
Phone: 956-782-0296

SSN: 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
DOB: DEC-30-1972 – 27 Y/O

NK Name:
Address:

Physician: MASON, EDWARD R.
Escorted: PD OFFICER
Effects: CLOTHES

Mailing:
ALAMO, TX 78516
Phone: 956-782-0296

Sex: MALE
Race: HISP- NON W
Weight: 220 lbs

Relation: SAME
Phone:

Drv License: 100000000000

*Trauma*

*Triage — Intubated*

*Went to UC*

*Should Be acute*

---

**EMPLOYER INFORMATION**

Employer: NO EMPLOYER
Address:
TX
Phone: 956-

Occupation: UNEMPLOYED
Work Rel: No

---

**BILLING INFORMATION**

Bill to: SELF PAY
Guarantor: GONZALEZ, GUSTAVO
Address:
ALAMO, TX, 78516
Phone: 956-782-0296

Relation: SAME
SSN: 465169882

Phone: 956-000-0000

---

**Nature of Call:** OTHER – OTHER – LACERATION TO NECK

CC/HPI: PT DID NOT VOICE ANY COMPLAINTS. PT HAD MINOR LACERATION TO THE CHEST.
Mechanism Injury: SELF INFLICTED.
Pertinent PMH: UNKNOWN
Medications: NONE
Allergies: NONE KNOWN

**TRAUMA**

Found: AMBULATING
Position: SEMI-FOWLERS
Transport: MAIN STRETCHER

ABC: AIRWAY=PATENT; BREATHING=NORMAL, SOUNDS EQUAL; CIRCULATION=ALL PULSES PRESENT; CVS=NO
ABNORMALITIES FOUND
Head: HEAD=NORMAL CEPHALIC; EARS=NO ABNORM /CLR/BILAT.; NOSE=NO ABNOR /CLR; MOUTH=NORMAL

*00249469*

Bar___    Community Emergency Care Foundation, Inc.    Page 2 of 3
P.O. Box 533668
1705 Vermont

Incident: 000004    **Harlingen, TX  78553-3668**

000009

| | |
|---|---|
| Neck: | NECK=MINOR LACERATION TO THE NECK . MINOR BLEEDING . |
| State of Conscious: | SOC=ALERT X3 ( PERSON/PLACE/TIME) |
| Chest: | CHEST=NO ABNORMALITY/TRAUMA |
| Abdomen: | ABDOMEN=NO ABNORMALITY/TRAUMA |
| Back: | UPPER BACK=NO ABNORMALITY/TRAUMA; LOWER BACK=NO ABNORMALITY |
| Pelvis: | PELVIS=NO ABNORMALITY/TRAUMA |
| Upper Extremities: | LEFT ARM=NO ABNORMALITY; LEFT HAND=NO ABNORMALITY; RIGHT ARM=NO ABNORMALITY; RIGHT HAND=NO ABNORMALITY |
| Lower Extremities: | RIGHT FOOT=NO ABNORMALITY; LEFT FOOT=NO ABNORMALITY; LEFT LEG=NO ABNORMALITY; RIGHT LEG=NO ABNORMALITY |
| Eyes: | LEFT PUPIL=PERRL; RIGHT PUPIL=PERRL; LEFT EYE=NO ABNORMALITY; RIGHT EYE=NO ABNORMALITY |
| Central Nervous S: | CENTRAL NERVOUS SYSTEM=NORMAL |
| Blood Loss: | BLOOD LOSS=0 - 50 ML |
| Skin: | TEMPERATURE=HOT; COLOR=NORMAL; MOISTURE=DIAPHORETIC |

Comments:  PT. FOUND=N/A;  PT. OUTCOME=N/A;  GENERAL=N/A;  COMMENT=N/A

**VITAL SIGNS**

2:45  BP=140 PALP, Pulse=132 Strong Regular, Resp Rate=18, Resp Left=CLEAR, Resp Right=CLEAR, Resp Effrt=NORMAL, ECG=NONE, ECG-12 ID=NONE, Cap Refill=Normal, Skin=Normal Moist Warm, SaO2=98%, LOC/SOC=AAOX3, Glasgow-E4 V5 M6=15, Left Pupil-Size 5 Reactive with Normal Dilation, Right Pupil-Size 5 Reactive with Normal Dilation, Ability to Move Left Arm-Strong, Right Arm-Strong, Left Leg-Strong, Right Leg-Strong

R/O CAUSE:  BEHAVIORAL - ANXIETY;  TRAUMA CALL - LACERATION - LACERATION CHEST - ABOVE THE CHEST , LACERATION TO THE NECK;  BEHAVIORAL - SCHIZOPHRENIC;  BEHAVIORAL - COMBATIVENESS
NUMBER:
Completed By: ESCARENO, ROBERT

Basic Life Sup: GLOVES-2 PAIR

Time  Treatment/Course
2:46 Intervention=PULSE OXIMETER;  By=ESCARENO, ROBERT;  Per=PROTOCOL;  INITIAL=99%;  INDICATION=TRAUMA;  RESULT=99%
0:06 Intervention=REPORT DISPOSITION;  By=ESCARENO, ROBERT;  Per=PROTOCOL;  REPORT=FAXED TO ER

General Comments:
OR INITIAL RESPONSE , TO LA PERLA . PT HAD FLED THE SCENE. STATED BY PD "FIRST CONTACT WITH THE PT , PT HAD LACERATION TO THE NECK AND HAD A KNIFE ". PT HAD A MINOR MVA NEAR A CANAL , BETWEEN BASS BLV AND WHITE RANCH# RD. STATED BY POLICE . PT WAS NOT IN THE VEHICLE , APARTLY PT HAD FLED THE SCENE. UNABLE TO LOCATE THE PT AT NIGHT. LA BRAI REQUESTED , SEARCH BY AIR CARE .  UNABLE TO FIND THE PT, BY AIR CARE . BORDER PATROL REQUESTED THIER HELO , PT WAS FOUND AND WAS REMOVED FROM THE CANAL , WHERE HE WAS HIDING . PT WAS HANDCIFFED . DO TO THE SEVERITY AND THE ACTION OF THE PT , PRIOR TO OUR CONTACT , PT REMAINED IN HANDCUFFS. LA PERLA PD OFFICER WAS IN THE UNIT. PT STATED "HE DID NOT REMEMBER ANYTHING THAT HAD HAPPEN ". PT HAD MINOR LACERATION TO THE UPPER OF THE CHEST . MINOR BLEEDING TO THE LACERATION . LUNG SOUND CLEAR , RESP. NORMAL. SELF INFLICTED LACERATION . NO RX. UNABLE TO OBTAIN ADDRESS. PT DID VOICE ANY COMPLAINTS. NO CHANGES OCCURED ON TRANSPORT. ON ARRIVAL TO WMC TRANSFER OF CARE WAS GIVEN TO RECIEVING NURSE.

**CHARGES**

| Code | Description | Quantity |
|---|---|---|
| I1 | BASE-EMER SS 1PT | 1 |
| I6 | PULSE OX | 1 |

**CREW SIGNATURES**

| Crew | Crew | Crew |
|---|---|---|
| CREW NO 00148 | CREW NO 00077 | CREW NO |



8

From WESTECH EMS Mobile Unit

Harlingen C..unity Emergency Care Foundation, Inc.                    Page 3 of 3
P.O. Box 533668
1705 Vermont

.t#: 000004                          Harlingen, TX  78553-3668      000010

---

NATURES - ACCEPT

s is to certify, I GONZALEZ, GUSTAVO am accepting TREATMENT AND TRANSPORT.

---

.EASE OF INFORMATION:  Your patient record may be disclosed, in full or part, to any organization contracted with
: Harlingen Community Emergency Care Foundation, Inc. ("Foundation"), physicians, hospitals, insurance companies,
licare, Medicaid, workers' compensation carriers, or the patient's employer, in accordance with the Texas Open
ords Act.     ASSIGNMENT OF BENEFITS:  If you, or any party liable to you, have entitlement to benefits arising
: of any insurance policies, the Foundation shall receive applicable benefits and discharge the insurance company
all obligations.  You will remain liable for any balance not covered.     MEDICARE:  If you identify yourself as
edicare beneficiary and currently have Part B benefits, the Foundation, retains the option whether or not to
ept assignment.  If the Foundation accepts assignment the signature below authorizes HCFA (Medicare) to pay any
owable benefits directly to the Foundation.  You also agree to pay the Medicare allowable coinsurance,
uctible, and remaining balance not covered by Medicare.     MEDICAID:  I understand that, in the opinion of the
ndation, the services or items that I have requested to be provided to me on the above date may not be covered
er the Texas Medical Assistance Program as being reasonable and medically necessary for my care.  I understand
: the Texas Department of Human Services or its health insuring agency determines the medical necessity of the
:ces or items that I requested and receive.  I also understand that I am responsible for any payment of
:ces or items I requested and receive, if these services or items are determined not to be reasonable and
.ally necessary for my care.     FINANCIAL AGREEMENT:  In consideration of the services rendered, you hereby
.idually obligate yourself to pay the billed amount; legally assessable finance and/or service charges; and all
.t cost expenses, and reasonable attorney s fees in the collection of any amounts due.

_____            _____            _____
RE                                 WITNESS 1                          WITNESS 2

---

NATURES - RECEIVING PHYSICIAN
eptance of Pt. GONZALEZ, GUSTAVO ACCEPTING PATIENT.

nature Acknowledges Delivery of Patient

_____            _____            _____
SNATURE                            WITNESS 1                          WITNESS 2

9

2:12:04 9/18/100 Page 4 of 4

000011

10

000012

OCT 0 3 2000

11

**VALLEY BAPTIST MEDICAL CENTER**
Emergency/Outpatient Record
MEDICAL RECORDS

000013

000015

Room # _____ ☐ Acute Care ☐ Urgent Care ☐ Fast Track   Pedi Weight _____ Last Tetanus _____ Allergies NkA

Triage Time 2215   LMP _____

Chief Complaint: "neck hurt", Two small lacerations to front of neck + being in MVA, pain't © shoulder "I tryed to kill myself"

Signature _____ (If indicated O₂ Sat 76% %)

| Temp 96.5 | OD OT ORDA | Pulse 136 | Resp. 30 | BP 146/53 | Pain | EMR | URG | NON URG | TR | NON TR | SUR | MED | ORT | PED | NEU | EENT | GU/GYN | PSY | OTH |

Time Seen by MD 2242   H & P Dictated By _____ Dr _____   Requests EMD to See Pt. Time _____
EMD Consult with Dr _____ Lawler @ 2340 AM PM

O1YS

CXR - pneumothorax, hemothorax, mediastinal __, EMD/trate, Petterson Conditionally  1/6  9/18/00  0200

Diagnostic Impression: _____

@ Time _____

ER Orders / Treatment / Medication (Route/Site) / Time Done / Nurse Signature

Td 0.5 mg IM 0005

Possible Drug Allergies: _____

RETURN OR SEE YOUR PHYSICIAN IMMEDIATELY IF YOUR CONDITION WORSENS.

☐ Work / School Excuse   Referred to _____   Physician Signature _____
☐ See Now   ☐ See if needed   ☐ Make appointment   ☐ Printed Instructions Given

Received & Understood Instructions _____   Nurse Signature R Tanyol RMS/PA
ADM DX   LINK   O zone 2 neck laceration © mediastinal emphysema   MEANS OF ARRIVAL 13 MS/PA   LAST VISIT WITHIN 72 HRS

**TESTS** (right column)
☐ CBC
☐ C12
☐ ISTAT-STAT 6
☐ ESCO
☐ CHP
☐ LFP
☐ AMYL
☐ BHCG
☐ GLUC
☐ GLUS (STAT)
☐ CA
☐ PT PTT
☐ ABG
☐ DDIM
☐ DIG-DGN
☐ DILAT PTN
☐ THEO
☐ T + XXM
# of units
☐ Type & Screen - TS
☐ Blood Group-ABORH
☐ ETOH
☐ SUBP
☐ USAP
☐ UA
☐ UCUL
☐ BL CUL
x _____

**RADIOLOGY**
☐ PCXR
☐ CXR
☐ PC SPINE
☐ CT WITH
☐ CT WITHOUT
☐ C-SPINE
☐ shoulder
☐ EKG
☐ OLD CHARTS

| ACCOUNT NUMBER | CC | REGISTRATION DATE, TIME, CLERK | TYPE | SRV | ATTENDING PHYSICIAN | MR NUMBER |
|---|---|---|---|---|---|---|
| 984589192 | E | 17Sep00 22:31 MONTEMA   F  ERM | | | | 00249463 |

GONZALEZ, Gustavo .
*****NEED ADDRESS*********
ALAMO, TX 78516
(956)782-0296  (956)782-0296

EMPLOYER: UNEMPLOYED
DOB: 30Dec72
AGE: 27
SEX: M

GONZALEZ   Gustavo .
*****NEED ADDRESS*********
ALAMO   TX 78516
(956)782-0296  465169883

EMPLOYER: UNEMPLOYED
MS: S
SS#: 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

SELF PAY

| GRP POL | CONTRACT | INSURED | RELATH |
|---|---|---|---|
| | 603 | 12 | |

ADM RTE PRIVATE PHYSICIAN & SRV: 900   NON-STAFF DOCTOR, D   E/D PHYSICIAN ON DUTY _____ ROOM & BED 553   TIME TO OBS _____ DATE TIME RELEASED 0210

000014

**VALLEY BAPTIST MEDICAL CENTER.**
Harlingen, Texas

## RELEASE FOR LEAVING HOSPITAL AGAINST ADVICE

This is to certify that I am leaving Valley Baptist Medical Center at my own insistence and against the advice of my attending physician and/or hospital authorities. I have been informed of the risk(s) involved, and hereby release the attending physician, the hospital, its employees and officers from all responsibility for any ill effect which may result.

## DISCARGO POR SALIR DEL HOSPITAL EN CONTRA DE LOS CONSEJOS MEDICOS

Por lo presente, certifico que salgo del Centro Médico (VALLEY BAPTIST MEDICAL CENTER) por mi propio voluntad y en contra de los consejos del médico que me atiende y/o de los autoridades del hospital. Me han informado del riesgo (o de los riesgos) que corro y libro el médico que me atiende, el hospital, sus empleados y oficiales de toda responsabilidad por cualquier mal efecto que pudiera resultar.

_____    _____    _____
Signature of Patient or Authorized Legal Representative / Relationship    Date / Fecha    Time / Hora
*Firma del Paciente o Representante Legal Autorizado / Relación*

_____
Witness (Hospital Employee) / *Testigo (Un Empleado del Hospital)*

**13**

*000041*

VALLEY BAPTIST MEDICAL CENTER  HARLINGEN, TX.  78550  MR#  00249469

NAME:  GONZALEZ, GUSTAVO   AGE:      ROOM: ER     ACCOUNT#  984589192

EMERGENCY ROOM ASSESSMENT        DATE:                    DR:   GUERRA

<u>DATE OF BIRTH:</u>

<u>TIME SEEN BY EMERGENCY ROOM PHYSICIAN:</u>

**HISTORY:**  (SUBJECTIVE)
   **CHIEF COMPLAINT:**  Neck hurts.
   **HISTORY OF PRESENT ILLNESS:**  The patient is a 27-year-old male
   who was brought in to the emergency department by the LaFeria
   Police Department after being apprehended. The patient apparently
   was stopped by the police after a relative reported he was in a
   rage and said he was going to kill someone. The patient was
   stopped by the police department, threatened to kill himself by
   putting a knife to his throat. He got back in a vehicle, wrecked
   his vehicle, had a physical altercation with the police officer.
   He was finally apprehended and was brought in to the emergency
   department for further evaluation for two small stab wounds to
   the anterior neck. The patient is also complaining of left
   shoulder discomfort. He denies any chest pain or shortness of
   breath. The patient is not very cooperative with the examiner and
   actually refuses treatment at first and says he does want to be
   treated, refuses treatment again and then does ask for treatment.
   He denies any alcohol or drug use. He is unsure as to his last
   tetanus immunization.
   **REVIEW OF SYSTEMS:**   Otherwise unobtainable secondary to the
   patient being very belligerent.
   **REMAINING REVIEW OF SYSTEMS NEGATIVE.**
   **PAST HISTORY:**
   **MEDICAL:**  None as per the patient.
   **SURGERY:**  Left knee surgery.
   **MEDICATIONS:**  Tylenol.
   **ALLERGIES:**  None.

<u>PHYSICAL EXAMINATION:</u>
   **GENERAL APPEARANCE:**   Male in no acute distress, nontoxic
   appearing.
   **VITAL SIGNS:**  Blood pressure 166/82, pulse 126, respirations 20,
   temperature 96.8.
   **HEENT:**  Normocephalic, atraumatic. Pupils are equal, round and
   reactive to light. Tympanic membranes are clear. Nares are clear.
   Oropharynx is clear.
   **NECK:**  Supple. No lymphadenopathy. No jugular venous distention.
   No swelling. He does have two small puncture wounds, one in the
   midline on the neck approximately two inches above the top of the
   sternum. When a Q-Tip is placed in that wound, it goes down about
   1/2 inch. There is no obvious hematoma or swelling or active
   bleeding from this wound. The other stab wound is approximately
   0.5 cm in length somewhat off center to the right side, just
   above the clavicle. Also it is about 1/2 inch deep when a Q-Tip
   is placed in the wound. There is no hematoma surrounding this. No

**14**

000014.2

VALLEY BAPTIST MEDICAL CENTER   HARLINGEN, TX.   78550   MR#   00249469

NAME:   GONZALEZ, GUSTAVO    AGE:     ROOM: ER    ACCOUNT#   984589192

EMERGENCY ROOM ASSESSMENT        DATE:              DR:   GUERRA

PAGE 2

active bleeding. No other abnormality.
**CHEST:** The chest is clear to auscultation bilaterally.
**HEART:** Regular rate and rhythm. No murmur, rub or gallop.
**ABDOMEN:** Soft, nontender, nondistended. Normal bowel sounds.
**EXTREMITIES:** The patient has multiple abrasions to his
extremities from the altercation with the police department but
he has no obvious deformities. He has some discomfort on
palpation of the right and left shoulder. Pulses are 2+ equal and
adequate.
**NEUROLOGIC:** The patient is alert. He seems somewhat confused but
also seems very manipulative and does not cooperate much with
verbal questioning. He moves all extremities well.

**MEDICAL DECISION:**

**COURSE IN EMERGENCY DEPARTMENT:** The patient was given DT 0.5 cc
IM times one. He was given Ancef 2 gm IV. We notified Dr. Lawler
when I noticed the depth of the wounds in his neck, at 2340. Dr.
Lawler went ahead and called in admission orders for short term
observation on this patient. We did cervical spine x-rays which
revealed some prevertebral air. At that time I went ahead and
ordered a CT scan of the patient's neck which showed extensive
cervical and mediastinal emphysema. There was no hematoma seen.
There was some focal thickening of the right lateral wall of the
trachea several centimeters below the larynx and questionable
focal laceration. CBC showed a white count of 18.4, normal
hemoglobin and hematocrit, normal differential. Chem-7 was within
normal limits. Alcohol level was 0. Type and screen was done. The
patient was 0 positive. Chest x-ray is pending at this time. I
did re-notify Dr. Lawler at 0145 of the results of the CT scan of
the neck. X-rays of the left shoulder revealed no fracture,
dislocation or other abnormality. The remainder of the cervical
spine did not reveal any fracture, subluxation or other
abnormality. The patient remained stable in the emergency
department. IV line was established and he was transferred to the
floor in stable condition.

**DIAGNOSTIC IMPRESSION:**

1. Two neck lacerations.
2. Mediastinal emphysema.

HG/efd19
00/09/18/09/18
J0K00139.ED                      HECTOR GUERRA, M.D.

15

000043

MAY 3 0 2001

16

000015

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550    MR#:  00249469

NAME: GONZALEZ, GUSATVO    AGE:        ROOM:       ACCOUNT#:  984589192

ADMITTED:  9/18/00    DISCHARGED:          DR: LAWLER    FORM:  H&P

**HISTORY OF PRESENT ILLNESS:**  The patient is a 27-year-old man who allegedly was in a motor vehicle accident, attempted to stab the arresting officers in the Laferia area, and then turned the knife on himself where he had a puncture wound low anterior cervical area attempting supposedly to kill himself.  He has been withdrawn and belligerent, noncooperative since admission to the hospital, refused permission for CT scan of the neck which showed some subcutaneous and apparently prevertebral emphysema.  The films will be reviewed soon as available.  The remaining history is very difficult to elicit from the patient who is withdrawn, stares blankly, closes his eyes during questioning, but definitely hears every word spoken and begin to get responses at the conclusion of my preliminary evaluation and examination.

**PAST HISTORY:**
    **MEDICAL:**  Apparently no allergies.
    **SURGICAL:**  Apparently he was operated on the left knee in Knapp Hospital 5 to 10 years ago for gunshot wound, details unavailable from the patient.
    **ALLERGIES:**  He says he has had no other serious allergies.
    **HABITS:**  Will not respond.

**REVIEW OF SYSTEMS:**  Unavailable.

**SOCIAL HISTORY:**  Form of work:  will not respond.  Has given several addresses.

**PHYSICAL EXAMINATION:**

    **GENERAL:**  He is a normal appearing man of stated age who is withdrawn, has a well-trimmed short beard, normocephalic.

    **HEENT:**  Pupils were equal, round and reactive to light.  Ears, nose, teeth, throat, tongue negative.

    **NECK:**  There is a small, looks like less than a centimeter transverse laceration or stab wound in the anterior neck just at the level of the suprasternal notch.  There is no hematoma, no bruit, no masses.  There is no crepitus.  There is no emphysema palpable.

    **LUNGS:**  Chest is symmetrical with good expansion.  Lungs clear without wheezing.

    **HEART:**  Regular rate and rhythm.

**17**

000016

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550   MR#:   00249469

NAME: GONZALEZ, GUSATVO   AGE:      ROOM:      ACCOUNT#:   984589192

ADMITTED:   9/18/00   DISCHARGED:            DR: LAWLER      FORM:   H&P

PAGE 2

    **ABDOMEN:** Soft, nontender.

    **EXTREMITIES:** No edema or tenderness, varicosities. Pules full and equal bilaterally.

    **NEUROLOGIC:** Not completed, other than noted that he moves all four extremities and seems to have normal feeling. His mental status is as described before, withdrawn and very poorly responsive, a bit of a blank stare, occasionally almost closing his eyes during questioning. Slow in all responses. Overheard my conversation with the guarding policeman and responded appropriately and promptly to that.

**ADMISSION DIAGNOSIS:**
1. Stab wound of neck.
2. Possible substance abuse.
3. Psychiatric disorder, undetermined.

**PLAN:** Psychiatric consultation has been requested. Continue NPO status. Repeat cervical x-ray. Repeat examination for possibility of cervical exploration, however, at the present time it would appear that this is not going to be a significant problem.

MRL/efd41
00/09/18/09/18
J0K00186.HP            MARION R. LAWLER, JR., M.D.

18

000017

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550    MR#:  00249469

NAME: GONZALEZ, GUSTAVO    AGE:      ROOM:503    ACCOUNT#:984589192

ADMITTED:          DISCHARGED:          DR: T GONZALEZ  FORM:  CN

## PSYCHIATRIC CONSULTATION

DATE OF CONSULTATION: 09/18/00

REFERRING PHYSICIAN: MARION R. LAWLER, M.D.

CONSULTING PHYSICIAN:  TOMAS A. GONZALEZ, M.D.

REASON FOR CONSULTATION: Self-inflicted stab wound to the neck.

CHIEF COMPLAINT:  "You're curious aren't you."

HISTORY OF PRESENT ILLNESS: This is a 27-year-old, English-speaking, Hispanic man, whose left arm is currently handcuffed to the bedrail with the police officer from LaFeria Police Department at his bedside.  The patient is not showing any aggressiveness or agitation at this time, however, when I speak with him he is extremely guarded and scans the room as if fearful that someone is going to harm him. During two one-to-one conversations with the patient, he is very withdrawn during most of the assessment and yet, at other times is inappropriate in his expression on his face as if responding to something that I do not see or hear.  The patient is difficult to get history from.  He is extremely internally preoccupied and at times scattered in his discussion. His flow of speech goes, "yeah, I had a car accident, I was hungry, exercised that day, can you read my mind." The patient consistently scans the room and asks me questions that are not related to the topic of the conversation.  For example, if I would give him "a million dollars or a billion dollars, or even a trillion dollars" if he tells me the story.   In another disorganized way, the patient says, "you're getting fatter and fatter," and when I ask him what he means, he says, he "knows all of the secrets of the universe."  The patient says that I can read his mind and he does not want to bother saying anything out loud, and when I question him about how he knows, he says, "those voices that are everywhere that other people do not hear", tell him that I can read his mind.  The patient says that he has been like this with "a change in my personalities ever since I went like this," and he rubs his hands as if to show me that when he rubs them his thoughts become disorganized.  The patient says he is not sleeping at all and he admitted to feeling very sad.

PAST PSYCHIATRIC HISTORY:  The patient says that he has been on lithium and Prozac in the past and in a very disjointed way, the patient admits that he has been at MHMR in the past and he was there for three months in 1994.  The patient in a guarded way, as if to have trouble formulating the words, cannot tell me who his doctor was, and

19

000018

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550    MR#:  00249469

NAME: GONZALEZ, GUSTAVO    AGE:    ROOM:503    ACCOUNT#:984589192

ADMITTED:    DISCHARGED:    DR: T GONZALEZ    FORM:  CN

**PAGE 2**

after that he was unable to participate with any more questioning.

I telephoned David Moron, M.D., Medical Director, at Tropical Texas for MHMR at (956)423-8094 and requested clinical information on this patient. Dr. Moron stated he looked in their files under the patient's name, birth date, and social security number, that I provided him, and Dr. Moron informed me they had no record of this patient.

**PAST HISTORY:**
    **MEDICAL:** The patient cut his throat with a knife prior to arriving to the hospital.    The patient has been guarded, withdrawn, and very difficult to interview. Thus, we do not specifically know whether he has diabetes, high blood pressure, cancer, kidney disease, seizures, or head trauma.  Workup thus far, has shown normal results on most parameters.  A CT of the head has not yet been done.

**FAMILY PSYCHIATRIC HISTORY:** The patient is very guarded and does not want to answer many questions as if fearful and internally preoccupied.  We do not have that history.

**SOCIAL HISTORY:** The patient will not give me any information.  He is disorganized and evasive.  He wants food or money in order to get that information. I reminded him he is not to eat anything as he is scheduled for surgery later today.

**MEDICATIONS:** At this time the patient is on Ancef and gentamicin.

**DRUG ALLERGIES:** He has no known drug allergies.

**MENTAL STATUS EXAMINATION:**

    **APPEARANCE, BEHAVIOR, AND LEVEL OF CONSCIOUSNESS:** This is a healthy-appearing, Hispanic man, with a goatee, with an obvious growth of beard for about two or three days, unshaven. His hair is moderate length, dark, and thick.  He does not want to answer many questions.  He looks at me as if he is fearful of me.  He scans the room.  Every time someone in the room moves or makes a gesture he looks at them with wide-open eyes as if to make sure that they are not going to harm him.  His left arm is handcuffed to the bed and seems to forget that he is handcuffed.  It does not bother him.  He does not make any effort to leave.  He is not agitated, aggressive or hostile, however, during some of the assessment he smiles inappropriately as if responding to

**20**

000019

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550    MR#:    00249469

NAME: GONZALEZ, GUSTAVO    AGE:    ROOM:503 ACCOUNT#:    984589192

ADMITTED:    DISCHARGED:    DR: T GONZALEZ    FORM:    CN

---

PAGE 3

something I do not see or hear.

**SPEECH:** His speech is mumbled English, irrelevant to the topic at times.

**AFFECT:** Inappropriate to the topic at times and mostly flat.

**MOOD:** Fearful and paranoid.

**THOUGHT PROCESS:** Shows disorganized, disjointed speech, which reflects disjointed, disorganized thoughts. He is internally stimulated and preoccupied.

**THOUGHT CONTENT:** The patient admits to auditory hallucinations "everywhere." The patient is very guarded and does not give a lot of other information. It is obvious that he is internally preoccupied. He does admit that he wants to hurt himself, and unprovoked and oddly blurts out "can I cut my throat?" during an unrelated topic in the conversation.

**ORIENTATION:** The patient knows person, place, and date. He will not comment on the situation.

**MEMORY:** Not formally testable.

**COGNITION:** Scattered, however not formally testable. The patient is guarded and evasive.

**INSIGHT:** Poor.

**JUDGEMENT:** Poor.

**FORMULATION:** This is a 27-year-old, English-speaking, Hispanic man, who arrived to the Valley Baptist Medical Center under police custody after cutting his neck. Reportedly, the patient cut his neck after confronted by police. Reportedly, the patient had blood on his clothing, prior to cutting his neck, when they arrested him. At this time, the patient is very guarded, paranoid, fearful, internally stimulated, confused in his thoughts, and says that he wants to hurt himself. The patient has irrelevant sentences to the conversation and is not able to give me a lot of the history either because he is guarded and paranoid that I will harm him, or he cannot formulate the sentences to describe that. The patient shows no current substances of abuse on screening, and we do not know of any medical problems that may be causing this condition at this time. Nevertheless, this patient does show evidence of a psychotic process as evidenced mostly

21

000020

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550    MR#:    00249469

NAME: GONZALEZ, GUSTAVO    AGE:    ROOM:503    ACCOUNT#: 984589192

ADMITTED:    DISCHARGED:    DR: T GONZALEZ    FORM:    CN

## PAGE 4

by auditory hallucinations, ideas of reference, paranoia, inappropriate affect, scanning the room constantly, and disjointed thoughts.

I spoke to La Feria Police Chief Gonzalez over the telephone and he informed me the patient was arraigned earlier today on two attempted murder charges. Chief Gonzalez also informed me the patient was the primary suspect on a murder of a body found earlier today. Chief Gonzalez stated police detectives were coming to see the patient regarding this murder. I informed Chief Gonzalez the patient is scheduled for surgery today and he stated he would get the police detectives to VBMC as soon as possible.

DIAGNOSIS:
AXIS I:      1. Psychosis, not otherwise specified.
             2. Rule out bipolar disorder, mixed episode with
                psychosis.
             3. Rule out schizophrenia, paranoid type.
             4. Rule out psychotic disorder, secondary to a medical
                problem.
AXIS II:     No diagnosis made.
AXIS III:    Status post self-inflicted laceration to the neck.
AXIS IV:     Current stressors for this patient are severe as he is
             under police custody and he has pending legal troubles.
AXIS V:      30, current global assessment of functioning as the
             patient is grossly psychotic.

RECOMMENDATIONS:
1. We will check labs, RPR, TSH, and HIV to continue with the
   assessment.
2. We will get a CT of the head to rule out any recent trauma.
3. We will hold psychotropic medications until after this patient
   concludes his surgical procedures and until his arraignments for
   his charges are completed, or until September 19, 2000, whichever
   is first.  I am concerned that if we give this patient
   psychotropic medication today he will fall asleep and he will not
   be able to participate in his legal procedures. Also, the patient
   is scheduled for surgery later today and I do not want the
   patient's necessary anesthesia to conflict with the psychotropic
   medications.

22

000021

VALLEY BAPTIST MEDICAL CENTER HARLINGEN, TX. 78550    MR#:  00249469

NAME: GONZALEZ, GUSTAVO    AGE:    ROOM:503    ACCOUNT#:984589192

ADMITTED:    DISCHARGED:    DR: T GONZALEZ    FORM:  CN

**PAGE 5**

4.  This patient is under strict police hold and custody.  The
    patient will require continued psychiatric treatment whether that
    be here with police custody on site, or at a mental hospital, yet
    to be determined. However, it is preferred that this patient be
    transferred to a psychiatric institution for inpatient treatment
    as soon as possible.

TAG/efd76
00/09/18/09/18
J0K00671.CN

                    TOMAS A. GONZALEZ, M.D.

cc:  Marion R. Lawler, M.D.

23

VALLEY B. _____ MEDICAL C_NTER
Harlingen, Texas

000022

PHYSICIAN'S PROGRESS NOTES

| Date | Time | |
|------|------|---|
| 9/18 | | 27 y.o. 5' Hr. onto clean, fell B → attempted to sht. police — SW to neck x 2, self-inflicted — current employer |
| 9/18/00 | 415 PM | Psychiatry – Dictated |

27 y.o. Hispanic English speaking man. Brought to VBMC ER after cutting his neck. Pt cut his neck after attempting to harm police (2X) after a traffic stop. Patient was reportedly noted to have blood on his clothing at the time of the traffic stop, before cutting his neck.

Pt assessed in ER and found to have NO alcohol, and NO other substances of abuse in his system.

MSE On one to one discussion with patient. He is handcuffed to the bed. He moves very little and seems to forget that he is handcuffed. His speech is slow mumbled English and he mumbles and whispers at stimuli I do not see or hear. He is internally stimulated and smiles and scowls for reasons not apparent to me and not appropriate to the conversation. His affect is flat at times and inappropriate to the topic at others. He admits to hearing voices "everywhere"

(more →) Tomás _____ Gonzales

VBMC 1610-010 '92

24

GONZALEZ, GUSTAVO
EMERGENCY DEPARTMENT
984580192
M S 11/30/72

**VALLEY BAPTIST MEDICAL CENTER**
Harlingen, Texas

000023

**PHYSICIAN'S PROGRESS NOTES**

| Date | Time | |
|------|------|---|
| 9/18/00 | | (continued from other side) |

Psychiatry
and states I can read his mind.
Pt is guarded, paranoid and fearful
as evidenced by scanning the room
constantly, jerking his head at anyone's
movement c̄ wide eyes as if to fear
for himself. Pt did know person, place,
Sent 2000, he was guarded when I
asked his situation. At one instance
he blurted out "can I just cut my
throat?"
      Impression: Pt is psychotic as
evidenced by paranoia, ideas of reference,
auditory hallucinations, internal stimula-
tions etc... see dictation for diagnoses.
      Rec: Pt going to surgery today
this will hold on psychotropics today &
until p̄ surgery. Also, some legal
proceedings are still pending and I
am fearful of sedating the patient c̄
psychotropics. Pt under strict police
surveillance - they are at his bedside,
and they assure me they will not
allow him to hurt himself or
anyone else.
                        Tomas Gonzalez MD

25

000024

9/18/00 ✓                    GONZALEZ, GUSTAVO                   503-01
                             984589192

Psychiatric examination confirms diagnosis of psychosis with
paranoia, etc.  The patient actually responds fairly normal
and appropriately to me this afternoon.  His voice is
absolutely normal and strong.  He has no crepitous palpable in
the neck.  He moves his neck from side to side without any
apparent pain or soreness.  There is no hematoma, no
pulsation, no bleeding. He is swallowing his saliva without
difficulty. I think he is going to really get by without any
significant injury or requirement for cervical drainage
expiration, etc.  Will re-evaluate tomorrow and anticipate
initiating clear liquids at that time.    Note is also made:
He was previously taking Prozac and Lithium.  Perhaps we
should find out who his treated physician was and check a
Lithium level.   The cervical follow-up films this afternoon
show similar anterior and retropharyngeal PVT and emphysema of
a very small amount.  No increase.


                    MARION R. LAWLER, JR., M.D.

MRL:gf
00/09/18//09/19
j0kp3647.pn

26

000025

27

**VALLEY BAPTIST MEDICAL CENTER**
Harlingen, Texas    000026

**PARAPROFESSIONAL PROGRESS NOTES**

| CODE | DATE | TIME | |
|------|------|------|---|
| | 9-19-00 | 1018 | Received the body of Gonzalez Gustavo # 984589192 (CA-00-173) from rm. 503 5th S.T. Transported the body to the morgue with an order for autopsy as per J.P. Wise. As per Carolyn Shwartz R.N. House Supervisor, Tina Briones Patients Relations has the medical chart of Gonzalez Gustavo at this time. —James Martinez 9-19-00  1018 |
| | 9-19-00 | 1954 | Released the body of Gonzalez Gustavo # 984589192 (CA-00-173) to Guerra F.E. Adan Barrera Lic #9910 Exp. date 11-30-01. No Valuables or belongings on body.  Security |

**CODE DESCRIPTION**

| | | | | | | |
|---|---|---|---|---|---|---|
| D/C | Discharge Planning | HH | Home Health | SCT | Security Officer | |
| DE | Diabetes Education | HOS | Hospice | SS | Social Service | |
| DT | Diet Therapy/Education | KL | Kleberg Radiation Dept. | | _____ | |
| EEG | Electroencephalography | MAR | Morgue Personnel | | _____ | |
| EKG | Electrocardiography | NM | Nuclear Medicine | | _____ | |
| ET | Enterostomal Therapy | S/LP | Speech/Language Pathology | | | |

VBMC 1610-031-0392

28

**VALLEY BAPTIST MEDICAL CENTER**
Harlingen, Texas    000027
**PARAPROFESSIONAL PROGRESS NOTES**

| CODE | DATE | TIME | |
|------|------|------|---|
| | | | |

**CODE DESCRIPTION**

| | | | | | |
|---|---|---|---|---|---|
| D/C | Discharge Planning | HH | Home Health | SCT | Security Officer |
| DE | Diabetes Education | HOS | Hospice | SS | Social Service |
| DT | Diet Therapy/Education | KL | Kleberg Radiation Dept. | | |
| EEG | Electroencephalography | MAR | Morgue Personnel | | |
| EKG | Electrocardiography | NM | Nuclear Medicine | | |
| ET | Enterostomal Therapy | S/LP | Speech/Language Pathology | | |

29

VBMC 1610-031-0392

PHYSICIAN'S ORDERS

CHECK ORDER
AS
PROCESSED

1. STAMP PATIENT NAME IN ALL THREE
   SPACES BEFORE PUTTING IN CHART
2. SEE THAT ORDERS ARE APPROVED AND SENT
   TO PHARMACY ASAP

000022

## VALLEY BAPTIST MEDICAL CENTER
### HARLINGEN, TEXAS

ORDERS AND DIRECTIONS

PATIENT IDENTIFICATION

DRUG ALLERGIES    NONE [  ]  1.  NKA.  2.

DATE 9/17/00   TIME 2345    ☐ OUTPATIENT  ☐ OSS  ☐ ADMIT SHORT TERM OBSERVATION   ☐ INPATIENT  ☐ A.M. ADMIT   ☐ VERBAL ORDER  ☐ PHONE ORDER

Admit to Medical Floor (STC) ✓
ISI
Diagnosis: Stab Wound
NPO                    #14
CBC in A.M.            #15.
Ancef 2g IV/now → 0000 in ER
Psych consult in AM #16 — Ross
T.O. Dr. Lawler / _____

DATE/TIME 0918 00 0310   CHECK/NOTED BY: _____   PHYSICIAN'S SIGNATURE   1

☐ OUTPATIENT  ☐ OSS  ☐ ADMIT SHORT TERM OBSERVATION   ☐ INPATIENT  ☐ A.M. ADMIT   ☐ VERBAL ORDER  ☐ PHONE ORDER

DATE    TIME

9/18    Ancef gm II IV. 512 L
Gentamycin 160 mg IV. 9AM
old charts to floor
X-rays to floor (CT, etc) / L
Drug screen if not done in ER

DATE/TIME 0918 00   ORDERS NOTED BY: _____   PHYSICIAN'S SIGNATURE   2

☐ OUTPATIENT  ☐ OSS  ☐ ADMIT SHORT TERM OBSERVATION   ☐ INPATIENT  ☐ A.M. ADMIT   ☐ VERBAL ORDER  ☐ PHONE ORDER

DATE    TIME

9/19    PA or lat cervical X-ray
in dept & bring to
floor
CBC in AM / L

DATE/TIME 0918 00   ORDERS NOTED BY: _____   PHYSICIAN'S SIGNATURE   3

FORM #SEQ927 (12/95)    IF AN EQUIVALENT PER HOSPITAL FORMULARY POLICY MAY
NOT BE DISPENSED, PLEASE WRITE "NO" IN THIS COLUMN

CROSS OUT THE BLANK LINES OF EACH SECTION NOT USED

000029

Acct #: 984589192
MR #: 00249469
**GONZALEZ, Gustavo**
503-01
Born:       30-Dec-1972
Sex: M Age: 27

*** Valley Baptist Medical Center ***

# PHYSICIAN ORDERS

Admitted: 18-Sep-2000 02:30
Discharged:

Run:  18-Sep-2000 03:05
From: 18-Sep-2000 07:00  To: 19-Sep-2000 06:59
Page:  1
Provider : LAWLER, MARION R.,

Drug Allergies: [ ]None    1.                 2.                 3.

Date 9/18/00  Time 450 PM    [ ]Outpatient  [ ]Obs.   [ ]Inpatient   [ ]Verbal Order
                              [ ]Short Term Observation  [ ]AM Admit   [ ]Phone Order

1) LABS  TSH, RPR, HIV

2) CT Head c̄ & s̄ contrast p̄ neck. # No

   surgery

3) Any psychotropics to be ordered

   by psychiatrist on call or Dr.

   Gonzalez

| Date/Time | Orders Noted By: | Physician Signature |
|-----------|------------------|---------------------|

Date_____  Time_____    [ ] Verbal Order    [ ] Phone Order

9/18    within limits

admit -

Dx: S/W Neck

Psychosis

| Date/Time | Orders Noted By: | Physician Signature |
|-----------|------------------|---------------------|

If an Equivalent per Hospital Formulary Policy May Not Be Dispensed, Write 'NO' in This Column. ===>

## FAX ORDERS TO PHARMACY

VBMC 1965-300-062K          [Sdl2.vbchtr.drforms]

**31**

| Allergies: ☐ No Known Allergies | VALLEY BAPTIST MEDICAL CENTER |
|---|---|

NKA

VALLEY BAPTIST MEDICAL CENTER
Harlingen, Texas

000030

**PHYSICIAN MEDICATION ORDERS**

☐ No Meds   ☐ Meds Unknown   ☐ Family to Bring          Page ___ of ___

| MEDICATION THERAPY Prior to Admission Drug - Dose - Frequency | Time of Last Dose | Continue in Hospital | REFER TO (Name of Physician) | Continue in Hospital | Continue on Dismissal | | Patient Identification |
|---|---|---|---|---|---|---|---|
| 1 INSULIN ☐ Yes ☐ No | | ☐ Yes ☐ No ☐ Refer | | ☐ Yes ☐ No | ☐ Yes | ☐ No | |
| 2 Prozac | | ☐ Yes ☐ No ☐ Refer | | ☐ Yes ☐ No | ☐ Yes | ☐ No | |
| 3 Lithium | | ☐ Yes ☐ No ☐ Refer | | ☐ Yes ☐ No | ☐ Yes | ☐ No | |
| 4 | | ☐ Yes ☐ No ☐ Refer | | ☐ Yes ☐ No | ☐ Yes | ☐ No | |
| 5 | | ☐ Yes ☐ No ☐ Refer | | ☐ Yes ☐ No | ☐ Yes | ☐ No | |
| 6 | | ☐ Yes ☐ No ☐ Refer | | ☐ Yes ☐ No | ☐ Yes | ☐ No | |

Date/Time 09/18/00  0150   R DAMASO RN   Transcribing Nurse

Date/Time   M.D.

Date/Time   Nurse Receiving Order

**MEDICATION PRESCRIPTION** — VALLEY BAPTIST MEDICAL CENTER, Harlingen, Texas

Patient's Name | Address | Doctor's Printed Name

| Rx | Drug | Dose | Frequency | Quantity | Rx | Drug | Dose | Frequency | Quantity |

Product Selection Permitted   M.D.   Dispense as Written   M.D.   DEA No.   Date

**EQUIPMENT PRESCRIPTION** — VALLEY BAPTIST MEDICAL CENTER, Harlingen, Texas

Patient's Name | Address

☐ Crutches   ☐ Hospital Bed   Other
Walker   ☐ Bedside Commode
☐ Wheelchair   Other   32
☐ IV Equipment   ☐ Oxygen   Date   M.D.

RADIOLOGY REPORT

HARLINGEN, TEXAS 78550    VALLEY BAPTIST MEDICAL CENTER    000031    CHART

| NAME | | DATE OF BIRTH | AGE | SEX | CASE NUMBER | ORDER | X-RAY NUMBER |
|------|--|---------------|-----|-----|-------------|-------|--------------|
| GONZALEZ, Gustavo | | 12/30/72 | 27 | M | 984589192 | 1 | 00249469 |

| ATTENDING PHYSICIAN | ADMIT DATE | ROOM/BED | DIAGNOSIS | | |
|---------------------|------------|----------|-----------|--|--|
| LAWLER, MARION JR. R | | 503 01 | STO/STAB WOUND | | |

| PRIORITY | DATE TO BE DONE | ORDER DATE/TIME/INITIALS/UNIT | ORDERING PHYSICIAN | ACCESS # |
|----------|-----------------|-------------------------------|--------------------|----------|
| 1 | 09/17/00 | 09/17/00 22:41 DPERE ED | GUERRA, JR, HECTOR | |

| PROCEDURES ORDERED | | CPT CODE |
|--------------------|--|----------|
| 2100394  CHEST ONE VIEW | | 71010 |

| | SIDE |
|--|------|
| MVA/LACERATIONS | N/A |

PORTABLE CHEST:

Cardiac silhouette, pulmonary vascularity, and lung fields appear within normal limits.

IMPRESSION:

1)    No acute or active chest findings are demonstrated.

September 21, 2000  10:31            G.K.SKYE II M.D./mlg
`185`

33

DEPARTMENT OF RADIOLOGY

RADIOLOGY REPORT

HARLINGEN, TEXAS 78550      VALLEY BAPTIST MEDICAL CENTER 000032      CHART

| NAME | | DATE OF BIRTH | AGE | SEX | CASE NUMBER | ORDER | X-RAY NUMBER |
|------|---|---------------|-----|-----|-------------|-------|--------------|
| GONZALEZ, Gustavo | | 12/30/72 | 27 | M | 984589192 | 6 | 00249469 |

| ATTENDING PHYSICIAN | ADMIT DATE | ROOM/BED | DIAGNOSIS | | |
|---------------------|------------|----------|-----------|--|--|
| LAWLER, MARION JR. R | | 503 01 | STO/STAB WOUND | | |

| PRIORITY | DATE TO BE DONE | ORDER DATE | TIME/INITIALS/UNIT | ORDERING PHYSICIAN | ACCESS # |
|----------|-----------------|------------|--------------------|--------------------|---------|
| S | 09/17/00 | 09/17/00 | 23:28 VDE L ED | GUERRA, JR, HECTOR | |

| PROCEDURES ORDERED | | CPT CODE |
|--------------------|--|----------|
| 2101368  SPINE CERVICAL W/OBL | | 72050 |

| | SIDE |
|--|------|
| MVA | N/A |

C-SPINE W/OBLIQUES:

Vertebral bodies and disc space heights appear to be satisfactorily maintained. Overall alignment of the spine approximates anatomical. Oblique view demonstrate patency into the neural foramina. No facet overriding changes are identified. There is noted to be some gas dissecting through the soft tissue planes of the neck, which could be secondary to penetrating trauma. Accompanying chest radiograph demonstrates no pneumothorax, but follow-up could possibly be obtained.

September 21, 2000   10:40
`185`

G.E. SKYE, II M.D./mlg

34

DEPARTMENT OF RADIOLOGY

RADIOLOGY REPORT

HARLINGEN, TEXAS 78550     VALLEY BAPTIST MEDICAL CENTER    000033    CHART

| PATIENT | NAME | DATE OF BIRTH | AGE | SEX | CASE NUMBER | ORDER | X-RAY NUMBER |
|---|---|---|---|---|---|---|---|
| | GONZALEZ, Gustavo | 12/30/72 | 27 | M | 984589192 | 7 | 00249469 |

| ATTENDING PHYSICIAN | ADMIT DATE | ROOM/BED | DIAGNOSIS |
|---|---|---|---|
| LAWLER, MARION JR. R | | 503 01 | STO/STAB WOUND |

| ORDER | PRIORITY | DATE TO BE DONE | ORDER DATE/TIME/INITIALS/UNIT | ORDERING PHYSICIAN | ACCESS # |
|---|---|---|---|---|---|
| | S | 09/18/00 | 09/18/00 0:07 LDELA ED | GUERRA, JR, HECTOR | |

PROCEDURES ORDERED
2100734  SHOULDER COMPLETE LT                                    CPT CODE

PAIN TO LT SHOULDER                                              SIDE
                                                                LEFT

**LEFT SHOULDER:**

Humeroglenoid and acromioclavicular relationships appear to be maintained. No fractures or bursal calcifications or large osteophytes are appreciated.

September 21, 2000  10:32            G.E.SKYE, M.D./mlg
`185`

35

DEPARTMENT OF RADIOLOGY

HARLINGEN, TEXAS 78550          VALLEY BAPTIST MEDICAL CENTER     00003 4          CHART

| NAME | DATE OF BIRTH | AGE | SEX | CASE NUMBER | ORDER | X-RAY NUMBER |
|---|---|---|---|---|---|---|
| GONZALEZ, Gustavo | 12/30/72 | 27 | M | 984589192 | 10 | 00249469 |

| ATTENDING PHYSICIAN | ADMIT DATE | ROOM/BED | DIAGNOSIS | | |
|---|---|---|---|---|---|
| LAWLER, MARION JR. R | | 503 01 | STO/STAB WOUND | | |

| PRIORITY | DATE TO BE DONE | ORDER DATE/TIME/INITIALS/UNIT | | ORDERING PHYSICIAN | ACCESS # |
|---|---|---|---|---|---|
| S | 09/18/00 | 09/18/00 0:45 LDELA ED | | GUERRA, JR, HECTOR | |

| PROCEDURES ORDERED | | CPT CODE |
|---|---|---|
| 2767721   CT SCAN NECK W/CONTRAST | | 70491 |

| | SIDE |
|---|---|
| STAB WOUND TO NECK | N/A |

CT NECK W/CNT:

CLINICAL HISTORY:  Stab wound to the neck.

TECHNIQUE:

Images are obtained at 5 mm. intervals from the skull base to the thoracic inlet following
IV contrast infusion.

FINDINGS:

There is extensive  subcutaneous emphysema in  the anterior neck,  most pronounced at  and
below the  level of  the larynx,  extending into  the  superior mediastinum.  There is  no
evidence of focal hematoma. There  is slight thickening of  the right lateral wall of  the
trachea, seen on  two consecutive sections,  at the level of  the mid thyroid. This  is at
approximately  the level  of the  soft  tissue defects  from the stab  wound, and  may be a
reflection of tracheal injury.

Exam appears  otherwise unremarkable. Thyroid gland appears  normal. Cervical soft tissues
are unremarkable. There is normal  opacification of the carotid arteries and  the internal
jugular veins, with no CT evidence of vascular injury.

CONCLUSION:

   1)   Extensive cervical emphysema.

   2)   Slight  thickening along the right lateral aspect  of the trachea at the level
       of the mid thyroid, a nonspecific finding.

   3)   No hematoma identified.

September 18, 2000  8:36                    CHARLES FISHER, M.D./lam
`312`

DEPARTMENT OF RADIOLOGY

36

RADIOLOGY REPORT

HARLINGEN, TEXAS 78550    **VALLEY BAPTIST MEDICAL CENTER**    000035    CHART

| PATIENT | NAME | DATE OF BIRTH | AGE | SEX | CASE NUMBER | ORDER | X-RAY NUMBER |
|---|---|---|---|---|---|---|---|
| | GONZALEZ, Gustavo | 12/30/72 | 27 | M | 984589192 | 19 | 00249469 |

| ATTENDING PHYSICIAN | ADMIT DATE | ROOM/BED | DIAGNOSIS |
|---|---|---|---|
| LAWLER, MARION JR. R | 09/18/00 | 503 01 | STO/STAB WOUND |

| ORDER | PRIORITY · DATE TO BE DONE | ORDER DATE/TIME/INITIALS/UNIT | ORDERING PHYSICIAN | ACCESS # |
|---|---|---|---|---|
| | R    09/18/00 | 09/18/00  8:13  LALVA 5ST | LAWLER, MARION JR. R | |

| PROCEDURES ORDERED | | CPT CODE |
|---|---|---|
| 2101590  NECK FOR SOFT TISSUE | | 70360 |

| DX | SIDE |
|---|---|
| PA/LAT CERVICAL X-RAY BRING FILM TO FLOOR | N/A |

**NECK FOR SOFT TISSUES:**

Two views of the neck for soft tissue demonstrate some air in the prevertebral soft tissues and in the right neck. No thickening of the soft tissues anterior to the spine is demonstrated on the lateral view. Epiglottis, vallecula, and aryepiglottic folds are normal in appearance. Subglottic airway is unremarkable.

**IMPRESSION:**

    1.    Air in the precervical space and right neck.

September 18, 2000  16:31                    HARRY BUTTERS, M.D./ag
`234`

DEPARTMENT OF RADIOLOGY

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000036

```
NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000
REC#    : 00249469    LOC : 5ST         ROOM: 503-01    DOB : 12/30/1972 27Y    M
CASE#   : 984589192   DR  : LAWLER, MARION R. JR        CODE: 80
```

*************************************** ELECTROLYTES ***************************************

| DATE: | 09/17 | | |
|-------|-------|-------|-------|
| TIME: | +2350 | NORMAL | UNITS |
| LOC: | AMB | | |
| --- | --- | --- | --- |
| SODIUM | 138 | 136-145 | MMOL/L |
| POTASSIUM | 4.0 | 3.5-5.1 | MMOL/L |
| CHLORIDE | 105 | 100-112 | MMOL/L |
| CARBON DIOXIDE | 27 | 20-31 | MMOL/L |

*************************************** GENERAL CHEMISTRIES ***************************************

| DATE: | 09/17 | | |
|-------|-------|-------|-------|
| TIME: | +2350 | NORMAL | UNITS |
| LOC: | AMB | | |
| --- | --- | --- | --- |
| GLUCOSE | 105 | 70-110 | MG/DL |
| BUN | 10 | 7-22 | MG/DL |
| CREATININE | 1.0 | 0.5-1.2 | MG/DL |
| CA | 9.6 | 8.2-10.0 | MG/DL |

*************************************** SPECIAL CHEMISTRIES ***************************************

| DATE: | 09/18/00 | | |
|-------|----------|--------|-------|
| TIME: | +1832 | NORMAL | UNITS |
| LOC: | 5ST | | |
| --- | --- | --- | --- |
| ALCOHOL, SERUM | | 0-0 | G/DL |
| LITHIUMS | | 0.5-1.5 | MEQ/L |
| HIV | PEND | NEG | |

```
GONZALEZ,GUSTAVO                        CONTINUED                    PAGE 1
09/18/2000 19:56                              CHART COPY CUMULATIVE SUMMARY
```

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

# 000037

```
NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000
REC#    : 00249469       LOC : 5ST          ROOM: 503-01     DOB : 12/30/1972 27Y     M
CASE#   : 984589192      DR  : LAWLER, MARION R. JR          CODE: 80
```

================================ SPECIAL CHEMISTRIES ================================

| DATE: | 09/18/00 | 09/17/00 |
|---|---|---|
| TIME: | +0126 | +2350 |
| LOC: | AMB | AMB |
| --- | --- | --- |
| ALCOHOL, SERUM | | 0.000 |
| LITHIUMS | <0.1 L | |

******************************** THYROID FUNCTION ********************************

| DATE: | 09/18 | | |
|---|---|---|---|
| TIME: | +1832 | NORMAL | UNITS |
| LOC: | 5ST | | |
| --- | --- | --- | --- |
| TSH | PEND | 0.40-7.00 | UIU/ML |

******************************** DRUGS OF ABUSE ********************************

| DATE: | 09/18/00 | | |
|---|---|---|---|
| TIME: | +0120 | NORMAL | UNITS |
| LOC: | AMB | | |
| --- | --- | --- | --- |
| AMPHETAMINES, URINE | NEGATIVE | NEG | |
| BARBITUATES, URINE | NEGATIVE | NEG | |
| BENZODIAZOPENES, URINE | NEGATIVE | NEG | |
| COCAINE, URINE | NEGATIVE | NEG | |
| OPIATES, URINE | NEGATIVE | NEG | |
| CANNABINOIDS, URINE | NEGATIVE | NEG | |
| ALCOHOL, URINE | NEGATIVE | | |
| PHENCYCLIDINE, URINE | NEGATIVE | NEG | |

**39**

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000033

```
NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000
REC#    : 00249469      LOC : 5ST        ROOM: 503-01    DOB : 12/30/1972 27Y    M
CASE#   : 984589192     DR  : LAWLER, MARION R. JR       CODE: 80
```

******************************* ROUTINE HEMATOLOGY *******************************

| DATE: | 09/18/00 | 09/17/00 | | NORMAL | UNITS |
|---|---|---|---|---|---|
| TIME: | +0548 | +2350 | | | |
| LOC: | 5ST | AMB | | | |
| WBC | 15.0 H | 18.4 H | | 4.8-9.2 | TH/UL |
| | | CKD | | | |
| RBC | 4.99 | 5.46 | | 4.20-5.60 | M/UL |
| HGB | 14.5 | 15.5 | | 13.2-17.4 | G/DL |
| HCT | 43.0 | 46.3 | | 38.3-50.2 | % |
| MCV | 86.1 | 84.7 | | 80.5-94.9 | FL |
| MCH | 29.0 | 28.3 | | 27.7-32.9 | PG |
| MCHC | 33.7 | 33.5 | | 32.9-36.2 | GM/DL |
| PLT | 194 | 221 | | 160-400 | TH/UL |
| RDWCV | 14.9 H | 14.7 | | 11.5-14.7 | % |
| MPV | 8.5 L | 7.8 L | | 9.0-12.7 | FL |
| DIFM | | MANUAL | | | |
| SEGT | | 71 | | 49.4-76.5 | % |
| BD | | 9 | | 0-10 | % |
| LMPH | | 16 L | | 18.1-46.4 | % |
| MONOS | | 4 | | 0.0-4.1 | % |
| EOS | | 0 L | | 0.1-4.2 | % |
| BASO | | 0 | | 0-2 | % |
| META | | 0 | | 0 | % |
| MYELO | | 0 | | 0 | % |

******************** MORPHOLOGY AND PLATELET ESTIMATE ********************

```
9/17/00
  2350   DIFFERENTIAL,MANUAL
         PLATELET ESTIMATE              [ADQ]
```

<<RESULTS CONTINUED ON NEXT PAGE>>

```
--FOOTNOTES---
 D     RESULT CHECKED
```

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000039

```
NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000
REC#    : 00249469      LOC : 5ST        ROOM: 503-01      DOB : 12/30/1972 27Y    M
CASE#   : 984589192     DR  : LAWLER, MARION R. JR         CODE: 80
```

******************************** MORPHOLOGY AND PLATELET ESTIMATE ********************************

```
DIFFERENTIAL,MANUAL                          <<CONTINUED FROM PREVIOUS PAGE>>

                        ADEQUATE
    RBC MORPHOLOGY      NORMAL
    WBC MORPHOLOGY      SLIGHT TOXIC GRANULATION
                        FEW ATYPICAL LYMPHS
```

***************************************** SEROLOGY *****************************************

```
DATE:                        09/18/00
TIME:                        +1832        NORMAL    UNITS
LOC:                         5ST
          -----------------------------------------------------------------------
RPR                          PEND          NR
```

***************************** BLOOD TYPING AND ANTIBODY TESTING *****************************

```
TEST:    ABO/RH     ANTIBODY
                    SCREEN
UNITS:
          -----------------------------------------------------------------------
09/17/00
+  2350  O POSITIVE    NEGATIVE
```

**41**

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000040

```
NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000    DISCHARGED: 09/19/2000
REC#    : 00249469      LOC : 5ST          ROOM: 503-01      DOB : 12/30/1972 27Y    M
CASE#   : 984589192     DR  : LAWLER, MARION R. JR           CODE: 80
```

************************************** ELECTROLYTES **************************************

| DATE: | 09/17 | | | |
|---|---|---|---|---|
| TIME: | 2350 | | NORMAL | UNITS |
| OC: | AMB | | | |
| SODIUM | 138 | | 136-145 | MMOL/L |
| POTASSIUM | 4.0 | | 3.5-5.1 | MMOL/L |
| CHLORIDE | 105 | | 100-112 | MMOL/L |
| CARBON DIOXIDE | 27 | | 20-31 | MMOL/L |

************************************ GENERAL CHEMISTRIES ************************************

| DATE: | 09/17 | | | |
|---|---|---|---|---|
| TIME: | 2350 | | NORMAL | UNITS |
| OC: | AMB | | | |
| GLUCOSE | 105 | | 70-110 | MG/DL |
| BUN | 10 | | 7-22 | MG/DL |
| CREATININE | 1.0 | | 0.5-1.2 | MG/DL |
| | 9.6 | | 8.2-10.0 | MG/DL |

************************************ SPECIAL CHEMISTRIES ************************************

| DATE: | 09/18/00 | | |
|---|---|---|---|
| TIME: | +1904 | NORMAL | UNITS |
| OC: | 5ST | | |
| ALCOHOL, SERUM | | 0-0 | G/DL |
| LITHIUMS | <0.1 L | 0.5-1.5 | MEQ/L |
| HIV | | NEG | |

**42**

```
                          VALLEY BAPTIST MEDICAL CENTER
                        DEPARTMENT OF LABORATORY MEDICINE

                                                          000041

       NAME   : GONZALEZ,GUSTAVO
       ADMITTED: 09/18/2000    DISCHARGED: 09/19/2000
       REC#   : 00249469    LOC : 5ST         ROOM: 503-01    DOB : 12/30/1972 27Y    M
       CASE#  : 984589192    DR  : LAWLER, MARION R. JR       CODE: 80
```

```
        ================================== SPECIAL CHEMISTRIES ==================================
   DATE:                       [--------------------------------09/18/00--------------------------------]
   TIME:                              +1832                          0126
   LOC:                                5ST                            AMB
                        ------------------------------------------------------------------------
   LITHIUMS                                                          <0.1 L
   HIV                                NEGATIVE
                        PERFORMED AT MAYO MEDICAL LABORATORIES


        ================================== SPECIAL CHEMISTRIES ==================================
   DATE:                             09/17/00
   TIME:                              2350
   LOC:                                AMB
                        ------------------------------------------------------------------------
   ALCOHOL, SERUM                      0.000


        ******************************** THYROID FUNCTION ********************************
   DATE:                     09/18
   TIME:                     +1832                                 NORMAL    UNITS
   LOC:                       5ST
                        ------------------------------------------------------------------------
   TSH                       0.70                                   0.40-7.00 UIU/ML
```

**43**

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000042

NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000    DISCHARGED: 09/19/2000
REC#    : 00249469       LOC : 5ST        ROOM: 503-01      DOB : 12/30/1972 27Y      M
CASE#   : 984589192      DR  : LAWLER, MARION R. JR          CODE: 80


******************************* DRUGS OF ABUSE *******************************

| | | NORMAL | UNITS |
|---|---|---|---|
| ATE: | 09/18/00 | | |
| IME: | 0120 | | |
| OC: | AMB | | |

| | | | |
|---|---|---|---|
| AMPHETAMINES, URINE | NEGATIVE | NEG | |
| BARBITUATES, URINE | NEGATIVE | NEG | |
| BENZODIAZOPENES, URINE | NEGATIVE | NEG | |
| COCAINE, URINE | NEGATIVE | NEG | |
| OPIATES, URINE | NEGATIVE | NEG | |
| CANNABINOIDS, URINE | NEGATIVE | NEG | |
| ALCOHOL, URINE | NEGATIVE | | |
| PHENCYCLIDINE, URINE | NEGATIVE | NEG | |


******************************* ROUTINE HEMATOLOGY *******************************

| | 09/18/00 | 09/17/00 | | NORMAL | UNITS |
|---|---|---|---|---|---|
| DATE: | | | | | |
| TIME: | 0548 | 2350 | | | |
| OC: | 5ST | AMB | | | |
| WBC | 15.0 H | 18.4 H | | 4.8-9.2 | TH/UL |
| | | CKD | | | |
| RC | 4.99 | 5.46 | | 4.20-5.60 | M/UL |
| GB | 14.5 | 15.5 | | 13.2-17.4 | G/DL |
| HCT | 43.0 | 46.3 | | 38.3-50.2 | % |
| MCV | 86.1 | 84.7 | | 80.5-94.9 | FL |
| MCH | 29.0 | 28.3 | | 27.7-32.9 | PG |
| MCHC | 33.7 | 33.5 | | 32.9-36.2 | GM/DL |
| PLT | 194 | 221 | | 160-400 | TH/UL |
| RDWCV | 14.9 H | 14.7 | | 11.5-14.7 | % |
| MPV | 8.5 L | 7.8 L | | 9.0-12.7 | FL |
| DIFM | | MANUAL | | | |
| NEUT | | 71 | | 49.4-76.5 | % |
| BAND | | 9 | | 0-10 | % |
| LYMPH | | 16 L | | 18.1-46.4 | % |
| MONOS | | 4 | | 0.0-4.1 | % |
| EOS | | 0 L | | 0.1-4.2 | % |
| BASO | | 0 | | 0-2 | % |
| META | | 0 | | 0 | % |

---FOOTNOTES---
CKD    RESULT CHECKED
       GONZALEZ,GUSTAVO
       09/24/2000 00:39

CONTINUED

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000043

```
NAME    : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000    DISCHARGED: 09/19/2000
REC#    : 00249469      LOC : 5ST           ROOM: 503-01      DOB : 12/30/1972 27Y      M
CASE#   : 984589192     DR  : LAWLER, MARION R. JR         ·CODE: 80
```

**************************************** ROUTINE HEMATOLOGY ****************************************

```
DATE:       09/18/00 09/17/00
TIME:         0548    2350                                              NORMAL    UNITS
LOC:          5ST     AMB
          --------------------------------------------------------------------------------
MYELO              0                                                      0         %
```

**************************** MORPHOLOGY AND PLATELET ESTIMATE ****************************

```
09/17/00
  2350  DIFFERENTIAL,MANUAL
        PLATELET ESTIMATE            [ADQ]
                                ADEQUATE
        RBC MORPHOLOGY          NORMAL
        WBC MORPHOLOGY          SLIGHT TOXIC GRANULATION
                                FEW ATYPICAL LYMPHS
```

**************************************** SEROLOGY ****************************************

```
DATE:                     09/18/00
TIME:                      +1832            NORMAL     UNITS
LOC:                        5ST
          --------------------------------------------------------------------------------
RPR                    NONREACTIVE              NR
```

**************************** BLOOD TYPING AND ANTIBODY TESTING ****************************

```
TEST:     ABO/RH    ANTIBODY
                    SCREEN
UNITS:
          --------------------------------------------------------------------------------
09/17/00
  2350  O POSITIVE    NEGATIVE
```

**************************************** CANCELLED TESTS ****************************************

```
GONZALEZ,GUSTAVO                       CONTINUED                          45
09/24/2000 00:39                                                       PAGE 4
                                                        FINAL MEDICAL RECORDS COPY
```

VALLEY BAPTIST MEDICAL CENTER
DEPARTMENT OF LABORATORY MEDICINE

000044

```
NAME     : GONZALEZ,GUSTAVO
ADMITTED: 09/18/2000    DISCHARGED: 09/19/2000
REC#     : 00249469     LOC : 5ST        ROOM: 503-01    DOB : 12/30/1972 27Y    M
CASE#    : 984589192    DR  : LAWLER, MARION R. JR       CODE: 80
```

***************************************** CANCELLED TESTS *****************************************

```
·/19/00   0400    CANCELLED: AUTOMATED BLOOD COUNT
                  REASON:    PATIENT DISCHARGED
```

000045

47

5 DAY GRAPHIC FLOWSHEET

**000046**

```
Acct #: 984589192          *** VALLEY BAPTIST MEDICAL CENTER ***    Printed. 19-Sep-2000 07 40
MR #· 00249469             ***        HARLINGEN, TEXAS         ***    From: 17 Sep 00  0000   To  21 Sep 00  2359
GONZALEZ, Gustavo                                                    Page:    1
Unit: 5ST    Room: 503-01                                           Attending MD  LAWLER, MARION R., MD
Born:   30-Dec-1972        Admitted. 18-Sep-2000 02 30
Sex. M Age: 27             Discharged:
```

| DATE. | 17Sep00 | 18Sep00 | 19Sep00 | 20Sep00 | 21Sep00 |
|---|---|---|---|---|---|
| TIME: | 00 04 08 12 16 20 | 00 04 08 12 16 20 | 00 04 08 12 16 20 | 00 04 08 12 16 20 | 00 04 08 12 16 20 |

```
105.0 --
104.0 --
103.0 --
102.0 --
101.0 --
100.0 --                      --*--※--*--
 99.0 --            ※       ※
 98.0 --
 97.0 --
 96.0 --
 95.0 --
Temp. (F)
    Site    +   +   +   +       +   +   +   +       +   +   +   +       +   +   +   +       +   +   +   +
```

| | | | | | |
|---|---|---|---|---|---|
| BP/Systolic | | 128  118 122 | | | |
| Diastolic | | 64  72 54 | | | |
| Pulse | | 89  89 76 | | | |
| Respiration | | 20  20 20 | | | |
| DailyWeight | | | | | |

**48**

VALLEY BAPTIST MEDICAL CENTER
Harlingen, Texas

000047

PHYSICIAN'S PROGRESS NOTES

| Date | Time | |
|------|------|---|
| 1/19/00 | 0322 | Heard cry for help coming from southside of hall. Heard loud rattling / thumping sound. Saw pt. in 5C3-01 standing at the doorway yanking on handcuff to the left hand attached to bed (Witnessed by M. Lucio RN, M. Valdez LVN and L. Vega LVN) At this time the officer yelled "Get down! Get down! I sprayed mace!" |
| | 0324 | Security paged stat. Loud banging sound heard. Nurses came back to nurses station for protection |
| | 0325 | House supervisor E. Mauricio RN notified + en route. 1st VBMC officer arrived at this time |
| | 0326 | Pt c̄ no pulse and no respirations at this time as per house supervisor |
| | 0326 | Randy Baker (administrator) paged and made aware of situation |
| | 0330 | Pt's in surrounding area moved to other area of unit |
| | 0330 | Dr. Gonzalez + Dr. Lawler paged |
| | 0334 | Dr. Gonzalez made aware of pt's status — expired |
| | 0335 | Dr. Lawler made aware of pt's status - expired |
| | 0358 | R. Flores Jr |
| | | R.R. Garza        NPD officers |
| | | S. Castillo        on scene |
| | | M. Loya |
| | 0402 | Chief of Police of La Feria B. Gonzalez arrived |
| | 0413 | Peace officer taken via stretcher to ER by VBMC officer R. Ruiz |
| | 0430 | D. Barker RN, nurse manager, notified of situation |
| | | M. Lucio RN |

VBMC 1610-010-C  2

49

**VALLEY BAPTIST MEDICAL CENTER**
Harlingen, Texas

000048

PHYSICIAN'S PROGRESS NOTES

| Date | Time | |
|------|------|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

50

VBMC 1610-010   .92



*** Valley Baptist Medical Cente. ***          MEDICATION ADMINISTRATION RECORD          **IV**   000049

| Inits | Signature | Inits | Signature |
|-------|-----------|-------|-----------|

ADMINISTRATION SITE CODE
A. Buttocks RUQ.    E. Rt. Abdomen
B. Buttocks LUQ.    F. Lt. Abdomen
C. Rt. Deltoid      G. Rt. Thigh
D. Lt. Deltoid      H. Lt. Thigh

Allergies:

Ht:    Cm.    Wt:    Kg.    BSA: 0.00
Patient/Fam. Ed. Codes: 1. Patient Instructed on Medications
                        2. Family Instructed on Medications
                        3. Goal Met
                        4. Accurately Demonstrates Procedure
                        5. Literature Given
                        6. Food/Drug Interaction Instructed

ORD# Medication        Source        Route   Start   End   Stop
     Dose                            Freq    Date    Date  Type         Dose Administration
     Ord as/Comments

**Syn: KEFZOL 1000MG VIAL**
IV   CEFAZOLIN SODIUM              IV     9/18/00   9/28/00 S
0017 **Dose: 2 GM**                Q12HR-0809  2359

     **SODIUM CHLORIDE 0.9%**       50 ML
                           Rate:    100 ML/HR
                                        Comment: refrigerated item.

_Cu_ Verified      *** Pending RX Verification

**Syn: GARAMYCIN 80MG/2ML**
IV   GENTAMICIN SULFATE           IV     9/18/00   9/28/00 S
0018 **Dose: 160 MG**              Q24Hrs 0800  2359

     **SODIUM CHLORIDE 0.9%**       150 ML
     Volume:    4 ml               Rate:   300 ML/HR
                                        Comment:
                                        INFUSE OVER 30 MINUTES

_Cu_ Verified      *** Pending RX Verification

Acct #: 984589192          *** Valley Baptist Medical Center ***      Run:  18-Sep-2000 08:31
MR #: 00249469                                                        From: 18-Sep-2000 08:00 To: 19-Sep-2000 06:59
GONZALEZ, Gustavo               MEDICATION ADMIN. RECORD              Page:   1  of ____
503-01                                                               Provider : LAWLER, MARION R., MD
Born:    30-Dec-1972       Admitted: 18-Sep-2000 02:30
Sex: M Age: 27             Discharged:

IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV  IV
                              *** End of Report · CHTMAGO ***                    51

```
*** Valley Baptist Medical Center ***        MEDICATION ADMINISTRATION RECORD              000050
|Inits|___Signature_____|      ||Inits|___Signature_____|     ADMINISTRATION SITE CODE
|     |                        |      ||     |                        |   A. Buttocks RUQ.    E. Rt. Abdomen
|     |                        |      ||     |                        |   B. Buttocks LUQ.    F. Lt. Abdomen
|     |                        |      ||     |                        |   C. Rt. Deltoid      G. Rt. Thigh
|     |                        |      ||     |                        |   D. Lt. Deltoid      H. Lt. Thigh
|     |                        |      ||     |                        |
|_____|_____|      ||_____|_____|
```

Allergies:                                         Ht:     Cm.    Wt:        Kg.

|Patient/Fam. Ed. Codes: 1. Patient Instructed on Medications
|                        2. Family Instructed on Medications
|                        3. Goal Met
|                        4. Accurately Demonstrates Procedure
|                        5. Literature Given
| Dose Administration

Acct #: 984589192          *** 5ST Valley Baptist Medical Center ***    Run:  18-Sep-2000 08:28
MR #: 00249469                                                          From: 18-Sep-2000 08:28  To: 19-Sep-2000 06:59
GONZALEZ, Gustavo                MEDICATION ADMIN. RECORD               Page: ____ of ____
503-01                                                                 Provider : LAWLER, MARION R , MD
Born:    30-Dec-1972       Admitted: 18-Sep-2000 02:30
Sex· M Age: 27             Discharged:

52

```
      ***  Valley Baptist Medical Center  ***        MEDICATION ADMINISTRATION RECORD
     |Inits|__Signature_____||Inits|__Signature_____|
     |     |                           ||     |                           |
     |     |                           ||     |                           |
     |     |                           ||     |                           |
     |     |                           ||     |                           |
     |     |                           ||     |                           |
Allergies:                                                         Wt:        Cm.    Wt:
```

IV  000051

ADMINISTRATION SITE CODE

| | |
|---|---|
| A. Buttocks RUQ. | E. Rt. Abdomen |
| B. Buttocks LUQ. | F. Lt. Abdomen |
| C. Rt. Deltoid | G. Rt. Thigh |
| D. Lt. Deltoid | H. Lt. Thigh |

Wt:        Cm.    Wt:          Kg.    BSA:  0.00

Patient/Fam. Ed. Codes: 1. Patient Instructed on Medications
2. Family Instructed on Medications
3. Goal Met
4. Accurately Demonstrates Procedure
5. Literature Given
6. Food/Drug Interaction Instructed

| ORD# | Medication          Source | Route   Start   End   Stop |
|------|----------------------------|----------------------------|
|      | Dose                       | Freq    Date    Date  Type |
|      | Ord as/Comments            | Dose Administration        |

Syn: **GARAMYCIN 80MG/2ML**
IV   GENTAMICIN SULFATE          IV    9/18/00   9/28/00 S
0018 **Dose: 160 MG**            Q24Hrs 0800      2359     |--------------------------------

       SODIUM CHLORIDE 0.9%       150 ML
       Volume:    4 ml           Rate:    300 ML/HR
                                          Comment:
                                          INFUSE OVER 30 MINUTES
   :Verified

Syn: **KEFZOL 1000MG VIAL**                        | 09 ____ 21 ____
IV   CEFAZOLIN SODIUM            IV    9/18/00   9/28/00 S
0017 **Dose: 2 GM**              Q12HR- 0809      2359     |--------------------------------

       SODIUM CHLORIDE 0.9%       50 ML
                                 Rate:    100 ML/HR
                                          Comment: refrigerated item.
   :Verified

```
Acct #: 984589192          ***  Valley Baptist Medical Center  ***     Run:  19-Sep-2000 02:05
MR #: 00249469                                                         From: 19-Sep-2000 07:00 To: 20-Sep-2000 06:59
GONZALEZ, Gustavo               MEDICATION ADMIN. RECORD              Page:  1 of ____
503-01                                                                Provider : LAWLER, MARION R., MD
Born:    30-Dec-1972        Admitted: 18-Sep-2000 02:30
Sex: M Age: 27              Discharged:                                        53
```

IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV   IV

000052

54

```
09 11 994581 00
GONZALEZ, GUSTAVO
EMERGENCY DEPARTMENT
C0249499    M S 12/30/75
```

**VALLEY BAPTIST MEDICAL CENTER**
Harlingen, Texas          **000053**

## VACCINE ADMINISTRATION RECORD

This record will be kept in your medical file or your child's medical file. It will record what vaccine was given, when the vaccine was given, the name of the company that made the vaccine, the vaccine's special lot number, the signature and title of the person who gave the vaccine, and the address where the vaccine was given.

This consent allows Valley Baptist Medical Center to submit this data to the Texas Department of Health.

I have read or have had explained to me the information about diphtheria, tetanus (lockjaw), pertussis (whooping cough), measles, mumps, rubella, hepatitis B, polio, Hemophilus B disease, Synagis and/or Chickenpox vaccines. I have been given a copy of this information. I have had a chance to ask questions that were answered to my satisfaction. I understand the benefits and risks of the vaccine and ask that the vaccine checked below be given to me or to the person named below for whom I am authorized to make this request.

**Vaccine to be given:**

☐ DTP   ☐ DtaP   ☐ Pertussis   ☐ Hepatitis B   ☐ IVP   ☐ Hib
☐ DT   ☒ Td   ☐ Tetanus   ☐ Chickenpox   ☐ TB Test   ☐ HBIG
☐ MMR   ☐ Measles   ☐ Mumps   ☐ Rubella   ☐ Synagis

Signature of person to receive vaccine or person authorized to make the request (parent or guardian):

✖ _____    Date 9/11/00

FOR CLINIC/OFFICE USE:
Date Vaccine Administered 9/18/00
Vaccine Manufacturer Aventis Pasteur
Vaccine Lot Number U0268AA  0610?
Site of Injection (L) Deltoid
Signature of Vaccine Administrator _____ RN
Title of Vaccine Administrator

---

## CERTIFICACIÓN DE VACUNAS

El médico o la clínica puede guardar este comprobante an su expediente médico o an el expediente médico de su niño. Registrarán que vacuna se he administrado, cuando la administraron, el nombre de la empresa qua febricó la vacuna, el número especial de lote de ls vacuna, la firma y título de la persona que puso la vacuna, y la dirección donde fue aplicada la vacuna.

Este comprobante permite a Valley Baptist Medical Center de entregar esta certificación de vacunas al Texas Department of Health.

He leído y se me ha explicado la información acerca de las vacunas de difteria, tétanos, tos ferina, sarampión, paperas, rubéola, hepatitis B, poliomielitis, enfermedad de hemofilia B, sinagis y /0 varicela. He recibido una copia de esta información. Se me ha dado la oportunidad de preguntar y se me ha contestado a mi entera satisfacción. Entiendo los beneficios y los riesgos de la vacuna y pido que se me de la vacuna indicada abajo y a la persona cuyo nombre está al calce, de quien tengo autorización para hacerle esta petición.

**Vaccine to be given:**

☐ DTP   ☐ DtaP   ☐ Tosferina   ☐ Hepatitis B   ☐ IVP   ☐ Hib
☐ DT   ☐ Td   ☐ Tetanus   ☐ Varicela   ☐ TB Test   ☐ HBIG
☐ MMR   ☐ Sarampión   ☐ Paperas   ☐ Rubéola   ☐ Synagis

Signature de persona que debe recibir la vacuna o persona autorizada a hacer la petición (padre, madre, o tutor legal).

✖ _____    Fecha _____

For Clinic/Office Use:
Date Vaccine Administered
Vaccine Manufacturer
Vaccine Lot Number
Site of Injection
Signature of Vaccine Administrator  55
Title of Vaccine Administrator

SEP-18-20   ON 06:58 P   no EMERGENCY ACUTE C      FAX NO.   `3895b23            . 01

000054

VALLEY BAPTIST MEDICAL CENTER
Harlingen, Texas

CONSENT TO TEST FOR ANTIBODIES TO THE
HUMAN IMMUNODEFICIENCY VIRUS (HIV)

1. I _____ have been advised by my physician(s) to have a blood test to detect
(Patient's Name)
the presence of antibodies to the Human Immunodeficiency Virus (HIV), the virus that causes Acquired Immuno-
deficiency Syndrome (AIDS). I have been advised that the procedure, which involves the withdrawal by needle
of a small amount of blood for laboratory testing (about 1 1/2 tablespoons), may cause some slight discomfort
at the site of entry of the needle, and that the procedure has minimal risks, such as bruising, soreness and
a slight risk of infection.

2. I understand that a positive test means that at some point in the past I have been exposed to this virus.
A positive test does NOT mean I have or definitely will develop AIDS. A percentage of individuals exposed to
this virus will develop and/or transmit AIDS, but I understand that the exact risk is presently unknown.

I also understand that a negative result does NOT mean that I am totally free of this virus. As well, it
does NOT mean that I am totally free of the risk of developing or transmitting AIDS, especially if I fit into
one of the high risk groups (male homosexuals, bisexuals, sexual partners of bisexual men, prostitutes, IV
drug abusers, recipients of repetitive transfused blood products).

3. I have been provided with information about the test for antibodies to the HIV virus, about the HIV virus,
and about AIDS, and I have been given the opportunity to ask questions regarding this information and have
my questions answered. I have been informed by my physician(s) that the test, in the opinion of the physi-
cian(s), is important both to my health care and to ensure that appropriate evaluation can be undertaken and
adequate precautions taken to prevent transmission of the virus to others.

4. I have been informed by my physician(s) that if my test results are positive, it may be necessary to take
infectious disease precautions, about which my physician will provide me more detailed information. I have
been informed that if I decline permission for this test, decisions whether to take infectious disease pre-
cautions will be made on the basis of other medical information concerning me. I have been informed that if
I refuse permission for the HIV antibody test, my health care, including diagnosis and treatment, may be
adversely affected.

5. My physician(s) have informed me that if I consent to have the test done, it is important, both for my health
care and for the health of others who will be providing care to me, that the test results be placed in my
health record, and that the health record is the most accurate way for all health care providers involved in
a patient's care to be fully informed of a patient's diagnosis and the treatment. Therefore, if I agree to
have the test done, the results of the test will be recorded in my health record and persons involved in my
health care will have access to that information.

6. I have been informed that the performance and results of the HIV antibody test are considered confidential.
I have been informed by my physician(s) that the test results in my health record shall not be released
without my written permission, except to the individuals and organizations that have been given access by law
who also are required to keep my health record information confidential. These include: (a) myself; (b) my
physician(s) and agents and employees thereof; (c) health care facility staff who provide my health care or
handle specimens of my body fluids or tissues; (d) funeral director or other persons who would prepare my
body for burial or other disposition if I should die; (e) health care facility staff committees, agencies
that license and accredit the health care facility, and health care services review organizations for the
purpose of conducting program monitoring and evaluation of health care services; (f) court of record under
lawful order; and (g) authorized researcher(s) affiliated with the health care facility.

7. If I do not consent to the HIV antibody test, I agree to assume all risks that may result from my refusal to
consent. I also agree not to hold my physician(s) or any other personnel responsible for any adverse results
that may arise from my refusal to consent to the HIV antibody test.

I do ✓ do not ___ (check one) consent to the performance of the HIV antibody test.

_____          9/18/00
Signature of Patient                    Date

_____          9/18/00
Witness                                 Date

VBMC_1600-039-1288

56

000055

## *Disclosure And Consent For Medical And Radiological Procedures*

**TO THE PATIENT:**   You have the right, as a patient, to be informed about your condition and the recommended surgical, medical, or diagnostic procedure to be used so that you may make the decision whether or not to undergo the procedure after knowing the risks and hazards involved.  This disclosure is not meant to scare or alarm you, it is simply an effort to make you better informed so you may give or withhold your consent to the procedure.

I (we) voluntarily request Dr. _GUERRA._____ as my physician, and such associates, technical assistants and other health care providers as they may deem necessary to treat my condition which has been explained to me as:_ STAB wound to neck_____

I (we) understand that the following surgical, medical, and/or diagnostic procedure(s) are planned for me and I (we) voluntarily consent and authorize these procedure(s):___ CAT Scan of neck_____ ___with Contrast_____

I (we) understand that my physician may discover other or different conditions which require additional or different procedures than those planned.  I (we) authorize my physician, and such associates, technical assistants and other health care providers to perform such other procedures which are advisable in their professional judgement.

| | IV. | |
|---|---|---|
| I.   ☐ Not applicable.                    *Initial* _____ | IV.   The blood products for my surgery are:          *Initial* | |
| | 1.   Blood Bank blood as prescribed by my physician. _____ | |
| II.   I (We)  (do)  (do not)   consent to the use of blood and blood products as deemed necessary. | 2.   Blood donated by myself for my own use first, then Blood Bank blood if required in my doctor's opinion. _____ | |
| III.   Risks associated with Blood/Blood Products Transfusion are:<br>1.   Fever, itching, and/or skin rash.<br>2.   Transfusion reaction which may include kidney failure pain, shock, anemia, and/or bleeding.  *Initial*<br>3.   Heart failure or shortness of breath.<br>4.   Hepatitis.<br>5.   A.I.D.S. (Acquired Immune Deficiency Syndrome).<br>6.   Other infections. | 3.   Blood donated by friends or relatives first, then Blood Bank blood if required in my doctor's opinion. _____<br>4.   Only blood donated by myself for my own use (autologous). _____<br>5.   Only blood donated by friends or relatives (recipient specific). _____<br>V.   Alternative methods which may be used instead of blood products have been explained. _____ | |

I (we) understand that no warranty or guarantee has been made to me as to result or cure.

Just as there may be risks and hazards in continuing my present condition without treatment, there are also risks and hazards related to the performance of the surgical, medical, and/or diagnostic procedures planned for me.  I (we) realize that common to surgical, medical, and/or diagnostic procedures is the potential for infection, blood clots in veins and lungs, hemorrhage, allergic reactions, and even death.  I (we) realize that the following risks and hazards may occur in connection with this particular procedure:

☒ **Risks as disclosed by my physician are listed in the appropriate box on the following pages.**

☐ **The Texas Medical Disclosure Panel has determined that no further disclosure of risks is required.  I (we) understand that if I have any questions about any risks or hazards, I am to ask my physician and I have been given an opportunity to do so.**

I (we) understand that anesthesia involves additional risks and hazards but I (we) request the use of anesthetics for the relief and protection from pain during the planned and additional procedures.  I (we) realize the anesthesia may have to be changed possibly without explanation to me (us).  I (we) understand that certain complications may result from the use of any anesthetic including respiratory problems, drug reactions, paralysis, brain damage or even death.  Other risks and hazards which may result from the use of general anesthetics range from minor discomfort to injury to vocal cords, teeth or eyes.  I (we) understand that other risks and hazards resulting from spinal or epidural anesthetics include headache and chronic pain.

I (we) have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risks of nontreatment, the procedures to be used, and the risks and hazards involved, and I (we) believe that I (we) have sufficient information to give this informed consent.

I (we) certify this form has been fully explained to me, that I (we) have read it or have had it read to me, that the blank spaces have been filled in, and that I (we) understand its contents.

Date _09/18/00_ Time _0045_     Signature of Patient or Legally Responsible Person _____     Relationship _____

Witness Name _Roy Tamayo_     Address (Street Or P.O Box) _VBMC_     City _Harlingen_     State _TX_     Zip Code _78550_

Translated/Interpreted into _____ / Read / Translated to Patient by _____                    5?

PATIENT UNABLE TO SIGN FOR THE FOLLOWING REASON(S):
☐ Physical disability      ☐ Lacks capacity to make health care decisions      ☐ Other _____

This form is designed to comply with the requirements promulgated by the Texas Medical Disclosure Panel.                    VBMC 1600-058-032k

The following treatments and procedures require full disclosure by the physician or health care provider to the patient or person authorized to consent for the patient. The information listed in each box are the risks associated with treatments or procedures performed and disclosed by my physician. Initial by the patient or legally responsible party acknowledges receipt and understanding of the disclosure.

000056

| | |
|---|---|
| **ALL FEMALES MUST COMPLETE:**<br>I understand that radiation can be harmful to the unborn child. (Initial)<br><br>_____ I am pregnant.    _____ I am not pregnant.<br><br>I could be pregnant. | Initial    I (we) reject this diagnostic procedure.<br>I (we) realize that such rejection might influence my prognosis (predicted future medical condition) by withholding diagnostic information from my referring physician. |

| | |
|---|---|
| Initial   Abdominal & Pelvic Biopsies<br>1. Bleeding.<br>2. Infection.<br>_____ 3. Pain.<br>4. Anaphylaxis (local anesthesia) | Initial   Angioplasty (Intravascular Dilatation Technique)<br>1. Swelling, pain, tenderness, or bleeding at site of blood vessel puncture.<br>_____ 2. Damage to parts of body supplied by artery with resulting loss of function or amputation.<br>3. Injury to the vessel that may require immediate surgical intervention.<br>4. Recurrent or continuation of original condition.<br>5. Allergic sensitivity reaction to injected contrast media. |
| Initial   Arteriovenous Access<br>1. Thrombosis.<br>2. Inadequate flow for dialysis.<br>3. Infection in and around site of operation or elsewhere including lungs, kidneys or other organs.<br>4. Swelling of extremity (acute and/or chronic).<br>5. Loss of circulation beyond access site.<br>6. Embolus.<br>7. Paralysis of involved extremity.<br>8. Loss of extremity.<br>9. Formation of pseudoaneurysms.<br>10. Heart failure. | Initial   Aspiration of Abdominal/Pelvic Fluid Collection<br>1. Bleeding.    3. Anaphylaxis (Local Anesthesia).<br>_____ 2. Infection.    4. Pain. |
| | Initial   Breast Core Biopsy / Cyst Aspiration<br>1. Bleeding.    4. Infection.<br>2. Hematoma.    5. Surgical biopsy may still be<br>_____ 3. Pain    indicated. |
| Initial   Amniocentesis<br>1. Fetal or maternal bleeding.<br>2. Infection in amniotic cavity or maternal abdomen.<br>3. Premature rupture of membranes.<br>4. Injury or death of fetus.<br>5. Abdominal cramping or discomfort to mother<br>6. Premature labor and delivery. | Initial   Contrast Study<br>1. Infection.<br>2. Allergic reaction.<br>3. Loss of blood.<br>4. Loss of function of any limb or organ (such as kidney failure).<br>5. Paralysis.<br>6. Brain damage.<br>7. Cardiac arrest or death.<br>8. Alterations in blood pressure.<br>9. Allergic rash.<br>10. Swelling of the lips or eyelids.<br>11. Difficulty breathing. |
| Initial   Angiography, Aortography, Arteriography (Arterial Injection of Contrast Media -Diagnostic)<br>1. Injury to artery.<br>2. Damage to parts of the body supplied by the artery with resulting loss of function or amputation. (blood clot)<br>3. Swelling, pain, tenderness or bleeding at the site of the blood vessel perforation.<br>4. Aggravation of the condition that necessitated the procedure.<br>5. Allergic sensitivity reaction to injected contrast media.<br>6. Stroke.<br>7. Death. | Initial   Magnetic Resonance Imaging (MRI) / Contrast Studies<br>1. Pain.<br>2. Burning.<br>3. Headaches.<br>4. Nausea.<br>5. Vomiting.<br>6. Fainting (syncope).<br>7. Heart blockage (vasovagal reaction).<br>8. Decreased blood pressure (hypotension).    **58**<br>9. Abdominal pain.<br>10. Death. |
| Initial   Angiography with Occlusion Techniques - Therapeutic (Embolization of Artery)<br>1. Injury to artery.<br>2. Loss or injury to body parts.<br>3. Swelling, pain, tenderness or bleeding at the site of the blood vessel perforation<br>4. Aggravation of the condition that necessitated the procedure<br>5. Allergic sensitivity reaction to injected contrast media. | **MRI PREGNANT PATIENT**<br>If pregnant, there are no known biological hazards associated with MRI examinations, however, exact harmful threshold are not known and the total effect on a developing fetus is not known. Accepted practice is to delay MRI imaging of the mother or fetus until after 12 weeks of gestation Examinations before 12 weeks are performed only when required due to medical necessity. Exams prior to 12 weeks have not been known to cause problems. |



**Valley Baptist Medical Center**
2101 Pease Street, P.O. Drawer 2588
Harlingen, Texas 78550

Patient Name _____    MR # _____ **000057** _____

### INTRAVENOUS PYELOGRAM / CT

Your doctor has scheduled you for an x-ray procedure which requires the use of iodinated contrast. The contrast is injected into the bloodstream by a needle placed in a vein in your arm. This contrast circulates through your body and is eliminated by the kidneys. Normally this is quite safe; however any injection carries some risk to yourself. Mild contrast reactions may cause hives or sneezing. Rarely (1 case per 1,000) a serious reaction may occur and very rarely (1 case per 40,000) death may occur.

Certain patients are at higher risk for reactions to contrast. Higher risk patients are those who have history of: (1) previous allergy-like reaction to contrast which required treatment; (2) severe allergies or asthma; (3) severe or incapacitating heart disease, (4) multiple myeloma, sickle cell disease, polycythemia or pheochromocytoma; (5) severe kidney disease, particularly that caused by diabetes. If you believe you are in one of the above categories please notify the technologist or radiologist.

I AM IN THE HIGH RISK CATEGORY: ☐ NO   ☐ YES

BECAUSE OF ITEMS #: _____

I KNOW OF NO SUBSTANCE I AM ALLERGIC TO EXCEPT:

_____

_____
_____

I (we) realize that the medical history and statements given above will influence the performance of the procedure planned for me.

Based on the above information if you are in a high risk group, your procedure will be performed with non-ionic or low osmolar contrast media. Unfortunately these agents are expensive (an additional $80-$120 per examination) and your insurance may not cover the cost. If you are not in a high risk group, you may request that non-ionic or low osmolar contrast be used. However, conventional contrast is recommended and has a long history of being safe and effective. If you have any questions, please ask the x-ray technologist.

As a result of this procedure, there may be risks of: INFECTION, ALLERGIC REACTION, LOSS OF BLOOD, OR LOSS OF FUNC- TION OF ANY LIMB OR ORGAN (SUCH AS KIDNEY FAILURE), PARALYSIS, BRAIN DAMAGE, CARDIAC ARREST OR DEATH. Additionally, there may be other possible risks including but not limited to: alterations in blood pressure, allergic rash, swelling of the lips or eyelids and difficulty breathing.

Alternatives to contrast Intravenous Pyelograms-are: Radionuclide Renogram, Ultrasound study or Retrograde Pyelogram. Alterna- tives to contrast CT Scans are: Ultrasound or MRI studies in some cases.

Patient Initial _____

VBMC 1600-058-032k

| Initial | |
|---|---|
| _____ | **Lung Biopsy**<br>1. Pneumothorax.<br>2. Hemothorax.<br>3. Infection.<br>4. Pain. |
| _____ | **Myelography**<br>1. Chronic pain.<br>2. Transient headache, nausea, vomiting.<br>3. Numbness.<br>4. Impaired muscle function. |
| _____ | **Paracentesis (Removal of Fluid From the Abdomen)**<br>1. Bleeding.<br>2. Infection.<br>3. Anaphylaxis (Local Anesthesia).<br>4. Death |
| _____ | **Percutaneous Biliary Study and/or Drainage**<br>1. Infection.<br>2. Loss of blood.<br>3. Loss of function of any limb or organ (such as kidney failure).<br>4. Cardiac arrest or death.<br>5. Alterations in blood pressure.<br>6. Injury to artery.<br>7. Damage to parts of the body supplied by the artery with resulting loss of function or amputation (blood clot).<br>8. Swelling, pain, tenderness or bleeding at the site of the procedure. |
| _____ | **Percutaneous Renal Drainage**<br>1. Infection.<br>2. Loss of blood.<br>3. Loss of function of any limb or organ (such as kidney failure).<br>4. Cardiac arrest or death.<br>5. Alterations in blood pressure.<br>6. Injury to artery.<br>7. Damage to parts of the body supplied by the artery with resulting loss of function or amputation (blood clot).<br>8. Swelling, pain, tenderness or bleeding at the site of the procedure. |
| _____ | **Thoracentesis (Removal of Fluid From the Chest)**<br>1. Bleeding<br>2. Infection.<br>3. Anaphylaxis (Local Anesthesia).<br>4. Collapsed Lung. |
| _____ | **Thyroid Toxcosis / Ablation**<br>1. Permanent under-activity of the thyroid gland.<br>2. Tenderness and/or swelling of the thyroid gland.<br>3. A temporary increase in the symptoms of thyroid over-activity.<br>4. Hypocalcemia secondary to irradiation of the parathyroid glands |
| _____ | **OTHER**<br>Possible Complications    **59**<br>1 _____<br>2 _____<br>3. _____ |



**Valley Baptist Medical Center**
*2101 Pease Street, P.O. Drawer 2588*
*Harlingen, Texas 78550*

000058

Patient Name _____    MR # _____

| Initial | Bronchoscopy |
|---|---|
|  | 1. Tear or perforation of esophagus and/or lung. |
|  | 2. Obstruction caused by laryngeal spasms. |
| ——— | 3. Seizure. |
|  | 4. Respiratory failure. |
|  | 5. Damage to intra-abdominal structures (e.g. bowel, blood vessels, or nerves). |
|  | 6. Intra-abdominal abscess and infectious complications |
|  | 7. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation. |
|  | 8. Conversion of the procedure to an open procedure. |
|  | 9. Cardiac dysfunction. |
|  | 10. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section. |
|  | 11. Death. |

| Initial | Esophageal Dilatation |
|---|---|
|  | 1. Discomfort may accompany the procedure including chest pain and sore throat. |
| ——— | 2. Aspiration. |
|  | 3. Damage to intra-abdominal structures (e.g., intestinal tract, blood vessels, or nerves). |
|  | 4. Intra-abdominal abscess and infectious complications |
|  | 5. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation. |
|  | 6. Conversion of the procedure to an open procedure. |
|  | 7. Cardiac dysfunction. |
|  | 8. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section. |
|  | 9. Death. |

| Initial | Colonoscopic Procedure with Biopsy, Polypectomy or Cautery |
|---|---|
|  | 1. Discomfort. |
|  | 2. Bloating of the abdomen. |
| ——— | 3. Drug reaction. |
|  | 4. Infection. |
|  | 5. Damage to intra-abdominal structures (e.g. bowel, bladder, blood vessels, or nerves). |
|  | 6. Intra-abdominal abscess and infectious complications |
|  | 7. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation. |
|  | 8. Conversion of the procedure to an open procedure. |
|  | 9. Cardiac dysfunction. |
|  | 10. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section. |
|  | 11. Death. |

| Initial | Endoscopic Retrograde Cholangiopancreatography with Sphincterotomy |
|---|---|
|  | 1. Pancreatitis due to irritation of the pancreatic ducts by dye. |
| ——— | 2. Infection of the bile duct. |
|  | 3. Drug reaction. |
|  | 4. Aspiration. |
|  | 5. Damage to intra-abdominal structures (e.g. bowel, bladder, blood vessels, or nerves). |
|  | 6. Intra-abdominal abscess and infectious complications |
|  | 7. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation. |
|  | 8. Conversion of the procedure to an open procedure. |
|  | 9. Cardiac dysfunction. |
|  | 10. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section. |
|  | 11. Death. |

60

000053

## Disclosure And Consent For Medical And Radiological Procedures

**TO THE PATIENT:** You have the right, as a patient, to be informed about your condition and the recommended surgical, medical, or diagnostic procedure to be used so that you may make the decision whether or not to undergo the procedure after knowing the risks and hazards involved. This disclosure is not meant to scare or alarm you; it is simply an effort to make you better informed so you may give or withhold your consent to the procedure.

I (we) voluntarily request Dr. _Gonzalez_ as my physician, and such associates, technical assistants and other health care providers as they may deem necessary to treat my condition which has been explained to me as: _Psychosis_

I (we) understand that the following surgical, medical, and/or diagnostic procedure(s) are planned for me and I (we) voluntarily consent and authorize these procedure(s): _Delta Scan of head with and without contrast_

I (we) understand that my physician may discover other or different conditions which require additional or different procedures than those planned. I (we) authorize my physician, and such associates, technical assistants and other health care providers to perform such other procedures which are advisable in their professional judgement.

I.  ☐ Not applicable.                                                 *Initial*

II. I (We) (do) (do not) consent to the use of blood and blood products as deemed necessary.

III. Risks associated with Blood/Blood Products Transfusion are:
1. Fever, itching, and/or skin rash.
2. Transfusion reaction which may include kidney failure pain, shock, anemia, and/or bleeding.
3. Heart failure or shortness of breath.
4. Hepatitis.
5. A.I.D.S. (Acquired Immune Deficiency Syndrome).
6. Other infections.

IV. The blood products for my surgery are:                       *Initial*
1. Blood Bank blood as prescribed by my physician.
2. Blood donated by myself for my own use first, then Blood Bank blood if required in my doctor's opinion.
3. Blood donated by friends or relatives first, then Blood Bank blood if required in my doctor's opinion.
4. Only blood donated by myself for my own use (autologous).
5. Only blood donated by friends or relatives (recipient specific).

V. Alternative methods which may be used instead of blood products have been explained.

I (we) understand that no warranty or guarantee has been made to me as to result or cure.

Just as there may be risks and hazards in continuing my present condition without treatment, there are also risks and hazards related to the performance of the surgical, medical, and/or diagnostic procedures planned for me. I (we) realize that common to surgical, medical, and/or diagnostic procedures is the potential for infection, blood clots in veins and lungs, hemorrhage, allergic reactions, and even death. I (we) realize that the following risks and hazards may occur in connection with this particular procedure:
☐ Risks as disclosed by my physician are listed in the appropriate box on the following pages.
☐ The Texas Medical Disclosure Panel has determined that no further disclosure of risks is required. I (we) understand that if I have any questions about any risks or hazards, I am to ask my physician and I have been given an opportunity to do so.

I (we) understand that anesthesia involves additional risks and hazards but I (we) request the use of anesthetics for the relief and protection from pain during the planned and additional procedures. I (we) realize the anesthesia may have to be changed possibly without explanation to me (us). I (we) understand that certain complications may result from the use of any anesthetic including respiratory problems, drug reactions, paralysis, brain damage or even death. Other risks and hazards which may result from the use of general anesthetics range from minor discomfort to injury to vocal cords, teeth or eyes. I (we) understand that other risks and hazards resulting from spinal or epidural anesthetics include headache and chronic pain.

I (we) have been given an opportunity to ask questions about my condition, alternative forms of anesthesia and treatment, risks of nontreatment, the procedures to be used, and the risks and hazards involved, and I (we) believe that I (we) have sufficient information to give this informed consent.

I (we) certify that this form has been fully explained to me, that I (we) have read it or have had it read to me, that the blank spaces have been filled in, and that I (we) understand its contents.

Date _9/18/00_   Time _2295_   Signature of Patient or Legally Responsible Person X _____   Relationship _self_

Witness Name _____   Address (Street Or P.O. Box) _VBMC_   City _Harlingen_ State _TX_ Zip Code _78570_

Translated/Interpreted into _____ / Read / Translated to Patient by _____
PATIENT UNABLE TO SIGN FOR THE FOLLOWING REASON(S):
☐ Physical disability   ☐ Lacks capacity to make health care decisions   ☐ Other _____

This form is designed to comply with the requirements promulgated by the Texas Medical Disclosure Panel.                    VBMC 1600-059-0028

61

The following treatments and procedures require full disclosure by the physician or health care provider to the patient or person authorized to consent for the patient. The information listed in each box are the risks associated with treatments or procedures performed and disclosed by my physician. Initial by the patient or legally responsible party acknowledges receipt and understanding of the disclosure.

000060

| | |
|---|---|
| **ALL FEMALES MUST COMPLETE:**<br>I understand that radiation can be harmful to the unborn child. (Initial)<br>_____ I am pregnant. _____ I am not pregnant.<br>I could be pregnant. | Initial _____ I (we) reject this diagnostic procedure.<br>I (we) realize that such rejection might influence my prognosis (predicted future medical condition) by withholding diagnostic information from my referring physician. |

| Initial | Abdominal & Pelvic Biopsies |
|---|---|
| | 1. Bleeding.<br>2. Infection.<br>3. Pain.<br>4. Anaphylaxis (local anesthesia) |

| Initial | Arteriovenous Access |
|---|---|
| | 1. Thrombosis.<br>2. Inadequate flow for dialysis.<br>3. Infection in and around site of operation or elsewhere including lungs, kidneys or other organs.<br>4. Swelling of extremity (acute and/or chronic).<br>5. Loss of circulation beyond access site.<br>6. Embolus.<br>7. Paralysis of involved extremity.<br>8. Loss of extremity.<br>9. Formation of pseudoaneurysms.<br>10. Heart failure. |

| Initial | Amniocentesis |
|---|---|
| | 1. Fetal or maternal bleeding.<br>2. Infection in amniotic cavity or maternal abdomen.<br>3. Premature rupture of membranes.<br>4. Injury or death of fetus.<br>5. Abdominal cramping or discomfort to mother.<br>6. Premature labor and delivery. |

| Initial | Angiography, Aortography, Arteriography (Arterial Injection of Contrast Media -Diagnostic) |
|---|---|
| | 1. Injury to artery.<br>2. Damage to parts of the body supplied by the artery with resulting loss of function or amputation. (blood clot)<br>3. Swelling, pain, tenderness or bleeding at the site of the blood vessel perforation.<br>4. Aggravation of the condition that necessitated the procedure.<br>5. Allergic sensitivity reaction to injected contrast media.<br>6. Stroke.<br>7. Death. |

| Initial | Angiography with Occlusion Techniques - Therapeutic (Embolization of Artery) |
|---|---|
| | 1. Injury to artery.<br>2. Loss or injury to body parts.<br>3. Swelling, pain, tenderness or bleeding at the site of the blood vessel perforation.<br>4. Aggravation of the condition that necessitated the procedure.<br>5. Allergic sensitivity reaction to injected contrast media. |

| Initial | Angioplasty (Intravascular Dilatation Technique) |
|---|---|
| | 1. Swelling, pain, tenderness, or bleeding at site of blood vessel puncture.<br>2. Damage to parts of body supplied by artery with resulting loss of function or amputation.<br>3. Injury to the vessel that may require immediate surgical intervention.<br>4. Recurrent or continuation of original condition.<br>5. Allergic sensitivity reaction to injected contrast media. |

| Initial | Aspiration of Abdominal/Pelvic Fluid Collection |
|---|---|
| | 1. Bleeding.     3. Anaphylaxis (Local Anesthesia).<br>2. Infection.   4. Pain. |

| Initial | Breast Core Biopsy / Cyst Aspiration |
|---|---|
| | 1. Bleeding.     4. Infection.<br>2. Hematoma.   5. Surgical biopsy may still be<br>3. Pain              indicated. |

| Initial | Contrast Study |
|---|---|
| | 1. Infection.<br>2. Allergic reaction.<br>3. Loss of blood.<br>4. Loss of function of any limb or organ (such as kidney failure).<br>5. Paralysis.<br>6. Brain damage.<br>7. Cardiac arrest or death.<br>8. Alterations in blood pressure.<br>9. Allergic rash.<br>10. Swelling of the lips or eyelids.<br>11. Difficulty breathing. |

| Initial | Magnetic Resonance Imaging (MRI) / Contrast Studies |
|---|---|
| | 1. Pain.<br>2. Burning.<br>3. Headaches.<br>4. Nausea.<br>5. Vomiting.<br>6. Fainting (syncope).<br>7. Heart blockage (vasovagal reaction).<br>8. Decreased blood pressure (hypotension).<br>9. Abdominal pain.<br>10. Death |

62

**MRI PREGNANT PATIENT**
If pregnant, there are no known biological hazards associated with MRI examinations; however, exact harmful threshold are not known and the total effect on a developing fetus is not known. Accepted practice is to delay MRI imaging of the mother or fetus until after 12 weeks of gestation. Examinations before 12 weeks are performed only when required due to medical necessity. Exams prior to 12 weeks have not been known to cause problems.



**Valley Baptist Medical Center**
*2101 Pease Street, P.O. Drawer 2588*
*Harlingen, Texas 78550*

9 1  984589  2
NZALEZ, GUSTAV
YLER, MARION

Patient Name _____    MR # _____

---

### INTRAVENOUS PYELOGRAM / CT

Your doctor has scheduled you for an x-ray procedure which requires the use of iodinated contrast. The contrast is injected into the bloodstream by a needle placed in a vein in your arm. This contrast circulates through your body and is eliminated by the kidneys. Normally this is quite safe; however any injection carries some risk to yourself. Mild contrast reactions may cause hives or sneezing. Rarely (1 case per 1,000) a serious reaction may occur and very rarely (1 case per 40,000) death may occur.

Certain patients are at higher risk for reactions to contrast. Higher risk patients are those who have history of: (1) previous allergy-like reaction to contrast which required treatment; (2) severe allergies or asthma; (3) severe or incapacitating heart disease, (4) multiple myeloma, sickle cell disease, polycythemia or pheochromocytoma; (5) severe kidney disease, particularly that caused by diabetes. If you believe you are in one of the above categories please notify the technologist or radiologist.

I AM IN THE HIGH RISK CATEGORY: ☐ NO   ☐ YES

BECAUSE OF ITEMS #: _____

I KNOW OF NO SUBSTANCE I AM ALLERGIC TO EXCEPT:

_____
_____
_____

I (we) realize that the medical history and statements given above will influence the performance of the procedure planned for me.

Based on the above information if you are in a high risk group, your procedure will be performed with non-ionic or low osmolar contrast media. Unfortunately these agents are expensive (an additional $80-$120 per examination) and your insurance may not cover the cost. If you are not in a high risk group, you may request that non-ionic or low osmolar contrast be used. However, conventional contrast is recommended and has a long history of being safe and effective. If you have any questions, please ask the x-ray technologist.

As a result of this procedure, there may be risks of: INFECTION, ALLERGIC REACTION, LOSS OF BLOOD, OR LOSS OF FUNCTION OF ANY LIMB OR ORGAN (SUCH AS KIDNEY FAILURE), PARALYSIS, BRAIN DAMAGE, CARDIAC ARREST OR DEATH. Additionally, there may be other possible risks including but not limited to: alterations in blood pressure, allergic rash, swelling of the lips or eyelids and difficulty breathing.

Alternatives to contrast Intravenous Pyelograms are: Radionuclide Renogram, Ultrasound study or Retrograde Pyelogram. Alternatives to contrast CT Scans are: Ultrasound or MRI studies in some cases.

Patient Initial _____

VBMC 1600-058-032x

---

| Initial | |
|---|---|
| | **Lung Biopsy**  000061 |
| | 1. Pneumothorax. |
| | 2. Hemothorax. |
| | 3. Infection. |
| | 4. Pain. |

| Initial | |
|---|---|
| | **Myelography** |
| | 1. Chronic pain. |
| | 2. Transient headache, nausea, vomiting. |
| | 3. Numbness. |
| | 4. Impaired muscle function. |

| Initial | |
|---|---|
| | **Paracentesis (Removal of Fluid From the Abdomen)** |
| | 1. Bleeding. |
| | 2. Infection. |
| | 3. Anaphylaxis (Local Anesthesia). |
| | 4. Death |

| Initial | |
|---|---|
| | **Percutaneous Biliary Study and/or Drainage** |
| | 1. Infection. |
| | 2. Loss of blood. |
| | 3. Loss of function of any limb or organ (such as kidney failure). |
| | 4. Cardiac arrest or death. |
| | 5. Alterations in blood pressure. |
| | 6. Injury to artery. |
| | 7. Damage to parts of the body supplied by the artery with resulting loss of function or amputation (blood clot). |
| | 8. Swelling, pain, tenderness or bleeding at the site of the procedure. |

| Initial | |
|---|---|
| | **Percutaneous Renal Drainage** |
| | 1. Infection. |
| | 2. Loss of blood. |
| | 3. Loss of function of any limb or organ (such as kidney failure). |
| | 4. Cardiac arrest or death. |
| | 5. Alterations in blood pressure. |
| | 6. Injury to artery. |
| | 7. Damage to parts of the body supplied by the artery with resulting loss of function or amputation (blood clot). |
| | 8. Swelling, pain, tenderness or bleeding at the site of the procedure. |

| Initial | |
|---|---|
| | **Thoracentesis (Removal of Fluid From the Chest)** |
| | 1. Bleeding. |
| | 2. Infection. |
| | 3. Anaphylaxis (Local Anesthesia). |
| | 4. Collapsed Lung. |

| Initial | |
|---|---|
| | **Thyroid Toxicosis / Ablation** |
| | 1. Permanent under-activity of the thyroid gland. |
| | 2. Tenderness and/or swelling of the thyroid gland. |
| | 3. A temporary increase in the symptoms of thyroid over-activity. |
| | 4. Hypocalcemia secondary to irradiation of the parathyroid glands. |

| Initial | |
|---|---|
| | **OTHER** _____ |
| | Possible Complications  **63** |
| | 1. _____ |
| | 2. _____ |
| | 3. _____ |



**Valley Baptist Medical Center**
*2101 Pease Street, P.O. Drawer 2588*
*Harlingen, Texas 78550*

000062

Patient Name _____     MR # _____

| Initial | Bronchoscopy |
|---|---|
| | 1. Tear or perforation of esophagus and/or lung.<br>2. Obstruction caused by laryngeal spasms.<br>3. Seizure.<br>4. Respiratory failure.<br>5. Damage to intra-abdominal structures (e.g. bowel, blood vessels, or nerves).<br>6. Intra-abdominal abscess and infectious complications<br>7. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation.<br>8. Conversion of the procedure to an open procedure.<br>9. Cardiac dysfunction.<br>10. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section.<br>11. Death. |

| Initial | Esophageal Dilatation |
|---|---|
| | 1. Discomfort may accompany the procedure including chest pain and sore throat.<br>2. Aspiration.<br>3. Damage to intra-abdominal structures (e.g., intestinal tract, blood vessels, or nerves).<br>4. Intra-abdominal abscess and infectious complications<br>5. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation.<br>6. Conversion of the procedure to an open procedure.<br>7. Cardiac dysfunction.<br>8. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section.<br>9. Death. |

| Initial | Colonoscopic Procedure with Biopsy, Polypectomy or Cautery |
|---|---|
| | 1. Discomfort.<br>2. Bloating of the abdomen.<br>3. Drug reaction.<br>4. Infection.<br>5. Damage to intra-abdominal structures (e.g. bowel, bladder, blood vessels, or nerves).<br>6. Intra-abdominal abscess and infectious complications<br>7. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation.<br>8. Conversion of the procedure to an open procedure.<br>9. Cardiac dysfunction.<br>10. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section.<br>11. Death. |

| Initial | Endoscopic Retrograde Cholangiopancreastography with Sphincterotomy |
|---|---|
| | 1. Pancreatitis due to irritation of the pancreatic ducts by dye.<br>2. Infection of the bile duct.<br>3. Drug reaction.<br>4. Aspiration.<br>5. Damage to intra-abdominal structures (e.g. bowel, bladder, blood vessels, or nerves).<br>6. Intra-abdominal abscess and infectious complications<br>7. Trocar site complications (e.g., hematoma/ bleeding, leakage of fluid, or hernia formation.<br>8. Conversion of the procedure to an open procedure.<br>9. Cardiac dysfunction.<br>10. All risks and hazards of the same surgery when done as an open procedure, if any risks and hazards are listed in this section.<br>11. Death. |

**64**

# BEHAVIORAL HEALTH SERVICES

000063

Acct #: 984589192          . *** Valley Baptist Medical Center ***      Run:  19-Sep-2000 07:55
MR #: 00249469                 ***      HARLINGEN, TEXAS      ***      From: 18 Sep 00  0700   To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                       Page:   1
Sex: M Age:Age                                                          Provider: DAVIS, HARRY A
Born:    30-Dec-1972


18Sep00   1058          RES
                                   attempted to see pt. for teh purposes of getting psychjo-social hx.
                                   on behalf of staff psychiatrist. pt. was uncooperative and refused
                                   to answer questions beyond his name. Dr. Gonzalez to f/u per
                                   consult.


Signature(s):      RES  ROY SHENEMAN, MA,LPC

                                          End of Report                                              65

000064

CC: _"neck hurt" two small_
_lacerations to front of neck p being_ ~~in MVA, pain @ shoulder~~

Allerges: ☑ NKA  ☐ See "Physician Medication Orders" (VBMC 1965-103)

000065

☐ Patient requests EMD     ☐ Patient requests personal MD
☐ Personal MD requests EMD
Pt arrived in ER with the following:          ☐ IV #1 _____
☐ None          ☐ Foley Cath          Site _____ Credit _____
☐ N/G Tube     ☐ Urine; Amt _____   ☐ IV #2 _____
☐ Backboard    ☐ Dressing _____     Site _____ Credit _____
☐ Cervical Collar ☐ CPR                ☐ IVPB _____
☐ ET Tube  BS R___ L___                ☐ Other _____

## MEDICATIONS   ☐ See "Physician Medication Orders" (VBMC 1965-103)
☐ Meds unknown by patient.   ☐ Patient unsure of medication names
Description by patient: _____

_Tylenol_

## PAST MEDICAL HISTORY   ☑ Per Patient  ☐ No One Available
☑ Patient denies any past medical history.
☐ Per Significant Other (ID) _____
☐ TB  ☐ COPD  ☐ Cardiac  ☐ Seizures  ☐ Respiratory  ☐ Neurological
☐ MI  ☐ Kidney  ☐ Ulcers  ☐ Bleeding  ☐ Pacemaker  ☐ Antidepressant
☐ CVA ☐ Cancer ☐ Diabetes ☐ Steroids ☐ Back Injury ☐ Hypertension
☐ Blood Transfusion      Other _____

Blood Glucose: ☐ No  ☐ Yes  Frequency _____
Past Hospitalization / Surgeries? _____
_left knee surgery_

Presently under TX for _No_

---

### PEDIATRICS ONLY
Pediatric Immunizations current?  ☐ Yes  ☐ No   If no, refer to Health Dept.
Had Disease:  ☐ Rubella  ☐ Polio   ☐ Diphtheria  ☐ Chicken Pox
             ☐ Tetanus  ☐ Mumps  ☐ Small Pox  ☐ Whooping Cough

### REVIEW OF SYSTEMS  (check all that apply)          Breath Sounds
**Respiratory**   ☑ No Distress                        R  L
☐ Trach/Stoma   ☐ Smoker _____ pkgs/day     ☑ ☑ Clear
☐ Cough/Sputum Appearance _____              ☐ ☐ Crackles
☐ SOB ☐ Slow ☐ Deep ☐ Shallow ☐ Labored ☐ Rapid  ☐ ☐ Wheezing
☐ Other _____                                ☐ ☐ Rhonchi
**Cardiac**: Pulse: ☑ Regular  ☐ Strong  ☑ Rapid  ☐ ☐ Decreased
            ☐ Irregular ☐ Weak ☐ Pedal Edema      ☐ ☐ Absent
☐ Pedal Pulses  R _+_  L _+_  (+ −)
☐ Chest Pain / Location / Duration _N/A_

**Neurological**
☑ Conscious    ☐ Unconscious   ☐ Confused   ☐ Slow to Answer
☑ Alert        ☐ Combative     ☐ Numbness   ☐ Neck Rigidity
☐ Oriented     ☐ Disoriented   ☐ Lethargic  ☐ Tingling
☐ Memory Intact ☐ Memory Impaired ☑ Suspected ETOH/Drug Use
☐ Answers Appropriately  ☐ Other _____
Drainage: _____ Ear _____ Nose  Description _____
Speech: ☑ WNL  ☐ Silent  ☐ Slurred ☐ Unable to Speak ☐ Incoherent
Primary Language _Spanish_
**Psychosocial**  ☐ Cooperative  ☑ Good Eye Contact  ☐ Fearful
                  ☐ Uncooperative ☑ Flat Affect      ☐ Crying
**Appearance**   ☐ Normal  ☐ Frail  ☐ Obese
**Hygiene**      ☐ Normal  ☑ Dirty
**Skin Condition** ☑ Normal ☐ Warm ☐ Hot  ☐ Dry
                   ☐ Cool  ☐ Cold ☐ Moist
**Color**  ☑ Normal ☐ Pale ☐ Cyanotic ☑ Flushed
           ☐ Ashen ☐ Rash ☐ Mottled ☐ Jaundiced

_9/17/02  2215_          _signature_          RN
Date / Time      Initial / Signature

---

**Skin Integument** ☐ WNL ☐ Dry ☐ Scaly  Initial _____
☐ Pressure Sore ☐ Central Line _____ ☐ AV Graft _____
☐ Wound/Dressing (Location/Description) _____
☐ Other _____
**H.E.E.N.T.**  ☐ WNL                Initial _____
☐ Blind  ☐ Vision Impaired  R ___ L ___
☐ Hearing Impaired  R ___ L ___   ☐ Difficulty Swallowing
☐ Other _____
**Musculoskeletal**  ☐ Moves Extremities   Initial _____
☐ Amputation/Location _____
☐ Pain/Location _____
☐ Joint Swelling/Location _____
☐ Other _____

**Gastrointestinal** ☐ WNL ☐ Wt change  Initial _____
☐ Constipation ☐ Diarrhea ☐ Nausea/Vomiting ☐ Feeding Tube
**Abdomen:** ☐ Tender ☐ Rigid ☐ Distended ☐ Gastrostomy Tube
☐ Other _____  Diet _____
☐ Abd Pain/Location _____
☐ Ostomy/Type _____
Alcohol Intake _____  Last BM _____
**Genitourinary** ☐ WNL              Initial _____
☐ Frequency ☐ Burning ☐ Hematuria ☐ Nephrostomy
☐ Incontinent ☐ Retention ☐ Urostomy ☐ Foley/Suprapubic
VAG: ☐ Bleeding/Description _____  LMP _____
     ☐ Discharge/Description _____
☐ Other _____

67

_____          _____          RN
Date / Time      Initial / Signature

# 1 UNIVERSAL

000066

| Date/Time | NURSING DIAGNOSIS | INTERVENTION / OUTCOME |
|---|---|---|
| 9/17/00 | 2215 | Patient to room 1 Urgent Care 27 year old male c/o neck pain, two laceration (stab wounds) to front of neck, being in a MVA, painful (R) shoulder. Patient states he tried to kill himself with a knife. Cleaned wounds. Patient ready for exam ——— BTBDR |
| | 2242 | Dr. Guerra at bedside — BTBStu |
| | 2336 | Dr. Lawler paged — BTBNtu |
| | 2336 | Dr. Lawler to admit patient - BTBDR |
| | 2355 | IV line started to (R) hand 18 gauge using aseptic tech. No infil. + no redness or swelling noted at site ——— BTBNtu |
| | 2400 | Adm. Ancef 2g IV as ordered — BTBNtu |
| | 0005 | Td 0.5cc IM to (L) deltoid — Juliano R |
| | 0010 | To x-ray c/o stretcher accompanied by PD + x-ray tech ——— Juliano RN |
| | 0022 | Return from x-ray ——— Juliano RN |
| | 0029 | Er D ordering neck CSpine, going to order CT neck w/o contrast (A) |
| | 0045 | pt refused to sign cat scan c contrast, Er D RR Guerra. Signed authorization given to CT, LFPD officer, Er I c pt (A) |
| 0100 | | Back from CT. PD and security handcuffed to stretcher at calm quiet, urinal given -KB |
| | 0017 | random urine spec'n given pt unable, USAP per Er D ——— c SOR |
| | 0150 | Er D discuss CT results c Dr. Lawler — (A) |
| | 0206 | wtrls 124/75 - 97 SR 19 - 97% on room - 99.2 (R) - (A) |
| | 0210 | to floor, Er I, RN, Laterm PD, alert c slow verbal response, but denies chest pain or SOB ——— R Tamayo R |

68

**VALLEY BAPTIST MEDICAL CENTER**
Harlingen, Texas
**ADMISSION ASSESSMENT**

000067

| Date/Time | NURSING DIAGNOSIS | INTERVENTION / OUTCOME |
|---|---|---|
| | | |

| VITAL SIGNS | TIME | TEMP | PULSE | RESP | B/P | V | M | (V)ALUABLES / (M)EDICATIONS |
|---|---|---|---|---|---|---|---|---|
| | 2215 | 96.8 | 126 | 20 | 166/87 | | | Kept with patient in ED — all ER x rays |
| | | | | | | | | Sent to Unit with patient — to five clt |
| | 0003 | 9 | 100 | 20 | 127/77 | | | Given to Security |
| | | | | | | | | Given to |
| | | | | | | | | Given to — Clothes, belts to ER |

**PHYSICIAN SIGNATURE VERIFYING ORDERS FOR MEDICATIONS, PROCEDURES AND TREATMENTS** (if needed)

_____ MD   Voice Order MD _____ / Nurse _____

☐ **DISCHARGED** | **CONDITION** | ☐ **ADMITTED** | **TRANSPORT METHOD** | **TRANSPORT EQUIPMENT**
☐ Alone | ☐ Improved | Accompanied by | ☐ Ambulatory | ☐ O₂
☐ Accompanied by Adult | ☑ Stable | EMT I, LFDD & T | ☐ Wheelchair | ☐ Heart Monitor
Phone _____ | ☐ Unchanged | RN | ☐ Stretcher | ☐ RS 710
☐ AMA | | | ☐ Carried in Arms | ☐
**VITAL SIGNS:** (if indicated)  B/P 121/75  P 97 SR 99.2 (E)  R 19  O₂ 97 % rm
Date 09/18/00  Time 0210   Nurse Signature/Credentials  R Tamayo RN

**TO BE COMPLETED ON ADMISSION TO NURSING UNIT**

| How Arrived | Admit From | VITAL SIGNS: | T _____ | B/P | Ht _____ |
|---|---|---|---|---|---|
| ☐ Ambulatory  ☐ W/C  ☐ Arms | ☐ ED  ☐ MD Office | | P _____ | L | Weight _____ kg |
| ☐ Ambulance  ☐ Stretcher | ☐ RR  ☐ Other | | R _____ | R | _____ lbs ___ oz |

| V | M | (V)ALUABLES / (M)EDICATIONS | SAFETY ASSESSMENT | PPt Level on |
|---|---|---|---|---|
| ___ ___ | Kept with patient in ED | Admission _____ | |
| ___ ___ | Sent to Unit with patient | History of Falls ☐ No ☐ Yes | |
| ___ ___ | Given to Security | | |
| ___ ___ | Given to _____ | | 69 |
| ___ ___ | Given to _____ | | |

Date _____   Time _____        Nurse Signature/Credentials _____

## EDUCATION / DISCHARGE PLANNING ASSESSMENT:

**Cultural:**   Patient / Family:

Speaks. ☐ English   ☐ Spanish  Other _____
Reads.   ☐ English   ☐ Spanish  Other _____
Writes.  ☐ English   ☐ Spanish  Other _____
Primary Caregiver/Other to be instructed (name/phone)_____
_____

**Psychosocial:**   Marital Status:   S   M   D   W

Lives: ☐ Alone  ☐ With Spouse  ☐ With Children  ☐ With Parents
      # of Children _____  ☐ Other _____
If applicable. ☐ Father's Age _____  ☐ Mother's Age _____
Feeding: ☐ Self  ☐ w/Assist
Performs ADL: ☐ Self  ☐ w/Assist  ☐ Unable
Utilities: ☐ Water  ☐ Electric  ☐ Kitchen Facilities
Special Education Needs: ☐ Requires Interpreter _____
_____

Demonstrates:  ☐ Readiness to Learn  ☐ Resistance to Education
☐ Understanding of reason for hospitalization_____
_____

Main concern about hospitalization _____
_____

Cultural Needs: ☐ Religion/Denomination _____
☐ Food _____

**Limitations:**  Prosthesis _____
☐ Blind  Ⓛ Ⓡ ☐ Glasses      ☐ Contacts  ☐ Hemianopsia
☐ Deaf  Ⓛ Ⓡ ☐ Reads Lips    ☐ Uses Sign Language
☐ Expressive Language Deficit   ☐ Receptive Language Deficit
Affected Side: ☐ Right  ☐ Left  ☐ Neglect
Oriented to: ☐ Person  ☐ Time  ☐ Place  ☐ Disoriented
Level of Understanding: ☐ Good  ☐ Fair  ☐ Poor
☐ Other _____
Attention Span: ☐ Adequate  ☐ Inadequate
☐ Hearing Aid(s)  Other _____
Dentures?  Yes  No      Dentures Used to Eat?     Yes   No
☐ Difficulty chewing       ☐ Difficulty swallowing

**SOCIAL SERVICE**  ( Check all that apply)
☐ Nursing Home (Refer to SS)    ☐ Homeless (Refer to SS)
☐ Patient lives alone and has no apparent family or significant others.
☐ Patient will be unable to return to former living situation.
☐ Patient demonstrates a degree of confusion and/or disorientation.
☐ Patient is unable to take medication as prescribed.
☐ Patient unable to perform self-help activities / has difficulty in mobility.
☐ History of non-compliance with health care plan.
☐ Patient may require special equipment or services after discharge.
☐ Readmission to ED/hospital within 15, 30 or 60 days.
☐ Potential for home infusion.
☐ Current Home Services:  ☐ Day Care  ☐ Nurse  ☐ Housekeeper
☐ Other _____
Do you anticipate changes in your living situation after discharge?
☐ Yes ☐ No  Explain _____

**DIABETES ASSESSMENT**
☐ Newly diagnosed         ☐ Gestational Diabetes
☐ Diabetes out of control  ☐ Pediatric Diabetes

**ENTEROSTOMAL THERAPY**
☐ Skin Breakdown / Incontinence  ☐ All Ostomies
☐ Braden Scale <16
☐ Pt. admitted with wound; followed by Wound Care Center

**INFECTION CONTROL:**
☐ Readmission with infection (post-op wound, IV site, diarrhea,
   pneumonia, etc.)
☐ Communicable Disease.  ○ TB or exposure to TB  ○ Measles
   ○ Chicken pox  ○ Blood-borne disease  ○Other _____

**PHYSICAL THERAPY / REHAB SERVICES**
☐ Recent/significant decline in ambulation.

**NUTRITIONAL RISK**
☐ Wounds         ☐ Malnutrition        ☐ Anorexia
☐ CA - Esophageal, Gastric Colorectal   ☐ TPN / TF
☐ Readmission to hospital within 30 days
☐ Unexplained/Unintentional weight loss of >10 lbs within last month
   not related to diet, fluid, pulmonary DX, edema, diuresis or dialysis.

**OCCUPATIONAL THERAPY / REHAB SERVICES**
Patient follows simple commands &/or gestures with recent/significant
decline in ability to:
☐ Use upper extremity(ies) functionally.
☐ Perform self-care skills (excluding bathing).

**RESPIRATORY THERAPY**
☐ All patients with asthma.

**SPEECH/LANGUAGE PATHOLOGY/REHAB SERVICES**
☐ On CVA/TIA patients, Pt fails nursing bedside dysphagia
   assessment & has difficulty taking medicines/liquids/foods.

**PATIENT RIGHTS & RESPONSIBILITIES**
Directive to Physician? ☐ Yes  ☐ No       Copy on Chart? ☐ Yes ☐ No
Durable Power of Attorney for Health Care? ☐ Yes ☐ No
      Copy on Chart? ☐ Yes ☐ No
Pt. wishes Directive to Physician.  ☐ Yes ☐ No
Pt. wishes Durable Power of Attorney for Health Care.  ☐ Yes ☐ No
Pt. has Directive to Physician but it is not available.  ☐ Yes ☐ No
Name of Person to bring? _____
Pt. wishes to create directive to apply until unavailable directive
   is delivered. Contact Guest Relations/House Supervisor.  ☐ Yes ☐ No
Organ Donor Card prepared? ☐ Yes ☐ No
VBMC Information Book provided?  ☐ Yes ☐ No

**REFERRALS INITIATED ON ADMISSION:**
☐ Diabetes (8199994)          ☐ Enterostomal Therapy (4590006)
☐ Food Service (DR001)        ☐ Occupational Therapy (3890003)
☐ Infection Control (1490010) ☐ Respiratory Therapy (MISCRC)
☐ Physical Therapy (3790110)  ☐ Speech/Language Therapy (3990024)
☐ Social Services (SS001)

☐ **No Referrals Identified on Admission**

Assessed By: _____ RN

Date _____     Time _____

**290000**



# NURS.  -G ADM..SION  A TABASE

VALLEY BAPTIST MEDICAL CENTER ***
*** HARLINGEN, TEXAS ***

Acct #: 984589192
MR #: 00249469
GONZALEZ, Gustavo
Unit:   V   Room: 503-01
Born:   30-Dec-1972
Sex: M Age: 27

Admitted: 18-Sep-2000 02:30
Discharged:

Prir.  J: 18-Sep-2000 06:47
From: 17 Sep 00  0700   To: 18 Sep 00  0659
Page:   1
Attending MD: LAWLER, MARION R., MD

000069

Allergies:

## ADMIT ARRIVAL/MEDS/PAST MEDICAL HX

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Arrived Via | (Comment) | STRETCHER | 18Sep00 | 0235 |
| 18Sep00 | 0232 | MMC | Admit From: | (Comment) | ED | 18Sep00 | 0235 |
| 18Sep00 | 0232 | MMC | Smoker  (pkgs/day in comments) | | | 18Sep00 | 0235 |

UNABLE TO OBTAIN INFOORMATION FROM PT.

## EDUCATION/DISCHARGE PLANNING ASSESS

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Primary Language Spoken | (Comment) | BILINGUAL | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Language(s) able to read | (Comment) | BILINGUAL | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Language(s) able to write | (Comment) | BILINGUAL | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Level of Education | (Comment) | COLLEGE | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Unable to assess Motivation Level | | | 18Sep00 | 0238 |

PT CONFUSED, IRRATIONAL.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Do you feel your illness is: | (Comment) | CHRONIC | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Expectations of treatment: | (Comment) | DIAGNOSTIC | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Uncooperative | | | 18Sep00 | 0238 |

REFUSING TO GIVE MUCH INFORTATION.  ]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sep00 | 0232 | MMC | Anxious | | | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Marital Status: | (Comment) | SINGLE | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Lives: | (Comment) | ALONE | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Feeding: | (Comment) | SELF | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Performs ADL: | (Comment) | SELF | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Utilities: Water | (Comment) | YES | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Utilities: Electric | (Comment) | YES | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Utilities: Kitchen Facilities | (Comment) | YES | 18Sep00 | 0238 |

## SOCIAL SERVICE ADMIT ASSESSMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Demonstrates a degree of confusion and/or disorientation | | 18Sep00 | 0242 |

SEEMS TO BE OUT OF TOUCH WITH REALITY, STATING THAT THE OFFICER IS
TRYING TO KILL HIM AND ALL OF US.

## REFERRAL ADMISSION ASSESSMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | No Admission Referrals Identified | | 18Sep00 | 0240 |

THERE IS A CONSULT ORDERED FOR PT IN AM WITH THE PYSCH. MD.

Signature(s):    MMC  MARY COLVIN, RN

71

# NURSING ADMISSION DATABASE

Acct #: 984589192
MR #: 00249469
GONZALEZ, Gustavo
Unit:   V    Room: 503-01
Born:    30-Dec-1972
Sex: M Age: 27

* VALLEY BAPTIST MEDICAL CENTER ***
*** HARLINGEN, TEXAS ***

Admitted: 18-Sep-2000 02:30
Discharged:

Printed: 18-Sep-2000 06:47
From: 17 Sep 00  0700  To: 18 Sep 00  0659
Page:   2
Attending MD: LAWLER, MARION R., MD

000070

Allergies:

Signature(s):

72

# NURSI  -Y ADMISSION [ \`ABASE

```
Acct #: 984589192          *** VALLEY BAPTIST MEDICAL CENTER ***   Printe.. 19-Sep-2000 07:39
MR #: 00249469             ***      HARLINGEN, TEXAS          ***   From: 17 Sep 00  0700  To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                  Page:  1
Unit:  V   Room: 503-01                                           Attending MD: LAWLER, MARION R., MD
Born:   30-Dec-1972        Admitted: 18-Sep-2000 02:30
Sex: M Age: 27             Discharged:
```

## 000071

Allergies:

### ADMIT ARRIVAL/MEDS/PAST MEDICAL HX

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Arrived Via        (Comment) | STRETCHER | 18Sep00 | 0235 |
| 18Sep00 | 0232 | MMC | Admit From:        (Comment) | ED | 18Sep00 | 0235 |
| 18Sep00 | 0232 | MMC | Smoker  (pkgs/day in comments) | | 18Sep00 | 0235 |

UNABLE TO OBTAIN INFOORMATION FROM PT.

### EDUCATION/DISCHARGE PLANNING ASSESS

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Primary Language Spoken    (Comment) | BILINGUAL | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Language(s) able to read   (Comment) | BILINGUAL | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Language(s) able to write  (Comment) | BILINGUAL | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Level of Education         (Comment) | COLLEGE | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Unable to assess Motivation Level | | 18Sep00 | 0238 |

PT CONFUSED, IRRATIONAL.

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Do you feel your illness is:  (Comment) | CHRONIC | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Expectations of treatment:    (Comment) | DIAGNOSTIC | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Uncooperative | | 18Sep00 | 0238 |

REFUSING TO GIVE MUCH INFORTATION.  ]

| | | | | | | |
|---|---|---|---|---|---|---|
| .ep00 | 0232 | MMC | Anxious | | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Marital Status:         (Comment) | SINGLE | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Lives:                  (Comment) | ALONE | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Feeding:                (Comment) | SELF | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Performs ADL:           (Comment) | SELF | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Utilities: Water        (Comment) | YES | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Utilities: Electric     (Comment) | YES | 18Sep00 | 0238 |
| 18Sep00 | 0232 | MMC | Utilities: Kitchen Facilities  (Comment) | YES | 18Sep00 | 0238 |

### SOCIAL SERVICE ADMIT ASSESSMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | Demonstrates a degree of confusion and/or disorientation | | 18Sep00 | 0242 |

SEEMS TO BE OUT OF TOUCH WITH REALITY, STATING THAT THE OFFICER IS
TRYING TO KILL HIM AND ALL OF US.

### REFERRAL ADMISSION ASSESSMENT

| | | | | | | |
|---|---|---|---|---|---|---|
| 18Sep00 | 0232 | MMC | No Admission Referrals Identified | | 18Sep00 | 0240 |

THERE IS A CONSULT ORDERED FOR PT IN AM WITH THE PYSCH.  MD.

Signature(s):    MMC MARY COLVIN, RN

## 73

# NURSI `·¦ ADMISSION Ɍ \`¦`ABASE

Acct #: 984589192                    ***  VALLEY BAPTIST MEDICAL CENTER ***     Printeᴜ  19-Sep-2000 07:39
MR #: 0C249469                       ***         HARLINGEN, TEXAS        ***     From: 17 Sep 00  0700   To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                                Page:   2
Unit:   V    Room: 503-01                                                        Attending MD: LAWLER, MARION R., MD
Born:    30-Dec-1972              Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                   Discharged:

000072

Allergies:

Signature(s):

74

D A Y   G R A P H I C   F L O W S H E E T

**000073**

```
Acct # 984589192           *** VALLEY BAPTIST MEDICAL CENTER ***    Printed. 19-Sep-2000 07:40
MR # 00249469              ***        HARLINGEN, TEXAS         ***    From: 17 Sep 00  0000  To  21 Sep 00 2359
GONZALEZ, Gustavo                                                    Page:  1
Unit: 5ST    Room: 503-01                                            Attending MD: LAWLER, MARION R., MD
Born    30-Dec-1972        Admitted: 18-Sep-2000 02:30
Sex: M Age: 27             Discharged:
```

| DATE: | 17Sep00 | 18Sep00 | 19Sep00 | 20Sep00 | 21Sep00 |
|---|---|---|---|---|---|
| TIME: | 00\| 04\| 08\| 12\| 16\| 20\| | 00\| 04\| 08\| 12\| 16\| 20\| | 00\| 04\| 08\| 12\| 16\| 20\| | 00\| 04\| 08\| 12\| 16\| 20\| | 00\| 04\| 08\| 12\| 16\| 20\| |

```
105.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
104.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
103.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
102.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
101.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
100.0 --|-----+--+--+--+--+--|-----+--+--+--+-X+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
 99.0 --|-----+--+--+--+--+--|--X--+--X--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
 98.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
 97.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
 96.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
 95.0 --|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|-----+--+--+--+--+--|
Temp. (F)|
    Site|  +  +  +  +  +     +  +  +  +  +     +  +  +  .+  +     +  +  +  +  +     +  +  +  +  +
```

| BP/Systolic | \| \| \| \| \| \| | 128\| \|118\|122\| | \| \| \| \| \| \| | \| \| \| \| \| \| | \| \| \| \| \| \| |
|---|---|---|---|---|---|
| Diastolic | \| \| \| \| \| \| | 64\| \|72\|54\| | \| \| \| \| \| \| | \| \| \| \| \| \| | \| \| \| \| \| \| |
| Pulse | \| \| \| \| \| \| | 89\| \|89\|76\| | \| \| \| \| \| \| | \| \| \| \| \| \| | \| \| \| \| \| \| |
| Respiration | \| \| \| \| \| \| | 20\| \|20\|20\| | \| \| \| \| \| \| | \| \| \| \| \| \| | \| \| \| \| \| \| |
| DailyWeight | \| | | \| | \| | \| |

**75**

```
            2 4   H O . R   P A T I E N T   C A R E   R E C O R D - F  R T  I      000074
  Acct #. 984589192          *** VALLEY BAPTIST MEDICAL CENTER ***   Printed:  19-Sep-2000 07:44
  MR # 00249469              ***      HARLINGEN, TEXAS        ***   From: 17 Sep 00  0700   To: 19 Sep 00  0659
  GONZALEZ, Gustavo                                                 Page:    1
  Unit    V   Room: 503-01                                          Attending MD. LAWLER, MARION R., MD
  Born    30-Dec-1972        Admitted: 18-Sep-2000 02.30
  Sex. M Age: 27             Discharged:
```

---

### GENERAL CARE

```
  18Sep00   0721       MRG    ID Bracelet On
  18Sep00   0721       MRG    Bed - Down
  18Sep00   0721       MRG    Bed - Rails Up
  18Sep00   0721       MRG    Bed - Wheels Locked
  18Sep00   0721       MRG    Hygiene Needs Met                  ASSIST
  18Sep00   0721       MRG    HOB             (Comment)          HOB 10
  18Sep00   0721       MRG    Activity        (Comment)          Bedrest
  18Sep00   0721       MRG    Turn            (Comment)          Per Self
  18Sep00   0721       MRG    Non Skid Slippers On
  18Sep00   0721       MRG    # of BMs        (Comment)          0
  18Sep00   0721       MRG    Date of Last BM                    9-18-00
  18Sep00   2039       EH     ID Bracelet On
  18Sep00   2039       EH     Bed - Down
  18Sep00   2039       EH     Bed - Rails Up
  18Sep00   2039       EH     Bed - Wheels Locked
  18Sep00   2039       EH     HOB             (Comment)          HOB 10
  18Sep00   2039       EH     Activity        (Comment)          Bedrest
  18Sep00   2039       EH     Turn            (Comment)          Per Self
  18Sep00   2039       EH     Non Skid Slippers On
  18Sep00   2039       EH     # of BMs        (Comment)          0
  18Sep00   2039       EH     Date of Last BM                    9-18-00
```

---

### SHIFT ASSESSMENT

```
  18Sep00   0243       MMC    - - Respiratory WNL - -
  18Sep00   0243       MMC    - - Cardiac WNL - -
  18Sep00   0243       MMC    - - Genitourinary WNL - -
  18Sep00   0243       MMC    Alert
  18Sep00   0243       MMC    Moves all Extremities
  18Sep00   0243       MMC    Disoriented
  18Sep00   0243       MMC    Neuro - Other        (Note)
                              IS DISORIENTED AND UNCOOPERATIVE WITH CARE.  REFUSING TO ANSWER
                              QUESTIONS.  STATING THAT THE OFFICER GUARDING HIM IS TRYING TO KILL
                              HIM, THAT HE NEEDS TO LEAVE.
  18Sep00   0243       MMC    Uncooperative
  18Sep00   0243       MMC    Psychosocial - Other   (Note)
                              POLICE OFFICER GUARDING PT FOR THE NIGHT.  HANDCUFFED TO BED FOR NOW.
                              PT REFUSING TO ANSWER QUESTIONS.  STATES THAT IT IS DANGEROUS HERE.
  18Sep00   0243       MMC    Skin Temperature   (Comment)   Warm
  18Sep00   0243       MMC    Skin Color         (Comment)   Pink
                              COLOR OF SCLARA YELLOW.

  Signature(s):   MRG  MARGARITA GONZALEZ, NA          EH   EUSEBIA HERNANDEZ, CNA
                  MMC  MARY COLVIN, RN
```

76

24 HOUR PATIENT CARE RECORD-P..T I    **000075**

```
Acct #: J84589192        *** VALLEY BAPTIST MEDICAL CENTER ***    Printed: 19-Sep-2000 07.44
MR #: 00249469           ***    HARLINGEN, TEXAS        ***    From: 17 Sep 00  0700  To: 19 Sep 00  0659
GJNZALEZ, Gustavo                                              Page:  2
Unit:  V  Room: 503-01                                        Attending MD: LAWLER, MARION R., MD
Born:    30-Dec-1972      Admitted: 18-Sep-2000 02:30
Sex: M Age: 27            Discharged:
```

SHIFT ASSESSMENT

```
18Sep00  0243    MMC   Skin Condition        (Comment)   Dry
18Sep00  0243    MMC   Skin - Other          (Note)
                          HAS DRY AND INTACT DRESSING TO FRONT OF NECK.
18Sep00  0243    MMC   HEENT Abnormal        (Note)
                          SCLARA YELLOW.
18Sep00  0243    MMC   Musculoskeletal - Other (Note)
                          BEDFAST FOR TONIGHT.  WELL-BUILT, WELL-NOURISHED YOUNG MAN.
18Sep00  1353    MS    - - Neurological WNL  - -
18Sep00  1353    MS    - - HEENT WNL - -
18Sep00  1353    MS    - - Musculoskeletal WNL - -
18Sep00  1353    MS    - - Respiratory WNL - -
18Sep00  1353    MS    - - Cardiac WNL - -
18Sep00  1353    MS    - - Gastrointestinal WNL - -
18Sep00  1353    MS    - - Genitourinary WNL - -
18Sep00  1353    MS    Uncooperative
                          WHE BEING ASKED QUESTIONS PT DOES NOT ANSWER RIGHT AWAY AND GIVES
                          VAGUE ANSWER.
18Sep00  1353    MS    Skin - Other          (Note)
                          LESS THAN 2CM SELF IMPLICTED STAB WOUND TO THE NECK.  NO BLEEDING.
                          WIHT SLIGHT REDNESS AROUND IT.
18Sep00  1353    MS    Gastrointestinal- Other (Note)    NPO
                          FOR POSSIBLE SURGERY
18Sep00  2015    MV    - - Neurological WNL  - -
18Sep00  2015    MV    - - HEENT WNL - -
18Sep00  2015    MV    - - Respiratory WNL - -
18Sep00  2015    MV    - - Cardiac WNL - -
18Sep00  2015    MV    - - Gastrointestinal WNL - -
18Sep00  2015    MV    - - Genitourinary WNL - -
18Sep00  2015    MV    Uncooperative
                          PT. UNCOOPERATIVE WITH CARE.  STATES HE IS HUNGRY AND THIRSTY.  ON
                          NPO STATUS AS PER ORDER.  PT.  GIVEN SMALL AMOUNT OF ICE CHIPS.
18Sep00  2015    MV    Psychosocial - Other  (Note)
                          WITH LA FERIA PEACE OFFICER AT BEDSIDE.
18Sep00  2015    MV    Skin Temperature      (Comment)   Warm
18Sep00  2015    MV    Skin Color            (Comment)   Pink
18Sep00  2015    MV    Skin Condition        (Comment)   Dry
18Sep00  2015    MV    Skin - Other          (Note)
                          WITH SMALL SELF INFLICTED WOUND TO NECK AREA.  SURROUNDING SKIN PINK
                          IN COLOR.
18Sep00  2015    MV    Musculoskeletal - Other (Note)
                          WITH DECREASED MOBILITY.  IS WITH HANDCUFF IN PLACE TO LEFT HAND TO
                          BED.


Signature(s):   MMC  MARY COLVIN, RN              MS   MARIO SILVERIO, RN
                MV   MARY VALDEZ, LVN
```

**77**

```
                 24  HOUR  PATIENT  CARE  RECORD-PART I
Acct #. 184589192            *** VALLEY BAPTIST MEDICAL CENTER ***    Printed: 19-Sep-2000 07:4  000076
MR # 00249469                 ***       HARLINGEN, TEXAS      ***     From: 17 Sep 00  0700  To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                     Page:  3
Unit.  V   Room: 503-01                                              Attending MD. LAWLER, MARION R., MD
Born:     30-Dec-1972        Admitted: 18-Sep-2000 02:30
Sex. M Age: 27               Discharged:
```

---

### CHARGE NURSE

| | | | | | |
|---|---|---|---|---|---|
| 18Sep00 | 0243 | MMC | 7P-7A SHIFT | (Note) | F.CABRERA |
| 18Sep00 | 1353 | MS | 7A-7P SHIFT | (Note) | E. LUJANO |
| 18Sep00 | 2015 | MV | 7P-7A SHIFT | (Note) | M.LUCIO |

---

### LINES INSERTION/DISCONTINUED

| | | | | | |
|---|---|---|---|---|---|
| 18Sep00 | 0243 | MMC | IV Attempts | (Comment) | ER |
| 18Sep00 | 0243 | MMC | Line #1 Type | (Comment) | PIV |
| 18Sep00 | 0243 | MMC | Line #1 Site | (Comment) | RH |
| 18Sep00 | 0243 | MMC | Line #1 Insertion Date | | 9-17-00 |
| 18Sep00 | 0243 | MMC | Line #1 Insertion Time | | ER |
| 18Sep00 | 0243 | MMC | Line #1 Gauge | (Comment) | 20 g |
| 18Sep00 | 0243 | MMC | Line #1 Condition | (Comment) | WNL |
| 18Sep00 | 0243 | MMC | Line #1 Site Care Date | | 9-17-00 |
| 18Sep00 | 0243 | MMC | Line #1 Tubing Date Chg | | 9-17-00 |
| 18Sep00 | 1353 | MS | IV Attempts | (Comment) | 1 |
| 18Sep00 | 1353 | MS | Line #1 Type | (Comment) | PIV |
| 18Sep00 | 1353 | MS | Line #1 Site | (Comment) | RH |
| 18Sep00 | 1353 | MS | Line #1 Insertion Date | | 9-18-00 |
| 18Sep00 | 1353 | MS | Line #1 Insertion Time | | 1800 |
| 18Sep00 | 1353 | MS | Line #1 Gauge | (Comment) | 18 g |
| 18Sep00 | 1353 | MS | Line #1 Condition | (Comment) | WNL |
| 18Sep00 | 1353 | MS | Line #1 Site Care Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | IV Attempts | (Comment) | 1 |
| 18Sep00 | 2015 | MV | Line #1 Type | (Comment) | PIV |
| 18Sep00 | 2015 | MV | Line #1 Site | (Comment) | RH |
| 18Sep00 | 2015 | MV | Line #1 Insertion Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #1 Insertion Time | | 1800 |
| 18Sep00 | 2015 | MV | Line #1 Gauge | (Comment) | 18 g |
| 18Sep00 | 2015 | MV | Line #1 Condition | (Comment) | WNL |
| 18Sep00 | 2015 | MV | Line #1 Site Care Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #1 D/C Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #1 D/C Time | | 2000 |
| 18Sep00 | 2015 | MV | Line #1 Reason for D/C | (Comment) | PULLED OUT |
| 18Sep00 | 2015 | MV | Line #1 Cond. After D/C | (Comment) | WNL |
| 18Sep00 | 2015 | MV | Line #2 Type | (Comment) | HL |
| 18Sep00 | 2015 | MV | Line #2 Site | (Comment) | RH |
| 18Sep00 | 2015 | MV | Line #2 Insertion Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #2 Insertion Time | | 2200 |
| 18Sep00 | 2015 | MV | Line #2 Gauge | (Comment) | 20 g |
| 18Sep00 | 2015 | MV | Line #2 Condition | (Comment) | WNL |

```
Signature(s):   MMC  MARY COLVIN, RN              MS   MARIO SILVERIO, RN
                MV   MARY VALDEZ, LVN
```

78

```
            2 4   H O U R   P A T I E N T   C A R E   R E C O R D - P A R T   I        000077
Acct #  984589192           *** VALLEY BAPTIST MEDICAL CENTER ***    Printed. 19-Sep-2000 07:44
MR #.  00249469                      ***   HARLINGEN, TEXAS    ***    From: 17 Sep 00  0700  To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                    Page:   4
Unit:  V   Room  503-01                                             Attending MD· LAWLER, MARION R., MD
Born:    30-Dec-1972        Admitted. 18-Sep-2000 02.30
Sex: M Age: 27              Discharged.
```

---

### LINES INSERTION/DISCONTINUED

| 18Sep00 | 2015 | MV | Line #2 Site Care Date | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #2 Tubing Date Chg | 9-18-00 |

---

### BRADEN SCALE

| 18Sep00 | 0243 | MMC | Sensory Perception - No Impairment | |
| 18Sep00 | 0243 | MMC | Moisture - Rarely Moist | |
| 18Sep00 | 0243 | MMC | Activity - Walks Occasionally | |
| 18Sep00 | 0243 | MMC | Mobility - Slightly Limited | |
| 18Sep00 | 0243 | MMC | Nutrition - Adequate | |
| 18Sep00 | 0243 | MMC | Friction and Shear - No Apparent Problem | |
| 18Sep00 | 0243 | MMC | Braden Scale - Total | 0020 |
| 18Sep00 | 1353 | MS | Sensory Perception - No Impairment | |
| 18Sep00 | 1353 | MS | Moisture - Rarely Moist | |
| 18Sep00 | 1353 | MS | Activity - Walks Occasionally | |
| 18Sep00 | 1353 | MS | Mobility - Slightly Limited | |
| 18Sep00 | 1353 | MS | Nutrition - Adequate | |
| 18Sep00 | 1353 | MS | Friction and Shear - No Apparent Problem | |
| 18Sep00 | 1353 | MS | Braden Scale - Total | 0020 |
| 18Sep00 | 2015 | MV | Sensory Perception - No Impairment | |
| 18Sep00 | 2015 | MV | Moisture - Rarely Moist | |
| 18Sep00 | 2015 | MV | Activity - Walks Occasionally | |
| 18Sep00 | 2015 | MV | Mobility - Slightly Limited | |
| 18Sep00 | 2015 | MV | Nutrition - Adequate | |
| 18Sep00 | 2015 | MV | Friction and Shear - No Apparent Problem | |
| 18Sep00 | 2015 | MV | Braden Scale - Total | 0020 |

---

### PROGRESS NOTE

| 18Sep00 | 0523 | FGC | Progress Notes-Psychosocial | DONE |

ADMITTED TO ROOM # 503 WITH A DRESSING ACROSS HIS NECK . AS PER ER
REPORT, PT HAS TWO LACERATIONS ( STAB WOUNDS ) TO ANTERIOR ASPECT OF
NECK R/T PT. ATTEMPTING TO KILL HIMSELF. HANDCUFFED TO (L) HAND;
UNDER STRICT SURVEILLANCE BY THE POLICE DEPARTMENT. UNABLE TO
COMPLETE ADMISSION DATA BASE ; PT. WITHDRAWN . REFUSES TO RESPOND TO
QUESTIONS AND JUST STARES BLANKLY AND SUSPICIOUSLY WHEN BEING ASKED.

| 18Sep00 | 1429 | MS | Progress Notes-Miscellaneous | DONE |

PT REMAINS ON NPO FOR POSSIBLE NECK WOUND SURGERY.

| 18Sep00 | 1617 | MS | Progress Notes-Miscellaneous | DONE |

PT ASKING IF HE COULD HAVE SOMETHING TO EAT.  MADE HIM AWARE THAT HE

```
Signature(s):    MV   MARY VALDEZ, LVN              MMC  MARY COLVIN, RN
                 MS   MARIO SILVERIO, RN            FGC  FELINA CABRERA, RN
```

79

```
                    2 4   H O      P A T I E N T   C A R E   R E C O R D - 1   A T I         000073
Acct #  984589192          *** VALLEY BAPTIST MEDICAL CENTER ***     Printed:  19-Sep-2000 07:44
MR #  00249469             ***      HARLINGEN, TEXAS       ***       From: 17 Sep 00  0700  To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                   Page:   5
Unit    V   Room  503-01                                            Attending MD: LAWLER, MARION R., MD
Born.     30-Dec-1972      Admitted: 18-Sep-2000 02.30
Sex. M Age  27             Discharged:
```

MAY GO TO SURGERY AND WILL NEED TO KEEP HIM ON NPO PRIOR TO IT
ASSURE PT THAT HE'LL GET SOMETHING TO EAT AS SOON AS POSSIBLE POST
SURGERY.

---

PROGRESS NOTE

18Sep00    1930       MV     Progress Notes-Miscellaneous        DONE
                                PT.  IN BED    AWAKE, ALERT, ORIENTED X3.  DENIES ANY PRESENT
                                DISCOMFORTS AT PRESENT.  WITH HANDCUFF IN PLACE TO LEFT ARM AND
                                RESTRAINED TO BED.  LA FERIA PEACE OFFICER AT BEDSIDE.  PT.  CALM AND
                                COOPERATIVE.  VERY QUICK TO RESPOND TO ANSWERS.  WILL CONT.  TO
                                MONITOR.  NO DISTRESS NOTED.

18Sep00    2020       ML     Progress Notes-Miscellaneous        DONE
                                PT.  IN BED.  CONTINUES WITH LEFT HAND RESTRAINED BY HANDCUFF.  CALM
                                AND COOPERATIVE ASKING FOR BATH.  PT.  GIVEN WARM WATER AND SOAP.  PT.
                                TOLD TO BATHE SELF WITH HAND NOT RESTRAINED.  PT.  AGREED.

18Sep00    2115       MV     Progress Notes-Miscellaneous        DONE
                                PT.  IN BED.  REMAINS RESTRAINED TO BED WITH HANDCUFF.  REQUESTING
                                WATER AND SOMETHING TO EAT AT THIS TIME.  EXPLAINED TO PT.  THAT HE IS
                                SCHEDULED FOR EXAMS IN AM THAT REQUIRE TO HIM TO HAVE NOTHING BY
                                MOUTH.  PT.  GIVEN ICE CHIPS AT THIS TIME AND VERY QUIET AFTER ICE
                                CHIPS GIVEN TO HIM.  PEACE OFFICER CONTINUES AT BEDSIDE.  NO DISTRESS
                                NOTED.

18Sep00    2315       MV     Progress Notes-Miscellaneous        DONE
                                PT.  IN BED.  WITH EYES CLOSED RESTING.  DENIES ANY DISCOMFORT AT
                                PRESENT.  PEACE OFFICER CONT.  AT BEDSIDE.  NO DISTRESS NOTED.

19Sep00    0115       MV     Progress Notes-Miscellaneous        DONE
                                PT.  IN BED.  RESTING QUIETLY.  NO DISTRESS NOTED.  REMAINS HANDCUFFED
                                TO BED.  PEACE OFFICER CONT.  AT BEDSIDE.  NO DISTRESS NOTED.

19Sep00    0324       ML     Progress Notes-Miscellaneous        DONE
                                PHYSICAL ALTERCATION BETWEEN PT AND LA FERIA POLICE OFFICER- OFFICER
                                ASKING FOR ASSISTANCE- SECURITY AND HOUSE SUPERVISOR PAGED STAT

19Sep00    0325       ML     Progress Notes-Miscellaneous        DONE
                                HOUSE SUPERVISOR E.  MAURICIO RN AND VBMC SECURITY ON FLOOR- PT WITH
                                NO PULSE AND NO RESPIRATIONS AS PER THE HOUSE SUPERVISOR

19Sep00    0338       ML     Progress Notes-Miscellaneous        DONE
                                HARLINGEN POLICE DEPARTMENT ARRIVED

19Sep00    0445       ML     Progress Notes-Miscellaneous        DONE
                                PT PRONOUNCED BY JUDGE DAVID WISE

Signature(s).      MV   MARY VALDEZ, LVN                       ML   MARTA LUCIO, RN

80

```
              24  HOL   PATIENT CARE RECORD-P, T II        000079
Acct # 984589192         *** VALLEY BAPTIST MEDICAL CENTER ***   Printed:  19-Sep-2000 07 44
MR #. 00249469           ***       HARLINGEN, TEXAS       ***   From: 17 Sep 00  0700  To  19 Sep 00  0659
GONZALEZ, Gustavo                                               Page:   1
Unit    V   Room. 503-01                                       Attending MD: LAWLER, MARION R., MD
Born    30-Dec-1972      Admitted: 18-Sep-2000 02.30
Sex: M Age: 27           Discharged:
```

PASTORAL CARE ASSESSMENT

```
18Sep00   1630      CD    * * * Type of Visit * * *
18Sep00   1630      CD    Initial Assessment
18Sep00   1630      CD    Inpatient
18Sep00   1630      CD    * * * Pastoral Services Provided * * *
18Sep00   1630      CD    Chaplain Availability Information
18Sep00   1630      CD    Religious Literature
18Sep00   1630      CD    * * * Pastoral Contacts * * *
18Sep00   1630      CD    Patient and Family Not Available
19Sep00   0600      JT    * * * Type of Visit * * *
19Sep00   0600      JT    Initial Assessment
19Sep00   0600      JT    Inpatient
19Sep00   0600      JT    Emergency
19Sep00   0600      JT    Death Ministry
19Sep00   0600      JT    * * * Pastoral Services Provided * * *
19Sep00   0600      JT    Prayer
19Sep00   0600      JT    * * * Pastoral Contacts * * *
19Sep00   0600      JT    Patient
```

CASE MANAGEMENT ASSESSMENT

```
18Sep00   1016      RPV   Chart Reviewed
18Sep00   1016      RPV   Diagnosis              (Note)
                              STAB WOUND
18Sep00   1016      RPV   Interviewed
18Sep00   1016      RPV   No Needs Identified at This Time
18Sep00   1016      RPV   Other                  (Note)
                              ON POLICE HOLD
```

INTERDISCIPLINARY CARE PLANNING

```
18Sep00   1016      RPV   Social Service
```

SS/CM INITIAL ASSESSMENT

```
18Sep00   1016      RPV   PRE-HOSPITAL RESIDENCE  (Comment)   Other
                              ON POLICE HOLD


Signature(s):   CD- CARMEN DEVARS,              JT  JOHN TEER, director
                RPV RITA VILLARREAL, RN/CASE MG
```

81

000080

2 4  H O U   P A T I E N T  C A R E  R E C O R D - P   T  II

Acct #: 984589192              *** VALLEY BAPTIST MEDICAL CENTER ***      Printed. 19-Sep-2000 07:44
MR # 00249469                  ***      HARLINGEN, TEXAS      ***         From: 17 Sep 00  0700   To: 19 Sep 00  0659
GONZALEZ, Gustavo                                                        Page:  2
Unit.  V   Room: 503-01                                                  Attending MD· LAWLER, MARION R., MD
Born·    30-Dec-1972           Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                 Discharged:

SS/CM-PROGRESS NOTE

18Sep00   1016       RPV    CASE MANAGEMENT PROGRESS NOTES
                               MET WITH PT WHOSE AFFECT IS FLAT.  PT UNDERSTANDS THAT HE IS HERE IN
                               THE HOSPITAL, BUT HE IS UNDER THE IMPRESSION THAT THIS IS HIS NEW
                               HOME.  EXPLAINED THAT DR LAWLER WILL REVIEW X-RAYS & RE-EXAMINE ITM TO
                               DETERMINE WHETHER OR NOT PT WILL NEED SURGERY.  IF PT REQUIRES
                               SURGERY, HE MAY NEED TO BE HERE ANOTHER 3 DAYS OR SO.  IF HE DOES NOT
                               REQUIRE SURGERY, HE MAY BE DISCHARGED TODAY OR TOMORROW.  PT IS ON
                               POLICE HOLD, & THERE IS A POLICE OFFICER AT HIS SIDE.  PT'S LT WRIST
                               IS HANDCUFFED TO SIDE RAIL.  MD ORDERED NPO STATUS FOR PT, & WILL CALL
                               MD FOR DIET ORDER IF HE DOES NOT ROUND BY MID AFTERNOON.  NO DISCHARGE
                               NEEDS IDENTIFIED.  WILL FOLLOW CASE.
18Sep00   1055       RG     SOCIAL SERVICE PROGRESS NOTES
                               ss/dp made aware of 27 y/o hispanic male admitted 9/17/00 with
                               stab wound.  pt apparently is under restaints (hand cuffs) and hgn pd
                               is involved.  pt is in a daze and non communicable.  cm, rita aware
                               and no needs identified at present, due to hgn pd being involved.
                               possible death/suicidal attempt is predicted in terms of pt's
                               girlfriend reported missing as well.  pt is in stable condition.
                               ss will continue to follow for developments.

Signature(s)·    RPV  RITA VILLARREAL, RN/CASE MG          RG   REBECCA GALLAGA, LSW

82

000081

PATIENT / FAMILY EDUCATION RECORD

| | | |
|---|---|---|
| Acct # 984589192 | *** VALLEY BAPTIST MEDICAL CENTER *** | Printed: 19-Sep-2000 07:44 |
| MR # 00249469 | *** HARLINGEN, TEXAS *** | From: 17 Sep 00 0700  To: 19 Sep 00 0659 |
| GONZALEZ, Gustavo | | Page: 1 |
| Unit: 5ST   Room. 503-01 | | Attending MD: LAWLER, MARION R., MD |
| Born   30-Dec-1972 | Admitted: 18-Sep-2000 02:30 | |
| Sex. M Age. 27 | Discharged | |

Education Codes:

1  Procedure Demonstrated/Information Discussed     6. Refuses Information/Demonstration     A. Supplies Provided
2. Accurately States Information                    7. Needs Reinforcement                   B. Literature Given
3  Accurately Demonstrates Procedure                8. Family/Significant Other              C. Video Shown
4. Unable to Accurately State Information            9  Goal Met                               D. Model
5. Unable to Accurately Demonstrate Procedure

PATIENT EDUCATION GENERAL CARE

18Sep00   0721      MRG   Admit Orientation Complete      1,2,3,9,

Signature(s):     MRG  MARGARITA GONZALEZ, NA

83

VALLEY BAPTIST MEDICAL CENTER
Harlingen, Texas

**PATIENT CARE PATHWAY**

VBMC 1610-075-1090

094490

`[...] 484589192`
`[...] GUSTAVO`
`[...] DEPARTMENT`
`[...] 12/30/72`

DRG #

SURGERY: 1)

ELOS:

DX: = Police DPS(Reservation) 9/18/60 = Harlingen (NICU)

| | | Init. | Signature/Status | Init. | Signature/Status |
|---|---|---|---|---|---|
| | | | | | 00008. |

| Date/LOS Day | POD | POD | POD | POD | POD | POD |
|---|---|---|---|---|---|---|
| IV Therapy | | | | | | HL |
| Lab | 1/RC Whnum.lne 4859 | | | | | |
| | Drug Screen (Emergency Dept) | | | | | |
| | Pedi against Bones | | | | | |
| | BM RPR HIV | | | | | |
| DAILY | | | | | | |
| X-Ray | Portat cervical x-ray | | | | | |
| | in view supgt cord | | | | | |
| | CT head & spine | | | | | |
| | F neurosurg | | | | | |
| EKG | | | | | | |
| Special Procedure(s) | | | | | | CT fluoro w/contrast |
| | | | | | | F Neurosurg |
| MEDS (See MAR) | | | | | | |
| Consultations | (1) single consult | | | | | |
| | for Apm | | | | | |
| Other(s) | old chart zefon | | | | | |
| | X-ray to Neurosurg for | | | | | |
| Remult HT | (1/18) Neurosurgeon | | | | | |
| UST | to be advised by | | | | | |
| | F qualification consult... | | | | | |

IN CASE OF EMERGENCY CALL:

84

| DATE INIT. NURSING DIAGNOSIS | Dx. c/LOS | 9/18 | 9/19 | 9/20 | 9/21 | 9/2. |
|---|---|---|---|---|---|---|
| ANXIETY: Related to Hospital/Surg. | | | | | | 000083 |
| Goal: Demonstrates lessened anxiety by _____ day | | | | 503 Gronzalez, G. | | |
| COMFORT: Alteration Related to: Disease Process/Surgery | | | | Any psychotropics | | |
| Goal: Verbalizes diminished pain 30-60 min after intervention | | | | to be ordered by | | |
| EDUCATION: Disease Process/Surgery | Ask family re: blood donation | | | psychiatrist on call | | |
| Goal: Verbalizes understanding by _____ day | | | | or Dr. Gronzalez | | |
| ACTUAL/ POTENTIAL FOR INJURY: Infection / Falls / Hemorrhage / Post-Op Complications | | | | | | |
| Goals: Temp between _____ & _____ Wound clean & dry Hgb > _____ gms post-op No injury during hospitalization | PPI: 3 | PPI: 1/2 | PPI: | PPI: | PPI: | |
| NEURO | | | | | | |
| LOC: Alteration Related to: Disease Process/Surgery/ Seizures | | | | | | |
| Goals: Oriented to time, person, place in _____ days Seizures controlled by DC Injuries prevented | Neuro Signs: | | | | | |
| CARDIO/RESPIRATORY | | | | | | |
| Cardiac Status: Alteration Related to: Angina/Dysrhythmias/ Disease Process | | | | | | |
| Goals: BP > _____ systolic Pedal pulses present Tolerates activity Stable rhythm | | | | | | |
| Resp.Status: Alteration Related to: Anesthesia/Disease Process | Resp.Therapy: | | | | | |
| Goals: Maintain patent airway Adequate ABG's Resp. <24/min. Relief of SOB within one hr after TX | Vital Signs: Q8 | hr 4° | | | | 000084 |
| MUSCULOSKELETAL | Activity: | | | | | |
| Mobility Impaired, Related to: Disease Process/Surgery | | | | | | |
| Goals: Optimum functional mobility achieved Contractures prevented | | | | | | |
| Skin Integrity Impaired, related to: Disease Process/ Immobility/Incontinence | | | | | | |
| Goals: Skin integrity maintained and/or healing occurs | | | | | | |
| GASTROINTESTINAL | | | | | | |
| Fluid Volume/Nutrition: Alteration in Related to: Chemo/DKA/ Disease Process/Surgery | | | | | | |
| Goals: Lytes WNL; Wt. maintained: Bowel sounds present Eats _____ % meals BM by _____ day | Diet: Npo | Npo | | | | |
| GENITOURINARY | | | | | | |
| Bowel/Urinary Elimination; Alterations Related to: Disease Process/Surgery | | | | | | |
| Goal: No signs of retention at time of D/C. | | | | | | |
| DISCHARGE PLANNING (DP) | | | | | | |
| Goal: Home Care needs identified & managed by discharge | Notify Discharge Planning Nurse | | | | | |
| OTHERS | | partial complete | complete | | | |
| | | | | | | 85A |

| ROOM | LAST NAME Gonzalez | FIRST NAME Gustavo | AGE 23 | DOCTOR Lowder | ALLERGIES NKA | ADM. DATE |
|---|---|---|---|---|---|---|

| DATE | VARIATION | CAUSE | INTERVENTION | ACTION(S) |
|------|-----------|-------|--------------|-----------|
| Day 1-<br>D/C | | | **ANXIETY**<br>-Assess anxiety level.<br>-Allow ventilation of feelings & offer support & empathy.<br>-Provide explanations/teaching | |
| Day 1-<br>D/C | | | **COMFORT** (see inside) | |
| Day 1-<br>D/C | | | **EDUCATION**<br>-Provide education materials.<br>-Reinforce pt's instructions.<br>-Explain all procedures & use of equipment.<br>-Document pt's/family understanding & return demo.<br>-Answer questions---refer to appropriate resources.<br>-On-going teaching. | |

| DATE | INTERVENTION | DATE | VARIATION | CAUSE |
|------|--------------|------|-----------|-------|
| Day 1-<br>D/C | **ACTUAL POTENTIAL FOR INJURY**<br>-Monitor V/S - med. for temp of up or above. notify MD of increase temp (101) or above.<br>-Notify MD of abnormal labs.<br>-Report excessive drainage, redness, increase swelling of<br>-Side rails up/Call light w/in reach at all times.<br>-Change dressings if saturated. (Report to MD) | | | |
| Day 1-<br>D/C | **NEURO**<br>-Neuro checks q ___<br>-Notify MD for change in Neuro status.<br>-Maintain patent airway. | | | |
| Day 1-<br>D/C<br><br>POD<br>3-6 | **CARDIO/RESPIRATORY**<br>-Monitor HR; Note & report irregular rates.<br>-Report K+ <3.5 or >5.5.<br>-Neurovascular checks<br>-Note S & S of fluid overload (SOB-Jugular Vein Distention)<br>-O₂Sat-Ck if SOB, Dyspnetic of anxious.<br>-Cardiac Rehab (CR) Nurse to show teaching films. | | | |

| DATE | INTERVENTION | DATE | VARIATION | ACTION(S) |
|------|--------------|------|-----------|-----------|
| Day 1-<br>D/C | **MUSCULOSKELETAL**<br>-Increase mobility.<br>-Encourage confidence<br>-Independence.<br>-ROM<br>-Keep skin clean/dry.<br>-Turn q ___ if indicated.<br>-Notify E.T. of skin breakdown. | | | |
| Day 1-<br>D/C | **GASTROINTESTINAL**<br>-Report abnormal blood loss<br>-fluid volume<br>-Report excessive vomiting - diarrhea - constipation.<br>-Monitor food intake.<br>-Monitor bowel sounds.<br>-Record BMs. | | | |
| Day 1-<br>D/C | **GENITOURINARY**<br>-Accurate I&O - monitor urine output.<br>-Check DTV w/in 8 hrs. after D.C. Foley<br>-Assess for bladder distention, low output, discomfort. | | | |

| DATE | INTERVENTION | DATE | CAUSE | ACTION(S) |
|------|--------------|------|-------|-----------|
| Day 1-<br>D/C | 00008 5<br>**DISCHARGE PLANNING** (DP)<br>-Notify Discharge Planner<br>-Obtain MD orders for D/C Planning.<br>-Obtain necessary signatures on forms<br>-Order equipment, etc. | | | |

85 B

## NOTICE OF INFORMATION ACCESS AND SECURITY PRACTICES FOR PATIENTS

000086

### VBMC's Principles of Information Management

1. Health information concerning an individual is intended primarily to foster and enhance the health of that individual. Other uses, such as billing, quality review, and research, are secondary.
2. VBMC's Information System aims to promote rapid, direct access to patient information by clinicians.
3. The VBMC Information System includes resources which ensure the security of information and its confidential use.
4. VBMC recognizes the rights of patients to know how information about them is protected from unauthorized disclosure, alteration, or loss, and how they might obtain access to their medical information.

### Access to Information, Security, and Your Rights as a Patient

1. Information about you is collected primarily to help your doctors and nurses maintain or restore your health. This information is contained in your medical record. The Medical Records Department of the Hospital takes care of your record and controls who has access to it. Federal and state laws protect your record from unauthorized release, and it is the job of the Medical Records Department to make sure these laws are followed at VBMC.
2. Other departments have information about you. For example, the Business Office has information about the charges for your care at the hospital and your insurance benefits. This information is held in the hospital's computer system. VBMC has policies and procedures which protect information about you from unauthorized disclosure, alteration, damage, or loss.

3. You have a right to privacy. This means VBMC will not disclose information about you unless you authorize us to do so, or unless the hospital is required by law to make a disclosure.
   - You have a right to know to whom your information is disclosed.
   - You have a right not to consent to release of information.
4. You have a right to review information contained in your medical record and have your questions about that information addressed.
   - You have a right to clear and complete presentation of information.
5. You have a right to protection of information released to third parties. That is, you have a right to expect third parties to whom your information is released will respect your privacy and not alter, damage, or release information without your consent.
6. You have a right to expect information about you will be available to your doctors in unaltered form, with nothing missing.
7. You have a right to expect your records will be kept for at least as long as required by law and not disposed of in a manner which might violate your right to privacy.

### Where to Call About Your Information

1. Medical Records Department, 389-1713
2. Business Services:
   a. Admissions Supervisor, 389-1693
   b. Patient Accounts Supervisor, 389-2041
3. Information Services Department: Information Security Officer, 389-1609

---

## PATIENT / FAMILY RESPONSIBILITIES

1. **Providing information** about present complaints, past illnesses, hospitalization, medications, and other matters related to their health: such as reporting unexpected changes in the patient's condition to provider.
2. **Asking questions** when they do not understand what they have been told about the patient's care or what they are expected to do.
3. **Following instructions** with treatment and discharge plans.
4. **Accepting** the consequences of not following instructions.
5. **Following hospital rules and regulations** concerning patient care and conduct.

6. **Acting with consideration and respect** of other patients/ hospital personnel by not making unnecessary noise, smoking, or causing distraction and respecting the property of other persons and hospital.
7. **Pain Management:** As a patient, we expect that you will:
   - Ask your doctor or nurse what to expect regarding pain and pain management.
   - Discuss pain relief options with your doctor or nurse.
   - Work with your doctor and nurse to develop a pain management plan.
   - Ask for pain relief when pain first begins.
   - Help the doctor and nurse measure your pain.
   - Tell the doctor or nurse if your pain is not relieved.

---

I hereby acknowledge receipt of this document and understand my rights and responsibilities as a patient.     86

White-Medical Record; Yellow-Financial Record; Pink-Patient     VBMC 1947-004-032k

# VALLEY BAPTIST MEDICAL CENTER
## PATIENT RIGHTS

000087

**NO ONE SHOULD BE DENIED THEIR RIGHTS ON THE BASIS OF RACE, COLOR, CREED, ORIGIN, OR SOURCE OF PAYMENT FOR CARE. PATIENTS HAVE THE RIGHT TO:**

1. Considerate and respectful care.
2. Privacy.
3. Receive care in a safe setting.
4. Be free from all forms of abuse or harassment.
5. Obtain knowledge from his/her physician regarding complete and current information concerning diagnosis, treatment, and prognosis.
6. Obtain information necessary to give informed consent for treatment, procedures, or services and to be involved in decision-making. Patient/family will also be informed in advance of furnishing or discontinuing care.
7. Participate in the development and implementation of the plan of care.
8. Formulate advance directives and to have VBMC staff and practitioners who provide care comply with these directives according to the law.
9. Have a family member of their own choice and their own physician notified promptly of their admission to VBMC. Provide names and phone numbers of the family member and physician to the nurse.
10. Know, by name, physicians and those persons responsible for coordinating, providing care, treatments and/or procedures.
11. Refuse treatment to the extent permitted by law, and to be informed of the medical consequences of his actions.
12. Review, examine and receive an explanation of all billing information.
13. Confidentiality of all communication, records, consultation and treatments related to their care.
14. Sign the Announcement Not Permitted / Confidentiality Authorization if he/she does not want anyone to know they are a patient at VBMC.
15. Access the information contained in the medical record within a reasonable time frame.
16. Expect (within their capacity) that a hospital or agency must make reasonable response to request for services.
17. Know hospital or department rules and regulations applicable to their conduct as a patient.
18. Expect reasonable continuity of care.
19. Freedom from restraints in the acute-care medical-surgical setting unless clinically necessary. Restraints will not be used as a means of coercion, discipline, convenience or retaliation by staff.
20. Freedom from seclusion and restraints used in behavior management unless clinically necessary. Restraints will not be used as a means of coercion, discipline, convenience or retaliation by staff.
21. Appropriate assessment and management of pain.
    - Information about pain and pain relief measures.
    - A concerned staff committed to pain prevention.
    - Health professionals who respond quickly to reports of pain.
    - State-of-the-art pain management.

Valley Baptist Medical Center has a grievance process and regards all patient/family concerns or complaints as significant. A patient/family can contact Guest Relations Department to express a grievance by calling 389-1104. Appropriate action is taken on every concern.

1. Whatever the type of concern, VBMC's grievance process will facilitate prompt fair resolution.
2. The grievance process will route each concern on a timely manner to the appropriate decision making body.
3. Response time to a grievance will depend on the category:
    - Category I: Complaints about general care, understanding a diagnosis or communication issues will be addressed within 24-48 hours of being received. Resolution may take up to 10-15 working days.
    - Category II: Complaints (verbal or written) about quality issues or billing will be addressed within 48-72 hours of being received. Resolution may take up to 30 working days.

**Note: Due to unusual circumstances, response time may be longer.**

4. Complexity, number of personnel to be contacted and investigation time are factors to be considered in addressing patient/family complaints.
5. On weekends and holidays or after regular office hours, complaints may be reported to the house supervisor. A written or oral report will be referred to Guest Relations Department.

87

VALLEY BAPTIST MEDICAL CENTER *(called)* *@ 1440* *to Brother*
Harlingen, Texas    000088 *FF*

**PATIENT EXPIRATION RECORD**

*141-0897*

09 18 984589192
GONZALEZ, GUSTAVO
LAWLER, MARION
0024?469    M S 12/30/??

---

## 1  PATIENT DATA    ⑰

Name Gustavo Gonzalez

Room # 303  Hospital # 984589192

Address

Alamo Tx 78516

SS# 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  DOB 12-30-??

Date of Death 9-19-00  Time of Death 0445 am pm

Pronounced By S. P David Wise

Death Certificate
Will Be Signed By S. P David Wise

Did death result from external causes, i.e., accident, homicide,
suicide. ☑Yes *(Complete #7)* ☐ No

## 2  NEXT OF KIN NOTIFICATION

Next of Kin Richard Muniz

Relationship Brother

Address 1313 Sago Palm

Alamo, TX 7  *Refered to VBMC*

Phone 783-9376 Time Notified *@1440* am pm
        358-0575

## 3  SPIRITUAL CARE (Check ALL that apply)

☐ Pastoral Services notified    ☐ Family minister present
☐ Family declined spiritual care    ☑ Family not present

## 4  FUNERAL HOME NOTIFICATION    580-1111

Sterling FH - Weslaco / Mission    *Chapel @ 1710*

Funeral Home of Choice by Informant

Richard Muniz - Brother

Name of Informant / Relationship    *Jenessa Collison*

Time Notified 16:41 17:17 am pm

Person Receiving Call Carlos Dotson

## 5  MORGUE DATA

Time Arrived in Morgue 10:08 am pm

Delivered By

Received By James Martins, Security

## 6  JUSTICE OF PEACE NOTIFIED:

Name S. P David Wise

Time 0338  By: HPD

---

## 7  REQUIRED REQUEST FOR ORGAN / TISSUE DONATION

Prior to offering the option of donation to the legal next of kin,
contact one of the following:    *Francesca*

**TEXAS ORGAN SHARING ALLIANCE**  Call 1-800-275-1744

a. For patients meeting brain death criteria
b. Patients being supported on mechanical support who are
   expected to progress to brain death.
c. All deaths will be referred for possible tissue donation.

**Contraindications to Organ Donation**:

a. Malignancy (other than primary Brain Tumor Metastis)
b. Confirmed HIV/AIDS

TOSA contacted:  Date 9-19-00  Time 0664

**LEGACY OF LIFE**    (Activated by TOSA)

(skin, bone, cardiovascular tissue, soft tissue)
All deaths will be referred for possible tissue donation.

VBMC contacted by: (Name) Stacie

Date 9-19-00  Time 0702

**LION'S EYE BANK** (Corneas, whole eyes)    (Activated by TOSA)

VBMC contacted by: (Name) _____

Date _____ Time _____

☐ YES ☑ NO  IS THIS PATIENT A POTENTIAL DONOR?

☑ Due to **Contraindications** circled and/or listed below,
the next-of-kin was not offered the option of donation.

**Contraindications to Tissue Donation**:

a. HIV
b. Alzheimer's, Parkinson's, Creutzfeldt-Jacob disease.
c. IV drug use
List: due to social/med. Hx

Name/Title of person offering the option of donation to next-of-kin:

☐ Next-of-kin REFUSED donation.

Signature _____

☑ Next-of-kin was not present / approachable at this time.
Appropriate information forwarded to donor organization.

☐ Next-of-kin CONSENTED TO:

____ ORGANS,    ____ TISSUE,    ____ CORNEAS

## 8  AUTOPSY? ☑Yes No    PERMIT SIGNED? ☑Yes No

Relationship S. P Wise

## 9  VALUABLES TO none

Signature of Person Receiving Valuables

PRINT Name/Relationship of Person Receiving Valuables

---

SIGNATURE OF HOUSE SUPERVISOR  Carolyn Schoenaker RN    86

White - Medical Record; Yellow - Supervisor; Pink - Funeral Home    VBMC 1610-049-0199

000001

2 4   H O U R   P A T I E N T   C A R E   R E C O R D - P A R T   I

```
Acct #: 984589192              *** VALLEY BAPTIST MEDICAL CENTER ***    Printed: 20-Oct-2000 11:01
MR #: 00249469                 ***      HARLINGEN, TEXAS           ***    From: 17 Sep 00  0700  To: 20 Sep 00  0659
GONZALEZ, Gustavo                                                        Page:   1
Unit:   V    Room: 503-01                                               Attending MD: LAWLER, MARION R., MD
Born:     30-Dec-1972          Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                 Discharged: 19-Sep-2000 04:45
```

---

### GENERAL CARE

```
18Sep00    0721        MRG    ID Bracelet On
18Sep00    0721        MRG    Bed - Down
18Sep00    0721        MRG    Bed - Rails Up
18Sep00    0721        MRG    Bed - Wheels Locked
18Sep00    0721        MRG    Hygiene Needs Met                      ASSIST
18Sep00    0721        MRG    HOB              (Comment)             HOB 10
18Sep00    0721        MRG    Activity         (Comment)             Bedrest
18Sep00    0721        MRG    Turn             (Comment)             Per Self
18Sep00    0721        MRG    Non Skid Slippers On
18Sep00    0721        MRG    # of BMs         (Comment)             0
18Sep00    0721        MRG    Date of Last BM                       9-18-00
18Sep00    2039        EH     ID Bracelet On
18Sep00    2039        EH     Bed - Down
18Sep00    2039        EH     Bed - Rails Up
18Sep00    2039        EH     Bed - Wheels Locked
18Sep00    2039        EH     HOB              (Comment)             HOB 10
18Sep00    2039        EH     Activity         (Comment)             Bedrest
18Sep00    2039        EH     Turn             (Comment)             Per Self
18Sep00    2039        EH     Non Skid Slippers On
18Sep00    2039        EH     # of BMs         (Comment)             0
18Sep00    2039        EH     Date of Last BM                       9-18-00
```

---

### SHIFT ASSESSMENT

```
18Sep00    0243        MMC    - - Respiratory WNL - -
18Sep00    0243        MMC    - - Cardiac WNL - -
18Sep00    0243        MMC    - - Genitourinary WNL - -
18Sep00    0243        MMC    Alert
18Sep00    0243        MMC    Moves all Extremities
18Sep00    0243        MMC    Disoriented
18Sep00    0243        MMC    Neuro - Other          (Note)
                                     IS DISORIENTED AND UNCOOPERATIVE WITH CARE.  REFUSING TO ANSWER
                                     QUESTIONS.  STATING THAT THE OFFICER GUARDING HIM IS TRYING TO KILL
                                     HIM, THAT HE NEEDS TO LEAVE.
18Sep00    0243        MMC    Uncooperative
18Sep00    0243        MMC    Psychosocial - Other   (Note)
                                     POLICE OFFICER GUARDING PT FOR THE NIGHT.  HANDCUFFED TO BED FOR NOW.
                                     PT REFUSING TO ANSWER QUESTIONS.  STATES THAT IT IS DANGEROUS HERE.
18Sep00    0243        MMC    Skin Temperature   (Comment)     Warm
18Sep00    0243        MMC    Skin Color         (Comment)     Pink
                                     COLOR OF SCLARA YELLOW.
```

```
Signature(s):    MRG  MARGARITA GONZALEZ, NA              EH   EUSEBIA HERNANDEZ, CNA
                 MMC  MARY COLVIN, RN
```

2 4   H O U R   P A T I E N T   C A R E   R E C O R D - P A R T   I                 000002

```
Acct #: 984589192              *** VALLEY BAPTIST MEDICAL CENTER ***    Printed: 20-Oct-2000 11:01
MR #: 00249469                 ***        HARLINGEN, TEXAS        ***    From: 17 Sep 00  0700  To: 20 Sep 00  0659
GONZALEZ, Gustavo                                                       Page:    2
Unit:   V   Room: 503-01                                               Attending MD: LAWLER, MARION R., MD
Born:    30-Dec-1972           Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                 Discharged: 19-Sep-2000 04:45
```

---

SHIFT ASSESSMENT

```
18Sep00   0243        MMC      Skin Condition          (Comment)    Dry
18Sep00   0243        MMC      Skin - Other            (Note)
                                   HAS DRY AND INTACT DRESSING TO FRONT OF NECK.
18Sep00   0243        MMC      HEENT Abnormal          (Note)
                                   - SCLARA YELLOW.
18Sep00   0243        MMC      Musculoskeletal - Other (Note)
                                   BEDFAST FOR TONIGHT.  WELL-BUILT, WELL-NOURISHED YOUNG MAN.
18Sep00   1353        MS       - - Neurological WNL - -
18Sep00   1353        MS       - - HEENT WNL - -
18Sep00   1353        MS       - - Musculoskeletal WNL - -
18Sep00   1353        MS       - - Respiratory WNL - -
18Sep00   1353        MS       - - Cardiac WNL - -
18Sep00   1353        MS       - - Gastrointestinal WNL - -
18Sep00   1353        MS       - - Genitourinary WNL - -
18Sep00   1353        MS       Uncooperative
                                   WHE BEING ASKED QUESTIONS PT DOES NOT ANSWER RIGHT AWAY AND GIVES
                                   VAGUE ANSWER.
18Sep00   1353        MS       Skin - Other            (Note)
                                   LESS THAN 2CM SELF IMPLICTED STAB WOUND TO THE NECK.  NO BLEEDING.
                                   WIHT SLIGHT REDNESS AROUND IT.
18Sep00   1353        MS       Gastrointestinal- Other (Note)         NPO
                                   FOR POSSIBLE SURGERY
18Sep00   2015        MV       - - Neurological WNL  - -
18Sep00   2015        MV       - - HEENT WNL - -
18Sep00   2015        MV       - - Respiratory WNL - -
18Sep00   2015        MV       - - Cardiac WNL - -
18Sep00   2015        MV       - - Gastrointestinal WNL - -
18Sep00   2015        MV       - - Genitourinary WNL - -
18Sep00   2015        MV       Uncooperative
                                   PT.  UNCOOPERATIVE WITH CARE.  STATES HE IS HUNGRY AND THIRSTY.  ON
                                   NPO STATUS AS PER ORDER.  PT.  GIVEN SMALL AMOUNT OF ICE CHIPS.
18Sep00   2015        MV       Psychosocial - Other    (Note)
                                   WITH LA FERIA PEACE OFFICER AT BEDSIDE.
18Sep00   2015        MV       Skin Temperature        (Comment)    Warm
18Sep00   2015        MV       Skin Color              (Comment)    Pink
18Sep00   2015        MV       Skin Condition          (Comment)    Dry
18Sep00   2015        MV       Skin - Other            (Note)
                                   WITH SMALL SELF INFLICTED WOUND TO NECK AREA.  SURROUNDING SKIN PINK
                                   IN COLOR.
18Sep00   2015        MV       Musculoskeletal - Other (Note)
                                   WITH DECREASED MOBILITY.  IS WITH HANDCUFF IN PLACE TO LEFT HAND TO
                                   BED.
```

```
Signature(s):    MMC MARY COLVIN, RN              MS  MARIO SILVERIO, RN
                 MV MARY VALDEZ, LVN
```

90

24 HOUR PATIENT CARE RECORD-PART I     000003

```
Acct #: 984589192          *** VALLEY BAPTIST MEDICAL CENTER ***     Printed: 20-Oct-2000 11.01
MR #: 00249469             ***      HARLINGEN, TEXAS        ***      From: 17 Sep 00  0700  To: 20 Sep 00  0659
GONZALEZ, Gustavo                                                    Page:   3
Unit:  V   Room: 503-01                                             Attending MD: LAWLER, MARION R., MD
Born:    30-Dec-1972       Admitted: 18-Sep-2000 02:30
Sex: M Age: 27             Discharged: 19-Sep-2000 04:45
```

---

CHARGE NURSE

| | | | | | |
|---|---|---|---|---|---|
| 18Sep00 | 0243 | MMC | 7P-7A SHIFT | (Note) | F.CABRERA |
| 18Sep00 | 1353 | MS | 7A-7P SHIFT | (Note) | E. LUJANO |
| 18Sep00 | 2015 | MV | 7P-7A SHIFT | (Note) | M.LUCIO |

---

LINES INSERTION/DISCONTINUED

| | | | | | |
|---|---|---|---|---|---|
| 18Sep00 | 0243 | MMC | IV Attempts | (Comment) | ER |
| 18Sep00 | 0243 | MMC | Line #1 Type | (Comment) | PIV |
| 18Sep00 | 0243 | MMC | Line #1 Site | (Comment) | RH |
| 18Sep00 | 0243 | MMC | Line #1 Insertion Date | | 9-17-00 |
| 18Sep00 | 0243 | MMC | Line #1 Insertion Time | | ER |
| 18Sep00 | 0243 | MMC | Line #1 Gauge | (Comment) | 20 g |
| 18Sep00 | 0243 | MMC | Line #1 Condition | (Comment) | WNL |
| 18Sep00 | 0243 | MMC | Line #1 Site Care Date | | 9-17-00 |
| 18Sep00 | 0243 | MMC | Line #1 Tubing Date Chg | | 9-17-00 |
| 18Sep00 | 1353 | MS | IV Attempts | (Comment) | 1 |
| 18Sep00 | 1353 | MS | Line #1 Type | (Comment) | PIV |
| 18Sep00 | 1353 | MS | Line #1 Site | (Comment) | RH |
| 18Sep00 | 1353 | MS | Line #1 Insertion Date | | 9-18-00 |
| 18Sep00 | 1353 | MS | Line #1 Insertion Time | | 1800 |
| 18Sep00 | 1353 | MS | Line #1 Gauge | (Comment) | 18 g |
| 18Sep00 | 1353 | MS | Line #1 Condition | (Comment) | WNL |
| 18Sep00 | 1353 | MS | Line #1 Site Care Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | IV Attempts | (Comment) | 1 |
| 18Sep00 | 2015 | MV | Line #1 Type | (Comment) | PIV |
| 18Sep00 | 2015 | MV | Line #1 Site | (Comment) | RH |
| 18Sep00 | 2015 | MV | Line #1 Insertion Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #1 Insertion Time | | 1800 |
| 18Sep00 | 2015 | MV | Line #1 Gauge | (Comment) | 18 g |
| 18Sep00 | 2015 | MV | Line #1 Condition | (Comment) | WNL |
| 18Sep00 | 2015 | MV | Line #1 Site Care Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #1 D/C Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #1 D/C Time | | 2000 |
| 18Sep00 | 2015 | MV | Line #1 Reason for D/C | (Comment) | PULLED OUT |
| 18Sep00 | 2015 | MV | Line #1 Cond. After D/C | (Comment) | WNL |
| 18Sep00 | 2015 | MV | Line #2 Type | (Comment) | HL |
| 18Sep00 | 2015 | MV | Line #2 Site | (Comment) | RH |
| 18Sep00 | 2015 | MV | Line #2 Insertion Date | | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #2 Insertion Time | | 2200 |
| 18Sep00 | 2015 | MV | Line #2 Gauge | (Comment) | 20 g |
| 18Sep00 | 2015 | MV | Line #2 Condition | (Comment) | WNL |

```
Signature(s):    MMC  MARY COLVIN, RN                  MS   MARIO SILVERIO, RN
                 MV   MARY VALDEZ, LVN
```

91

2 4   H O U R   P A T I E N T   C A R E   R E C O R D - P A R T   I       000004

```
Acct #: 984589192              *** VALLEY BAPTIST MEDICAL CENTER ***    Printed: 20-Oct-2000 11:01
MR #: 0C249469                 ***      HARLINGEN, TEXAS        ***     From: 17 Sep 00 0700  To: 20 Sep 00 0659
GONZALEZ, Gustavo                                                      Page:   4
Unit:  V    Room: 503-01                                              Attending MD: LAWLER, MARION R., MD
Born:    30-Dec-1972           Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                 Discharged: 19-Sep-2000 04:45
```

---

### LINES INSERTION/DISCONTINUED

| | | | | |
|---|---|---|---|---|
| 18Sep00 | 2015 | MV | Line #2 Site Care Date | 9-18-00 |
| 18Sep00 | 2015 | MV | Line #2 Tubing Date Chg | 9-18-00 |

---

### BRADEN SCALE

| | | | | |
|---|---|---|---|---|
| 18Sep00 | 0243 | MMC | Sensory Perception - No Impairment | |
| 18Sep00 | 0243 | MMC | Moisture - Rarely Moist | |
| 18Sep00 | 0243 | MMC | Activity - Walks Occasionally | |
| 18Sep00 | 0243 | MMC | Mobility - Slightly Limited | |
| 18Sep00 | 0243 | MMC | Nutrition - Adequate | |
| 18Sep00 | 0243 | MMC | Friction and Shear - No Apparent Problem | |
| 18Sep00 | 0243 | MMC | Braden Scale - Total | 0020 |
| 18Sep00 | 1353 | MS | Sensory Perception - No Impairment | |
| 18Sep00 | 1353 | MS | Moisture - Rarely Moist | |
| 18Sep00 | 1353 | MS | Activity - Walks Occasionally | |
| 18Sep00 | 1353 | MS | Mobility - Slightly Limited | |
| 18Sep00 | 1353 | MS | Nutrition - Adequate | |
| 18Sep00 | 1353 | MS | Friction and Shear - No Apparent Problem | |
| 18Sep00 | 1353 | MS | Braden Scale - Total | 0020 |
| 18Sep00 | 2015 | MV | Sensory Perception - No Impairment | |
| 18Sep00 | 2015 | MV | Moisture - Rarely Moist | |
| 18Sep00 | 2015 | MV | Activity - Walks Occasionally | |
| 18Sep00 | 2015 | MV | Mobility - Slightly Limited | |
| 18Sep00 | 2015 | MV | Nutrition - Adequate | |
| 18Sep00 | 2015 | MV | Friction and Shear - No Apparent Problem | |
| 18Sep00 | 2015 | MV | Braden Scale - Total | 0020 |

---

### PROGRESS NOTE

| | | | |
|---|---|---|---|
| 18Sep00 | 0523 | FGC | Progress Notes-Psychosocial         DONE |

ADMITTED TO ROOM # 503 WITH A DRESSING ACROSS HIS NECK . AS PER ER
REPORT, PT HAS TWO LACERATIONS ( STAB WOUNDS ) TO ANTERIOR ASPECT OF
NECK R/T PT. ATTEMPTING TO KILL HIMSELF. HANDCUFFED TO (L) HAND;
UNDER STRICT SURVEILLANCE BY THE POLICE DEPARTMENT. UNABLE TO
COMPLETE ADMISSION DATA BASE ; PT. WITHDRAWN . REFUSES TO RESPOND TO
QUESTIONS AND JUST STARES BLANKLY AND SUSPICIOUSLY WHEN BEING ASKED.

| 18Sep00 | 1429 | MS | Progress Notes-Miscellaneous         DONE |

PT REMAINS ON NPO FOR POSSIBLE NECK WOUND SURGERY.

| 18Sep00 | 1617 | MS | Progress Notes-Miscellaneous         DONE |

PT ASKING IF HE COULD HAVE SOMETHING TO EAT. MADE HIM AWARE THAT HE

```
Signature(s).    MV  MARY VALDEZ, LVN               MMC  MARY COLVIN, RN
                 MS  MARIO SILVERIO, RN             FGC  FELINA CABRERA, RN
```

92

24 HOUR PATIENT CARE RECORD-PART I          000005

Acct #: 984589192                    *** VALLEY BAPTIST MEDICAL CENTER ***     Printed: 20-Oct-2000 11:01
MR #: 03249469                       ***        HARLINGEN, TEXAS        ***     From: 17 Sep 00  0700  To: 20 Sep 00  0659
GONZALEZ, Gustavo                                                              Page:   5
Unit:   V   Room. 503-01                                                       Attending MD: LAWLER, MARION R., MD
Born:     30-Dec-1972               Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                      Discharged: 19-Sep-2000 04:45

                    MAY GO TO SURGERY AND WILL NEED TO KEEP HIM ON NPO PRIOR TO IT.
                    ASSURE PT THAT HE'LL GET SOMETHING TO EAT AS SOON AS POSSIBLE POST
                    SURGERY.

                                        PROGRESS NOTE

18Sep00   1930        MV     Progress Notes-Miscellaneous        DONE
                             PT. IN BED. AWAKE. ALERT ORIENTED X3. DENIES ANY PRESENT.

                             DISCOMFORTS AT PRESENT.  WITH HANDCUFF IN PLACE TO LEFT ARM AND
                             RESTRAINED TO BED.  LA FERIA PEACE OFFICER AT BEDSIDE.  PT.  CALM AND
                             COOPERATIVE.  VERY QUICK TO RESPOND TO ANSWERS.  WILL CONT.  TO
                             MONITOR.  NO DISTRESS NOTED.
18Sep00   2020        ML     Progress Notes-Miscellaneous        DONE
                             PT.  IN BED.  CONTINUES WITH LEFT HAND RESTRAINED BY HANDCUFF.  CALM
                             AND COOPERATIVE ASKING FOR BATH.  PT.  GIVEN WARM WATER AND SOAP.  PT.
                             TOLD TO BATHE SELF WITH HAND NOT RESTRAINED.  PT.  AGREED.
18Sep00   2115        MV     Progress Notes-Miscellaneous        DONE
                             PT.  IN BED.  REMAINS RESTRAINED TO BED WITH HANDCUFF.  REQUESTING
                             WATER AND SOMETHING TO EAT AT THIS TIME.  EXPLAINED TO PT.  THAT HE IS
                             SCHEDULED FOR EXAMS IN AM THAT REQUIRE TO HIM TO HAVE NOTHING BY
                             MOUTH.  PT.  GIVEN ICE CHIPS AT THIS TIME AND VERY QUIET AFTER ICE
                             CHIPS GIVEN TO HIM.  PEACE OFFICER CONTINUES AT BEDSIDE.  NO DISTRESS
                             NOTED.
18Sep00   2315        MV     Progress Notes-Miscellaneous        DONE
                             PT.  IN BED.  WITH EYES CLOSED RESTING.  DENIES ANY DISCOMFORT AT
                             PRESENT.  PEACE OFFICER CONT.  AT BEDSIDE.  NO DISTRESS NOTED.
19Sep00   0115        MV     Progress Notes-Miscellaneous        DONE
                             PT.  IN BED.  RESTING QUIETLY.  NO DISTRESS NOTED.  REMAINS HANDCUFFED
                             TO BED.  PEACE OFFICER CONT.  AT BEDSIDE.  NO DISTRESS NOTED.
19Sep00   0324        ML     Progress Notes-Miscellaneous        DONE
                             PHYSICAL ALTERCATION BETWEEN PT AND LA FERIA POLICE OFFICER- OFFICER
                             ASKING FOR ASSISTANCE- SECURITY AND HOUSE SUPERVISOR PAGED STAT
19Sep00   0325        ML     Progress Notes-Miscellaneous        DONE
                             HOUSE SUPERVISOR E.  MAURICIO RN AND VBMC SECURITY ON FLOOR- PT WITH
                             NO PULSE AND NO RESPIRATIONS AS PER THE HOUSE SUPERVISOR
19Sep00   0338        ML     Progress Notes-Miscellaneous        DONE
                             HARLINGEN POLICE DEPARTMENT ARRIVED
19Sep00   0445        ML     Progress Notes-Miscellaneous        DONE
                             PT PRONOUNCED BY JUDGE DAVID WISE

Signature(s):     MV   MARY VALDEZ, LVN                    ML   MARTA LUCIO, RN

000006

```
              2 4   H O U R   P A T I E N T   C A R E   R E C O R D - P A R T   II
Acct #: 984589192          *** VALLEY BAPTIST MEDICAL CENTER ***    Printed: 20-Oct-2000 11:02
MR #: 00249469             ***        HARLINGEN, TEXAS        ***    From: 17 Sep 00  0700   To: 20 Sep 00  0659
GONZALEZ, Gustavo                                                    Page:   1
Unit:   V   Room: 503-01                                            Attending MD: LAWLER, MARION R., MD
Born:      30-Dec-1972          Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                  Discharged: 19-Sep-2000 04:45
```

---

PASTORAL CARE ASSESSMENT

| | | | |
|---|---|---|---|
| 18Sep00 | 1630 | CD | * * * Type of Visit * * * |
| 18Sep00 | 1630 | CD | Initial Assessment |
| 18Sep00 | 1630 | CD | Inpatient |
| 18Sep00 | 1630 | CD | * * * Pastoral Services Provided * * * |
| 18Sep00 | 1630 | CD | Chaplain Availability Information |
| 18Sep00 | 1630 | CD | Religious Literature |
| 18Sep00 | 1630 | CD | * * * Pastoral Contacts * * * |
| 18Sep00 | 1630 | CD | Patient and Family Not Available |
| 19Sep00 | 0600 | JT | * * * Type of Visit * * * |
| 19Sep00 | 0600 | JT | Initial Assessment |
| 19Sep00 | 0600 | JT | Inpatient |
| 19Sep00 | 0600 | JT | Emergency |
| 19Sep00 | 0600 | JT | Death Ministry |
| 19Sep00 | 0600 | JT | * * * Pastoral Services Provided * * * |
| 19Sep00 | 0600 | JT | Prayer |
| 19Sep00 | 0600 | JT | * * * Pastoral Contacts * * * |
| 19Sep00 | 0600 | JT | Patient |
| 19Sep00 | 0744 | DAZ | * * * Type of Visit * * * |
| 19Sep00 | 0744 | DAZ | Initial Assessment |
| 19Sep00 | 0744 | DAZ | Inpatient |
| 19Sep00 | 0744 | DAZ | Emergency |
| 19Sep00 | 0744 | DAZ | Death Ministry |
| 19Sep00 | 0744 | DAZ | * * * Pastoral Services Provided * * * |
| 19Sep00 | 0744 | DAZ | Prayer |
| 19Sep00 | 0744 | DAZ | * * * Pastoral Contacts * * * |
| 19Sep00 | 0744 | DAZ | Patient |

---

CASE MANAGEMENT ASSESSMENT

| | | | |
|---|---|---|---|
| 18Sep00 | 1016 | RPV | Chart Reviewed |
| 18Sep00 | 1016 | RPV | Diagnosis                    (Note) |
| | | | STAB WOUND |
| 18Sep00 | 1016 | RPV | Interviewed |
| 18Sep00 | 1016 | RPV | No Needs Identified at This Time |
| 18Sep00 | 1016 | RPV | Other                        (Note) |
| | | | ON POLICE HOLD |

---

INTERDISCIPLINARY CARE PLANNING

| | | | |
|---|---|---|---|
| 18Sep00 | 1016 | RPV | Social Service |

```
Signature(s):    CD  CARMEN DEVARS,              JT   JOHN TEER, director
                 DAZ DAVID ZAVALA,               RPV  RITA VILLARREAL, RN/CASE MG
```

94

**000007**

24 HOUR PATIENT CARE RECORD - PART II

| | |
|---|---|
| Acct #: 984589192 | *** VALLEY BAPTIST MEDICAL CENTER *** |
| MR #: 00249469 | *** HARLINGEN, TEXAS *** |
| GONZALEZ, Gustavo | |
| Unit:   V   Room: 503-01 | |
| Born:   30-Dec-1972 | Admitted: 18-Sep-2000 02:30 |
| Sex: M Age: 27 | Discharged: 19-Sep-2000 04:45 |

Printed:  20-Oct-2000 11:02
From: 17 Sep 00  0700  To: 20 Sep 00  0659
Page:   2
Attending MD: LAWLER, MARION R., MD

---

SS/CM INITIAL ASSESSMENT

18Sep00    1016        RPV     PRE-HOSPITAL RESIDENCE  (Comment)    Other
                               ON POLICE HOLD

---

SS/CM-PROGRESS NOTE

18Sep00    1016        RPV     CASE MANAGEMENT PROGRESS NOTES
                               MET WITH PT WHOSE AFFECT IS FLAT.  PT UNDERSTANDS THAT HE IS HERE IN
                               THE HOSPITAL, BUT HE IS UNDER THE IMPRESSION THAT THIS IS HIS NEW
                               HOME.  EXPLAINED THAT DR LAWLER WILL REVIEW X-RAYS & RE-EXAMINE HIM TO
                               DETERMINE WHETHER OR NOT PT WILL NEED SURGERY.  IF PT REQUIRES
                               SURGERY, HE MAY NEED TO BE HERE ANOTHER 3 DAYS OR SO.  IF HE DOES NOT
                               REQUIRE SURGERY, HE MAY BE DISCHARGED TODAY OR TOMORROW.  PT IS ON
                               POLICE HOLD, & THERE IS A POLICE OFFICER AT HIS SIDE.  PT'S LT WRIST
                               IS HANDCUFFED TO SIDE RAIL.  MD ORDERED NPO STATUS FOR PT, & WILL CALL
                               MD FOR DIET ORDER IF HE DOES NOT ROUND BY MID AFTERNOON.  NO DISCHARGE
                               NEEDS IDENTIFIED.  WILL FOLLOW CASE.

18Sep00    1055        RG      SOCIAL SERVICE PROGRESS NOTES
                               ss/dp made aware of 27 y/o hispanic male admitted 9/17/00 with
                               stab wound.  pt apparently is under restaints (hand cuffs) and hgn pd
                               is involved.  pt is in a daze and non communicable.  cm, rita aware
                               and no needs identified at present, due to hgn pd being involved.
                               possible death/suicidal attempt is predicted in terms of pt's
                               girlfriend reported missing as well.  pt is in stable condition.
                               ss will continue to follow for developments.

Signature(s)       RPV  RITA VILLARREAL, RN/CASE MG        RG    REBECCA GALLAGA, LSW

95

000008

P A T I E N T / F A M I L Y   E D U C A T I O N   R E C O R D

Acct #: 984589192              *** VALLEY BAPTIST MEDICAL CENTER ***     Printed: 20-Oct-2000 11:02
MR #: 00249469                 ***       HARLINGEN, TEXAS        ***     From: 17 Sep 00  0700  To: 20 Sep 00  0659
GONZALEZ, Gustavo                                                       Page:  1
Unit:  V    Room: 503-01                                                Attending MD: LAWLER, MARION R., MD
Born:   30-Dec-1972            Admitted: 18-Sep-2000 02:30
Sex: M Age: 27                 Discharged: 19-Sep-2000 04:45

Education Codes:

1. Procedure Demonstrated/Information Discussed    6. Refuses Information/Demonstration     A. Supplies Provided
2. Accurately States Information                   7. Needs Reinforcement                   B. Literature Given
3. Accurately Demonstrates Procedure               8. Family/Significant Other              C. Video Shown
4. Unable to Accurately State Information           9. Goal Met                              D. Model
5. Unable to Accurately Demonstrate Procedure

PATIENT EDUCATION GENERAL CARE

18Sep00   0721       MRG    Admit Orientation Complete       1,2,3,9,

Signature(s):    MRG  MARGARITA GONZALEZ, NA

96

# EXHIBIT E

DONATO GARCIA

April 9, 2003

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARY E. CARRANZA, Individually      *
and as Next Friend of ANGEL         *
MATTHEW GONZALEZ, GUSTAVO           *
GONZALEZ, JR., and ALYSSA           *
LAUREN GONZALEZ, Minor Children     *
and on Behalf of All of Those       *
Entitled to Recover for Death of    *
GUSTAVO GONZALEZ, Deceased, Under   *
the Texas Wrongful Death Act,       *
and CELIA MUNIZ GONZALEZ,           *
Individually and as Personal        *
Representative of the ESTATE OF     *
GUSTAVO GONZALEZ, Deceased,         *
                      Plaintiffs,   *
vs.                                 *
                                    *
CITY OF LA FERIA, TEXAS, LA         *
FERIA POLICE DEPARTMENT, OFFICER    *
GERARDO "JERRY" RAMIREZ,            *
Individually and in his Official    *
Capacity; and VALLEY BAPTIST       *
MEDICAL CENTER,                     *
                      Defendants,   *
                                    *   CIVIL ACTION NO. B-02-180
GUSTAVO GONZALEZ, Individually      *
Pursuant to the Texas Wrongful      *
Death Act for the Death of          *
GUSTAVO GONZALEZ, Deceased,         *
                      Intervenor,   *
                                    *
vs.                                 *
                                    *
CITY OF LA FERIA, TEXAS, OFFICER    *
GERARDO "JERRY" RAMIREZ,            *
Individually and in his Official    *
Capacity; and VALLEY BAPTIST       *
MEDICAL CENTER,                     *
                      Defendants.   *
*****************************************************************

VIDEOTAPED ORAL DEPOSITION OF
DONATO GARCIA
APRIL 9, 2003
++***********************************************************

DONATO GARCIA                                                                April 9, 2003

Page 2

```
 1        ORAL DEPOSITION OF DONATO GARCIA, produced as a witness
 2   at the instance of the Plaintiff and duly sworn, was taken in
 3   the above-styled and numbered cause on the 9th day of April
 4   2003, from 11:00 a.m. to 5:00 p.m., before Katherine J.
 5   Brookbank, CSR in and for the State of Texas, reported by
 6   method of machine shorthand, at the office of Willette &
 7   Guerra, 3505 Boca Chica Boulevard, Brownsville, Texas, 78521,
 8   pursuant to the United States District Court Procedure and the
 9   provisions stated on the record hereto.
10                          APPEARANCES
     FOR THE PLAINTIFF(S)
11        Mr. Joseph Barrientos
          WATTS LAW FIRM
12        555 N. Carancahua, Suite 1400
          Corpus Christi, Texas   78478
13
     FOR INTERVENOR
14        Mr. Phillip Stein
          THE LAW OFFICES OF PHILLIP J. STEIN, P.C.
15        14-A Palm Village Center
          Brownsville, Texas   78520
16
     FOR THE DEFENDANT(S)
17        Mr. Scott Clark and Mr. William Pope
          ADAMS & GRAHAM, L.L.P.
18        222 E. Van Buren, West Tower
          P. O. Drawer 1429
19        Harlingen, Texas   78551
20        Mr. Eduardo Garza
          WILLETTE & GUERRA
21        International Plaza, Suite 460
          3505 Boca Chica Boulevard
22        Brownsville, Texas   78521
23   ALSO PRESENT:  Tele Video and Audio Productions
24   (Note by reporter:  Exhibits were not available to validate
     quoted material.  No quotes used around quoted material)
25
```

DONATO GARCIA                                                                    April 9, 2003

Page 3

1                              INDEX

                                                          PAGE

2

     Appearances ------------------------------------  2
3    Stipulations (Attached hereto) -------------------- N/A
4    DONATO GARCIA
          Examination by Mr. Joseph Barrientos --------   4
5         Examination by Mr. William Pope -------------  145
          Examination by Mr. Eduardo Garza ------------  149
6         Examination by Mr. Joseph Barrientos --------  150
7    Changes and Signature --------------------------- 158
     Reporter's Certificate ---------------------------
8                              EXHIBITS
     NO. DESCRIPTION                               PAGE
9    1 - Notice of Deposition                        9
10   2 - LFPD Policy & Procedure Manual             15
11   3 - Grand Jury                                 21
12   4 - Autopsy Report                             48
13   5 - Incident Report                            48
14   6 - Death Report                               49
15   7 - Harlingen Offense Report                   49
16   8 - Harlingen Investigation                    49
17   9 - Accident Video                             51
18   10 - Reenactment Video                         51
19   11 - Restraints                               116
20   12 - Critical Care Medical Protective Restraints  116
21   13 - Forensic Staff Information List           116
22   14 - Letters                                  156
23   15 - VBMC Medical Records (Marked in G. Ramirez depo)
24   16 - Diagram drawn by G. Ramirez (Marked in G. Ramirez depo)
25   17 - Autopsy report (Marked in G. Ramirez depo)

DONATO GARCIA                                                                      April 9, 2003

1    the training or lack thereof regarding use of deadly force,

2    force and deadly force.  That's kind of redundant of B,

3    actually, and I apologize for that.  But there is -- is there

4    any other training or instructional manual or booklet or body

5    of information that is used in training officers for the La

6    Feria Police Department besides Exhibit Number 2?

7        A    All of the -- all of the officers that -- that are

8    employed by the -- by the city are trained by the original

9    police academy.

10       Q    Okay.  All right.  Well, I assume that -- all

11   right.  First of all, give me the complete name of the academy

12   and where it is located.

13       A    It is located in Harlingen.

14       Q    Okay.

15       A    At the TSTC campus.  And it is the Lower Rio Grande

16   Valley Police Academy.

17       Q    And -- okay.  And this is the training academy that

18   Officer Ramirez would have gone through prior to the time he

19   was employed by the city of La Feria?

20       A    Before that.

21       Q    Yes, sir.  Okay.  All right.  Does the -- does the

22   city of La Feria have access to or have knowledge of the type

23   of training specifically with regard to the items that are

24   listed here in paragraph 1A through G -- well, strike that.

25   Let me go back.

DONATO GARCIA                                                                                      April 9, 2003

Page 17

1              Does the city of La Feria have access to training

2     materials used by the Lower Rio Grande Valley Police Academy

3     in training potential police officers?

4                    MR. GARZA:  Objection.  Form.

5                    THE WITNESS:  Yes.

6      Q     (BY MR. BARRIENTOS) Okay.  Is that something you-all

7     maintain in your office?

8      A     It is something that is faxed to me every quarterly

9     from the Rio Grande Valley Police Academy.

10     Q     And do -- do -- the city of La -- I am sorry, sir.

11     A     It is a continuous education.

12     Q     Does the city of La Feria Police Department maintain

13    a copy of that in its office?

14     A     Yes.

15     Q     Okay.  Does it have one there today?

16     A     Yes.

17     Q     Okay.  And would this -- the one that is there today

18    be substantially the same as whatever would have been in

19    existence in -- at the time that Officer Ramirez was hired?

20     A     When an officer is -- is sent to the academy, he

21    brings his certificate, with a completion of every course that

22    he takes.

23     Q     All right.  I understand.  So what -- so what the

24    city of La Feria -- what the police department maintains is a

25    certification that the applicants or police officers have

Page 32

1    Does it have a name or designation?

2        A    No.  It just goes in his peronsal file.

3        Q    Okay.  So let me ask.  Is -- in the way or in the

4    manner that that information is stored, is it stored in a

5    separate file or area or place that says complaints or would

6    you have to go through each officer's personnel file to glean

7    that specific information?

8        A    Each officer's file.

9        Q    Okay.  And it's your -- it is the city's testimony

10   that it does not maintain a separate index or body of records

11   specifically designed to record or document those type -- that

12   type of information?

13       A    No.

14       Q    Well, let me ask.  Did you produce any information

15   or documents regarding complaints, grievances, suits, reports,

16   reprimands, commendations or other documentations that allege

17   use of excessive force by members of the La Feria, Texas P.D.?

18       A    He has never had one, so there is nothing there.

19       Q    Okay.  The -- the item in H is -- and I understand

20   your -- your answer with regard to Officer Ramirez.  Item H

21   does not -- is not limited to Officer Ramirez.  Let me ask you

22   this.  Did you -- did you conduct a search for such complaints

23   regarding members of the La Feria Police Department other than

24   with Officer Ramirez?

25       A    Yes.  There is nothing there.

DONATO GARCIA                                                    April 9, 2003

Page 33

1       Q    Okay.  So your testimony is this incident -- the

2   city's testimony, excuse me, is that the incident that

3   occurred in September of 2000 is the only incident in which it

4   has been alleged that a member of the La Feria, Texas police

5   department used excessive force during an encounter with --

6   with a citizen?

7       A    Yes.

8       Q    Okay.  And that is the city's testimony -- and I

9   understand you are an individual, but you are basing that on

10  your 13 years of experience -- actually, more than that now.

11  I guess it would be more like 16 years, approximately, of

12  experience with the La Feria, Texas police department.   Is

13  that correct?

14      A    Okay.

15      Q    To your knowledge or to the city's knowledge, are --

16  is the city's position is that it -- it has never had a

17  complaint or a suit or a grievance filed against any of its

18  police officers for excessive use of force other than this

19  lawsuit involving Mr. Gonzalez' family?

20      A    Yes, it has.

21      Q    Okay.  I am sorry.  I misunderstood you, then.

22      A    Okay.

23      Q    What H, I think was -- is -- is asking about is all

24  of those other incidents or items.

25      A    Okay.

DONATO GARCIA                                                    April 9, 2003

Page 34

1      Q    And I am sorry if I wasn't clear earlier.  Okay.  So

2  let me go back to my first question.  Is it correct that there

3  are other incidents of complaints, grievances, suits, alleging

4  excessive use of force by members of the La Feria, Texas

5  police demonstrate other than this incident involving Mr.

6  Gonzalez?

7      A    There was one that I am aware of.

8      Q    Okay.  There is one that you are aware of?

9      A    Yes.

10     Q    All right.  And did you -- does the city and the

11  police department maintains documentation of that --

12     A    Yes.

13     Q    -- other incident?  Okay.  And is that located there

14  somewhere at the police department?

15     A    It is located at the city hall.

16     Q    Okay.  And that is something that you have access to

17  if you need it?

18     A    Yes.

19     Q    Okay.  Can you tell me, just briefly -- briefly,

20  what -- what incident that involved and the date or the year

21  in which it occurred?

22     A    I am going to say 1989, I believe.

23     Q    Okay.  The incident of which you speak, do you

24  recall what the -- the method or the mode of -- of excessive

25  force was alleged to have been?

DONATO GARCIA                                                                April 9, 2003

Page 35

1       A       That -- she was arrested.  That's -- that's it.

2       Q       Well, let me -- let me be more specific.  For

3   example, in this case I am alleging on behalf of Mr. Gonzalez'

4   family that excessive force was used in this case, that being

5   specifically that he was shot which resulted in his death.

6               What I am asking in the other case in 1989, can you

7   tell me what was the force that was alleged to have been used,

8   if any?

9       A       Oh, there was no force used.

10      Q       Okay.  The -- what did the complainant or the person

11  who made the complaint in that case accuse the police officer

12  or the police department --

13      A       Unlawful arrest.

14      Q       An unlawful arrest.  Did it involve use of a

15  firearm?

16      A       No.

17      Q       Did it involve use of deadly force?

18      A       No.

19      Q       Did that result in a lawsuit?

20      A       I believe so.

21      Q       And the officer involved was not Officer Ramirez.

22      A       No.

23      Q       Is that correct?  Okay.  Was the officer involved in

24  that case still on the La Feria, Texas police department in

25  September of 2001 when this incident occurred?

DONATO GARCIA                                                    April 9, 2003

Page 71

1    officer is trained in the use of deadly force.

2        Q    Okay.  My review of Exhibit Number 2, when I read

3    it, I didn't see anywhere that I remember, and you correct me

4    if I am wrong, because you are more familiar with it than I

5    am.  But I didn't see there anywhere where it refers the

6    officer back to their training academy experience.  So let me

7    ask you this.  Is what you have just told me something that is

8    in addition to what is in the manual or is what you have told

9    me something that is applicable instead of what is in the

10   manual?

11       A    No.  I am not -- I am not saying that.  I am saying

12   that the -- that the use of force is trained at the academy.

13       Q    Okay.  All right.  So when it would -- the question

14   of when it is appropriate to use deadly force is not something

15   that the city of La Feria trained its officers to do --

16       A    No.

17       Q    I am sorry.

18       A    I am sorry.  Go ahead.

19       Q    Okay.  The city of La Feria relies on the police

20   academy to do the training of when it is proper or appropriate

21   to use deadly force, relies on the police academy to train the

22   applicants that the city of La Feria ultimately hires on when

23   that use of deadly force is proper or appropriate.

24       A    It is -- it is up to the -- to the academy, sir.

25   The officers are trained there in the use of deadly force.

DONATO GARCIA                                                        April 9, 2003

Page 72

1      Q     Okay.  All right.  And that is okay.  I am not

2    fussing.  I just want to make sure I understand.  The city of

3    La Feria relies on the police academy and the training that is

4    rendered there in order to teach their police officers when it

5    is appropriate or permissible to use deadly force?

6      A     Yes.

7      Q     Okay.  Is it correct, then, or do I understand from

8    your testimony that the city of La Feria provides no

9    additional training with regard to the use of deadly force?

10     A     It is a continuing education.  The officer is sent

11   back to the training.  It is -- it is training that they take.

12   It is training that I make available to them, continuous

13   education.  They have the training.  They shall have the

14   training every two years.

15     Q     Okay.

16     A     Mandated by TCLEOSE.

17     Q     Earlier I think we -- we discussed what actually is

18   taught at the academy.  And I believe your testimony was that

19   the city of La Feria does not have input into what is actually

20   taught or the training that they -- that the applicant or the

21   officer actually receives.  You rely on them to do that.

22     A     Correct.

23     Q     And would the same be true for the continuing

24   education that you have described that occurs or is supposed

25   to occur every two years?

DONATO GARCIA                                                              April 9, 2003

Page 73

1       A     Yes.

2       Q     So, then, the entirety of what is taught to an

3    officer like Officer Ramirez in terms of use of deadly force

4    and in terms of the limits of the constitutional application

5    of that force, when it is appropriate under the law, is done

6    entirely by an outside agency.

7       A     By the police academy.

8       Q     Let me -- let me go specifically to a couple of

9    provisions here.

10      A     All right.

11      Q     Do you know whether anything in Section 6 -- well, I

12   will tell you.  I am not sure how this -- how this goes.  At

13   page 10, the last section on here is Section 6.06, which is

14   titled Serious Bodily Injury.  And then the next page, there

15   is no new subtitle.  So I don't know if this falls under

16   Serious Bodily Injury or if it is some other subtopic.  And

17   then -- it must be the same one because 6.07 is the next one

18   at page 12.  So let me -- let me ask you this way.

19            Do you know whether the details on page 10, 11, and

20   the top of page 12 with regard to the use of deadly force, are

21   these provisions -- can you tell me whether they are in any

22   way in conflict with what the officer is taught at the

23   training academy on the use of deadly force?

24      A     No.

25      Q     Do you know -- do you know one way or another

DONATO GARCIA                                                                    April 9, 2003

```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE

                      SOUTHERN DISTRICT OF TEXAS

 2                        BROWNSVILLE DIVISION

 3    MARY E. CARRANZA, ET AL,          *

                         plaintiffs,    *

 4                                      *

      VS.                               *    C. A. NO. B-02-180

 5                                      *

      CITY OF LA FERIA, TEXAS, ET AL,   *

 6                        defendants    *

 7    ----------------------------------------------------------

                       REPORTER'S CERTIFICATION

 8           VIDEOTAPED DEPOSITION OF DONATO GARCIA

                          APRIL 9, 2003

 9    ----------------------------------------------------------

10        I, KATHERINE J. BROOKBANK, Certified Shorthand Reporter

11    in and for the State of Texas, hereby certify to the

12    following:

13        That the witness, DONATO GARCIA, was duly sworn by the

14    officer and that the transcript of the oral deposition is a

15    true record of the testimony given by the witness;

16        That the deposition transcript was submitted on

17    _____ to the witness or to the attorney for

18    witness for examination, signature, and return to me by

19    _____;

20        I further certify that I am neither counsel for, related

21    to, nor employed by any of the parties or attorneys in the

22    action in which this proceeding was taken, and further that I

23    am not financially or otherwise interested in the outcome of

24    the action.

25
```

DONATO GARCIA                                                           April 9, 2003

Page 160

1        Certified to by me this ___1st___ day of ___May___ , 2003.

2

         Costs: _____

3    Due and owing by Plaintiff

4        _Katherine J. Brookbank_
         KATHERINE J. BROOKBANK, Texas CSR 2060

5        Expiration Date:  12/31/04

         7800 IH-10 West, Suite 100

6    San Antonio, Texas   78230

         (210) 377-3027

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared <u>GERARDO XAVIER RAMIREZ</u> who, after by being duly sworn did depose and say:

I have been informed that under the Penal Code of the State of Texas, Section 37.02: A person commits the offense of perjury if, he makes a false statement under oath or swears to the truth of a false statement previously made; and the statement is required or authorized by law to be made under oath.

My name is Gerardo Xavier Ramirez. My date of birth is August 4, 1978. I am employed by the City of La Feria as a reserve Peace Officer.

On September 18, 2000 at about 2:30 p.m. I got a call from Sgt. Tony Garcia asking if I wanted to work at the hospital watching a prisoner. He told me that the guy I was going to be watching had murdered his girlfriend. When I arrived at the hospital I was escorted to room 503. There I met with La Feria Police Officer Isidro Delgado. Isidro told me to be careful of the guy. He also told me that he will start to talk to you and pick at you. He also stated that the guy was mental.

During the course of the day the guy tried to make small talk with me. I would try to keep my answers to yes and no and a shake of the head. I didn't asked him anything. He did ask a few times to go to the bathroom. I told him that I would call security and put the shackles on him and he could go. He didn't like the shackles and told me "never mind". Everything went as well as expected . He finally went to sleep at around 1:00 in the morning. The last time the nurses came in was at about midnight. Right around 3:00 he woke up. He seemed different. He seemed to be quite. He would look at me and look away. He did this a couple of times. He looked at the counter top. On the counter top is where the shackles were at. There was just something "creepy" about him. I don't know what it was but he seemed different. He then started telling me to release him. He just sounded weird. His tone of voice was hollow. He got out of the bed on the right side over the guard rail. I quickly stood up and told him to get back into bed. At first he didn't want to, but then said "okay, okay". He then got back into the bed.

SWORN AND SUBSCRIBED TO BEFORE ME, on this 19th. day of SEPTEMBER, 2000

Notary Public in and for Cameron County, Texas

Richard V. Turner
Name (printed or typed)          Commission Expires

RICHARD V. TURNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 16, 2001

Gonzalez, Celia
1306-000544

He stayed in bed just a few seconds. I sat back on the chair by the door. As soon as I sat back down he got back out of bed. This time he was standing straight up. He told me to let him go and to take off the chain. He was not asking he was telling me to take them off and let him go. I kept telling him that I was not going to do it and to get back into bed. I told him to get back into bed or I would get a hold of somebody and put him back into bed. This is when he started getting upset. I went around the bed and went to the phone which was on the window sill. He came across the bed and started dragging the bed towards me. I kept telling him to get back get back, get back. When he refused I pulled my baton. He was about four feet away. He was still coming towards me dragging the bed with him. I struck him once in the shoulder. He stopped then came at me again. I struck him again in the shoulder blade area. I went down and tried to get his legs. I missed his legs and he went back across the bed. I tried to get to the door to get away. He pulled the bed over blocking my way out. I dropped my baton as I was getting my OC spray. The baton seemed to have no effect on him. I thought that if he couldn't see me I could get away. He is now behind the bed pushing it towards me . Ever since I tried to get to the phone I was calling for help. I was calling for security. Nobody came in. I heard somebody in the hall calling out "call security". Each time he would try to come across the bed at me I would strike him on the arm. He would call out in pain but keep coming. I sprayed him with my "OC". That stopped him for a few seconds, then he came at me again. I struck him again with the baton in the shoulder. Now he was in a rage. He was trying to break the handcuffs or the bed rail. When he couldn't do that he reached down and turned the bed over. He reached on the counter and grabbed the shackles and jumped over the bed. He now is within striking range of me with the shackles. He swung at me and hit me full in the face. He swung again and hit me again. I was backing away from him. I was pinned in the corner between the table and the window. I was looking in his face. What I saw was a look that said that he was going to get me. I knew that he was going to kill me. I was in fear of my life. I had taken two blows to the face almost losing consciousness, I am breathing OC spray. I think that altogether I must have taken five hits from the shackles. The only thing I was thinking is that I can't go down, I can't go down. I pulled my service weapon. I have a 9mm. Beretta automatic with a 15 round clip with one in the chamber. I saw him stop for a moment with his eyes getting large. I saw him grit his teeth and start to swing the shackles at me again. I aimed at the center mass of his body and fired.. I fired, and he still came at me. I kept firing. Some of the round spun him around then he would turn and come back towards me. Even as he started going down he would start back at me. I continued to fire. I fired everything I had at him. He stayed down. I looked to make sure that he was not moving and started yelling for back up. I need back up. I have one down and need back up. I went to the phone, put my weapon on the window sill and called the La Feria Police Department. I talked to Jesse Garcia. I told Jesse that I need officers here. I told him that I had

SWORN AND SUBSCRIBED TO BEFORE ME, on this 19th day of SEPTEMBER, 2000

Notary Public in and for Cameron County, Texas

Richard V. Turner
Name (printed or typed)

RICHARD V. TURNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 16, 2001

Commission Expires

Gonzalez, Celia
1306-000545

killed him and I need officers. About that time the security guards came into the room. I told Jesse to get some officers here quick. The security guards assisted in getting me out of the room. They put me on a gurney. I didn't know how bad I was hurt. I felt my face. I had a large bump on my head and had blood on my hand and face. They had me sit on the gurney. I told them to leave everything alone in the room. They went in the room I guess to check on the guy. About that time the Harlingen Police Officers started coming in. I laid back on he gurney and sort of went into shock. I don't remember to much after that. Somebody gave me a towel for my face. I remember trying to get the room secure.

SWORN AND SUBSCRIBED TO BEFORE ME, on this 19th. day of SEPTEMBER, 2000

Notary Public in and for Cameron County, Texas

RICHARD V. TURNER
Notary Public
STATE OF TEXAS
My Comm. Exp. Oct. 16, 2001

Richard V. Turner
Name (printed or typed)          Commission Expires

Gonzalez, Celia
1306-000546

·I, *GERARDO VALDEZ RAMIREZ*, have been advised of my Constitutional Rights by:

Officer *DET. R. VILLAREAL*, and clearly understand them.

Signed x _____

Date *9-19-2000*     Time *7:13AM*

Witness: *Roberto J. Hinojosa*
*Chief of Police La Feria*

## LEGAL RIGHTS

ʃR(1)  You have the right to have a lawyer present to advise you either prior to any questioning or during any questioning.

ʃR (2)  If you are unable to employ a lawyer, you have the right to have a lawyer appointed to counsel with you prior to or during any questioning, and

ʃR (3)  You have the right to remain silent and not make any statement at all and that any statement you make may and probably will be used in evidence against you at your trial.

)R (4)  You have the right to terminate the interview at any time.

The Code provides the officer who takes the statement must give the accused the warning. The accused must then knowingly, intelligently and voluntarily waive his right to counsel and his right to remain silent. Failure to comply will void a confession.

Gonzalez, Celia
1306-000547

STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared Gerardo Xavier Ramirez who, after by being duly sworn did depose and say:

My name is Gerardo Xavier Ramirez and my date of birth is August 4, 1978.  I am currently employed by the City of La Feria as a reserve Peace Officer.

On September 18, 2000 at about 2:30 PM, I got a call from Sgt. Tony Garcia asking if I wanted to work at the hospital watching a prisoner.  He told me that the guy I was going to be watching had murdered his girlfriend.  When I arrived at the hospital 3:15 PM, I was escorted to room 503.  There I met with La Feria Police Officer Isidro Delgado. Isidro told me to be careful of the guy.  He also told me that he would start to talk to you and pick at you.  He also stated that the guy was mental.

When I got to the room, the guy I was going to guard was handcuffed to the bed. His left hand was handcuffed to the left bedrail.  The cuffs belonged to Isidro Delgado and we did not switch out.  During the course of the day the guy tried to make small talk with me.  I would try to keep my answers to yes and no and a shake of the head.  I didn't ask him anything.  He did ask me a few times to go to the bathroom.  I told him that I would call security and put the shackles on him and he could go.  He didn't like the shackles and told me "never mind".  Everything went as well as expected.  He finally went to sleep at around 1:00 in the morning.  When he went to sleep, I was sitting on the chair next to the door.  Also, the door was open because the nurses were continually checking the guy.  The last time the nurses came in was at about midnight.  Right around 3:00 he woke up.  He seemed different.  He seemed to be quiet.  He would look at me and look away.  He did this a couple of times.  He looked at the counter top.  On the counter top is where the shackles were at.  The counter top I am talking about was the one where the sink and mirror were at.  There was just something "creepy" about him.  I don't know what it was but he seemed different.  He then started telling me to release him.  He just sounded weird.  His tone of voice was hollow.  He got out of the bed on the right side over the guardrail.  It was really his left.  I quickly stood up and told him to get back into bed.  At first he did not want to, but then said, "okay, okay".  He then got back into the bed.  He stayed in bed just a few seconds.  I sat back on the chair by the door.  As soon as I sat back down he got back out of bed.  This time he was standing straight up.  He was standing on the side of the bed to his left.  He told me to let him go and to take off the chain.  He was not asking he was telling

SWORN AND SUBSCRIBED TO BEFORE ME, on this 25th day of September 20 00

Notary Public in and for Cameron County Texas

Alvaro Garcia                    2-9-2002
Name (printed or typed)    Commission Expires

ALVARO R. GARCIA
MY COMMISSION EXPIRES
February 9, 2002

Gonzalez, Celia
1306-000548

me to take them off and let him go. I kept telling him that I was not going to do it and to get back into bed. I told him to get back into bed or I would get a hold of somebody and put him back into bed. This is when he started getting upset. I went around the bed and went to the phone which was on the windowsill. He came across the bed and started dragging the bed towards me. What I mean is that he on the left side of the bed (his left) and crossed over to the other side (his right). I kept telling him to get back, get back, get back. When he refused I pulled my baton. The baton I was carrying was an Asp. He was about four feet away. He was still coming towards me dragging the bed with him. He was still on his right side of the bed. I struck him once in the shoulder. He stopped then came at me again. I struck him again in the shoulder blade area. I went down and tried to get his legs. I missed his legs and he went back across the bed. I tried to get to the door to get away. He is now behind the bed pushing it towards me. He had crossed over again and was on his left side again. Ever since I tried to get to the phone I was calling for help. I was calling security. Nobody came in. I heard somebody in the hall call out "call security". Each time he would try to come across the bed at me I would strike him on the arm. He would call out in pain but keep coming. I sprayed him with my "OC". That stopped him for a few seconds, then he came at me again. I struck him again with the baton in the shoulder. Now he was in a rage. He was trying to break the handcuffs or the bed rail. When he couldn't do that he reached down and turned the bed over. He was still on the left side of the bed (his left). He reached on the counter and grabbed the shackles and jumped over the bed (to his right). He now is within striking range of me with the shackles. He swung at me and hit me full in the face. He swung again and hit me again. I was backing away from him. I was pinned in the corner between the table and the window. I was looking in his face. What I saw was a look that said that he was going to get me. I knew that he was going to kill me. I was in fear of my life. I had taken two blows to the face and almost lost consciousness. I was also breathing OC spray. I think that altogether I must have taken five hits from the shackles. The only thing I was thinking is that I can't go down, I can't go down. I pulled me service weapon. I have a 9 MM Berretta automatic with a 15 round clip with one in the chamber. I saw him stop for a moment with his eyes getting large. I saw him grit his teeth and start to swing the shackles at me again. I aimed at the center mass of his body and fired. I fired, and he still came at me. I kept firing. Some of the rounds spun him around then he would turn and come back towards me. Even as he started going down he would start back at me. I continued to fire. I fired everything I had at him. I know he was going down when I was shooting but I did not shoot at him on the ground. I remember that I shot about four or five rounds and then paused for a couple of seconds. When I saw that he was coming at me again, I started to shot again. He stayed down. I looked to make sure that he was not moving and started yelling for back up. I need back up. I have one down and need back up. I went to the

SWORN AND SUBSCRIBED TO BEFORE ME, on this 25th day of _September_ 20 00

Notary Public in and for Cameron County Texas

Alvaro R. Garcia                                   2-9-2002
Name (printed or typed)        Commission Expires

ALVARO R. GARCIA
MY COMMISSION EXPIRES
February 9, 2002

Gonzalez, Celia
1306-000549

phone, put my weapon on the windowsill and called the La Feria Police Department. I talked to Jesse Garcia. I told Jesse that I need officers here. I told him that I had killed him and I need officers. About that time the security guards came into the room. I told Jesse to get some officers here quick. The security guards assisted in getting me out of the room. They put me on a gurney. I didn't know how bad I was hurt. I felt my face. I had a large bump on my head and had blood on my hand and face. They had me sit on the gurney. I told them to leave everything alone in the room. They went into the room I guess to check on the guy. About that time the Harlingen Police Officers started coming in. I laid back on the gurney and sort of went into shock. I don't remember too much after that. Somebody gave me a towel for my face. I remember trying to get the room secure.

I attended the Lower Rio Grande Peace Officer Academy from March 1999 to August 1999. My instructors were Ray Wisdom, Maz Martinez, and Joe Vasquez. I completed the 560 hours of training and received my Basic Peace Officer License. While going through the academy, I was certified with a .357 revolver, and I was also certified for carrying OC spray and the expandable Monadnock baton. I was not certified in the Asp. I was hired by La Feria PD as a Reserve Officer on December 1999. On January 2000, I was hired by La Feria PD as a full-time dispatcher. Around March of 2000, I qualified with my Berretta 9 MM with Terry Vinson at his range in San Benito. I had purchased this Berretta on November 1999 from Guns and Goods at a gun show. They told me it was a used gun and an officer had traded it in. Previously, I was security guard in McAllen and as a clerk for South Texas Immigration Council. I was never in the military.

I am from Alamo but I did not know the guy that I shot. When I was talking to him, he was telling me that I looked familiar to him but I did not know him.

SWORN AND SUBSCRIBED TO BEFORE ME, on this 25th day of _September_ 20 00

_____
Notary Public in and for Cameron County Texas

_Alvaro R. Garcia_        2-9-2002
Name (printed or typed)    Commission Expires

ALVARO R. GARCIA
MY COMMISSION EXPIRES
February 9, 2002

Gonzalez, Celia
1306-000550