IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

MAR 2 4 2004

Michael N. Milby
Clerk of Court

| | |
|---|---|
| MARY E. CARRANZA, Individually<br>And as Next Friend of ANGEL<br>MATTHEW GONZALEZ, GUSTAVO<br>GONZALEZ, JR. and ALYSSA LAUREN<br>GONZALEZ, Minor Children<br>And on Behalf of All of Those Entitled<br>To Recover for Death of GUSTAVO<br>GONZALEZ, Deceased, Under the<br>Texas Wrongful Death Act, and<br>CELIA MUNIZ GONZALEZ,<br>Individually and As Personal<br>Representative of the ESTATE OF<br>GUSTAVO GONZALEZ, Deceased<br><br>                     Plaintiffs<br><br>vs.<br><br>CITY OF LA FERIA, TEXAS,<br>LA FERIA POLICE DEPARTMENT,<br>OFFICER GERARDO "JERRY"<br>RAMIREZ, Individually and in his<br>Official Capacity; and<br>VALLEY BAPTIST MEDICAL CENTER<br><br>                     Defendants<br><br>GUSTAVO GONZALEZ, Individually<br>Pursuant to the Texas Wrongful Death<br>Act for the death of GUSTAVO<br>GONZALEZ, Deceased<br><br>                     Intervener<br><br>vs.<br><br>CITY OF LA FERIA, TEXAS<br>OFFICER GERARDO "JERRY"<br>RAMIREZ, Individually and in his<br>Official Capacity; and<br>VALLEY BAPTIST MEDICAL CENTER<br><br>                     Defendants | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br><br><br><br><br><br><br><br>CIVIL ACTION. NO. B-02-180 |

## PLAINTIFFS' AND INTERVENER'S RESPONSE TO DEFENDANT VALLEY BAPTIST MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Plaintiffs and Intervener's and file their Response to Valley Baptist Medical Center's Motion for Summary Judgment and, in support thereof would respectfully show the Court the following:

## A. INTRODUCTION

1.      Plaintiffs are MARY E. CARRANZA, Individually and as Next Friend of ANGEL MATTHEW GONZALEZ, GUSTAVO GONZALEZ, JR. and ALYSSA LAUREN GONZALEZ, Minor Children and On Behalf of All of Those Entitled to Recover For the Death of GUSTAVO GONZALEZ, Deceased; Under the Texas Wrongful Death Act; and CELIA MUNIZ GONZALEZ, Individually and As Personal Representative of the ESTATE OF GUSTAVO GONZALEZ, Deceased.  The Intervener is GUSTAVO GONZALEZ, SR. and the moving Defendant is VALLEY BAPTIST MEDICAL CENTER (VBMC).

2.      Plaintiffs originally sued VBMC in state court based upon negligence claims and Intervener joined the suit thereafter.  The claims as to VBMC allege negligence in the safety and security practices used (or not used) by VBMC's non-medical security department and staff.  Plaintiffs and Intervener claim that VBMC was negligent in the formulation and implementation of policies designed to protect the safety of patients under police custody; in training and supervising its employees; and in determining what information should be disclosed to police officers guarding patients so that they might appropriately guard the same.

3.      VBMC filed a motion for Summary Judgment on Plaintiffs' and Intervener's negligence causes of action for failure to produce expert testimony on the following issues:

a)  the mental health of Plaintiffs' and Intervener's decedent; and

b)  the standard of care for patient safety and hospital security.

4.    Summary Judgment is improper in this case because VBMC has incorrectly stated that the mental health of the decedent is an *essential element* of any claims Plaintiffs and Intervener have made against VBMC, because they incorrectly state that expert testimony is *necessary* to show that VBMC was negligent with respect to the claims made against it and because there is evidence as to the negligence of VBMC.  Specifically, there is evidence of VMBC's negligence with regard to the formulation and implementation of policies designed to protect the safety of patients under police custody; in training and supervising its security employees; and in determining what information should be disclosed to police officers guarding patients so that they might appropriately guard the same.

## B.  Statement Of Facts

5.    At the time Gustavo Gonzalez was arrested and taken for treatment to the Valley Baptist Medical Center, no agreements regarding protocol or procedures for the security of in-custody patients existed between the City of La Feria Police Department and the Valley Baptist Medical Center (Chief Donato Garcia deposition, p. 26, line 23 through p. 27, line 25; p. 29, line 20 through p. 30, line 7).  In fact, neither Defendant Officer Ramirez nor any other officer of the La Feria Police Department had ever guarded a patient at a hospital. (Donato Garcia deposition, p. 102, line 4 through line 10).

6.    Neither Defendant Officer Ramirez nor the City of La Feria received any guidance from Valley Baptist Medical Center on when, under what conditions or to what extent restraints should be used. (Donato Garcia deposition, p. 113, line 16

through p. 114, line 5). None of the documents that might deal with patient restraint or forensic staff were ever provided to members of the La Feria Police Department prior to the time Mr. Gonzalez was killed. (Donato Garcia deposition, p. 116, line 9 through p. 118, line 24). In addition, the La Feria Police Department was never provided with any information regarding Gustavo Gonzalez' mental health status, mental health history, or suicide risk by Valley Baptist Medical Center. (Donato Garcia deposition, p. 119, line 10 through p. 120, line 10).

7.      Valley Baptist Medical Center testified through its then Director of Security, Mr. Blake Hubbard, who established that at the time of this incident the Valley Baptist Medical Center employed thirty-five (35) to forty (40) individuals in their security department who were employees of the hospital. About sixty percent (60%) of VBMC's security guards were commissioned by the Texas Commission on Private Security at that time. (Hubbard deposition, p. 11, line 9 through p. 13, line 208).

8.      The hospital security department would collect information on in-custody patients, extensively to determine what level of security the hospital should provide (Hubbard deposition, p. 26, line 9-17; p. 27, line 7 through p. 29, line 13). The hospital also retained ultimate responsibility and authority to finally decide what restraints should be used and at what level. (Hubbard deposition, p. 53, line 21 through p. 54, line 17). While a heightened security or safety risk would be a set of circumstances where the hospital would be called upon to provide additional security, no policy or instruction outlined any procedure for the same. (Hubbard deposition, p. 18, line 1-22; p. 23, line 5-15; and p. 24, line 10-15). And although hospital security had the discretion to assign additional security to assist law enforcement officers with in-custody patients, including patients accused of violent felonies, the hospital security department never

actually made any such assignments. (Hubbard deposition, p. 32, line 4-17; p. 33, line 14 through p. 34, line 14).

9.    The hospital security department was aware that at the time Mr. Gonzalez came to the Valley Baptist Medical Center he was suspected of violent behavior, that he had an allegedly self-inflicted wound, and that he had been combative during his arrest and the hospital emergency room itself. (Hubbard deposition, p. 93, line 17 through p. 94, line 19). The information regarding the in-custody patients' mental or medical condition, while not shared with law enforcement personnel, should be available to the hospital security staff. (Hubbard deposition, p. 56, line 7-20).

10.    The Director of Security also stated that hospital staff should let the security department know if a patient presents a security risk. (Hubbard deposition, p. 65, line 11 through p. 66, line 19). And while the health care staff noted indications that Mr. Gonzalez was psychotic and had expressed paranoia and verbalized violent thoughts, this information was not shared with the security department. (Hubbard deposition, p. 107, line 9-20; p. 107, line 25 through p. 109, line 4).

11.    In spite of the information possessed by the hospital regarding Mr. Gonzalez' mental history and recent violent behavior, no specific request was made of the hospital security department to provide any additional security in or around the area of the hospital where Mr. Gonzalez was located. (Hubbard deposition, p. 73, line 9 through p. 74, line 12).

12.    VBMC's security staff used radios to communicate directly with each other but Officer Ramirez was not issued any communication device by the hospital that would have allowed him to contact security personnel directly. (Hubbard deposition, p. 146, line 17 through p. 147, line 10). This is in spite of the fact that

hospital policy prevents police officers from using their own radios while on the premises. (Hubbard deposition, p. 150, line 22 through p. 151, line 3).

13.    Officer Ramirez testified that upon his arrival at the hospital he was met by a security guard who escorted him to the room where Mr. Gonzalez was located but did not share any other information, documents, paperwork, or provide explanation as to any of the procedures at the hospital. (Ramirez deposition, p. 89, line 13 through p. 90, line 13). At no time did Officer Ramirez receive information from the Valley Baptist Medical Center about the type or level of restraint that should be used with respect to Mr. Gonzalez. (Ramirez deposition, p. 95, line 22 through p. 97, line 9). In fact, the only contact Officer Ramirez had with hospital security personnel over the approximately twelve hours leading up to Mr. Gonzalez' death were two bathroom breaks. (Ramirez deposition, p. 107, line 2 through p. 108, line 6). At no time did any hospital staff explain to Officer Ramirez the difference between various types of restraints or reasons therefore. (Ramirez deposition, p. 208, line 7 through p. 210, line 8).

14.    Officer Ramirez was not informed of Mr. Gonzalez' medical and/or psychological condition. Officer Ramirez felt that he should have been provided with the information regarding Mr. Gonzalez' medical and mental history and that this information would have changed the manner of restraint he would have sought for Mr. Gonzalez. (Ramirez deposition, p. 225, line 1; p. 227, line 5-22). Had he known of those things, he would have initiated or suggested some greater degree of restraint than what was in place at the time of his arrival. (Ramirez deposition, p. 108, line 25 through p. 109, line 15). Specifically, Officer Ramirez would have used the leg shackles or other cuffs to reduce Mr. Gonzalez' movement and thereby diminish any risk involved. (Ramirez deposition, p. 110, line 4-10).

15.     Officer Ramirez was concerned that his only method of communication with hospital security was a telephone located next to the trustee/patient and further testified that there was no one to take his suggestion about additional communication. (Ramirez deposition, p. 108, line 7-19). Later during his watch, when Mr. Gonzalez failed to comply with his initial request, Ramirez began calling out for security, yelling out in the hallway but no security staff responded until after the ordeal was over and Mr. Gonzalez was dead. (Ramirez deposition, p. 132, line 2 through p. 134, line 6). He also testified that from the time Mr. Gonzalez first stood up until the time he fired the last shot felt like a "long time" and, although it might be "an exaggeration to state it was from fifteen to twenty minutes, it felt like that amount" of time to him. (Ramirez deposition, p. 231, line 16 through p. 232, line 7).

16.     Regardless of whether the restraint was forensic or medical, the hospital had the ultimate authority to determine the type and level of restraint. (Hubbard deposition, p. 98, line 17 through p. 99, line 4). Ramirez testified that if the hospital had instructed him to restrain Mr. Gonzalez to some greater degree, this would have prevented the incident. (Ramirez deposition, p. 223, line 21 through p. 224, line 1). The hospital representative also acknowledged that had additional restraints been used on Mr. Gonzalez, this incident would have been prevented. (Hubbard deposition, p. 121, line 24 through p. 122, line 9).

## C.  Standard Of Review

17.     Although summary judgment is proper in a case where there is no genuine issue of *material* fact, this is not a case in which the Court should grant such a motion. FED. R. CIV. P. 56(C); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

18.     VBMC must demonstrate the absence of a material fact either by (1) submitting summary judgment evidence that negates the existence of a *material element* of Plaintiff's claims or (2) showing there is no evidence to support an *essential element* of Plaintiff's claim. *Celotex Corp.*, 477 U.S. at 322-25, 106 S.Ct. at 2552-54; *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996). VBMC may not rely on conclusory statements to establish that Plaintiffs and Intervener have not presented evidence on an essential element of their claims. Rather, VBMC must demonstrate an absence of genuine factual dispute. See *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555. Only if VBMC meets its burden are Plaintiffs and Intervener required to respond with summary judgment proof to show a genuine issue of material fact. FED.R.CIV.P. 56(E).

19.     In determining whether there is a disputed issue of material fact that precludes summary judgment, the Court must consider all evidence in the light most favorable to Plaintiffs and Intervener as the non-movants. *Hom v. Squire*, 81 F.3d 969, 973 (10th Cir. 1996).

### D. Argument

20.     In this case, VBMC has failed to negate the existence of a *material element* of Plaintiffs' and Intervener's claims and has likewise failed to show that there is no evidence to support an *essential element* of their claims. VBMC's motion must fail at the outset because it incorrectly asserts that the mental health of the deceased, Gustavo Gonzalez, is an *essential element* of Plaintiffs' and Intervener's claims. Even though nothing in the pleadings indicate that Plaintiffs or Intervener made any claims of *medical malpractice* against the hospital, VBMC has cleverly re-characterized the negligence claims leveled against its security department and staff as involving *medical malpractice* -

and therefore as claims that *require* expert medical testimony. In doing so, VBMC has mischaracterized Plaintiffs' and Intervener's claims and seeks to burden them with additional, unessential elements not required by their negligence claims as to non-medical issues.

21.    The cases cited by VBMC in support of its summary judgment, as it relates to Mr. Gonzalez' *mental condition*, involve either the diagnosis or treatment of medical diseases or mental illnesses; legal malpractice; or highly technical claims of automotive defects in a product liability claim. This case does not involve a claim of any defective product and at no time have Plaintiffs or Intervener alleged that VBMC committed *medical malpractice* as defined under §4590i of the MEDICAL LIABILITY AND INSURANCE IMPROVEMENT ACT OF TEXAS. Neither Plaintiffs nor Intervener have ever claimed that their decedent received inadequate or substandard medical care or complained that any *medical procedure*, be it complex or not, was incorrectly performed upon him while he was admitted at the VBMC. The state of Mr. Gonzalez' mental health at the time of his death, while perhaps interesting or even *relevant* to some issue of liability or damages in the case, is simply not an *element* of any of Plaintiffs' or Intervener's claims, much less one that is *essential* to their causes of action. For this reason, VBMC's motion for summary judgment on this point should be denied.

22.    VBMC's summary judgment motion is also defective on its secondary point in that it incorrectly asserts that the substantive law of Texas, which is applicable in this case, *requires* expert testimony to establish the standard of care, or deviation from the same, as to hospital safety and security. VBMC cited *no* authority for this proposition but rather argues that the safety and security issues involved go beyond the ordinary knowledge and expertise of lay people by describing the alleged negligence in

expert testimony was not necessary to establish that the hospital was negligent in retaining, supervising and assigning its employees. _Id._ at 813.

26.     The _Golden Villa Nursing Home_ case was very similar in that it involved a suit against the nursing home for leaving a patient unattended despite having knowledge of the patient's tendency to wander away. The unguarded patient left the nursing home premises and was injured when she was struck by a passing motorist. The nursing home appealed, contending that expert testimony was required to show the requisite standard for patient supervision. The Court rejected the argument and held that expert testimony was not necessary to establish that the nursing home was negligent in leaving the patient unattended. _Golden Villa Nursing Home_ at 349. The Court noted that

> "The standard of nonmedical, administrative, ministerial or routine care at a hospital need not be established by expert testimony because the jury is competent from its own experience to determine and apply such a reasonable care standard."

_Golden Villa Nursing Home_ at 349; _Mounds v. Von Eye_, 245 F.2d 756, 763 (8th Cir.1957).

27.     As in the cases cited above, Plaintiffs and Intervener do not make claims against the hospital for the performance of some medical procedure upon the body of Gustavo Gonzalez before his death. The claims herein involve purely non-medical or administrative activities of the hospital and its staff. The issues are not so complicated that a jury _requires_ expert testimony to comprehend them. They are easily within the understanding of any qualified juror who might be selected to hear the case.

### E. Summary Judgment Evidence

28.     In support of its response, Plaintiffs and Intervener include the following evidence in the attached appendix:

Plaintiffs' & Intervener's Response to
Defendant VBMC's MSJ                                                                    Page 11

this case as involving *medical treatment procedures*. No such requirement for expert testimony exists in this case because Plaintiffs and Intervener have made no such claims.

23.    The standard of non-medical, administrative, ministerial, or routine care at a hospital need not be established by expert testimony because a jury is competent from its own experience to determine and apply such a reasonable care standard. This is well settled law in Texas. *Mills v. Angel*, 995 S.W.2d 262, 268 (Tex.App.-Texarkana 1999); *St. Paul Medical Center v. Cecil*, 842 S.W.2d 808, 812 (Tex.App.-Dallas 1992); *Golden Villa Nursing Home, Inc. v. Smith*, 674 S.W.2d 343, 349 (Tex.App. 14 Dist. 1984).

24.    In the *Mills* case, the Court held that:

> "Expert testimony was generally required when the underlying issue involves the performance of *medical procedures* because the alleged negligence is not within the common knowledge of the layman.  But when the underlying negligence involves the standard of nonmedical, administrative, ministerial or routine care at a hospital, expert testimony is not needed because the jury is competent from its own experience to determine and apply such a reasonable care standard."

*Mills* at 268.

25.    The *St. Paul Medical Center* case involved the hospital's appeal from an adverse jury verdict against the hospital for negligently retaining, supervising and assigning a nurse to work in its' labor and delivery unit. The hospital argued that the verdict should be reversed because there was no expert testimony to establish the standard of care for the hospital in retaining, supervising and assigning its employee. *St. Paul Medical Center* at 812. The Court distinguished those cases cited by the hospital as requiring expert testimony, noting that "these cases involve the performance of medical procedures by doctors. Therefore, the nature of the alleged negligence was not within the common knowledge of laymen." *Id.* at 813. Ultimately, the Court held that

Plaintiffs' & Intervener's Response to
Defendant VBMC's MS)

a.  The deposition testimony of Officer Gerardo "Jerry" Ramirez;

b.  The deposition testimony of the City of La Feria, Texas by and through it's designated representative, Police Chief Donato Garcia;

c.  The deposition testimony of the VBMC by and through it's corporate representative, Mr. Blake Hubbard, Director of Security;

d.  Plaintiffs' First Amended Complaint; and

e.  Plaintiffs and Intervener's Disclosures and Witness Lists.

### F. Conclusion

29.  As Defendant VBMC has incorrectly asserted that Plaintiffs' claims are grounded in medical malpractice and, correspondingly, that the decedent's mental health is an *essential element* of Plaintiffs' and Intervener's claims and, as Defendant VBMC has further incorrectly represented that the law of Texas *requires* expert testimony to establish the standard of non-medical, administrative, ministerial, or routine care at a hospital, summary judgment in this case is not warranted. Furthermore, as there is testimonial evidence to support the elements of Plaintiffs' and Intervener's claims summary judgment is further improper in this case. For these and other equitable reasons, Plaintiffs and Intervener respectfully pray that the Court deny Defendant VBMC's motion for summary judgment and allow this case to proceed to trial at the Court's convenience so that justice may be done.

Respectfully submitted,

WATTS LAW FIRM, L.L.P.
555 N. Carancahua, Suite 1400
Corpus Christi, Texas 78478
(361) 887-0500
(361) 887-0055 – Fax

By: _Joseph Barrientos (w/p)_
Mikal C. Watts
State Bar No. 20981820
Federal I. D. No. 12419

Joseph Barrientos
State Bar No. 01816495
Federal I.D. No. 15032

ATTORNEYS FOR PLAINTIFFS


LAW OFFICE OF PHILLIP J. STEIN, P.C.
14-A Palm Village Center
Brownsville, Texas 78520
(956) 541-9243
(956) 541-9244 - Fax

By: _Phillip J. Sti_
Phillip J. Stein
State Bar No. 19129600
Federal I.D. No. 24943

ATTORNEY FOR INTERVENER

## CERTIFICATE OF CONFERENCE

   I certify that on March 23, 2004, I conferred with Defendant's Attorney of Record, and he is opposed to this motion.

_Phillip J. Sti_
Phillip Stein

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the above and foregoing *Plaintiffs and Intervener's Response to Defendant Valley Baptist Medical Center's Motion for Summary Judgment* was this the 23rd day of March, 2004, served by Certified Mail, Return Receipt Requested and U.S. Regular Mail on:

Charles Willette, Jr.
WILLETTE & GUERRA, L.L.P.
International Plaza, Suite 460
3505 Boca Chica Blvd.
Brownsville, Texas 78521

William L. Pope
ADAMS & GRAHAM, L.L.P.
P. O. Drawer 1429
Harlingen, Texas 78551-1429

Phillip Stein

Plaintiffs' & Intervener's Response to
Defendant VBMC's MSJ

Page 14

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARY E. CARRANZA, Individually          §
And as Next Friend of ANGEL             §
MATTHEW GONZALEZ, GUSTAVO               §
GONZALEZ, JR. and ALYSSA LAUREN         §
GONZALEZ, Minor Children                §
And on Behalf of All of Those Entitled  §
To Recover for Death of GUSTAVO         §
GONZALEZ, Deceased, Under the           §
Texas Wrongful Death Act, and           §
CELIA MUNIZ GONZALEZ,                   §
Individually and As Personal            §
Representative of the ESTATE OF         §
GUSTAVO GONZALEZ, Deceased              §
                                        §
            Plaintiffs                  §
                                        §
vs.                                     §
                                        §
CITY OF LA FERIA, TEXAS,                §
LA FERIA POLICE DEPARTMENT,             §
OFFICER GERARDO "JERRY"                 §
RAMIREZ, Individually and in his        §
Official Capacity; and                  §
VALLEY BAPTIST MEDICAL CENTER           §
                                        §
            Defendants                  §
                                        §      CIVIL ACTION. NO. B-02-180
GUSTAVO GONZALEZ, Individually          §
Pursuant to the Texas Wrongful Death    §
Act for the death of GUSTAVO            §
GONZALEZ, Deceased                      §
                                        §
            Intervener                  §
                                        §
vs.                                     §
                                        §
CITY OF LA FERIA, TEXAS                 §
OFFICER GERARDO "JERRY"                 §
RAMIREZ, Individually and in his        §
Official Capacity; and                  §
VALLEY BAPTIST MEDICAL CENTER           §
                                        §
            Defendants                  §

## AFFIDAVIT OF PHILLIP J. STEIN

STATE OF TEXAS            §
                         §
COUNTY OF CAMERON         §

On this the 23rd day of March, 2004, personally appeared Phillip J. Stein before me, the undersigned Notary Public, and after being duly sworn stated the following under oath:

My name is Phillip J. Stein; I am over 18 years of age, and I reside in, Brownsville, Cameron County, Texas. I have never been convicted of a crime, and I am fully competent to make this affidavit.

I am a licensed attorney in the State of Texas. I am counsel for Intervener in this case.

I personally attended and participated in the depositions of Donato Garcia, Gerardo Ramirez, and the Valley Baptist Medical Center's corporate representative, Mr. Blake Hubbard. Their depositions, attached hereto as Exhibits "A", "B" and "C", respectively, and incorporated as summary judgment evidence in the Response of Plaintiffs and Intervener herein, are true and correct copies of their testimony in this case.

The other exhibits attached hereto, including the amended complaint, disclosures and witness lists of Plaintiffs and Intervener and incorporated as summary judgment evidence in the Response of Plaintiffs and Intervener herein, are true and correct copies of those pleadings.

Further, Affiant sayeth not,

_____
Phillip J. Stein

SUBSCRIBED AND SWORN TO BEFORE ME, on this the 23rd day of March 2004.

_____
Notary Public, State of Texas

My Commission Expires: 10/7/07


JANIE CALVILLO
Notary Public, State of Texas
My Commission Expires
October 07, 2007

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MARY E. CARRANZA, Individually §
And as Next Friend of ANGEL §
MATTHEW GONZALEZ, GUSTAVO §
GONZALEZ, JR. and ALYSSA LAUREN §
GONZALEZ, Minor Children §
And on Behalf of All of Those Entitled §
To Recover for Death of GUSTAVO §
GONZALEZ, Deceased, Under the §
Texas Wrongful Death Act, and §
CELIA MUNIZ GONZALEZ, §
Individually and As Personal §
Representative of the ESTATE OF §
GUSTAVO GONZALEZ, Deceased §
§
          Plaintiffs §
§
vs. §
§
CITY OF LA FERIA, TEXAS, §
LA FERIA POLICE DEPARTMENT, §
OFFICER GERARDO "JERRY" §
RAMIREZ, Individually and in his §
Official Capacity; and §
VALLEY BAPTIST MEDICAL CENTER §
§
          Defendants §          CIVIL ACTION. NO. B-02-180
§
GUSTAVO GONZALEZ, Individually §
Pursuant to the Texas Wrongful Death §
Act for the death of GUSTAVO §
GONZALEZ, Deceased §
§
          Intervenor §
§
vs. §
§
CITY OF LA FERIA, TEXAS §
OFFICER GERARDO "JERRY" §
RAMIREZ, Individually and in his §
Official Capacity; and §
VALLEY BAPTIST MEDICAL CENTER §
§
          Defendants §

## ORDER DENYING DEFENDANT VALLEY BAPTIST MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT

BE IT REMEMBERED, that _on the day_ _____, 2004, the Court

considered Plaintiffs and Intervenor's Response to Defendant Valley Baptist Medical Center's

Motion for Summary Judgment and has determined that the Motion should be DENIED.

Exhibit
"A"

DONATO GARCIA                                                                                    April 9, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
MARY E. CARRANZA, Individually     *
and as Next Friend of ANGEL        *
MATTHEW GONZALEZ, GUSTAVO          *
GONZALEZ, JR., and ALYSSA          *
LAUREN GONZALEZ, Minor Children    *
and on Behalf of All of Those      *
Entitled to Recover for Death of   *
GUSTAVO GONZALEZ, Deceased, Under  *
the Texas Wrongful Death Act,      *
and CELIA MUNIZ GONZALEZ,          *
Individually and as Personal       *
Representative of the ESTATE OF    *
GUSTAVO GONZALEZ, Deceased,        *
                     Plaintiffs,   *
vs.                                *
                                   *
CITY OF LA FERIA, TEXAS, LA        *
FERIA POLICE DEPARTMENT, OFFICER   *
GERARDO "JERRY" RAMIREZ,           *
Individually and in his Official   *
Capacity; and VALLEY BAPTIST       *
MEDICAL CENTER,                    *
                    Defendants,    *
                                   *   CIVIL ACTION NO. B-02-180
GUSTAVO GONZALEZ, Individually     *
Pursuant to the Texas Wrongful     *
Death Act for the Death of         *
GUSTAVO GONZALEZ, Deceased,        *
                    Intervenor,    *
                                   *
vs.                                *
                                   *
CITY OF LA FERIA, TEXAS, OFFICER   *
GERARDO "JERRY" RAMIREZ,           *
Individually and in his Official   *
Capacity; and VALLEY BAPTIST       *
MEDICAL CENTER,                    *
                    Defendants.    *
```

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

VIDEOTAPED ORAL DEPOSITION OF
DONATO GARCIA
APRIL 9, 2003

+ + * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DONATO GARCIA                                                          April 9, 2003

**Page 2**

1    ORAL DEPOSITION OF DONATO GARCIA, produced as a witness
2   at the instance of the Plaintiff and duly sworn, was taken in
3   the above-styled and numbered cause on the 9th day of April
4   2003, from 11:00 a.m. to 5:00 p.m., before Katherine J.
5   Brookbank, CSR in and for the State of Texas, reported by
6   method of machine shorthand, at the office of Willette &
7   Guerra, 3505 Boca Chica Boulevard, Brownsville, Texas, 78521,
8   pursuant to the United States District Court Procedure and the
9   provisions stated on the record hereto.
10              APPEARANCES
   FOR THE PLAINTIFF(S)
11     Mr. Joseph Barrientos
       WATTS LAW FIRM
12     555 N. Carancahua, Suite 1400
       Corpus Christi, Texas 78478
13
   FOR INTERVENOR
14     Mr. Phillip Stein
       THE LAW OFFICES OF PHILLIP J. STEIN, P.C.
15     14-A Palm Village Center
       Brownsville, Texas 78520
16
   FOR THE DEFENDANT(S)
17     Mr. Scott Clark and Mr. William Pope
       ADAMS & GRAHAM, L.L.P.
18     222 E. Van Buren, West Tower
       P. O. Drawer 1429
19     Harlingen, Texas 78551
20     Mr. Eduardo Garza
       WILLETTE & GUERRA
21     International Plaza, Suite 460
       3505 Boca Chica Boulevard
22     Brownsville, Texas 78521
23   ALSO PRESENT: Tele Video and Audio Productions
24   (Note by reporter: Exhibits were not available to validate
     quoted material. No quotes used around quoted material)
25

**Page 3**

1                    INDEX
                             PAGE
2
     Appearances ------------------------------ 2
3    Stipulations (Attached hereto) ----------------- N/A
4    DONATO GARCIA
       Examination by Mr. Joseph Barrientos -------- 4
5      Examination by Mr. William Pope ------------- 145
       Examination by Mr. Eduardo Garza ------------ 149
6      Examination by Mr. Joseph Barrientos -------- 150
7    Changes and Signature -------------------------- 158
     Reporter's Certificate --------------------------
8                   EXHIBITS
     NO. DESCRIPTION                       PAGE
9    1 - Notice of Deposition              9
10   2 - LFPD Policy & Procedure Manual          15
11   3 - Grand Jury                   21
12   4 - Autopsy Report               48
13   5 - Incident Report              48
14   6 - Death Report                 49
15   7 - Harlingen Offense Report           49
16   8 - Harlingen Investigation            49
17   9 - Accident Video                 51
18   10 - Reenactment Video              51
19   11 - Restraints                 116
20   12 - Critical Care Medical Protective Restraints  116
21   13 - Forensic Staff Information List     116
22   14 - Letters                    156
23   15 - VBMC Medical Records (Marked in G. Ramirez depo)
24   16 - Diagram drawn by G. Ramirez (Marked in G. Ramirez depo)
25   17 - Autopsy report (Marked in G. Ramirez depo)

**Page 4**

1                  DONATO GARCIA,
2       having been duly sworn, testified as follows:
3            E X A M I N A T I O N
4      Q   (BY MR. BARRIENTOS) Would you please state your
5   name, sir?
6      A   My name is Donato Garcia.
7      Q   Mr. Garza --
8      A   Garcia.
9      Q   Garcia. I am sorry. Mr. Garcia, how do you -- how
10  do you earn a living, sir?
11     A   Ask me again, sir.
12     Q   What is your job?
13     A   My job is the chief of police in La Feria.
14     Q   Okay. And how long have you been the chief of
15  police -- of police in La Feria, Texas?
16     A   I am going on three years.
17     Q   Okay. Were you the chief of police at the time of
18  the incident upon which this case is based in September of
19  2000?
20     A   No.
21     Q   Okay. How long after that did you become chief of
22  police?
23     A   I believe right after that.
24     Q   Okay. Can you tell me the name of the person who
25  was the chief of police on the date this incident occurred?

**Page 5**

1   And -- and let me use the -- the date of the initial seizure
2   of Mr. Gonzalez, September the 17th, I believe.
3      A   Roberto Gonzales.
4      Q   Do you remember -- Chief Garcia, do you remember the
5   date that you became -- that you were sworn in as police
6   chief?
7      A   I believe it was in June. I don't remember the
8   date. I remember the month.
9      Q   June of the following year, 2001?
10     A   I believe so.
11     Q   Okay. Chief Garcia, my name is Joseph Barrientos.
12  I am a lawyer from Corpus Christi, Texas. And I am here to
13  take your deposition in the case involving the death of a
14  young man in September here in -- in Harlingen, in -- named
15  Gustavo Gonzalez. Are you familiar with -- with the case?
16     A   I am.
17     Q   Okay. And I -- my understanding is that you have
18  been asked to come here today as a representative of the city
19  of La Feria. Is that correct?
20     A   Yes.
21     Q   And you are aware that you are speaking on behalf of
22  -- of the city of La Feria, Texas, as opposed to giving
23  individual answers.
24     A   Yes.
25     Q   Okay. Let me ask you a couple of questions before

(210) 377-3027                     ESQUIRE DEPOSITIONS SERVICES               FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                  (800) 969-3027
                                                                   ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                    April 9, 2003

Page 6

1  we get started in the details of this incident.  First of all,
2  have you reviewed anything before coming here today in order
3  to prepare you for this deposition?
4     A   Reviewed as what?  The case or what?
5     Q   Yes, sir.  What I want to know is, have you looked
6  at any materials, documents, photographs, videotapes, any --
7  anything to prepare you to come here today to -- to answer
8  questions.
9     A   Yes, I have.
10    Q   Okay.  Can you tell me -- well, let me ask first.
11 Do you have those materials with you?
12    A   No.
13    Q   Can you tell me in a list form what those materials
14 are?
15    A   There was paperwork and some -- some video.
16    Q   Okay.  When you say paperwork, can you be more
17 specific, Chief Garcia?
18    A   Yes.  The case that attorney here on my -- on my
19 right had.
20    Q   Mr. Garza?
21    A   Yes.
22    Q   All right.  Where were the documents that you
23 reviewed -- where were they reviewed?
24    A   In my office.
25    Q   Do you have a copy or copy set of the documents that

Page 7

1  you reviewed?
2     A   No.
3     Q   Were you given a set of documents to look at that
4  you later returned to someone?
5     A   No.
6     Q   Okay.  Can you clarify for me, then, how that came
7  about or where those documents are at this time?
8     A   Mr. Garza met with me in my office.
9     Q   Okay.  Mr. Garza had the documents?
10    A   Yes.
11    Q   Okay.  When did the meeting occur, sir?
12    A   Last -- I believe last week sometime.
13    Q   Okay.  And you did not retain a copy of any of the
14 documents that you reviewed?
15    A   No.  No, I didn't.
16    Q   Was one of the documents that you were given or
17 asked to look at a deposition notice?
18    A   No.
19    Q   I know this is the court reporter's copy.  I tried
20 to -- I tried to hurry it up here so I did not lug the box
21 that I had in my truck with me.  So I am going to show you a
22 copy of the notice in this case that I believe was sent to
23 you, just so that you have a chance to look at that.  I want
24 to make sure that I understand your answers.  Why don't you
25 take a minute to look at that.  When you finish looking at it,

Page 8

1  just let me know.
2     A   This was -- this was faxed to me prior to the
3  meeting.
4     Q   Okay.  All right.
5     A   Before the meeting.
6     Q   Very well.  And were you told that these were the --
7  the subject areas that you would be asked to discuss at the
8  deposition today?
9     A   No.  I just read it.
10    Q   Okay.  After reading it, did you understand that
11 these would be the subject matter areas that you would be
12 asked to discuss here today?
13    A   No.  It wasn't until the attorney met with us.
14    Q   Okay.  When he met with you, did you go over the
15 notice?
16    A   No.
17       MR. GARZA:  Let me just -- let me just object
18 to the extent that it may call for some attorney/client --
19       MR. BARRIENTOS:  Sure.
20       MR. GARZA:  -- privileged information.  And I
21 will instruct my -- my client not to answer or not to provide
22 any answers regarding any conversations that you and I had or
23 that you had with any of your attorneys associated with this
24 case.  You may continue.
25    Q   (BY MR. BARRIENTOS) Chief Garcia, let me -- and let

Page 9

1  -- your attorney is right.  I am not asking you about
2  conversations you had with Mr. Garza or anyone from his
3  office.  What I want to know is whether you looked at this
4  document and whether you, after looking at it, understood the
5  purpose of your coming here today?
6     A   I read it, yes.
7     Q   Okay.
8     A   And I understood that.
9     Q   There is a part of that document that requests that
10 you produce and bring with you certain documents or
11 information.  Did you review that part of the notice?
12    A   No.
13    Q   Okay.  Do you mind if I take a look at it?  I am
14 going to mark the reporter's notice as Exhibit Number 1.
15 Okay.  Paragraph 6A, it mentions and asks you to bring papers,
16 documents, and tangible things designated to be produced by
17 the witness and/or required to be produced by the witness at
18 the time and place of the deposition.  And then when it says
19 what that material is, it talks about all materials,
20 documents, photographs, videotapes, memorandum, manuals or
21 other items concerning any topic or the topics enumerated
22 above in paragraphs A through G.  And those are the ones on
23 the -- page 2 and 3 of the notice.
24    A   Uh-huh.
25    Q   Okay.  Did you do -- did you perform some type of a

3 (Pages 6 to 9)

DONATO GARCIA                                                        April 9, 2003

Page 10

1  search in your office to gather any documents that would be
2  related to items A through G in this notice?
3     A   Everything that -- that -- that was in the office
4  was handed over to the attorneys.
5     Q   Okay. When you say everything in the office, do you
6  mean the city of La Feria or the city of La Feria Police
7  Department's entire file?
8     A   Yes.
9     Q   Okay. Let me go down and ask about some of these
10  specifically. And I am not picking at you. I just want to
11  know what we have here with us today. Because if we don't
12  have it, I won't spend time asking you about it. I just want
13  to kind of establish what that is.
14        Okay. Item 1A involves any documents involving the
15  status of Gustavo Gonzalez deceased as a medical patient,
16  suspect, arrestee, pretrial detainee or prisoner at the time
17  that he was taken to the Valley Baptist Medical Center in
18  September of 2000. Let me ask on behalf of the city of La
19  Feria, what is the city's position, if it has one, as to Mr.
20  Gonzalez' status at the time that he was taken to Valley
21  Baptist Medical Center?
22     A   We had no status.
23     Q   Okay. So at that time, he was -- well, let me start
24  off with things -- work backwards. He was not convicted of
25  any crime at that time so he was not a prisoner. Is that

Page 11

1  correct?
2     A   Okay. No.
3     Q   Okay. He was not charged at that time with any
4  offense. So he was not awaiting trial because he had not been
5  charged or indicted. Is that correct?
6     A   There was two charges pending on him.
7     Q   Okay.
8     A   Before the hospital.
9     Q   Before the hospital?
10     A   Uh-huh.
11     Q   All right. What charges would those have been?
12     A   Aggravated assault on two peace officers.
13     Q   Okay. Had -- had a complaint or complaints been
14  filed in those -- for those incidents at the time he was taken
15  to the hospital?
16     A   I did not work the case, sir. It was the other
17  investigator.
18     Q   Okay. Do you know, from having looked at the file,
19  on the date -- the date at which a complaint had been filed
20  against Mr. Gonzalez --
21     A   Yes.
22     Q   -- for those items?
23     A   Yes.
24     Q   Okay. Can you tell us what date that would have
25  been?

Page 12

1     A   Oh, I can't tell you the date, sir. I don't -- I
2  don't know.
3     Q   Is that somewhere in the file materials that you --
4     A   I believe so, yes.
5     Q   -- that you discussed. We will come back to that in
6  a little bit. Let me ask you, the offenses for which you say
7  had been charged at the time he was taken to the hospital, do
8  you remember what those were?
9     A   I am going to say criminal attempt.
10     Q   Criminal attempt?
11     A   Yes.
12     Q   Okay. Criminal attempt at what offense under the
13  penal code?
14     A   Criminal attempt homicide, I believe.
15     Q   Okay. And who -- who would be the -- who would be
16  the alleged victims of -- or victim of the criminal attempt?
17     A   Two of the officers. Two of the La Feria Police
18  Officers.
19     Q   All right. And I read through some of the material,
20  so I think I have an idea of who they are, but for the record,
21  so we have a name associated, who would those have been?
22     A   I can't recall.
23     Q   Okay. Would it be correct that they would have been
24  the two officers who initially came into contact with Mr.
25  Gonzalez?

Page 13

1     A   I believe so.
2     Q   On the traffic stop?
3     A   Yes.
4     Q   On the 17th of September?
5     A   Yes, sir.
6     Q   Okay. Any other charges that you believe would have
7  been pending at the time he was taken to the hospital?
8     A   No. Nothing.
9     Q   All right. Now, at the time he was at the
10  hospital -- let me ask a couple of other questions about that.
11  Prior to the time of his death, had he been processed or
12  booked into any type of detention facility or jail?
13     A   No. He -- No. The -- the -- Mr. Gustavo was given
14  emergency treatment, so he was transported to the hospital
15  first.
16     Q   So he wasn't -- he wasn't booked. Is that correct?
17     A   Not at the time.
18     Q   He wasn't -- well, when I say -- I mean at any time
19  before his death, between the time he was -- he was stopped by
20  the police on September 17th and the time of his death on the
21  early morning hours of September 19th, was he ever booked?
22     A   No.
23     Q   Was he ever finger printed?
24     A   No.
25     Q   Was he ever photographed in a way that people who

4 (Pages 10 to 13)

DONATO GARCIA                                                                April 9, 2003

---

Page 14

1  are arrested are?
2      A   No.
3      Q   And I think you told me we -- we would have to look
4  at the documents to figure out what day the complaint was
5  actually filed.
6      A   I believe so.
7      Q   Okay. All right. All right. And, Chief Garcia, is
8  it -- do I understand your testimony to be that you have
9  provided everything in the way of documents, videotapes,
10  photographs, any other materials involved with Mr. Gonzalez
11  status as a person under arrest, a pretrial detainee,
12  prisoner, any of those categories, you have provided all of
13  that to counsel, Mr. Garza or his office?
14      A   Yes.
15      Q   All right. Section B asks for any and all policies,
16  practices, training methods in the use of force and deadly
17  force employed by the city of La Feria or its police
18  department, including but not limited to firearm use upon
19  suspects, pretrial detainees, arrestees and/or prisoners.
20  Included in the documents that you have told us you provided
21  to counsel, did the city of La Feria provide any and all
22  policies regarding training methods regarding use of force and
23  deadly force?
24      A   Yes.
25      Q   Okay. And I think I have in here the material that

---

Page 15

1  Mr. Garza produced to us a section that says La Feria Police
2  Department Policy and Procedure Manual. And let me mark that
3  as Exhibit Number 2. And what I want to ask you is, before I
4  give you a chance to look at this, is this the sum total of
5  the policy and procedure manual that existed for the La Feria
6  Police Department in September of 2000?
7      A   Yes, it is.
8      Q   Are there any other sections or is this part of a
9  larger document or is this the entire document?
10      A   This is -- this is the document.
11      Q   I understand from reading that document that there
12  is also a procedure manual for city employees that is also
13  applicable to police officers who work for La Feria, including
14  Mr. Ramirez.
15      A   I am not aware of that.
16      Q   Okay. In any case, as far as policies and/or
17  training materials or methods, is it the city of La Feria's
18  testimony that Exhibit Number 2 is the entirety of what it
19  provides to its officers?
20      A   Yes.
21      Q   I am sorry, sir?
22      A   Yes.
23      Q   Very good. I will take that and put it aside. All
24  right.
25          Item C. Okay. It's very similar to B. It asks for

---

Page 16

1  the training or lack thereof regarding use of deadly force,
2  force and deadly force. That's kind of redundant of B,
3  actually, and I apologize for that. But there is -- is there
4  any other training or instructional manual or booklet or body
5  of information that is used in training officers for the La
6  Feria Police Department besides Exhibit Number 2?
7      A   All of the -- all of the officers that -- that are
8  employed by the -- by the city are trained by the original
9  police academy.
10      Q   Okay. All right. Well, I assume that -- all
11  right. First of all, give me the complete name of the academy
12  and where it is located.
13      A   It is located in Harlingen.
14      Q   Okay.
15      A   At the TSTC campus. And it is the Lower Rio Grande
16  Valley Police Academy.
17      Q   And -- okay. And this is the training academy that
18  Officer Ramirez would have gone through prior to the time he
19  was employed by the city of La Feria?
20      A   Before that.
21      Q   Yes, sir. Okay. All right. Does the -- does the
22  city of La Feria have access to or have knowledge of the type
23  of training specifically with regard to the items that are
24  listed here in paragraph 1A through G -- well, strike that.
25  Let me go back.

---

Page 17

1          Does the city of La Feria have access to training
2  materials used by the Lower Rio Grande Valley Police Academy
3  in training potential police officers?
4          MR. GARZA: Objection. Form.
5          THE WITNESS: Yes.
6      Q   (BY MR. BARRIENTOS) Okay. Is that something you-all
7  maintain in your office?
8      A   It is something that is faxed to me every quarterly
9  from the Rio Grande Valley Police Academy.
10      Q   And do -- do -- the city of La -- I am sorry, sir.
11      A   It is a continuous education.
12      Q   Does the city of La Feria Police Department maintain
13  a copy of that in its office?
14      A   Yes.
15      Q   Okay. Does it have one there today?
16      A   Yes.
17      Q   Okay. And would this -- the one that is there today
18  be substantially the same as whatever would have been in
19  existence in -- at the time that Officer Ramirez was hired?
20      A   When an officer is -- is sent to the academy, he
21  brings his certificate, with a completion of every course that
22  he takes.
23      Q   All right. I understand. So what -- so what the
24  city of La Feria -- what the police department maintains is a
25  certification that the applicants or police officers have

---

(210) 377-3027                        ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100              SAN ANTONIO, TEXAS 78230                      (800) 969-3027
                                                                        ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                                                    April 9, 2003

**Page 18**

1  passed the training academy?
2      A   Yes. He gets a basic certificate.
3      Q   Okay. And -- and I apologize. My question probably
4  was not very clear. What I am asking you about is does the
5  city maintain a set of the materials which are used to train
6  the officers during this class that they take?
7      A   No. It comes through from the academy, police
8  academy.
9      Q   Okay. Does the city of La Feria have access to
10 those materials if they desire to see them?
11     A   Yes.
12     Q   Okay. And that is really what I am asking. I am
13 not necessarily asking about whether there is a certificate
14 for Officer Ramirez or other officers are maintained.
15         What I am asking is do you-all have a copy of what
16 is taught to them?
17     A   No. All I get is a certificate.
18     Q   Okay.
19     A   They are handed a copy of what -- the material went
20 through.
21     Q   I understand. Does -- does the city, then, other
22 than a certificate that the officer has passed the course that
23 has been administered by the Lower Rio Grande Valley Police
24 Academy, other than the certificate, does the city of La Feria
25 have any direct knowledge of the specific training that is

**Page 19**

1  administered to those potential applicants?
2      A   No. Only the class that they take.
3      Q   Okay. So when an applicant comes to you and they
4  have obtained a certificate, is -- do I take it, then, that
5  city of La Feria has to assume that the areas of -- of law
6  enforcement training, that it requires their applicants have
7  knowledge of have been covered by the -- by the police
8  academy?
9      A   Yes.
10     Q   Does the city of La Feria or its police department
11 have any oversight of the material that is taught at the
12 training academy course?
13     A   No.
14     Q   Do you -- does the city of La Feria or the police
15 department have any input into what is taught at the training
16 academy?
17     A   No.
18     Q   Does the city of La Feria have any police officers
19 who are, perhaps, instructors at the academy?
20     A   No.
21     Q   Do you know who the academy is run by? Is it a
22 private institution?
23     A   No.
24     Q   Okay. Let me -- when I asked you two questions at
25 once, that wasn't fair. First of all, do you know who runs

**Page 20**

1  the academy?
2      A   I don't know who they -- who it is, just the Lower
3  Rio Grande Valley Police Academy.
4      Q   Do you know whether it is a private -- a private
5  entity --
6      A   No.
7      Q   -- or --
8      A   It is not, because they bring in students from all
9  over the valley, even cadets from Kingsville, Hidalgo County
10 McAllen, Brownsville, Port Isabel.
11     Q   All right. Do you know, is there -- is there an
12 executive director --
13     A   Yes.
14     Q   -- or person who runs the academy?
15     A   Yes.
16     Q   Do you know that person's name?
17     A   I believe it is R.D. Moore. I am not too sure.
18 Okay?
19     Q   Okay. Are you -- are you aware of what
20 certification, if any, the -- that particular training academy
21 has?
22     A   Can you ask me again, sir?
23     Q   Yes, sir. Well, let me -- let me ask it this way
24 first. Do you know whether the police training academy is
25 required to have any type of certification in order to train

**Page 21**

1  police officers?
2      A   I am sure --
3      Q   Any type of license or certification?
4      A   I am sure they do, because they have to answer to
5  the Texas Commission of Law Enforcement Officer Standards of
6  Education in Austin.
7      Q   To TCLEOSE?
8      A   TCLEOSE.
9      Q   All right. So I understand your answer to be that
10 you believe they do, but are you aware of specifically what
11 type of certification and or authorization they are required
12 to have?
13     A   No, I am not.
14     Q   Do you know whether they -- whether they have it at
15 this time?
16     A   I am sure they do, sir.
17     Q   Do you know whether it has ever lapsed?
18     A   No.
19     Q   Okay. Going to item D. It asks about any grand
20 jury proceedings regarding the incident made the basis of this
21 suit, including photographs, recordings, other tangible items.
22 And I see in here -- I was produced a letter essentially
23 stating that the grand jury had chosen not to take any action
24 in this case, which I will mark as Exhibit 3.
25         And, Chief Garcia, what I want to ask you is, is

(210) 377-3027                      ESQUIRE DEPOSITIONS SERVICES                      FAX (210) 344-6016
7800 IH-10 WEST, SUITE 100             SAN ANTONIO, TEXAS 78230                          (800) 969-3027
                                                                              ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                    April 9, 2003

**Page 22**

1  there any other material that you are aware of, documentary
2  evidence, that is related to the grand jury investigation or
3  deliberation in this case, separate and apart from Exhibit
4  Number 3?
5     A   Okay, sir. Can you ask me the question again?
6     Q   Yes. Exhibit Number 3 is a letter indicating that
7  the Cameron County grand jury declined to take any action on
8  this case when it was presented to them. Is that correct?
9     A   Yes, sir.
10    Q   Is there any other material that you are aware of
11 that is related to the grand jury investigation of this case
12 that is separate and apart from Exhibit Number 3?
13    A   No, no, I am not aware of.
14    Q   That is the only thing that you have been made aware
15 of from the grand jury?
16    A   Right.
17    Q   Did you testify -- well, let me ask this. Do you
18 know whether any officers from La Feria Police Department
19 testified in front of the grand jury regarding this matter?
20    A   No.
21    Q   Okay. No. Does that mean none of them did or you
22 don't know whether they did?
23    A   I don't know.
24    Q   What is the name of the officer who is in charge of
25 the investigation for the La Feria Police Department?

**Page 23**

1     A   He is no longer with La Feria Police Department, but
2  it was Daniel Delgado.
3     Q   Daniel Delgado.
4     A   Uh-huh.
5     Q   Okay. And what was his rank at the time?
6     A   He was the investigator.
7     Q   Okay. Do you know, Chief Garcia, where Officer
8  Delgado is today?
9     A   I believe he is working for the U.S. Marshal's as a
10 security at the building here in Brownsville.
11    Q   You believe he still resides here in the Brownsville
12 area?
13    A   I don't know where he resides.
14    Q   Uh --
15    A   But he resigned the La Feria PD to come work over
16 here.
17    Q   Let me ask you, do you -- do you believe that
18 Officer Delgado would have most information, most knowledge
19 about whether anyone testified in front of the grand jury or
20 do you believe that would be some other person?
21    A   I have no idea. I don't know, sir. I have no
22 idea.
23    Q   All right. Okay. If -- if -- Chief Garcia, if you
24 can't tell us whether anyone from La Feria PD testified in
25 front of the grand jury, can you tell us whether any of the

**Page 24**

1  information gathered by the La Feria Police Department was
2  presented to the grand jury?
3     A   Sir, we did not work the case.
4     Q   Okay.
5     A   Harlingen Police Department worked the case.
6     Q   All right. Item E calls for any contracts,
7  agreements, understandings, etc. between the city of La Feria,
8  Texas and Valley Baptist Medical Center regarding treatment of
9  prisoners, restraints, security, safety, and/or force used
10 with regard to in-custody patients at the Valley Baptist
11 Medical Center.
12        First of all, let me ask you, do you know whether
13 the city of La Feria had any type of a written agreement with
14 Valley Baptist Medical Center to treat its prisoners who
15 needed medical attention?
16    A   No.
17    Q   It did not or you don't know whether it did?
18    A   No, I don't believe it does.
19    Q   Have you made any efforts to determine whether any
20 such agreement exists?
21    A   I don't -- No, I have not.
22    Q   Okay. For example, the city of La Feria has a city
23 manager. Is that correct?
24    A   Yes.
25    Q   And had a city manager at the time this incident

**Page 25**

1  occurred.
2     A   I have no idea, sir.
3     Q   Is that correct?
4     A   I don't know.
5     Q   Well, let me -- have -- have you made an inquiry,
6  for example, of the mayor or the city manager or someone on
7  the city staff to -- to ascertain whether there is any type of
8  agreement between the city of La Feria and Valley Baptist
9  Medical Center for treatment?
10    A   No, there is no contract, sir.
11    Q   Okay. Very well. Is there any -- well, let me ask
12 you. If there is no written contract or written agreement, is
13 there some understanding between the city of La Feria and the
14 Valley Baptist Medical Center regarding the hospital's
15 treatment of arrestees or prisoners?
16    A   No.
17    Q   Can you tell us on behalf of the city, Chief Garcia,
18 how was it determined to take Mr. Garcia to Valley Baptist
19 Medical Center as opposed to another hospital?
20    A   You asked me if Mr. Garcia. You are inquiring about
21 Mr. -- Gustavo?
22    Q   Yes. I am sorry.
23    A   Okay.
24    Q   Chief -- Chief Garcia, can you tell us how it was
25 that Mr. Gonzalez was taken to Valley Baptist Medical Center

7 (Pages 22 to 25)

DONATO GARCIA                                                                              April 9, 2003

**Page 26**

1  as opposed to some other healthcare facility?
2      A   Okay.   He was involved in a chase.   Apparently he
3  lost control of his vehicle.   He fled on foot.   And from there
4  he sustained some injuries.   And he was taken directly to the
5  Valley Baptist Medical Center.
6      Q   Okay.   My question is more specifically directed as
7  to what -- how was the decision made to bring him to Valley
8  Baptist Medical Center as opposed to Valley Regional Medical
9  Center or some other hospital?
10     A   It is in Cameron County, sir.
11     Q   Okay.   Was it just the closest place --
12     A   Yes.
13     Q   -- to where you-all were?
14     A   Yes.
15     Q   And that's what I am trying find out --
16     A   Okay.
17     Q   -- whether is some -- there is some kind of
18  preference --
19     A   No.
20     Q   -- or policy that requires him to be taken to one
21  hospital as opposed to the other?
22     A   No.
23     Q   All right.   Let me ask this, then, Chief Garcia, and
24  still on item E.   I read through this material.   I did not see
25  any agreements, as you -- as you mentioned --

**Page 27**

1      A   Uh-huh.
2      Q   -- between the city and Valley Baptist Medical
3  Center.   I also did not see any written communication
4  regarding protocol for procedures for the treatment of
5  pretrial detainees or arrestees between Valley Baptist Medical
6  Center and the La Feria Police Department.
7      A   Okay.   The officers that are trained at the academy
8  have no training as to how to guard a prisoner at the
9  hospital.
10     Q   Okay.   How is it that the city of La Feria knows
11  that?
12     A   I -- I know that for -- they don't train officers at
13  the -- at the academy as to how to treat prisoners at the
14  hospital.
15     Q   Okay.   Does -- did the -- has the city of La Feria
16  ever, to your knowledge, received information from the Valley
17  Baptist Medical Center on protocols or procedures, if any,
18  regarding the security of in-custody patients?
19     A   No.
20     Q   If there is no such writing that you have seen or
21  that you are aware of that exists or that the city is aware
22  of, is there any understanding that is unwritten between
23  Valley Baptist Medical Center and the city of La Feria as to
24  the security or restraint of in-custody patients?
25     A   At the time, I was not aware of anything.

**Page 28**

1      Q   At the time of this incident, Chief Garcia, how long
2  had you been with the La Feria Police Department?
3      A   Thirteen years.
4      Q   And during those 13 years prior to Mr. Gonzalez'
5  death, had the La Feria Police Department taken other
6  prisoners to the Valley Baptist Medical Center for treatment?
7      A   I have not taken any prisoners to the Valley
8  Baptist.
9      Q   Okay.   When you say you, do you mean you
10  personally --
11     A   Yes.
12     Q   -- because understand I am asking -- the questions I
13  am asking -- and it is difficult because you are standing here
14  face to face and I am directing my questions to you, so let me
15  be specific.
16         To your knowledge, has the city of La Feria or has
17  the city of La Feria ever taken any prisoners, pretrial
18  detainees, arrestees, anyone who they had custody of to the
19  hospital for treatment for -- let me go further, who required
20  a guard to accompany them?
21     A   Some of the prisoners, that I am aware of, are taken
22  from the cell to the front and they are picked up by ambulance
23  and they are taken by ambulance.
24     Q   Okay.   Can you recall any other incidents, whether
25  you personally were involved or not --

**Page 29**

1      A   No.
2      Q   -- where the city of La Feria had prisoners or
3  arrestees or pretrial detainees taken to Valley Baptist
4  Medical Center that required a police guard from the city of
5  La Feria?
6      A   No.
7      Q   So this incident with Mr. Gonzalez is the only one
8  that you were personally aware of --
9      A   Yes.
10     Q   -- in your --
11         MR. GARZA:   Let him finish his question.
12         THE WITNESS:   I am sorry.
13         MR. BARRIENTOS:   I am sorry.
14     Q   (BY MR. BARRIENTOS)  This is the only one that you
15  are personally aware of?
16     A   Yes.
17     Q   Okay.   And this is the only one that you are aware
18  of whether you were personally involved or -- or not?
19     A   Yes.
20     Q   Okay.   And just so I am clear, on September the
21  17th, when Mr. Gonzalez was taken to the Valley Baptist
22  Medical Center, it is the city's position that there was no
23  understanding as to protocol or procedure regarding the
24  security of in-custody patients either in writing or --
25     A   No.

8 (Pages 26 to 29)

DONATO GARCIA                                                                    April 9, 2003

---

Page 30

1    Q    -- or not in a writing?
2    A    No.
3    Q    And the city's position is that the city had never
4    received any information from the Valley Baptist Medical
5    Center about such a protocol or procedure regarding security
6    or restraint of in-custody patients?
7    A    No. Not that I am aware of.
8    Q    All right. And consequently, the city has no
9    documents to that effect?
10   A    No.
11   Q    All right. Item F refers to the personnel file and
12   history of Gerardo Jerry Ramirez as maintained by the city of
13   La Feria or its police department including but not limited to
14   any prior instances, complaints, reprimands, evaluations,
15   personnel actions, promotions or commendations regarding any
16   use of force by Gerardo Jerry Ramirez.
17        Let me ask first, have you -- I looked through here
18   and I didn't see anything that looked like a personnel file.
19   Let me ask first, does the city of La Feria Police Department
20   maintain a personnel file for Officer Ramirez?
21   A    Yes.
22   Q    Would it -- does it include items such as
23   complaints, reprimands, evaluations, personnel actions,
24   promotions, commendations and other such items?
25   A    Yes.

---

Page 31

1    Q    Would it also contain -- well, strike that. Let me
2    go back. Did you produce a -- a copy of that file to -- well,
3    strike that. Let me go back. I don't want to know what
4    conversation you had with Mr. Garza or attorneys in this
5    office. What I need to know is whether you produced those
6    documents to them in response to this deposition notice.
7    A    Everything that we have on Officer Ramirez the
8    attorneys have.
9    Q    Okay. All right. And, finally, and I am going to
10   go back and we are going to talk about these in detail. I
11   just want to know, as I said, what we have. So there is a
12   personnel file?
13   A    Yes.
14   Q    Okay. Item H calls for any complaints, grievances,
15   suits, reports, reprimands, commendations or other
16   documentation of the alleged use of excessive force by members
17   of the La Feria Texas Police Department upon suspects,
18   pretrial detainees, arrestees and/or prisoners from 1990 up
19   to and including the date of this notice.
20        Let me ask first, did -- does the La Feria Police
21   Department maintain records or a file, if you will, regarding
22   complaints of alleged excessive force by its police department
23   members?
24   A    Yes.
25   Q    Okay. Is there something that that file is called?

---

Page 32

1    Does it have a name or designation?
2    A    No. It just goes in his peronsal file.
3    Q    Okay. So let me ask. Is -- in the way or in the
4    manner that that information is stored, is it stored in a
5    separate file or area or place that says complaints or would
6    you have to go through each officer's personnel file to glean
7    that specific information?
8    A    Each officer's file.
9    Q    Okay. And it's your -- it is the city's testimony
10   that it does not maintain a separate index or body of records
11   specifically designed to record or document those type -- that
12   type of information?
13   A    No.
14   Q    Well, let me ask. Did you produce any information
15   or documents regarding complaints, grievances, suits, reports,
16   reprimands, commendations or other documentations that allege
17   use of excessive force by members of the La Feria, Texas P.D.?
18   A    He has never had one, so there is nothing there.
19   Q    Okay. The -- the item in H is -- and I understand
20   your -- your answer with regard to Officer Ramirez. Item H
21   does not -- is not limited to Officer Ramirez. Let me ask you
22   this. Did you -- did you conduct a search for such complaints
23   regarding members of the La Feria Police Department other than
24   with Officer Ramirez?
25   A    Yes. There is nothing there.

---

Page 33

1    Q    Okay. So your testimony is this incident -- the
2    city's testimony, excuse me, is that the incident that
3    occurred in September of 2000 is the only incident in which it
4    has been alleged that a member of the La Feria, Texas police
5    department used excessive force during an encounter with --
6    with a citizen?
7    A    Yes.
8    Q    Okay. And that is the city's testimony -- and I
9    understand you are an individual, but you are basing that on
10   your 13 years of experience -- actually, more than that now.
11   I guess it would be more like 16 years, approximately, of
12   experience with the La Feria, Texas police department.  Is
13   that correct?
14   A    Okay.
15   Q    To your knowledge or to the city's knowledge, are --
16   is the city's position is that it -- it has never had a
17   complaint or a suit or a grievance filed against any of its
18   police officers for excessive use of force other than this
19   lawsuit involving Mr. Gonzalez' family?
20   A    Yes, it has.
21   Q    Okay. I am sorry. I misunderstood you, then.
22   A    Okay.
23   Q    What H, I think was -- is -- is asking about is all
24   of those other incidents or items.
25   A    Okay.

---

9 (Pages 30 to 33)

DONATO GARCIA                                                      April 9, 2003

**Page 34**

1  Q  And I am sorry if I wasn't clear earlier. Okay. So
2  let me go back to my first question. Is it correct that there
3  are other incidents of complaints, grievances, suits, alleging
4  excessive use of force by members of the La Feria, Texas
5  police demonstrate other than this incident involving Mr.
6  Gonzalez?
7  A  There was one that I am aware of.
8  Q  Okay. There is one that you are aware of?
9  A  Yes.
10  Q  All right. And did you -- does the city and the
11  police department maintains documentation of that --
12  A  Yes.
13  Q  -- other incident? Okay. And is that located there
14  somewhere at the police department?
15  A  It is located at the city hall.
16  Q  Okay. And that is something that you have access to
17  if you need it?
18  A  Yes.
19  Q  Okay. Can you tell me, just briefly -- briefly,
20  what -- what incident that involved and the date or the year
21  in which it occurred?
22  A  I am going to say 1989, I believe.
23  Q  Okay. The incident of which you speak, do you
24  recall what the -- the method or the mode of -- of excessive
25  force was alleged to have been?

**Page 35**

1  A  That -- she was arrested. That's -- that's it.
2  Q  Well, let me -- let me be more specific. For
3  example, in this case I am alleging on behalf of Mr. Gonzalez
4  family that excessive force was used in this case, that being
5  specifically that he was shot which resulted in his death.
6  What I am asking in the case in 1989, can you
7  tell me what was the force that was alleged to have been used,
8  if any?
9  A  Oh, there was no force used.
10  Q  Okay. The -- what did the complainant or the person
11  who made the complaint in that case accuse the police officer
12  or the police department --
13  A  Unlawful arrest.
14  Q  An unlawful arrest. Did it involve use of a
15  firearm?
16  A  No.
17  Q  Did it involve use of deadly force?
18  A  No.
19  Q  Did that result in a lawsuit?
20  A  I believe so.
21  Q  And the officer involved was not Officer Ramirez.
22  A  No.
23  Q  Is that correct? Okay. Was the officer involved in
24  that case still on the La Feria, Texas police department in
25  September of 2001 when this incident occurred?

**Page 36**

1  A  Ask me again, sir.
2  Q  Yes, sir. Was the officer involved in the 1989
3  incident still on the police force in La Feria --
4  A  Yes.
5  Q  -- in September of 2000?
6  A  (Nods head affirmatively)
7  Q  Okay. Do you recall who that individual is?
8  A  Yes, sir. That was me.
9  Q  Okay. Chief Garcia, is it possible -- and I
10  understand this is somewhat difficult because you are
11  answering on behalf of the city, but is it possible that there
12  are other officers who have had complaints, grievances, suits
13  filed for actions in which -- which they have been involved
14  that you are not aware of because they didn't involve you
15  personally. Or is there something about your position that
16  puts you in a -- in a place where you are charged with knowing
17  that information where you are supposed to find out about it
18  or keep track of it?
19  A  No. There hasn't been anybody else involved in
20  this.
21  Q  All right. I think the only other thing that we
22  asked you-all to bring, Chief Garcia, was a CV or some type of
23  resume. Do you -- do you have something like that? I didn't
24  -- I didn't notice it in the material --
25  A  A what, sir?

**Page 37**

1  Q  A resume or a bio?
2  A  No, I didn't.
3  Q  Well, let me -- let me -- let me -- that's okay. You know,
4  sometimes people don't keep them. I didn't keep them until I
5  needed one. Let me just ask you a little bit about your --
6  about your personal history. Okay? First of all, where were
7  you born?
8  A  In Willacy County.
9  Q  And what where did you go to school?
10  A  Sebastian and Lyford.
11  Q  And what year did you finish secondary school?
12  A  What year what, sir?
13  Q  What year did you graduate from high school?
14  A  I didn't -- I didn't graduate. I got my GED.
15  Q  GED. Okay. What year did you get your GED, sir?
16  A  I believe it was '71.
17  Q  Okay. And after obtaining the GED, did you go to
18  work or did you go to school?
19  A  No. I went to work.
20  Q  Okay. What kind of work did you do initially?
21  A  Farm.
22  Q  Okay. Let me -- let me kind of shortcut it this
23  way. When was the first time that you would have been
24  involved in law enforcement-type work?
25  A  1979, 1980.

10 (Pages 34 to 37)

DONATO GARCIA                                                                    April 9, 2003

---

Page 38

1   Q   Okay.  And how did you get started in law
2   enforcement?
3       A   It was always something I wanted to do.  My father
4   was a constable, elected constable, Precinct 4 in Sebastian.
5   Q   Okay.
6       A   And that's how I --
7   Q   That's what got you interested?
8       A   Yes.
9   Q   Okay.  What was your first job in the law
10  enforcement field?
11      A   Patrolman.
12  Q   Okay.  For what -- for what governmental entity?
13      A   Sir?
14  Q   For whom did you work?
15      A   I graduated in 1980 from the academy.  And -- and
16  went to work for the Raymondville Police Department.
17  Q   Raymondville?
18      A   Raymondville Police Department.
19  Q   How long did you work in Raymondville?
20      A   Nine years.
21  Q   Okay.  When you left the Raymondville Police
22  Department, what was your rank?
23      A   Crime prevention officer.
24  Q   Okay.  In 1989, I guess, when you left there.  Where
25  did you go?

---

Page 39

1       A   I went directly to La Feria Police Department.
2   Q   And let me ask you, do you have a TCLEOSE
3   certification?
4       A   Yes, I do.
5   Q   Okay.  When were you first certified?
6       A   1980.
7   Q   And did you also attend the Lower Rio Grande Valley
8   Police Academy or was it --
9       A   Yes.  Yes.
10  Q   -- some other police academy?  All right.  And then
11  1989 you began with La Feria P.D.  And what was your starting
12  position with La Feria P.D.?
13      A   Patrolman.
14  Q   Okay.  Can you, in kind of maybe a summary fashion,
15  tell me what your work history has been with La Feria P.D.,
16  how you went from patrolman in 1989 to chief of police.
17  What --
18      A   Okay.
19  Q   -- steps you went through.
20      A   I started with the La Feria Police Department in
21  February of 1989.  In 1990, I was promoted to patrol sergeant.
22  At the end of 19 -- the beginning of 1991, I was promoted to
23  the Cameron County Drug Enforcement Task Force, still working
24  for the La Feria Police Department.  I worked as an undercover
25  agent for four and a half, five years.  And my tour ended here

---

Page 40

1   in Brownsville.  And I was transported back to the La Feria
2   Police Department.
3   Q   All right.  And when did your tour with the task
4   force conclude?
5       A   Sir?
6   Q   All right.  When did your tour with the task force
7   end, what year?
8       A   I believe it was 1995, I believe.
9   Q   Okay.
10      A   And I went back to the -- to the La Feria Police
11  Department and took the position as an investigator.
12  Q   Okay.  Were you assigned to any particular division
13  as an investigator or was it a general investigator?
14      A   I was the head investigator, lead investigator.
15  Q   Okay.  And did you remain in that position until you
16  became chief of police --
17      A   Right.
18  Q   -- in 2001?
19      A   Uh-huh.
20  Q   Chief Garcia, in -- in September of 2000, can you
21  tell us how many police officers the city of La Feria had
22  employed?
23      A   I believe -- dispatchers or just officers?
24  Q   Let's talk about the whole department first and then
25  you can -- you can break it down for me by category.

---

Page 41

1       A   Four non-commissioned dispatchers and six patrolmen.
2   Q   All right.  All right.  What about administrative
3   personnel such as the chief or assistant chief?
4       A   No.  There isn't any.
5   Q   So there were six patrol officers.  And that
6   included the chief of police?
7       A   No.
8   Q   No?
9       A   No.  That includes -- that is just patrolmen.
10  Q   Okay.
11      A   And then my two investigators.
12  Q   Okay.  That's -- that's what I wanted to get to.
13      A   And then myself.
14  Q   Two investigators and you, as the head investigator,
15  lead investigator.
16      A   There are two investigators only, myself and another
17  one.
18  Q   Okay.  And anyone else besides the four dispatchers,
19  six patrol officers, two investigators?  Anyone else?
20      A   No.  I have a warrant officer, but he is included in
21  the six.
22  Q   Okay.  And this would have been the number of people
23  who worked for La Feria P.D. in September of 2000 before you
24  became police chief?
25      A   I believe so.

---

11 (Pages 38 to 41)

DONATO GARCIA                                                                                      April 9, 2003

---

**Page 42**

1    Q   Okay. And the one person I guess we are leaving off
2    here is the chief of police, himself. Correct?
3    A   Uh-huh.
4    Q   Okay.
5    A   Yes.
6    Q   All right. Is it correct that Officer Ramirez --
7    can you tell me when it was that Officer Ramirez was initially
8    hired by the La Feria Police Department?
9    A   I didn't hire him, sir. I -- I don't remember.
10   Q   Okay. That would be in the personnel file?
11   A   Yes.
12   Q   All right. If you didn't hire him, do you have --
13   if you are not able to tell me the date, are you able to
14   narrow the timeframe or give me any idea of how long he had
15   been working for La Feria P.D. as of September of 2000?
16   A   A little over three years.
17   Q   Okay. When he was hired, was he hired as a
18   dispatcher, a patrolman or an investigator?
19   A   He was hired as a full-time dispatcher and a reserve
20   peace officer.
21   Q   All right. When he was hired as a full-time
22   dispatcher, was he among the four non-commissioned dispatchers
23   that you mentioned?
24   A   I believe so, but he was commissioned.
25   Q   He was commissioned?

---

**Page 43**

1    A   Yes.
2    Q   When he was initially hired?
3    A   Yes. Because he was a reserve officer.
4    Q   All right. And for the three years or so preceding
5    Mr. Gonzalez' death, for what period of that time did Mr.
6    Ramirez work as a dispatcher?
7    A   He was a full-time dispatcher, sir.
8    Q   Okay. Let me -- let me. I am sorry. Let me
9    clarify that question. If your -- if your testimony is that
10   you believe he worked for about three years, or a little over
11   three years for La Feria Police Department prior to September
12   of 2000 and that he started as a dispatcher -- let me go back
13   and maybe do it this way.
14        At the time of Mr. Gonzalez' death, he was not a
15   full-time dispatcher. Is that correct?
16   A   Yes, he was.
17   Q   He was?
18   A   Yes.
19   Q   All right. So his primary duties with the La Feria
20   Police Department from the time he was hired through the time
21   of Mr. Gonzalez' death would have been as a dispatcher rather
22   than a patrolman?
23   A   His duties as a dispatcher and also a reserve
24   officer.
25   Q   Okay. Let me ask this. Is there -- can -- can you

---

**Page 44**

1    tell us on behalf of the city with regard Mr. Ramirez' actual
2    work on a day-to-day basis, time spent, what is the city's
3    position as to the amount of time Mr. -- excuse me, Officer
4    Ramirez spent working as a dispatcher doing dispatching duties
5    as opposed to a reserve officer who, for example, would have
6    engaged in patrol duties? Do you understand what I am
7    trying to --
8    A   No.
9    Q   That's a long question. Okay. How -- how much --
10   for what period of time or what percentage of time did he work
11   as a dispatcher and for what percentage of time was he on the
12   street or on the road as a patrol or a reserve officer?
13   A   He is a 40 hour dispatcher.
14   Q   So his regular schedule from week to week included
15   40 hours in which he was taking calls in and dispatching --
16   A   Right.
17   Q   Doing dispatch work?
18   A   Uh-huh. Yes, sir.
19   Q   Any work that he did as a reserve officer in the
20   capacity as a patrol officer --
21   A   Right.
22   Q   -- would have been over and above the 40 hours he
23   put in as a dispatcher?
24   A   Yes.
25   Q   Is there any indication or is there anything in the

---

**Page 45**

1    documents that the city maintains that would indicate to us
2    how much additional time he would have spent in -- fulfilling
3    the duties of a reserve officer separate and apart from being
4    a dispatcher?
5    A   No.
6    Q   Was he paid for the time that he spent as a reserve
7    officer working in the capacity or with the duties of a
8    patrolman?
9    A   No. He wasn't -- he wasn't paid.
10   Q   At the time that this incident occurred in September
11   of 2000, when Mr. Ramirez was asked or assigned to go to the
12   Valley Baptist Medical Center and guard to Gustavo Gonzalez,
13   was he on duty at that time as a dispatcher or was he there in
14   his capacity as a reserve officer?
15   A   He was there as a reserve officer.
16   Q   I take it, then, from the city's testimony that he
17   was not being paid or compensated for the period of time that
18   he was at the hospital and during which this incident
19   occurred?
20   A   I don't know how the -- the former chief made
21   arrangements with the officer to assign him to that post. I
22   don't -- I don't know.
23   Q   Okay. Well, let me -- let me go back and ask this.
24   Do you know or does the city know what Officer Ramirez' normal
25   working hours were as a dispatcher?

---

(210) 377-3027                          ESQUIRE DEPOSITIONS SERVICES                          FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100                  SAN ANTONIO, TEXAS 78230                            (800) 969-3027
                                                                                 ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                    April 9, 2003

Page 46

1    A   There -- we have four shifts. They are daytimes,
2  afternoon, midnights, and then there is the split shift.
3    Q   Okay. Did Officer Ramirez have a -- what shift was
4  he on during the week of September the 17th, I guess, during
5  the time period when this incident happened?
6    A   I don't know, sir. I wasn't making the shifts at
7  the time.
8    Q   Would that be reflected in his personnel file or
9  personnel record?
10   A   I don't believe so.
11   Q   Would it be reflected in his pay records?
12   A   Very possible. I don't know.
13   Q   Okay. Do you know whether Officer Ramirez
14  submitted a claim for -- a workers compensation claim for any
15  injuries he may have received during this incident?
16   A   I have no idea, sir.
17   Q   Was Officer Ramirez, then -- let me ask this. What
18  is the city's position as to whether Officer Ramirez was in
19  the employ of the city at the time of this incident or not?
20   A   He was an employee.
21   Q   Yes, sir.
22   A   As a dispatcher.
23   Q   At the time of this incident.
24   A   Yes. And he is also a reserve officer for the city.
25   Q   Okay. And at the -- he was operating as a reserve

Page 47

1  officer, but at the time of this incident at the hospital, I
2  mean, it is your understanding that he was outside of his
3  duties as a dispatcher. He was there as a reserve officer.
4  Is that correct?
5    A   He is a full commissioned officer. Whether he is a
6  reserve officer or not he is a full commissioned officer with
7  the city of La Feria.
8    Q   And -- and you are not sure -- the city is not sure
9  at this point today whether he was being paid or compensated
10  for his time there at the time this incident occurred?
11   A   No, I am not sure.
12   Q   Is there -- Chief Garcia, is there -- does the city
13  know or can the city tell us what -- whether Mr. -- excuse
14  me -- whether Officer Ramirez would have worked earlier that
15  day or the day before? Is there any record that you can think
16  of that would tell us what shift he was normally on and what
17  shift he actually worked during that time period?
18   A   No.
19   Q   Well, perhaps we can -- we can ask him about that.
20  He may remember himself. Okay. Chief Garcia, I am going to
21  go through a stack of documents that I have been provided by
22  Mr. Garza. We have already gone through some of them. I am
23  going to go through these in kind of a list form. And -- and
24  what I -- what I want to know after we go through all of these
25  as a group is whether there is anything that you produced that

Page 48

1  is -- that is not here. Okay. And I say you -- when you --
2  that you produced when you were getting ready for this
3  deposition. Okay.
4        The first was a no bill from the grand jury that we
5  identified as Exhibit Number 3. Correct?
6    A   (Nods head affirmatively)
7    Q   And I think you have already talked about that.
8  Exhibit Number 2 was the policy and procedure manual from the
9  the city of La Feria --
10   A   Yes.
11   Q   -- Police Department. Correct. There is an autopsy
12  report that I will mark as Exhibit Number 4. Is that
13  something that you produced to Mr. Garza or that your office
14  has a copy of?
15   A   I believe so, sir.
16   Q   Okay. There is a criminal history for Gustavo
17  Gonzalez.
18   A   Correct.
19   Q   There is an incident report from the La Feria Police
20  Department, which I am going to mark as Exhibit 5. I am sure
21  that would have been part of your file, too. Is that correct?
22   A   Yes.
23   Q   There is a custodial death report prepared by the La
24  Feria Police Department, which was sent to the office of the
25  Attorney General, I believe. Is that correct?

Page 49

1    A   Yes, sir.
2    Q   I am going to mark that as Exhibit Number 6. The La
3  Harlingen Police Department offense report provided to the La
4  Feria Police Department during the investigation. I am going
5  to mark that as Exhibit Number 7. Is that also something that
6  La Feria P.D. maintained within its files?
7    A   Yes, sir.
8    Q   Okay. And a file that has been identified as a
9  Harlingen Police Department Investigation file provided to
10  defense counsel that I am going to mark as Exhibit 8. I don't
11  know if you can tell me one way or another whether this item
12  here, and I know it is kind of thick, but is that something
13  that you produced had or that you have a copy of?
14   A   This -- this was produced by the former chief, I
15  believe.
16   Q   Chief Gonzalez?
17   A   Yes. I believe so. Yes.
18   Q   Is there -- Chief Garcia, the -- the documents we
19  have so far, Exhibits 1 through 8, are there any items that
20  you gathered in preparation for your deposition that are not
21  included within these eight exhibits?
22   A   Everything is here.
23   Q   Okay. Is there anything that you produced to
24  counsel in this case, I don't want to know about your
25  discussions with him, but anything you produced to him that is

13 (Pages 46 to 49)

DONATO GARCIA                                                                April 9, 2003

**Page 50**

1  not here today?
2      A   Everything is here.
3      Q   Okay. Now, I think we have already talked about
4  briefly what -- what is not here is Officer Ramirez' personnel
5  file.
6      A   (Nods head affirmatively)
7      Q   Is that correct?
8      A   Okay.
9      Q   And any other documents regarding other complaints,
10 grievances, lawsuits involving allegations of use of excessive
11 force, because you have specified one for us that is not here.
12     A   Okay.
13     Q   Those -- those two things we know are not among
14 these --
15         MR. GARZA: Objection. Form.
16     Q   Is that correct? He -- he has to do that for the
17 Record. If he -- to protect the record. You may answer the
18 question. If he comes to a point where there is a privilege,
19 then he will instruct you not to answer it. Obviously, you
20 should listen to him and consult with him at that time. Okay.
21         Those two items, the personnel file and any other
22 complaints or incidents of excessive uses of force or
23 allegations of excessive uses of force, those things are not
24 included within these documents. Is that correct?
25     A   Hold on, sir. I didn't hear you, sir. What did you

**Page 51**

1  say?
2          MR. GARZA: You can answer that question. Go
3  ahead.
4          THE WITNESS: Can you ask me again?
5          MR. GARZA: I didn't object to that question.
6  Go right ahead.
7      Q   (BY MR. BARRIENTOS) Is it correct that Officer
8  Ramirez' personnel file is not among these documents that we
9  have identified?
10     A   Okay.
11     Q   Is it also correct that there are no documents
12 reflecting other incidents of allegations of excessive force.
13 Those documents are not included in here?
14     A   No.
15     Q   Okay. All right.
16         (lunch break)
17     Q   (BY MR. BARRIENTOS) Chief Garcia, before we broke, I
18 think we were going over some of the documents -- items that
19 you had produced in getting ready -- ready for the
20 deposition. And I neglected to mark -- and I just want to do
21 this for the record, two other items, Exhibits 9 and 10. Nine
22 is the -- something titled the accident videotape in the La
23 Feria Police Department file, which I will represent to you I
24 have looked at and chose police officers out -- and I don't
25 remember the road. But apparently it is the incident where

**Page 52**

1  Mr. Gonzalez' vehicle was stopped and the initial search for
2  him was begun on September 17th.
3      A   Okay.
4      Q   And Exhibit Number 10, which a videotape of the
5  reenactment conducted after the incident with Officer Ramirez
6  and some other individuals from, I think, Harlingen Police
7  Department --
8      A   Okay.
9      Q   -- at the hospital -- or in a hospital, which I have
10 marked as Exhibit 10. And I have a couple of questions about
11 these.
12         First of all, Exhibit 9, were you at the scene in
13 this videotape on the night that -- that the initial stop
14 occurred? Did you take part in that --
15     A   No.
16     Q   -- investigation. Okay. Have you viewed this tape
17 that has marked as Exhibit Number 9?
18     A   I viewed one tape. I don't know which one, sir.
19     Q   Okay. The tape that you reviewed, what -- what were
20 the context -- contents of the --
21     A   The reenactment.
22     Q   Okay. The reenactment. So you have not seen any
23 videotape from the scene, the traffic stop that occurred?
24     A   No.
25     Q   Do you know the source of Exhibit Number 9, then?

**Page 53**

1  In other words, is -- if you haven't viewed it personally, do
2  you know who took it, from where it came, if it was an edited
3  portion of a longer tape? Do you have any other information
4  about it?
5      A   No, sir.
6      Q   Is there someone at the city of La Feria who would
7  know that and/or would be able to tell us or tell us about
8  that?
9      A   The only one that would have the answer to that
10 would be the former chief.
11     Q   The former chief. Oh, and I meant to ask you about
12 that. Thank you for reminding me before we go any further.
13 Chief Gonzalez, when did he actually leave his -- his office?
14     A   He passed away in December, I believe, of --
15     Q   December of what year?
16     A   I am going to say 2000.
17     Q   2000.
18     A   I believe.
19     Q   Okay. And, if I remember correctly, you didn't take
20 office as chief of police until about June of 2001.
21     A   Yeah.
22     Q   So there was a vacancy -- am I correct in assuming
23 there was a vacancy from the time of his death until the time
24 that you took over?
25     A   It wasn't that long. Maybe he did pass away in

14 (Pages 50 to 53)

DONATO GARCIA                                                                                   April 9, 2003

Page 54

1   2001.
2       Q   Okay.  Well, let me ask it this way.  Were there any
3   intervening people who took over the office of chief of police
4   between Chief Gonzalez and yourself?
5       A   No.
6       Q   Okay.  Was -- was -- was his death -- was he sick or
7   ill or was it something expected or --
8       A   He had been fighting a -- diabetes.
9       Q   Okay.  All right.  Would there be anyone else other
10  than Chief Gonzalez who we are not able to --
11      A   No, sir.
12      Q   -- depose at this time who would know where the
13  contents of Exhibit Number 9 came from?
14      A   Can I see that?
15      Q   Sure.  Yes, sir.  Please do.
16      A   No, sir.  I have never seen this one before.
17      Q   Okay.  All right.  So am I to understand, then, that
18  there is -- there is no way that you can -- can testify as to
19  the contents of the tape and when it was taken and what is on
20  it?
21      A   I wasn't there, sir.
22      Q   Okay.  Exhibit Number 10 is the reenactment?
23      A   Yes, sir.
24      Q   And you have seen that?
25      A   Yes, sir.

Page 55

1       Q   Were you there when it occurred or did you take
2   part in the reenactment?
3       A   No.
4       Q   Do you know if -- does the Harlingen Police
5   Department or -- excuse me.  Does the city of La Feria have a
6   copy of this videotape?  Is this something that you turned
7   over to Mr. Garza's office?
8       A   Yes.
9       Q   Okay.  How long is the videotape that the city of La
10  Feria has in its possession?
11      A   I didn't know that it was -- that it was in our
12  possession.  This is when I went through the files and found
13  it.  And I don't know how long it had been there.
14      Q   Do you-all have just one tape, then?
15      A   That's the one that I turned over.
16      Q   Do you know where the city of La Feria obtained
17  their copy of the tape?
18      A   No, sir.  I have no idea.
19      Q   To your knowledge, has anyone with the city -- was
20  it -- was this edited from a longer or larger tape or was this
21  a reenactment where someone turned on the videotape and just
22  let it go all the way through?
23      A   I don't know.
24      Q   All right.  Let me go back and ask you a few
25  questions in detail about some of these exhibits that we have

Page 56

1   here in front of us.  All right.  Chief Garcia, from my
2   reading of the exhibit that was produced -- if I can find it
3   here.  The procedures manual for the city of La Feria Police
4   Department, is it correct that the chief of police is the
5   policymaking authority for the city of La Feria Police
6   Department?
7       A   No.  All I do is -- the policymaking comes from the
8   councilmen.
9       Q   The city council?
10      A   Yes.
11      Q   Okay.
12      A   I can suggest a policy and they will approve it.
13      Q   Well, let me ask -- let me -- let me go to this and
14  ask you perhaps in terms of implementation.  That may -- may
15  clear some of this up.  At -- let me see -- a paragraph --
16  section 1, paragraph 1.01 under Purpose, reads as follows.
17          MR. GARZA:  What exhibit is that, counsel?
18          MR. BARRIENTOS:  Exhibit -- I am sorry.
19  Exhibit Number 2.
20      Q   (BY MR. BARRIENTOS)  It says the -- and I will give
21  this to you.  I just need it to read because I only have one
22  copy in front of me.
23          The purpose of this policy and procedures manual is
24  to provide further guidelines and standards of conduct for
25  members of the La Feria Police Department beyond that of the

Page 57

1   city personnel and policies manual.  The city manual contains
2   policies applicable to all employees, while this manual only
3   applies to members of the La Feria Police Department.  Is that
4   correct?
5       A   Yes.
6       Q   Okay.  And Section 2, paragraph 2.01 is titled --
7   subtitled Review, reads as follows:  Supervisory personnel
8   will be responsible for the review of this manual and will
9   submit any recommendations for revisions to these procedures
10  to the chief of police.
11      A   Yes.
12      Q   Did I read that correctly?  And at Section 4.01
13  titled Chain of Command reads as follows:  The chief of police
14  is in full charge of the La Feria Police Department.  He is
15  responsible to the city manager for the efficiency, discipline
16  and morale of the La Feria Police Department.  The chief of
17  police may promote employees to ranks or positions of
18  responsibility and demote from rank or positions of
19  responsibility as best suits the efficient operations of the
20  department.  Is that correct --
21      A   Yes.
22      Q   -- as stated in the policy manual?
23      A   Yes.
24      Q   Let me ask, there are also some other policies in
25  here specifically with regard to use of force.  The question I

15 (Pages 54 to 57)

DONATO GARCIA                                                                April 9, 2003

**Page 58**

1  have is -- for you as a representative of the city of La
2  Feria -- would the policies in this specific Exhibit Number 2
3  be required to be adopted by the city counsel of La Feria
4  before they were put into effect by the police department in
5  -- in 2000, in September of 2000?
6     A   Can you ask me the question again, please?
7     Q   Sure. The provisions that are in this policy manual
8  that specifically applies to the police department, were these
9  required to be submitted or were they submitted to the city
10  council for approval before they were adopted by the police
11  department?
12    A   No, sir. The -- the procedures that I was given
13  and so I imagine they have been approved by the commission
14    Q   Okay. Well, what I am asking is do you know whether
15  that was something that actually happened or whether -- you
16  understand, I am trying to find out in terms of running the
17  police department and setting procedures and policies for the
18  police department is that a function that the chief of police
19  perform? Is it a function that the city manager performs or
20  the city council or all three to some extent, if you know?
21    A   I believe it comes from the city manager to the
22  councilmen and then it comes to me.
23    Q   Okay. In terms of -- I think a moment ago you
24  indicated you could make suggestions or recommendations --
25    A   Right.

**Page 59**

1     Q   -- as to policy, but they had to be approved by
2  someone else.
3     A   Uh-huh.
4     Q   Is that a yes?
5     A   Yes.
6     Q   Okay. And it is your testimony that as a
7  representative of the city that -- that someone else you
8  believe to be the city manager.
9     A   Correct.
10    Q   Is that correct?
11    A   Yeah.
12    Q   In terms of the knowledge of police work and the
13  substance of this particular manual, who is going to be in a
14  better position to make substantive recommendations about what
15  should go in that policy manual? The chief of police or the
16  city manager?
17    A   That would be the city manager.
18    Q   Okay. So is it the city's position that the city
19  manager, whoever that might be from time to time, is going to
20  have more training and knowledge on the issues of police
21  procedure than the chief of police?
22    A   He is the city manager. Yeah.
23    Q   Okay. As a -- I understand your response in terms
24  of how the approval may go or from whom the -- the approval
25  must come. But the question I have is one, I guess, is more

**Page 60**

1  based on your experience as an employee of the police
2  department.
3        In your experience, who is -- in your opinion, is
4  going to be -- or, excuse me, in your experience is going to
5  be better equipped to make recommendations as to what the
6  police policies and procedures should be? Would that be the
7  acting police chief or the city manager, whoever those
8  individuals happen to be at the time?
9     A   At the time of when, sir?
10    Q   Well, first, I am actually not limiting it to time.
11  I am just asking you in general. Would you expect that the
12  chief of police is going to know more about police procedures
13  than the city manager?
14    A   No, sir. It would be the city manager.
15    Q   The city manager is going to know more than the
16  police chief?
17    A   He is the one that runs the city, sir.
18    Q   Okay. So it is your testimony that the city manager
19  approved whatever policies are included within Exhibit Number
20  2?
21    A   I believe so, yes.
22    Q   Can you tell us, on behalf of the city, whether this
23  would have been done independent of the chief of police or in
24  conjunction with the chief of police?
25    A   No, I don't know.

**Page 61**

1     Q   Well, let me ask you, has there -- has there been
2  any revision to Exhibit Number 2, to this manual, since the
3  time of Gustavo Gonzalez' death?
4     A   No.
5     Q   Can you tell me when the last time this procedure
6  manual would have been revised prior to the time of his death?
7     A   No, I can't tell you.
8     Q   Has it -- has it ever had any revision to it?
9     A   I don't know, sir. I don't believe so.
10    Q   Can you tell me, on behalf of the city, when or
11  approximately when it was adopted?
12    A   I have no idea, sir.
13    Q   Do you know whether it would have been adopted prior
14  to the time of Gustavo Gonzalez' death?
15    A   No.
16    Q   So you are telling me this -- it may be that this
17  policy manual was not even in effect at the time that Mr.
18  Gonzalez was taken to Valley Baptist Medical Center?
19    A   Yes. It has been there for a long time.
20    Q   Okay. It has been -- it was there before then. You
21  just don't know --
22    A   Yes.
23    Q   -- how long before then.
24    A   Yes.
25    Q   Okay. I am sorry. I misunderstood you. All right.

16 (Pages 58 to 61)

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027
ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                                                    April 9, 2003

Page 62

1  Now, let me ask you. You mentioned that the chief of police,
2  while not having the authority to adopt or approve the
3  policies, has input or can make recommendations as to the
4  policies. Did I understand that correctly?
5      A  Yes, sir.
6      Q  Can you give me an example of what type of
7  recommendations or suggestions you -- you are talking about?
8      A  I can suggest -- that policy is used for me as a --
9  as a guide to follow in case an incident occurs. I can refer
10  that to the city manager. That's what I use it for.
11     Q  Okay. Let me ask you. Can you give me an example
12  of a specific recommendation or suggestion that you have made
13  to the city manager about what should be or should not be in
14  the policy and procedure manual --
15     A  I have not.
16     Q  -- for the police department? Prior to the time you
17  became chief of police, are you aware of any recommendation
18  that had been made by the chief of police or by -- by Chief
19  Gonzalez, for example, to the city manager about what should
20  or should not be contained --
21     A  No.
22     Q  -- in the procedure manual?
23     A  No.
24     Q  All right. And, Chief, I hate to -- I don't mean to
25  belabor this, but I want to make sure I understand. Earlier,

Page 63

1  I think your initial response to this was that the procedure
2  manual was approved by the city counsel of the city of La
3  Feria.
4      A  Yes.
5      Q  Is that -- is that your understanding?
6      A  That's my understanding.
7      Q  Okay. So that the city manager didn't set the
8  policy. He would present it to the city council?
9      A  To the city commission.
10     Q  Who would set the policy and the city manager would
11  implement it.
12     A  Right.
13     Q  Is that your understanding?
14     A  That's how I understand it, sir.
15     Q  Okay. All right. Now, with regard to official
16  policies of the city of La Feria regarding -- regarding the --
17  well, first let me ask about authorized weapons. What -- what
18  is the -- the policy of the city of La Feria's police
19  department with regard to -- to weapons, weapons equipment
20  that is allowed to be possessed or used by police officers --
21  officers during their work?
22     A  The officer can -- can carry a weapon of his choice.
23     Q  Does the city of La Feria own any weapons which it
24  provides for its police officers to use?
25     A  Yes.

Page 64

1      Q  Okay. Can you tell us, members of the jury, what
2  weapons are owned by the city of La Feria?
3      A  Shotguns.
4      Q  Okay. How --
5      A  Twelve 12 gauge shotguns.
6      Q  Twelve gauge shotguns. How many?
7      A  Four.
8      Q  Any other weapons?
9      A  No.
10     Q  Okay. All right. And -- so, for example, night
11  sticks or ASPs, mace, and handguns or side arms, if those
12  items are being used by a city of La Feria police officer,
13  those items are things which that officer must provide or does
14  provide on their own?
15     A  Correct. But the officer has to be certified --
16     Q  Correct?
17     A  -- on those weapons.
18     Q  That's what I am -- I was going to get to that in
19  just a moment.
20     A  Okay.
21     Q  Let me ask, is there a policy, because Section 6.01,
22  An Authorized Weapon, does not list, for example, the type o[f]
23  or kind or model of firearm or baton or other weapon that ma[y]
24  be used. It states generally that a weapon approved by the
25  police department -- excuse me, let me start over. It -- it

Page 65

1  states that an authorized weapon is approved by the La Feria
2  PD for official use by its officers and that a firearm is
3  authorized if it is owned by the La Feria PD or is listed on
4  file with the La Feria Police Department as qualified with --
5  by a particular officer?
6      A  Uh-huh. Yes.
7      Q  Is that correct? Okay. So, in this particular
8  case, do you know what type of weapon Officer Ramirez had a[t]
9  the time this incident occurred?
10     A  He carried a 9 millimeter.
11     Q  Nine millimeter pistol.
12     A  Handgun.
13     Q  Semi-automatic?
14     A  Right. Correct.
15     Q  Carried?
16     A  On duty.
17     Q  On duty. That carries a clip with 15 rounds and
18  carries one in the chamber?
19     A  Correct.
20     Q  Of the other officers on the La Feria Police
21  Department, police force, do you know what the other officers
22  carry in terms of side arms or handguns?
23     A  Some officers carry a .45, some officers carry a
24  .40, some officers carry a 9 millimeter.
25     Q  Okay.

17 (Pages 62 to 65)

DONATO GARCIA                                                              April 9, 2003

**Page 66**

1    A    And some officers carry a .45.
2    Q    Do you know how many officers other than officer
3  Ramirez carried or used a 9 millimeter?
4    A    Three or four officers carry a 9 millimeter.
5    Q    The other officers who use the -- other types of
6  weapons that you have described, do you know whether those --
7  whether those weapons were of a semi-automatic type, were they
8  revolvers? Do you know?
9    A    What -- what weapons are you referring to?
10  Handguns?
11    Q    Handguns.
12    Q    Or shotguns.
13    Q    Handguns. Handguns.
14    A    They are all semi-automatic.
15    Q    Is there -- okay. Now, let me see if I understand.
16  In Officer Ramirez' case, what is the city's position as to
17  whether he was qualified for use of that type of handgun?
18    A    He is certified and he is certified through the
19  pistol range.
20    Q    Okay. Do you know when it was that he would have
21  been certified -- qualified with respect to use of that type
22  of weapon?
23    A    All the officers qualify once a year.
24    Q    Okay. Now, if I understand with respect to a 9
25  millimeter, that is a separate -- you can qualify for

**Page 67**

1  different type weapons?
2    A    Right.
3    Q    Was this the -- was this the only weapon that
4  Officer Ramirez was qualified on or had he qualified for
5  others and perhaps worked his way up to this one?
6    A    No, sir. I believe that is the only weapon he
7  carried.
8    Q    Is there a policy by the city of La Feria that
9  dictates or that offers some guidance as to what type of
10  ammunition may be used?
11    A    No.
12    Q    That is left up to the --
13    A    To the individual officer.
14    Q    -- complete discretion of the individual officer.
15  Is that true in all circumstances? Strike that. Let me be
16  more clear. Is that true regardless of what the assignment
17  is?
18    A    Yes.
19    Q    So if there is some special assignment, there is no
20  particular load or ammunition that is recommended or required
21  by a police officer?
22    A    He is a commissioned officer. He can carry a weapon
23  and the ammunition of his choice.
24    Q    Okay. And specifically with regard to guarding a
25  person, for example, in the position of Mr. Gonzalez at a

**Page 68**

1  hospital facility other than a correctional facility, nothing
2  in the La Feria Police Department requires an officer like
3  Officer Ramirez to carry or load a certain type of ammunition?
4    A    No.
5    Q    All right. To your knowledge, did the city of La
6  Feria ever receive from the Valley Baptist Medical Center any
7  written instruction as to the type of ammunition or load that
8  was permitted by officers who are guarding in-custody
9  patients?
10    A    Not to my knowledge.
11    Q    Has the city of La Feria ever received any
12  instruction or information in some form other than writing
13  about what type of ammunition or load was permitted by
14  officers who are guarding in-custody patients?
15    A    No, sir. Not to my knowledge.
16    Q    Chief Garcia, are you qualified for use of a 9
17  millimeter?
18    A    No, sir. I don't carry a 9.
19    Q    Okay. You are familiar from your police experience
20  that there are different characteristics that are applicable
21  to different types of -- of ammunition that may be used.
22    A    Can you ask that question again, please?
23    Q    Sure. Is it correct that different types of
24  ammunition, different types of bullets have different
25  characteristics in terms of stopping power, in terms of

**Page 69**

1  velocity, in terms of range, distance which they may travel?
2    A    I know that some travel at a faster speed than
3  others.
4    Q    All right. And on the occasion that we are -- that
5  we are here today on, is it correct that Officer Ramirez would
6  not have been asked or instructed to use any particular type
7  of ammunition by the city of La Feria Police Department?
8    A    No, not to my knowledge.
9    Q    Have you -- has the city learned, since the time of
10  this event, that Officer Ramirez would have been required to
11  use ammunition of a particular type if he was going to be
12  guarding an in-custody patient at Valley Baptist?
13    A    No.
14    Q    All right. Okay. And so as long as -- if I
15  understand correctly, as long as an officer was qualified on
16  that -- on a particular weapon, they could carry that weapon.
17    A    Yes.
18    Q    And that they had complete unfettered discretion to
19  -- to decide which weapon they chose to use?
20    A    That would be up to the individual officer.
21    Q    And the same with the ammunition they used, they
22  basically had unfettered discretion to decide what type of
23  ammunition to use in what particular setting or assignment.
24    A    That would be up to the officer.
25    Q    All right. Chief Garcia, Section 6.02 defines -- of

18 (Pages 66 to 69)

DONATO GARCIA

April 9, 2003

Page 70

1  the procedure manual, Exhibit Number 2, defines deadly force
2  as force that is intended or known by the actor to cause or in
3  the manner of its use or intended use is capable of causing
4  death or serious bodily injury.
5       First let me ask you, is it the position of the city
6  of La Feria that deadly force was indeed used in this case?
7  A   Yes.
8  Q   That is clear?
9  A   Yes, sir.
10  Q   All right. Now, what I want to talk to you about is
11  the circumstances under which deadly force is permitted to be
12  used or authorized for use by members of the city of La Feria
13  Police Department. First of all, let me ask the policy -- and
14  I believe this is -- my page number is blanked out. But at
15  page 11, or what is -- what is between pages 10 and 12 of the
16  policy manual that I have that the number is obliterated,
17  there is a section here that dicusses use of force and use of
18  deadly force. Are you familiar with this section of the
19  policy manual?
20  A   Yes.
21  Q   Can you tell us, and if you need to refer to this,
22  feel free to, but what is the -- what is the policy, if any,
23  of the city of La Feria with regard to the use of deadly force
24  by its police officers?
25  A   We will refer back to the police academy, how the

Page 71

1  officer is trained in the use of deadly force.
2  Q   Okay. My review of Exhibit Number 2, when I read
3  it, I didn't see anywhere that I remember, and you correct me
4  if I am wrong, because you are more familiar with it than I
5  am. But I didn't see there anywhere where it refers the
6  officer back to their training academy experience. So let me
7  ask you this. Is what you have just told me something that is
8  in addition to what is in the manual or is what you have told
9  me something that is applicable instead of what is in the
10  manual?
11  A   No. I am not -- I am not saying that. I am saying
12  that the -- that the use of force is trained at the academy.
13  Q   Okay. All right. So when it would -- the question
14  of when it is appropriate to use deadly force is not something
15  that the city of La Feria trained its officers to do --
16  A   No.
17  Q   I am sorry.
18  A   I am sorry. Go ahead.
19  Q   Okay. The city of La Feria relies on the police
20  academy to do the training of when it is proper or appropriate
21  to use deadly force, relies on the police academy to train the
22  applicants that the city of La Feria ultimately hires on when
23  that use of deadly force is proper or appropriate.
24  A   It is -- it is up to the -- to the academy, sir.
25  The officers are trained there in the use of deadly force.

Page 72

1  Q   Okay. All right. And that is okay. I am not
2  fussing. I just want to make sure I understand. The city of
3  La Feria relies on the police academy and the training that is
4  rendered there in order to teach their police officers when it
5  is appropriate or permissible to use deadly force?
6  A   Yes.
7  Q   Okay. Is it correct, then, or do I understand from
8  your testimony that the city of La Feria provides no
9  additional training with regard to the use of deadly force?
10  A   It is a continuing education. The officer is sent
11  back to the training. It is -- it is training that they take.
12  It is training that I make available to them, continuous
13  education. They have the training. They shall have the
14  training every two years.
15  Q   Okay.
16  A   Mandated by TCLEOSE.
17  Q   Earlier I think we -- we discussed what actually is
18  taught at the academy. And I believe your testimony was that
19  the city of La Feria does not have input into what is actually
20  taught or the training that they -- that the applicant or the
21  officer actually receives. You rely on them to do that.
22  A   Correct.
23  Q   And would the same be true for the continuing
24  education that you have described that occurs or is supposed
25  to occur every two years?

Page 73

1  A   Yes.
2  Q   So, then, the entirety of what is taught to an
3  officer like Officer Ramirez in terms of use of deadly force
4  and in terms of the limits of the constitutional application
5  of that force, when it is appropriate under the law, is done
6  entirely by an outside agency.
7  A   By the police academy.
8  Q   Let me -- let me go specifically to a couple of
9  provisions here.
10  A   All right.
11  Q   Do you know whether anything in Section 6 -- well, I
12  will tell you. I am not sure how this -- how this goes. At
13  page 10, the last section on here is Section 6.06, which is
14  titled Serious Bodily Injury. And then the next page, there
15  is no new subtitle. So I don't know if this falls under
16  Serious Bodily Injury or if it is some other subtopic. And
17  then -- it must be the same one because 6.07 is the next one
18  at page 12. So let me -- let me ask you this way.
19       Do you know whether the details on page 10, 11, and
20  the top of page 12 with regard to the use of deadly force, are
21  these provisions -- can you tell me whether they are in any
22  way in conflict with what the officer is taught at the
23  training academy on the use of deadly force?
24  A   No.
25  Q   Do you know -- do you know one way or another

19 (Pages 70 to 73)

DONATO GARCIA                                                                      April 9, 2003

**Page 74**

1  whether they are in conflict or not?
2      A  No.
3      Q  Let me ask you specifically.  There is a paragraph
4  about halfway down the page at what I believe is page 11 that
5  reads as follows:  An officer shall not use deadly force
6  except when immediately necessary to protect himself or
7  another person from death or serious bodily injury.  Do you
8  see that provision there?
9      A  Yes, sir.
10      Q  Is it correct that an officer is not permitted to
11  use deadly force to prevent an escape?
12      A  Is it correct for what, sir?
13      Q  That an officer for the La Feria Police Department
14  is not permitted to use deadly force in order to prevent an
15  escape.
16          MR. GARZA:  Objection.  Form.
17      Q  (BY MR. BARRIENTOS) And the reason I ask -- I mean,
18  I don't mean to interrupt you if you -- I don't mean to interrupt
19  your answer.  But if -- it looks like you are thinking about
20  that.  But the reason I ask this, because this specifically
21  says -- sets out some limitation on when deadly force may be
22  used.  And when I read through here, I did not see anything
23  that authorized the use of deadly force to prevent an escape.
24  My question is, is that in here somewhere to your knowledge?
25      A  I will have to read it, sir.

**Page 75**

1      Q  Yes, sir.  Go ahead.
2      A  An officer does not shoot at a fleeing felon.
3      Q  All right.  So, then, an officer is not permitted
4  under the policies and provisions of the city of La Feria's
5  written rules to use deadly force to prevent an escape?
6      A  Yes, sir.
7          MR. GARZA:  Objection.  Form.
8      Q  (BY MR. BARRIENTOS) Okay.  The next question, and
9  you may have answered this already, Chief Garcia, but let
10  me -- I want to make sure that I am fair about it, complete
11  about it.
12          If there is no written policy that allows use of
13  deadly force to prevent an escape, is there some unwritten
14  policy or practice or custom of the La Feria Police Department
15  that permits or allows or authorizes officers to use deadly
16  force to prevent an escape?
17      A  No.
18      Q  Are you able to tell us or is the city of La Feria
19  able to tell us whether the training that an officer such as
20  Officer Ramirez would have received at the training academy
21  teaches an officer that it is permissible or appropriate to
22  use deadly force to prevent an escape?
23      A  No.
24      Q  Okay.  This is -- I guess because I ask questions
25  poorly sometimes, I am going to ask you again.  Does no --

**Page 76**

1  does your answer mean you don't know one way or another or
2  that the training he would have received does not teach an
3  officer that they can use deadly force to prevent an escape?
4      A  It does not teach the officers to shoot at a fleeing
5  felon or to an escapee.
6      Q  Okay.  And your testimony on that is based on what,
7  sir?
8      A  The academy.
9      Q  Okay.  Because you have been -- I take that to mean
10  because you have been through the academy and through the
11  course?
12      A  Yes.  But laws change every September.
13      Q  Okay.  Well, let me ask -- believe me, I know.  Let
14  me -- let me ask this.  Do I take it, then, from your
15  testimony that the position of the city of La Feria is that
16  the training academy teaches its students that it is improper
17  to use deadly force to prevent an escape?
18          MR. GARZA:  Objection.  Speculation.
19      Q  (BY MR. BARRIENTOS) If you know.  And if you don't
20  know, you can tell me you don't know if don't know.  Of if you
21  know as to a certain time period, you can specify that for
22  me.  I don't mean to lock you into something.
23      A  No.
24      Q  It is open-ended.
25      A  No.

**Page 77**

1      Q  Okay.  No what?
2      A  No to their teaching.
3      Q  Okay.  I am going to go back and try again.  And it
4  is my fault, not yours.  When you went through the academy,
5  did they teach you that it was okay to use deadly force to
6  stop an escape?
7      A  When I went through an academy, yes.
8      Q  Yes.
9      A  We could shoot at a fleeing felon.
10      Q  Okay.
11      A  But the laws have changed now that we cannot.
12      Q  All right.  Okay.  And so your testimony is -- the
13  city's testimony is that when Officer Ramirez went through the
14  training academy sometime prior to 1990 that he would have
15  been taught that it is improper to use deadly force to prevent
16  an escape.
17      A  Yes.
18      Q  All right.  What -- what this part of the policy
19  that we went over on use of deadly force says is that, as you
20  noted, an officer shall not use deadly force except when
21  immediately necessary to protect himself or another person
22  from death or serious bodily injury.  Is that correct?
23      A  Yes, sir.
24      Q  All right.  Is there any guidance given to police
25  officers as to how to recognize that situation if and when it

20 (Pages 74 to 77)

DONATO GARCIA                                                                                        April 9, 2003

**Page 78**

1  occurs?
2      A   The officers are properly trained at the academy for
3  the type of force that is necessary to use.
4      Q   All right. Can you give me -- can you tell me with
5  any more specificity what type of training they receive in
6  order to help them recognize when the situation arises in
7  which they would be permitted to use deadly force?
8      A   Imminent danger on himself or others.
9      Q   Does the training include, to your knowledge, Chief
10 Garcia, training on -- on the manner in which to avoid such
11 situations?
12     A   Ask me again, sir.
13     Q   Yes. Does the training on the use of deadly force
14 include training on how to avoid such situations?
15     A   Training? Yes. There is type of trainings, yes.
16     Q   Can you tell me what type of training, based on your
17 experience, that includes?
18     A   There is verbal, presence, and then there is
19 imminent danger.
20     Q   All right. Is it correct that police officers or
21 potential police officers are trained or supposed to be
22 trained on how to avoid placing themselves in a situation that
23 could place them in immediate danger or another person in
24 immediate danger?
25     A   No. They are always in danger. No.

**Page 79**

1      Q   Okay. So there is -- there is no type of training,
2  for example, that will help an officer, give an officer some
3  guidance, on how to deal with or conduct themselves in the
4  presence of a suspect or perhaps regarding a prisoner or
5  perhaps when presented with a domestic disturbance type of
6  situation, a robbery situation, those types of things
7  aren't -- aren't tested or taught or trained in the -- in the
8  police academy?
9          MR. GARZA: Objection. Form.
10         THE WITNESS: No.
11     Q   (BY MR. BARRIENTOS) So, then, am I correct to take
12 from that answer, then, while the policy speaks in general
13 terms about when an officer cannot use deadly force, it is
14 basically going to be left up to the officer to recognize and
15 to use their own judgment about when they are in immediate
16 danger?
17     A   They have to go back to their raining, refer back to
18 their training.
19     Q   And that -- and that's what I am asking you about.
20 What I am asking or what I am trying to find out is can you
21 tell us or do you know the training that you speak of, what
22 exactly does it teach or try to show the potential officers to
23 educate them in terms of when -- when that situation arises?
24     A   Ask me again, sir.
25     Q   Yes. What I am trying to find out, other than

**Page 80**

1  telling a police officer don't use deadly force unless you are
2  in immediate danger of death or serious bodily injury, is
3  there any guidance given to police officers, specific
4  guidance, on when that situation arises or when that use of
5  force or deadly force is proper beyond the general description
6  that is in the -- in the policy manual?
7      A   That's the best -- that's the academy training, sir.
8      Q   Okay. And that's what I am trying to find out.
9  What does the academy train them to do?
10     A   To see when there is danger.
11     Q   Okay. For example, if -- do you know if the -- if
12 an officer is confronted with an individual who is
13 uncooperative, would that be a proper situation in which to
14 use deadly force?
15     A   No.
16     Q   If an officer is confronted with a situation of a
17 person who is unresponsive to the officer's commands, would
18 that call for the use of deadly force?
19     A   No.
20     Q   If an officer is presented with a person who is
21 medicated or perhaps suffers from some type of mentally --
22 mental illness or delusion, is that an appropriate situation
23 for use of deadly force?
24     A   No.
25     Q   If an officer is presented with a situation where an

**Page 81**

1  individual is verbally abusive or threatening, verbally
2  threatening to an officer, is that appropriate use of deadly
3  force in that situation?
4      A   No.
5      Q   In fact, the manual specifically talks and speaks of
6  that issue. Is that correct?
7      A   Yes.
8      Q   If an officer finds himself in a situation where
9  they are confronted with force that is less than deadly, does
10 that authorize an officer to use deadly force in return?
11     A   No.
12     Q   Chief Garcia, in -- all right. Let -- let me ask
13 you with -- with respect -- earlier you testified that police
14 officers going through the training academy do not receive
15 training on -- excuse me -- on guarding people in -- in a
16 hospital. Is that correct?
17     A   That's right.
18     Q   Let me ask this. Would it be fair that they -- that
19 they do not receive training on how to guard people outside of
20 a correctional facility setting?
21     A   I don't know about a correctional facility, sir.
22     Q   Okay. Well, let me -- let me go back. Let me go
23 specifically with what your -- what your earlier testimony
24 was. Your testimony was that in the training academy police
25 officers are not trained on how to guard in-custody patients.

21 (Pages 78 to 81)

DONATO GARCIA                                                                                      April 9, 2003

**Page 82**

1    A    No, sir.
2    Q    Is it the position of the city of La Feria that that
3    type of training is -- is something that is desirable for
4    trainees to have?
5    A    The training that you talk about, sir, is -- is for
6    prison guards. We are peace officers. We are not trained to
7    guard prisoners.
8    Q    Well, let me ask, do you believe that the training
9    that is received by trainees such as Officer Ramirez -- if
10   they did not receive any training on how to guard an
11   in-custody patient, do you believe that that training was
12   inadequate?
13   A    No, I don't believe that.
14   Q    And if I understand correctly, these officers were
15   not given any additional training on what to do in a hospital
16   setting if they are guarding an in-custody patient by the city
17   of La Feria itself?
18   A    No.
19   Q    Now, the city of La Feria, would it be correct to
20   say that, from time to time, is probably going to have someone
21   who would be a patient at a -- at a hospital, not necessarily
22   Valley Baptist, but at some healthcare facility?
23   A    That --
24   Q    You are pretty sure that that is going to happen at
25   some point in time?

**Page 83**

1    A    Okay. What are -- what are you asking?
2    Q    Is -- is that -- or would you agree with that or
3    would the city agree with that?
4    A    I have no idea, sir. Maybe.
5    Q    Okay.
6    A    It might happen.
7    Q    Okay. Well, let me ask, do you believe as a chief
8    of police that it is forseeable that at some point somebody
9    who you-all arrest is going to wind up needing medical
10   attention --
11   A    Yes.
12   Q    -- of one kind or another?
13   A    Yes.
14   Q    And that you-all, the city, may be required to send
15   one of the police officers to -- to guard that person?
16   A    Yes.
17   Q    That is something that happens. It may not happen
18   every day, but it does happen from time to time in police
19   work.
20   A    Yes.
21   Q    Given those circumstances, do you believe -- do you
22   -- is it -- is it the city's position that the training that
23   the police officers would receive is adequate given that it
24   does not train an officer on what they should do and not do in
25   a -- in a hospital or healthcare facility setting?

**Page 84**

1    A    Yes, sir. I believe it is adequate.
2    Q    Okay. Now, you mentioned training that -- or,
3    excuse me. You mentioned correctional officers. Is there
4    specific training that is available to correctional officers
5    on how to manage or -- or handle people who are in custody?
6    A    I believe so. There at the Texas state
7    penitentiaries. You have to go through their little academy.
8    Q    Okay. Is that training available or something that
9    is available to -- to peace officers as well?
10   A    No.
11   Q    Is the information that is taught at those -- at
12   those type of institutions something -- the information, not
13   the course itself, but the information, the techniques that
14   they teach, is that something that can be made available to
15   law enforcement officers as well as correctional officers?
16   A    At one point or another, yes. In the near future.
17   Q    That -- is that something that the city of La Feria,
18   if it had chosen to do so, could have made available to their
19   officers?
20   A    I believe so.
21   Q    And the -- for whatever reason, the city of La
22   Feria, at least at -- at the time this incident had occurred
23   with Officer Ramirez, had chosen not to do that?
24   A    There wasn't nothing available like that.
25   Q    Okay. The -- you mean the knowledge was not there

**Page 85**

1    or the techniques were not known?
2    A    No. The training was -- was -- was not there. The
3    training, we didn't know about that.
4    Q    Okay. Let me see if I understand. The training
5    that you are talking about was not available from -- was not
6    provided by the city of La Feria?
7    A    What training are you referring to? To as a peace
8    officer or a prison guard?
9    Q    As a correctional officer.
10   A    We are -- we are not correctional officers.
11   Q    Okay. What I am trying -- what I am trying to ask
12   you is you told me earlier that, look, we don't teach -- we
13   don't teach potential police officers how to guard people --
14   A    Correct.
15   Q    -- in any setting because we are not correctional
16   officers.
17   A    Correct.
18   Q    What I am asking, it is true, isn't it, that -- that
19   those techniques and those procedures were known prior to
20   September of 2000?
21   A    No.
22   Q    They were not known?
23   A    No.
24   Q    They were known to correctional officers but not to
25   peace officers?

22 (Pages 82 to 85)

DONATO GARCIA                                                              April 9, 2003

Page 86

1    A   Possibly. I don't know.
2    Q   Well, I guess what I am asking you, Chief -- is I am
3  not disagreeing with you or arguing with you about the fact
4  that La Feria did not -- did not provide that training to its
5  police officers. And I am not -- I am not going to take issue
6  with whether they should have or shouldn't have.
7        What I am asking you is if the city had chosen to
8  gather that information and provide it their peace officers,
9  that information and those techniques were known in the law
10 enforcement profession. Is that correct?
11   A   That would be up to the police academy, sir.
12   Q   Okay. All right. But at the time that this
13 occurred, the city of La Feria -- was the city aware that
14 these officers did not provide that training in to how to guard
15 in-custody patients or people in a -- in a correctional
16 setting?
17   A   Not at the police academy, no.
18   Q   Okay. And that's what I am trying to find -- that's
19 what I am trying to ask you about. If the city had chosen to
20 -- and I am -- I am not arguing and I am not trying to tell
21 you that they were good or bad or right or wrong for doing it
22 or not doing it.
23       What I am asking is is it correct if they had chosen
24 to, that information was available to the city of La Feria to
25 provide to its officers?

Page 87

1    A   No. It was not available to the city.
2    Q   It was not?
3    A   No.
4    Q   Okay. All right. So, then, I take it, then, that
5  it would be the city's position that the city -- well, let me
6  ask. Were any of the -- do you know if any of the police
7  officers who were employed by the city of La Feria in
8  September of 2000 had been correctional officers before?
9    A   No, sir.
10   Q   You don't know one way or an other or -- or they
11 were not?
12   A   I don't believe they were.
13   Q   Okay. I take it then it is the position of the city
14 of that the city didn't care one way or the other whether
15 their police officers had training on how to guard people in a
16 correctional facility or hospital facility or any other type
17 of facility.
18   A   The police academy --
19       MR. GARZA: Objection. Argumentative.
20       THE WITNESS: The police academy teaches our
21 officers the TCLEOSE-mandated courses that they have, and
22 that's what we deal with.
23   Q   (BY MR. BARRIENTOS) Okay. Can you tell me what
24 specifically was taught?
25   A   Just about family violence, culture diversity,

Page 88

1  sexual assaults, let's see, child abuse. Some other
2  courses --
3    Q   Okay.
4    A   -- that I can't think of right now.
5    Q   Those sound like -- like areas where people are
6  taught in what context certain offenses may occur and types of
7  offenses, violations of the penal code, different things
8  like -- is that what you are talking about?
9    A   The penal code, yeah.
10   Q   What I am talking about is it sounds like you
11 were -- you were saying to me that the academy provides
12 training who how to guard people who are in custody.
13   A   No, sir.
14   Q   It does not. So, for example, training or
15 information on what type of restraints to use on -- on an
16 in-custody individual is not given at the academy?
17   A   Handcuffs.
18   Q   Handcuffs. Okay. Beyond handcuffs, is there any
19 other training?
20   A   That's it, sir.
21   Q   Okay. Training on -- on -- on physical facilities
22 and on proximity to prisoners or in-custody individuals, those
23 methods or procedures for keeping safe distances, for keeping
24 other people out of danger are not taught at the police
25 academy.

Page 89

1    A   Just handcuffs.
2    Q   Okay. When you say just handcuffs, you mean how do
3  -- how to put them on, how to take them off, how to make sure
4  that they are not cutting off circulation?
5    A   Yes.
6    Q   Those types of things?
7    A   Yes.
8    Q   Those things are taught.
9    A   Yes.
10   Q   But in terms of being responsible for watching a
11 person, guarding a person, the physical location you are in,
12 the furnishings, the dimensions of the room, the type of
13 restraints used, if any, the degree of restraint that is
14 required based upon the person's physical stature and medical
15 condition, mental condition, those things are not taught at
16 the police academy?
17   A   Well, we are not doctors, sir.
18   Q   I understand that. And I am not -- I am not arguing
19 with you, Chief. I am not -- I am not fussing at you or
20 getting mad at you.
21   A   Okay. No.
22   Q   I am just trying -- trying to establish what they
23 teach and what they don't teach.
24   A   Uh-huh.
25   Q   So my question is do they teach things like that at

23 (Pages 86 to 89)

DONATO GARCIA                                                                    April 9, 2003

Page 90

1  police academy?
2    A   They teach the proper use of handcuffs.
3    Q   Okay. And that -- that was going to be the extent
4  of restraints and/or guarding people who are in custody?
5    A   Yes.
6    Q   Okay. All right, then. Is it fair to say, then,
7  beyond what is taught at the police training academy and how
8  to apply the proper use of -- of restraints, the hand
9  restraints, the handcuffs, excuse me, that the city of La
10  Feria doesn't require any greater training in terms of
11  guarding or other type restraints by its police officers?
12    A   Any what, sir?
13    Q   Any great -- any further training on restraint
14  methods or security techniques -- techniques for in-custody
15  people.
16    A   No.
17    Q   And it is okay if they have it. You don't get
18  penalized for that. But the city doesn't require it or even
19  recommend it?
20    A   We don't have it.
21    Q   So the city is basically -- is indifferent to that
22  type of training?
23        MR. GARZA: Objection. Form.
24    Q   (BY MR. BARRIENTOS) If you have it, great. And if
25  you don't have it, that's okay, too.

Page 91

1        MR. GARZA: Objection. Form.
2    Q   (BY MR. BARRIENTOS) Is that correct?
3    A   We don't -- we don't -- the academy teaches the
4  proper use of handcuffs. It does -- does not teach an officer
5  how to guard a prisoner.
6    Q   And that's what I am saying. The city of La Feria
7  and its police department don't care one way -- I am not
8  saying don't care. I don't mean that if a negative or
9  pejorative way. But it does not make a difference to them
10  whether an officer has that additional training or not as long
11  as they come through the certification process from the
12  academy and -- and receive that certification?
13    A   Once they come through the academy, sir, they are
14  certified, they are commissioned officers, and they are hired
15  on at the P.D.
16    Q   Would that be a yes to my question?
17    A   Yes.
18    Q   Okay. All right. Chief Garcia, on -- with respect
19  specifically to Officer Ramirez, and I know that we have been
20  provided a personnel file, but let me ask a couple of just
21  general questions. All right. I don't have it in front of
22  me.
23        Was Officer Ramirez in any way reprimanded for the
24  incident which occurred on September the 19th of 2000?
25    A   No.

Page 92

1    Q   Okay. Is there anything in his personnel file that
2  indicates he violated any policy of the city of La Feria or
3  its police department?
4    A   No.
5    Q   Was there an investigation into whether that, in
6  fact, occurred?
7    A   The investigation was conducted by the Harlingen
8  Police Department.
9    Q   And I appreciate your specifying that. Did the city
10  of La Feria or the city of La Feria Police Department conduct
11  its own investigation as into whether a violation of any of
12  its policies or procedures occurred on September the 19th?
13    A   I am not aware if they -- if the former chief did it
14  or not.
15    Q   Okay. If the -- if the former -- Chief Gonzalez,
16  Chief Gonzalez had done so, would that be reflected in the
17  personnel file?
18    A   It would show, yes.
19    Q   Now, have you read or looked at, I guess it would be
20  Exhibits 1 through 10, with the exception of 9, which is the
21  videotape out on the scene that they have talked about you
22  don't have personal knowledge of, have you reviewed the
23  information or read the reports, specifically the autopsy
24  report on Exhibit Number 4, the custodial death report of the
25  La Feria Police Department, Exhibit Number 6, and the

Page 93

1  Harlingen P.D. report provided to the La Feria P.D., Exhibit
2  Number 7, have you read those documents?
3    A   No, sir.
4    Q   Are you personally familiar with the details of the
5  incident that occurred at Valley Baptist Medical Center
6  between September 17th and the time of Mr. Gonzalez' death,
7  September 19th?
8    A   No, sir.
9    Q   You are here and you are able to talk to us about
10  issues of policy and things of that nature, but you do not
11  have knowledge of the incident itself?
12    A   No, sir.
13    Q   Well, let me ask you, as part of your preparation
14  for the deposition, have you had occasion to review any of the
15  statements that were given by Officer Ramirez or the other
16  investigating officers in this case?
17    A   No. This -- the investigation was handed over to
18  the former chief and the confidential -- so I didn't get to
19  see it or review it.
20    Q   All right. In any case, to your knowledge, there
21  have been no -- well, let me ask. Your testimony is, from the
22  city of La Feria, that Officer Ramirez was not reprimanded for
23  the incident which occurred on September the 9th.
24    A   No.
25    Q   He was not demoted?

24 (Pages 90 to 93)

DONATO GARCIA                                                                April 9, 2003

| | |
|---|---|
| **Page 94** | **Page 96** |

**Page 94**

1   A  No.
2   Q  He was not penalized in any manner in his
3  employment.
4   A  No.
5   Q  Okay. Do you know whether the city of La Feria has
6  taken a position that he was -- well, let me ask. You may
7  have told me this earlier, but forgive me, but is it the city
8  of La Feria's position that he was acting within the course
9  and scope of his employment at the time this incident
10  occurred?
11   A  Yes.
12   Q  What we don't know is whether he was being
13  compensated for that -- for that work --
14   A  No.
15   Q  -- at that point in time. All right. And was
16  Officer Ramirez in any way -- was he issued any type of
17  commendation, you know -- I think I have asked you whether he
18  got in trouble for what happened. If he didn't get in trouble
19  for what happened, did he get recognized for what happened in
20  some type --
21   A  No.
22   Q  -- of positive way? Were his duties altered or
23  changed at all?
24   A  He became a full-time officer with the city of La
25  Feria.

**Page 95**

1   Q  Okay. So since that time, he has -- let me ask
2  this. Am I to understand from that that he has not returned
3  to duties as a dispatcher?
4   A  No, he is no longer a dispatcher.
5   Q  Were there any findings by the city -- were there --
6  you testified that to your knowledge there was no separate
7  investigation as to the propriety of -- of Officer Ramirez'
8  actions by the city of La Feria or the city of La Feria Police
9  Department.
10   A  No.
11   Q  All right. And, if I understand, you were not able
12  to testify as to the investigation because it was conducted by
13  the Harlingen Police Department?
14   A  Correct.
15   Q  And I take it the city of La Feria has neither --
16  has neither condemned nor condoned one way or the other
17  Officer Ramirez' actions on that night?
18   A  Officer Ramirez acted accordingly.
19   Q  Okay. Accordingly to what?
20   A  To the -- to the use of deadly force.
21   Q  Okay. Is that an opinion you are expressing on
22  behalf of the city of La Feria or is that a personal opinion
23  as chief you are expressing?
24   A  He followed the policy. He followed what he was
25  trained to do at the academy.

**Page 96**

1   Q  All right. What I want to ask you is can you tell
2  me what he was trained to do in the academy. And -- and I
3  know that is probably more than a one-sentence answer, but I
4  am going to ask you to break it up. First of all, tell us
5  what the city of La Feria believes he was trained to do in the
6  training academy.
7   A  The training academy, he goes through the academy.
8  He has been trained all sorts of law, penal codes. He is
9  trained in the use of force, the use of deadly force.
10   Q  What is the city of La Feria's position on the
11  training that Officer Ramirez received on the use of deadly
12  force?
13   A  That is -- that is -- that is the training that he
14  has gotten and that is the training as provided by the
15  academy.
16   Q  Okay. Well -- and I understand that. Where -- from
17  what I am asking is what was it?
18   A  What was it?
19   Q  Yes, sir. What did they teach him specifically?
20   A  That -- I just told you, sir. The use of force,
21  the use of deadly force.
22   Q  All right. What I am trying to find out, Chief
23  Garcia, is what did they teach him, if -- if anything, or if
24  you know, about when it is appropriate to use deadly force?
25   A  The officer that is trained knows when to use deadly

**Page 97**

1  force.
2   Q  Okay. I am sorry. Now -- now I think I understand
3  you. The training that the officer receives at the academy
4  basically teaches the officer that it is -- it is up -- it is
5  within their judgment as to when that situation arises.
6   A  It is within their fear of life, the fear of
7  imminent danger for him and others.
8   Q  All right. And you made a statement that you
9  believe or that I guess the city is taking the position that
10  Officer Ramirez acted in accordance with that policy.
11   A  In accordance to his training, yes.
12   Q  Okay. What specifically is it that the city of La
13  Feria contends are the -- is the act or are the acts which
14  made Officer Ramirez reasonably -- reasonably believe that he
15  was in imminent danger of death or serious bodily injury at
16  the time this incident occurred?
17   A  He feared for his life.
18   Q  Okay. I am -- I am going to ask if you will -- I
19  understand that is the position that that is what the
20  procedure or the policy calls for. That is, don't use deadly
21  force unless you feel that death or serious bodily injury is
22  imminent or immediate.
23      What I am asking you as a representative of the city
24  of La Feria is what specific acts or events occurred which the
25  city of La Feria believes reasonably placed Officer Ramirez in

(210) 377-3027               ESQUIRE DEPOSITIONS SERVICES         FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100        SAN ANTONIO, TEXAS 78230          (800) 969-3027
ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                         April 9, 2003

**Page 102**

1  full-time officer was not called to come and perform that
2  duty?
3      A  No.
4      Q  Okay. To your knowledge, had Officer Ramirez ever
5  guarded an arrestee or a pretrial detainee or prisoner?
6      A  No officer has ever guarded a -- none of the La
7  Feria officers had ever guarded --
8      Q  Guarded anyone at the hospital?
9      A  No.
10     Q  To your knowledge, prior to this -- to this
11 incident, had Officer Ramirez ever placed anyone under arrest?
12     A  Yes. He has placed a lot of people under arrest.
13     Q  Okay. And, again, I am sorry because I haven't had
14 a chance to look at the personnel file. To your knowledge,
15 has Officer Ramirez, prior to the time of this incident, ever
16 had occasion to draw his weapon?
17     A  Not to my knowledge.
18     Q  Has he ever had occasion to fire his weapon?
19     A  No.
20     Q  Has he ever had occasion to use the other weapons
21 which he was authorized to carry as a peace officer,
22 specifically his night stick or ASP and/or the mace spray?
23     A  No, not to my knowledge.
24     Q  Was Officer Ramirez used -- although he was a
25 dispatcher primarily at that time, is it a situation where he

**Page 103**

1  was used pretty much interchangeably with the other officers
2  in terms of duty assignments or was -- was the thought behind
3  asking him to come to the hospital that if -- if Officer
4  Ramirez is there, then that means we can leave our patrolman
5  out on the street and we can have him come and perform this
6  duty?
7      A  No. The -- the --
8      Q  Was it a manpower issue I guess is what I am asking?
9      A  No. The reserve officers are a -- are commissioned
10 officers. And they must work certain hours to keep their
11 license up.
12     Q  Okay.
13         MR. GARZA:  Counsel.
14         MR. BARRIENTOS:  Yes.
15         MR. GARZA:  He needs to make a phone call at 3
16 o'clock.
17         MR. BARRIENTOS:  Sure.
18         MR. GARZA:  Can we take a break?
19         MR. BARRIENTOS:  Sure.
20         (Short break)
21     Q  (BY MR. BARRIENTOS) Chief Garcia, let me see. There
22 is a couple of other things I want to go over with you in
23 terms of documents. First of all, on the autopsy report, have
24 you -- have you had a chance to review the autopsy report in
25 this case?

**Page 104**

1      A  No.
2      Q  Okay. Let me ask you -- if you haven't had -- had a
3  chance to review it yet, let me ask you to assume a couple of
4  things for purposes of the question and then I am going to ask
5  you a hypothetical. Is the use of deadly force, specifically
6  a firearm, a handgun -- is -- is the city's policy with regard
7  to use of a firearm and deadly force, does it permit use of
8  deadly force in the use of a firearm -- does it limit it or
9  restrict it in any -- in any when they -- once an officer
10 decides that they need to use it? In other words, is an
11 officer taught or is it the policy of the city of La Feria
12 that an officer should use the least amount of force required
13 in order to accomplish whatever objective that officer has in
14 mind?
15     A  It is taught at the academy, yes.
16     Q  Okay. And would that be true for use of any force,
17 including deadly force?
18     A  No. That is not true, because the officer uses the
19 force necessary until the -- the threat is eliminated.
20     Q  Okay. So, for example, if an officer is able to
21 eliminate a threat by use of verbal commands, then they would
22 not be -- it would be a violation of policy for them to -- to
23 exceed a verbal command if a verbal command will do it?
24     A  Yes.
25     Q  In other words, if they tell someone to stop a

**Page 105**

1  particular activity or give someone an order and that person
2  complies or -- or does not present a threat, if the threat is
3  removed or eliminated, then the officer's use of force should
4  stop at that point.
5      A  Correct.
6      Q  Is the use of force -- does the policy permit an
7  elevation of the level of force -- strike that. Let me start
8  again. Under what circumstances does the policy of the city
9  of La Feria permit an elevation of the level of force used by
10 a police officer?
11     A  When there is the fear for life.
12     Q  Okay. Well, let me ask. If an officer is presented
13 with a physical threat -- let's -- let's say an officer gets
14 into an altercation where he is trying to subdue a suspect and
15 the suspect is striking the officer with his fists, okay, the
16 officer, under that -- under that scenario would be permitted
17 to use similar physical force to subdue the suspect. That is,
18 the officer could use physical force and/or strike them with
19 their hands in order to subdue them or remove the threat.
20     A  Yes.
21     Q  If the officer uses similar force in response to the
22 force presented to them, are they then authorized by the
23 policy to exceed that force and go to a higher level of force
24 if their use of the -- of the similar response is not
25 successful in removing -- removing the threat?

27 (Pages 102 to 105)

DONATO GARCIA

April 9, 2003

Page 106

1   A   If the threat is there, yes.
2   Q   So, for example, the officer doesn't have to wait --
3   if an officer is -- if someone is trying to -- gets in a fist
4   fight with an officer, the officer can fight back.
5   A   Yes.
6   Q   If the officer fights back and that does not remove
7   the threat, then the officer can go and use, perhaps, their
8   mace?
9   A   A Mace.
10  Q   If that still does not remove the threat, then the
11  officer would be permitted to use, perhaps, the night stick or
12  baton or the --
13  A   ASP.
14  Q   ASP.  Is that correct?
15  A   Yes.
16  Q   And if -- and, now, those forms of force that I have
17  just mentioned, physical -- using an officer's own body, that
18  is fists or feet, use of the mace or use of the baton or ASP,
19  those are all forms of -- of non-deadly force?
20  A   Correct.
21  Q   Okay.  Now, if the officer is presented with the
22  same degree of force or is presented with non-deadly force,
23  are they permitted, then, to go above those three levels or
24  those three items to the use of a firearm in order to remove
25  the threat?

Page 107

1   A   If the threat is there, sir, and the officer fears
2   for his life, yes.
3   Q   All right.  So, for example, under that -- under
4   that interpretation, an officer may be confronted with -- with
5   an individual who is -- who may be fighting or uncooperative
6   but not have a firearm or a knife or any kind of weapon.  In
7   other words, the only weapons may be their hands or their
8   fists.  And, if I understand you correctly, it would be the
9   policy of the city of La Feria that an officer under those
10  circumstances would be permitted to use deadly force if that
11  is what -- if they felt that they were in danger of death or
12  serious bodily injury?
13  A   No.
14  Q   No?  Okay.  Then tell me where I am -- where I went
15  wrong there.  At what point would they be allowed to use
16  deadly force, if at all?
17  A   When there is -- when there is a weapon used --
18  Q   Okay.
19  A   -- against the officer.
20  Q   So if an officer is confronted with force or a
21  threat, but the threat does not include a weapon of some kind,
22  then the officer, under those circumstances, is never going to
23  be allowed, under the policy, to use deadly force?
24  A   No.
25  Q   Okay.  So their alternative -- excuse me.  Their

Page 108

1   options are to try and subdue the subject with similar
2   force --
3   A   Yes.
4   Q   -- in response?  Is an option for the officer to
5   abate the altercation or leave the altercation, that is,
6   escape, get away, put distance between themselves and the
7   suspect?  Is that an option that is taught to officers?
8   A   In the academy, I believe so.
9   Q   Okay.  So, for example, are officers taught that in
10  a situation where the officer may not be -- let's say maybe he
11  physically overmatched.  And that -- that happens.  There
12  is -- you know, there is huge guys out there that lift
13  weights, you know, five days you a week a lot bigger than you
14  and I.  And, you know, my size, I can sympathize with the
15  person in that situation.  But is -- is an option that the
16  officers have, and that they are taught, is that rather than
17  engage in a futile effort to try and subdue someone, that they
18  may leave the altercation or put distance between themselves
19  and the subject for safety purposes?
20  A   In the academy, we are trained to face the
21  altercation, sir.
22  Q   Okay.  So, then, the training -- let me see if I
23  understand.  Let me make sure I understand.  Under no -- under
24  no circumstances is an officer permitted to extricate
25  themselves from a physical altercation with a subject?

Page 109

1   A   You can put space between you, but if the individual
2   keeps coming at you and striking at you. . .
3   Q   Okay.  All right.  Now, in terms of the use of
4   deadly force, if I understand your testimony, the city of La
5   Feria's policy is that an officer can only use deadly force if
6   they are confronted by a subject who has a weapon.
7   A   Yes.
8   Q   Is that correct?
9   A   Yes, sir.
10  Q   Is there a -- a description or some type of
11  indication as to what type of weapon we are talking about or
12  is that -- is that subject to some interpretation?
13  A   Any weapon that can cause bodily injury or harm to
14  an officer.
15  Q   Okay.  Bodily injury or harm or death or serious
16  bodily injury?
17  A   Yes.  To the officer.
18  Q   Because -- and I am asking that because, as I
19  understand, there is difference.  It has been a while since I
20  have been a prosecutor, but there is a difference between
21  bodily injury, serious bodily injury, and death.  Is that your
22  understanding as well?
23  A   The -- the -- as long as there is threat, imminent
24  danger to the officer.
25  Q   Okay.  The reason I ask, because in the policy, and

28 (Pages 106 to 109)

DONATO GARCIA                                    April 9, 2003

**Page 110**

1 I can't remember the exact page number, but it is one of those
2 sections. I think it is Section 6. It says the officer is --
3 can use deadly force only if they are presented with the
4 immediate threat of serious -- of death or serious bodily
5 injury.
6    A  Correct.
7    Q  Okay. My understanding is serious bodily injury is
8 -- is a different thing from bodily injury. It is more
9 serious or more extensive than just bodily injury.
10   A  Yes.
11   Q  Is that your understanding?
12   A  Yes.
13   Q  Okay. So an officer is not allowed to use deadly
14 force if they are confronted with a subject who may, in fact,
15 injure them at a -- if that injury does not rise to a level of
16 serious bodily injury or death.
17   A  Yes.
18   Q  So it would not be proper, for example, for an
19 officer, in response to a -- a wrestling situation or a fist
20 fight, to take out his service revolver and shoot a subject.
21       MR. GARZA: Objection. Form.
22       THE WITNESS: If the threat is there and the
23 officer cannot escape and he fears for his life, he can.
24   Q  (BY MR. BARRIENTOS) Okay. So from that answer, I
25 take it it sounds like there are situations in which the city

**Page 111**

1 feels that an officer is permitted to use deadly force even in
2 a situation where the subject has no weapon.
3    A  It depends on the situation, as to how the officer
4 is being attacked.
5    Q  Okay. And that decision is left to the sole
6 discretion of the officer who finds themselves in that
7 situation?
8    A  In that situation.
9    Q  Okay. And other than what is taught at the training
10 academy, the city does not give any other guideline to the
11 officer as to when that situation might arise?
12   A  No.
13   Q  Okay. All right. In this particular case, is it --
14 what is the level of threat that the city believes Officer
15 Ramirez was presented with at the time this incident occurred?
16   A  He was presented with a level of death, seriously
17 bodily injury to cause death.
18   Q  Okay. What I tried to ask about earlier and maybe I
19 should have gone about it this way to begin with, but what is
20 it that Mr. Gonzalez -- that the city of La Feria believes Mr.
21 Gonzalez did that constituted a threat of serious bodily
22 injury or death?
23   A  The -- the handcuffs. Those are deadly weapons.
24   Q  Okay. And from reading the -- the reports, my
25 understanding is from Officer Ramirez -- we have haven't taken

**Page 112**

1 his deposition yet, but from the other statements that he has
2 given, my understanding is that his contention is Mr. Gonzalez
3 picked up a set of -- you called them handcuffs. And I
4 believe they have been referred to as shackles as well.
5    A  Yes, sir.
6    Q  And -- and used those and swung at and struck
7 Officer Ramirez.
8    A  Yes.
9    Q  Okay. Now, the shackles that we are talking about,
10 were those equipment that is issued by the city of La Feria
11 Police Department?
12   A  Yes. Those -- those are ours.
13   Q  And do you happen to have a set of those with you?
14   A  No.
15   Q  Okay. Do you happen to have a set of those at the
16 police department?
17   A  Yes.
18   Q  I was a little confused when I first read through
19 this, because when I heard -- when I heard the word leg
20 restraint -- restraint or shackle, I had in mind the things
21 that the prisoners would wear during a trial, that is the
22 brace on the leg that locks the knee so that they can't run.
23 Apparently I was wrong about that. We are talking about a set
24 of metal clasps that go around the ankles of a prisoner.
25   A  Correct.

**Page 113**

1    Q  And there is a chain in between them just like there
2 is on a set of handcuffs.
3    A  Yes.
4    Q  But the chain is longer to allow a prisoner a bigger
5 gait so they can take small steps to walk to the bathroom or
6 wherever it is that they need to go.
7    A  Correct.
8    Q  The set of -- of -- I am going to call them
9 shackles, that were in the hospital room at the time, can you
10 tell us, do you know who those belonged to, which officer they
11 were assigned to or checked out to?
12   A  I believe it was Ysidro Delgado.
13   Q  And Officer Delgado left those there for use by
14 other officers who would come in after him?
15   A  Right.
16   Q  Was there any policy in effect by the city of La
17 Feria which dictated or guided officers on when those leg
18 restraints had to be used?
19   A  No.
20   Q  Is there any guideline, written or verbal, that
21 indicated or guided officers on when those shackles should be
22 used?
23   A  No.
24   Q  Had the police department, La Feria P.D. or the city
25 of La Feria received any information from Valley Baptist

29 (Pages 110 to 113)

DONATO GARCIA                                                                                                                    April 9, 2003

Page 118

1  Q  Okay. Was it within a few days? Was it weeks or
2  months later? Or was it sometime recently?
3  A  Sometime recently, I believe.
4  Q  Okay. Was it in the context of this -- this
5  litigation in this case?
6  A  Yeah, I think so. I believe so.
7  Q  Okay. So other than the context of this litigation
8  or this case, it is the city's testimony that they have had no
9  knowledge of these --
10  A  No.
11  Q  -- guidelines or policies?
12  A  No.
13  Q  Have you had a chance to review the contents of
14  Exhibits 11, 12, and 13 other than what I have just shown you
15  right there?
16  A  No.
17  Q  It may be a little bit unfair for me to ask you
18  about the details of these documents if you haven't had a
19  chance to review them, but let me ask you this, just
20  generally, if these documents call for specific procedures
21  with regard to restraints that were different from what was
22  being used at the time, would the city of La Feria have
23  instructed its police officers to follow those guidelines?
24  A  Yes. If we had that before the incident, yes.
25  Q  Chief Garcia, let me ask you couple of other

Page 119

1  questions about -- about restraints. You said it earlier that
2  it was the city's position that Officer Ramirez was faced
3  with -- he was in fear of his life and that he was faced with
4  what he believed to be potentially or deadly or deadly force
5  or a threat that constituted a risk of serious bodily injury
6  for his life.
7  A  For his life.
8  Q  For his life. Is that correct?
9  A  Yes.
10  Q  What, if any knowledge, did the city of La Feria,
11  including its police department, have about Gustavo Gonzalez
12  at the time that it transported him from -- from the public
13  roadway or near the public roadway to the Valley Baptist
14  Medical Center?
15  A  None whatsoever.
16  Q  Okay. Was the city of La Feria or its police
17  officers provided with any information as to Mr. Gonzalez'
18  mental health status?
19  A  No, sir.
20  Q  Did the city or its police department know that Mr.
21  Gonzalez had a long history of mental illness?
22  A  No, sir.
23  Q  Did the city or its police officers know that Mr.
24  Gonzalez had a long history of having been prescribed
25  medication for mental illness?

Page 120

1  A  No.
2  Q  Did the city or its police department know that Mr.
3  Gonzalez had a -- did the city have knowledge that Mr.
4  Gonzalez might be a suicide risk?
5  A  No, sir.
6  Q  Did the city of La Feria receive any such
7  information of this nature between the time Mr. Gonzalez was
8  admitted to the hospital and the time that Officer Ramirez had
9  the altercation and shot Mr. Gonzalez?
10  A  None whatsoever, sir.
11  Q  Let me ask. Does the city of La Feria Police
12  Department have a policy with regard to the restraint and/or
13  security of persons who are either suffering from mental
14  illness, mental disease, or suicidal ideations?
15  A  Do we -- do we have any information on that?
16  Q  No, sir. Do you have any policies -- does the city
17  have any policies that -- that dictate how officers are
18  supposed to handle or deal with people who are either mentally
19  ill or have suicidal ideations?
20  A  No.
21  Q  Okay. So, if I understand that -- do I take that to
22  mean that -- well, let me ask it this way. Had the -- had
23  that information been provided to the city of La Feria and its
24  police department, in other words, that Mr. Gonzalez had a
25  long history of mental illness, that he had been or was

Page 121

1  supposed to have been taking medication for that illness, or
2  that he had suicidal ideations or tendencies, would that have
3  made a difference in the manner in which Mr. Gonzalez was
4  restrained or guarded?
5      MR. POPE: Objection. Form.
6      THE WITNESS: I don't know, sir.
7  Q  (BY MR. BARRIENTOS) Well, let me ask. If -- if --
8  if the city did not receive any instruction -- your testimony
9  is the city did not receive any instruction or guideline from
10  the hospital about how to restrain Mr. Gonzalez. And if your
11  testimony is also that the city had no information that Mr.
12  Gonzalez had a history of mental illness that required
13  medication for that mental illness or had expressed suicidal
14  ideations, how was it that it was determined what restraints
15  should be used for Mr. Gonzalez?
16  A  Just one handcuff to the bed.
17  Q  Okay. Well, what I am asking is can you tell me
18  whether that was a decision made by city of La Feria or
19  whether that was a decision made by someone else?
20  A  That was a decision made by the first officer that
21  was there.
22  Q  Do you know -- the first officer there being?
23  A  Ysidro Delgado.
24  Q  Officer Delgado. Do you know whether Officer
25  Delgado consulted with anyone from the hospital about whethe

31 (Pages 118 to 121)

DONATO GARCIA                                                                April 9, 2003

---

**Page 122**

1  that restraint was adequate or proper or appropriate in this
2  case?
3      A  I don't know.
4      Q  Is it the city's position that Mr. Gonzalez, upon
5  his admission to the hospital, was a serious threat to the
6  safety of other persons?
7      A  To the safety of what?
8      Q  Of other -- of other people?
9      A  We don't know that.
10     Q  The city did not know that at the time?
11     A  No.
12     Q  Okay.  At some time between his admission and the
13 time of the shooting, did the city of La Feria obtain or
14 receive information that made it believe that Mr. Gonzalez was
15 a threat to the safety of himself or other people?
16     A  No.  Not to my knowledge.
17     Q  At the time -- at the time of the -- so let me see
18 if I understand.  Up to the time before the shooting occurred,
19 I am talking about the events that led up to it, if we -- if
20 we if assume for purposes of this question that Officer
21 Ramirez' testimony about what happened occurred in the way
22 that he explains it, is it the testimony of the city that up
23 to that point in time the city had no reason to believe that
24 Mr. Gonzalez was a threat to himself, to -- to the safety of
25 himself or other people?

---

**Page 123**

1      A  We had no knowledge of that.
2      Q  And would the answer be the same in terms of whether
3  he had -- whether he was -- strike that.  Let me go back.  Is
4  that also true as far as the city's understanding about Mr.
5  Gonzalez' mental health or stability, number one.  And his --
6  whether he was a suicide risk?
7      A  We had no knowledge of that either, sir.
8      Q  And -- and -- and I want to make sure I understand.
9  The city's position is it had no knowledge of that up to and
10 including the time of the shooting?
11     A  Yes.
12     Q  Okay.  All right.  Chief Garcia, with respect to the
13 actions taken by Officer Ramirez, can you tell me what your
14 understanding is or what the city's understanding or position
15 is as to the actions that he took -- I don't mean to
16 propriety.  I don't mean whether they were good actions to
17 take or not.  Can you tell me what the city's position is as
18 to what Mr. -- Officer Ramirez actually did during the
19 sequence of events?
20     A  He used -- first he started off with very little
21 force, minimum force, his presence, his commands, his mace,
22 his -- his baton, and the individual just kept coming at him,
23 swinging at him with the leg irons, the shackles.  And the
24 individual wouldn't stop.  And that elevated the -- the threat
25 to deadly force.

---

**Page 124**

1      Q  Chief Garcia, is it the position of the city that
2  Officer Ramirez, prior to the time he made the decision to use
3  deadly force, should have tried to extricate himself from the
4  situation, or remove himself from the room, the hospital room,
5  where this occurred?
6      A  Officer Ramirez did everything he could he -- to
7  extract himself from that situation.  The individual kept
8  coming at him with the bed and barricaded it against the door
9  where he had no exit.
10     Q  Let me -- let me come back and be -- try and be a
11 little more specific.  It is my understanding from your answer
12 that the city's position is that Officer Ramirez did
13 everything he could to -- prior to using deadly force.  He
14 used the other levels of force before then.  Is that correct?
15     A  Correct.
16     Q  What I am trying to ask is -- let me ask it a
17 different way.  Would it have been appropriate, or should --
18 should an officer if he was in Officer's Ramirez' position
19 have tried to leave the room, that is, escape the situation
20 before deciding to use deadly force?
21        MR. GARZA:  Objection.  Form.
22     Q  (BY MR. BARRIENTOS) And I -- I am not saying Officer
23 Ramirez didn't try to do that.  What I am trying to set out is
24 what is the procedure for --
25     A  We -- we are trained at the academy, sir, not to run

---

**Page 125**

1  from incidents.
2      Q  Okay.
3      A  Okay.
4      Q  So, then, under this policy, Officer Ramirez would
5  not be allowed to try and leave the room in order to escape
6  this imminent threat of death or serious bodily injury?
7      A  He tried.
8      Q  Okay.  I am -- I am not arguing right now with you
9  whether he tried or didn't.  That question we will talk with
10 him about tomorrow.  What I am asking is is an officer
11 permitted to -- is one of their options to leave the room
12 under that -- under those circumstance?
13     A  That would be up to the officer.
14     Q  Okay.  So it is permitted?
15     A  It would be up to the officer if it was.
16     Q  Okay.  And that's what I am saying.  I am -- I am
17 not asking whether it is right or wrong in this situation.
18 What I am asking is that a permissible choice, permissible
19 option, that the officer has if the officer chooses to do so?
20     A  That would be up to the officer.
21     Q  Yes, sir.  Obviously that is up to the officer in
22 those particular -- in that particular circumstance.  And, I
23 -- like I said, I am not asking you this question to commit
24 whether Officer Ramirez did right or wrong or whether he tried
25 to get out or not.  What I am asking -- what I am trying to

---

32 (Pages 122 to 125)

DONATO GARCIA                                                      April 9, 2003

**Page 126**

1  establish is whether that is an option that is acceptable
2  under the policy of the police department.
3      A  He is not going to let an individual harm anybody
4  else. And no officer is going to do that. So he had the
5  situation there in that room and he was going to keep it
6  there. We had other people in the hospital, other patients,
7  nurses and doctors.
8      Q  And -- okay. So I am still -- I am still trying to
9  understand where we are at. Does that mean that Officer
10  Ramirez under that policy would be permitted to try and leave
11  the room or under your-all's -- under the policy of the city
12  of La Feria was he required to stay there in the room and
13  subdue Mr. Gonzalez.
14      A  It is not a policy. It is -- it is training.
15      Q  Well, let me ask this. If Officer Ramirez had
16  chosen instead of drawing his service -- I want to say
17  revolver, but it is not a revolver. If he had chosen instead
18  of drawing his gun to go around Mr. Gonzalez and get out of
19  the room and close the door and secure the door -- door behind
20  him with Mr. Gonzalez in the room, would that have been a
21  violation of the city's policy?
22      A  That you will have to go back to the training, sir.
23  And it is not -- it was just not a violation.
24      Q  It is not a violation of the city's policy?
25      A  No.

**Page 127**

1      Q  He could have done that and he wouldn't have gotten
2  in trouble with the city?
3      A  The officer did what he had to do at that point in
4  time.
5      Q  I understand the city's position. I understand your
6  loyalty to your officers. And it is admirable. But what I am
7  trying -- and I am not -- I am not trying to get you to say
8  anything bad about him. What I am trying to find out is
9  what -- what options are available to an officer in Officer
10  Ramirez' position.
11      A  That would be up to him, sir.
12      Q  Okay. And that's what I am trying to ask. If
13  Officer Ramirez had been able to get out of the room if he
14  chosen to or been able to get out of the room, that -- is that
15  something that would have been acceptable under the city's
16  policy with regard to use of force or not?
17      A  Officer Ramirez did what he had to do, sir. He
18  thought about his safety, safety to the other people in the
19  hospital on that floor and the nurses. And he took -- he took
20  action.
21      Q  Okay. If -- if the city's position is that he
22  received no information that Mr. Gonzalez was a threat to
23  himself or others and did not know that he was at risk for
24  suicide, what would have been the risk for the officer to
25  leave the room and extricate himself from that situation?

**Page 128**

1  What would have been the risk to him, to the officer, or other
2  people on that floor?
3      A  Deadly, sir.
4      Q  Okay. In -- in -- in what way, if the city's
5  position is that he did not have any information as to Mr.
6  Gonzalez' being a danger to himself or others?
7          MR. GARZA: Objection. Mischaracterizes the
8  prior testimony.
9          THE WITNESS: He showed deadly force towards
10  the officer.
11      Q  (BY MR. BARRIENTOS) Does it make -- and the city's
12  position is that Mr. Gonzalez would have posed a threat of
13  death or serious bodily injury to others if he had been
14  allowed to stay there in that room by himself or if he had
15  been shut in that room, in effect?
16      A  I don't know, sir.
17      Q  Is it the city's position that Mr. Gonzalez would
18  have been a threat of death or serious bodily injury to others
19  given that he was handcuffed to a 350 pound hospital bed at
20  the time?
21      A  He moved it, sir. He used that as a weapon, too,
22  against the officer.
23      Q  Okay. And what I mean -- and, I am sorry. That
24  probably sounded kind of smart aleck and I -- I don't mean
25  that.

**Page 129**

1      But what I mean is if Officer Ramirez had left the
2  room, is -- is the city's position that Mr. Gonzalez was still
3  a threat given that he would have to move that object to try
4  and get around the room, get out of the room, get access to
5  any other person and cause him any harm?
6      A  I don't know, sir.
7      Q  Okay. Is that a factor which the officer or an
8  officer in Officer Ramirez' position is supposed to take into
9  account in determining whether or not to use deadly force?
10  That is whether a subject is restrained or not or partially
11  restrained as he was in this case.
12      A  He used the -- the handcuffs to attack the officer.
13      Q  So is -- is the fact that he was -- that Mr.
14  Gonzalez was partially restrained in this case something that
15  an officer in Officer Ramirez' position should take into
16  effect or supposed to take into -- into account, excuse me,
17  into account in deciding whether it is appropriate to use
18  deadly force or not?
19      A  It depends on the individual, sir. And he was
20  attacking the officer.
21      Q  Okay. Chief Garcia, the -- I am going to ask you a
22  couple of questions about the -- the need for the application
23  of force in this instance. Is it your understanding that what
24  caused Officer Ramirez initially to begin to use force was
25  that Mr. Gonzalez failed to comply with -- with a request by

33 (Pages 126 to 129)

DONATO GARCIA                                                            April 9, 2003

Page 130

1   Officer Ramirez to get back into his bed or to lay down in his
2   bed?
3       A   He failed to comply with the officer's request.
4       Q   Okay.  And what I am asking is from your -- from
5   your review of these -- of this information, is it your
6   understanding that the need for the application of force began
7   when Mr. Gonzalez failed or refused to comply with Officer
8   Ramirez' request to lay down in the bed to which he was
9   handcuffed?
10      A   Yes.  It escalated to a deadly use of force.
11      Q   Okay.  Now, in that situation where Mr. Gonzalez
12  fails or refuses to comply with that verbal request, at that
13  point, what is an officer for the La Feria Police Department
14  in Officer Ramirez's position, what are they authorized to do
15  in terms of a response?
16      A   Verbal command, his presence, and then the -- and
17  then the mace, the baton.  And the threat is there.  He was
18  using the handcuffs to actually kill the officer.  The officer
19  then drew his weapon and used deadly force to stop the threat.
20      Q   Okay.  All right.  Do you agree with me that one of
21  the things the officer -- the first thing Officer Ramirez did
22  after he made these verbal commands to Mr. Gonzalez, which Mr.
23  Gonzalez failed or refused to comply with, is that he
24  attempted to get help, some security, into the room?  Is that
25  your understanding?

Page 131

1       A   No.
2       Q   All right.  How am I wrong in that or would you
3   please correct me and tell me --
4       A   It was after the fact.
5       Q   Okay.  So it is the city's position that Officer
6   Ramirez did not seek help from either other officers or other
7   security guards?
8       A   I believe Officer Ramirez was hollering for help,
9   asking for security through the -- through the -- this -- his
10  ordeal.
11      Q   Should Officer -- should -- should an officer in the
12  position of Officer Ramirez and under these circumstances,
13  rather than approaching or coming closer to where the subject
14  who is failing to comply with his verbal commands, should the
15  officer, under those circumstances, get closer or nearer to
16  that subject or should an officer in Officer Ramirez' position
17  seek help or assistance or backup?
18      A   Officer Ramirez gave his verbal command.  The
19  subject approached him and kept coming at him, swinging at
20  him, and he kept hollering for security.  It escalated.  And
21  the officer used deadly force.
22      Q   Chief Garcia, let me ask, because you have mentioned
23  a couple of times that he was presented with deadly force.
24  Are you aware of -- of a situation in which -- in your -- all
25  your years of police experience where someone has been killed

Page 132

1   with a pair of ankle shackles?
2       A   I have not heard of an incident yet.
3       Q   Now, is there -- well, let me go back with --
4   with -- discuss with you the -- the discussion we had about
5   remaining in the room.  If Mr. Gonzalez is handcuffed to the
6   bed, and I will represent to you somewhere in some documents
7   have seen that the bed weighs in the order of 340, 350 pounds,
8   albeit it is on wheels, but that's what it weighs, is it the
9   city's position that Mr. Gonzalez presented a threat of
10  immediate death or serious bodily injury to -- I know we have
11  already talked about Officer Ramirez, to other people there?
12      A   Yes, because he could wheel that -- that bed out of
13  the room.
14      Q   Okay.  Do you know what the dimensions of the door
15  are --
16      A   No.
17      Q   -- to the room to which he was secured?
18      A   No.
19      Q   Do you know whether it is possible to get the bed
20  out of the room in the position that Mr. Gonzalez was --
21  was --
22      A   Yes.
23      Q   -- handcuffed to?
24      A   Yes.  Because the beds are in and out of that door.
25  That's how they bring the patients in.

Page 133

1       Q   And that's what I am asking.  Have you been there
2   yourself.  Have you seen that room?
3       A   I have been in a hospital.
4       Q   But have you been to the room where this occurred?
5       A   No.
6       Q   All right.  The use of the -- of the pistol, of that
7   handgun by Officer Ramirez, on -- is it the city's position
8   that his use of the handgun -- I don't mean merely taking it
9   out and firing it, but the number of times which it was fired,
10  is it the city's position that his use of the handgun and the
11  manner in which it was used was reasonable and in compliance
12  with the city policy?
13      A   He used whatever deadly force called for until
14  the -- until the threat was stopped.
15      Q   Okay.  Let me ask you this.  Does the city provide
16  any training to its officers with regard to using a handgun or
17  a firearm in a method or in a way that it is designed to stop
18  a subject, that is injure them in a way that will debilitate
19  them or remove the threat without killing them?
20      A   No, sir.  The officers are trained at the academy to
21  draw their weapon to stop and kill.
22      Q   Okay.  So there is no training -- there is no such
23  training by the city of La Feria.  Correct?
24      A   (Nods head affirmatively)
25      Q   Yes?

34 (Pages 130 to 133)

DONATO GARCIA                                                    April 9, 2003

**Page 134**

1    A   Correct.
2    Q   And the police training -- the police academy
3  training, the training that it offers, if I understand your
4  testimony, teaches an officer that if you are going take out
5  your firearm and use it, you are trained to use it to shoot --
6  to -- not to injure or -- or debilitate but to kill?
7    A   To stop and disable or to stop and kill the threat.
8    Q   And so there is no room anywhere in there for any
9  middle ground?
10   A   No, sir. The officer does not draw the weapon to
11 fire a warning shot or an injury shot. No.
12   Q   Okay. Are you familiar -- I know you told me don't
13 use a 9 millimeter personally, but are you familiar with the
14 weapon -- the type of weapon that Officer Ramirez had at the
15 time?
16   A   Yes, sir.
17   Q   Are you familiar with the speed at which a person
18 may fire a full clip and a round in the chamber?
19   A   No, sir.
20   Q   Is it the city's position that Officer Ramirez'
21 firing all of the rounds, the 15 rounds in the clip and the
22 one in the chamber, was necessary to remove whatever threat
23 Mr. Gonzalez may have presented to him at that time?
24   A   Yes, sir.
25   Q   If there is a point at which -- let me ask this.

**Page 135**

1  Does the city have a position or does this -- strike that.
2  Does the city train its officers as to recognize when a threat
3  is removed?
4    A   It goes back to the academy training.
5    Q   Do you know whether the academy trains officers to
6  know that a threat is removed when a subject has retreated or
7  turned around or turned their back to an officer?
8    A   Or has complied.
9    Q   I am sorry?
10   A   Or has complied with the officer's request.
11   Q   Okay. So let's see if I understand. It should be
12 reasonably apparent to an officer who has found themselves in
13 a situation where they are using deadly force if the actor
14 complies with the officer's request or if the actor retreats,
15 turns their back, then that should be a clear indication to
16 the officer that the use of the deadly force after that point
17 is no longer necessary.
18       MR. GARZA: Objection. Form.
19       THE WITNESS: I don't know.
20   Q   (BY MR. BARRIENTOS) I am sorry, sir?
21   A   I don't know.
22   Q   Is it the policy of the city of La Feria that if a
23 subject turns their back to an officer who is firing their
24 weapon that the threat is then removed?
25       MR. GARZA: Objection. Form. Overbroad.

**Page 136**

1  Calls for speculation.
2    Q   (BY MR. BARRIENTOS) You may answer, if you can?
3    A   There is no threat. There is no threat.
4    Q   If a person has a back to an officer, and, of
5  course, I am -- I am leaving out a situation where someone, I
6  guess is -- you could be running backwards towards them. I
7  don't know why you would do that. But in the face of gunfire,
8  someone turned around or makes a defensive move or maneuver,
9  is that a clear indication that that threat had been removed?
10   A   I don't know, sir.
11   Q   Well, let me ask this. Would you agree with me that
12 a reasonable officer could infer or could believe that if a
13 subject turns their back that they are no longer a threat?
14   A   It depends on the officer's command. If the officer
15 tells him, "Turn around. Face your back to me," then there is
16 no threat there.
17   Q   Well, let me ask -- let me put it this way. If
18 someone is advancing towards an officer and the officer says,
19 "Stop. I command you to stop and get back. Stop," and the
20 person does not comply and the officer takes out their handgun
21 and fires at the subject, and in response the subject stops
22 and/or turns around and stops his advance to the officer, is
23 that not a clear indication that the subject, if not complying
24 with the officer's request is no longer a threat because they
25 are no longer advancing?

**Page 137**

1    A   It all depends on the situation, sir. You are
2  asking me -- you are putting me in a position where if I have
3  been there, and I am not. I haven't.
4    Q   Well, let ask this. Can you think of a set of
5  circumstances where it would ever be an appropriate use of
6  deadly force to use a firearm and to shoot a subject in the
7  back?
8    A   No.
9    Q   And certainly if a person or subject is shot in the
10 back more than one time, then that would be an even more
11 inappropriate use of deadly force?
12   A   It all depends on the situation.
13   Q   I think I asked you, Chief Garcia, whether you had
14 had a chance to review the autopsy report in this case and you
15 have indicated that you had not?
16   A   No.
17   Q   You don't -- sitting here today, you don't have any
18 personal knowledge of where the entry or exit wounds to Mr.
19 Gonzalez are located on this body?
20   A   No.
21   Q   Would your opinion as to the propriety of Mr.
22 Ramirez' use of deadly force change if the -- if you learned
23 that there were entry wounds in Mr. Gonzalez' back?
24   A   Sir, again, I would have to say it depends on the
25 situation that Officer Ramirez was in at that present time.

35 (Pages 134 to 137)

DONATO GARCIA                                                    April 9, 2003

Page 138

1    Q   Well, let me ask you this. And I understand. I am
2  not going to ask you to tell me or commit that that would be
3  an inappropriate use. Let me ask you whether it would be
4  possible that if the facts or the evidence are that there are
5  entry wounds in Mr. Gonzalez back that Officer Ramirez' use of
6  deadly force in this case, at least as far as those shots go,
7  was inappropriate?
8    A   No. I don't know, sir. I don't know.
9    Q   You don't know. You don't know whether that is
10 possible or not or --
11   A   I don't know if that is possible, sir. I don't
12 know.
13   Q   Well, let me -- let me rephrase it and let me ask
14 you another way. I am sorry -- I am not -- I am not the best
15 -- I am not the best person to ask questions sometimes. I am
16 going to try and be more simple. I know you have told me you
17 don't believe that Officer Ramirez acted inappropriately.
18   A   No.
19   Q   And it is the city's position he acted
20 appropriately. You have also told me that you cannot think of
21 a set of circumstances where it would be appropriate use of
22 deadly force for a person -- for an officer to shoot someone
23 in the back.
24   A   No.
25   Q   And what I am asking you is -- and I don't expect

Page 139

1  you to commit to me and I am not asking you to commit to me,
2  but would you agree that it is possible, not probable or
3  likely, or even the case in this instance, but that it is
4  possible that an officer who uses a firearm and shoots a
5  subject in the back has used deadly force inappropriately?
6        MR. GARZA:  Objection. Overbroad.
7        THE WITNESS:  No, I don't believe so.
8    Q   (BY MR. BARRIENTOS) Okay. That is not a possibility
9  that you are willing to entertain?
10   A   No, sir.
11   Q   Chief Ramirez(sic), I admit, this is kind of a minor
12 detail, but in reading through these materials, I noticed that
13 there was a -- something called a crime scene video that was
14 taken. And it may have been taken by the -- by the Harlingen
15 P.D. and not your -- not your office. But have you seen
16 anything, any video of the actual scene of the incident?
17   A   No. The only one -- the only video I have seen is
18 that one over there.
19   Q   The re-enactment?
20   A   Yeah. The re-enactment.
21   Q   Okay. If that -- if you have not seen such a video,
22 have you heard it or seen it referenced in any of the material
23 you have looked at since this occurred?
24   A   No.
25   Q   Give me just a little bit of time to look through

Page 140

1  some notes. Chief Garcia, in Exhibit Number 6, I have a
2  couple of questions about some specific things. I will try
3  and go through them pretty quickly. I will scootch over here
4  as close as I can.
5        And I have these Bates numbered. So at page
6  000316 -- excuse me, 315, this is the report that was sent to
7  the Attorney General's office by Chief Gonzalez shortly after
8  the -- after the incident occurred. There is a question there
9  at this page, item number 9: Did deceased exhibit medical
10 problems prior to death? And yes is -- is marked, checked in.
11       And then the next question, number 10: Did
12 decreased exhibit mental problems prior to death? And there
13 is yes marked in here.
14       Do you know whether this information came to Chief
15 Gonzalez -- I am trying -- I am trying to figure out here and
16 reconcile this with some of the information you have given
17 me. I think you have testified that -- that -- that La Feria
18 P.D. and the city of La Feria didn't have any information
19 about his medical condition or the mental health condition
20 before the time of his death.
21   A   No.
22   Q   In this --
23   A   Not to my knowledge.
24   Q   Okay. In this report, Chief Gonzalez seems to
25 indicate that he did exhibit such problems. What -- what I

Page 141

1  am -- I guess what I am asking is do you know whether those
2  problems were -- were exhibited to the officers, the city or
3  whether these were -- were some healthcare facility or do you
4  know where this information came from?
5    A   I have no knowledge.
6    Q   Okay. The next page, 316, item number 10, it asks
7  whether the attendants are TCLEOSE certified correctional
8  officers. And it says no. And I guess the distinction here
9  is Officer Ramirez is not a correctional after but a peace
10 officer.
11   A   A Peace officer.
12   Q   Okay. And then item number 11 is suicide screening
13 utilized, and there is no checked there as well. Okay. The
14 question I have is are you familiar with the suicide screening
15 that is referenced in this question?
16   A   No.
17   Q   Okay. Do you know that is or what they are
18 referring to?
19   A   No, sir.
20   Q   Chief, can you tell me, 369, Exhibit number 6, is
21 this a La Feria P.D. report or is this some other agency? I
22 can't tell. Maybe you can help me.
23   A   This is a -- I believe it is Santa Rosa, sir.
24   Q   City of Santa Rosa?
25   A   I believe so.

                                              36 (Pages 138 to 141)

DONATO GARCIA                                                                    April 9, 2003

---

**Page 142**

1    Q   Okay.  All right.  And this is dated 9/17/00, time
2  received 2019 or 8:19 p.m.
3    A   Uh-huh.
4    Q   Correct?
5    A   Yes, sir.
6    Q   Okay.  And the reason --
7    A   I don't know military time.
8    Q   Okay.  I am guessing myself, but I think that is
9  what it is.
10    A   Okay.
11    Q   This information just indicates that -- that a
12  family member called in, a family member of Mr. Gonzalez, and
13  indicated that Mr. Gonzalez was driving a gold Lincoln, that
14  he was possibly intoxicated, he was mentally disturbed, and
15  possibly injured.  And, again, I am trying to find out what --
16  what information would have been available to the city of La
17  Feria Police Department at the time he was -- Mr. Gonzalez was
18  taken to the hospital, specifically about his medical
19  condition or his mental condition.  But, as I understand it,
20  this is not a -- this is not a La Feria P.D. report.  This
21  came into a different agency?
22    A   Yeah.  And -- and I believe we received the -- the
23  report, according to my dispatcher, as an intoxicated driver
24  coming into the city of La Feria.
25    Q   Okay.  All right.  Well, I am trying to see if I

---

**Page 143**

1  understand, because I have read some -- some things that
2  describe Mr. Gonzalez as being very violent and very dangerous
3  and a very high security risk and -- and -- and what I am
4  trying to find out is that I don't -- I don't get that sense
5  from what you are telling me, from what I -- what I -- what
6  you seem to be telling me is that the information the city of
7  La Feria had is that they had no information about Mr.
8  Gonzalez' --
9    A   No, sir.
10    Q   -- mental condition, medical condition, about his
11  being a threat to others.
12    A   No.
13    Q   Is that -- well, let me ask this.  If -- if we
14  assume for a moment that the city of La Feria did have some
15  information that this individual was very violent or capable
16  of causing other people death or serious bodily injury, that
17  he was a very high security risk, would that have made a
18  difference in the manner and in the level of security or the
19  type of restraint used on Mr. Gonzalez by the city of La Feria
20  P.D.?
21       MR. GARZA:  Objection.  Calls for speculation.
22       THE WITNESS:  No, I don't believe so.
23    Q   (BY MR. BARRIENTOS)  Would not have?
24    A   I don't know, sir.
25    Q   When you say you don't know, does that mean -- is

---

**Page 144**

1  there a -- I think maybe we have already established it, but I
2  want to make sure.  There is no policy that the city of La
3  Feria has that indicates what level -- at what level a -- a
4  prisoner or an arrestee should be maintained or secured.
5    A   No.
6    Q   Okay.  That policy is left to the discretion of
7  whatever officer happens to have custody or possession of that
8  person?
9    A   Correct.
10    Q   Let me go to Exhibit Number 7, and just a couple of
11  things I want to flip through real quick and ask you about.  At
12  page 000436 there is a consent to search, which I believe was
13  done with respect to Officer Ramirez.  And it indicates that
14  one vial of blood was taken from his person.  Was there some
15  type of toxicology or something that was run on the blood
16  sample from Officer Ramirez?
17    A   On Officer Ramirez.
18    Q   Yes, sir.
19    A   I have no knowledge, sir.
20    Q   Okay.  And -- and, like -- likewise, I guess you or
21  your department wouldn't have any knowledge of any results?
22    A   No, no knowledge of that.
23    Q   Chief Garcia, I may be almost finished.
24       MR. BARRIENTOS:  I tell you what I am going to,
25  Counsel, I am going to pass him so that we don't have to wait

---

**Page 145**

1  for me to look through my notes.  I will pass the witness and
2  if I find something else just to clean up, I will -- I will
3  come back.
4       Chief Garcia, thank you for your time.  I
5  will -- I will pass the witness at this time.
6       MR. STEIN:  I have no questions at this time.
7       MR. POPE:  I have a few.  I need to get
8  somewhere where I have mic.
9         E X A M I N A T I O N
10    Q   (BY MR. POPE) Chief, my name is Bill Pope.  I am
11  here today and I am representing Valley Baptist Medical
12  Center.  And I just have a few questions for you.
13       You have answered some questions here today in
14  response to Mr. Barrientos.  And you have indicated what
15  knowledge that the city of La Feria had or did not have
16  concerning Mr. Gonzalez' mental health history, for example.
17  And I just want to clarify something with you.  As far as the
18  investigative file from the city of Harlingen is concerned, or
19  any of the other documents that we have laying out here in
20  front of us today concerning internal documents to the police
21  department in -- in La Feria, documents from the district
22  attorney's office, things of that nature, have you reviewed
23  any of these prior to giving your testimony here today?
24    A   No.  The only video that I have reviewed is the
25  re-enactment.

---

37 (Pages 142 to 145)

DONATO GARCIA                                                      April 9, 2003

Page 146

1    Q   All right.  Other than reviewing the video
2  re-enactment, any documentation concerning investigation of
3  the incident, statements of people who were involved with this
4  particular individual, those you have not reviewed prior to
5  giving your testimony?
6    A   No.
7    Q   And so the testimony that you have given today about
8  what the city knew or did not know at any given time is simply
9  based on your knowledge.  Correct?
10   A   What I know, yes.
11   Q   Okay.  All right.  This particular individual that
12  we are talking about, is it your understanding that prior to
13  the incident, the incident being when Officer Ramirez was
14  called upon to use deadly force, that this individual had, in
15  fact, been arraigned at the hospital by Judge Salas?
16   A   I have no knowledge of that.
17   Q   Okay.  All right.  You don't know whether that
18  happened one way or the other?
19   A   No, I have no knowledge of that.
20   Q   All right.  Are you aware of any conversations that
21  took place between the psychiatrist that was treating Mr.
22  Gonzalez while he was in the hospital and Police Chief
23  Gonzalez?
24   A   No.  I have no knowledge of that either.
25   Q   All right.  And when you say you have no knowledge,

Page 147

1  that simply means of your personal knowledge you don't know
2  one way or the other.  Correct?
3    A   No, I don't know.
4    Q   That -- that -- that is a correct statement.  Right?
5    A   Okay.
6    Q   Mr. Barrientos gave you some -- showed you some
7  policies from the hospital with regard to restraint and also
8  with regard to what is called a forensic staff information
9  list.  You indicated you -- you personally had not seen those
10  before.  Correct?
11   A   No.
12   Q   Is that right?
13   A   Yes.
14   Q   When police officers from the La Feria Police
15  Department would be called upon to go to Valley Baptist,
16  whether it is in a custodial situation such as this or simply
17  if they are going in for -- for information, do they go in
18  uniformed and identified?
19   A   Yes.
20   Q   When they utilize restraint devices such as in this
21  particular instance where handcuffs or shackles are used, do
22  they -- does the officer have a key available to him at all
23  times so that if they have to be removed they can be
24  immediately removed?
25   A   Yes.

Page 148

1    Q   To your knowledge, was there a telephone available
2  in this particular patient's room at the time of the incident?
3    A   I believe so.
4    Q   To your knowledge, what is the difference, if any,
5  between the weapon that Officer Ramirez had and the ammunition
6  he was using and a .38 caliber weapon using 125 grain semi-wad
7  cutter ammunition, if you know?
8    A   Usually the wad cutter is used for training purposes
9  at the academy.
10   Q   Is a 9 millimeter a large caliber weapon?
11   A   No.
12   Q   Is it your understanding that during the -- the
13  course of the custody of this individual that the security at
14  the hospital did, on one or more occasions, relieve the
15  officer so that they could use the restroom?
16   A   I have no knowledge.
17   Q   Okay.  You don't know whether that happened one way
18  or the other?
19   A   No.
20   Q   In terms of Mr. Gonzalez, even though he was in the
21  hospital for treatment, was he in the custody of La Feria
22  Police Department?
23   A   Yes.
24   Q   Do you know what he was in the hospital for
25  treatment of?

Page 149

1    A   My understanding was for the injuries he sustained
2  in the accident.
3    Q   Did you have any knowledge at any time that he
4  had -- or was suspected to have cut his own throat with a
5  knife?
6    A   No.  I had no knowledge of that.
7    Q   And insofar as the person who was conducting the
8  investigation for the La Feria Police Department, or at least
9  asking the relevant questions as to what happened and
10  obtaining information along those lines, at the time this
11  happened, that would have been Chief Gonzales?
12   A   Chief Gonzalez and Daniel Delgado.
13   Q   Okay.  This was not something that you were involved
14  in at that time?
15   A   No.
16   Q   Okay.  In fact, your involvement in this only has
17  come about as a result of the fact that this lawsuit has been
18  filed and you are now the chief of police.  Correct?
19   A   Correct.
20   Q   All right.  That's all I have.  Thank you.
21          E X A M I N A T I O N
22   Q   (BY MR. GARZA)  Chief, other than this particular
23  lawsuit, are there any other complaints of excessive force
24  that you know about that were brought against any La Feria
25  Police Officer?

38 (Pages 146 to 149)

DONATO GARCIA                                                         April 9, 2003

Page 150

1    A   Excessive force?  No.
2    Q   And then with respect to the officers that work for
3  the La Feria Police Department, do they receive some type of
4  continued training of any kind?
5    A   Yes.  They receive all types of training for all
6  types of incidents, penal code, the Texas Penal Code, all the
7  laws, updating training.
8    Q   And why is it that they continuously receive
9  training?
10   A   Because it is mandated by TCLEOSE.
11   Q   So that is something that is mandated for the
12 officers to be able to maintain their licenses as peace
13 officers in Texas?
14   A   Correct.
15   Q   And who makes sure that your officers are in
16 compliance with those requirements and are receiving their
17 continued training?
18   A   I do.
19   Q   And do you also make whatever training seminars or
20 training issues that come up available to your officers so
21 they can attend them if they wish to?
22   A   Yes, I do.
23        MR. GARZA:  Thank you.  I pass the witness.
24        E X A M I N A T I O N
25   Q   (BY MR. BARRIENTOS) Chief Garcia, forgive me if I

Page 151

1  don't remember.  What -- what is your first name?
2    A   Donato.
3    Q   Donato.  Are you -- are you known as Don?  Do people
4  call you Don?
5    A   Yes.
6    Q   Do you recall an incident that occurred on Tuesday
7  June the 25th, 2002, in the 300 block of North Canal Street in
8  which an individual by the name of Francisco Alvino and
9  another individual, his wife, I believe Maria Alena Alvino,
10 were arrested?
11   A   Yes.
12   Q   And I believe there also -- there is also that
13 incident in which an individual by the name of -- by the name
14 of Marlene Vela, age 13, was also taken into custody.  Is that
15 correct?
16   A   Correct.
17   Q   Chief Garcia, were you present during the -- during
18 that incident itself?
19   A   What incident, sir?
20   Q   Yes.  The incident of their arrest.
21   A   Which one?
22   Q   On June 25th.
23   A   The Alvino incident?
24   Q   June 25th, yes, sir.
25   A   Yes.

Page 152

1    Q   Okay.  And were you present there from the beginning
2  of -- when I say from the time police initially arrived at or
3  near that location?
4    A   Yes.
5    Q   Until the time when they left?
6    A   Yes.
7    Q   All right.  And, in that incident, is it correct
8  that Mr. Alvino was struck by an officer by either a night
9  stick or baton or perhaps an ASP?  I am not sure which of
10 those.
11   A   Yes.
12   Q   And is it correct that he had no weapon at that
13 time?
14   A   His hands were a weapon.
15   Q   Okay.  Let me ask -- let me restate that.  Other
16 than his hands, he had no other object that he was using as a
17 weapon.  Is that correct?
18   A   That's correct.
19   Q   And is it the city's position that it has not
20 received a complaint with regard to an excessive -- use of
21 excessive force in that instance?
22   A   Is what, sir?
23   Q   Is it the city's position that it has not received a
24 complaint of the use of excessive force by members of the La
25 Feria Police Department for that incident?

Page 153

1    A   This is after the Gustavo incident.
2    Q   I understand -- I understand that.  And, you know
3  what, you are right.  I probably messed that up, too.  Let
4  me -- let me -- let me ask you this.  In response to my
5  earlier questions, your answers were directed to the time
6  period leading up to September 19th of 2000.  Is that correct?
7    A   Uh-huh.
8    Q   Is that a yes?
9    A   Yes, sir.
10   Q   Okay.  I am sorry.  For the record, she has to have
11 a yes or a no.
12   A   Yes.
13   Q   Okay.  Let me -- let me be more specific in my
14 questioning.  I also want to ask you about the time period
15 from September 19th up to the present time.  Are there any
16 other incidents in which there have been complaints or
17 grievances or lawsuits filed alleging use of excessive force
18 by members of the La Feria, Texas Police Department?
19   A   After the Gustavo incident, we have this one right
20 here.
21   Q   Okay.
22   A   The one that you are talking about.
23   Q   Regarding the Alvino?
24   A   Yes.
25   Q   Okay.  Any others besides this one?

39 (Pages 150 to 153)

DONATO GARCIA

April 9, 2003

**Page 154**

1    A   No.
2    Q   Is the chief of police required to be notified if
3  the city of La Feria is sued for some act of alleged excessive
4  force on the part of one of its police officers?
5    A   Is what, sir?
6    Q   Are you usually notified if the city is sued because
7  of some act that a police officer is alleged to have
8  committed?
9    A   Yes.
10    Q   And your testimony is the only ones you are aware of
11  are this incident involving Mr. Gonzalez and subsequent to
12  that the incident --
13    A   Yes.
14    Q   -- involving the Alvino family?  Are you sure of
15  that?
16    A   Yes, sir.
17    Q   Was Officer Ramirez present at the situation
18  involving the Alvino family?
19    A   No.
20    Q   All right.  Am I correct in that situation the
21  officers had reported to a residence in order to -- to check
22  to see whether a vehicle qualified as an abandoned vehicle
23  under the city ordinance?
24    A   Correct.
25    Q   And it went from checking to see whether a vehicle

**Page 155**

1  was abandoned to a situation that involved a physical
2  altercation in which Mr. Alvino was -- was arrested?
3    A   Correct.
4    Q   His wife and their daughter, I guess?
5    A   Correct.
6    Q   Okay.  Were the night sticks or any other form of
7  force used on Mrs. Alvino or on the 13-year-old.
8    A   On Mrs. Alvino?
9    Q   Mrs. Alvino.  How about on the 13-year-old, Marlene
10  Vela?
11    A   No.
12    Q   In that other incidences -- incident, excuse me, is
13  it -- am I correct in assuming that -- well, let me ask.  Has
14  there been some determination made as to whether the use of
15  force in that case was appropriate or not?
16    A   In what incident, sir?
17    Q   In the incident involving the Alvino family.
18    A   We have not gone to court on that so I wouldn't be
19  be able to tell you, sir.
20    Q   Okay.  Well, what I am ask -- and I am not asking
21  about any court outcome or outcome of any litigation.  What I
22  am asking is has the city or the police department conducted
23  its own investigation or made its own findings as to whether
24  the use of force on Mr. Alvino was excessive in that instance?
25    A   There has been incident reports made, yes.

**Page 156**

1    Q   Okay.  Has there been a finding or determination
2  made by the city about whether that use of force was
3  appropriate or not appropriate?
4    A   It was appropriate.
5    Q   There is one other set of documents I need you to
6  identify and mark and then I think I am finished.  It would be
7  the -- Chief Garcia -- okay.  I am just going to mark this
8  stack of documents here.  If I can find what I am up to.
9  Well, first of all, let me -- let me ask you to take a look at
10  this.  Are these documents maintained by the city of La Feria?
11    A   Yes.
12    Q   Okay.
13        MR. BARRIENTOS:  What -- what are we up to now?
14        THE COURT REPORTER:  I think number 14.
15        MR. BARRIENTOS:  Fourteen.  Okay.
16        THE COURT REPORTER:  This set, that was your
17  last one.
18    Q   (BY MR. BARRIENTOS) Chief Garcia, let me mark that
19  as Exhibit 14, this set of documents.  These are, I guess,
20  documents regarding Officer Ramirez' treatment subsequent to
21  the time of the incident on September 19th.  I guess they were
22  gathered for his workers compensation claim.
23    A   Yes, sir.
24    Q   Okay.
25        MR. BARRIENTOS:  I believe that's all the

**Page 157**

1  questions I have, Chief Garcia.  Thank you for your time.
2        MR. GARZA:  We reserve the rest of our
3  questions until the time of trial.
4        (Deposition concludes at 5:00 p.m.)

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027
ba1b3453-75cf-42ce-b310-8830324df896

DONATO GARCIA                                                                    April 9, 2003

**Page 158**

```
 1        CHANGES AND SIGNATURE
 2   RE:  CARRANZA VS. CITY OF LA FERIA
 3   PAGE   LINE   CHANGE      REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12       I, DONATO GARCIA, have read the foregoing deposition
     and hereby affix my signature that same is true and correct,
13   except as noted above.
14        _____
                DONATO GARCIA, Witness
15
16   THE STATE OF TEXAS   )
     COUNTY OF _____ )
17       Before me, _____, on this day personally
     appeared DONATO GARCIA, known to me (or proved to me under
18   oath or through _____) to be the person whose
     name is subscribed to the foregoing instrument and
19   acknowledged to me that he executed the same for the purpose
     and consideration therein expressed.
20
         Given under my hand and seal of office this _____
21   day of _____, 2003.
22
23        _____
             NOTARY PUBLIC IN AND FOR
24           THE STATE OF TEXAS
25
```

**Page 160**

```
 1   Certified to by me this _____ day of _____, 2003.
 2
     Costs: _____
 3   Due and owing by Plaintiff
 4        _____
              KATHERINE J. BROOKBANK, Texas CSR 2060
 5            Expiration Date: 12/31/04
              7800 IH-10 West, Suite 100
 6            San Antonio, Texas  78230
              (210) 377-3027
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 159**

```
 1       IN THE UNITED STATES DISTRICT COURT FOR THE
              SOUTHERN DISTRICT OF TEXAS
 2                BROWNSVILLE DIVISION
 3   MARY E. CARRANZA, ET AL,    *
              plaintiffs,  *
 4                             *
     VS.                       *  C. A. NO. B-02-180
 5                             *
     CITY OF LA FERIA, TEXAS, ET AL, *
 6            defendants  *
 7   -------------------------------------------
             REPORTER'S CERTIFICATION
 8     VIDEOTAPED DEPOSITION OF DONATO GARCIA
                  APRIL 9, 2003
 9   -------------------------------------------
10       I, KATHERINE J. BROOKBANK, Certified Shorthand Reporter
11   in and for the State of Texas, hereby certify to the
12   following:
13       That the witness, DONATO GARCIA, was duly sworn by the
14   officer and that the transcript of the oral deposition is a
15   true record of the testimony given by the witness;
16       That the deposition transcript was submitted on
17   _____ to the witness or to the attorney for
18   witness for examination, signature, and return to me by
19   _____
20       I further certify that I am neither counsel for, related
21   to, nor employed by any of the parties or attorneys in the
22   action in which this proceeding was taken, and further that I
23   am not financially or otherwise interested in the outcome of
24   the action.
25
```

**41 (Pages 158 to 160)**

DONATO GARCIA

April 9, 2003

Page 161

**A**

abandoned 154:22
155:1
abate 108:5
ability 101:3
able 42:13,13 53:7
54:10 75:18,19 93:9
95:11 100:20 101:3,6
104:20 127:13,14
150:12 155:19
about 7:7 9:1,19 10:9
10:12 13:10 18:4,13
21:19 23:19 25:20
30:5 31:10 33:23
36:15,17 37:5,6
40:24 41:2 43:10
47:19 48:7 49:24
50:3 52:10 53:4,7,11
53:20 55:25 59:14
60:12 62:7,13,19
63:17 68:13 70:10
74:4,19 75:10,11
79:13,15,19 81:21
82:5 85:3,5 86:3,19
87:25 88:8,10 92:21
93:9 96:24 101:7
109:11 111:18,19
112:9,23,23 116:4,10
118:18 119:1,1,11
121:10,25 122:19,21
123:4 125:10 127:8
127:18 129:22 132:4
132:11 140:2,19
142:18 143:7,10
144:11 146:7,12
149:17,24 153:14,22
155:9,21 156:2
above 9:22 44:22
106:23 158:12
above-styled 2:3
abuse 88:1
abusive 81:1
academy 16:9,11,16,17
17:2,9,20 18:1,7,8,24
19:8,12,16,19,21
20:1,3,14,20,24 27:7
27:13 38:15 39:8,10
70:25 71:6,12,20,21
71:24 72:3,18 73:7
73:23 75:20 76:8,10
76:16 77:4,7,14 78:2
79:8 80:7,9 81:14,24
84:7 86:11,17 87:18
87:20 88:11,16,25
89:16 90:1,7 91:3,12
91:13 95:25 96:2,6,7

96:7,15 97:3 104:15
108:8,20 111:10
124:25 133:20 134:2
135:4,5 148:9
acceptable 126:1
127:15
access 16:22 17:1 18:9
34:16 129:4
accident 3:17 51:22
149:2
accompany 28:20
accomplish 104:13
accordance 97:10,11
according 142:23
accordingly 95:18,19
100:19
account 129:9,16,17
accuse 35:11
acknowledged 158:19
act 1:6,15 97:13 154:3
154:7
acted 95:18 97:10
100:19 138:17,19
acting 60:7 94:8
action 1:14 21:23 22:7
127:20 159:22,24
actions 30:15,23 36:13
95:8,17 98:13 99:16
123:13,15,16
activity 105:1
actor 70:2 135:13,14
acts 97:13,24 98:8,14
actual 44:1 139:16
actually 14:5 16:3
33:10 47:17 53:13
58:15 60:10 72:17,19
72:21 115:6 123:18
130:18
ADAMS 2:17
addition 71:8
additional 45:2 72:9
82:15 91:10
adequate 83:23 84:1
122:1
administered 18:23
19:1
administrative 41:2
admirable 127:6
admission 122:5,12
admit 139:11
admitted 120:8
adopt 62:2
adopted 58:3,10 61:11
61:13
advance 136:22
advancing 136:18,25

affirmatively 36:6 48:6
50:6 133:24
affix 158:12
after 4:21,23 8:10 9:4
37:17 47:24 52:5
113:14 117:4,21,23
130:22 131:4 135:16
140:7,8 141:9 153:1
153:19
afternoon 46:2
again 4:11 20:22 22:5
36:1 51:4 58:6 68:22
75:25 77:3 78:12
79:24 99:3 102:13
105:8 137:24 142:15
against 11:20 33:17
107:19 124:8 128:22
149:24
age 151:14
agencies 98:6
agency 73:6 141:21
142:21
agent 39:25
Aggravated 11:12
ago 58:23
agree 83:2,3 130:20
136:11 139:2
agreement 24:13,20
25:8,12
agreements 24:7 26:25
ahead 51:3,6 71:18
75:1
AL 159:3,5
albeit 132:8
aleck 128:24
Alena 151:9
allegations 50:10,23
51:12
allege 32:16
alleged 12:16 31:16,22
33:4 34:25 35:7
154:3,7
alleging 34:3 35:3
153:17
allow 113:4
allowed 63:20 107:15
107:23 110:13 125:5
128:14
allows 75:12,15
almost 144:23
along 149:10
already 47:22 48:7
50:3 75:9 132:11
144:1
altercation 105:14
108:5,5,18,21,25

120:9 155:2
altered 94:22
alternative 107:25
although 102:24
Alvino 151:8,9,23
152:8 153:23 154:14
154:18 155:2,7,8,9
155:17,24
always 38:3 78:25
ALYSSA 1:4
ambulance 28:22,23
ammunition 67:10,20
67:23 68:3,7,13,21
68:24 69:7,11,21,23
148:5,7
among 42:22 50:13
51:8
amount 44:3 104:12
and/or 9:17 14:19
15:16 24:9 31:18
53:7 90:4 102:22
105:18 120:12
136:22
ANGEL 1:3
ankle 132:1
ankles 112:24
another 25:19 41:16
49:11 73:25 74:7
76:1 77:21 78:23
83:12 84:16 101:25
138:14 151:9
answer 6:7 8:21 21:4,9
32:20 50:17,19 51:2
53:9 74:19 76:1
79:12 96:3 99:3,12
99:23 110:24 123:2
124:11 136:2
answered 75:9 145:13
answering 36:11
answers 5:23 7:24 8:22
153:5
Antonio 160:6
anybody 36:19 126:3
anyone 9:2 23:19,24
28:18 41:18,19 54:9
55:19 101:15 102:8
102:11 121:25
anything 6:2,7 27:25
30:18 44:25 47:25
49:23,25 73:11 74:22
92:1 96:23 117:17
127:8 139:16
anywhere 71:3,5 134:8
apart 22:3,12 45:3
apologize 16:3 18:3
apparent 135:12

apparently 26:2 51:25
112:23
Appearances 2:10 3:2
appeared 158:17
applicable 15:13 57:2
68:20 71:9
applicant 19:3 72:20
applicants 17:25 19:1,6
71:22
application 73:4
129:22 130:6
applies 57:3 58:8
apply 90:8
appreciate 92:9 99:9
approached 131:19
approaching 131:13
appropriate 71:14,20
71:23 72:5 73:5
75:21 80:22 81:2
96:24 122:1 124:17
129:17 137:5 138:21
155:15 156:3,3,4
appropriately 138:20
approval 58:10 59:24
59:24
approve 56:12 62:2
approved 58:13 59:1
60:19 63:2 64:24
65:1
approximately 33:11
61:11
April 1:24 2:3 159:8
area 23:12 32:5
areas 8:7,11 19:5 88:5
arguing 86:3,20 89:18
125:8
Argumentative 87:19
arise 111:11
arises 78:6 79:23 80:4
97:5
arms 64:11 65:22
around 2:24 112:24
126:18 129:4 135:7
136:8,15,22
arraigned 146:15
arrangements 45:21
arrest 14:11 35:13,14
83:9 102:11,12
151:20
arrested 14:1 35:1
151:10 155:2
arrestee 10:16 102:5
144:4
arrestees 14:19 25:15
27:5 28:18 29:3
31:18

arrived 152:2
ascertain 25:7
aside 15:23
asked 5:18 7:17 8:7,12
  19:24 25:20 36:22
  45:11 69:6 94:17
  99:14 101:12 137:13
asking 9:1 10:12 18:4
  18:12,13,15 28:12,13
  33:23 35:6 58:14
  60:11 79:19,20 83:1
  85:18 86:2,7,23
  96:17 97:23 98:24
  100:4,5 103:3,8
  109:18 121:17
  125:10,17,18,23,25
  130:4 131:9 133:1
  137:2 138:25 139:1
  141:1 149:9 155:20
  155:22
asks 9:15 14:15 15:25
  21:19 141:6
ASP 102:22 106:13,14
  106:18 152:9
ASPs 64:11
assault 11:12
assaults 88:1
assign 45:21
assigned 40:12 45:11
  113:11
assignment 67:16,19
  69:23
assignments 103:2
assistance 131:17
assistant 41:3
associated 8:23 12:21
assume 16:10 19:5
  104:3 122:20 143:14
assuming 53:22 98:5
  155:13
Attached 3:3
attack 129:12
attacked 111:4
attacking 129:20
attempt 12:9,10,12,14
  12:16
attempted 130:24
attend 39:7 150:21
attendants 141:7
attention 24:15 83:10
attorney 6:18 8:13 9:1
  48:25 140:7 159:17
attorneys 8:23 10:4
  31:4,8 159:21
attorney's 145:22
attorney/client 8:18

Audio 2:23
Austin 21:6
authority 56:5 62:2
authorization 21:11
authorize 81:10
authorized 63:17 64:22
  65:1,3 70:12 74:23
  102:21 105:22
  130:14
authorizes 75:15
autopsy 3:12,25 48:11
  92:23 103:23,24
  137:14
available 2:24 72:12
  84:4,8,9,14,18,24
  85:5 86:24 87:1
  127:9 142:16 147:22
  148:1 150:20
avoid 78:10,14,22
awaiting 11:4
aware 5:21 15:15 20:19
  21:10 22:1,10,13,14
  27:21,21,25 28:21
  29:8,15,17 30:7 34:7
  34:8 36:14 62:17
  86:13 92:13 117:18
  131:24 146:20
  154:10
away 53:14,25 108:6
a.m 2:4

——————————
          B
——————————

B 14:15 15:25 16:2
back 12:5 16:25 31:2,3
  31:10 34:2 40:1,10
  43:12 45:23 55:24
  70:25 71:6 72:11
  77:3 79:17,17 81:22
  106:4,6 114:8 123:3
  124:10 126:22 130:1
  132:3 135:4,7,15,23
  136:4,13,15,19 137:7
  137:10,23 138:5,23
  139:5 145:3
backup 131:17
backwards 10:24 136:6
bad 86:21 127:8
Baptist 1:12,20 10:17
  10:21 24:8,10,14
  25:8,14,18,25 26:5,8
  27:2,5,17,23 28:6,8
  29:3,21 30:4 45:12
  61:18 68:6 69:12
  82:22 93:5 101:13
  113:25 116:18
  119:13 145:11

147:15
barricaded 124:8
Barrientos 2:11 3:4,6
  4:4 5:11 8:19,25 17:6
  29:13,14 51:7,17
  56:18,20 74:17 75:8
  76:19 79:11 87:23
  90:24 91:2 98:18
  103:14,17,19,21
  110:24 121:7 124:22
  128:11 135:20 136:2
  139:8 143:23 144:24
  145:14 147:6 150:25
  156:13,15,18,25
based 4:18 60:1 76:6
  78:16 89:14 98:5
  100:17,25 146:9
basic 18:2
basically 69:22 79:14
  90:21 97:4
basing 33:9
basis 21:20 44:2
Bates 140:5
bathroom 113:5
baton 64:23 106:12,18
  123:22 130:17 152:9
became 5:5 40:16
  41:24 62:17 94:24
become 4:21
bed 121:16 124:8
  128:19 130:1,2,8
  132:6,7,12,19
beds 132:24
before 2:4 5:25 6:2 8:5
  11:8,9 13:19 15:3
  16:20 41:23 47:15
  51:17 53:12 54:16
  58:4,10 61:20,23
  87:8 116:16 118:24
  122:18 124:14,20
  140:20 147:10
  158:17
began 39:11 130:6
begin 111:19 129:24
beginning 39:22 152:1
begun 52:2
behalf 1:5 5:21 10:18
  25:17 35:3 36:11
  44:1 60:22 61:10
  95:22 99:14
behind 103:2 126:19
being 35:4 45:3,17 47:9
  64:12 89:10 94:12
  98:1 111:4 114:25
  115:1,18,19 118:22
  121:22 128:6 143:2

143:11 146:13
beings 99:10
belabor 62:25
believe 4:23 5:2,7,10
  7:12,22 12:4,14 13:1
  13:6 14:6 20:17
  21:10 23:9,11,17,20
  24:18 34:22 35:20
  37:16 40:8,8,23
  41:25 42:24 43:10
  46:10 48:15,25 49:15
  49:17 53:14,18 58:21
  59:8 60:21 61:9 67:6
  70:14 72:18 74:4
  76:13 82:8,11,13
  83:7,21 84:1,6,20
  87:12 97:9,14 101:20
  108:8 112:4 113:12
  115:10 118:3,6
  122:14,23 131:8
  136:12 138:17 139:7
  141:23,25 142:22
  143:22 144:12 148:3
  151:9,12 156:25
believed 100:1,7 119:4
believes 96:5 97:25
  99:18 111:14,20
belonged 113:10
besides 16:6 41:18
  101:12 153:25
best 57:19 80:7 138:14
  138:15
better 59:14 60:5
between 13:19 24:7
  25:8,13 27:2,5,22
  54:4 70:15 93:6
  108:6,18 109:1,20
  113:1 120:7 122:12
  146:21 148:5
beyond 56:25 80:5
  88:18 90:7
bigger 108:13 113:4
bill 48:4 145:10
bio 37:1
bit 12:6 37:5 118:17
  139:25
blanked 70:14
block 151:7
blood 144:14,15
Boca 2:7,21
bodily 70:4 73:14,16
  74:7 77:22 80:2
  97:15,21 98:2 99:19
  107:12 109:13,15,16
  109:21,21 110:4,7,8
  110:9,16 111:17,21

119:5 125:6 128:13
  128:18 132:10
  143:16
body 16:4 32:10 106:17
  137:19
booked 13:12,16,21
booklet 16:4
born 37:7
both 115:15
Boulevard 2:7,21
box 7:20
brace 112:22
break 40:25 51:16 96:4
  103:18,20
briefly 34:19,19 50:4
bring 9:10,15 20:8 26:7
  36:22 132:25
brings 17:21
broke 51:17
Brookbank 2:5 159:10
  160:4
brought 149:24
Brownsville 1:2 2:7,15
  2:22 20:10 23:10,11
  40:1 159:2
building 23:10
bullets 68:24
Buren 2:18
B-02-180 1:14 159:4

——————————
          C
——————————

C 15:25 159:4
cadets 20:9
caliber 148:6,10
call 8:18 80:18 103:15
  113:8 118:20 151:4
called 31:25 101:23
  102:1 112:3 133:13
  139:13 142:12
  146:14 147:8,15
calls 24:6 31:14 44:15
  97:20 136:1 143:21
came 7:6 12:24 53:2
  54:13 140:14 141:4
  142:21
Cameron 22:7 26:10
  39:23
campus 16:15
Canal 151:7
capable 70:3 143:15
capacity 1:12,20 44:20
  45:7,14
car 114:9,12,16
Carancahua 2:12
care 3:20 87:14 91:7,8
  116:21

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX:(210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 163

**CARRANZA** 1:2 158:2
  159:3
**carried** 65:10,15 66:3
  67:7
**carries** 65:17,18
**carry** 63:22 65:22,23
  65:23,24 66:1,4
  67:22 68:3,18 69:16
  102:21
**case** 4:18 5:13,15 6:4
  6:18 7:22 8:24 11:16
  15:16 21:24 22:3,8
  22:11 24:3,5 35:3,4,6
  35:11,24 49:24 62:9
  65:8 66:16 70:6
  93:16,20 103:25
  111:13 115:10 118:5
  118:8 122:2 129:11
  129:14 137:14 138:6
  139:3 155:15
**categories** 14:12
**category** 40:25
**cause** 2:3 70:2 109:13
  111:17 129:5
**caused** 129:24
**causing** 70:3 143:16
**CELIA** 1:7
**cell** 28:22
**Center** 1:13,20 2:15
  10:17,21 24:8,11,14
  25:9,14,19,25 26:5,8
  26:9 27:3,6,17,23
  28:6 29:4,22 30:5
  45:12 61:18 68:6
  93:5 114:1 116:18
  119:14 145:12
**certain** 9:10 68:3 76:21
  88:6 103:10
**certainly** 137:9
**certificate** 3:7 17:21
  18:2,13,17,22,24
  19:4
**certification** 17:25
  20:20,25 21:3,11
  39:3 91:11,12 159:7
**certified** 39:5 64:15
  66:18,18,21 91:14
  141:7 159:10 160:1
**certify** 159:11,20
**chain** 57:13 113:1,4
**chamber** 65:18 134:18
  134:22
**chance** 7:23 15:4
  102:14 103:24 104:3
  117:1 118:13,19
  137:14

**change** 76:12 115:20
  137:22 158:3
**changed** 77:11 94:23
**Changes** 3:7 158:1
**characteristics** 68:20
  68:25
**charge** 22:24 57:14
**charged** 11:3,5 12:7
  36:16
**charges** 11:6,11 13:6
**chase** 26:2
**check** 154:21
**checked** 113:11 140:10
  141:13
**checking** 154:25
**Chica** 2:7,21
**chief** 4:13,14,17,21,25
  5:4,6,11 6:17 8:25
  14:7 21:25 23:7,23
  25:17,24,24 26:23
  28:1 36:9,22 39:16
  40:16,20 41:3,3,6,24
  42:2 45:20 47:12,20
  49:14,16,18 51:17
  53:10,11,13,20 54:3
  54:4,10 56:1,4 57:10
  57:13,16 58:18 59:15
  59:21 60:7,12,16,23
  60:24 62:1,17,18,18
  62:24 68:16 69:25
  75:9 78:9 81:12 83:7
  86:2 89:19 91:18
  92:13,15,16 93:18
  95:23 96:22 99:4,6
  100:20 101:22
  103:21 114:6 118:25
  123:12 124:1 129:21
  131:22 137:13
  139:11 140:1,7,14,24
  141:20 144:23 145:4
  145:10 146:22
  149:11,12,18,22
  150:25 151:17 154:2
  156:7,18 157:1
**child** 88:1
**Children** 1:4
**choice** 63:22 67:23
  125:18
**chooses** 125:19
**chose** 51:24 69:19
**chosen** 21:23 84:18,23
  86:7,19,23 126:16,17
  127:14
**Christi** 2:12 5:12
**circulation** 89:4
**circumstance** 125:12

  125:22
**circumstances** 67:15
  70:11 83:21 105:8
  107:10,22 108:24
  131:12,15 137:5
  138:21
**citizen** 33:6
**city** 1:10,18 5:18,22
  10:6,6,18 14:17,21
  15:12,17 16:8,19,22
  17:1,10,12,24 18:5,9
  18:21,24 19:5,10,14
  19:18 24:7,13,22,22
  24:25 25:6,7,8,13,17
  27:2,10,15,21,23
  28:16,17 29:2,4 30:3
  30:8,12,19 34:10,15
  36:11 40:21 44:1
  45:1,24 46:19,24
  47:7,8,12,13 48:9
  53:6 55:5,9,16,19
  56:3,5,9 57:1,1,15
  58:1,3,9,19,20,21
  59:7,8,16,17,18,22
  60:7,13,14,15,17,18
  60:22 61:10 62:10,13
  62:19 63:2,2,7,8,9,10
  63:16,18,23 64:2,12
  67:8 68:5,11 69:7,9
  70:5,12,23 71:15,19
  71:22 72:2,8,19 75:4
  75:18 76:15 82:2,16
  82:19 83:3,14 84:17
  84:21 85:6 86:7,13
  86:13,19,24 87:1,5,7
  87:13,14 90:9,18,21
  91:6 92:2,9,10 93:22
  94:5,7,24 95:5,8,8,15
  95:22 96:5,10 97:9
  97:12,23,25 98:4,8
  98:13,22,24 99:4,13
  99:17,18,23,25 100:6
  100:15 104:11 105:8
  107:9 109:4 110:25
  111:10,14,20 112:10
  113:16,24 114:24
  115:9 116:9 117:6,7
  117:7,8,12,13,14
  118:22 119:16,16,20
  119:23 120:2,3,6,11
  120:16,23 121:8,9,11
  121:18 122:10,13,22
  122:23 124:1 126:11
  127:2 133:12,15,23
  135:1,2,22 140:18
  141:2,24 142:16,24

  143:6,14,19 144:2
  145:15,18 146:8
  154:3,6,23 155:22
  156:2,10 158:2 159:5
**city's** 10:19 29:22 30:3
  32:9 33:2,8,15,16
  44:2 45:16 46:18
  59:18 66:16 77:13
  83:22 87:5 100:15
  104:6 115:15,16,21
  118:8 119:2 122:4
  123:4,9,14,17 124:12
  126:21,24 127:5,15
  127:21 128:4,11,17
  129:2 131:5 132:9
  133:7,10 134:20
  138:19 152:19,23
**CIVIL** 1:14
**claim** 46:14,14 156:22
**clarify** 7:6 43:9 145:17
**Clark** 2:17
**clasps** 112:24
**class** 18:6 19:2
**clean** 145:2
**clear** 18:4 29:20 34:1
  56:15 67:16 70:8
  135:15 136:9,23
**client** 8:21
**clip** 65:17 134:18,21
**close** 126:19 140:4
**closer** 131:13,15
**closest** 26:11
**code** 12:13 88:7,9
  150:6,6
**codes** 96:8
**come** 5:18 6:7 12:5
  23:15 59:25 91:11,13
  102:1 103:3,5 113:14
  124:10 145:3 149:17
  150:20
**comes** 18:7 19:3 50:18
  56:7 58:21,22
**comfortable** 116:1
**coming** 6:2 9:5 109:2
  123:22 124:8 131:13
  131:19 142:24
**command** 57:13 104:23
  104:23 130:16
  131:18 136:14,19
**commands** 80:17
  104:21 123:21
  130:22 131:14
**commendation** 94:17
**commendations** 30:15
  30:24 31:15 32:16
**commission** 21:5 58:13

  63:9
**commissioned** 42:24,25
  47:5,6 67:22 91:14
  103:9
**commit** 125:23 138:2
  139:1,1
**committed** 154:8
**communication** 27:3
**compensated** 45:17
  47:9 94:13
**compensation** 46:14
  156:22
**complainant** 35:10
**complaint** 11:13,19
  14:4 33:17 35:11
  152:20,24
**complaints** 11:13 30:14
  30:23 31:14,22 32:5
  32:15,22 34:3 36:12
  50:9,22 149:23
  153:16
**complete** 16:11 67:14
  69:18 75:10
**completion** 17:21
**compliance** 133:11
  150:16
**complied** 135:8,10
**complies** 105:2 135:14
  130:12,23 131:14
  136:20
**complying** 136:23
**concerned** 145:18
**concerning** 9:21
  145:16,20 146:2
**conclude** 40:4
**concludes** 157:4
**condemned** 95:16
**condition** 89:15,15
  140:19,19 142:19,19
  143:10,10
**condoned** 95:16
**conduct** 32:22 56:24
  79:3 92:10
**conducted** 52:5 92:7
  95:12 98:5 155:22
**conducting** 149:7
**confidential** 93:18
**conflict** 73:22 74:1
**confronted** 80:12,16
  81:9 107:4,20 109:6
  110:14
**confused** 112:18
**conjunction** 60:24
**consent** 144:12
**consequently** 30:8

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

consideration 158:19
consists 99:21
constable 38:4,4
constituted 111:21
119:5
constitutional 73:4
consult 50:20
consulted 121:25
contact 12:24
contain 31:1
contained 62:20
contains 57:1
contends 97:13 98:24
99:18
contention 112:2
contents 52:20 54:13
54:19 118:13
context 52:20 88:6
118:4,7
continue 8:24
continued 150:4,17
continuing 72:10,23
continuous 17:11 72:12
continuously 150:8
contract 25:10,12
contracts 24:6
control 26:3 115:5
conversation 31:4
conversations 8:22 9:2
146:20
convicted 10:24
copies 117:9,13
copy 6:25,25 7:13,19
7:22 17:13 18:15,19
31:2 48:14 49:13
55:6,17 56:22
Corpus 2:12 5:12
correct 5:19 11:1,5
12:23 13:16 22:8
24:23 25:3 33:13
34:2 35:23 42:2,6
43:15 47:4 48:5,11
48:18,21,25 50:7,16
50:24 51:7,11 53:22
56:4 57:4,20 59:9,10
64:15,16 65:7,14,19
68:23 69:5 71:3 72:7
72:22 74:10,12 77:22
78:20 79:11 81:6,16
82:19 85:14,17 86:10
86:23 91:2 95:14
98:19 105:5 106:14
106:20 109:8 110:6
112:25 113:7 115:13
119:8 124:14,15
131:3 133:23 134:1

142:4 144:9 146:9
147:2,4,10 149:18,19
150:14 151:15,16
152:7,12,17,18 153:6
154:20,24 155:3,5,13
158:12
correctional 68:1 81:20
81:21 84:3,4,15 85:9
85:10,15,24 86:15
87:8,16 141:7,9
correctly 53:19 57:12
62:4 69:15 82:14
107:8
Costs 160:2
council 56:9 58:10,20
63:8
councilmen 56:8 58:22
counsel 14:13,21 49:10
49:24 56:17 58:3
63:2 103:13 144:25
159:20
counter 115:12
County 20:9 22:7
26:10 37:8 39:23
158:16
couple 5:25 13:10
52:10 73:8 91:20
103:22 104:3 118:25
129:22 131:23 140:2
144:10
course 17:21 18:22
19:12 76:11 84:13
94:8 136:5 148:13
courses 87:21 88:2
court 1:1 2:8 7:19
155:18,21 156:14,16
159:1
covered 19:7
crime 10:25 38:23
139:13
criminal 12:9,10,12,14
12:16 48:16
Critical 3:20 116:21
CSR 2:5 160:4
culture 87:25
custodial 48:23 92:24
147:16
custody 28:18 84:5
88:12 90:4 144:7
148:13,21 151:14
custom 75:14
cut 149:4
cutter 148:7,8
cutting 89:4
CV 36:22

**D**

D 21:19
danger 78:8,19,23,24
78:25 79:16 80:2,10
88:24 97:7,15 98:1
107:11 109:24 128:6
dangerous 143:2
Daniel 23:2,3 149:12
date 4:25 5:1,5,8 11:19
11:19,24 12:1 31:19
34:20 42:13 160:5
dated 142:1
daughter 155:4
day 2:3 14:4 47:15,15
83:18 101:23 158:17
158:21 160:1
days 108:13 118:1
daytimes 46:1
day-to-day 44:2
deadly 14:16,23 16:1,2
35:17 70:1,6,11,18
70:23 71:1,14,21,23
71:25 72:5,9 73:3,20
73:23 74:5,11,14,21
74:23 75:5,13,15,22
76:3,17 77:5,15,19
77:20 78:7,13 79:13
80:1,5,14,18,23 81:2
81:9,10 95:20 96:9
96:11,21,24,25 97:20
98:10 104:5,7,8,17
107:10,16,23 109:4,5
110:3,13 111:1,23
119:4,4 123:25 124:3
124:13,20 128:3,9
129:9,18 130:10,19
131:21,23 133:13
135:13,16 137:6,11
137:22 138:6,22
139:5 146:14
deal 79:3 87:22 120:18
death 1:5,6,15,15 3:14
5:13 13:11,19,20
28:5 35:5 43:5,14,21
48:23 53:23 54:6
61:3,6,14 70:4 74:7
77:22 80:2 92:24
93:6 97:15,21 99:19
107:11 109:15,21
110:4,16 111:16,17
111:22 117:10 125:6
128:13,18 132:10
140:10,12,20 143:16
debilitate 133:18 134:6
deceased 1:6,8,16
10:15 140:9

December 53:14,15
decide 69:19,22
decides 104:10
deciding 124:20 129:17
decision 26:7 99:15
111:5 121:18,19,20
124:2
declined 22:7
decreased 140:12
defendants 1:13,21
159:6
DEFENDANT(S) 2:16
defense 49:10
defensive 136:8
defines 69:25 70:1
degree 89:13 106:22
Delgado 23:2,3,8,18
101:14,15,17,20
113:12,13 114:15
121:23,24,25 149:12
deliberation 22:3
delusion 80:22
demonstrate 34:5
demote 57:18
demoted 93:25
department 1:11 14:18
15:2,6 16:6 17:12,24
19:10,15 22:18,25
23:1 24:1,5 27:6 28:2
28:5 30:13,19 31:17
31:21,22 32:23 33:5
33:12 34:11,14 35:12
35:24 38:16,18,22
39:1,20,24 40:2,11
40:24 42:8 43:11,20
48:11,20,24 49:3,4,9
51:23 52:7 55:5 56:4
56:6,25 57:3,14,16
57:20 58:4,8,11,17
58:18 60:2 62:16
63:19 64:25 65:4,21
68:2 69:7 70:13
74:13 75:14 91:7
92:3,8,10,25 95:9,13
112:11,16 113:24
114:16 117:8,9,14
119:11,20 120:2,12
120:24 126:2 130:13
142:17 144:21
145:21 147:15
148:22 149:8 150:3
152:25 153:18
155:22
Department's 10:7
depends 111:3 129:19
136:14 137:1,12,24

depo 3:23,24,25
depose 54:12
deposition 1:22 2:1 3:9
5:13 6:3 7:17 8:8
9:18 31:6 48:3 49:20
51:20 93:14 112:1
157:4 158:11 159:8
159:14,16
describe 143:2
described 66:6 72:24
description 3:8 80:5
109:10
designated 9:16
designation 32:1
designed 32:11 133:17
desirable 82:3
desire 18:10
detail 31:10 55:25
101:4 139:12
details 6:1 73:19 93:4
118:18
detainee 10:16 14:11
102:5
detainees 14:19 27:5
28:18 29:3 31:18
detention 13:12
determination 155:14
156:1
determine 24:19
determined 25:18
121:14
determining 129:9
devices 147:20
diabetes 54:8
Diagram 3:24
dictate 120:17
dictated 113:17
dictates 67:9
dicusses 70:17
difference 91:9 109:19
109:20 121:3 143:18
148:4
different 67:1 68:20,21
68:23,24,24 88:7
110:8 118:21 124:17
142:21
difficult 28:13 36:10
dimensions 89:12
132:14
direct 18:25
directed 26:6 153:5
directing 28:14
directly 26:4 39:1
director 20:12
disable 134:7
disagreeing 86:3

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

discipline 57:15
discretion 67:14 69:18
  69:22 111:6 116:6
  144:6
discuss 8:7,12 101:4,6
  132:4
discussed 12:5 72:17
discussion 132:4
discussions 49:25
disease 120:14
dispatch 44:17
dispatcher 42:18,19,22
  43:6,7,12,15,21,23
  44:4,11,13,23 45:4
  45:13,25 46:22 47:3
  95:3,4 101:19,25
  102:25 142:23
dispatchers 40:23 41:1
  41:18 42:22
dispatching 44:4,15
distance 69:1 108:6,18
distances 88:23
distinction 141:8
district 1:1,1 2:8
  145:21 159:1,1
disturbance 79:5
disturbed 142:14
diversity 87:25
division 1:2 40:12
  159:2
doctors 89:17 126:7
document 9:4,9 15:9,9
  15:10,11 32:11
documentary 22:1
documentation 31:16
  34:11 146:2
documentations 32:16
documents 6:6,22,25
  7:3,7,9,14,16 9:10,16
  9:20 10:1,14 14:4,9
  14:20 30:9 31:6
  32:15 45:1 47:21
  49:18 50:9,24 51:8
  51:11,13,18 93:2
  101:1 103:23 116:17
  117:3,13 118:18,20
  132:6 145:19,20,21
  156:5,8,10,19,20
doing 44:4,17 86:21,22
domestic 79:5
Don 151:3,4
Donato 1:23 2:1 3:4 4:1
  4:6 151:2,3 158:11
  158:14,17 159:8,13
done 60:23 73:5 92:16
  127:1 144:13

door 124:8 126:19,19
  126:19 132:14,24
down 10:9 40:25 74:4
  130:1,8
draw 102:16 133:21
  134:10
Drawer 2:18
drawing 126:16,18
drawn 3:24
drew 130:19
driver 142:23
driving 142:13
Drug 39:23
Due 160:3
duly 2:2 4:2 159:13
during 18:6 28:4 33:5
  45:18 46:4,4,15
  47:17 49:4 63:21
  101:13 112:21
  123:18 148:12
  151:17,17
duties 43:19,23 44:4,6
  45:3,7 47:3 94:22
  95:3
duty 45:13 65:16,17
  101:24 102:2 103:2,6

**E**

E 1:2 2:18 4:3 24:6
  26:24 145:9 149:21
  150:24 159:3
each 32:6,8
earlier 34:1 47:14
  62:25 72:17 81:13,23
  85:12 94:7 99:15
  111:18 116:15 119:1
  153:5
early 13:21
earn 4:10
edited 53:2 55:20
Eduardo 2:20 3:5
educate 79:23
education 17:11 21:6
  72:10,13,24
effect 30:9 58:4 61:17
  113:16 128:15
  129:16
efficiency 57:15
efficient 57:19
effort 108:17
efforts 24:19
eight 49:21
either 29:24 120:13,18
  123:7 131:6 146:24
  152:8
elected 38:4

elementary 100:5
elevated 123:24
elevation 105:7,9
eliminate 104:21
eliminated 104:19
  105:3
emails 117:17
emergency 13:14
employ 46:19
employed 14:17 16:8
  16:19 40:22 87:7
  159:21
employee 46:20 60:1
employees 15:12 57:2
  57:17
employment 94:3,9
encounter 33:5
end 39:22 40:7
ended 39:25
enforcement 19:6 21:5
  38:2,10 39:23 84:15
  86:10
enforcement-type
  37:24
engage 108:17
engaged 44:6
enough 101:2
entertain 139:9
entire 10:7 15:9
entirely 73:6
entirety 15:18 73:2
Entitled 1:5
entity 20:5 38:12
entry 137:18,23 138:5
enumerated 9:21
equipment 63:19
  112:10
equipped 60:5
escalated 130:10
  131:20
escape 74:11,15,23
  75:5,13,16,22 76:3
  76:17 77:6,16 108:6
  110:23 124:19 125:5
escapee 76:5
essentially 21:22
establish 10:13 89:22
  126:1
established 144:1
ESTATE 1:8
ET 159:3,5
etc 24:7
evaluations 30:14,23
even 20:9 61:17 90:18
  111:1 137:10 139:3
  148:20

event 69:10 98:23
events 97:24 98:9,14
  101:5 122:19 123:19
ever 13:21,23,25 21:17
  27:16 28:17 61:8
  68:6,11 102:4,6,7,11
  102:15,18,20 137:5
every 17:8,21 72:14,25
  76:12 83:18
everything 10:3,5 14:9
  31:7 49:22 50:2
  124:6
everyithing 124:13
evidence 22:2 138:4
exact 110:1
exactly 79:22
examination 3:4,5,5,6
  159:18
example 24:22 25:6
  35:3 44:5 62:6,11,19
  64:10,22 67:25 79:2
  80:11 88:14 104:20
  106:2 107:3 108:9
  110:18 115:10
  145:16
exceed 104:23 105:23
except 74:6 77:20
  158:12
exception 92:20
excessive 31:16,22
  32:17 33:5,18 34:4
  34:24 35:4 50:10,22
  50:23 51:12 149:23
  150:1 152:20,21,24
  153:17 154:3 155:24
excuse 33:2 44:3 47:13
  55:5 60:4 64:25
  81:15 84:3 90:9
  107:25 129:16 140:6
  155:12
executed 158:19
executive 20:12
exhibit 9:14 15:3,18
  16:6 21:24 22:3,6,12
  48:5,8,12,20 49:2,5
  49:10 52:4,10,12,17
  52:25 54:13,22 56:2
  56:17,18,19 58:2
  60:19 61:2 70:1 71:2
  92:24,25 93:1 116:19
  116:21,23 140:1,9,12
  140:25 141:20
  144:10 156:19
exhibited 141:2
exhibits 2:24 3:8 49:19
  49:21 51:21 55:25

92:20 116:15 117:9
  118:14
existed 15:5
existence 17:19
exists 24:20 27:21
exit 124:9 137:18
expect 60:11 138:25
expected 54:7
experience 33:10,12
  60:1,3,4 68:19 71:6
  78:17 131:25
Expiration 160:5
explain 98:12
explains 122:22
expressed 121:13
  158:19
expressing 95:21,23
extensive 110:9
extent 8:18 58:20 90:3
extract 124:7
extricate 108:24 124:3
  127:25

**F**

F 30:11
face 28:14,14 108:20
  136:7,15
faced 119:2,3
facilities 88:21
facility 13:12 26:1 68:1
  68:1 81:20,21 82:22
  83:25 87:16,16,17
  141:3
fact 81:5 86:3 92:6
  110:14 129:13 131:4
  146:15 149:16,17
factor 129:7
facts 138:4
failed 129:25 130:3,7
  130:23
failing 131:14
fails 130:12
fair 19:25 75:10 81:18
  90:6
falls 73:15
familiar 5:15 68:19
  70:18 71:4 93:4
  98:14 134:12,13,17
  141:14
family 33:19 35:4
  87:25 142:12,12
  154:14,18 155:17
far 15:16 49:19 123:4
  138:6 145:17
Farm 37:21
fashion 39:14

**faster** 69:2
**father** 38:3
**fault** 77:4
**faxed** 8:2 17:8
**fear** 97:6,6 98:25 99:19 100:8 105:11 119:3
**feared** 97:17 98:20,22 99:24 100:1
**fears** 107:1 110:23
**February** 39:21
**feel** 70:22 97:21
**feels** 111:1 115:25
**feet** 106:18
**felon** 75:2 76:5 77:9
**felt** 107:11
**Feria** 1:10,11,18 4:13 4:15 5:19,22 10:6,6 10:19 12:17 14:17,21 15:1,5,13 16:6,19,22 17:1,12,24 18:9,24 19:5,10,14,18 22:18 22:25 23:1,15,24 24:1,7,13,22 25:8,13 27:6,10,15,23 28:2,5 28:16,17 29:2,5 30:13,19 31:17,20 32:17,23 33:4,12 34:4 35:24 36:3 39:1 39:11,12,15,20,24 40:1,10,21 41:23 42:8,15 43:11,19 47:7 48:9,19,24 49:4 49:6 51:23 53:6 55:5 55:10,16 56:3,5,25 57:3,14,16 58:2,3 63:3,16,23 64:2,12 65:1,3,4,20 67:8 68:2 68:6,11 69:7 70:6,12 70:23 71:15,19,22 72:3,8,19 74:13 75:14,18 76:15 82:2 82:17,19 84:17,22 85:6 86:4,13,24 87:7 90:10 91:6 92:2,10 92:10,25 93:1,22 94:5,25 95:8,8,15,22 96:5 97:13,24,25 98:4,8,22,24 99:4,13 99:17,18,23,25 100:6 100:15 102:7 104:11 105:9 107:9 111:20 112:10 113:17,24,25 115:10 116:9 117:6,7 117:7,8 118:22 119:10,16 120:6,11 120:23 121:18 122:13 126:12 130:13 133:23 135:22 140:17,18 141:21 142:17,20,24 143:7,14,19 144:3 145:15,21 147:14 148:21 149:8,24 150:3 152:25 153:18 154:3 156:10 158:2 159:5
**Feria's** 15:17 63:18 75:4 94:8 96:10 109:5 117:14
**few** 55:24 118:1 145:7 145:12
**field** 38:10
**fight** 106:4,4 110:20
**fighting** 54:8 107:5
**fights** 106:6
**figure** 14:4 140:15
**file** 10:7 11:18 12:3 30:11,18,20 31:2,12 31:21,25 32:2,5,6,8 42:10 46:8 48:21 49:8,9 50:5,21 51:8 51:23 65:4 91:20 92:1,17 102:14 145:18
**filed** 11:14,19 14:5 33:17 36:13 149:18 153:17
**files** 49:6 55:12
**finally** 31:9
**financially** 159:23
**find** 26:15 36:17 56:2 58:16 79:20,25 80:8 86:18 96:22 127:8 142:15 143:4 145:2 156:8
**finding** 156:1
**findings** 95:5 155:23
**finds** 81:8 111:6
**finger** 13:23
**finish** 7:25 29:11 37:11
**finished** 144:23 156:6
**fire** 102:18 134:11,18
**firearm** 14:18 35:15 64:23 65:2 104:6,7,8 106:24 107:6 133:17 134:5 137:6 139:4
**fired** 133:9
**fires** 136:21
**firing** 133:9 134:21 135:23
**FIRM** 2:11
**first** 6:1,10 13:15 16:11 19:25 20:24 24:12 30:17,19 31:20 34:2 37:6,23 38:9 39:5 40:24 48:4 52:12 60:10 63:17 70:5,13 96:4 103:23 112:18 121:20,22 123:20 130:21 151:1 156:9
**fist** 106:3 110:19
**fists** 105:15 106:18 107:8
**five** 39:25 108:13
**fled** 26:3
**fleeing** 75:2 76:4 77:9
**flip** 144:11
**floor** 127:19 128:2
**follow** 62:9 118:23
**followed** 95:24,24
**following** 5:9 159:12
**follows** 4:2 56:16 57:7 57:13 74:5
**foot** 26:3
**force** 14:16,17,22,23 16:1,2,2 24:9 30:16 31:16,22 32:17 33:5 33:18 34:4,25 35:4,7 35:9,17 36:3 39:23 40:4,6 50:11,22,23 51:12 57:25 65:21 70:1,2,6,11,17,18,23 71:1,12,14,21,23,25 72:5,9 73:3,5,20,23 74:5,11,14,21,23 75:5,13,16,22 76:3 76:17 77:5,15,19,20 78:3,7,13 79:13 80:1 80:5,5,14,18,23 81:3 81:9,10 95:20 96:9,9 96:12,20,21,24 97:1 97:21 98:10 104:5,7 104:8,12,16,17,19 105:3,6,7,9,17,18,21 105:22,23,23 106:16 106:19,22,22 107:10 107:16,20,23 108:2 109:4,5 110:3,14 111:1 119:4 123:21 123:21,25 124:3,13 124:14,20 127:16 128:9 129:9,18,23,24 130:6,10,19 131:21 131:23 133:13 135:13,16 137:6,11 137:22 138:6,22 139:5 146:14 149:23 150:1 152:21,24 153:17 154:4 155:7 155:15,24 156:2
**foregoing** 158:11,18
**forensic** 3:21 116:23 147:8
**forgive** 94:7 150:25
**form** 6:13 17:4 47:23 50:15 68:12 74:16 75:7 79:9 90:23 91:1 110:21 117:15,15 121:5 124:21 135:18 135:25 155:6
**former** 45:20 49:14 53:10,11 92:13,15 93:18
**forms** 106:16,19
**forseeable** 83:8
**found** 55:12 135:12
**four** 39:25 41:1,18 42:22 46:1 64:7 66:4
**Fourteen** 156:15
**Francisco** 151:8
**free** 70:22
**Friend** 1:3
**from** 2:4 5:12 9:2 11:18 15:11 17:9 18:7 20:8 20:9 22:3,12,15,18 23:24 26:3 27:16 28:22 29:4 30:4 31:18 37:13 38:15 39:16 43:20 44:14 45:3,16 48:4,8,19 52:6,23 53:2,23 54:13 55:20 56:1,7 57:18 58:21 59:19,24 68:6,19 72:7 74:7 76:14 77:22 79:12 80:21 82:20 83:18 85:5 91:11 93:21 95:2 96:16 100:12,14 108:25 110:8,24 111:24,25 112:1 113:25 114:3,24 116:10,17 118:21 119:12,12 120:13 121:9,25 124:3,4,7 124:11 125:1 127:25 130:4,4 131:6 141:4 143:5,5 144:14,16 145:18,21 147:7,14 152:1,2 153:15 154:25
**front** 22:19 23:19,25 28:22 56:1,22 91:21 145:20
**fulfilling** 45:2
**full** 47:5,6 57:14 134:18
**full-time** 42:19,21 43:7 43:15 94:24 101:18 101:20 102:1
**function** 58:18,19
**furnishings** 89:12
**further** 28:19 53:12 56:24 90:13 159:20 159:22
**fussing** 72:2 89:19
**futile** 108:17
**future** 84:16

G

**G** 3:23,24,24,25 9:22 10:2 16:24
**gait** 113:5
**Garcia** 1:23 2:1 3:4 4:1 4:6,8,9,9 5:4,11 6:17 8:25 14:7 21:25 23:7 23:23 25:17,18,20,24 26:23 28:1 36:9,22 40:20 47:12,20 49:18 51:17 56:1 68:16 69:25 75:9 78:10 81:12 91:18 96:23 99:5 100:20 101:22 103:21 114:6 118:25 123:12 124:1 129:21 131:22 137:13 140:1 144:23 145:4 150:25 151:17 156:7,18 157:1 158:11,14,17 159:8,13
**Garza** 2:20 3:5 4:7 6:20 7:8,9 8:17,20 9:2 14:13 15:1 17:4 29:11 31:4 47:22 48:13 50:15 51:2,5 56:17 74:16 75:7 76:18 79:9 87:19 90:23 91:1 98:16 103:13,15,18 110:21 124:21 128:7 135:18 135:25 139:6 143:21 149:22 150:23 157:2
**Garza's** 55:7
**gather** 10:1 86:8 115:8
**gathered** 24:1 49:20 156:22
**gauge** 64:5,6
**gave** 131:18 147:6
**GED** 37:14,15,15,17
**general** 40:13 48:25 60:11 79:12 80:5

DONATO GARCIA

April 9, 2003

Page 167

| | | | | |
|---|---|---|---|---|
| 91:21<br>generally 64:24 118:20<br>General's 140:7<br>Gerardo 1:11,19 30:12<br>  30:16<br>gets 18:2 105:13 106:3<br>getting 48:2 51:19<br>  89:20<br>give 15:4 16:11 42:14<br>  56:20 62:6,11 78:4<br>  79:2 105:11 111:10<br>  116:16 139:25<br>given 7:3,16 13:13<br>  58:12 77:24 80:3<br>  82:15 83:21,23 88:16<br>  93:15 112:2 114:20<br>  117:3 128:19 129:3<br>  140:16 146:7,8<br>  158:20 159:15<br>giving 5:22 99:4 145:23<br>  146:5<br>glean 32:6<br>gleaned 100:21<br>go 8:14 10:9 16:25<br>  28:19 31:2,3,10 32:6<br>  34:2 37:9,17,18<br>  38:25 43:12 45:11,23<br>  47:21,23,24 51:2,6<br>  53:12 55:22,24 56:13<br>  59:15,24 71:18 73:8<br>  75:1 77:3 79:17<br>  81:22,22 84:7 103:22<br>  105:23 106:7,23<br>  112:24 113:6 123:3<br>  126:18,22 132:3<br>  138:6 140:3 144:10<br>  147:15,17<br>goes 32:2 73:12 96:7<br>  135:4<br>going 4:16 7:21 9:14<br>  12:9 21:19 31:9,10<br>  34:22 47:20,23 48:20<br>  49:2,4,10 51:18<br>  53:16 59:13,19 60:4<br>  60:4,12,15 64:18<br>  69:11 75:25 77:3<br>  79:14 81:14 82:20,24<br>  83:9 86:5 90:3 96:4<br>  97:18 99:11 104:4<br>  107:22 113:8 114:17<br>  114:22 116:16,25<br>  126:3,4,5 129:21<br>  134:4 138:2,16<br>  144:24,25 147:17<br>  156:7<br>gold 142:13 | gone 16:18 47:22<br>  111:19 155:18<br>Gonzales 5:3 149:11<br>Gonzalez 1:3,4,4,6,7,8<br>  1:14,16 5:2,15 10:15<br>  10:20 11:20 12:25<br>  14:10 25:25 28:4<br>  29:7,21 33:19 34:6<br>  35:3 43:5,14,21<br>  45:12 48:17 49:16<br>  52:1 53:13 54:4,10<br>  61:3,14,18 62:19<br>  67:25 92:15,16 93:6<br>  101:13,23 111:20,21<br>  112:2 114:23 115:15<br>  117:10 119:11,17,21<br>  119:24 120:3,4,7,9<br>  120:24 121:3,10,12<br>  121:15 122:4,14,24<br>  123:5 126:13,18,20<br>  127:22 128:6,12,17<br>  129:2,14,25 130:7,11<br>  130:22,23 132:5,9,20<br>  134:23 137:19,23<br>  138:5 140:7,15,24<br>  142:12,13,17 143:2,8<br>  143:19 145:16<br>  146:22,23 148:20<br>  149:12 154:11<br>good 15:23 86:21<br>  123:16<br>gotten 96:14 127:1<br>governmental 38:12<br>graduate 37:13,14<br>graduated 38:15<br>GRAHAM 2:17<br>grain 148:6<br>grand 3:11 21:19,23<br>  22:2,7,11,15,19<br>  23:19,25 24:2 48:4<br>Grande 16:15 17:2,9<br>  18:23 20:3 39:7<br>great 90:13,24<br>greater 90:10<br>grievance 33:17<br>grievances 31:14 32:15<br>  34:3 36:12 50:10<br>  153:17<br>ground 134:9<br>group 47:25<br>guard 27:8 28:20 29:4<br>  45:12 81:19,25 82:7<br>  82:10 83:15 85:8,13<br>  86:14 87:15 88:12<br>  91:5 101:12,23<br>guarded 102:5,6,7,8 | 121:4<br>guarding 67:24 68:8,14<br>  69:12 81:15 82:16<br>  89:11 90:4,11 114:10<br>guards 82:6 131:7<br>Guerra 2:7,20<br>guess 33:11 38:24 42:1<br>  46:4 59:25 75:24<br>  86:2 92:19 97:9<br>  103:8 136:6 141:1,8<br>  144:20 155:4 156:19<br>  156:21<br>guessing 142:8<br>guidance 67:9 77:24<br>  79:3 80:3,4<br>guide 62:9<br>guided 113:17,21<br>guideline 111:10<br>  113:20 121:9<br>guidelines 56:24<br>  118:11,23<br>gun 126:18<br>gunfire 136:7<br>Gustavo 1:3,6,8,14,16<br>  5:15 10:15 13:13<br>  25:21 45:12 48:16<br>  61:3,14 119:11 153:1<br>  153:19<br>guys 108:12<br><br>**H**<br><br>H 31:14 32:19,20 33:23<br>half 39:25<br>halfway 74:4<br>hall 34:15<br>hand 90:8 158:20<br>handcuff 121:16<br>handcuffed 128:19<br>  130:9 132:5,23<br>handcuffs 88:17,18,18<br>  89:1,2 90:2,9 91:4<br>  111:23 112:3 113:2<br>  129:12 130:18<br>  147:21<br>handed 10:4 18:19<br>  93:17 117:4<br>handgun 65:12 66:17<br>  104:6 133:7,8,10,16<br>  136:20<br>handguns 64:11 65:22<br>  66:10,11,13,13<br>handle 84:5 120:18<br>hands 105:19 107:7<br>  152:14,16<br>happen 60:8 82:24<br>  83:6,17,18 112:13,15 | happened 46:5 58:15<br>  94:18,19,19 98:25<br>  100:9,16,24 101:5<br>  122:21 146:18<br>  148:17 149:9,11<br>happens 83:17 108:11<br>  144:7<br>Harlingen 2:19 3:15,16<br>  5:14 16:13 24:5 49:3<br>  49:9 52:6 55:4 92:7<br>  93:1 95:13 139:14<br>  145:18<br>harm 109:13,15 126:3<br>  129:5<br>hate 62:24<br>having 4:2 11:18 62:2<br>  119:24<br>head 36:6 40:14 41:14<br>  48:6 50:6 133:24<br>health 119:18 123:5<br>  140:19 145:16<br>healthcare 26:1 82:22<br>  83:25 141:3<br>hear 50:25<br>heard 112:19,19 132:2<br>  139:22<br>help 78:6 79:2 130:24<br>  131:6,8,17 141:22<br>hereto 2:9 3:3<br>Hidalgo 20:9<br>high 37:13 143:3,17<br>higher 105:23<br>him 11:6 26:7,20 29:11<br>  42:9,12 45:21 47:19<br>  49:25,25 50:20,20<br>  52:2 96:19,23 97:7<br>  98:25 99:1 103:3,5<br>  113:14 119:12<br>  123:22,23 124:8<br>  125:10 126:20 127:8<br>  127:11 128:1 129:5<br>  131:19,19,20 134:23<br>  136:15 144:25<br>  147:22<br>himself 42:2 47:20 74:6<br>  77:21 78:8 81:8<br>  122:15,24,25 124:3,4<br>  124:7 127:23,25<br>  128:6,14<br>hire 42:9,12<br>hired 17:19 42:8,17,17<br>  42:19,21 43:2,20<br>  91:14<br>hires 71:22<br>history 30:12 37:6<br>  39:15 48:16 119:21 | 119:24 120:25<br>  121:12 145:16<br>Hold 50:25<br>hollering 131:8,20<br>homicide 12:14<br>hospital 11:8,9,15 12:7<br>  13:7,10,14 25:19<br>  26:9,21 27:9,14<br>  28:19 45:18 47:1<br>  52:9,9 68:1 81:16<br>  82:15,21 83:25 87:16<br>  100:22,24 102:8<br>  103:3 113:9 114:3,11<br>  114:18,20 115:24<br>  116:10 120:8 121:10<br>  121:25 122:5 124:4<br>  126:6 127:19 128:19<br>  133:3 142:18 146:15<br>  146:22 147:7 148:14<br>  148:21,24<br>hospital's 25:14<br>hour 44:13<br>hours 13:21 44:15,22<br>  45:25 103:10<br>huge 108:12<br>human 99:10<br>hurry 7:20<br>hypothetical 104:5<br><br>**I**<br><br>idea 12:20 23:21,22<br>  25:2 42:14 46:16<br>  55:18 61:12 83:4<br>ideations 120:14,19<br>  121:2,14<br>identified 48:5 49:8<br>  51:9 147:18<br>identify 156:6<br>IH-10 160:5<br>ill 54:7 120:19<br>illness 80:22 119:21,25<br>  120:14,25 121:1,12<br>  121:13<br>imagine 58:13<br>immediate 78:23,24<br>  79:15 80:2 97:22<br>  110:4 132:10<br>immediately 74:6<br>  77:21 147:24<br>imminent 125:6<br>imminent 78:8,19 97:7<br>  97:15,22 98:1 99:19<br>  109:23<br>implement 63:11<br>implementation 56:14<br>improper 76:16 77:15 |

inadequate 82:12
inappropriate 137:11
138:3,7
inappropriately 138:17
139:5
incidences 155:12
incident 3:13 4:18,25
6:1 21:20 24:25 28:1
29:7 33:1,2,3 34:5,13
34:20,23 35:25 36:3
45:10,18 46:5,15,19
46:23 47:1,10 48:19
51:25 52:5 62:9 65:9
84:22 91:24 93:5,11
93:23 94:9 97:16
102:11,15 111:15
115:22 117:4,4,21,23
118:24 132:2 139:16
140:8 146:3,13,13
148:2 151:6,13,18,19
151:20,23 152:7,25
153:1,19 154:11,12
155:12,16,17,25
156:21
incidents 11:14 28:24
33:24 34:3 50:22
51:12 125:1 150:6
153:16
include 30:22 78:9,14
107:21
included 14:20 41:6,20
44:14 49:21 50:24
51:13 60:19
includes 41:9 78:17
including 14:18 15:13
21:21 30:13 31:19
104:17 117:8 119:11
123:10
indeed 70:6
independent 60:23
index 3:1 32:10
indicate 45:1 140:25
indicated 58:24 113:21
116:9 137:15 142:13
145:14 147:9
indicates 92:2 114:24
142:11 144:3,13
indicating 22:6
indication 44:25
109:11 135:15 136:9
136:23
indicted 11:5
indifferent 90:21
individual 5:23 33:9
36:7 67:13,14 69:20
80:12 81:1 88:16

99:5 107:5 109:1
123:22,24 124:7
126:3 129:19 143:15
146:4,11,14 148:13
151:8,9,13
Individually 1:2,7,12
1:14,19
individuals 52:6 60:8
88:22
infer 136:12
information 3:21 8:20
9:11 16:5 23:18 24:1
27:16 30:4 32:4,7,12
32:14 36:17 53:3
68:12 84:11,12,13
86:8,9,24 88:15
92:23 100:21 113:25
114:3 116:10,24
117:15 119:17 120:7
120:15,23 121:11
122:14 127:22 128:5
130:5 140:14,16,18
141:4 142:11,16
143:6,7,15 147:8,17
149:10
initial 5:1 52:1,13 63:1
initially 12:24 37:20
42:7 43:2 129:24
152:2
injure 110:15 133:18
134:6
injured 142:15
injuries 26:4 46:15
149:1
injury 70:4 73:14,16
74:7 77:22 80:2
97:15,21 98:2 99:20
107:12 109:13,15,16
109:21,21 110:5,7,8
110:9,15,16 111:17
111:22 119:5 125:6
128:13,18 132:10
134:11 143:16
input 19:15 62:3 72:19
inquiring 25:20
inquiry 25:5
insofar 149:7
instance 2:2 129:23
139:3 147:21 152:21
155:24
instances 30:14
instead 71:9 126:16,17
institution 19:22
institutions 84:12
instruct 8:21 50:19
instructed 69:6 118:23

instruction 68:7,12
121:8,9
instructional 16:4
instructors 19:19
instrument 158:18
intended 70:2,3 99:1
interchangeably 103:1
interested 38:7 159:23
internal 145:20
International 2:21
interpretation 107:4
109:12
interrupt 74:18,18
intervening 54:3
Intervenor 1:16 2:13
intoxicated 142:14,23
investigating 93:16
investigation 3:16 22:2
22:11,25 49:4,9
52:16 92:5,7,11
93:17 95:7,12 98:5
99:15 115:11 146:2
149:8 155:23
investigations 100:17
100:21,25
investigative 145:18
investigator 11:17 23:6
40:11,13,13,14,14
41:14,15 42:18
investigators 41:11,14
41:16,19
involve 35:14,17 36:14
involved 14:10 26:2
28:25 29:18 34:20
35:21,23 36:2,13,19
37:24 146:3 149:13
155:1
involvement 149:16
involves 10:14
involving 5:13 10:14
33:19 34:5 50:10
154:11,14,18 155:17
in-custody 24:10 27:18
27:24 29:24 30:6
68:8,14 69:12 81:25
82:11,16 86:15 88:16
88:22 90:14
irons 123:23
Isabel 20:10
issue 81:6 86:5 103:8
issued 94:16 112:10
issues 59:20 93:10
150:20
item 10:14 15:25 21:19
24:6 26:24 30:11
31:14 32:19,20 49:11

140:9 141:6,12
items 9:21 10:2 11:22
16:23 21:21 30:22,24
33:24 49:19 50:21
51:18,21 64:12,13
106:24 114:6,24
115:16

_____ J _____

J 2:4,14 159:10 160:4
jail 13:12
Jerry 1:11,19 30:12,16
job 4:12,13 38:9
Joseph 2:11 3:4,6 5:11
JR 1:4
Judge 146:15
judgment 79:15 97:5
June 5:7,9 53:20 151:7
151:22,24
jury 3:11 21:20,23 22:2
22:7,11,15,19 23:19
23:25 24:2 48:4 64:1
just 7:23 8:1,9,17,17
10:10,12 20:2 26:11
29:20 31:11 32:2
34:19 37:5 40:23
41:9 51:20 55:14,21
56:21 60:11 61:21
64:19 71:7 72:2
87:25 89:1,2,22
91:20 96:20 98:19
99:6,22,22 106:17
110:9 113:1 116:25
117:2 118:14,19
121:16 123:22
126:23 139:25
142:11 144:10 145:2
145:12,17 156:7
justified 98:10

_____ K _____

Katherine 2:4 159:10
160:4
keep 36:18 37:4,4
103:10 114:12,15
126:5
keeping 88:23,23
keeps 109:2
kept 123:22 124:7
131:19,20
key 147:22
kill 99:1 130:18 133:21
134:6,7
killed 98:1 131:25
killing 133:19
kind 10:13 16:2 26:17

37:20,22 39:14 47:23
49:12 64:23 83:12
107:6,21 128:24
139:11 150:4
Kingsville 20:9
knee 112:22
knew 146:8
knife 107:6 149:5
know 6:5 7:19 8:1 9:3
10:11 11:18 12:2
19:21,25 20:2,4,11
20:16,24 21:14,17
22:18,22,23 23:7,13
23:21 24:12,17 25:4
27:12 31:3,5,11 37:3
45:20,22,24,24 46:6
46:12,13 47:13,24
49:11,12,24 50:13
52:18,25 53:2,7
54:12 55:4,11,13,16
55:23 58:14,20 60:12
60:15,25 61:9,13,21
65:8,21 66:2,6,8,20
69:2 73:11,15,19,25
73:25 76:1,13,19,20
76:20,20,21 79:21
80:11 81:21 85:3
86:1 87:6,10 91:19
94:5,12,17 96:3,24
98:3,7,8,14 99:12
100:4 101:3,10,11
108:12,13,14 113:10
117:2 119:20,23
120:2 121:6,22,24
122:3,9,10 127:23
128:16 129:6 132:10
132:14,19 134:12
135:5,6,19,21 136:7
136:10 138:8,8,9,9
138:11,12,16 140:14
141:1,4,17 142:7
143:24,25 146:8,10
146:17 147:1,3 148:7
148:17,24 149:24
153:2
knowing 36:16
knowledge 16:22 18:25
19:7 23:18 27:16
28:16 33:15,15 55:19
59:12,20 68:5,10,15
69:8 74:24 78:9
84:25 92:22 93:11,20
95:6 100:13,14
101:16 102:4,10,14
102:17,23 116:13
117:5,11 118:9

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 169

| | | | | |
|---|---|---|---|---|
| 119:10 120:3 122:16 | 122:13 126:12 | 37:3,3,5,22,22 39:2 | 32:21 | 130:17 |
| 123:1,7,9 137:18 | 130:13 133:23 | 43:8,8,8,12,25 45:23 | limiting 60:10 | machine 2:6 |
| 140:23 141:5 144:19 | 135:22 140:17,18 | 45:23 46:17 54:2 | limits 73:4 | mad 89:20 |
| 144:21,22 145:15 | 141:21 142:16,20,24 | 55:22,24 56:13,13,13 | Lincoln 142:13 | made 21:20 22:14 |
| 146:9,16,19,24,25 | 143:7,14,19 144:2 | 56:15 57:24 61:1 | LINE 158:3 | 24:19 25:5 26:7 |
| 147:1 148:1,4,16 | 145:15,21 147:14 | 62:1,11 63:17 64:21 | lines 149:10 | 35:11 45:20 62:12,18 |
| 149:3,6 | 148:21 149:8,24 | 64:25 66:15 67:15 | list 3:21 6:13 47:23 | 84:14,18 97:8,14 |
| known 70:2 85:1,19,22 | 150:3 152:24 153:18 | 70:5,13 71:6 73:8,8 | 64:22 116:24 147:9 | 99:16 117:18 121:3 |
| 85:24 86:9 151:3 | 154:3 156:10 158:2 | 73:18,18 74:3 75:9 | listed 16:24 65:3 | 121:18,19,20 122:14 |
| 158:17 | 159:5 | 76:13,13,14 81:12,12 | listen 50:20 | 124:2 130:22 143:17 |
| knows 27:10 96:25 | lack 16:1 | 81:18,22,22,22 82:8 | litigation 118:5,7 | 155:14,23,25 156:2 |
| | lapsed 21:17 | 83:7 85:4 87:5 91:20 | 155:21 | maintain 17:7,12 18:5 |
| _____ | large 148:10 | 93:13,21 94:6 95:1 | little 12:6 37:5 42:16 | 30:20 31:21 32:10 |
| **L** | larger 15:9 55:20 | 99:2,3 101:11 103:21 | 43:10 84:7 112:18 | 150:12 |
| la 1:10,10,18 4:13,15 | last 7:12,12 61:5 73:13 | 104:2,3 105:7,12 | 118:17 123:20 | maintained 18:14 |
| 5:19,22 10:6,6,18 | 156:17 | 108:22,23 115:20 | 124:11 139:25 | 30:12 49:6 144:4 |
| 12:17 14:17,21 15:1 | later 7:4 118:2 | 116:2,14 117:2 | living 4:10 | 156:10 |
| 15:5,13,17 16:5,19 | LAUREN 1:4 | 118:19,25 120:11,22 | load 67:20 68:3,7,13 | maintains 17:24 34:11 |
| 16:22 17:1,10,12,24 | law 2:11,14 19:5 21:5 | 121:7 122:17 123:3 | located 16:12,13 34:13 | 45:1 |
| 18:9,24 19:5,10,14 | 37:24 38:1,9 73:5 | 124:10,10,16 126:3 | 34:15 115:21 137:19 | make 7:24 58:24 59:14 |
| 19:18 22:18,25 23:1 | 84:15 86:9 96:8 | 126:15 131:22 132:3 | location 89:11 152:3 | 60:5 62:3,25 72:2,12 |
| 23:15,24 24:1,7,13 | laws 76:12 77:11 150:7 | 133:15 134:25 | lock 76:22 | 75:10 89:3 91:9 |
| 24:22 25:8,13 27:6 | lawsuit 33:19 35:19 | 136:11,17,17 137:4 | locks 112:22 | 99:22 103:15 108:23 |
| 27:10,15,23 28:2,5 | 149:17,23 | 138:1,3,13,13,13 | long 4:14,21 28:1 38:19 | 123:8 128:11 144:2 |
| 28:16,17 29:2,5 | lawsuits 50:10 153:17 | 143:13 144:10 | 42:14 44:9 53:25 | 150:19 |
| 30:13,19 31:17,20 | lawyer 5:12 | 152:15,15 153:3,4,4 | 55:9,13 61:19,23 | makes 136:8 150:15 |
| 32:17,23 33:4,12 | lay 130:1,8 | 153:13,13 155:13 | 69:14,15 91:10 | making 46:6 |
| 34:4 35:24 36:3 39:1 | laying 145:19 | 156:9,9,18 | 109:23 117:23 | man 5:14 |
| 39:11,12,15,20,24 | lead 40:14 41:15 | letter 21:22 22:6 | 119:21,24 120:25 | manage 84:5 |
| 40:1,10,21 41:23 | leading 153:6 | Letters 3:22 | longer 23:1 53:3 55:20 | manager 24:23,25 25:6 |
| 42:8,15 43:11,19 | learned 69:9 137:22 | let's 40:24 88:1 105:13 | 95:4 113:4 135:17 | 57:15 58:19,21 59:8 |
| 47:7 48:9,19,23 49:3 | least 84:22 104:12 | 105:13 108:10 | 136:13,24,25 | 59:16,17,19,22 60:7 |
| 49:6 51:22 53:6 55:5 | 138:6 149:8 | 135:11 | look 7:3,17,23,25 9:13 | 60:13,14,15,18 62:10 |
| 55:9,16 56:3,5,25 | leave 53:13 103:4 | level 105:7,9,23 110:15 | 14:3 15:4 85:12 | 62:13,19 63:7,10 |
| 57:3,14,16 58:1,3 | 108:5,18 124:19 | 111:14,16 143:18 | 102:14 117:1,2 | mandated 72:16 |
| 63:2,16,18,23 64:2 | 125:5,11 126:10 | 144:3,3 | 139:25 145:1 156:9 | 150:10,11 |
| 64:12 65:1,3,4,20 | 127:25 | levels 106:23 124:14 | looked 6:5 9:3 11:18 | maneuver 136:8 |
| 67:8 68:2,5,11 69:7 | leaving 42:1 115:15 | LFPD 3:10 | 30:17,18 51:24 92:19 | manner 32:4 70:3 |
| 70:6,12,23 71:15,19 | 136:5 | license 21:3 103:11 | 139:23 | 78:10 94:2 116:11 |
| 71:22 72:3,8,19 | led 122:19 | licenses 150:12 | looking 7:25 9:4 | 121:3 133:11 143:18 |
| 74:13 75:4,14,18 | left 38:21,24 67:12 | life 97:6,17 98:20,23,25 | looks 74:19 | manpower 103:8 |
| 76:15 82:2,17,19 | 79:14 111:5 113:13 | 99:24 100:1,8 105:11 | lost 26:3 | manual 3:10 15:2,5,12 |
| 84:17,21 85:6 86:4 | 115:18 116:6 129:1 | 107:2 110:23 119:3,6 | lot 102:12 108:13 | 16:4 48:8 56:3,23 |
| 86:13,24 87:7 90:9 | 144:6 152:5 | 119:7,8 | Lower 16:15 17:2 | 57:1,1,2,8,22 58:7 |
| 91:6 92:2,10,10,25 | leg 112:19,22 113:17 | lift 108:12 | 18:23 20:2 39:7 | 59:13,15 61:2,6,17 |
| 93:1,22 94:5,8,24 | 123:23 | like 30:18 33:11 36:23 | loyalty 127:6 | 62:14,22 63:2 70:1 |
| 95:8,8,15,22 96:5,10 | less 81:9 | 68:2 73:3 74:19 | lug 7:20 | 70:16,19 71:8,10 |
| 97:12,24,25 98:4,8 | let 5:1,25 6:10 8:1,17 | 84:24 88:5,5,8,10 | lunch 51:16 | 80:6 81:5 |
| 98:22,24 99:4,13,17 | 8:17,25,25 10:9,18 | 89:25 110:25 113:1 | Lyford 37:10 | manuals 9:20 |
| 99:18,23,25 100:6,15 | 10:23 12:6 13:10 | 114:11,14 125:23 | L.L.P 2:17 | many 40:21 64:6 66:2 |
| 102:6 104:11 105:9 | 15:2 16:25 19:24 | 144:20 | | Maria 151:9 |
| 107:9 109:4 111:20 | 20:23,23 22:17 23:17 | likely 139:3 | _____ | mark 9:14 15:2 21:24 |
| 112:10 113:16,24,25 | 24:12 25:5,11 26:23 | likewise 144:20 | **M** | 48:12,20 49:2,5,10 |
| 115:9 116:9 117:6,7 | 28:14,19 29:11 30:17 | limit 104:8 | M 4:3 145:9 149:21 | 51:20 156:6,7,18 |
| 117:7,8,14 118:22 | 30:19 31:1,3,20 32:3 | limitation 74:21 | 150:24 | marked 3:23,24,25 |
| 119:10,16 120:6,11 | 32:14,21 34:2 35:2,2 | limited 14:18 30:13 | mace 64:11 102:22 | 52:10,17 116:15 |
| 120:23 121:18 | | | 106:8,9,18 123:21 | |

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 170

140:10,13
**Marlene** 151:14 155:9
**Marshal's** 23:9
**MARY** 1:2 159:3
**material** 2:24,24 9:19
12:19 14:25 18:19
19:11 22:1,10 26:24
36:24 139:22
**materials** 6:6,11,13
9:19 12:3 14:10
15:17 17:2 18:5,10
139:12
**matter** 8:11 22:19
**MATTHEW** 1:3
**may** 8:18,24 46:15
47:20 50:17 56:14,14
57:17 59:24 61:16
64:23 67:10 68:21
69:1 74:21 75:9
83:14,17 88:6 94:6
100:5 107:4,5,7
108:10,10,18 110:14
118:17 134:18,23
136:2 139:14 144:23
**maybe** 39:14 43:13
53:25 83:4 100:5
111:18 141:22 144:1
**mayor** 25:6
**McAllen** 20:10
**mean** 10:6 13:18 22:21
28:9 47:2 62:24
74:17,18,18 76:1,9
76:22 84:25 89:2
91:8 120:22 123:15
123:16 126:9 128:23
128:24 129:1 133:8
143:25
**means** 103:4 147:1
**meant** 53:11
**medical** 1:13,20 3:20
3:23 10:15,17,21
24:8,11,14,15 25:9
25:14,19,25 26:5,8,8
27:2,5,17,23 28:6
29:4,22 30:4 45:12
61:18 68:6 83:9
89:14 93:5 114:1
116:18,21 119:14
140:9,19 142:18
143:10 145:11
**medicated** 80:21
**medication** 119:25
121:1,13
**meeting** 7:11 8:3,5
**member** 33:4 142:12
142:12

**members** 31:16,23
32:17,23 34:4 56:25
57:3 64:1 70:12
152:24 153:18
**memorandum** 9:20
**mental** 80:22 89:15
119:18,21,25 120:13
120:14,25 121:12,13
123:5 140:12,19
142:19 143:10
145:16
**mentally** 80:21 120:18
142:14
**mentioned** 26:25 42:23
62:1 84:2,3 106:17
131:22
**mentions** 9:15
**merely** 133:8
**messed** 153:3
**met** 7:8 8:13,14
**metal** 112:24
**method** 2:6 34:24
133:17
**methods** 14:16,22
15:17 88:23 90:14
**mic** 145:8
**middle** 134:9
**midnights** 46:2
**might** 59:19 83:6
111:11 120:4
**military** 142:7
**millimeter** 65:10,11,24
66:3,4,25 68:17
134:13 148:10
**mind** 9:13 104:14
112:20
**minimum** 123:21
**minor** 1:4 139:11
**minute** 7:25
**Mischaracterizes**
98:16 128:7
**misunderstood** 33:21
61:25 98:18
**mode** 34:24
**model** 64:23
**moment** 58:23 64:19
116:25 143:14
**month** 5:8
**months** 118:2
**Moore** 20:17
**morale** 57:16
**more** 6:16 26:6 33:10
33:11 35:2 59:20,25
60:12,15 67:16 71:4
78:5 96:3 101:7
110:8,9 124:11

137:10,10 138:16
148:14 153:13
**morning** 13:21
**most** 23:18,18
**move** 129:3 136:8
**moved** 128:21
**much** 44:9 45:2 103:1
**MUNIZ** 1:7
**must** 59:25 64:13 73:17
103:10
**myself** 41:13,16 142:8

_____ **N** _____

**N** 2:12 4:3,3 145:9,9
149:21,21 150:24,24
**name** 4:5,6,24 5:11
12:21 16:11 20:16
22:24 32:1 145:10
151:1,8,13,13 158:18
**named** 5:14
**narrow** 42:14
**nature** 93:10 120:7
145:22
**near** 84:16 119:13
152:3
**nearer** 131:15
**necessarily** 18:13 82:21
**necessary** 74:6 77:21
78:3 104:19 134:22
135:17
**need** 31:5 34:17 56:21
70:21 99:11,12
104:10 113:6 129:22
130:6 145:7 156:5
**needed** 24:15 37:5
**needing** 83:9
**needs** 103:15
**negative** 91:8
**neglected** 51:20
**neither** 95:15,16
159:20
**never** 30:3 32:18 33:16
54:16 107:22
**new** 73:15
**next** 1:3 73:14,17 75:8
115:12 140:11 141:6
**night** 52:13 64:10
95:17 102:22 106:11
152:8 155:6
**Nine** 38:20 51:21 65:11
**Nods** 36:6 48:6 50:6
133:24
**none** 22:21 102:6
119:15 120:10
**non-commissioned**
41:1 42:22

**non-deadly** 106:19,22
**normal** 45:24 101:24
**normally** 47:16
**North** 151:7
**NOTARY** 158:23
**Note** 2:24
**noted** 77:20 158:12
**notes** 140:1 145:1
**nothing** 13:8 32:18,25
68:1 84:24
**notice** 3:9 7:17,22 8:15
9:11,14,23 10:2 31:6
31:19 36:24
**noticed** 139:12
**notified** 154:2,6
**number** 9:14 15:3,18
16:6 22:4,6,12 41:22
48:5,8,12 49:2,5 52:4
52:17,25 54:13,22
56:19 58:2 60:19
61:2 70:1,14,16 71:2
92:24,25 93:2 110:1
116:21,23 123:5
133:9 140:1,9,11
141:6,12,20 144:10
156:14
**numbered** 2:3 140:5
**nurses** 126:7 127:19
**N/A** 3:3

_____ **O** _____

**O** 2:18 4:3 145:9
149:21 150:24
**oath** 158:18
**object** 8:17 51:5 129:3
152:16
**Objection** 17:4 50:15
74:16 75:7 76:18
79:9 87:19 90:23
91:1 98:16 110:21
121:5 124:21 128:7
135:18,25 139:6
143:21
**objective** 104:13
**obliterated** 70:16
**obtain** 122:13
**obtained** 19:4 55:16
**obtaining** 37:17 149:10
**Obviously** 50:19
125:21
**occasion** 69:4 93:14
102:16,18,20
**occasions** 148:14
**occur** 7:11 72:25 88:6
**occurred** 4:25 25:1
33:3 34:21 35:25

45:15,10 47:10 52:14
52:23 55:1 65:9
84:22 86:13 91:24
92:6,12 93:5,23
94:10 97:16,24 98:15
98:23,25 99:18 100:3
100:7,17,22,25 101:5
111:15 115:22
122:18,21 124:5
133:4 139:23 140:8
151:6
**occurs** 62:9 72:24 78:1
**off** 10:24 42:1 89:3,4
123:20
**offense** 3:15 11:4 12:12
49:3
**offenses** 12:6 88:6,7
**offers** 67:9 134:3
**office** 2:6 6:24 7:8 9:3
10:1,3,5 14:13 17:7
17:13 31:5 48:13,24
53:13,20 54:3 55:7
139:15 140:7 145:22
158:20
**officer** 1:11,18 16:18
17:19,20 18:14,22
21:5 22:24 23:7,18
30:20 31:7 32:20,21
32:24 35:11,21,21,23
36:2 38:23 41:20
42:6,7,20 43:3,24
44:3,5,12,19,20 45:3
45:7,14,15,21,24
46:3,13,17,18,24
47:1,3,5,6,6,14 50:4
51:7 52:5 63:22
64:12,13,15 65:5,8
66:2,16 67:4,13,14
67:21,22 68:2,3 69:5
69:10,15,20,24 71:1
71:6 72:10,21 73:3,3
73:22 74:5,10,13
75:2,3,19,20,21 76:3
77:13,20 79:2,2,13
79:14 80:1,12,16,20
80:25 81:2,8,10 82:9
83:24 84:23 85:8,9
91:4,10,19,23 93:15
93:22 94:16,24 95:7
95:17,18 96:11,25
97:3,4,10,14,25 98:9
98:22 99:16,19,24
100:1,7,19 101:4,10
101:12,14,17,18,19
101:21,23 102:1,4,6
102:11,15,21,24

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 171

103:3 104:9,11,12,13
104:18,20 105:10,12
105:13,15,16,18,21
106:2,3,4,4,6,7,11,21
107:1,4,9,19,20,22
108:4,10,24 109:5,14
109:17,24 110:2,13
110:19,23 111:1,3,6
111:11,14,25 112:7
113:10,13 114:10,14
114:15,15 115:1,14
115:19,22,25 116:7
119:2 120:8 121:20
121:22,24,24 122:20
123:13,18 124:2,6,12
124:18,22 125:4,10
125:13,15,19,19,20
125:21,24 126:4,9,15
127:3,9,9,13,17,24
128:1,10,22 129:1,7
129:8,8,12,15,15,20
129:24 130:1,7,13,14
130:18,18,21,21
131:5,8,11,11,12,15
131:16,16,18,21
132:11 133:7 134:4
134:10,14,20 135:7
135:12,16,23 136:4
136:12,14,18,18,20
136:22 137:25 138:5
138:17,22 139:4
141:9,10,11 144:7,13
144:16,17 146:13
147:22 148:5,15
149:25 152:8 154:7
154:17 156:20
159:14
**officers** 11:12 12:17,18
12:24 15:13,19 16:5
16:7 17:3,25 18:6,14
19:18 21:1 22:18
27:7,12 33:18 36:12
40:21,23 41:5,19
51:24 63:20,21,24
65:2,20,21,23,23,24
66:1,2,4,5,23 68:8,14
70:24 71:15,25 72:4
75:15 76:4 77:25
78:2,20,21 79:22
80:3 81:14,25 82:6
82:14 83:15,23 84:3
84:4,9,15,15,19
85:10,13,16,24,25
86:5,8,14,25 87:7,8
87:15,21 90:11 91:14
93:16 101:12 102:7

103:1,9,10 108:7,9
108:16 113:14,17,21
118:23 119:17,23
120:17 127:6 131:6
133:16,20 135:2,5
141:2,8 147:14 150:2
150:12,13,15,20
154:4,21
**officer's** 32:6,8 80:17
105:3 106:17 115:4
124:18 130:3 135:10
135:14 136:14,24
**OFFICES** 2:14
**official** 1:12,19 63:15
65:2
**Oh** 12:1 35:9 53:11
**okay** 4:14,17,21,24
5:11,17,25 6:10,16
7:6,9,11,13 8:4,10,14
9:7,13,15,25 10:5,9
10:14,23 11:2,3,7,13
11:18,24 12:12,15,23
13:6 14:7,25 15:16
15:25 16:10,14,17,21
17:6,15,17 18:3,9,12
18:18 19:3,24 20:18
20:19 21:19 22:5,21
23:5,7,23 24:4,22
25:11,23 26:2,6,11
26:16 27:7,10,15
28:9,24 29:17,20
31:9,14,25 32:3,9,19
33:1,8,14,21,22,25
34:1,8,13,16,19,23
35:10,23 36:7,9 37:3
37:6,15,17,20,22
38:1,5,9,12,21,24
39:5,14,18 40:9,12
40:15 41:10,12,18,22
42:1,4,10,17 43:8,25
44:9 45:23 46:3,13
46:25 47:20 48:1,3
48:16 49:8,23 50:3,8
50:12,20 51:10,15
52:3,8,16,19,22
53:19 54:2,6,9,17,22
55:9 56:11 57:6
58:14,23 59:6,18,23
60:18 61:20,25 62:11
63:7,15 64:1,4,10,20
65:7,25 66:15,20,24
67:24 68:19 69:14
71:2,13,19 72:1,1,7
72:15 75:8,24 76:6,9
76:13 77:1,3,5,10,12
79:1 80:8,11 81:22

83:1,5,7 84:2,8,25
85:4,11 86:12,18
87:4,13,23 88:3,18
88:21 89:2,21 90:3,6
90:17,25 91:18 92:1
92:15 94:5 95:1,19
95:21 96:16 97:2,12
97:18 98:4,12,21
99:2,7,9,25 100:4,12
100:18 101:7,10,17
101:22 102:4,13
103:12 104:2,16,20
105:12,15 106:21
107:14,18,25 108:9
108:22 109:3,15,25
110:7,13,14 111:5,9
111:13,18,24 112:9
112:15 114:10,19
115:3 116:9,14 117:6
117:12,17,20 118:1,4
118:7 119:16 120:21
121:17 122:12
123:12 125:2,3,8,14
125:16 126:8 127:12
127:21 128:4,23
129:7,21 130:4,11,20
131:5 132:14 133:15
133:22 134:12
135:11 139:8,21
140:24 141:6,12,13
141:17 142:1,6,8,10
142:25 144:6,20
146:11,17 147:5
148:17 149:13,16
152:1,15 153:10,13
153:21,25 155:6,20
156:1,7,12,15,24
**once** 19:25 66:23 91:13
104:9
**one** 7:16 10:19 17:15
17:17 26:20 29:7,14
29:17 32:18 34:7,8
37:5 41:17 42:1
49:11 50:11 52:18,18
53:9 54:16 55:14,15
56:21 59:25 60:17
65:18 67:5 73:17,17
73:25 76:1 83:12,15
84:16 87:10,14 91:7
95:16 110:1 121:16
123:5 125:11 130:20
134:22 137:10
139:17,18 144:14
146:18 147:2 148:14
148:17 151:21
153:19,22,25 154:4

156:5,17
**ones** 9:22 154:10
**one-sentence** 96:3
**only** 19:2 22:14 29:7,14
29:17 33:3 36:21
41:16 53:9 56:21
57:2 67:3,6 107:7
109:5 110:3 139:17
139:17 145:24
149:16 154:10
**open-ended** 76:24
**operating** 46:25
**operations** 57:19
**opinion** 60:3 95:21,22
99:7,21 137:21
**opposed** 5:22 25:19
26:1,8,21 44:5
**option** 108:4,7,15
125:19 126:1
**options** 108:1 125:11
127:9
**oral** 1:22 2:1 159:14
**ordeal** 131:10
**order** 6:2 20:25 72:4
74:14 78:6 104:13
105:1,19 106:24
125:5 132:7 154:21
**ordinance** 154:23
**original** 16:8
**other** 9:21 11:16 13:6
13:10 14:10 15:8
16:4 18:14,21,24
21:21 22:1,10 23:20
26:1,9,21 28:5,24
30:24 31:15 32:16,23
33:18,24 34:3,5,13
35:6 36:12,21 39:10
50:9,9,21 51:12,21
52:6 53:1,3 54:9
57:24 64:8,23 65:20
65:21 66:2,5,5 68:1
68:12 73:16 79:25
87:10,14,16 88:1,19
88:24 90:11 93:15
95:16 98:6 101:11
102:20 103:1,22
104:10,25 107:7
111:9,10 112:1
113:14 117:15 118:7
118:14,25 120:24
122:6,8,8,15,25
124:14 126:6,6
127:18 128:1 129:5
131:6,6 132:11
141:21 143:16
145:19, 146:1,18

147:2 148:18 149:22
149:23 152:15,16
153:16 155:6,12
156:5
**others** 67:5 69:3 78:8
97:7 127:23 128:6,13
128:18 143:11
153:25
**otherwise** 159:23
**out** 14:4 26:15 36:17
51:24 58:16 70:14
74:21 79:20,25 80:8
88:24 92:21 96:22
103:5 108:12 110:20
113:11 116:20
124:23 125:25
126:18 127:8,13,14
129:4 132:12,20,24
133:9 134:4 136:5,20
140:15 142:15 143:4
145:19
**outcome** 155:21,21
159:23
**outside** 47:2 73:6 81:19
**over** 8:14 10:4 20:9
23:15 42:16 43:10
44:22 51:18 53:24
54:3 55:7,15 64:25
77:19 93:17 103:22
139:18 140:3
**Overbroad** 135:25
139:6
**overmatched** 108:11
**oversight** 19:11
**owing** 160:3
**own** 63:23 64:14 79:15
92:11 106:17 149:4
155:23,23
**owned** 64:2 65:3
**o'clock** 103:16

---
**P**
---

**P** 2:18
**page** 3:1,8 9:23 70:14
70:15 73:13,14,18,19
73:20 74:4,4 110:1
140:5,9 141:6 144:12
158:3
**pages** 70:15
**paid** 45:6,9,17 47:9
**pair** 132:1
**Palm** 2:15
**papers** 9:15
**paperwork** 6:15,16
**paragraph** 9:15 16:24
56:15,16 57:6 74:3

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 172

paragraphs 9:22
part 9:9,11 15:8 48:21
  52:14 55:2 77:18
  93:13 154:4
partially 129:10,14
particular 20:20 40:12
  59:13 65:5,7 67:20
  69:6,11,16,23 105:1
  111:13 125:22,22
  146:4,11 147:21
  148:2 149:22
parties 159:21
pass 53:25 144:25
  145:1,5 150:23
passed 18:1,22 53:14
patient 10:15 69:12
  82:11,16,21
patients 24:10 27:18,24
  29:24 30:6 68:9,14
  81:25 86:15 126:6
  132:25
patient's 148:2
patrol 39:21 41:5,19
  44:6,12,20
patrolman 38:11 39:13
  39:16 42:18 43:22
  45:8 101:18,25 103:4
patrolmen 41:1,9
pay 46:11
PD 23:15,24 65:2,3
peace 11:12 42:20 82:6
  84:9 85:7,25 86:8
  101:18 102:21 141:9
  141:11 150:12
pejorative 91:9
penal 12:13 88:7,9 96:8
  150:6,6
penalized 90:18 94:2
pending 11:6 13:7
penitentiaries 84:7
people 13:25 37:4
  41:22 54:3 81:15,19
  84:5 85:13 86:15
  87:15 88:5,12,24
  90:4,15 102:12
  120:18 122:8,15,25
  126:6 127:18 128:2
  132:11 143:16 146:3
  151:3
percentage 44:10,11
perform 9:25 58:19
  102:1 103:5
performs 58:19
perhaps 19:19 47:19
  56:14 67:5 79:4,5
  80:21 106:7,11 152:9

period 43:5 44:10
  45:17 46:5 47:17
  76:21 153:6,14
permissible 72:5 75:21
  125:18,18
permit 104:7 105:6,9
permits 75:15
permitted 68:8,13
  70:11 74:10,14 75:3
  78:7 105:16 106:11
  106:23 107:10
  108:24 111:1 115:23
  125:11,14 126:10
peronsal 32:2
person 4:24 14:11
  20:14 23:20 35:10
  42:1 67:25 74:7
  77:21 78:23 80:17,20
  83:15 89:11,11 105:1
  108:15 115:3,5 129:5
  134:17 136:4,20
  137:9 138:15,22
  144:8,14 149:7
  158:18
personal 1:7 37:6
  92:22 95:22 99:7,21
  100:13,14 137:18
  147:1
personally 28:10,25
  29:8,15,18 36:15
  53:1 93:4 101:2
  134:13 147:9 158:17
personnel 30:11,15,18
  30:20,23 31:12 32:6
  41:3 42:10 46:8,9
  50:4,21 51:8 57:1,7
  91:20 92:1,17 102:14
persons 120:13 122:6
person's 20:16 89:14
Phillip 2:14,14
phone 103:15
photographed 13:25
photographs 6:6 9:20
  14:10 21:21
physical 88:21 89:11
  89:14 105:13,17,18
  106:17 108:25 155:1
physically 108:1
picked 28:22 112:3
picking 10:10
pistol 65:11 66:19
  133:6
place 9:18 26:11 32:5
  36:16 78:23 98:9
  115:21,22 146:21
placed 97:25 98:9

100:7 102:11,12
  115:11
placing 78:22
Plaintiff 2:2 160:3
plaintiffs 1:9 159:3
PLAINTIFF(S) 2:10
Plaza 2:21
please 4:4 54:15 58:6
  68:22 131:3
point 47:9 50:18 82:25
  83:8 84:16 94:15
  105:4 107:15 122:23
  127:3 130:13 134:25
  135:16
police 1:11 4:13,15,15
  4:17,22,25 5:5 10:6
  12:17 13:20 14:17
  15:1,6,13 16:6,9,16
  17:2,3,9,12,24,25
  18:7,23 19:7,10,14
  19:18 20:3,24 21:1
  22:18,25 23:1 24:1,5
  27:6 28:2,5 29:4
  30:13,19 31:17,20,22
  32:23 33:4,12,18
  34:5,11,14 35:11,12
  35:24 36:3 38:16,18
  38:21 39:1,8,10,16
  39:20,24 40:2,10,16
  40:21 41:6,24 42:2,8
  43:11,20 48:11,19,24
  49:3,4,9 51:23,24
  52:6 53:20 54:3 55:4
  56:3,4,5,25 57:3,10
  57:13,14,16,17 58:4
  58:8,10,17,18,18
  59:12,15,20,21 60:1
  60:6,7,12,12,16,23
  60:24 62:1,16,17,18
  63:18,20,24 64:12,25
  65:4,20,21 67:21
  68:2,19 69:7 70:13
  70:24,25 71:19,21
  72:3,4 73:7 74:13
  75:14 77:24 78:20,21
  79:8 80:1,3 81:13,24
  83:8,15,18,23 85:13
  86:5,11,17 87:6,15
  87:18,20 88:24 89:16
  90:1,7,11 91:7 92:3,8
  92:10,25 95:8,13
  105:10 112:11,16
  113:24 114:16 117:8
  117:8,14 118:23
  119:11,16,20,23
  120:2,11,24 126:2

130:13 131:25 134:2
  134:2 142:17 145:20
  146:22 147:14,14
  148:22 149:8,18,25
  150:3 152:2,25
  153:18 154:2,4,7
  155:22
policies 14:15,22 15:16
  57:1,2,24 58:2,17
  60:6,19 62:3,4 63:16
  75:4 92:12 116:20
  118:11 120:16,17
  147:7
policy 3:10 15:2,5
  26:20 48:8 56:12,23
  57:22 58:7 59:1,15
  61:17 62:8,14 63:8
  63:10,18 64:21 67:8
  70:13,16,19,22 75:12
  75:14 77:18 79:12
  80:6 92:2 93:10
  95:24 97:10,20 104:6
  104:11,22 105:6,8,23
  107:9,23 109:5,25
  113:16 114:24 115:4
  115:9,9,17 116:2
  120:12 125:4 126:2
  126:10,11,14,21,24
  127:16 133:12
  135:22 144:2,6
policymaking 56:5,7
poorly 75:25
Pope 2:17 3:5 121:5
  145:7,10,10
Port 20:10
portion 53:3
posed 128:12
position 10:19 29:22
  30:3 33:16 36:15
  39:12 40:11,15 44:3
  46:18 59:14,18 66:16
  67:25 70:5 76:15
  82:2 83:22 87:5,13
  94:6,8 96:10 97:9,19
  98:1,10,13,22 99:12
  100:16 115:15,21
  119:2 122:4 123:9,14
  123:17 124:1,12,18
  127:5,10,21 128:5,12
  128:17 129:2,8,15
  130:14 131:5,12,16
  132:9,20 133:7,10
  134:20 135:1 137:2
  138:19 152:19,23
positions 57:17,18
positive 94:22

possessed 63:20
possession 55:10,12
  144:7
possibility 139:8
possible 36:9,11 46:12
  132:19 138:4,10,11
  139:2,4
possibly 86:1 142:14
  142:15
post 45:21
potential 17:3 19:1
  78:21 79:22 85:13
potentially 119:4
pound 128:19
pounds 132:7
power 68:25
practical 114:11,14
practice 75:14
practices 14:16
preceding 43:4
Precinct 38:4
preference 26:18
preparation 49:20
  93:13
prepare 6:3,7
prepared 48:23
prescribed 119:24
presence 78:18 79:4
  123:21 130:16
present 2:23 63:8
  105:2 137:25 151:17
  152:1 153:15 154:17
presented 22:8 24:2
  79:5 80:20,25 105:12
  105:22 106:21,22
  110:3 111:15,16
  131:23 132:9 134:23
pretrial 10:16 14:11,19
  27:5 28:17 29:3
  31:18 102:5
pretty 82:24 103:1
  140:3
prevent 74:11,14,23
  75:5,13,16,22 76:3
  76:17 77:15
prevention 38:23
primarily 102:25
primary 43:19
printed 13:23
prior 8:2 13:11 16:18
  28:4 30:14 43:11
  61:6,13 62:16 77:14
  85:19 98:16 102:10
  102:15 117:3,10
  124:2,13 128:8
  140:10,12 145:23

DONATO GARCIA

April 9, 2003

Page 173

146:4,12
prison 82:6 85:8
prisoner 10:16,25
  14:12 27:8 79:4 91:5
  102:5 112:24 113:4
  144:4
prisoners 14:19 24:9
  24:14 25:15 27:13
  28:6,7,17,21 29:2
  31:18 82:7 88:22
  112:21
private 19:22 20:4,4
privilege 50:18
privileged 8:20
probable 139:2
probably 18:3 82:20
  96:3 128:24 153:3
problems 140:10,12,25
  141:2
procedure 2:8 3:10
  15:2,5,12 29:23 30:5
  48:8 59:21 61:5
  62:14,22 63:1 70:1
  97:20 124:24
procedures 27:4,17
  56:3,23 57:9 58:12
  58:17 60:6,12 85:19
  88:23 92:12 118:20
proceeding 159:22
proceedings 21:20
process 91:11
processed 13:11
produce 9:10 31:2
  32:14
produced 2:1 9:16,17
  15:1 21:22 31:5
  47:25 48:2,13 49:13
  49:14,23,25 51:19
  56:2 116:17
Productions 2:23
profession 86:10
promote 57:17
promoted 39:21,22
promotions 30:15,24
proper 71:20,23 80:5
  80:13 90:23 91:4
  98:13 110:18 122:1
properly 78:2
propriety 95:7 99:16
  123:16 137:21
prosecutor 109:20
protect 50:17 74:6
  77:21
Protective 3:20 116:22
protocol 27:4 29:23
  30:5

protocols 27:17
proved 158:17
provide 8:21 14:21
  56:24 64:13,14 86:4
  86:8,25 133:15
provided 14:9,12,20
  47:21 49:3,9 85:6
  91:20 93:1 96:14
  117:21,24 119:17
  120:23
provides 15:19 63:24
  72:8 88:11
provision 74:8
provisions 2:9 58:7
  73:9,21 75:4
proximity 88:22
psychiatrist 146:21
public 119:12,13
  158:23
purpose 9:5 56:16,23
  158:19
purposes 104:4 108:19
  122:20 148:8
pursuant 1:15 2:8
put 15:23 44:23 58:4
  89:3 98:25 99:18
  108:6,18 109:1
  136:17
puts 36:16
putting 137:2
P.C 2:14
P.D 32:17 39:11,12,15
  41:23 42:15 49:6
  91:15 93:1,1 113:24
  114:8,12 139:15
  140:18 141:21
  142:20 143:20
p.m 2:4 142:2 157:4

                Q
qualified 65:4 66:17,21
  67:4,4 68:16 69:15
  154:22
qualify 66:23,25
quarterly 17:8
question 18:3 22:5 26:6
  29:11 34:2 43:9 44:9
  50:18 51:2,5 57:25
  58:6 59:25 68:22
  71:13 74:24 75:8
  89:25 91:16 104:4
  122:20 125:9,23
  140:8,11 141:14,15
questioning 153:14
questions 5:25 6:8
  13:10 19:24 28:12,14

52:10 55:25 75:24
  91:21 119:1 129:22
  138:15 140:2 145:6
  145:12,13 149:9
  153:5 157:1,3
quick 144:11
quickly 140:3
quoted 2:24,24
quotes 2:24

                R
raining 79:17
Ramirez 1:11,19 3:23
  3:24,24,25 15:14
  16:18 17:19 18:14
  30:12,16,20 31:7
  32:20,21,24 35:21
  42:6,7 43:6 44:1,4
  45:11,24 46:3,13,17
  46:18 47:14 50:4
  51:8 52:5 65:8 66:3
  66:16 67:4 68:3 69:5
  69:10 73:3 75:20
  77:13 82:9 84:23
  91:19,23 93:15,22
  94:16 95:7,17,18
  96:11 97:10,14,25
  98:9,22 99:16,19,24
  100:1,19 101:4,11,12
  101:19,23 102:4,11
  102:15,24 103:4
  111:15,25 112:7
  114:15 115:1,14,19
  115:23 119:2 120:8
  122:21 123:13,18
  124:2,6,12,18,23
  125:4,24 126:10,15
  127:10,13,17 129:1,8
  129:15,24 130:1,8,21
  131:6,8,12,16,18
  132:11 133:7 134:14
  134:20 137:22,25
  138:5,17 141:9
  144:13,16,17 146:13
  148:5 154:17 156:20
Ramirez's 130:14
Ramirez(sic) 139:11
range 66:19 69:11
rank 23:5 38:22 57:18
ranks 57:17
rather 43:21 108:16
  131:13
Raymondville 38:16,17
  38:18,19,21
RE 158:2
reach 115:7

read 8:9 9:6 12:19
  26:24 56:21 57:12
  71:2 74:22,25 92:19
  92:23 93:2 112:18
  143:1 158:11
reading 8:10 15:11
  56:2 111:24 139:12
reads 56:16 57:7,13
  74:5
ready 48:2 51:19,19
real 144:11
really 18:12 114:19
reason 74:17,20 84:21
  99:25 101:22,25
  109:25 122:23 142:6
  158:3
reasonable 133:11
  136:12
reasonably 97:14,14,25
  135:12
recall 12:22 28:24
  34:24 36:7 151:6
receive 68:6 78:5 81:14
  81:19 82:10 83:23
  86:14 91:12 120:6
  121:8,9 122:14 150:3
  150:5,8
received 27:16 30:4
  46:15 68:11 75:20
  76:2 82:9 96:11
  113:25 116:10 117:9
  117:12,14 127:22
  142:2,22 152:20,23
receives 72:21 97:3
receiving 98:2 150:16
recently 118:2,3
recognize 77:25 78:6
  79:14 135:2
recognized 94:19
recommend 90:19
recommendation 62:12
  62:17
recommendations 57:9
  58:24 59:14 60:5
  62:3,7
recommended 67:20
reconcile 140:16
record 2:9 12:20 32:11
  46:9 47:15 50:17,17
  51:21 117:6 153:10
  159:15
recordings 21:21
records 3:23 31:21
  32:10 46:11
Recover 1:5
redundant 16:2

reenactment 3:18 52:5
  52:21,22 54:22 55:2
  55:21
refer 62:9 70:21,25
  79:17
referenced 139:22
  141:15
referred 112:4
referring 66:9 85:7
  141:18
refers 30:11 71:5
reflected 46:8,11 92:16
reflecting 51:12
refused 130:7,23
refuses 130:12
regard 16:23 24:10
  32:20 44:1 57:25
  63:15,19 67:24 70:23
  72:9 73:20 104:6
  118:21 120:12
  127:16 133:16 147:7
  147:8 152:20
regarding 8:22 14:22
  14:22 16:1 21:20
  22:19 24:8 25:14
  27:4,18 29:23 30:5
  30:15 31:21 32:15,23
  50:9 63:16,16 79:4
  153:23 156:20
regardless 67:16
Regional 26:8
regular 44:14
related 10:2 22:2,11
  159:20
relevant 149:9
relies 71:19,21 72:3
relieve 148:14
rely 72:21
remain 40:15
remaining 132:5
remember 5:4,4,7,8
  12:8 42:9 47:20
  51:25 53:19 71:3
  110:1 117:25 151:1
reminding 53:12
remove 105:19 106:6
  106:10,24 124:4
  133:19 134:22
removed 105:3 135:3,6
  135:24 136:9 147:23
  147:24
removing 105:25,25
rendered 72:4
rephrase 138:13
report 3:12,13,14,15
  3:25 48:12,19,23

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 174

| | | | | |
|---|---|---|---|---|
| 49:3 92:24,24 93:1 103:23,24 137:14 140:6,24 141:21 142:20,23<br>**reported** 2:5 154:21<br>**reporter** 2:24 156:14 156:16 159:10<br>**reporter's** 3:7 7:19 9:14 159:7<br>**reports** 31:15 32:15 92:23 111:24 155:25<br>**represent** 51:23 132:6<br>**representative** 1:8 5:18 58:1 59:7 97:23 100:15<br>**representing** 145:11<br>**represenive** 99:4<br>**reprimanded** 91:23 93:22<br>**reprimands** 30:14,23 31:15 32:16<br>**request** 129:25 130:3,8 130:12 135:10,14 136:24<br>**requests** 9:9<br>**require** 90:10,18<br>**required** 9:17 20:25 21:11 28:19 29:4 58:3,9 67:20 69:10 83:14 89:14 104:12 121:12 126:12 154:2<br>**requirements** 150:16<br>**requires** 19:6 26:20 68:2 115:4<br>**reserve** 42:19 43:3,23 44:5,12,19 45:3,6,14 45:15 46:24,25 47:3 47:6 103:9 157:2<br>**residence** 154:21<br>**resides** 23:11,13<br>**resigned** 23:15<br>**respect** 66:21,24 81:13 91:18 99:13 100:13 123:12 144:13 150:2<br>**response** 31:6 59:23 63:1 105:21,24 108:4 110:19 130:15 136:21 145:14 153:4<br>**responsibility** 57:18,19<br>**responsible** 57:8,15 89:10<br>**rest** 157:2<br>**restate** 152:15<br>**restrain** 121:10<br>**restrained** 121:4 129:10,11,14 | **restraint** 27:24 30:6 89:13 90:13 112:20 112:20 116:11 120:12 122:1 143:19 147:7,20<br>**restraints** 3:19,20 24:9 88:15 89:13 90:4,8,9 90:11 113:18 114:1,4 116:11,19,22 118:21 119:1 121:14<br>**restrict** 104:9<br>**restroom** 148:15<br>**result** 35:19 100:21 149:17<br>**resulted** 35:5<br>**results** 144:21<br>**resume** 36:23 37:1<br>**retain** 7:13<br>**retreated** 135:6<br>**retreats** 135:14<br>**return** 81:10 159:18<br>**returned** 7:4 95:2<br>**review** 9:11 57:7,8 71:2 93:14,19 103:24 104:3 118:13,19 130:5 137:14<br>**reviewed** 6:2,4,23,23 7:1,14 52:19 92:22 101:1,2 145:22,24 146:4<br>**reviewing** 146:1<br>**revised** 61:6<br>**revision** 61:2,8<br>**revisions** 57:9<br>**revolver** 110:20 126:17 126:17<br>**revolvers** 66:8<br>**re-enactment** 139:19 139:20 145:25 146:2<br>**right** 4:23 6:19,22 8:4 9:1 11:11 12:19 13:9 14:7,7,15 15:24 16:10,11,21 17:23 20:11 21:9 22:16 23:23 24:6 26:23 30:8,11 31:9 34:10 36:21 39:10 40:3,6 40:17 41:2,2 42:6,12 42:21 43:4,19 44:16 44:21 51:6,15 54:9 54:17 55:24 56:1 58:25 61:25 62:24 63:12,15 64:10 65:14 67:2 68:5 69:4,14,25 70:10 71:13 72:1 73:10 75:3 77:12,18 | 77:24 78:4,20 81:12 81:17 86:12,21 87:4 88:4 90:6 91:18,21 93:20 94:15 95:11 96:1,22 97:8 98:21 99:8 101:10 107:3 109:3 111:13 113:15 115:7,8 118:15 123:12 125:8,17,24 130:20 131:2 133:6 142:1,25 146:1,11,17 146:20,25 147:4,12 149:20 152:7 153:3 153:19 154:20<br>**Rio** 16:15 17:2,9 18:23 20:3 39:7<br>**rise** 110:15<br>**risk** 119:5 120:4 123:6 127:23,24 128:1 143:3,17<br>**road** 44:12 51:25<br>**roadway** 119:13,13<br>**robbery** 79:6<br>**Roberto** 5:3<br>**room** 89:12 100:3,7,22 100:24 113:9 114:11 115:2,14 124:4,4,19 125:5,11 126:5,11,12 126:19,20 127:13,14 127:25 128:14,15 129:2,4,4 130:24 132:5,13,17,20 133:2 133:4 134:8 148:2<br>**Rosa** 141:23,24<br>**round** 134:18<br>**rounds** 65:17 134:21 134:21<br>**rules** 75:5<br>**run** 19:21 112:22 124:25 144:15<br>**running** 58:16 136:6<br>**runs** 19:25 20:14 60:17<br>**R.D** 20:17<br><br>**S**<br><br>**safe** 88:23<br>**safety** 24:9 108:19 122:6,7,15,24 127:18 127:18<br>**Salas** 146:15<br>**same** 17:18 69:21 72:23 73:17 99:20 106:22 115:14 123:2 158:12 158:19<br>**sample** 144:16<br>**San** 160:6 | **Santa** 141:23,24<br>**saying** 71:11,11 88:11 91:6,8 124:22 125:16<br>**says** 9:18 15:1 32:5 56:20 74:21 77:19 110:2 136:18 141:8<br>**scenario** 105:16<br>**scene** 52:12,23 92:21 139:13,16<br>**schedule** 44:14<br>**school** 37:9,11,13,18<br>**scootch** 140:3<br>**scope** 94:9<br>**Scott** 2:17<br>**screening** 141:12,14<br>**seal** 158:20<br>**search** 10:1 32:22 52:1 144:12<br>**Sebastian** 37:10 38:4<br>**secondary** 37:11<br>**section** 14:15 15:1 56:16 57:6,12 64:21 69:25 70:17,18 73:11 73:13,13 110:2<br>**sections** 15:8 110:2<br>**secure** 126:19<br>**secured** 132:17 144:4<br>**security** 23:10 24:9 27:18,24 29:24 30:5 90:14 120:13 130:24 131:7,9,20 143:3,17 143:18 148:13<br>**see** 18:10 21:22 26:24 27:3 30:18 54:14 56:15 66:15 71:3,5 74:8,22 80:10 85:4 88:1 93:19 103:21 108:22 122:17 135:11 142:25 154:22,25<br>**seek** 131:6,17<br>**seem** 100:5 143:6<br>**seems** 140:24<br>**seen** 27:20 52:22 54:16 54:24 132:7 133:2 139:15,17,21,22 147:9<br>**seizure** 5:2<br>**semantics** 115:20<br>**seminars** 117:17 150:19<br>**semi-automatic** 65:13 66:7,14<br>**semi-wad** 148:6<br>**send** 83:14<br>**sense** 143:4 | **sent** 7:22 17:20 48:24 72:10 140:6<br>**separate** 22:3,12 32:5 32:10 45:3 66:25 95:6<br>**September** 4:18 5:2,14 10:18 13:4,20,21 15:6 29:20 33:3 35:25 36:5 40:20 41:23 42:15 43:11 45:10 46:4 52:2 58:5 76:12 85:20 87:8 91:24 92:12 93:6,7 93:23 153:6,15 156:21<br>**sequence** 101:5 123:19<br>**sergeant** 39:21<br>**serious** 70:4 73:14,16 74:7 77:22 80:2 97:15,21 98:2 99:19 107:12 109:15,21 110:4,4,7,9,16 111:21 119:5 122:5 125:6 128:13,18 132:10 143:16<br>**seriously** 111:16<br>**service** 110:20 126:16<br>**set** 6:25 7:3 18:5 63:7 63:10 112:3,13,15,23 113:2,8 124:23 137:4 138:21 156:5,16,19<br>**sets** 74:21<br>**setting** 58:17 69:23 81:20 82:16 83:25 85:15 86:16<br>**sexual** 88:1<br>**shackle** 112:20<br>**shackles** 112:4,9 113:9 113:21 114:15,22 115:11,21 123:23 132:1 147:21<br>**shift** 46:2,3 47:16,17<br>**shifts** 46:1,6<br>**shoot** 75:2 76:4 77:9 110:20 134:5 137:6 138:22<br>**shooting** 122:13,18 123:10<br>**shoots** 139:4<br>**Short** 103:20<br>**shortcut** 37:22<br>**shorthand** 2:6 159:10<br>**shortly** 140:7<br>**shot** 35:5 120:9 134:11 134:11 137:9<br>**shotguns** 64:3,5,6 |

DONATO GARCIA

| | | | | |
|---|---|---|---|---|
| 66:12 | 151:19,24 152:22 | 98:4 116:6 127:15 | **staff** 3:21 25:7 116:23 | 135:6,23 136:13,21 |
| **shots** 138:6 | 153:9 154:5,16 | 129:14 139:13 | 147:8 | 136:21,23 137:6,9 |
| **show** 7:21 79:22 92:18 | 155:16,19 156:23 | 144:15 145:2,17 | **standards** 21:5 56:24 | 139:5 |
| 116:14,14 | **sitting** 137:17 | 149:13 150:11 | **standing** 28:13 | **submit** 57:9 |
| **showed** 128:9 147:6 | **situation** 77:25 78:6,22 | **sometime** 7:12 77:14 | **start** 10:23 64:25 105:7 | **submitted** 46:14 58:9,9 |
| **shown** 118:14 | 79:6,6,23 80:4,13,16 | 118:2,3 | **started** 6:1 38:1 39:20 | 159:16 |
| **shows** 115:11 | 80:22,25 81:3,8 97:5 | **sometimes** 37:4 75:25 | 43:12 123:20 | **subscribed** 158:18 |
| **shut** 128:15 | 102:25 108:10,15 | 138:15 | **starting** 39:11 | **subsequent** 154:11 |
| **sick** 54:6 | 110:19 111:2,3,7,8 | **somewhat** 36:10 | **state** 2:5 4:4 84:6 | 156:20 |
| **side** 64:11 65:22 | 111:11 114:10 | **somewhere** 12:3 34:14 | 158:15,24 159:11 | **substance** 59:13 |
| **signature** 3:7 158:1,12 | 116:12 124:4,7,19 | 74:24 132:6 145:8 | **stated** 2:9 57:22 | **substantially** 17:18 |
| 159:18 | 125:17 126:5 127:25 | **sorry** 4:9 15:21 17:10 | **statement** 97:8 147:4 | **substantive** 59:14 |
| **similar** 15:25 105:17 | 130:11 131:24 | 25:22 29:12,13 33:21 | **statements** 93:15 112:1 | **subtitle** 73:15 |
| 105:21,24 108:1 | 135:13 136:5 137:1 | 34:1 43:8 56:18 | 146:3 | **subtitled** 57:7 |
| **simple** 138:16 | 137:12,25 147:16 | 61:25 71:17,18 97:2 | **states** 1:1 2:8 64:24 | **subtopic** 73:16 |
| **simply** 116:19 146:8 | 154:17,20 155:1 | 102:13 128:23 135:9 | 65:1 159:1 | **successful** 105:25 |
| 147:1,16 | **situations** 78:11,14 | 135:20 138:14 | **stating** 21:23 | **sued** 154:3,6 |
| **since** 61:2 69:9 95:1 | 110:25 | 153:10 | **stature** 89:14 | **suffering** 120:13 |
| 109:19 139:23 | **six** 41:1,5,19,21 | **sorts** 96:8 | **status** 10:15,20,22 | **suffers** 80:21 |
| **sink** 115:12 | **size** 108:14 | **sound** 88:5 | 14:11 119:18 | **suggest** 56:12 62:8 |
| **sir** 4:5,10,11 6:5 7:11 | **small** 113:5 | **sounded** 128:24 | **stay** 101:13 126:12 | **suggestion** 62:12 |
| 11:16 12:1 13:5 | **smart** 128:24 | **sounds** 88:10 110:25 | 128:14 | **suggestions** 58:24 62:7 |
| 15:21 16:21 17:10 | **sole** 111:5 | **source** 52:25 | **Stein** 2:14,14 145:6 | **suicidal** 120:14,19 |
| 20:22,23 21:16 22:5 | **some** 6:15,15 8:18 9:25 | **SOUTHERN** 1:1 159:1 | **steps** 39:11 13:5 | 121:2,13 |
| 22:9 23:21 24:3 25:2 | 10:9 12:19 23:20 | **space** 109:1 | **stick** 102:22 106:11 | **suicide** 120:4 123:6 |
| 25:10 26:10 36:1,2,8 | 25:13 26:1,4,9,17,17 | **speak** 34:23 79:21 | 152:9 | 127:24 141:12,14 |
| 36:25 37:12,15 38:13 | 28:21 36:22 39:10 | **speaking** 5:21 99:14 | **sticks** 64:11 155:6 | **suit** 21:21 33:17 |
| 40:5 42:9 43:7 44:18 | 47:22 51:18 52:6 | **speaks** 79:12 81:5 | **still** 23:11 26:24 35:24 | **Suite** 2:12,21 160:5 |
| 46:6,16,21 48:15 | 55:25 56:15 57:24 | **special** 67:19 | 36:3 39:23 106:10 | **suits** 31:15 32:15 34:3 |
| 49:1,7 50:25,25 | 58:20 65:23,23,24 | **specific** 6:17 18:25 | 126:8,8 129:2 | 36:12 57:19 |
| 52:18 53:5 54:11,15 | 66:1 67:9,19 68:12 | 28:15 32:7 35:2 58:2 | **Stipulations** 3:3 | **sum** 15:4 |
| 54:16,21,23,25 55:18 | 69:2 73:16 74:21 | 62:12 80:3 84:4 | **stop** 13:2 52:13,23 77:6 | **summary** 39:14 |
| 58:12 60:9,14,17 | 75:13 79:2 80:21 | 97:24 118:20 124:11 | 104:25 105:4 123:24 | **Supervisory** 57:7 |
| 61:9,12 62:5 63:14 | 82:22,25 83:8 88:1 | 140:2 153:13 | 130:19 133:17,21 | **supposed** 36:17 72:24 |
| 67:6 68:15,18 70:9 | 94:20 99:15 101:3,3 | **specifically** 10:10 | 134:7,7 136:19,19,19 | 78:21 120:18 121:1 |
| 71:24 74:9,12,25 | 101:22,25 107:21 | 16:23 21:10 26:6 | **stopped** 13:19 52:1 | 129:8,16 |
| 75:1,6 76:7 77:23 | 109:10,12 116:20 | 32:11 35:5 57:25 | 133:14 | **sure** 7:24 8:19 20:17 |
| 78:12 79:24 80:7 | 117:15 122:12 | 58:8 67:24 73:8 74:3 | **stopping** 68:25 | 21:2,4,16 47:8,8,11 |
| 81:21 82:1,5 83:4 | 130:24 132:6 140:1,2 | 74:20 81:5,23 87:24 | **stops** 136:21,22 | 48:20 54:15 58:7 |
| 84:1 86:11 87:9 | 140:16 141:3,21 | 91:19 92:23 96:19 | **stored** 32:4,4 114:7,8 | 62:25 68:23 72:2 |
| 88:13,20 89:17 90:12 | 143:1,1,14 144:14 | 97:12 100:6 102:22 | 114:23,25 | 73:12 75:10 82:24 |
| 91:13 93:3,8,12 | 145:13 147:6,6 150:3 | 104:5 142:18 | **street** 44:12 103:5 | 89:3 99:23 103:17,19 |
| 96:19,20 100:23 | 154:3,7 155:14 | **specificity** 78:5 | 151:7 | 108:23 123:8 144:2 |
| 107:1 108:21 109:9 | **somebody** 83:8 | **specified** 50:11 | **strike** 16:24 31:1,3 | 150:15 152:9 154:14 |
| 112:5 114:13 117:25 | **someone** 7:4 25:6 53:6 | **specify** 76:21 | 67:15 105:7,18 123:3 | **suspect** 10:16 79:4 99:1 |
| 119:19,22 120:5,10 | 55:21 59:2,7 82:20 | **specifying** 92:9 | 135:1 | 105:14,15,17 108:7 |
| 120:16 121:6 123:7 | 104:25 105:1 106:3 | **speculation** 76:18 | **striking** 105:15 109:2 | **suspected** 149:4 |
| 124:25 125:21 | 108:17 121:19 | 136:1 143:21 | **struck** 112:6 152:8 | **suspects** 14:19 31:17 |
| 126:22 127:11,17 | 131:25 136:5,8,18 | **speed** 69:2 134:17 | **students** 20:8 76:16 | **sustained** 26:4 149:1 |
| 128:3,16,21 129:6,19 | 138:22 | **spend** 10:12 | **subdue** 105:14,17,19 | **swinging** 123:23 |
| 133:20 134:10,16,19 | **something** 17:6,8 31:25 | **spent** 44:2,4 45:2,6 | 108:1,17 126:13 | 131:19 |
| 134:24 135:20 | 34:16 36:15,23 38:3 | **split** 46:2 | **subject** 8:7,11 108:1,19 | **sworn** 2:2 4:2 5:5 |
| 136:10 137:1,24 | 48:13 49:5,12 51:22 | **spray** 102:22 | 108:25 109:6,12 | 159:13 |
| 138:8,11 139:10 | 54:7 55:6 58:15 71:7 | **squad** 114:9,12,16 | 110:14,20 111:2 | **swung** 112:6 |
| 141:19,23 142:5 | 71:9,14 76:22 82:3 | **stability** 123:5 | 114:11 129:10 | **sympathize** 108:14 |
| 143:9,24 144:18,19 | 83:17 84:8,12,14,17 | **stack** 47:21 156:8 | 131:13,16,19 133:18 | |

DONATO GARCIA

April 9, 2003

Page 176

| T | | | | |
|---|---|---|---|---|
| **T** 4:3 145:9 149:21 150:24 | **teaching** 77:2 | 160:4,6 | 106:23,24 | 99:14 137:17 145:11 145:13,20,23 146:7 |
| **take** 5:13 7:25 9:13 15:23 18:6 19:2,4 21:23 22:7 25:18 45:16 52:14 53:19 55:1 72:11 76:9,14 79:11 86:5 87:4,13 89:3 95:15 98:13 103:18 110:20,25 113:5 116:25 120:21 123:17 129:8,15,16 134:4 156:9 | **techniques** 84:13 85:1 85:19 86:9 90:14,14 **Tele** 2:23 **telephone** 148:1 **tell** 4:24 6:10,13 11:24 12:1 23:24,25 25:17 25:24 34:19 35:7 39:15 40:21 42:7,13 44:1 47:13,16 49:11 53:7,7 60:22 61:5,7 61:10 64:1 70:21 73:12,21 75:18,19 76:20 78:4,16 79:21 86:20 87:23 96:1,4 99:11,21 100:6,10,12 100:13,14,20,24 101:3 104:25 107:14 113:10 116:16 117:13,23 121:17 123:13,17 131:3 138:2 141:20,22 144:24 155:19 | **thank** 53:12 145:4 149:20 150:23 157:1 **their** 19:6 55:17 63:21 64:14 71:6 72:4 77:2 79:15,17,18 84:7,18 86:8 87:15 97:5,6 98:6 103:10 105:19 105:24 106:7 107:7,7 107:25,25 125:11 133:21 135:7,15,23 135:23 136:13,20 150:12,16 151:20 155:4 **themselves** 78:22 79:3 108:6,18,25 111:6 135:12 **thereof** 16:1 **thick** 49:12 **thing** 22:14 36:21 110:8 130:21 **things** 9:16 10:24 50:13 50:23 64:13 79:6 88:7 89:6,8,15,25 93:10 99:20 101:2 103:22 104:4 112:20 130:21 140:2 143:1 144:11 145:22 | **throat** 149:4 **through** 9:22 10:2 12:19 16:18,24 18:7 18:20 26:24 30:17 32:6 39:19 43:20 47:21,22,23,24 49:19 55:12,22 66:18 74:22 76:10,10 77:4,7,13 81:14 84:7 91:11,13 92:20 96:7 112:18 117:1,2 131:9,9 139:12,25 140:3 144:11 145:1 158:18 **time** 4:17 7:7 9:18 10:12,16,20,23,25 11:3,14 12:7 13:7,9 13:11,17,18,19,20 16:18 17:19 21:15 23:5 24:25 27:25 28:1 37:23 43:5,14 43:20,20 44:2,3,10 44:10,11 45:2,6,10 45:13,17 46:5,7,19 46:23 47:1,10,10,17 50:20 53:23,23 54:12 59:19,19 60:8,9,10 61:3,5,6,14,17,19 62:16 65:9 69:9 76:21 82:20,20,25 83:18,18 84:22 86:12 93:6 94:9,15 95:1 97:16 98:15,23 101:7 101:19,20 102:15,25 111:15 113:9 114:25 115:5,22 117:7,10 118:22 119:12 120:7 120:8 122:10,12,13 122:17,17,18,23 123:10 124:2 127:4 128:20 134:15,23 137:10,25 139:25 140:20 142:1,7,17 145:4,5,6 146:8 148:2 149:3,10,14 152:2,5,13 153:5,14 153:15 156:21 157:1 157:3 | **told** 8:6 14:3,20 71:7,8 85:12 94:7 96:20 134:12 138:16,20 **tomorrow** 125:10 **top** 73:20 **topic** 9:21 **topics** 9:21 **total** 15:4 **tour** 39:25 40:3,6 **towards** 128:9 136:6 136:18 **Tower** 2:18 **toxicology** 144:15 **track** 36:18 **traffic** 13:2 52:23 **train** 18:5 20:25 27:12 71:21 80:9 83:24 135:2 **trained** 16:8 27:7 71:1 71:12,15,25 78:2,21 78:22 79:7 81:25 82:6 95:25 96:2,5,8,9 96:25 108:20 124:25 133:20 134:5 **trainees** 82:4,9 **training** 14:16,22 15:17 16:1,4,5,17,23 17:1,3 18:1,25 19:6 19:12,15 20:20,24 27:8 59:20 71:6,20 72:3,9,11,11,12,13 72:14,20 73:23 75:19 75:20 76:2,16 77:14 78:5,9,10,13,14,15 78:16 79:1,18,21 80:7 81:14,15,19,24 82:3,5,8,10,11,15 83:22 84:2,4,8 85:2,3 85:4,7 86:4,14 87:15 88:12,14,19,21 90:7 90:10,13,22 91:10 96:6,7,11,13,14 97:3 97:11 108:22 111:9 126:14,22 133:16,22 133:23 134:2,3,3 135:4 148:8 150:4,5 150:7,9,17,19,20 **trainings** 78:15 **trains** 135:5 **transcript** 159:14,16 **transported** 13:14 40:1 137:20 **travel** 69:1,2 **treat** 24:14 27:13 |
| **taken** 2:2 10:17,20 11:14 12:7 13:7 25:25 26:4,20 28:5,7 28:17,21,23 29:3,21 54:19 61:18 94:6 111:25 123:13 139:14,14 142:18 144:14 151:14 159:22 | | | | |
| **takes** 17:22 136:20 **taking** 44:15 97:9 121:1 133:8 | **telling** 61:16 80:1 143:5,6 **tells** 136:15 **tendencies** 121:2 **terms** 56:14 58:16,23 | **think** 12:20 14:3,25 33:23 36:21 47:15 48:7 50:3 51:18 52:6 58:23 63:1 72:17 88:4 94:17 97:2 | | |
| **talk** 31:10 40:24 70:10 82:5 93:9 125:9 | 59:12,23 65:22 68:25 68:25 69:1 73:3,4 79:13,23 89:10 90:10 103:2,23 109:3 123:2 130:15 148:20 | 99:11 110:2 118:6 137:4,13 138:20 140:17 142:8 144:1 156:6,14 | | |
| **talked** 48:7 50:3 92:21 132:11 | | | | |
| **talking** 62:7 85:5 88:8 88:10 101:7 109:11 112:9,23 122:19 146:12 153:22 | **tested** 79:7 **testified** 4:2 22:19 23:19,24 81:13 95:6 140:17 | **thinking** 74:19 **Thirteen** 28:3 **though** 148:20 **thought** 103:2 127:18 | | |
| **talks** 9:19 81:5 **tangible** 9:16 21:21 **tape** 52:16,18,19 53:3 54:19 55:14,17,20 **task** 39:23 40:3,6 | **testify** 22:17 54:18 95:12 **testimony** 14:8 15:18 32:9 33:1,2,8 43:9 45:16 59:6 60:18 72:8,18 76:6,15 | **threat** 104:19,21 105:2 105:2,13,19,25 106:1 106:7,10,25 107:1,21 107:21 109:23 110:4 110:22 111:14,21 119:5 122:5,15,24 | | |
| **taught** 18:16 19:11,15 72:18,20 73:2,22 77:15 79:7 84:11 87:24 88:6,14 89:8 89:15 90:7 104:11,15 108:7,9,16 111:9 | 77:12,13 81:23,24 93:21 98:17 109:4 118:8 121:8,11 122:21,22 128:8 134:4 145:23 146:5,7 154:10 159:15 | 123:24 125:6 127:22 128:12,18 129:3 130:17,19 132:9 133:14,19 134:7,22 135:2,6,24 136:3,3,9 136:13,16,24 143:11 | | |
| **TCLEOSE** 21:7,8 39:2 72:16 141:7 150:10 **TCLEOSE-mandated** 87:21 | | | | |
| **teach** 72:4 76:2,4 77:5 79:22 84:14 85:12,13 89:23,23,25 90:2 91:4 96:19,23 | **Texas** 1:1,6,10,15,18 2:5,7,12,15,19,22 4:15 5:12,22 21:5 24:8 31:17 32:17 33:4,12 34:4 35:24 84:6 150:6,13 153:18 158:15,24 159:1,5,11 | **threatening** 81:1,2 **three** 4:16 42:16 43:4 43:10,11 58:20 66:4 | **timeframe** 42:14 **times** 131:23 133:9 147:23, **titled** 51:22 57:6,13 73:14 116:19,21,23 **today** 5:18 6:2,7 8:8,12 9:5 10:11 17:15,17 23:8 47:9 50:1 69:5 | |
| **teaches** 75:21 76:16 87:20 91:3 97:4 134:4 | | | | |

(210) 377-3027
7800 IH-10 WEST, SUITE 100

**ESQUIRE DEPOSITIONS SERVICES**
SAN ANTONIO, TEXAS 78230

FAX (210) 344-6016
(800) 969-3027

DONATO GARCIA

April 9, 2003

Page 177

treating 146:21
treatment 13:14 24:8
25:9,15 27:4 28:6,19
148:21,25 156:20
trial 11:4 112:21 157:3
tricky 99:22
tried 7:19,20 111:18
124:3,19 125:7,9,24
trouble 94:18,18 127:2
truck 7:21
true 67:15,16 72:23
85:18 104:16,18
123:4 158:12 159:15
try 77:3 79:22 108:1,17
124:10,23 125:5
126:10 129:3 138:16
140:2
trying 26:15 44:7 58:16
79:20,25 80:8 85:11
85:11 86:18,19,20
89:22,22 96:22 99:22
105:14 106:3 114:20
124:16,23 125:25
126:8 127:7,7,8,12
140:15,15 142:15,25
143:4
TSTC 16:15
Tuesday 151:6
Turn 136:15
turned 55:6,15,21
135:7,7 136:8
turns 135:15,23 136:13
136:22
Twelve 64:5,6
two 11:6,12 12:17,17
12:24 19:24 41:11,14
41:16,19 50:13,21
51:21 72:14,25
type 9:25 13:12 16:22
20:25 21:3,11 24:13
25:7 32:11,12 36:22
62:6 64:22 65:8 66:7
66:17,21 67:1,9 68:3
68:7,13 69:6,11,22
78:3,5,15,16 79:1,5
80:21 82:3 84:12
87:16 88:15 89:12
90:11,22 94:16,20
109:10,11 116:11
134:14 143:19
144:15 150:3
types 66:5 68:21,23,24
79:6 88:6 89:6 150:5
150:6

U

Uh 23:14
Uh-huh 9:24 11:10
23:4 27:1 40:19 42:3
44:18 59:3 65:6
89:24 114:21 142:3
153:7
ultimately 71:22
uncooperative 80:13
107:5
under 1:6 12:12 14:11
56:16 70:11 73:5,15
75:4 102:11,12 105:8
105:16,16 107:3,3,9
107:22,23 108:23,23
116:12 125:4,12,12
126:2,10,11,11
127:15 131:12,15
154:23 158:17,20
undercover 39:24
understand 7:24 8:10
14:8 15:11 17:23
18:21 21:9 28:12
32:19 33:9 36:10
44:6 54:17 58:16
59:23 62:4,25 63:14
66:15,24 69:15 72:2
72:7 82:14 85:4
89:18 95:2,11 96:16
97:2,19 98:21 99:10
101:1 107:8 108:23
108:23 109:4,19
120:21 122:18 123:8
126:9 127:5,5 134:3
135:11 138:1 142:19
143:1 153:2,2
understanding 5:17
25:13 27:22 29:23
47:2 63:5,6,13
100:16 109:22 110:7
110:11 111:25 112:2
123:4,14,14 124:11
129:23 130:6,25
146:12 148:12 149:1
understandings 24:7
understood 9:4,8
unfair 118:17
unfettered 69:18,22
uniformed 147:18
United 1:1 2:8 159:1
unlawful 35:13,14
unless 80:1 97:21
unresponsive 80:17
until 8:13 37:4 40:15
53:20,23 104:19
133:13,14 152:5
157:3

unwritten 27:22 75:13
updating 150:7
use 5:1 14:16,18,22
16:1 30:16 31:16
32:17 33:18 34:4
35:14,17 50:10 57:25
62:10 63:24 65:2
66:5,17,21 68:16
69:6,11,19,23 70:3,3
70:12,17,17,23 71:1
71:12,14,21,23,25
72:5,9 73:3,20,23
74:5,11,14,23 75:5
75:12,15,22 76:3,17
77:5,15,19,20 78:3,7
78:13 79:13,15 80:1
80:4,14,18,23 81:2
81:10 88:15 90:2,8
91:4 95:20 96:9,9,11
96:20,21,24,25 97:20
102:20 104:5,7,7,8
104:10,12,16,21
105:3,6,17,18,24
106:7,11,18,18,24
107:10,15,23 109:3,5
110:3,13 111:1
113:13 114:6 115:6
124:2,20 127:16
129:9,17,24 130:10
133:6,8,10 134:5,5
134:13 135:16 137:5
137:6,11,22 138:3,5
138:21 146:14
148:15 152:20,24
153:17 155:14,24
156:2
used 2:24 16:5 17:2
18:5 24:9 33:5 35:4,7
35:9 62:8 63:20
64:12,24 66:3 67:10
68:21 69:21 70:6,12
74:22 89:13 102:24
103:1 105:9 107:17
112:6 113:18,22
114:1,4,17,25 115:1
115:19 116:12
118:22 121:15
123:20 124:14
128:21 129:12
130:19 131:21
133:11,13 139:5
143:19 147:21 148:8
155:7
uses 50:22,23 104:18
105:21 139:4
using 98:10 106:17

124:13 130:18
133:16 135:13 148:6
148:6 152:16
usually 148:8 154:6
utilize 147:20
utilized 141:13
U.S 23:9

V

vacancy 53:22,23
validate 2:24
valley 1:12,20 10:17,20
16:16 17:2,9 18:23
20:3,9 24:8,10,14
25:8,14,18,25 26:5,7
26:8 27:2,5,16,23
28:6,7 29:3,21 30:4
39:7 45:12 61:18
68:6 69:12 82:22
93:5 101:13 113:25
116:17 119:13
145:11 147:15
Van 2:18
VBMC 3:23
vehicle 26:3 52:1
154:22,22,25
Vela 151:14 155:10
velocity 69:1
verbal 78:18 104:21,23
104:23 113:20
130:12,16,22 131:14
131:18
verbally 81:1,1
very 8:6 15:23,25 18:4
25:11 46:12 123:20
143:2,2,3,15,17
vial 144:14
victim 12:16
victims 12:16
video 2:23 3:17,18 6:15
139:13,16,17,21
145:24 146:1
videotape 51:22 52:4
52:13,23 55:6,9,21
92:21
VIDEOTAPED 1:22
159:8
videotapes 6:6 9:20
14:9
viewed 52:16,18 53:1
Village 2:15
violated 92:2
violation 92:11 104:22
126:21,23,24
violations 88:7
violence 87:25

124:13 130:18
133:16 135:13 148:6
148:6 152:16
usually 148:8 154:6
utilize 147:20
utilized 141:13
U.S 23:9

violent 143:2,15
vs 1:9,17 158:2 159:4

W

wad 148:8
wait 106:2 144:25
walk 113:5
want 6:5 7:23 9:3
10:10,12 15:3 21:25
31:3,11 47:24 49:24
51:20 62:25 70:10
72:2 75:10 96:1
99:22 103:22 116:14
123:8 126:16 144:2
144:11 145:17
153:14
wanted 38:3 41:12
warning 134:11
warrant 41:20
wasn't 8:13 13:16,16
13:18 19:25 34:1
45:9,9 46:6 53:25
54:21 84:24
waste 101:7
watching 89:10
WATTS 2:11
way 13:25 14:9 20:23
32:3 37:23 43:13
49:11 54:2,18 55:22
67:5 73:18,22,25
76:1 87:10,14 91:7,9
91:23 94:16,22 95:16
111:19 120:22
122:21 124:17 128:4
133:17,18 136:17
138:14 146:18 147:2
148:17
weapon 63:22 64:22,23
64:24 65:1,8 66:22
67:3,6,22 69:16,16
69:19 102:16,18
107:6,17,21 109:6,11
109:13 111:2 128:21
130:19 133:21
134:10,14,14 135:24
148:5,6,10 152:12,14
152:17
weapons 63:17,19,19
63:23 64:2,8,17 66:6
66:7,9 67:1 102:20
107:7 111:23
wear 112:21
week 7:12 44:14,14
46:4 108:13
weeks 118:1
weighs 132:7,8

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

DONATO GARCIA

weights 108:13
well 6:10 8:6 10:23
 13:18 16:10,24 20:23
 22:17 25:5,11,11
 31:1,2 32:14 35:2
 37:3 45:23 47:19
 54:2 56:13 58:14
 60:10 61:1 63:17
 73:11 76:13 81:22
 82:8 83:7 84:9,15
 86:2 87:5 89:17
 93:13,21 94:6 96:16
 99:2 101:11 105:12
 109:22 112:4 116:2
 120:22 121:7,17
 126:15 132:3 136:11
 136:17 137:4 138:1
 138:13 141:13
 142:25 143:13
 155:13,20 156:9
went 18:19 37:19 38:16
 39:1,16,19 40:10
 55:12 77:4,7,13,19
 107:14 154:25
were 2:24 4:17 5:5 6:22
 6:23 7:3,16 8:6,6
 12:8 26:13 28:25
 29:8,18 37:6 39:5
 40:12 41:5 45:25
 48:2 51:18 52:12,19
 54:2 55:1 58:4,8,9,10
 66:7,7 82:14 85:1,19
 85:22,24 86:9,21
 87:6,7,11,12 88:11
 88:11 93:15 94:22
 95:5,5,11 98:13
 101:12 107:11
 112:10 113:9,11
 114:17,17,20 115:1,1
 115:11,15,16,18,19
 115:21 117:3,4,20,24
 118:21 123:16
 137:23 141:2,2,3,3
 146:3 149:13,24
 151:10,17 152:1,14
 153:5 155:6 156:21
weren't 101:1 115:18
West 2:18 160:5
whatsoever 119:15
 120:10
wheel 132:12
wheels 132:8
while 57:2 62:2 79:12
 109:19 115:23
 146:22
whole 40:24

wife 151:9 155:4
Willacy 37:8
Willette 2:6,20
William 2:17 3:5
willing 139:9
wind 83:9
wish 150:21
witness 2:1 9:17,17
 17:5 29:12 51:4
 79:10 87:20 110:22
 121:6 128:9 135:19
 139:7 143:22 145:1,5
 150:23 158:14
 159:13,15,17,18
witnesses 101:4
word 112:19
words 53:1 104:10,25
 107:7 120:24
work 10:24 11:16
 15:13 23:15 24:3
 37:18,19,20,24 38:14
 38:16,19 39:15 43:6
 44:2,10,17,19 59:12
 63:21 83:19 94:13
 103:10 150:2
worked 24:5 39:24
 41:23 43:10 47:14,17
 67:5
workers 46:14 156:22
working 23:9 39:23
 42:15 44:4 45:7,25
wouldn't 123:24 127:1
 144:21 155:18
wounds 137:18,23
 138:5
wrestling 110:19
writing 27:20 29:24
 30:1 68:12
written 24:13 25:12,12
 27:3 68:7 75:5,12
 113:20 116:20
 117:15
wrong 71:4 86:21
 107:15 112:23
 125:17,24 131:2
Wrongful 1:6,15

X

X 4:3 145:9 149:21
 150:24

Y

yeah 53:21 59:11,22
 88:9 118:6 139:20
 142:22
year 5:9 34:20 37:11

37:12,13,15 40:7
 53:15 66:23
years 4:16 28:3,4 33:10
 33:11 38:20 39:25
 42:16 43:4,10,11
 72:14,25 131:25
young 5:14
your-all's 126:11
you-all 17:6 18:15
 26:13 36:22 55:14
 83:9,14 117:18
Ysidro 101:14,15,20
 113:12 121:23

0

000316 140:6
000436 144:12

1

1 3:9 9:14 49:19 56:16
 92:20
1A 10:14 16:24
1.01 56:16
10 3:18 51:21 52:4,10
 54:22 70:15 73:13,19
 92:20 140:11 141:6
100 160:5
11 3:19 70:15 73:19
 74:4 116:15,19 117:9
 118:14 141:12
11:00 2:4
116 3:19,20,21
12 3:20 64:5 70:15
 73:18,20 116:15,21
 117:9 118:14
12/31/04 160:5
125 148:6
13 3:21 28:4 33:10
 116:15,23 117:9
 118:14 151:14
13-year-old 155:7,9
14 3:22 156:14,19
14-A 2:15
1400 2:12
1429 2:18
145 3:5
149 3:5
15 3:10,23 65:17
 134:21
150 3:6
156 3:22
158 3:7
16 3:24 33:11
17 3:25
17th 5:2 13:4,20 29:21
 46:4 52:2 93:6

19 39:22
19th 13:21 91:24 92:12
 93:7 153:6,15 156:21
1979 37:25
1980 37:25 38:15 39:6
 38:24 39:11,16,21
1989 34:22 35:6 36:2
1990 31:18 39:21 77:14
1991 39:22
1995 40:8

2

2 3:2,10 9:23 15:3,18
 16:4 48:8 56:19 57:6
 58:2 60:20 61:2 70:1
 71:2
2.01 57:6
2000 4:19 10:18 15:6
 33:3 36:5 40:20
 41:23 42:15 43:12
 45:11 53:16,17 58:5
 58:5 85:20 87:8
 91:24 153:6
2001 5:9 35:25 40:18
 53:20 54:1
2002 151:7
2003 1:24 2:4 158:21
 159:8 160:1
2019 142:2
2060 160:4
21 3:11
210 160:6
222 2:18
25th 151:7,22,24

3

3 3:11 9:23 21:24 22:4
 22:6,12 48:5 103:15
300 151:7
315 140:6
316 141:6
340 132:7
350 128:19 132:7
3505 2:7,21
369 141:20
377-3027 160:6
38 148:6

4

4 3:4,12 38:4 48:12
 92:24
4.01 57:12
40 44:13,15,22 65:24
45 65:23 66:1
460 2:21
48 3:12,13

49 3:14,15,16

5

5 3:13 48:20
5:00 2:4 157:4
51 3:17,18
555 2:12

6

6 3:14 49:2 73:11 92:25
 110:2 140:1 141:20
6A 9:15
6.01 64:21
6.02 69:25
6.06 73:13
6.07 73:17

7

7 3:15 49:5 93:2 144:10
71 37:16
7800 160:5
78230 160:6
78478 2:12
78520 2:15
78521 2:7,22
78551 2:19

8

8 3:16 49:10,19
8:19 142:2

9

9 1:24 3:9,17 51:21
 52:12,17,25 54:13
 65:10,24 66:3,4,24
 68:16,18 92:20
 134:13 140:9 148:10
 159:8
9th 2:3 93:23
9/17/00 142:1

# Exhibit "B"

GERARDO RAMIREZ                                                          April 10, 2003

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| MARY E. CARRANZA, Individually and as Next Friend of ANGEL MATTHEW GONZALEZ, GUSTAVO GONZALEZ, JR., and ALYSSA LAUREN GONZALEZ, Minor Children and on Behalf of All of Those Entitled to Recover for Death of GUSTAVO GONZALEZ, Deceased, Under the Texas Wrongful Death Act, and CELIA MUNIZ GONZALEZ, Individually and as Personal Representative of the ESTATE OF GUSTAVO GONZALEZ, Deceased, Plaintiffs, vs. | * * * * * * * * * * * * * * * * * * * * |
| CITY OF LA FERIA, TEXAS, LA FERIA POLICE DEPARTMENT, OFFICER GERARDO "JERRY" RAMIREZ, Individually and in his Official Capacity; and VALLEY BAPTIST MEDICAL CENTER, Defendants, | * * * * * * * * |
| | * CIVIL ACTION NO. B-02-180 |
| GUSTAVO GONZALEZ, Individually Pursuant to the Texas Wrongful Death Act for the Death of GUSTAVO GONZALEZ, Deceased, Intervenor, vs. | * * * * * * * |
| CITY OF LA FERIA, TEXAS, OFFICER GERARDO "JERRY" RAMIREZ, Individually and in his Official Capacity; and VALLEY BAPTIST MEDICAL CENTER, Defendants. | * * * * * * * |

*************************************************************

VIDEOTAPED ORAL DEPOSITION OF
GERARDO RAMIREZ
APRIL 10, 2003

+*************************************************************

GERARDO RAMIREZ                                                          April 10, 2003

**Page 2**

1    ORAL DEPOSITION OF GERARDO RAMIREZ, produced as a witness
2  at the instance of the Plaintiff and duly sworn, was taken in
3  the above-styled and numbered cause on the 10th day of April
4  2003, from 10:30 a.m. to 6:00 p.m., before Katherine J.
5  Brookbank, CSR in and for the State of Texas, reported by
6  method of machine shorthand, at the office of Willette &
7  Guerra, 3505 Boca Chica Boulevard, Brownsville, Texas, 78521,
8  pursuant to the United States District Court Procedure and the
9  provisions stated on the record hereto.
10                    APPEARANCES
    FOR THE PLAINTIFF(S)
11    Mr. Joseph Barrientos
         WATTS LAW FIRM
12       555 N. Carancahua, Suite 1400
         Corpus Christi, Texas  78478
13
    FOR THE INTERVENOR
14    Mr. Phillip Stein
         THE LAW OFFICES OF PHILLIP J. STEIN, P.C.
15       14-A Palm Village Center
         Brownsville, Texas  78520
16
    FOR THE DEFENDANT(S)
17    Mr. Scott Clark and Mr. William Pope
         ADAMS & GRAHAM, L.L.P.
18       222 E. Van Buren, West Tower
         P. O. Drawer 1429
19       Harlingen, Texas  78551
20    Mr. Eduardo Garza
         WILLETTE & GUERRA
21       International Plaza, Suite 460
         3505 Boca Chica Boulevard
22       Brownsville, Texas  78521
23  ALSO PRESENT:  Tele Video and Audio Productions
24  (Note by reporter: Exhibits were not available to validate
        quoted material.  No quotes used around quoted material)
25

**Page 3**

1                    INDEX
                        PAGE
2
   Appearances --------------------------------- 2
3  Stipulations (Attached hereto) -------------------- N/A
4  GERARDO RAMIREZ
       Examination by Mr. Joseph Barrientos --------- 4
5      Examination by Mr. William Pope ---------- 226
       Examination by Mr. Eduardo Garza ------------ 244
6      Examination by Mr. Joseph Barrientos --------- 244
   Changes and Signature ---------------------- 246
7  Reporter's Certificate -------------------- 247
8                  EXHIBITS
   NO. DESCRIPTION                          PAGE
9  1 - Notice of Deposition      (Exhibits 1-14 marked
                                 in D. Garcia depo)
10  2 - LFPD Policy & Procedure Manual
11  3 - Grand Jury
12  4 - Autopsy Report
13  5 - Incident Report
14  6 - Death Report
15  7 - Harlingen Offense Report
16  8 - Harlingen Investigation
17  9 - Accident Video
18  10 - Re-enactment Video
19  11 - Restraints
20  12 - Critical Care Medical Protective Restraints
21  13 - Forensic Staff Information List
22  14 - Letters
23  15 - VBMC Medical Records              98
24  16 - Diagram drawn by G. Ramirez       120
25  17 - Autopsy                           195

**Page 4**

1               GERARDO RAMIREZ,
2        having been duly sworn, testified as follows:
3            E X A M I N A T I O N
4    Q   (BY MR. BARRIENTOS) Good morning.  Would you please
5  tell us your name, sir?
6    A   Yes, sir.  My name is Officer Gerardo Javier
7  Ramirez.
8    Q   Officer Ramirez, we had a chance to meet
9  yesterday --
10   A   Yes, sir.
11   Q   -- during the -- Chief Garcia's deposition.  Is that
12  correct?
13   A   Yes, sir.
14   Q   And let me ask you, is -- have you ever given a
15  deposition before?
16   A   No.
17   Q   Okay.  You -- you -- after being here for several
18  hours yesterday, I guess you probably picked up on how to --
19  how the procedure is?
20   A   Somewhat, yes.
21   Q   Okay.  The only thing I will tell you, is once in a
22  while with Chief Garcia, he would answer with an uh-huh or
23  huh-uh.  And I need you to answer with a yes or no, whatever
24  the appropriate answer is, so that the court reporter will be
25  clear about what -- what your response is.

**Page 5**

1    A   Not a problem.  Yes, sir.
2    Q   If I ask you something you don't understand, you
3  stop me, and I will try and rephrase it and ask a better
4  question.
5    A   Definitely.
6        THE COURT REPORTER:  Can I ask you to speak up,
7  also, please?
8        THE WITNESS:  No problem.
9        THE COURT REPORTER:  Thank you.
10       THE WITNESS:  Yes.
11   Q   (BY MR. BARRIENTOS) All right.  Let me -- let me
12  begin by trying to find out a little bit about -- about you,
13  Officer Ramirez.  First of all, where are you from?
14   A   I am from Alamo, Texas.
15   Q   And were you born there?
16   A   No.  I was born in McAllen.
17   Q   Okay.  What are your parents' names?
18   A   Arturo and Irma Ramirez.
19   Q   And what -- what do your folks do?
20   A   My father has his own business.  And he works in --
21  I guess you could say proposal writing.  And he helps other
22  businesses start out, you know, that are starting.  It is a
23  non-profit organization that works with the low income
24  housing.
25   Q   You mean like -- I am sorry I didn't mean to

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                        (800) 969-3027
                                                                        a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                April 10, 2003

---

Page 6

1  interrupt you.
2      A   No. That's okay.
3      Q   You mean like grant writing?
4      A   Yes. Yes.
5      Q   What is the name of your father's business?
6      A   Center for Economic Opportunities.
7      Q   Center for Economic Opportunities.
8      A   Yes.
9      Q   Okay. Has your father ever been a police officer?
10     A   No.
11     Q   How about your mother?
12     A   No.
13     Q   What does your mother do?
14     A   She works -- she is a -- used would be the director
15 of religious education for the Catholic church in Alamo,
16 Resurrection Catholic Church. She now works and does
17 marriage, I guess you can say, set-ups. Or she helps the
18 couples that are just looking to become married and/or --
19     Q   The classes like they made us take before we got
20 married?
21     A   Yes. Exactly.
22     Q   Okay.
23     A   Exactly.
24     Q   All right. Do you have any brothers and sisters?
25     A   Yes, I do.

---

Page 7

1      Q   Can you tell me their names?
2      A   Luis Alberto Ramirez, my little brother.
3      Q   Okay. Is that your own sibling?
4      A   Yes.
5      Q   What does Luis Alberto do for a living?
6      A   He is a student.
7      Q   Where is he a student?
8      A   In the Alamo Middle School -- I am sorry, middle
9  school. Memorial High School.
10     Q   Okay. Are you married?
11     A   No.
12     Q   Do you have any children?
13     A   No, sir.
14     Q   Where do you go to high school?
15     A   I went to PSJA South High School in San Juan. And I
16 also attended the Memorial High School in Alamo.
17     Q   Okay. Did you graduate from high school?
18     A   Yes.
19     Q   Okay. Which -- which high school did you graduate
20 from?
21     A   The Memorial.
22     Q   What year?
23     A   '98.
24     Q   Okay. And I didn't ask you, but how old are you?
25 What is your date of birth?

---

Page 8

1      A   Twenty-four. August 45th of 1978.
2      Q   Okay. Do you have any relatives who are police
3  officers?
4      A   Yes.
5      Q   Who would that be?
6      A   My uncle, Fernando Gonzalez.
7      Q   Okay.
8      A   He is from out of state, but. . .
9      Q   He lives out of state?
10     A   Yes.
11     Q   He is a police officer out of state?
12     A   He retired. Retired.
13     Q   Where did he retire from?
14     A   The -- I believe the last department, he was a chief
15 at the Ray Police Department, Colorado.
16     Q   Was he ever a police officer here in the state of
17 Texas?
18     A   No. No.
19     Q   All right. After high school, have you -- did you
20 take any -- did you attend college on a full-time or part-time
21 basis?
22     A   I believe it was just a part-time, part-time.
23     Q   Okay. Did you have a -- a major area of study that
24 you were trying to get into?
25     A   Police administration.

---

Page 9

1      Q   Okay. Did you receive any degrees?
2      A   No.
3      Q   Okay. Did you -- are you still going to school or
4  did -- at some point did you decrease the time -- the amount
5  of time you spent going to school to go to -- to spend more
6  time working or --
7      A   Yes.
8      Q   Okay.
9      A   Because of that fact.
10     Q   Okay. Can you give me an idea of when -- how much
11 time, how many classes, how many hours you would have taken in
12 college and about when that dropped off in favor of work?
13     A   About 12. But due to the work, I had to leave.
14     Q   So you -- 12 -- okay. You completed about 12 hours
15 of college?
16     A   Yeah.
17     Q   Was that all in one full-time semester or did that
18 -- was that spread out over --
19     A   Spread out. Spread out.
20     Q   What did -- I know when you first start college, you
21 know, you take a lot of basics and you don't really,
22 sometimes, get into the, you know, for example, police
23 administration courses, until you get closer to the end or
24 maybe halfway through your curriculum.
25     A   Very much.

---

3 (Pages 6 to 9)

GERARDO RAMIREZ                                                    April 10, 2003

Page 10

1    Q   So the question I have is, did you actually get to
2    take any courses in police administration or police work or
3    criminal justice --
4    A   Criminal justice.
5    Q   -- or anything like that?  Criminal justice.
6    A   Criminal justice.
7    Q   Is that one class?
8    A   One class.
9    Q   Three-hour class?
10   A   Uh-huh.
11   Q   And where did you go to school?
12   A   Texas Pan American.  Here.
13   Q   Okay.  Do you remember what year and what semester
14   you took the class in criminal justice?
15   A   No, I do not.
16   Q   Do you remember who your professor was?
17   A   No, I don't recall.
18   Q   Do you remember how you did in class?
19   A   I had some complications because of work.
20   Q   Okay.  Did you -- did you complete the class or did
21   have to -- did you withdraw from it or --
22   A   I believe I withdrew.
23   Q   Okay.  After -- okay.  And that would have been --
24   would that have been immediately after high school that you
25   began taking these classes?

Page 11

1    A   Yes.
2    Q   Okay.  Were you also working when you left high
3    school?
4    A   Yes.
5    Q   Where were you working when you graduated from high
6    school?
7    A   Quintanilla Security.
8    Q   Okay.  What did you do for Quintanilla Security?
9    A   I was working as a security officer at the time.
10   Q   When did you begin working for them?
11   A   I don't recall the exact date.
12   Q   Okay.  Was it while you were still in high school or
13   after you graduated?
14   A   No.  After.
15   Q   Okay.  If you don't remember the date that you began
16   working for them, can you give me some idea of how long after
17   you graduated from high school it would have been that you --
18   that you began working for them?
19   A   Possibly in the same year of graduation, '98.
20   Q   Okay.
21       THE REPORTER:  I am sorry.  I really need to
22   get you to speak up.
23       THE WITNESS:  I am sorry.
24       THE REPORTER:  I am having a hard time getting
25   everything you are saying.

Page 12

1        THE WITNESS:  No problem.
2        THE REPORTER:  Thank you.
3        THE WITNESS:  Not a problem.
4    Q   (BY MR. BARRIENTOS)  Okay.  Let me see -- let me ask
5    again.  About how long after your graduation from high school,
6    did you begin working for Quintanilla Security?
7    A   I would say about -- a little after -- possibly a
8    couple of months within the same year of '98, I believe.
9    Q   Okay.  And at that time you would have been how old?
10   A   About 18.
11   Q   Okay.
12   A   Eighteen.
13   Q   Okay.
14   A   No.  Nineteen.
15   Q   Nineteen?
16   A   I believe.
17   Q   Okay.  How did you get the job at Quintanilla
18   Security?
19   A   I went in and applied.  And I was called in later
20   that I was hired.
21   Q   Okay.  Did you -- did you read about it in the
22   paper, hear about an opening on the radio, or did you -- did
23   you know someone who worked there, perhaps?
24   A   No.  No.  I just, basically, went looking for work,
25   you know, in that area, field.  I have always been -- the

Page 13

1    type -- drawn to that type of work, and applied.
2    Q   Okay.  Who hired you?
3    A   I believe it was, at the time, Pedro Quintanilla,
4    which is the owner of that company.
5    Q   Okay.  Is it still in existence?
6    A   No.  I don't believe so.
7    Q   And where was Quintanilla Security located at the
8    time?
9    A   McAllen.  McAllen.
10   Q   All right.  And so you applied for the position of
11   security guard and you were hired for that position?
12   A   Yes.
13   Q   When they hired you, did they -- were you informed
14   that you would be given any type of training or education in
15   order to prepare you for that work?
16   A   No.  No.
17   Q   But did you, in fact, receive any before you began
18   working for them?
19   A   No.
20   Q   Where was the -- what was the first assignment you
21   had as a security guard for Quintanilla Security?
22   A   Working at a football game in Sharyland.
23   Q   High school games?
24   A   Yeah..
25   Q   Okay.  As a -- as a security guard for Quintanilla

(210) 377-3027                     ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100           SAN ANTONIO, TEXAS 78230                   (800) 969-3027
                                                                  a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                                April 10, 2003

---

Page 14

1  Security Company, did you have -- were you provided with
2  equipment to do your work?
3      A   No. We purchased all our own.
4      Q   Okay. What equipment did you have, that you
5  purchased on your own, when you began working at Quintanilla
6  Security?
7      A   Basically, restraints, handcuffs, and a flashlight.
8      Q   You did not have -- I take it from -- from what you
9  have just told me, then, during the time you worked for
10 Quintanilla Security, you did not have any type of a weapon,
11 that is a night stick, mace, or a firearm?
12     A   No.
13     Q   Okay. Were you allowed to do that as a security
14 guard for Quintanilla Security?
15     A   Only if we were trained to carry.
16     Q   Were there other security guards at Quintanilla
17 Security who did have those weapons or equipment?
18     A   Yes.
19     Q   Did you receive any training or instruction from
20 anyone at Quintanilla Security about how to use restraints?
21     A   No.
22     Q   Did you receive training or education from anyone
23 other than Quintanilla Security about how to use restraints
24 that you purchased?
25     A   No. Not -- not at that point.

---

Page 15

1      Q   Was it basically a situation where you would rely on
2  what you had observed?
3      A   Yes. Yes.
4      Q   And/or learned on your own up to that point?
5      A   Yes.
6      Q   How long did you work for Quintanilla Security?
7      A   I would say for about a year to a year and a half.
8      Q   All right. And during -- so I understand correctly,
9  during the entire time that you worked for Quintanilla
10 Security, the only equipment that you had other than, I
11 suppose, a uniform, would be your restraints, handcuffs?
12     A   Yes, sir.
13     Q   And during the entire time that you worked at
14 Quintanilla Security, the only -- you did not receive any
15 training or education about how to use the restraints that you
16 had purchased?
17     A   No, sir.
18     Q   All right. And were you still going to -- to
19 school, to college, while you were working for Quintanilla
20 Security?
21     A   Yes, sir.
22     Q   After the year or year and a half at Quintanilla
23 Security, where did you work next?
24     A   The South Texas Immigration Council.
25     Q   Let me ask -- let me go back and ask you. What were

---

Page 16

1  the circumstances of your departure from Quintanilla Security?
2      A   I was looking to pursue the academy, the police
3  department academy.
4      Q   So you resigned?
5      A   Yes.
6      Q   Left your job there?
7      A   Yes.
8      Q   Okay. And, I am sorry, after there -- after leaving
9  Quintanilla Security, you went to work where, again?
10     A   The South Texas Immigration Council in Harlingen.
11     Q   All right. And what did you do for the South Texas
12 Immigration Council?
13     A   Clerk, work -- I did a lot of maintenance there as
14 far as helping to file, some data processing, you know, data
15 entry.
16     Q   Was it more of a clerical position?
17     A   Yes. Yes.
18     Q   Did it -- did it have any law enforcement component?
19     A   We worked hands on with the INS at times.
20     Q   Okay. In what -- in what respect? How -- how so?
21     A   We did work for them. A lot of the clients that
22 they would send to us or we were closely associated with them
23 regarding working on processing people that wanted to reside
24 here in the United States.
25     Q   Okay.

---

Page 17

1      A   But nothing as far as field work.
2      Q   No enforcement work.
3      A   Yes. Just, basically, clerical.
4      Q   During the time you worked at South Texas
5  Immigration, did you continue your -- did you work at all as a
6  security guard for Quintanilla or any other security service?
7      A   No, sir.
8      Q   Did you keep the equipment that you had had while
9  working at Quintanilla Security?
10     A   Yes, sir.
11     Q   And how long did you work at the South Texas
12 Immigration Council?
13     A   I would say for about two, maybe three months.
14     Q   Let me ask. How did you wind up there? Did you,
15 again, did you just happen to hear about a position open? Did
16 you know someone who worked there or --
17     A   The -- the director.
18     Q   Okay.
19     A   I did -- I did know him.
20     Q   Okay. Who was the director?
21     A   Benito Pena.
22     Q   Okay. He told you, "Hey, we have an opening. Maybe
23 you are interested. Come and apply"?
24     A   Yeah. Yes, sir.
25     Q   All right. So you worked there two to three

---

5 (Pages 14 to 17)

GERARDO RAMIREZ                                                      April 10, 2003

---

Page 18

1   months. And then you left there?
2       A   Yes.
3       Q   How did you leave? Under what circumstances?
4       A   To -- basically, fine circumstances. It was
5   usually -- it was basically to complete my -- my schooling at
6   at the academy.
7       Q   Did you resign or were you let go?
8       A   I was -- I resigned.
9       Q   Okay. All right. And then after the two to three
10  months there, you went where?
11      A   I was unemployed and attending the academy full
12  time.
13      Q   All right. And, again, so that I get it correctly,
14  what is name of the academy you attended and the place where
15  it is located?
16      A   The Lower Rio Grande Development Council Police
17  Academy in Harlingen.
18      Q   Lower Rio Grande Development Council --
19      A   Police Academy.
20      Q   -- Police Academy in Harlingen. Okay. Did you
21  apply for admission to the academy?
22      A   Yes, sir.
23      Q   Did you -- how many times did you apply?
24      A   It only took one application.
25      Q   All right. And do you remember what month and year

Page 19

1   you would have began your academy training?
2       A   No, I do not. I am sorry.
3       Q   Do you remember what year? If not the month, do you
4   remember what year?
5       A   Not the month. I believe sometime in '99. I don't
6   recall the exact month, but in '99. It had to have been
7   sometime during the spring, because it -- the academy, itself,
8   was a six-month program, and I completed it in August.
9       Q   Officer Ramirez, let me go back and ask you a couple
10  -- before we talk about the academy. When you graduated from
11  high school, had you taken any courses in -- in law
12  enforcement or criminal justice or anything like that in high
13  school?
14      A   Yes, sir.
15      Q   How many courses did you take?
16      A   Two. Two. They were --
17      Q   I am sorry.
18      A   I am sorry. Go ahead.
19      Q   Do you remember what the names of the courses were?
20      A   Yes. Law Enforcement 1 and 2.
21      Q   All right. Do you remember the name of the teacher
22  you had?
23      A   Yes.
24      Q   Who(sic) was the name of the teacher?
25      A   Ms. Arcute. I don't recall her first name.

Page 20

1       Q   Okay. Can you spell her name?
2       A   A-R-U -- I mean, I am sorry, A-R-C-U-T-E.
3       Q   U-T-E. Okay. And do you know if she is still at
4   McAllen High School, Memorial High School?
5       A   No, she is not.
6       Q   Okay. Do you know where she is now?
7       A   I believe she retired from teaching.
8       Q   When you graduated from high school, do you remember
9   what your GPA was?
10      A   No, I do not.
11      Q   The college courses that you took, I know you
12  told me -- we talked about one that you had to withdraw
13  because of work reasons. The other courses that you took, do
14  you remember what your average grade might have been in those
15  --
16      A   I don't recall. I am sorry.
17      Q   Okay. Have you ever had to take remedial courses
18  for things such as reading or writing, math, anything like
19  that?
20      A   Math. Yes.
21      Q   I didn't like math either.
22      A   Yes.
23      Q   Okay. And when you went to the academy, did you
24  have to undergo any type -- other than an application, did you
25  have to undergo any other type of screening process or

Page 21

1   physical examination or anything like that?
2       A   Yes, sir. It basically required a criminal -- a
3   full criminal background history check. And we had to have a
4   sponsoring agency, which was the Alamo Police Department for
5   me.
6       Q   Which one? I am sorry.
7       A   Alamo Police Department.
8       Q   Alamo Police Department. Okay. Let me go back and
9   ask. How -- how was it that you -- I suppose you had to go
10  and, basically, hustle a sponsor -- or not hustle, but get a
11  sponsor?
12      A   Yes, sir.
13      Q   Okay. How -- how did you get the Alamo Police
14  Department to do that for you?
15      A   Well, it was in my home town. And I went ahead and
16  just -- when it was asked of me to go and -- and provide a
17  criminal history check or obtain a criminal history background
18  check, we have to go and speak with the chief of police
19  department at the agency and request a sponsorship to attend,
20  and -- which is, basically, they provide you with a criminal
21  history background check. And, thus, it is submitted to the
22  -- the director.
23      Q   Okay.
24      A   Once it is -- once it is submitted along with the
25  application.

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES           FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230               (800) 969-3027
                                                                    a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                              April 10, 2003

1   Q   And I assume before they will give you a
2   sponsorship, that the -- it is required that the history come
3   back clear?
4   A   Yes, sir.
5   Q   Except probably for traffic violations and things
6   like that.
7   A   Yes.
8   Q   Okay. I assume that, but let me just ask you, so we
9   have it on the record, have you ever been arrested for a
10  felony?
11  A   No, sir.
12  Q   Have you ever been arrested for a crime of moral
13  turpitude?
14  A   No, sir.
15  Q   Do you know what a crime of moral turpitude is?
16  A   Basically, a minor offense.
17  Q   Have you ever been convicted of any offense other
18  than a traffic offense?
19  A   No, sir.
20  Q   When you began the academy, I think you said there
21  was a background check. Was there any type of medical
22  examination that you had to go through?
23  A   I am sorry?
24  Q   Any type of medical examination that you had to go
25  through?

1   A   Can you repeat the question?
2   Q   Yes. When you entered the academy, the police
3   academy, was there any type of medical examination that you
4   had to undergo before being admitted?
5   A   No, sir. No, sir.
6   Q   Was there any type of psychological examination that
7   you had to go through before becoming admitted?
8   A   No, sir.
9   Q   Were there any such examinations required while you
10  were at the academy?
11  A   No, sir.
12  Q   Okay. Were any -- anything like that required
13  before you could be, I guess, given your certificate of
14  completion in the course of study?
15  A   No, sir. Only required when you go and apply at the
16  agency.
17  Q   Okay. All right. Well, let me ask you a little bit
18  about the -- about what you did at the -- at the academy.
19  First of all, can you tell me how long your course of study
20  was there?
21  A   Six months.
22  Q   And how many days per week did you attend the police
23  academy?
24  A   I believe, if I am not mistaken, it is about five,
25  five to six days out of the week.

1   Q   Okay. And is the arrangement with the -- with the
2   police academy that you attended such that cadets, I guess, is
3   what you call them?
4   A   Yes, sir.
5   Q   Cadets stay at the facility or do they come and go
6   each day?
7   A   They come and go each day.
8   Q   What -- how many hours per day was -- was the
9   academy course?
10  A   It could range, depending on the area of the lesson
11  plan that day, anywhere from eight to maybe 12, depending on
12  the training that day.
13  Q   How many people were in your class, I guess?
14  A   At the beginning?
15  Q   Yes, sir.
16  A   I would say about a good 20 to 30.
17  Q   How much time was spent in classroom work versus
18  what I will call field training or -- or hands-on training?
19  A   I would say mostly about 80 percent of the time that
20  we spent at the academy was on mostly classroom work, itself.
21  Q   Officer Ramirez, before entering the police academy,
22  had you ever owned a firearm?
23  A   No, sir.
24  Q   Before going into the police academy, had you ever
25  fired a gun?

1   A   Yes, sir.
2   Q   What types had you used?
3   A   Mostly for hunting. When me and my father would go
4   hunting, it would be either a .12 gauge or a small arms rifle,
5   .22 caliber weapon.
6   Q   Prior to going into the police academy, had you ever
7   fired a handgun?
8   A   Yes, sir. Yes, sir.
9   Q   Was it a handgun that was owned by your father or
10  someone in your family?
11  A   My -- yeah, my uncle. My father's brother.
12  Q   What type of -- of handgun was it?
13  A   A .45 -- .45 Yama. It is like a 1911, a pistol.
14  That type of model.
15  Q   Okay. Was that -- that -- was that particular model
16  a revolver or semi-automatic?
17  A   Semi-automatic.
18  Q   How many times do you think you have had the
19  opportunity to fire that weapon?
20  A   I would say about maybe three times, three times.
21  Q   Okay. When you went into the academy, were you, as
22  part of your training, given courses or trained in the use of
23  force?
24  A   Yes, sir.
25  Q   In what situations, if you can remember, were you

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100            SAN ANTONIO, TEXAS 78230                          (800) 969-3027
                                                                          a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                              April 10, 2003

---

**Page 26**

1  trained about the use of force?  And let me, let me -- let me
2  -- let me clarify what I mean.  Yesterday you were here for
3  Chief Garcia's deposition.
4      A   Yes, sir.
5      Q   And I think you heard me ask him some questions
6  about actions that a -- that a -- that an officer might take
7  in a correctional facility versus actions an officer might
8  take who is out on the street.
9      A   Yes.
10     Q   Do you remember that?  He -- part of what his
11 testimony was was that -- is that police officers at the
12 academy are -- are not correctional officers.  They are not
13 trained as correctional officers.  I want to ask you, if you
14 can tell me, when you-all received your training on use of
15 force at the police academy, was it -- was it taught to you as
16 how to use force in all situations or did it differ based upon
17 the setting that an officer might find themselves(sic) in?
18     A   It would differ depending on the situation and
19 setting.
20     Q   I am going to ask you, basically, what you were
21 taught in just a little bit.  But let me ask you, is it
22 correct that as part of the training you received in the use
23 of force, you were also trained that there -- that there is a
24 limit on the use of force that should be observed by peace
25 officers?

**Page 27**

1      A   Yes, sir.
2      Q   And is it also correct that police officers are
3  trained that once a threat is removed that their application
4  of force is to cease?
5      A   Yes, sir.
6      Q   The -- let me ask you first.  Do -- was there a
7  course, a part of the course that taught use of force to --
8      A   Yes, sir.
9      Q   Did it have a name?
10     A   Yes, sir.
11     Q   What was the name?
12     A   Use of force.
13     Q   Do you remember who your -- who your teacher or
14 instructor was?
15     A   Yes.  It was Ray Wisdom.
16     Q   Okay.  Was -- and is Ray Wisdom a -- currently a
17 peace officer?
18     A   I would not know.  I wouldn't know.  At the time,
19 yes, he was.
20     Q   Do you know what department he was with at the time?
21     A   No, sir.
22     Q   Do you know if he was from the Valley or this area?
23     A   I believe he was from the Cameron County area.
24     Q   Was he the only instructor you had in the -- on the
25 subject of use of force?

**Page 28**

1      A   If I recall, yes.
2      Q   All right.  What was the duration of the -- of the
3  class or the part of the training on the use of force?  How
4  long did it last?
5      A   (No response)
6      Q   In other words, did it -- did it start at the six
7  months -- did it start at the beginning of the six months and
8  last until the end or was it a shorter period of time within?
9      A   Actually, it -- it fell in the -- it was through the
10 duration of the entire program.  We would use and cover
11 certain areas at different time -- points in time.  When --
12 usually with use of force, the -- the curriculum would come
13 into play in other parts or other areas of the lessons.  And
14 they would tie in with other --
15     Q   I guess what I am trying to find out is -- maybe if
16 I ask, was there a time period each day which was devoted to
17 training in the use of force?
18     A   Yes.
19     Q   Okay.  How long was that period each day?
20     A   Anywhere from an hour to maybe to 15 minutes,
21 depending on the topic.
22     Q   Okay.  All right.  Officer Ramirez, with regard to
23 the -- to the use of force, can you tell me what it is you
24 were taught at the police academy with regard to the use of
25 deadly force?

**Page 29**

1      A   As to what application?
2      Q   Well, let me ask you this.  Let me be a little more
3  specific.  What did you -- what were you taught at the police
4  academy in terms of the proper or appropriate circumstances
5  for using deadly force?
6      A   Whenever somebody would -- let's say an individual
7  would threaten to either do bodily harm to myself or a third
8  person, or put us in a situation where we feared for our
9  safety, the safety of others or life.
10     Q   Any other situations other than where a person is,
11 as you say, threatening bodily harm to you or to another
12 person?
13     A   Basically, just protection of self and life for
14 myself or the other person or another person, I should say.
15     Q   Let me ask you, because yesterday I got into a
16 little discussion with Chief Garcia about the difference
17 between bodily harm, serious bodily harm, and death.
18     A   Yes, sir.
19     Q   Okay.  And the distinction between death and injury
20 is pretty clear.  I assume you understand that.
21     A   Yes.  Yes.
22     Q   What I want to ask you about is, as you recall it at
23 the police academy, were you trained as to any distinction
24 between bodily injury and serious bodily injury?
25     A   No, sir.  No, sir.

8 (Pages 26 to 29)

GERARDO RAMIREZ                                                              April 10, 2003

Page 30

1    Q   So you were taught that, if there was some chance or
2   some possibility that you might be injured in any way, that
3   that would be an appropriate circumstance for you to use
4   deadly force?
5    A   Yes, sir.
6    Q   All right. Okay. Chief Garcia mentioned that he
7   did not believe that you had received or that cadets who had
8   gone to the police academy at the time that you would have
9   received any training in the -- in restraint techniques beyond
10  the use of handcuffs. Do you remember that testimony
11  yesterday?
12   A   Yes, sir.
13   Q   Is that correct or do you agree with that or --
14   A   No.
15   Q   Okay. You have a different recollection?
16   A   Yes, sir.
17   Q   Okay. What training were you given in the use of
18  restraints?
19   A   Basically, we have an area of training, what is
20  called mechanics of arrest. And in that we use -- and are
21  trained in scenarios on how to place handcuffs on the suspect,
22  use other options besides restraints. We have verbal
23  restraints, commands, your presence, physical applications as
24  well.
25   Q   Were you given any training on -- on the -- when I

Page 31

1   say restraint, I also include within that security restraint
2   of persons who are in custody?
3    A   Yes, sir.
4    Q   Is it correct that you also received training on
5   distinguishing -- strike that. Is it correct that the type of
6   security and/or restraint used that you were trained at that
7   would be dependent to some extent upon the -- the individual
8   circumstances?
9    A   Yes, sir.
10   Q   Is it correct that, for example, if a subject was
11  believed to be or if there was some indication that a subject
12  was perhaps violent, that that might call for a different type
13  or different level of restraint?
14   A   Yes, sir.
15   Q   Is it correct that if a subject was thought to be
16  subject to mental illness or unstable in some psychological
17  way, that that might call for a different level of restraint?
18   A   Yes, sir.
19   Q   A higher level of restraint?
20   A   Higher or lower, depending on the situation.
21   Q   Okay. If a person had exhibited some indication
22  that they were suicidal, would that also call for a different
23  type or perhaps a different level of restraint?
24   A   Yes, sir.
25   Q   Did you receive any training on how -- on what the

Page 32

1   procedure or proper procedures might be for the security of a
2   person who is in custody in a medical facility?
3    A   No, sir.
4    Q   Was there anything else that was remotely similar to
5   that in the -- in the police academy that might have -- that
6   might be applied in a -- in a -- you know, even though it is
7   -- even though you may not have been trained, "Okay. Here is
8   how to guard someone in a hospital," was there any training
9   that you received that was similar to it that you could apply
10  in that situation?
11   A   No, sir.
12   Q   All right. Well, let me ask you, in the situation
13  where a person is believed to be or thought to be someone who
14  may have exhibited aggressive characteristics or violent
15  characteristics, what would be the proper level of restraint
16  that could be used for that person?
17   A   Depending on the -- the person and his character at
18  the time. If he did appear violent or, let's say, an extreme
19  threat, I believe the maximum amount of restraint would be
20  utilized.
21   Q   And what might that include?
22   A   Anywhere from -- would this be in the sense of
23  mental danger, danger to himself or --
24   Q   I was -- I was going to take them separately. I was
25  going to ask you specifically about someone who is violent,

Page 33

1   someone who is mentally unstable or psychologically unstable,
2   someone who is perhaps a suicide threat. If it is easier for
3   you to answer them all as one, you can do that.
4    A   That would -- you would vary, depending upon the
5   person themselves. If they are a threat to themselves or
6   other people, the restraints themselves or use of that type of
7   restraint would vary anywhere from handcuffs to -- well, with
8   what we are supplied. Basically, your handcuffs. And that's
9   about it.
10   Q   Well, were you trained in the use of any other type
11  of restraint technique or restraint equipment aside from
12  handcuffs?
13   A   No, sir.
14   Q   Okay. For example, in this case, I think we have
15  learned there was a pair of -- of leg shackles, basically,
16  handcuffs that go around someone's ankles. Were you trained
17  in the use of those items at the police academy?
18   A   No, sir.
19   Q   Were you trained in the use of any other type of
20  restraint device or equipment?
21   A   Not device or equipment. Basically, techniques and
22  --
23   Q   Techniques -- and techniques, we are talking about
24  physical holds and things --
25   A   Exactly.

9 (Pages 30 to 33)

GERARDO RAMIREZ                                                              April 10, 2003

Page 34

1    Q   -- that you use with your body?
2    A   Yes.
3    Q   I am not talking about that for the moment. I am
4   talking about equipment?
5    A   Equipment? No.
6    Q   Okay. All right. Were you given any instruction,
7   for example, if you were to be detaining a suspect or a
8   prisoner or detainee, on the -- let me strike that. Let me go
9   back.
10       With regard to training at the police academy, did
11  you also receive firearm training?
12   A   Yes, sir.
13   Q   And what or with what weapons were you trained?
14   A   Smith & Wesson revolver and a .12 gauge Remington
15  shotgun.
16   Q   What caliber of revolver?
17   A   It varied from .357 and .38 caliber.
18   Q   All right. At the police academy, were you given
19  any training for use with a 9 millimeter pistol -- handgun of
20  the type that you were using when you were on duty on the date
21  this happened?
22   A   No, sir.
23   Q   Were you taught the distinction of whether there was
24  any distinction between ammunition that could be used by
25  police officers?

Page 35

1    A   Yes, sir.
2    Q   And, for example, what type of -- of load would have
3   been used with the -- with the Smith & Wesson that you were
4   trained with at the police academy?
5    A   It never -- it never came into play with the --
6   specifically the revolver itself. But we did use a target
7   load, which was just a ball round or lead ball round.
8    Q   Did you receive any training on the effect of
9   different types of ammunition on -- on the target which they
10  might strike, including the human body?
11   A   No.
12   Q   Did you receive any training on -- if you did not
13  train with a 9 millimeter at the academy, did you -- were you
14  educated or trained at all in the distinction or differences
15  between different types of handguns that may be used in law
16  enforcement service?
17   A   Trained? No.
18   Q   For example, the difference between, perhaps, the
19  characteristics of a revolver versus a semi-automatic pistol?
20   A   Something that I learned on my own.
21   Q   Okay. And -- and I understand that. What I am --
22  what I am trying to figure out is what they -- what they
23  taught you at the academy. Was there any training about the
24  difference in characteristics that was -- characteristics in
25  terms of rapidity of fire, sensitivity of the trigger

Page 36

1   mechanism --
2    A   Anything --
3    Q   -- target? Anything like that between
4   semi-automatic weapons and the revolver that were used at the
5   police academy?
6    A   I believe it was lightly touched upon, but not
7   specifically presented in a class or lesson.
8    Q   Is there anything that you can recall about that at
9   this point today?
10   A   No. No. Not accurate.
11   Q   All right. At -- at the police academy, did you
12  have any courses on -- on laws that might affect directly your
13  work as a police officer?
14   A   Yes.
15   Q   Were you given any training at all on the limits on
16  police officers and the use of force, deadly or otherwise?
17   A   Yes, sir.
18   Q   Okay. What -- what do you recall having been
19  taught? And I know that you may have been taught several
20  things. But in terms of application of force, not deadly
21  force, just plain force, what is it that you were taught in
22  terms of the appropriate application of force in general?
23   A   Basically, whenever a threat or some type of a
24  danger posed to the officer, you know, which is myself, the
25  application of force would be necessary to control the

Page 37

1   situation.
2    Q   What were you taught about -- well, let me ask this.
3   You were not -- it is true that you were not taught that a
4   police officer is -- is allowed to use force or should use
5   force in every situation?
6    A   Yes, sir, that's true.
7    Q   Would you agree that a person has a right to be free
8   from, for example, excessive force?
9    A   Yes, sir.
10   Q   And would you agree that a person has a right, even
11  a person who is under arrest, has a right to be free from
12  force that is applied in a way that is not designed to obtain
13  some police objective?
14   A   Yes, sir.
15   Q   For example, a person shouldn't be subjected to
16  unnecessary pain or injury or force even if they are in
17  custody or being detained by the police?
18   A   Yes, sir.
19   Q   And they shouldn't be subjected to pain or injury or
20  force that is applied to them merely for the purpose of
21  punishing them. Is that correct?
22   A   Yes, sir, that's correct.
23   Q   Punishment, that's something that the courts should
24  do and judges and juries do?
25   A   Exactly.

10 (Pages 34 to 37)

GERARDO RAMIREZ                                                    April 10, 2003

**Page 38**

1    Q   So any -- any force that would be applied for that
2  purpose or with that intent in mind would be inappropriate?
3    A   Yes, sir.
4    Q   And you agree that any force that is applied that is
5  applied maliciously by a police officer would be inappropriate
6  force?
7    A   Yes, sir.
8    Q   And that a person has a right to be free from that
9  type of application of force?
10   A   Yes, sir.
11   Q   Do you agree that the application of force merely
12 for the purpose of inflicting pain upon someone would be an
13 inappropriate application of force?
14   A   Yes, sir.
15   Q   And those were all things that you were taught at
16 the police academy?
17   A   Yes.
18   Q   All right.  Now, I understand, from looking at the
19 documents we have been provided here, that you did indeed
20 complete the police training academy successfully.
21   A   Yes, sir.
22   Q   Did you come out with a rank or a grade or is it
23 simply you are certified or not certified?
24   A   Basically, certified or not certified.
25   Q   Was there any particular area of the training

**Page 39**

1  that -- well, let me ask you.  You are tested on your -- on
2  your -- on the subjects which you are taught?
3    A   Definitely.
4    Q   Were there any areas of training in which you failed
5  to obtain any of the objectives?
6    A   No, sir.
7    Q   And you passed everything?
8    A   Yes, sir.
9    Q   Is there an area that was your strongest area?
10   A   Yes, sir.
11   Q   Which was that?
12   A   The penal code.
13   Q   Knowledge of the penal code.  Texas penal code?
14   A   Yes, sir.
15   Q   And that is knowledge of the things which -- the
16 elements which make up certain criminal offenses?
17   A   Yes, sir.
18   Q   Was there an area that you were perhaps, I won't say
19 weakest in, but that you were the least strong areas?
20   A   Two.  Actually, the criminal code of procedure and
21 the Texas traffic law.
22   Q   How did you do in the areas of study that had to do
23 with use of force?
24   A   I would say standard, you know.  I did pretty well.
25   Q   Okay.  Did you fail any of those objectives or tests

**Page 40**

1  that were administered?
2    A   No, sir.
3    Q   In the -- with the -- with the handgun training,
4  were you rated with the -- with the -- in terms of handgun
5  training and usage?
6    A   Yes, sir.
7    Q   What was your rating and your last rating?
8    A   I don't recall.  I don't recall.
9    Q   With regard to use of force in a situation where an
10 officer is going to use a handgun, what were you taught at the
11 academy in terms of using a handgun?
12   A   I am sorry.  Can you repeat it?
13   Q   Yeah.  In a situation -- what I want to know is what
14 they taught you at the academy as to how you should use you
15 handgun -- your handgun if you were in a situation where you
16 believe that you needed to use it.
17   A   Usually with imminent bodily harm or fear.
18   Q   Okay.  What I am asking is can you be more specific?
19 When you are in a situation where you have decided, I have to
20 use my gun --
21   A   Yes.
22   Q   -- what did the training academy teach you, if
23 anything, about where to shoot or how to shoot at a subject,
24 what the target areas were, where you should try and direct
25 your fire, how many times you should fire?  First, I guess I

**Page 41**

1  need to know, were you given any training about that type of
2  situation as all?
3    A   Yes.
4    Q   Okay.  Can you tell me what it is that you were
5  taught in that regard?
6    A   Basically, when we -- we do fire our weapon, we are
7  taught that the area that we should concentrate on is
8  basically center mass, which is the primary area of the body,
9  the biggest part of the body and/or we -- we -- we shoot to --
10 to kill.
11   Q   So, I understand this, you are trained in a
12 situation where you have made the decision to use your weapon
13 you are trained to shoot at the -- I think you used the term
14 center mass --
15   A   Yes.
16   Q   -- of the body.  We have a videotape here, can you
17 -- would you mind standing up and showing the members of the
18 jury what area of the body you are talking about when you use
19 the word center mass?
20   A   Center mass is between the shoulders and the
21 waistline, which would be the area biggest of the body.
22   Q   Okay.  You can have a seat.
23   A   Thank you.
24   Q   All right.  Now, are you given any instruction on
25 the number of times you should fire in order to determine --

11 (Pages 38 to 41)

GERARDO RAMIREZ                                                                April 10, 2003

Page 42

1  strike that. Let me go back.
2        I think earlier we discussed the fact that you were
3  trained that you should apply force until you believe the
4  threat --
5        A  Is --
6        Q  - is removed or the officer's directives are
7  complied with. Is that correct?
8        A  Yes, sir.
9        Q  Are you taught anything about the number of times
10 you should fire at a subject before you try and ascertain
11 whether that is happening?
12       A  Yes.
13       Q  What were you taught?
14       A  Basically, until we assess that the danger no longer
15 exists.
16       Q  Okay. So you are trained at the police academy to
17 fire and to keep firing until the subject either stops or they
18 comply with your orders?
19       A  Yes, sir.
20       Q  Are you taught that -- that a -- well, let me ask.
21 What are you taught about trying to recognize when a subject
22 has complied with your directives or whether a subject has
23 stopped and the threat is removed?
24       A  I am sorry. I didn't understand the question.
25       Q  Okay. Were you given any examples or any

Page 43

1  instruction about how to recognize whether you have -- you
2  have achieved your objective of removing the threat?
3        A  Yes.
4        Q  And what -- what were you taught in that regard?
5        A  Basically, if the individual does comply or the
6  threat no longer exists, it will be basically apparent. If
7  he -- if -- if the threat is neutralized, it will be apparent
8  to the officer. He will either stop or, you know, there will
9  no longer be a danger there. And that's -- that's what is
10 basically taught. Once the threat is removed and the danger
11 ceases, you are okay.
12       Q  Would you agree that it would be a sign of the
13 threat being removed if an individual who was advancing on an
14 officer stops their advance?
15       A  Yes, sir.
16       Q  Would it also be a sign of removal of the threat if
17 an individual who had been advancing on an officer turned
18 around and stops their advance?
19       A  Depending on the situation.
20       Q  It might be?
21       A  It may be.
22       Q  Okay. You know, that is one thing that an officer
23 can take into consideration?
24       A  Yes, sir.
25       Q  If an individual falls to the ground and drops,

Page 44

1  would that be an indication that the threat is removed?
2        A  It may.
3        Q  If an individual holds up their hands in a defensive
4  posture, is that some indication that the threat is removed?
5        A  It may.
6        Q  If an individual does these things, those would be
7  indications to an officer that the application of force should
8  cease at that point.
9        A  I am sorry?
10       Q  I said, if an individual does those things that we
11 just discussed, that is if they fall to the ground, if they
12 stop their advance, if they turn around so that their back is
13 to the officer, those would all be things that would indicate
14 to an officer that their application of force should stop at
15 that point.
16       A  In certain circumstances, yes.
17       Q  And you would agree with me that a reasonable police
18 officer under those circumstances with those factors present
19 would stop their application of force.
20       A  Yes, sir.
21       Q  And certainly would stop their application of deadly
22 force.
23       A  Yes, sir.
24       Q  The -- all right. After -- well, let me ask this.
25 Who were your instructors -- I think you told me who they were

Page 45

1  with use of force and that was Mr. Wisdom or Officer Wisdom, I
2  guess. I apologize if I don't know his rank.
3        A  That's okay.
4        Q  I am just going to say Mr. Wisdom. What instructor
5  did you have on fire instruction?
6        A  It would Ray Wisdom and Moss Martinez, as well as
7  Juan Vasquez or Joe Vasquez. I am sorry. I am sorry.
8        Q  And do you know where -- any of those individuals,
9  if they are still at the training academy or what agency they
10 work with?
11       A  I believe Mr. Martinez no longer is with the academy
12 at the time. And he is with the Cameron County auto theft
13 task force. The whereabouts of Mr. Vasquez, I do not know.
14       Q  Okay. Officer Ramirez, I want to ask you a few more
15 questions about the -- about what you learned about the
16 application. Did you learn that before you applied force that
17 you have to assess the need to apply the force?
18       A  Yes, sir.
19       Q  Okay. And, for example, there may be situations
20 where an officer may be able to handle the situation without
21 any application of force.
22       A  Definitely, yes, sir.
23       Q  And there are situations where an officer may be
24 able to handle a situation by using a lesser degree of force
25 than deadly force.

                                                    12 (Pages 42 to 45)

GERARDO RAMIREZ                                                                    April 10, 2003

---

**Page 46**

1  A  Yes, sir.
2  Q  And would you agree that an officer has a duty to
3  weigh all of the circumstances that they are presented with
4  before deciding to use force at all?
5  A  Yes, sir.
6  Q  And they certainly should do that when -- before
7  they decide to use deadly force.
8  A  Yes.
9  Q  Are you taught -- were you taught at the police
10  academy how to recognize a threat to a police officer?
11  A  Yes, sir.
12  Q  Okay. Can you tell me what it is you were taught
13  with regards to recognizing a threat?
14  A  It varies on the situation itself, the threat. It
15  can -- it can mean different things. Recognizing a threat as
16  far as a person, situation. Is that what you are --
17  Q  Yes.
18  A  -- implying? A person itself, suspicious behavior,
19  basically, something that would -- that would not be normal,
20  normal behavior as far as a person, suspicious behavior,
21  anything that would alert us to -- to the -- that some type of
22  threat may be apparent or -- or -- how should I say? If there
23  is some type of a threat or some type of a -- I should say --
24  I can't find the words for it. But if there is some type of a
25  behavior that doesn't seem out of the norm, and it is

**Page 47**

1  apparent, which is in regard to violent behavior, there is a
2  threat there. And we usually -- not taught, but just to more
3  or less just to pick up on those -- on those signs.
4  Q  Would you agree that in -- in assessing whether a
5  situation or a person presents a threat to an officer, the
6  officer should consider the -- the surrounding circumstances?
7  A  Yes, sir.
8  Q  Okay. For example, they should consider the men --
9  the physical condition of the -- of the person, the subject?
10  A  Yes, sir.
11  Q  The mental condition of the person or subject?
12  A  Definitely. Yes, sir.
13  Q  Whether they have exhibited any tendency for
14  violence?
15  A  Yes.
16  Q  What information the officer has as to whether -- as
17  to that person's potential for violence?
18  A  Yes, sir.
19  Q  Whether that person -- that person's physical
20  condition, that is whether they are restrained or not
21  restrained?
22  A  Definitely.
23  Q  For example, you will agree that a person who is --
24  who is restrained or partially restrained is not going to be
25  as big a threat as a person who is unrestrained?

**Page 48**

1  A  Yes.
2  Q  And that a person who is restrained to a higher
3  degree or level with equipment is going to be even less of a
4  threat than a person who is partially restrained?
5  A  Yes.
6  Q  And that, correspondingly, the greater the degree of
7  restraint, the lesser threat that subject presents to the
8  officer or to others?
9  A  Yes, sir.
10  Q  And that prior to deciding to use or apply force in
11  a situation, an officer should do all that he can to remove
12  any threat before it rises?
13  A  Yes.
14  Q  Okay. All right. Some sort of an aside here,
15  Officer Ramirez, let me -- let's get past the police training
16  academy. Did -- after you left the academy, where did you go
17  look for work?
18  A  Several agencies. I began looking into the closer
19  agencies near my home area. But a lot of the agencies were
20  looking for officers with experience and time. So I went out
21  and about looking for certain other agencies. I applied in
22  San Juan, which was the first area which I applied to. Alamo,
23  of course. Pharr. And the -- I am not sure if I applied in
24  Hidalgo. Then I came over and I did hear of officers that
25  were needed in the area of Cameron County, which was La Feria

**Page 49**

1  and Santa Rosa area. I applied at the La Feria Police
2  Department and was hired there.
3  Q  Let me go back. When did you -- when did you
4  graduate from the academy?
5  A  I believe in August of '99, if I recall.
6  Q  Okay. So you applied in several agencies. Most of
7  them, though were looking -- you -- you did not get any job
8  offers because most of them were looking for officers with --
9  A  Yes.
10  Q  -- some years of experience?
11  A  Yes, sir. It was the bigger agencies, so. . .
12  Q  And you applied and then were given -- were you
13  given an interview or were you just hired straight off by La
14  Feria?
15  A  Interview was -- was the first thing that was given
16  by La Feria. Two, is -- in fact. One by the chief of police
17  and then by the city manager.
18  Q  And the chief of police at that time would have been
19  Chief Gonzalez?
20  A  Yes, sir.
21  Q  And the city manager was?
22  A  Mr. Phillip. Mr. Sunny Phillip.
23  Q  What did your interview consist of?
24  A  It ranged from history of myself, what got me to --
25  to apply or become a peace -- or want to become a police

---

13 (Pages 46 to 49)

GERARDO RAMIREZ                                                         April 10, 2003

Page 50

1  officer, background information, past employers, school.
2      Q   As part of this interview process, were you required
3  to get a physical and/or psychological examination?
4      A   Yes, sir.
5      Q   Okay. And who did you go to for the psychological
6  examination?
7      A   I believe it was Dr. Pena, I believe, in McAllen.
8      Q   Okay. And the physical exam?
9      A   The physical exam, I don't remember the area, but I
10 believe it was --
11     Q   Or the doctor's name.
12     A   I don't recall. I can probably try to find it
13 later. I don't recall the doctor himself.
14     Q   Okay. And did you -- did you obtain favorable
15 reports on both of those examinations?
16     A   Yes, sir.
17     Q   Okay. So there was nothing in there that prevented
18 your becoming a police officer at the La Feria Police
19 Department?
20     A   No, sir.
21     Q   All right. And when you first were hired by the La
22 Feria Police Department, Chief Garcia told us that you began
23 working as a dispatcher. Is that correct?
24     A   No. Reserve. Reserve first.
25     Q   Then why don't you -- let me -- let's -- you are the

Page 51

1  one we are talking about. Why don't you kind of to tell me
2  when you began working with La Feria. First of all, when was
3  it that you started?
4      A   I believe the date which I began was sometime in
5  December of '99, toward the end of the month. I don't recall
6  the exact date.
7      Q   Okay. And when you began with the La Feria Police
8  Department, what position were you hired for?
9      A   Patrol.
10     Q   Patrol officer.
11     A   Uh-huh.
12     Q   Okay. Chief Garcia mentioned -- kept using the term
13 reserve officer. Was it -- was it as a reserve officer or a
14 --
15     A   Full -- it was a reserve officer at the time.
16     Q   Okay. Tell me what the distinction is so that I
17 understand correctly. What is the distinction between a
18 reserve patrol officer and a patrol officer?
19     A   The reserve police officer holds all of the
20 commission that a full-time officer would, but in the sense
21 that we don't get paid for -- for our work. We -- we are not
22 compensated that way.
23     Q   Okay. All right. So you actually began working for
24 the -- for the La Feria Police Department as a -- a person who
25 held all of the required commissions but as a person who is

Page 52

1  essentially volunteering their services?
2      A   Exactly.
3      Q   All right. And at some point did you begin working
4  as a non-reserve or as a regular patrol officer?
5      A   Yes.
6      Q   Okay.
7      A   Yes.
8      Q   When would that have been?
9      A   That would have been sometime -- I believe it was
10 February of 2001.
11     Q   So it was after this incident?
12     A   Yeah.
13     Q   Okay. Yesterday, Chief Garcia mentioned that you
14 had -- that you primarily had been working as a -- as a
15 dispatcher.
16     A   Uh-huh.
17     Q   Would that include the time? Because we were
18 talking -- you mentioned working as a reserve patrol officer.
19 Did you -- did you work for the city of La Feria Police
20 Department as a dispatcher on a paid basis and then volunteer
21 your time as a reserve officer, or was all of your time
22 basically on a basis without compensation?
23     A   No. It was as a paid dispatcher and a unpaid
24 reserve officer.
25     Q   I see. Okay.

Page 53

1      A   Uh-huh.
2      Q   All right. Okay. So when you began in December of
3  1999, did you begin immediately as a dispatcher?
4      A   I am sorry?
5      Q   When you began working in December of 1999 for La
6  Feria Police Department, did you begin as a dispatcher?
7      A   No, sir.
8      Q   You began as a reserve officer?
9      A   Yes, sir.
10     Q   How many hours a week did you work as a reserve
11 officer?
12     A   It varied. Usually, anywhere from four to -- it
13 could have been 10 to 13 a day.
14     Q   Four to?
15     A   Anywhere. It varied.
16     Q   Anywhere from 10 to 12?
17     A   Yeah. To 13 hours.
18     Q   And how many days a week was this?
19     A   It could have been anywhere from three to maybe
20 four.
21     Q   Was there a shift schedule that you were worked in
22 where you were worked into the rotation or were you simply
23 called on kind of an as-needed basis?
24     A   As-needed or whenever we -- we -- we could come in.
25     Q   Okay. So then for the regular rotation -- I mean,

14 (Pages 50 to 53)

GERARDO RAMIREZ                                                              April 10, 2003

Page 54

1  during this time, La Feria Police Department had officers,
2  patrol officers, who they paid -- full-time officers they paid
3  for their work.
4      A   Yes, sir.
5      Q   Okay.  My question is, do you know whether you were
6  rotated in on a regular schedule even though you were a
7  reserve officer or did they simply call you, for example, when
8  one of the other officers, you know, had a court date or
9  needed time off or sick or something like that?
10     A   It varied.  It varied.  Because of the fact that
11  they would ask you to -- to come in, of course, and show
12  initiative and show up, and/or if they needed somebody to come
13  in when an officer was sick or needed time off.  Yeah.
14     Q   Okay.  So -- so what it sounds like, Officer
15  Ramirez, is that they -- well, let me ask this.  When -- when
16  you were hired, did they tell you you were going to be hired
17  on a reserve officer basis?
18     A   Yes, sir.
19     Q   Did they tell you or indicate to you after some
20  period of time that they believed they were going to have a
21  position open up where they could pay you for your work?
22     A   Yes, sir.
23     Q   What period of time was that that they said that
24  would be --
25     A   That would -- it would usually be whenever another

Page 55

1  officer would leave.  They had no consistent time, timeframe.
2      Q   Okay.  Did they give you an estimate as to how long
3  they believed that was?
4      A   No.
5      Q   Did they give you a limit.  Did they say, "Look, we
6  don't know when it is going to be, but it's, you know, it will
7  -- we are fairly certain we will have something open up in the
8  next three months, six months, next year"?
9      A   No.
10     Q   So they -- you were kind of taking it on faith that
11  eventually they were going to have something for you?
12     A   Yes, sir.
13     Q   All right.  At what point was it that you began
14  working the dispatcher capacity to where you were paid for
15  your work?
16     A   I believe after the -- sometime in February of that
17  -- of 2000.
18     Q   February of 2000?
19     A   I believe so.
20     Q   Around that time?
21     A   Uh-huh.
22     Q   And how many hours a week were you working as a
23  dispatcher when you began?
24     A   Forty.
25     Q   Okay.  Did they have a dispatcher leave, or

Page 56

1  something like that?  Is that what occurred?
2      A   I believe they did.  I believe they did.
3      Q   All right.  Did you have a shift that you worked at
4  that time?
5      A   Yes, sir.
6      Q   What shift was that?
7      A   It was an eight-hour shift.  And it varied depending
8  on the week.  I believe it was -- it started out with the
9  swing shift.
10     Q   Which would be what hours?
11     A   Basically, everybody's day off.  So it varied from
12  the 7 to 3.
13     Q   7 a.m. to 3 p.m.?
14     A   Uh-huh.  And then the 3 to 11 p.m.  And then the 11
15  to 7.
16     Q   Okay.  So it -- it -- it would change maybe from
17  week to week?
18     A   Yes, depending on the other dispatchers' day off.
19     Q   Okay.  Now -- and you were paid for this work as a
20  dispatcher?
21     A   Yes, sir.
22     Q   How much were you paid at that time?
23     A   I believe it was $5.60 an hour, minimum.
24     Q   Now, after the hours that you worked, your 40 hours
25  a week as a dispatcher, did you also during -- did you

Page 57

1  continue doing reserve police officer work after you became a
2  full-time dispatcher?
3      A   Yes, sir.
4      Q   Okay.  Can you tell me how many -- how many -- how
5  much time you spent as a reserve officer separate and apart
6  from your duties as a dispatcher?
7      A   It would vary depending on the time that I had off.
8  On my days off, I would come in.  If I had some time where I
9  didn't feel that I want -- you know, I had time to come in
10  the next day, it would -- I would stay until after, you know,
11  after I completed my shift.  And it would vary from --
12  anywhere from four hours to maybe eight.
13     Q   Can you give me some -- if you had to, and I don't
14  expect you to be able to tell me how much time you spent every
15  day or the week.  But if you had to tell me on a weekly or
16  monthly basis, about how many -- many hours would you spend
17  working as a reserve officer separate and apart from the 40
18  hours as a dispatcher?
19     A   Four to eight.
20     Q   Four to eight hours per week or month?
21     A   Per week.
22     Q   Per week.
23     A   Per week.
24     Q   Okay.  All right.  During the time -- and let me
25  ask.  Did this continue, that is your work as a dispatcher, up

15 (Pages 54 to 57)

GERARDO RAMIREZ                                                April 10, 2003

---

**Page 58**

1 through and including the time of this incident?
2    A  Yes, sir.
3    Q  Okay.  So for from February to 2000 until September
4 the 19th, the day that this happened of 2000, you were still
5 working as a full-time dispatcher and, in addition, you were
6 basically volunteering your time and services as a reserve
7 officer?
8    A  Yes, sir.
9    Q  During the seven or so months between February 2000
10 and September 2000, when this incident occurred, did you --
11 did you work patrol?
12    A  Yes, sir.
13    Q  Did you operate a unit?
14    A  Yes, sir.
15    Q  When you first got to La Feria Police Department,
16 were you assigned or were you given a weapon to use?
17    A  No, sir.  I purchased everything on my own.
18    Q  Okay.  Tell me what it is that you purchased when
19 you began working?
20    A  A 9 millimeter Barretta, model 92FS.
21    Q  When did you purchase that?  And I think I have seen
22 some documents in here, so I can look it up.  But it is
23 probably faster if you tell me.
24    A  I don't -- I don't recall.  I am sorry.
25    Q  Okay.  Did --

**Page 59**

1    A  Some time --
2    Q  -- you buy it before --
3    A  I believe some time before I began to apply at the
4 agencies.  Sometimes after -- after the academy -- between the
5 timeframe of after the academy and before I got hired.
6    Q  Okay.  So you actually bought it before you began
7 working for La Feria Police Department?
8    A  Yes, sir.
9    Q  Did the La Feria Police Department require you to
10 obtain a certification, qualification on that weapon before
11 you were allowed to use it during your work?
12    A  They certified me.
13    Q  Who certified you?
14    A  Terry Vinson.
15    Q  Terry Vinson is?
16    A  He is a -- I believe the -- now he is the chief of
17 Palm Valley, the police chief of Palm Valley Police
18 Department.
19    Q  At the time that he -- that he qualified you with
20 that weapon, what was his position?
21    A  I believe he was a patrolman or a -- he was an
22 instructor, but he held the position of patrolman somewhere.
23 I don't recall what agency.
24    Q  Okay.  So he wasn't with the La Feria PD?
25    A  No, sir.

**Page 60**

1    Q  How did -- you how did you find your way to -- to
2 Vinson, I guess, in order to have him qualify you?
3    A  Through the agency.
4    Q  La Feria?
5    A  Uh-huh.
6    Q  So you told them you wanted to qualify with a
7 nine -- for a 9 millimeter and they told you, "Fine.  You need
8 to go to" --
9    A  Well, there were -- when the time came up, the time
10 came up for it.  Because he -- he had to set up the classes
11 for that.
12    Q  All right.  And did -- what other equipment did you
13 buy when you began working for the La Feria Police Department?
14    A  Of course, I had my handcuffs and a flashlight, the
15 pepper spray that I was certified in.  Of course the
16 knock-knock -- I mean, I am sorry, the ASP, the A-S-P.
17    Q  Okay.  With regard to the qualification that you
18 went through for use of the 9 millimeter, were you qualified
19 on that -- I gather from your previous answer you bought it
20 before you began working for La Feria, but you didn't qualify
21 on it until after you began working for them?
22    A  Yes, sir.
23    Q  Do you remember when you became qualified for use of
24 the 9 millimeter?
25    A  No, sir, I do not.

**Page 61**

1    Q  Do you remember -- let me ask you this.  Were you
2 qualified shortly after you began working for La Feria or was
3 it some time after?
4    A  Some time after.
5    Q  Are we talking about a period of several weeks or
6 several months?
7    A  It may have been about a month or two.
8    A  A month or two.
9    A  Yeah.
10    Q  During that interim time period, what weapon did you
11 use if you were not qualified with the 9 millimeter?
12    A  The 9.
13    Q  You had it with you?
14    A  Yes.
15    Q  So you used it in your work before you actually
16 received the certification?
17    A  Uh-huh.
18    Q  The qualification?
19    A  Yes, sir.
20    Q  All right.  During your qualification with the 9
21 millimeter, were you trained in the character -- the
22 characteristics of the -- of the weapon?
23    A  As far as did somebody train me?
24    Q  Yes, sir.
25    A  Or -- no, sir.  No, sir.

---

16 (Pages 58 to 61)

Page 62

1    Q   Tell me what your qualification consisted of?
2    A   Normal qualification required by the state,
3  TCLEOSE.  It is just a basic qualification of where an
4  individual will shoot from different lengths of distance --
5    Q   Okay.  Are you talking -- I am sorry.  I didn't
6  mean to interrupt you.
7    A   That's okay.
8    Q   Please continue.
9    A   No.  Go ahead.  Go ahead.
10   Q   Your qualification then was in terms of accuracy?
11   A   Accuracy and speed.
12   Q   Okay.  Did you learn from your qualification with
13  the 9 millimeter that it -- it is a markedly different weapon
14  from the weapons that you were trained on at the police
15  academy?
16   A   No.
17   Q   So then your experience was that the -- the weapons
18  were similar?
19   A   Somewhat.
20   Q   Okay.  The 9 millimeter upon which you qualified, so
21  that the jury understands, and I don't know that all of them
22  will understand the difference between revolvers and
23  semi-automatic weapons and fully automatic weapons, can you
24  explain for the jury how the firing mechanism works on the 9
25  millimeter weapon that you have?

Page 63

1    A   The semi-automatic 9 millimeter Barretta is a
2  semi-automatic weapon, which the mechanism is a blow back
3  action pistol.  In other words, it is a self-loading mechanism
4  rather than in the sense of a revolver where the cylinder
5  turns with every pull of the trigger.  This action causes the
6  slide to go back as the round is fired, thus, bringing the
7  slide forward after and loading another round.
8    Q   Okay.  It operates on a clip?
9    A   On a magazine, yes.
10   Q   A magazine?
11   A   Yes.
12   Q   At the bottom of the magazine there is a spring?
13   A   Yes, sir.
14   Q   And the spring is at the bottom of a stack of
15  bullets?
16   A   Yes, sir.  And it ejects them into the chamber as
17  the -- as the casing of the spent round is ejected.
18   Q   And that allows an officer to fire more rounds at a
19  faster rate?
20   A   Yes, sir.
21   Q   And the clip in the 9 millimeter that you have and
22  that you have used in your work holds how many rounds?
23   A   Fifteen.
24   Q   And it also holds one in the chamber?
25   A   Yes, sir.

Page 64

1    Q   So a total of 16 rounds?
2    A   Yes, sir.
3    Q   When you qualified for the 9 millimeter, what was
4  your speed rating on the 9 millimeter?
5    A   I don't recall.  I don't recall.
6    Q   Okay.  If you don't recall what your particular
7  rating was, can you give the jury some idea as to how fast 16
8  rounds can be discharged from a 9 millimeter?
9    A   In a matter of seconds, anywhere from one to two.
10   Q   Is your 9 millimeter the type of weapon which -- in
11  which you can squeeze off rounds, fire rounds by repeated
12  application, squeezes to the trigger, or is it the type of
13  weapon where you can simply hold the trigger down and fire
14  multiple shots?
15   A   No, sir.  That would be -- that would make it a full
16  automatic.
17   Q   Full automatic.
18   A   Exactly.
19   Q   And so the weapon you have, in order to fire each
20  round, you have to -- you have to actually apply a different
21  squeeze, a different pressure to the trigger?
22   A   Yes.
23   Q   And so each round that you fire off requires a
24  decision to squeeze off another round?
25   A   Depending on the action, because there is a

Page 65

1  difference between single action and double action.
2    Q   Okay.  What type -- what -- what is the weapon that
3  you have?  A single action or double action?
4    A   It could be either or, depending on the -- on the --
5  on the -- on the way it is carried.  There is a mechanism in
6  the Barretta where you can -- you can manually pull the slide
7  back and chamber the round and, thus, turning it to a single
8  action mode or a double action, where you can fire it from --
9  when there is already one within the chamber, which makes
10  it -- gives it a heavier pull, the trigger.
11   Q   The -- what is the manner in which you use or had
12  the setting for your -- for your weapon?
13   A   Double action mode.
14   Q   And the double action, if I understand your previous
15  testimony, when you said adds --
16   A   A little bit of weight --
17   Q   Weight --
18   A   -- to the trigger.
19   Q   -- to the trigger.  Now, for a jury, can you explain
20  to them what that means?
21   A   It varies with the weapon itself.  When -- let's say
22  you are firing a revolver, a revolver itself has a very heavy
23  trigger pull.  The trigger pull itself is when you place your
24  finger and there is consistent pressure that has to be applied
25  to the trigger itself in order to fire the round.  On a single

17 (Pages 62 to 65)

April 10, 2003

**Page 66**

1 action mode on a weapon, the trigger pull is lighter.
2  Q   Okay.  So, in English, that means is when you have a
3 heavier trigger pull, it means you have to press harder --
4  A   Yes, sir.
5  Q   -- to pull the trigger?
6  A   Exactly.
7  Q   You have apply more force.
8  A   Exactly.  This Barretta and make and model don't --
9 usually the first round on the weapon itself is a -- is a
10 heavier pull.  After firing the first round, the weapon
11 becomes, I should say, single -- which causes the -- the
12 trigger to become lighter.
13  Q   And so that I understand.  At the time this incident
14 occurred, how did you have your weapon set or how was it used?
15 As a single or a double action?
16  A   Double action.
17  Q   So the double action would require a heavier trigger
18 pull, more force to pull the trigger?
19  A   Exactly.
20  Q   Would that -- and that would be true not only for
21 the first shot, but for all of the succeeding shots --
22  A   No.
23  Q   Or only for the first shot?
24  A   Only for the first shot.
25  Q   After the first shot from -- if a person were using

**Page 67**

1 your weapon, after the first shot there would be a lighter
2 trigger?
3  A   Yes, sir.
4  Q   And it would not require the application of as much
5 force to fire subsequent rounds?
6  A   Yes, sir.
7  Q   Have you ever had your weapon adjusted in terms of
8 the trigger action?
9  A   No, sir.
10     (Lunch break)
11  Q   (BY MR. BARRIENTOS) Officer Ramirez, good afternoon
12  A   Yes.  Good afternoon, sir.
13  Q   Okay.  Let me go back so we can try and get through
14 the rest of the day on this.  I forgot to ask you a little bit
15 about -- about some of your training, too.  Have you ever
16 received any training in self-defense training or anything
17 like that?
18  A   Yes, sir.
19  Q   What kind exactly?
20  A   Tae Kwan Do, hand-to-hand.
21  Q   Hand-to-hand combat?
22  A   Yes.
23  Q   At the academy?
24  A   No.  No.  This was prior, before the academy.
25  Q   Okay.  Did you achieve any certain level of

**Page 68**

1 proficiency or belt status or something like that?
2  A   Yes, sir.  Back belt.
3  Q   Okay.  And what year were you -- and what year did
4 you receive that -- that level of achievement?
5  A   I believe I was 16 or 17 at the time.
6  Q   Okay.  Did you continue with your training after
7 that time?
8  A   No, sir.
9  Q   Have you had any other training in self-defense
10 since that time?
11  A   No, sir.
12  Q   Okay.
13  A   Other than what I was taught at the academy.
14  Q   Okay.  And at the academy specifically, what were
15 you taught in terms of self-defense and/or --
16  A   Hand-to-hand combat.
17  Q   -- hand-to-hand combat?
18  A   Your basic restraints, holds, to that -- to that
19 effect.  You know, holds, restraints with your hands, of
20 course.  You know, strikes, minimal force strikes, stuff like
21 that.
22  Q   How many years of training did you have of Tae Kwan
23 Do before you received a black belt?
24  A   Let me see.  I began when I was about maybe 11 or
25 12, and from that point on.  It ceased after -- after

**Page 69**

1 receiving my black belt.
2  Q   Okay.  So four or five years?
3  A   Yeah.
4  Q   Okay.  Would it be fair to say, then, that you -- at
5 least
6 as of the time you graduated from high school you are
7 proficient in self defense?
8  A   To a sense.  Not as -- not as proficient as I was at
9 that time, you know, when I left high school.  I did leave
10 when I was about 19.
11  Q   And one other question I wanted to ask you.  On the
12 A-S-P, ASP, the expandable baton, if you can explain to the
13 jury what a -- what is an ASP?
14  A   An ASP is an expandable baton that we use for an
15 impact weapon, as you can say.  And it is basically a metal
16 expandable baton that has, I believe, depending on the
17 length, three slides, as you -- like --
18  Q   Segments?
19  A   -- segments.  That extend upon -- it is just a
20 motion that you extend it by grasping the baton by the handle
21 and leaning it forward and it expands itself and it holds
22 itself in place.
23  Q   Is there a qualification that an officer can receive
24 for that weapon?
25  A   Yes, sir.

18 (Pages 66 to 69)

GERARDO RAMIREZ                                                    April 10, 2003

---

Page 70

1  Q   Did you have a qualification for that at the time
2  you joined the La Feria Police Department?
3  A   Yes, sir.
4  Q   Does a qualification have to be renewed or updated?
5  A   Yes, sir.
6  Q   At the time of this event, were you qualified with
7  the ASP?
8  A   Yes, sir.
9  Q   Do you ever recall indicating otherwise in any of
10  the statements you have given about this incident?
11  A   As to what?
12  Q   About your qualification on the ASP?
13  A   When -- yes, I was asked at one point in time. Yes.
14  Q   Did you respond in a previous statement that you
15  were not qualified in using the ASP?
16  A   No, sir. That was wrongly reported by the
17  investigator that asked me.
18  Q   I am sorry. I didn't understand your answer -- your
19  response. I didn't hear your response.
20  A   I am sorry. That aspect of the -- that question was
21  -- was asked me by an investigator at the time of the
22  incident. And my reply was yes. Because, when I had taken
23  the training -- what it essentially was was a -- the
24  knock-knock course, which is a different type of expandable
25  baton. It is actually very similar in shape, form, and it is

---

Page 71

1  utilized the same way, because it also is an expandable --
2  excuse me -- expandable baton, but in the sense that it is
3  just a different name for it. And it is the same training and
4  the same use. And -- but we were advised by our instructor,
5  you know, when we took the courses that it is the same thing
6  and it is just a different name. So you are basically
7  qualified in -- in expandable baton use.
8  Q   Okay. There is a statement I have seen somewhere
9  where you -- a statement taken when you indicate that you were
10  not qualified on the ASP.
11  A   Yes. That was --
12  Q   Is that an incorrect part -- is that an error in the
13  statement or is -- is the distinction the one that you just
14  noted? That is you were qualified on one type of ASP but not
15  on another?
16  A   I believe that was maybe a possible -- possible
17  error or an insight(sic) from the investigator when he asked
18  me that question.
19  Q   Okay. So you -- your testimony is you were
20  qualified in use of the ASP --
21  A   Yes.
22  Q   -- at the time you joined La Feria Police
23  Department?
24  A   Yes, sir.
25  Q   And at the time of the --

---

Page 72

1  A   Yes, sir.
2  Q   -- incident. And the same thing with regard to the
3  -- well, I suppose if you qualified -- I think I saw the sheet
4  you qualified for the Barretta in March of 19 -- or, excuse
5  me, March of 2000.
6  A   Okay.
7  Q   Is that correct? I think that's what I have seen.
8  A   I couldn't place a date, or so.
9  Q   Well, your recertification would not have come up --
10  A   No, for another year.
11  Q   Okay. All right. The -- during the time that you
12  worked as a reserve officer, had you ever had any occasion
13  that you felt required you to use force on an individual?
14  A   Could you be a little bit more specific on that?
15  Q   Yes. During the time you worked as -- because I
16  imagine it didn't occur while you were a dispatcher.
17  A   No.
18  Q   Or while you were working as a reserve officer.
19  Between February -- excuse me, between December 1999, when you
20  began with La Feria PD up until the date of this incident,
21  during that time, had you ever had to engage in the use of
22  force against an individual as a police officer?
23  A   Yes, sir.
24  Q   Okay. How many times?
25  A   I couldn't recall. There were several points where

---

Page 73

1  we were put in situations where -- if you would like to
2  specify as far as the use of force engaged in there, it
3  would --
4  Q   Let me ask you -- let me -- let me divide it up and
5  maybe it will be easier. How many times or would you say that
6  you were in a situation that you felt required you to engage
7  in the use of force that was less than deadly force?
8  A   I would say maybe about -- maybe two to three times.
9  Q   Okay. Now, in those two to three times, can you
10  tell me what degree or level of use of force you -- you used?
11  A   They range from my presence to physical restraints.
12  That would be the end. As far as any impact weapons are
13  involved, none were are used. The only thing utilized at that
14  point was ranging from my presence, the situation, commands,
15  and physical restraint.
16  Q   All right. So, then, if I understand correctly,
17  before September the 19th of 2000, you never had an occasion
18  to use your ASP --
19  A   No, sir.
20  Q   -- baton or stick. And you never had occasion to
21  use the OC or the mace --
22  A   No, sir.
23  Q   -- spray prior to the time that this incident
24  occurred?
25  A   No, sir.

---

19 (Pages 70 to 73)

GERARDO RAMIREZ                                                                April 10, 2003

---

**Page 74**

1    Q   Okay. There were occasions where you had to use
2    physical restraint.
3    A   Yes, sir.
4    Q   Okay. And can you describe for us generally what
5    physical restraint -- restraint you used?
6    A   Basically, holds, grappling techniques.
7    Q   Okay. Are we talking about a wrist lock, head
8    lock? What -- what -- can you be more specific?
9    A   Wrist locks, arm locks, just to control and subdue
10   the subject.
11   Q   All right. On -- on those occasions where you had
12   to -- where you thought you were in a position that you needed
13   to use force in the form of a physical restraint, not -- not
14   just your mere presence, but a physical restraint, when was
15   the last time that that would have occurred prior to this
16   incident?
17   A   I couldn't recall an exact time.
18   Q   Do you recall an incident?
19   A   They mostly had to deal with other officers needing
20   assistance at the time.
21   Q   Did it -- would it have involved an incident which
22   -- that you specifically recall?
23   A   No.
24   Q   Were arrests involved?
25   A   Yes, there were.

---

**Page 75**

1    Q   Do you recall the individuals who were involved?
2    A   No, I don't. I do not.
3    Q   Do you recall what the nature of the offense was?
4    A   It ranged from domestic disturbances to traffic --
5    traffic stops.
6    Q   All right. And here we are talking again about two
7    to three occasions?
8    A   Yes, sir. They were normally with other agencies
9    that were requiring assistance, county units, other officers
10   that were out there.
11   Q   Okay. On those occasions, were you -- did you have
12   to use that force in order to subdue someone or did you use
13   that force as a continuation of force that was already being
14   applied by another officer?
15   A   To subdue.
16   Q   To subdue?
17   A   To subdue.
18   Q   Okay. What type -- on the -- in the instances where
19   you did have to use physical restraint, what type of force, if
20   any, were you presented with that made you feel you needed to
21   use that force?
22   A   In a sense of resisting, kicking, shifting of
23   weight, struggling.
24   Q   Okay. Since -- and I don't want to go -- if we were
25   talking about a long period of time, or many, many, many

---

**Page 76**

1    different arrests, I might forego this. But, since we are
2    talking about two or three, I am going to ask you to tell me
3    about each of the ones where you had to physically restrain
4    someone.
5    A   Okay.
6    Q   Okay. So we can take them either from the last one
7    going back or the first one coming forward, however you want
8    to do it?
9    A   Okay. Either or.
10   Q   Okay. Why don't we start with the first one that
11   occurred?
12   A   I believe one of them was an incident involving a
13   disturbance, if I recall correctly. The officer requested
14   some assistance because he began to have several other
15   individuals there, family members, I believe. And in that
16   sense, one or more of the family members was arrested because
17   they attempted to interfere with the situation. In that
18   sense, you know, we were called in to assist. And some
19   struggling occurred with the family members where they had to
20   be arrested and placed as well. That was one of the
21   occasions.
22   Q   Let me ask you some questions about that. First of
23   all, did that occur within the city limits within the city of
24   La Feria?
25   A   Yes, sir. I believe so.

---

**Page 77**

1    Q   And you -- were you the only officer to respond?
2    A   I don't recall if that -- there was more than one.
3    I don't think there was more than one of our officers.
4    Q   Okay. When you arrived, you said there was a --
5    there was a need to subdue a subject or subjects there. Did
6    you have a situation where a person or persons were attacking
7    you?
8    A   Not in that sense, not in that form.
9    Q   Can you tell me or rather than me kind of guessing
10   and you saying yes or no, why don't you tell me what
11   situation -- what the individuals did in that particular case
12   that made you feel that it was appropriate to use force to
13   subdue them?
14   A   Usually when a suspect like that were to attempt to,
15   in a sense, struggle with you where you can be hurt or you
16   can -- or he could pose a threat in the sense that if he has a
17   hand free, you know, he could strike you, you know. To
18   prevent that what you need to do is you need to subdue that
19   arm or that body part in order to control the subject, subdue
20   him. Because that -- as long as he has that option or that --
21   that, I would say, hand or leg free, if it is required that
22   you subdue it in order to prevent you from becoming injured,
23   you need to go ahead and --
24   Q   Okay.
25   A   -- and then do that.

---

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100              SAN ANTONIO, TEXAS 78230                    (800) 969-3027
                                                                        a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                                April 10, 2003

Page 78

1    Q   I think I understand. What -- what I want to know
2  is if -- can you tell me on the first -- the first time that
3  you ever had to use physical force to restrain someone, in
4  that incident, can you tell me what the person did
5  specifically that caused you to use physical force -- force to
6  subdue him?
7    A   The shifting of weight, just -- just strike -- not
8  -- not -- I shouldn't say striking. It was more of a pushing
9  effect as far as him trying to get away and, you know, I did
10  feel that, you know, me may have tried to strike me, in that
11  sense, and I was just trying to protect myself in the sense of
12  him trying to do that. He began to push me and shove me and
13  trying to, you know, leave the area. And I had to go ahead
14  and restrain him and -- and subdue him.
15    Q   Okay. And the person that you are talking about, do
16  you remember -- let me ask you. Do you remember who that
17  person was?
18    A   No, sir.
19    Q   Do you remember their approximate age?
20    A   I believe he was in his 20s.
21    Q   Size?
22    A   I don't remember. I couldn't say an exact size.
23  Possibly about -- he was a little bit taller than me.
24    Q   I am about --
25    A   I would say about --

Page 79

1    Q   -- maybe 5'9" with my boots on and about 175
2  pounds. Is this person about my size?
3    A   No. He is about maybe, I would say, about 5'5".
4    Q   Okay.
5    A   5'5", maybe 150.
6    Q   And this person, if I understand, did you tell him
7  that they were -- when you were arresting them or did you have
8  to arrest him because they made some gesture toward you?
9    A   Detention. Detention.
10    Q   Was this person -- prior to the time that you
11  physically restrained them, were they restrained in any way?
12    A   Prior?
13    Q   Yes.
14    A   No.
15    Q   They weren't in handcuffs?
16    A   No.
17    Q   They weren't in a physical location that would
18  restrict their movement?
19    A   No.
20    Q   All right. And then -- on that occasion, what
21  specifically did you do to restrain them?
22    A   Arm holding, an arm hold and utilizing my handcuffs.
23    Q   And let me ask. I assume that you initially told
24  them or asked them to do something which they failed or
25  refused to do?

Page 80

1    A   Yes.
2    Q   Okay. What was it that you asked them to do?
3    A   Place their hands behind their back.
4    Q   And they failed or refused to do that?
5    A   Refused.
6    Q   And what did you do in response to that?
7    A   Continued to order them to do -- to do that and
8  comply.
9    Q   Okay. And at some point did you decide that that
10  was not working and that you needed to do something else?
11    A   Yes, sir.
12    Q   Okay. And what happened that caused you to go to
13  another level of --
14    A   After continuous warnings and -- and commands
15  presented before him to advise him to turn around and place
16  his hands behind his back, I believe up to the third point in
17  time, I felt that he -- he wasn't going to comply to my orders
18  and I had to take action and -- and -- and to physically turn
19  him around and place his hands behind his back.
20    Q   Okay. During this time was this person making any
21  verbal threats?
22    A   No. But he was becoming belligerent and vulgar.
23    Q   All right. So you put -- you used an arm lock or
24  wrist lock?
25    A   Arm lock or arm hold.

Page 81

1    Q   Okay. And is this the one that we see on television
2  sometimes where you twist their elbow behind their back and
3  their wrist in an upward direction kind of like an L behind
4  their back?
5    A   Somewhat. Somewhat.
6    Q   And was that sufficient to subdue this person or did
7  they continue to refuse and fail to comply with your --
8    A   Sufficient.
9    Q   You placed the handcuffs on them?
10    A   Yes. Yes.
11    Q   Was this the only person there who required some
12  type of physical restraint?
13    A   No. I believe there was another -- another party
14  involved. But I believe one of the officers didn't have any
15  or as much difficulty as I did with the other individual.
16    Q   All right. That is the first instance?
17    A   Yes, sir.
18    Q   All right. Was there another?
19    A   I believe there was, yes, sir.
20    Q   Okay. Tell me about the next incident.
21    A   I believe it was in regards to a deputy that was
22  requesting assistance on a traffic stop.
23    Q   Okay. And where did that traffic stop occur?
24    A   This occurred in -- somewhere just outside the city
25  limits by the Business 83 area.

21 (Pages 78 to 81)

GERARDO RAMIREZ                                                    April 10, 2003

Page 82

1    Q   And tell me, basically, so we can kind of can get
2    through this a little faster, what basically happened in that
3    incident?
4    A   That incident, I believe he was on a traffic stop.
5    And I don't really recall as pretty much what he was telling
6    me as far as the story, what took place. Because when we get
7    called out there, we get called out to assist the officer. We
8    don't know what is going on at the time other than what the
9    agency is telling us to go and assist the officer on duty
10   because he has got some type of situation happening.
11   Q   Okay.
12   A   So --
13   Q   Well, yeah. And I don't want you to try and tell me
14   the whole history. What I -- what I want to know is when you
15   got there --
16   A   Uh-huh.
17   Q   -- what did you see and hear?
18   A   The deputy was struggling with an individual. And
19   he was trying his best to subdue the individual, which he did
20   have trouble with. They were on the ground wrestling. And
21   when I came up to the -- to the area, I exited my unit and
22   assisted him in subduing him.
23   Q   Okay. Was this one person?
24   A   Yes, sir.
25   Q   And the officer who you assisted, do you remember

Page 83

1    who that was?
2    A   No, sir.
3    Q   Okay. The individual who was resisting or refusing
4    or failing to comply with whatever direction he was getting
5    from the officer, can you tell us how big that person was?
6    A   I would say anywhere from maybe five -- five feet to
7    maybe 5'3".
8    Q   Male or female?
9    A   Male.
10   Q   Did they have any type of weapon?
11   A   No. Not that I could recall.
12   Q   All right. What did you do -- what physical force
13   did you use to subdue him?
14   A   Just utilized the wrist lock and arm lock. The
15   same -- the same fashion.
16   Q   And --
17   A   It consisted of myself and the deputy.
18   Q   And was that enough to subdue him at that point?
19   A   Yes, sir.
20   Q   Any other incidences besides those two?
21   A   There was a third, but I believe it was on the same
22   occasion, well, the same type of incident.
23   Q   Okay. After this traffic stop?
24   A   Uh-huh.
25   Q   Okay. Just briefly, why don't you tell me about

Page 84

1    that, when and where it happened.
2    A   Okay. I believe it was on another traffic stop
3    regarding the county. And they were having some difficulty
4    with -- with an individual that had become belligerent and was
5    intoxicated. And he began fighting with the deputy himself.
6    So I responded, as did others, I believe. And we -- when we
7    arrived at the location, the deputy was struggling with the
8    individual as well, because he was refusing to put his hands
9    behind his back and trying to shift his weight back and forth.
10   A struggle ensued. And, you know, we -- we assisted the
11   deputy once again, using the wrist lock, arm lock. He was
12   placed on the ground and -- and handcuffed immediately.
13   Q   Okay. And -- and any other situation besides those
14   three we have just discussed?
15   A   No.
16   Q   And, in those situations, each of those people were
17   unrestrained prior to the time that you got them subdued?
18   A   Yes, sir.
19   Q   They were in an open or public area?
20   A   Yes, sir.
21   Q   Okay. And on any of those occasions -- let me ask
22   this. Did you or any of the other officers there resort to
23   any higher level of -- of physical restraint?
24   A   No.
25   Q   Anybody have to use mace?

Page 85

1    A   No, sir.
2    Q   Or a baton?
3    A   No, sir.
4    Q   Or a firearm?
5    A   No, sir.
6    Q   Okay. All right. Let me ask you a little bit about
7    the time period closer to the -- to the incident here at
8    Valley Baptist. First of all, can you tell me for the -- for
9    the week -- for the two weeks, I guess, week after and the
10   week before this occurred, were you working as a dispatcher?
11   A   Yes, sir.
12   Q   Were you working your 40 hours?
13   A   Yes, sir.
14   Q   What shift were you working?
15   A   I don't recall. I don't know.
16   Q   Okay. Is there any way for us -- I have looked in
17   these records that we have been provided and I can't tell
18   from those records. Maybe -- maybe it is in the pay stubs.
19   Is there anybody you know who -- who we could ask and tell us
20   what shift you were working at the time?
21   A   There may be, but he no longer works with our
22   agency.
23   Q   Who is that person?
24   A   Tony Garcia. He was my sergeant of communications
25   at the time.

22 (Pages 82 to 85)

GERARDO RAMIREZ                                                    April 10, 2003

Page 86

1   Q   Uhm --
2   A   He did the --
3   Q   Scheduling?
4   A   Scheduling.
5   Q   Let me -- well, let me ask this about that.  You
6   first came to the Valley Baptist Medical Center on the 18th of
7   September.
8   A   Yes, sir.
9   Q   Sometime in the afternoon.  Is that correct?
10  A   Yes, sir.
11  Q   And I think I read from some of the documents here
12  that you received a call or someone from the La Feria Police
13  Department began calling you mid- to late morning of that day?
14  A   Yes, sir.
15  Q   Do you know whether you worked at any time on
16  September the 18th before coming to Valley Baptist Medical
17  Center?
18  A   I don't believe so.  It was my day off.
19  Q   It was your day off?
20  A   Yes.
21  Q   Would you have worked on the 17th?
22  A   I may have.  I may have.
23  Q   If you worked on the 17th, do you remember what
24  shift or what hours you worked on the 17th?
25  A   No.

Page 87

1   Q   On the day -- on the night before this incident, the
2   night that began on the 17th and ended the morning of the
3   18th, were you -- do you know how many hours of sleep you got?
4   A   No.  No, I don't recall.
5   Q   And I guess either you don't remember if you -- is
6   it possible you may have worked that evening or the night
7   before --
8   A   I could have been.
9   Q   -- the graveyard shift?
10  A   I know I didn't work the graveyard shift on that
11  time.  But it could have been the either 3 to 11 or the 7 to 3
12  shift.
13  Q   On the day before?
14  A   Yeah.
15  Q   On the 17th?
16  A   I am not sure which one.  But I know the graveyard
17  shift, if I would have gotten off I, wouldn't have been able
18  to sleep.  I remember sleeping that -- that day.
19  Q   Okay.  That's what I was going to ask you.  Do you
20  remember whether you slept during the day of the 18th?
21  A   No.  No, I didn't.
22  Q   So on the -- on the morning of the -- when I say the
23  morning, I mean daylight hours, 8, 9 in the morning, you --
24  you woke up at some period of time that morning?
25  A   Yes, sir.

Page 88

1   Q   Did whatever you were doing during the day?
2   A   Yes, sir.
3   Q   Okay.  All right.  Let me ask you.  On -- can you
4   tell me what you recall -- when you recall first being
5   notified or asked to come to the Valley Baptist Medical
6   Center?
7   A   Sometime in the mid-morning, like you stated.  I
8   don't recall the exact time, you know.  It has been a while.
9   But sometime toward mid-morning when I received the call.
10  Q   And who called you?
11  A   My sergeant of communications.
12  Q   And what did he tell you?
13  A   He stated that there was a subject that had been
14  detained, a suspect in a murder, and that they needed some
15  assistance in guarding him at the -- the Valley Baptist
16  Medical Center.
17  Q   Okay.  And he told you this was a person who was a
18  suspect in a homicide?
19  A   Uh-huh.  Yes, sir.
20  Q   Okay.  Did he tell you anything else?
21  A   No, sir.
22  Q   And what did you tell him in response?
23  A   I would be right there.
24  Q   Did you go to the police department first or did you
25  go straight to the hospital?

Page 89

1   A   Straight to the hospital.
2   Q   What time did you arrive there?
3   A   About 3 o'clock.
4   Q   Were you briefed by anyone when you got there?
5   A   My senior officer at the time.
6   Q   Who was that?
7   A   Ysidra Delgado.
8   Q   Officer Delgado?
9   A   Yes, sir.
10  Q   Okay.  Is that the same Officer Delgado whose -- who
11  had been standing guard with Mr. Gonzalez during the day?
12  A   Yes, sir.
13  Q   Did you meet with any officials from the hospital?
14  A   No, sir.
15  Q   Did you meet with any of the security personnel from
16  the hospital?
17  A   Yes, sir.
18  Q   Who did you meet with?
19  A   I believe one of the security guards there.  I don't
20  recall his name.  But he -- he was -- when I arrived at the
21  hospital, I was escorted by security to the room.
22  Q   Okay.  So the security personnel that you met, was
23  this someone who you were directed specifically to talk to or
24  was it just -- .
25  A   Somebody --

23 (Pages 86 to 89)

GERARDO RAMIREZ                                                                    April 10, 2003

---

Page 90

1    Q   -- the first person you happened to run into who had
2  a security uniform on?
3    A   No, no.  I was just directed to -- to -- that he
4  would be escorting me to the -- to the room.
5    Q   Okay.  Did this security officer, other than
6  escorting you to the room, do anything else for you?
7    A   No, sir.
8    Q   Did they give you any other information, documents,
9  paperwork?
10   A   No, sir.
11   Q   Did they explain any procedures the hospital had to
12 you?
13   A   No, sir.
14   Q   Did you speak with any other officials from the
15 hospital or have any contact with any other officials from the
16 hospital when you first got there aside from the security
17 officer that you had mentioned?
18   A   No, sir.  No, sir.  Maybe the intake, when I went to
19 the front desk, but that was it.
20   Q   At the -- did the security officer or the intake
21 desk give you any instruction with regard to your weapons?
22   A   No, sir.
23   Q   Did they give you any instruction with regard to
24 your gun or your ammunition or what you are allowed or not
25 allowed to have in the hospital?

---

Page 91

1    A   No, sir.
2    Q   When you went up to -- when you were taken to
3  Officer Delgado -- first of all, where were you taken?
4    A   Room 503.
5    Q   And was there anyone else there besides Officer
6  Delgado and Mr. Gonzalez?
7    A   I believe there was a nurse that may have been, you
8  know, checking him like they would on occasion.
9    Q   All right.  How long did Officer Delgado remain
10 there after you arrived?
11   A   I believe five minutes.
12   Q   What information, if any, did you get from Officer
13 Delgado at the time that you arrived?
14   A   Just that he had been acting strange and a little
15 odd, nothing out of the ordinary.  I mean, but that, you know,
16 just to keep an eye on him and make sure that, you know, that
17 he is okay.  And that should anything change, give us -- to
18 give him a call.
19   Q   Okay.  Did Officer Delgado indicate to you that
20 there were any rules or requirements regarding the -- the
21 restraints that were to be used on Mr. Gonzalez?
22   A   No.  Other than he stated that they were utilizing
23 only one hand because of the I.V. that was being put into his
24 other hand.
25   Q   Did he indicate to you any restrictions regarding

---

Page 92

1  your -- your handgun or the ammunition that you had?
2    A   No, sir.
3    Q   Do you know what kind of weapon Officer Delgado had?
4    A   Yes.
5    Q   What kind?
6    A   It is a model 96 Barretta similar to the 92F.  The
7  only thing is that it utilizes a 40 caliber round rather than
8  a 9 millimeter.
9    Q   And is it also a semi-automatic weapon?
10   A   Yes, sir, it is.
11   Q   All right.  Any other information you get from
12 Officer Delgado other than what you have just told us about?
13   A   No, sir.
14   Q   Did any of the hospital staff, the personnel,
15 doctors, nurses, anyone like that, come and give you any other
16 information about Mr. Gonzalez when you arrived?
17   A   No, sir.
18   Q   Officer Ramirez, did you have, at that time, an
19 understanding as to who was in charge of deciding what level
20 of restraint Mr. Gonzalez was supposed to have while he was
21 there in the hospital?
22   A   I am sorry.  Can you rephrase that?
23   Q   Sure.
24   A   Ask it again.
25   Q   Let me back up with another question.  When you

---

Page 93

1  arrived, was Mr. Gonzalez restrained?
2    A   Yes, sir.
3    Q   How?
4    A   He had one handcuff on, which would be my -- my
5  right, his left arm.
6    Q   And he was handcuffed to what?
7    A   The bed rail.
8    Q   And the bed was a hospital bed?
9    A   Yes, sir.
10   Q   Any other restraint at that time?
11   A   No, sir.
12   Q   Okay.  Were there any other restraints available?
13   A   Yes, sir.
14   Q   What were -- what else was available?
15   A   The leg shackles.
16   Q   All right.  And when you came into the room when you
17 first got there, where were the leg shackles?
18   A   On the countertop.
19   Q   Okay.  Whose cuffs -- whose handcuffs were on Mr.
20 Gonzalez at the time?
21   A   Mr. Delgado's, Officer Delgado's.
22   Q   Did those remain on him or did you-all switch them
23 out?
24   A   They remained on him.
25   Q   Okay.  And the leg shackles that you mentioned that

---

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100         SAN ANTONIO, TEXAS 78230                    (800) 969-3027
                                                                    a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ											April 10, 2003

**Page 94**

1  were on the counter, who did those belong to?
2     A   The police department.
3     Q   All right. When you -- when you came in, did
4  Officer Delgado tell you that Mr. Gonzalez was supposed to
5  remain restrained with the handcuffs?
6     A   Yes, sir.
7     Q   Did he tell you anything else about restraining you?
8     A   No, sir. Other than if he had to utilize the
9  restroom, he was to be restrained with the leg shackles.
10    Q   Now, did you have an understanding at that time as
11 to who was supposed to decide the level of restraint for Mr.
12 Gonzalez?
13    A   No, sir.
14    Q   Okay. Did you know whether that was a decision you
15 were supposed to make or whether that was up to someone else?
16    A   No, sir. No.
17    Q   Were you given any other information by any -- by
18 anyone at the police department about -- about his level of
19 restraint?
20    A   No.
21    Q   When you were sent to go and guard Mr. Gonzalez,
22 what were you told, if anything, about what you were supposed
23 to do there?
24    A   To watch him and notify the agency if anything else
25 would occur or any other news about his health had changed.

**Page 95**

1     Q   Can you tell me what you understand the purpose of
2  your being there --
3     A   To guard him.
4     Q   -- was? To guard. Okay. Now, when you say to
5  guard him, does that mean -- because that can mean different
6  things. Does that mean you were there to guard him to keep
7  other people from harming him? Were you there to keep him
8  from harming other people? Were you there to prevent him from
9  escaping or some combination?
10    A   Combination. Basically, whenever an officer -- I
11 believe, you know, the situation is when an officer is being
12 called to go and watch somebody, they are obviously for the
13 person's well-being as well as other people around him.
14 That's to my understanding why I was there.
15    Q   Had you ever before this day escorted anyone to the
16 hospital as a police officer --
17    A   No, sir.
18    Q   -- as a suspect or person who had been arrested?
19    A   No, sir.
20    Q   Had you ever guarded anyone at a hospital?
21    A   No, sir.
22    Q   All right. Have you -- if you had -- let me ask you
23 this. During the whole time that you were there up until the
24 point where this incident occurred, did anyone from the
25 hospital staff or administration come and give you any order

**Page 96**

1  or instruction about how he should be restrained?
2     A   No, sir.
3     Q   Were there people, hospital personnel coming in and
4  out during the, I guess, 12 or so hours that you were there,
5  coming in and out of the room to attend to Mr. Gonzalez?
6     A   Yes, sir.
7     Q   Okay. Let me ask you this. Because if you are
8  saying you did not receive any instruction from -- if you had
9  received instruction from the hospital staff about the level
10 of Mr. Gonzalez' restraint, do you know whether you were
11 required to get approval for that from your superiors or did
12 you understand that you were to comply or do what the hospital
13 told you to do?
14    A   At that time, no, neither.
15    Q   At that time no, what? You didn't --
16    A   I did not have that -- that information right before
17 me as far as if -- I didn't know that there was any policy,
18 procedure that would require me to, you know, if there was any
19 type of restraint, or, you know, would they require type of
20 restraint. What I am trying to say is that I didn't have any
21 information brought forth to me or any information brought
22 forth to me as far as what to, you know, how can I put it into
23 words? There was just no basic information given to me as far
24 as, you know, restraint.
25    Q   Well, if someone from the hospital had come in and

**Page 97**

1  told you this person needs to be restrained more fully,
2  perhaps with another set of handcuffs or both hands or leg
3  restraints at all times or one of each, or whatever it
4  happened -- whatever it would have happened to have been,
5  would you have followed those instructions or would you have
6  told them, "You need to wait until I get this approved"?
7     A   No. I would have. I would have restrained him.
8     Q   Complied with whatever their instructions were?
9     A   Yes, sir. Yes, sir.
10    Q   All right. I want to mark as an exhibit a set of
11 medical records from Valley Baptist Medical Center for Mr.
12 Gonzalez. And I want to ask you about some things that are
13 included in the medical -- as I understand, you didn't write
14 any of these. Correct? But there are some references in
15 here. And I want to ask you about your memory or recollection
16 of those.
17    A   Okay.
18    Q   Okay. I have marked as Exhibit Number 14(sic) a
19 copy of Mr. Gonzalez' medical records. Now, let me ask you,
20 you got to the hospital about what time again?
21    A   3 o'clock.
22    Q   3 o'clock. Okay. Do you remember a doctor coming
23 in to do a psychological assessment?
24    A   No, sir.
25    Q   Do you know Dr. Gonzalez?

25 (Pages 94 to 97)

GERARDO RAMIREZ

April 10, 2003

Page 98

1    A    No, sir.
2    Q    If there is some reference in the medical -- well,
3  let me ask. If you don't remember -- if you don't remember
4  Dr. Gonzalez specifically, or if you don't know who that is,
5  do you remember a -- a medical professional coming in to speak
6  with Mr. -- with Mr. Gonzalez?
7    A    Several.
8    Q    Several. Okay. Is it possible that one or more of
9  them would have been doctors?
10   A    Pretty much. There were nurses and -- and people
11 clothed and they obviously looked like doctors.
12   Q    Okay. Did any of them discuss with you -- did they
13 have any discussions with you about Mr. Gonzalez?
14   A    No, sir.
15   Q    So they went and did whatever it was they were
16 supposed to do and then they left?
17   A    Yes, sir.
18   Q    They didn't share any of the information they may
19 have gotten or had with you?
20   A    No, sir.
21   Q    Okay. At page 24 of the -- of Exhibit 15, there is
22 a handwritten note from Dr. Tomas Gonzalez, who apparently
23 came in and spoke with Mr. Gonzalez at about 4:15 that afternoon.
24   A    Okay.
25   Q    Do you remember somebody coming in early in your --

Page 99

1  in your shift?
2    A    Doctors, but I don't know if they were other than
3  physicians or. . .
4    Q    Part of what Dr. Gonzalez writes here is that the
5  patient is paranoid and fearful, saying things such as "Can I
6  just cut my throat?" Let me ask you, did you hear Mr.
7  Gonzalez say that?
8    A    No, sir.
9    Q    He also gives an impression here that Mr. Gonzalez
10 is psychotic as evidenced by paranoia and hallucinations.
11 Did -- did anyone share that with you during the time that you
12 were there?
13   A    No, sir.
14   Q    The last part of this note, Dr. Gonzalez writes -- I
15 am going to read this and you can look at it yourself. It
16 says: Patient under strict police surveillance there at his
17 bedside and they assure me they will not allow him to hurt
18 himself or anyone else.
19        That is the last thing he writes in this note. Do
20 you remember having any conversation with any doctor while you
21 were there?
22   A    No, sir.
23   Q    Okay. Are you -- now, what I want to ask you is,
24 are you telling me that you made no assurances to anyone or if
25 this happened, if you made some comment to Dr. Gonzalez, you

Page 100

1  just don't remember it at this point?
2    A    At this point, I don't recall speaking with a doctor
3  at that point.
4    Q    Okay. In any case, you don't remember him coming to
5  you and telling you this patient is psychotic and paranoid?
6    A    No, sir.
7    Q    Were you ever made aware of what medications he had
8  been -- he had been taking prior to his admission?
9    A    No, sir.
10   Q    Okay. At page 71 of the -- of this exhibit there is
11 a computerized typed item that looks like different notes that
12 were made by either nurses or other people who did consults
13 with Mr. Gonzalez. On September 18th, at 0232, which I
14 believe is 2:32 in the morning, there is a note here from
15 someone with the initials MMC that states: Demonstrates a
16 degree of confusion and/or disorientation. Seems to be out of
17 touch with reality. Stating that the officer is trying to
18 kill him and all of us.
19        First of all, at September 18th at 2:32 in the
20 morning, you were -- you were not there at that time?
21   A    No, sir.
22   Q    That would have been one of the other officers?
23   A    Yes, sir.
24   Q    Okay. Did anyone share that information with you
25 when you came in?

Page 101

1    A    No, sir.
2    Q    There is another note by the same person at the same
3  time, which indicates patient is confused and irrational. And
4  that they demonstrate a degree of confusion or disorientation,
5  as we mentioned, and that there is a consult ordered for a --
6  psychological consult ordered for the morning. No one shared
7  that information with you either, probably?
8    A    No, sir.
9    Q    Do you know if any of this information was shared
10 with Officer Delgado?
11   A    No, sir, I do not.
12       MR. POPE: Objection. Form.
13   Q    (BY MR. BARRIENTOS) Well, let me ask it this way.
14 Did -- did Officer Delgado indicate to you that he had
15 received any of this information?
16   A    No, sir, he did not.
17       MR. POPE: Objection. Form.
18   Q    (BY MR. BARRIENTOS) All right. There is another
19 note here at 2:43 a.m. on September 18th from MMC. It
20 indicates patient is disoriented and uncooperative with care,
21 refusing to answer questions, stating that the officer
22 guarding him is trying to kill him and that he needs to leave.
23 Did you ever receive this information from any source?
24   A    No, sir.
25   Q    Another note, the same time by the same person, the

26 (Pages 98 to 101)

GERARDO RAMIREZ                                                                          April 10, 2003

**Page 102**

1  patient is refusing to answers questions, states that it is
2  dangerous here. Do you recall receiving that information?
3      A   No, sir, I do not.
4      Q   That was at page 76. At page 77, on the 18th of
5  September, at 1353, which I believe is 1:53 in the afternoon,
6  by a person with the initials MS, when being asked questions,
7  patient does not answer right away and gives vague answers.
8  Now, did you have any conversation with Mr. Gonzalez yourself?
9  In other words, did you engage in any conversation?
10     A   Briefly. Briefly. But it wasn't anything specific.
11 He would ask me a question and I would either answer yes or no
12 or I didn't know.
13     Q   That's what I wanted to ask you. The conversation
14 you engaged in with Mr. Gonzalez, was it him asking you
15 questions or you asking him questions?
16     A   No, it was him asking me questions.
17     Q   All right. At page 79, a notation here by MMC at
18 2:43, 0243 on September 18th, mobility slightly limited. And,
19 if I understand correctly from what you have testified, the
20 only restraint he had was the handcuff to his left hand to the
21 bed rail.
22     A   Yes, sir.
23     Q   September 18th, 0523 or 5:23 a.m. A note from FGC.
24 Progress note psycho-social. Part of the entry reads as
25 follows: Patient attempting to kill himself, handcuffed to

**Page 103**

1  left hand, under strict surveillance by police department.
2  Patient withdrawn, unable -- excuse me. Refuses to respond to
3  questions and just stares blankly and suspiciously when being
4  asked.
5          Now, this is in the morning again before you got
6  there.
7      A   Uh-huh.
8      Q   Now, had you been informed by anyone that Mr.
9  Gonzalez was a suicide risk?
10     A   No, sir.
11     Q   All right. There is a note here September the
12 18th, 2020, which I believe is 8:20 in the evening. From ML,
13 that says: Patient is asking for a bath. He was given warm
14 water and soap and told to bathe himself with his unrestrained
15 hand. And patient cleaned. That apparently took place during
16 the time that you were there. Is that correct?
17     A   Yes, sir.
18     Q   Do you recall Mr. Gonzalez bathing himself, cleaning
19 himself?
20     A   Not without the restraint.
21     Q   I am sorry?
22     A   Not without the restraint.
23     Q   Not without the restraint?
24     A   He was restrained at all times.
25     Q   Okay. And that's -- that's -- what the note says is

**Page 104**

1  that he was told to bathe himself with his unrestrained hand.
2      A   Yes, sir.
3      Q   Or not restrained hand. Do you remember that
4  happening?
5      A   Yes, sir.
6      Q   So he cleaned himself with his right hand, which was
7  unrestrained?
8      A   Yes, sir.
9      Q   All right. And at that point, was it apparent to
10 you that he had some function with his unrestrained hand?
11     A   Yes, sir.
12     Q   During the evening -- during the time that you were
13 there, did he need to get up at all to go to the bathroom or
14 for any other purpose?
15     A   Yes, sir.
16     Q   And when -- when he did so, did you change the
17 manner of restraint?
18     A   No. Because of the fact that when he was advised he
19 was going to be further restrained, he stated that he didn't
20 want to go to the restroom any more because he didn't feel he
21 needed to be restrained. So we called in and notified the
22 nurse nearby so that he could be provided with either a bedpan
23 or urinal.
24     Q   Okay. I am going to ask you to speak up just a
25 little bit. I am having a little trouble hearing you.

**Page 105**

1      A   No problem. Yes, sir.
2      Q   All right. So you never had to use the leg shackles
3  on him during the time that you were there?
4      A   No, sir.
5      Q   And did they remain in the same place during the
6  entire time that you were there?
7      A   Yes, sir.
8      Q   Okay. If you -- you did not protect your handcuffs,
9  did you have your handcuffs still on -- in your possession
10 during that time?
11     A   Yes, sir.
12     Q   Is there some reason that the shackles were left
13 where they were rather than being put in -- in another place?
14     A   No, sir.
15     Q   Does your utility belt that you have that you use
16 have a place to the put the leg restraints?
17     A   No, sir.
18     Q   Could they have been put in a place that was not
19 accessible to anyone other than the police officer who was
20 guarding?
21     A   Yes.
22     Q   For example?
23     A   Nearby, closer -- closer to my area.
24     Q   All right. Let me ask you. Did you -- did you have
25 a radio with you?

27 (Pages 102 to 105)

GERARDO RAMIREZ                                                    April 10, 2003

Page 106

1   A   No, sir.
2   Q   Any type of -- of emergency device that -- a panic
3   button or something like that that would summon other
4   officers?
5   A   No, sir.
6   Q   Did anyone tell you what you needed to do in case
7   you needed relief or a break to get some water, go to the
8   bathroom, or something like that?
9   A   Yes, sir.
10  Q   Who told you, that person?
11  A   One of the security guards.
12  Q   Okay.  And when -- would this have been the security
13  guard who initially walked you up to the room or was it
14  someone else that came after that?
15  A   The one that walked me up to the room.
16  Q   And what did that person tell you?
17  A   He stated that if I needed to be relieved, to go
18  ahead and notify security by dialing a number into the
19  telephone that was right by the bedside area.
20  Q   Okay.  Were you told or briefed about what you
21  should do if you needed assistance or backup?
22  A   Other than to call security and that is it mainly.
23  Q   So, if you had some need for security, either for
24  relief or for some type of emergency, your instruction was
25  call them on the telephone?

Page 107

1   A   Yes, sir.
2   Q   Do you know whether there was a security officer
3   assigned to the floor that you were are on at the time?
4   A   No, sir.
5   Q   During the time that you stayed there in the room,
6   from the time you arrived until time of the incident with Mr.
7   Gonzalez, did you have any contact with any security personnel
8   from the hospital?
9   A   Yes.
10  Q   Okay.  And I want to exclude the time that the
11  person that walked you up to the room.  After you were walked
12  up to the room by the security officer who was there when you
13  first arrived, did any other security officers come by?
14  A   Yes.  In the sense that I had requested some
15  assistance because I had to utilize -- I had to go to the
16  bathroom.
17  Q   Okay.  So a couple of times during your stay
18  there --
19  A   Maybe twice.
20  Q   -- you called -- you went over to the phone and
21  called --
22  A   Yes, sir.
23  Q   In the room.
24  A   (Witness nods head affirmatively)
25  Q   Other than that, did you have any other contact with

Page 108

1   any of the security personnel?
2   A   No, sir.
3   Q   Okay.  Other than coming to relieve you for a short
4   time, did they give you have any other information or
5   instruction?
6   A   No, sir.
7   Q   Were there any other telephones in the room other
8   than the one that I think has been described as a phone in the
9   corner of the hospital room by the window?
10  A   No, sir.
11  Q   Did it concern you at all that if there was an
12  emergency, the telephone was on the opposite side of the room
13  and it had the patient between you and the telephone that you
14  needed to use for an emergency?
15  A   Yes.
16  Q   Did you make any suggestion or ask anyone about
17  whether another telephone or form of communication was
18  available?
19  A   There was none.
20  Q   Do you know whether the phone could have been moved,
21  for example, to another portion of the room that did not
22  require you to cross the room and actually get closer to Mr.
23  Gonzalez before you were able to summon help?
24  A   No.  No.  I did not know.
25  Q   Okay.  Officer Ramirez, I think I have asked you

Page 109

1   about a number of things about Mr. Gonzalez' medical condition
2   or psychological condition.
3   A   Yes, sir.
4   Q   And you indicated you did -- you had no knowledge of
5   those things?
6   A   No, sir.
7   Q   Had you known about those things or had you been
8   made aware of those things, would you have initiated any
9   greater degree of restraint than what was in place at the time
10  that you got there?
11  A   Yes, sir.
12  Q   What would you have done?
13  A   Utilized what -- what I had available, like my
14  shackles.  I would have utilized them to restrict his movement
15  and/or my other handcuffs.
16  Q   And had you been provided that information and
17  engaged in the further restraint that you talked about, do you
18  believe that Mr. Gonzalez would have been able to get out of
19  the bed and maneuver himself around in the way that actually
20  occurred?
21         MR. POPE:  Objection.  Form.
22         THE WITNESS:  I am sorry?
23  Q   (BY MR. BARRIENTOS) I said if he had been more fully
24  restrained, would he have been able to do the things
25  physically that occurred later on according to your testimony?

28 (Pages 106 to 109)

GERARDO RAMIREZ                                                          April 10, 2003

---

Page 110

1   A   No.
2       MR. POPE: Objection. Form.
3       THE WITNESS: No.
4   Q   (BY MR. BARRIENTOS) If you had been -- if you had
5   used the leg shackles, in what manner would you have
6   restrained him that was different from the way he was actually
7   restrained?
8   A   By placing the shackles on, they restrict his
9   movement for walking and/or kicking, which greatly reduces the
10  risk and allows him less movement.
11  Q   The IV that you said he had was placed, do you
12  remember where it was placed?
13  A   I believe on his right arm.
14  Q   On his right arm or on the -- on the back of his
15  right hand?
16  A   On the back of his right hand.
17  Q   Okay. Officer Ramirez, you said that you were told
18  that this was is a -- that Mr. Gonzalez was a suspect in a
19  homicide?
20  A   Uh-huh.
21  Q   Is that correct?
22  A   Yes, sir.
23  Q   Did you talk to any other law enforcement officials
24  besides people from La Feria Police Department --
25  A   No, sir.

---

Page 111

1   Q   -- before arriving at the hospital?
2   A   No, sir.
3   Q   Did you talk to any law enforcement officials from
4   any other agencies while you were there before the shooting?
5   A   No, sir.
6   Q   Were you made aware of who the -- who the victim
7   was supposed to have been in the homicide in which Mr.
8   Gonzalez was a suspect?
9   A   No, sir.
10  Q   Were you given any information about -- about the
11  circumstances under which Mr. Gonzalez was initially taken
12  into custody?
13  A   I am sorry. Could you repeat?
14  Q   Yes. Were you told anything about the details about
15  how Mr. Gonzalez was initially picked up?
16  A   Briefly. Briefly.
17  Q   All right. Do you know -- let me ask this.
18  Sometime subsequent to all of this, did you learn who -- did
19  you learn the identity of the person who Mr. Gonzalez had been
20  suspected of in whose homicide Mr. Gonzalez had been
21  suspected?
22  A   Prior or after?
23  Q   After.
24  A   After. Yes.
25  Q   Not prior?

---

Page 112

1   A   No.
2   Q   Do you know, did you have any contact with any
3   members of that person's families?
4   A   No, sir.
5   Q   Okay. Let me ask you a little bit about getting
6   closer to the time that -- that this incident may have
7   occurred. Had Mr. Gonzalez done anything through the day or
8   the evening prior to this last set of events that made you
9   feel that you were -- that you were in danger?
10  A   No, sir.
11  Q   Did Officer Delgado communicate that to you?
12  A   No, sir.
13  Q   Okay. Had Mr. Gonzalez made any threats to you up
14  to that point?
15  A   No, sir.
16  Q   During the evening, did you make any requests or
17  make any commands to him to do any particular thing?
18  A   No.
19  Q   Okay. So during the evening, you never had to ask
20  him to do anything, to get up, sit down, nothing like that?
21  A   No. No.
22  Q   All right. Did he comply with whatever requests or
23  suggestions you made to him during -- first, let me ask. Do
24  you remember making any to him, asking him to do anything?
25  A   Specifically, no, no.

---

Page 113

1   Q   Well, let me ask this. If it happens from -- and,
2   again, know there are a lot of statements here, there is a
3   re-enactment. But if it happens that there were things that
4   occurred that you asked him to do during the evening before
5   this last set of events, do you recall receiving any
6   resistance from him to do any of these things?
7   A   No.
8   Q   Did he comply with your other requests for orders?
9   A   Yes. Pretty much.
10  Q   Did you -- do you remember whether you had to ask
11  him to do that more than one time?
12  A   Not that I -- not that I can recall.
13  Q   Do you recall whether he seemed to have trouble or
14  difficulty understanding or responding to your requests?
15  A   No.
16  Q   All right. Now, you were there -- let me ask you.
17  When were you supposed to be relieved?
18  A   I believe I was advised that I was going to be
19  relieved possibly about maybe 11 or so.
20  Q   So you got there about 3:30, 3 or 3:30 in the
21  afternoon, and you were supposed to work there until about 11
22  that night?
23  A   (Nods head affirmatively)
24  Q   Is that correct?
25  A   Yes.

---

29 (Pages 110 to 113)

GERARDO RAMIREZ                                                         April 10, 2003

Page 114

1    Q   Okay. Well, obviously you stayed past that time.
2    A   Yes, sir.
3    Q   Okay. And did you your relief never arrive or did
4    they will call you and tell you that there was going to be a
5    delay or a change in schedule?
6    A   There was going to be a change or a delay because of
7    the fact we were shorthanded.
8    Q   Okay. How did you find out about that?
9    A   The officer that was on duty advised me.
10   Q   Who was that?
11   A   I believe it was either Martin Segura. He was an
12   officer that evening. And he -- he called me. If not, the
13   other officer. I know I received calls from both people.
14   Q   All right. And so did they indicate to you if -- if
15   there was going -- there was going to be a delay, about how
16   long the delay was going to be?
17   A   That they would notify me when they found somebody
18   available. They didn't give a specific time.
19   Q   Okay. So you didn't know -- let me ask you. When
20   did you -- when did you get this information?
21   A   Sometime between about toward the 11 o'clock, 11
22   o'clock time area, maybe 10:45, maybe about 11, I believe.
23   Q   Do you know at that point how long you had been up
24   or awake that day?
25   A   (No response)

Page 115

1    Q   Did you get a full night sleep the night before?
2    A   I believe so.
3    Q   I may have asked you?
4    A   I believe so.
5    Q   Okay. All right. Well, all right. Upon receiving
6    that information, it sounds like you were not sure when you
7    were are going to be relieved.
8    A   No.
9    Q   And that your stay there was going to be indefinite?
10   A   It may.
11   Q   All right. After that call, I think I read in some
12   of these reports here that you -- or statements that you
13   observed Mr. Gonzalez, he fell asleep?
14   A   Yes, sir.
15   Q   Is that correct? Can you tell me approximately what
16   time he fell asleep?
17   A   No, sir.
18   Q   Can you tell me approximately what time he woke up?
19   A   About maybe 3 o'clock.
20   Q   I am sorry?
21   A   About 3 o'clock.
22   Q   At 3 o'clock?
23   A   A.m.
24   Q   Were you awake during the entire time that you were
25   there with him?

Page 116

1    A   Yes, sir.
2    Q   Okay. There was no time that you took a nap or
3    perhaps dozed off?
4    A   No, sir.
5    Q   Are you sure of that?
6    A   Yes, sir.
7    Q   All right. The -- when Mr. Gonzalez woke up at
8    about 3 in the morning, did he say anything to you?
9    A   No.
10   Q   As I read the notes from the hospital record, the
11   first indication, at least that is in those notes, is that the
12   disturbance is first noticed at about 3:22 a.m.
13   A   (Witness nods head affirmatively)
14   Q   So what I want to ask you is can you tell me how
15   long after Mr. Gonzalez woke up was it that this set of -- set
16   of incidents began?
17   A   Around the same time frame. About 3 a.m., 3, around
18   that area. Beginning of 3 a.m. and on. It is -- I couldn't
19   say a specific time, but it was around that time when
20   everything began to happen. Immediately after a noise was
21   heard out in the hallway, he woke up. And that's when the
22   chain of events began to occur.
23   Q   Okay. Well, let me ask you. He was asleep?
24   A   Yes, sir.
25   Q   He woke up. Did he immediately start to do

Page 117

1    something which you asked him not to do or did some time pas
2    before that occurred?
3    A   Maybe about a few seconds.
4    Q   Okay. All right. He wakes up. And did you see him
5    when he woke up?
6    A   Yes, sir.
7    Q   What did he do that -- well, tell me, when he woke
8    up, what did he do?
9    A   What he did was he basically just looked around and
10   asked he, you know, what had -- what was the noise. I told
11   him, I said, "Well, it is just somebody in the hallway, you
12   know. Go back to bed. It is all right."
13   Q   Okay. I am going to ask you to a speak up a little
14   more. I am sitting two feet from you and I am having a little
15   problem hearing you.
16   A   I am sorry. Sorry.
17   Q   Okay. He woke up and there was a noise outside.
18   A   Yes, sir.
19   Q   Outside the room. And you -- and he asked -- he
20   asked you what that was?
21   A   About what the noise was.
22   Q   You told him to go back to sleep.
23   A   I said, "yeah, it was nothing."
24   Q   What happened after that?
25   A   He continues to look around. And then all of a

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                      (800) 969-3027
                                                                          a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                          April 10, 2003

**Page 118**

1  sudden he stood up.
2      Q   All right.  When you say stood up --
3      A   To the side of the bed.
4      Q   To the side.  All right.  His left hand is
5  handcuffed to the bed.
6      A   Uh-huh.
7      Q   And his right hand has an I.V. attached to it.
8  Correct?
9      A   Uh-huh.
10     Q   Is that a yes or a no?
11     A   Yes, sir.  I am sorry.
12     Q   Is the I.V. stand on the right side of the bed where
13  his right hand is or --
14     A   Yes, sir.
15     Q   Which side of the bed did he stand up on?
16     A   It would be on the left side.
17     Q   So he stood up on the side of the bed that had his
18  handcuffed hand?
19     A   Yes, sir.
20     Q   What did he do after he stood up?
21     A   He began looking around and looking at the side of
22  the bed, looking at me.  And I said, "You know, just go to
23  bed.  Get back into bed."
24     Q   Did he say anything to you at this time?
25     A   No.  He just said, "Let me go."

**Page 119**

1      Q   Did you respond to him?
2      A   I said -- yes.  I said I would not let him go.
3      Q   Now, when you say he -- he said let him go, was that
4  a request?  Was it a command?  What tone of voice did he have
5  when he said it?
6      A   A very passive voice.  He did not anything -- is it a
7  form of command?  No.  It was more of a passive, you know, let
8  me --
9      Q   He was asking you to let him go?
10     A   Yes.
11     Q   Not telling you to let him go?
12     A   No.
13     Q   And you told him to go back -- "No, I am not going
14  to let you go."
15     A   "Go back to bed."
16     Q   And what did he do then?
17     A   And he began shaking the handcuff.  He said, "Let me
18  go."  I said, "No.  I am not going to let you go.  You need to
19  go get back into bed."
20     Q   All right.  And after he asked you and you responded
21  no a second time, what did he do?
22     A   I think he -- I believe it was that time when he --
23  it took me one more time to -- to ask him to get back into
24  bed.  Other than that, he just looked around.  I don't think
25  he told me anything.  I don't recall him saying anything.

**Page 120**

1      Q   All right.  Now, where were you at the time that
2  this -- these requests that he made were going on?
3      A   I was standing by the doorway.
4      Q   Okay.  I am going to mark as Exhibit Number 16 a
5  diagram.  Let me ask you to -- let me ask you to take a look
6  at that first.
7      A   Yes, sir.
8      Q   Have you seen that item before?
9      A   This specific one?
10     Q   Yes, sir.
11     A   Not that I can recall.
12     Q   Well, let me tell you what.  I am going to ask
13  you -- I am going to mark it anyway.  We are going to watch a
14  videotape tape in a few minutes.  But I have marked a diagram
15  that was made, I believe, by the Harlingen Police Department
16  as Exhibit Number 16.
17     A   Uh-huh.
18     Q   All right.  And even though you didn't do the
19  diagram, what I want to ask you, after we go through this is I
20  am going to ask you to tell me whether this, while maybe not
21  to scale, represents not the size of the room but the
22  placement of the various items.
23     A   Okay.
24     Q   All right.  Okay.  Have you had a chance to be able
25  to look at this?

**Page 121**

1      A   No.
2          THE REPORTER:  Can I ask you to speak up,
3  please?
4          THE WITNESS:  Uh-huh.
5          THE REPORTER:  Thank you.
6          THE WITNESS:  Yes, ma'am.
7      Q   (BY MR. BARRIENTOS)  Let's look at Exhibit 16.  And
8  this is -- you are in room 503.  Is that correct?
9      A   Yes, sir.
10     Q   All right.  There is a legend here on the side of
11  this diagram.  All right?  Actually -- well, there is a
12  legend, but I don't think it applies to all -- all of the
13  items in here.  But here on the diagram it appears, if I am
14  correct, this is the symbol for a doorway?
15     A   Yes, sir.
16     Q   And A would be chairs here to the immediate left of
17  the doorway as you enter the room?
18     A   Yes, sir.
19     Q   B would be, I believe, a couch?
20     A   Yes, ma'am.
21     Q   And there is an item, a square, in the -- what would
22  be the -- this is the north, the south corner of the room?,
23     A   Yes, sir.
24     Q   And what was that object?
25     A   A table.

31 (Pages 118 to 121)

GERARDO RAMIREZ                                                                  April 10, 2003

Page 122

1    Q   Okay. And then going west along this side wall,
2  there is an item marked C. Do you recall what that item is?
3    A   I believe a type of chair.
4    Q   A chair. All right. And there is an area here with
5  a 20 marked in it. Do you recall what area this is?
6    A   That is the window area, where the window sill is.
7    Q   All right. And is that where the phone was located?
8    A   Yes, sir.
9    Q   Okay. And then coming along the west wall of the
10  room -- now, in this diagram, I think this has the location of
11  the bed and Mr. Gonzalez' body where they were after the
12  incident occurred.
13    A   Yes, sir.
14    Q   Before that occurred, where was the bed that Mr.
15  Gonzalez was in?
16    A   About right here, along the west side of the wall.
17    Q   All right. And was it facing out so that the
18  feet -- Mr. Gonzalez' feet would have been facing out in the
19  middle of the room?
20    A   Yes, sir.
21    Q   Or was it along the wall?
22    A   No. It was facing toward the middle of the room.
23    Q   Okay. And then coming over here to the north side
24  of the room, what was the item that was along this wall here?
25    A   That was the sink area and the counter.

Page 123

1    Q   All right. And was this where the ankles -- ankle
2  shackles would be located?
3    A   Yes, sir.
4    Q   Okay. And is there a bathroom in here?
5    A   Yes, sir.
6    Q   And I think it is kind of faded out here. But there
7  is an area marked bath. And then it fades out. Is this the
8  area where the bathroom was?
9    A   Yes, sir, it is.
10    Q   Okay. In this diagram, can you tell me where you
11  were seated at the -- at the time that Mr. Gonzalez got up and
12  asked you to -- let him go?
13    A   I was sitting right here, right there by the chair,
14  on the -- on the -- I believe it is the east side of the wall
15  corner.
16    Q   Okay. Let me ask you to take this blue pen and just
17  put -- circle the area where you were.
18    A   (So done)
19    Q   Okay. And at the time he was asking you to let him
20  go, was the bed in the original position?
21    A   Yes, sir.
22    Q   Okay. After the third time you asked him or he
23  asked you to let him go and you said no, what, if anything,
24  did he do at that point?
25    A   He complied and then went back to the bed.

Page 124

1    Q   Okay. And did he remain there?
2    A   For a brief period.
3    Q   Okay. How long did he remain there?
4    A   From two to five seconds.
5    Q   Okay. What happened next?
6    A   He stood back up. Then he --
7    Q   On which side of the bed?
8    A   The same. The same side of the bed.
9    Q   All right. What happened then?
10    A   He began to ask me again to the let him go. And I
11  would state, "No, I will not."
12    Q   Okay. How -- how many times did that occur?
13    A   About the same time, about three, three or four.
14    Q   All right. And did he ultimately get back into bed
15  and comply with your request?
16    A   No, sir.
17    Q   Okay. So the second time when he got out of the bed
18  and asked you to let him go, he did not get back into bed?
19    A   No, sir.
20    Q   Now, what did you do in response to that?
21    A   At that point, I advised him that I would notify
22  security to further restrain him.
23    Q   Did you feel at that point that Mr. Gonzalez was a
24  threat to you?
25    A   In a sense, in a sense I did feel.

Page 125

1    Q   Okay. Well, let me ask. At that point, did you
2  feel that it was necessary to apply or use any force in the
3  incident?
4    A   At that point, no. Possibly verbal commands at the
5  most. But no physical force.
6    Q   All right. In any case, after the second time that
7  he got up and wouldn't comply with your request, he felt that
8  he -- that he was a threat to your safety?
9    A   Yes, sir.
10    Q   Okay. You understand -- what -- and he was still
11  handcuffed to the bed at the time.
12    A   Yes, sir.
13    Q   Do you know what the dimensions of the bed were, how
14  much it weighs, and that kind of thing?
15    A   No, sir.
16    Q   Would you be surprised if I told you it weighs over
17  300 pounds?
18    A   No.
19    Q   All right. Now, you told Mr. Gonzalez that if he
20  didn't comply with your request, you were going to have to
21  call security to further restrain him?
22    A   Yes, sir.
23    Q   All right. And if you perceived a threat from Mr.
24  Gonzalez at that point, what were you -- all right -- you told
25  him you were going to do this. Did anything else happen

32 (Pages 122 to 125)

GERARDO RAMIREZ                                                                                              April 10, 2003

**Page 126**

1   between the time you told him you were going to call someone
2   and any action that you might have taken to actually do that?
3       A   No, sir.
4       Q   Did you-all have any further discussion or
5   conversation?
6       A   Yes, sir.
7       Q   Okay. Tell me what happened?
8       A   I advised him that I would give him five seconds to
9   get into bed or I would notify security.
10      Q   Okay. All right. And you gave him his five
11  seconds?
12      A   Yes, sir.
13      Q   Did he comply?
14      A   No.
15      Q   What did you do next?
16      A   I went around to the other side of the room where
17  the phone was located and I began dialing for security to
18  come -- to come to the room.
19      Q   Okay. Let me -- I want to -- I want to ask you to
20  do a couple of things with Exhibit Number 16. First of all,
21  with this yellow marker, because I don't want to obliterate
22  what is on the diagram, can you draw in for me the position
23  where Mr. Gonzalez' bed was prior to the time of the -- of
24  the altercation and the shooting.
25          MR. GARZA: We agree it is not to scale,

**Page 127**

1   Counsel?
2           MR. BARRIENTOS: Yeah. That's fine. I just
3   want to know where it was in the room.
4           THE WITNESS: I am making an X over it.
5       Q   (BY MR. BARRIENTOS) I tell you what. If you could,
6   just so we know which way it was pointed, if you can -- you
7   can mark it with an X, but if you would -- if you would --
8   let me see. The bed they have here in this diagram is maybe
9   about as long as my pen cap, about an inch. If you could draw
10  something of that similar dimension in the place where you
11  remember it being.
12      A   About that, that much.
13      Q   Okay. And that's about -- that's approximately
14  where the bed was when you were having these discussions with
15  Mr. Gonzalez?
16      A   Yes, sir.
17      Q   Okay. And he would have gotten off the bed on the
18  lefthand side. Is that correct?
19      A   Yes, sir.
20      Q   Okay. Why don't you put an X at approximately where
21  he would have been, at the side of the bed that he was on when
22  he did this?
23      A   (So done)
24      Q   Okay. All right. Now, at this point you told us
25  you -- you perceived a threat from Mr. Gonzalez.

**Page 128**

1       A   Yes, sir.
2       Q   And that is in spite of the fact that he is
3   partially restrained?
4       A   Yes, sir.
5       Q   And in spite of the fact that he is restrained and
6   hooked up to a bed that weighs in excess of 300 pounds. Is
7   that correct?
8       A   Yes, sir.
9       Q   Did you know at that point whether the bed could be
10  moved by Mr. Gonzalez?
11      A   Yes, sir.
12      Q   You did know?
13      A   Yes, I did.
14      Q   How did you know?
15      A   I looked at the -- at the floor area. It was on
16  rollers.
17      Q   Okay. Did you know or notice whether there were any
18  locks or brakes on the rollers?
19      A   No, sir.
20      Q   Do you know sitting here today whether there are or
21  not?
22      A   No.
23      Q   Whether there were or not?
24      A   No.
25      Q   Did you make any inspection other than a visual

**Page 129**

1   inspection to see the wheels about whether there were any
2   locks or brakes on the bed?
3       A   No, sir.
4       Q   Obviously if there were -- if there was a mechanism
5   in place about that -- about that area of the bed that would
6   have allowed you to lock the wheels and put brakes on them,
7   that would have inhibited his ability to move the bed.
8           MR. GARZA: Objection. Form.
9           THE WITNESS: Yes, sir.
10      Q   (BY MR. BARRIENTOS) The -- all right. At this
11  point, you decided you needed to call security?
12      A   Yes, sir.
13      Q   And that you needed -- he needed to be further
14  restrained?
15      A   Yes, sir.
16      Q   Did you call security because you thought you --
17  that you needed their approval for further restraint or did
18  you call them to help you restrain him if you needed it?
19      A   To assist me, yes.
20      Q   Okay. Did you already have in mind what further
21  restraints you wanted to use at that time?
22      A   Possibly anything I had there to utilize, leg
23  shackles, my handcuffs or anything that they would provide o
24  assist me in restraining him with.
25      Q   Let me ask you a little bit about the other parts of

33 (Pages 126 to 129)

GERARDO RAMIREZ                                                April 10, 2003

Page 130

1  the hospital before we go any further.
2      A   Yes, sir.
3      Q   Are there other patient rooms on either side of 503?
4      A   If I can recall, yes.
5      Q   Okay. And do you know whether there were patients
6  in those rooms?
7      A   No, sir.
8      Q   You don't recall or there were not?
9      A   I don't recall.
10     Q   How far away from room 503 is the -- is the nurses
11 station?
12     A   I don't recall. I don't recall.
13     Q   Is the setup at that area of the hospital such that
14 the nurses station is at the center of the floor and the rooms
15 extend out away from it?
16     A   I believe so.
17     Q   And if you don't remember the exact distance, can
18 you tell me whether 503 was at the end of the hall or about in
19 the middle or right next to the nurses station?
20     A   I believe at the end of the hall, hallway area.
21     Q   All right. And I believe you already told me you
22 don't know whether there was -- there was any other security
23 on duty on that floor?
24     A   No, sir.
25     Q   Do you know what floor of the hospital this was in

Page 131

1  relation to -- is this the top floor or near the top?
2      A   It is the top floor. Exactly where, I wouldn't
3  know.
4      Q   Are there any other security personnel that have to
5  be bypassed or do you have to go through to get to that area
6  of the hospital?
7      A   I wouldn't know.
8      Q   All right. What I want to ask you about is if at
9  this point you believe Mr. Gonzalez is a threat --
10     A   Yes, sir.
11     Q   -- to you?
12     A   Yes.
13     Q   And that your course of action at this time is to
14 call for assistance or backup, however you want to call it.
15     A   Yes, sir.
16     Q   You made a decision to go over and use the
17 telephone.
18     A   Yes, sir.
19     Q   Is there some reason you did not go to the door
20 which was right here next to you and leave the room to see if
21 there were any other security personnel available?
22     A   It being the situation where he began to stand up,
23 I didn't want to -- I didn't want to leave him unattended at
24 the time. I didn't want to leave the area for fear that, you
25 know, he could further injure himself or try to -- to do

Page 132

1  something.
2      Q   Okay. Well, it is correct, isn't it, that you could
3  have summoned help from one of the other hospital personnel or
4  security without having to leave him?
5      A   I called out. I called out. I called out toward
6  the hallway area, but I don't believe anybody heard me.
7      Q   Okay. Now let me ask you. You say you called out
8  for help. Were you calling out for help during this initial
9  period where he was talking to you standing beside his bed?
10     A   I am sorry. Say it again.
11     Q   When was the first time you called out for
12 assistance?
13     A   Okay. That was when -- before I had gone over to
14 use the phone, I had made that decision to go out and go by
15 the doorway, because, see, I wasn't sitting at the time when I
16 -- when I began to instruct Mr. Gonzalez to get back into bed.
17 I wasn't sitting in that area. I had placed myself just a few
18 feet prior, in front of the bed area when I had advised him
19 that he needed to stay, get back into bed, I moved from that
20 seat position. And then when the -- he failed to comply, I
21 went back to that area by the doorway and called out for
22 somebody to call security. When nobody or I received no
23 response from anybody outside, I went and used the phone.
24     Q   Okay. So before you went and used the phone, you
25 called out in the hallway for some help?

Page 133

1      A   Yes, sir.
2      Q   Do you recall what you said?
3      A   I see -- I said, "I need security in here. Please
4  get me some security."
5      Q   And --
6      A   In that tone.
7      Q   I am sorry. When you were yell -- when you say you
8  were yelling, where were you when you were yelling out into
9  the hallway for assistance?
10     A   By the doorway.
11     Q   Okay. Why don't you make an X there with this pen?
12     A   (So done)
13     Q   Okay. And there you were -- you were in a position
14 where you could watch him, keep your eye on him, and at the
15 same time --
16     A   Yes, sir.
17     Q   -- call out to the hallway?
18     A   Yes, sir.
19     Q   When I say -- when I asked you when you -- when you
20 called or asked for assistance, how did you do that?
21     A   I called out by stating, "I need security in here."
22     Q   Okay. But did you call out in the same way that you
23 just told me, "I need security"?
24     A   Yes, sir.
25     Q   Or did -- did you yell or did you speak?

34 (Pages 130 to 133)

GERARDO RAMIREZ                                                                      April 10, 2003

Page 134

1     A    I yelled.
2     Q    How many times?
3     A    I would say about maybe two or three.
4     Q    Could you see any other hospital personnel from
5    where you were?
6     A    No, sir.
7     Q    There is a door on that room.  Is that correct?
8     A    Yes, sir.
9     Q    Do you know whether the door could be locked?
10    A    No.
11    Q    The door has a handle on the outside of it, does it
12   not?
13    A    I believe so.
14    Q    Okay.  The door can be held shut from the outside?
15    A    Yes, sir.
16    Q    Do you know the dimensions of the door?
17    A    No.
18    Q    Do you know whether the hospital bed fits inside the
19   room?
20    A    Yes.
21    Q    I mean, fits -- fits through the door.  Excuse me.
22    A    Yes.
23    Q    Obviously it fits in the room.  Do you know whether
24   the hospital bed can fit through the door?
25    A    Yes, sir.

Page 135

1     Q    All right.  Is there some reason you did not leave
2    the room and hold the door shut if you felt that Mr. Gonzalez
3    was a threat to you?
4     A    At that time?
5     Q    Until assistance arrived.
6     A    No.
7     Q    Okay.  Would you agree with me that would have been
8    a -- an alternative choice that you could have made at the
9    time?
10         MR. GARZA:  Objection.  Form.
11         THE WITNESS:  Yes.
12    Q    (BY MR. BARRIENTOS) And given the fact that Mr.
13   Gonzalez was in there alone, that is, there was no one else in
14   the room that he could have put in danger, that stepping
15   outside the room and shutting the door and waiting for
16   assistance to arrive would have been a reasonable thing for
17   you to do.
18         MR. GARZA:  Objection.  Form.
19         THE WITNESS:  Yes.  But the fact that he is
20   also -- he could cause a danger to himself at that time was a
21   factor as well.  I felt that he could have maybe, you know,
22   when he began -- began -- how do I put it?  He became a little
23   bit irate at the time when he continued to refuse my commands
24   and stuff, and started tugging at the chain, which is his
25   restraint, I got a sense that, you know, he could maybe start

Page 136

1    getting upset.  And he could start to maybe hurt himself.
2     Q    (BY MR. BARRIENTOS) Okay.  Well, at that point, did
3    you feel that he was a bigger threat to you or a bigger threat
4    to himself?
5     A    More to himself.
6     Q    All right.  I understand your -- your explanation of
7    that concern for his well being.  But what I want to ask you
8    again is do you agree that it would have been a reasonable
9    alternative for you to step outside the room, and to shut the
10   door, preventing his escape and/or leaving the room and
11   waiting for backup?
12         MR. GARZA:  Objection.  Form.
13         THE WITNESS:  Yes, sir.
14    Q    (BY MR. BARRIENTOS) All right.  Now, if you
15   perceived a threat from Mr. Gonzalez, did you -- did that --
16   that threat that you perceived abate or stop after you decided
17   to go and use the telephone?
18    A    No.
19    Q    Okay.  So you are telling me that you perceived a
20   threat from Mr. Gonzalez and you felt he was a threat to your
21   safety?
22    A    Yes, sir.
23    Q    And, in spite of that threat, you went across the
24   room, diagonal across the room, to use the telephone to call
25   for backup?

Page 137

1     A    Yes, sir.
2     Q    And you did that even though it would take you,
3    basically, right across his path and in much closer proximity
4    to him than you were originally?
5     A    Yes, sir.
6     Q    And it would have put you within his reach?
7     A    Not in a sense.  He still -- he was still restrained
8    so there was some immobility there.
9     Q    Okay.  Will you agree it would have put you -- you
10   would have had to get closer to him than you were when this
11   conversation with him started?
12    A    Yes, sir.
13    Q    And you agree that it would have put him -- put you
14   in a position where he was between you and the only way to get
15   out of the room?
16    A    Yes.
17    Q    Okay.  And I say that, I assume the window didn't
18   open.
19    A    No, sir.
20    Q    Even if it did, it was on the fifth floor?
21    A    Exactly.
22    Q    Okay.  All right.  Well, let me -- let me ask you,
23   did you -- did you make a conscious decision to go over there
24   in spite of this danger or did you even think about it when
25   you went over to use the phone?

                                                      35 (Pages 134 to 137)

GERARDO RAMIREZ                                                      April 10, 2003

Page 138

1    A   I don't recall. I am sorry. I am sorry.
2    Q   Okay. All right. And, if you would, with -- with
3  this pen also, if would you kind of do, maybe with a dot or a
4  dotted line or something, the path you took to go use the
5  phone?
6    A   (So done)
7    Q   All right. And what -- what happened after you
8  walked across the room to use the telephone?
9    A   When I went and reached for the phone, Mr. Gonzalez
10 came across the bed as I was dialing and attempted to reach
11 for me.
12   Q   Okay. When you say he came across the bed --
13   A   To the right side.
14   Q   To the right side of the bed?
15   A   Right side of the bed.
16   Q   Okay. So that would have been the side of the bed
17 where his IV was?
18   A   Yes, sir.
19   Q   So, if I understand that maneuver correctly, then,
20 his left arm -- can you hold up your left hand?
21   A   Yes.
22   Q   That hand would have been handcuffed to the opposite
23 side of the bed?
24   A   Yes, sir.
25   Q   Will you extend it?

Page 139

1    A   Yes, sir.
2    Q   So his hand was handcuffed to the opposite side of
3  the bed. The bed was up next to him?
4    A   Yes, sir.
5    Q   And you would have been in a position over to Mr.
6  Gonzalez -- over to your right?
7    A   Yes, sir.
8    Q   And did you say anything else to him during the time
9  that you were walking over to use the telephone?
10   A   No, sir.
11   Q   Did he say anything else to you?
12   A   No, sir.
13   Q   He rolled back over the bed?
14   A   Yes, sir.
15   Q   And you said he reached -- what did you say again?
16 He reached for you?
17   A   He reached for me.
18   Q   All right. When you say he reached for you, can you
19 tell me specifically what you mean by that?
20   A   He reached out his hand and tried to either grab me,
21 just grab me, in a sense.
22   Q   Okay. Now, did he have anything in his hand?
23   A   No, sir.
24   Q   When you say he reached out to you, I want to make
25 sure I understand. He didn't swing at you or strike you?

Page 140

1    A   No, sir.
2    Q   Or attempt to do that?
3    A   No, sir.
4    Q   He reached out towards you?
5    A   Yes, sir.
6    Q   Did he tell you at that time that he was going to
7  hit you or strike you?
8    A   No, sir. He did not.
9    Q   Did he actually touch you?
10   A   No. He did not.
11   Q   All right. Now, at this point -- well, let me ask
12 you. You say he reached for you. Was there anything in that
13 area of the room -- do you know whether he was reaching for
14 anything else, for example, a telephone?
15   A   I was the only person there. And I was the only --
16 I was the closest object. I perceived that he was reaching
17 for me.
18   Q   That's what you believe?
19   A   Yes, sir.
20   Q   Okay. Did you already have the telephone in your
21 hand at that point?
22   A   Yes, sir, I did.
23   Q   Had you dialed yet?
24   A   I was dialing the first two numbers when I observed
25 that he was reaching toward me.

Page 141

1    Q   Okay. All right. Now, if he reached towards you,
2  and, as you say, he didn't actually touch you, what did you do
3  in response?
4    A   I ordered him to get back and move -- move back,
5  move away.
6    Q   All right. And did you do anything else besides
7  tell him to do that?
8    A   I continued to give verbal commands and he continued
9  to reach. And then he began dragging the bed toward me. And
10 in that sense, I pulled my -- my impact weapon.
11   Q   Okay.
12   A   And I ordered him back.
13   Q   All right. So the -- how many times did you tell
14 him to get back?
15   A   I don't recall. But numerous.
16   Q   Okay. And your testimony is at this point, he did
17 not comply with that?
18   A   No, sir.
19   Q   At this point, if you had chosen to or wanted to,
20 could you have moved further away from him?
21   A   I could have.
22   Q   Okay. And at this point, if you had chosen to, it's
23 correct that you could you have -- have gotten out of the
24 room.
25       MR. GARZA: Objection. Form.

36 (Pages 138 to 141)

GERARDO RAMIREZ                                                April 10, 2003

**Page 142**

1    THE WITNESS: Yes, sir.
2    Q    (BY MR. BARRIENTOS) All right. Now, if you say he
3    reached for you but -- did not actually touch you, and then he
4    began to drag the bed.
5    A    Yes, sir.
6    Q    Is that correct? Did you remain in the same place
7    while all of this was occurring or were you moving at all?
8    A    I was somewhat moving, yes.
9    Q    I believe you told us at this point or at some point
10   during this -- this time period, you took out your impact
11   weapon?
12   A    Yes, sir.
13   Q    The ASP. All right. And did you strike Mr.
14   Gonzalez with the ASP?
15   A    Yes, I did.
16   Q    Did you tell him before you struck him that you were
17   going to strike him?
18   A    I don't recall.
19   Q    Where did you strike him?
20   A    On his arm.
21   Q    Which arm?
22   A    His -- I believe it was his -- the right arm.
23   Q    Okay.
24   A    The right arm.
25   Q    Can you show us the area of the right arm you

**Page 143**

1    believe you struck him the first time?
2    A    Either the forearm or upper bicep area.
3    Q    All right. Did you hit him again?
4    A    Yes, sir.
5    Q    Where?
6    A    The same area. The same area. It was another
7    strike to the upper bicep area.
8    Q    How many times total do you believe you struck Mr.
9    Gonzalez with the ASP?
10   A    I don't recall. I don't recall.
11        THE COURT REPORTER: Can you speak up, please.
12        THE WITNESS: Yes, sir. It was after
13   continuous commands to step back and step back. And he would
14   not -- and he continued to advance. So there were several
15   strikes. I don't recall the exact number, but I would say
16   there were several.
17   Q    (BY MR. BARRIENTOS) Well, let me ask you about the
18   ones you remember. Do you remember the first two because you
19   told me about them?
20   A    Yes, sir.
21   Q    Do you remember any other specific blows that you
22   struck?
23   A    No. Just the two, and that there were numerous
24   after that.
25   Q    Okay. When you say numerous, I am not -- can you

**Page 144**

1    give me any more specific idea. Are we talking about another
2    couple or are we talking about five more, 10 more?
3    A    I would say about five at most total.
4    Q    What areas of his body were struck?
5    A    The upper bicep area, mostly.
6    Q    Any other area? Was it -- did you ever strike him
7    in the head?
8    A    No. There was an attempted strike on his lower
9    legs, but he moved.
10   Q    Now, during all of this time that you were using the
11   ASP to try and subdue him, did Mr. Gonzalez actually touch
12   you?
13   A    He attempted to, but, no.
14   Q    All right. And during the time that you were using
15   the ASP to subdue him, if you had chosen to, could you have
16   put more distance between you and him?
17   A    At that point, no.
18   Q    At that point. At which point?
19   A    At that point where we began to -- where the strikes
20   became -- to come into play, he was getting closer and closer
21   to me. And that was -- that option was no -- no longer
22   available to me.
23   Q    At the time you began hitting him with the ASP, if
24   you had chosen to, would you have been able to leave the room
25   A    I am sorry?

**Page 145**

1    Q    Would you have been able to leave the room to get
2    out?
3    A    At what point? I am sorry.
4    Q    At the time you began striking him with the ASP?
5    A    Yeah. Yes, sir.
6    Q    Is there some reason you chose not to do that?
7    A    No. It was just the fact that I was going to
8    attempt to -- to subdue him and control the situation so that
9    he no longer posed a threat to himself or myself.
10   Q    Okay. And when you said you perceived a threat from
11   Mr. Gonzalez, what is it that you believe that he could do to
12   you given the condition on the partial restraints that he had
13   at the time?
14   A    At what point?
15   Q    At -- at the point where you begin using the ASP.
16   A    I am sorry. Can you --
17   Q    Yeah. At the point where you -- where you took out
18   the ASP and began to hit him with it --
19   A    Okay.
20   Q    -- what threat did you perceive from Mr. Gonzalez?
21   What is it that you thought that he could or would do to you?
22   A    Grab hold of me. Grab hold of me. Strike me. It
23   -- it varied. But, basically, he could have struck me. He
24   could have grabbed me. And that would put me closer in
25   contact with him where he could have reached me. And once he

37 (Pages 142 to 145)

GERARDO RAMIREZ                                                April 10, 2003

**Page 146**

1  got ahold of me, I have other weapons that are available to
2  him to utilize.
3  Q   When -- let me ask this. Before using the ASP, did
4  you consider or think about using any of the training, the
5  self defense or hand-to-hand combat, or Tae Kwan Doe from your
6  black belt training?  Did you consider using any of those
7  techniques or training to try to subdue him before going for
8  the -- the ASP?
9  A   Yes, it was considered.
10 Q   Okay. Did you actually try that?
11 A   No, sir.
12 Q   All right. Now, while using the ASP, did you
13 believe that the threat that Mr. Gonzalez presented -- you
14 have described it as his -- his being able to strike you and
15 grab you?
16 A   Yes.
17 Q   So at that point, you believed that he might -- he
18 might be able to cause you some bodily injury?
19 A   Yes, sir.
20 Q   Did you believe that he might be able to cause you
21 death or serious bodily injury?
22 A   No, sir.
23 Q   All right. After using the ASP, did you use any of
24 other equipment that you had available to you?
25 A   Yes, sir.

**Page 147**

1  Q   What did you use?
2  A   My pepper spray.
3  Q   What was it that caused you to be able to go to use
4  your pepper spray in favor of -- instead of the ASP or did you
5  continue to use both?
6  A   I utilized both, both.
7  Q   Okay. So you are striking him with the ASP?
8  A   I discontinued the use of the ASP after I went to my
9  second option. And then after the second one failed, which
10 was the pepper spray, I began to utilize my baton once again.
11 Q   Okay. What did you do with the baton -- with the
12 baton while you took out the -- the mace, the pepper spray?
13 A   I placed it on the ground. I dropped it.
14 Q   You dropped it?
15 A   Yes.
16 Q   Okay.
17 A   Alongside me.
18 Q   All right. Well, let me ask a little bit about
19 that. Did you -- did you intend to drop it?  In other words,
20 did you put it down so you could get the pepper spray out or
21 did you drop it accidentally during the -- during the action
22 of swinging it at him?
23 A   No. I dropped it in order to get my other -- my
24 pepper spray out.
25 Q   All right. Did getting your pepper spray out

**Page 148**

1  require two hands?
2  A   No, sir.
3  Q   If it doesn't require it, did you happen to use two
4  hands on this occasion?
5  A   No, sir.
6  Q   Is there some reason you dropped the ASP in order to
7  get the pepper spray?
8  A   Yes, sir.
9  Q   What is that?
10 A   I was holding off the bed that he was trying to push
11 on to me.
12 Q   Okay. Mr. Gonzalez was pushing the bed towards you?
13 A   Yes, sir.
14 Q   And what area of the room were you in when this
15 occurred?
16 A   I would say about right here.
17 Q   Okay. I tell you what I am going to do. Where you
18 first marked your path to go use the telephone, would you put
19 an A at the end of that, you know, and circle it?
20 A   (So done)
21 Q   So we know that is where you were when you went to
22 use the phone?
23 A   Yes, sir.
24 Q   When you initially started to use the ASP?
25 A   Yes, sir.

**Page 149**

1  Q   And then through the sequence of events you
2  described, you moved more towards the middle of the room -- or
3  you tell --
4  A   More toward --
5  Q   You tell me.
6  A   Actually, toward the corner, the east corner of the
7  room.
8  Q   Okay. Why don't you draw in for me -- continue that
9  dotted line and show me where you were when you began to use
10 the pepper spray.
11 A   Okay. About right here.
12 Q   Why don't you draw a B at that location, sir.
13 A   (So done)
14 Q   You may need to do it a little darker so I can tell
15 it is a B.
16 A   There. My handwriting is bad. I am sorry.
17 Q   That's okay. All right. And you are at this area.
18 And is the bed in about the position where it is now in this
19 diagram that is drawn in by the officer who did the diagram?
20 A   Almost, but not quite. It is at a different angle.
21 Q   Okay.
22 A   At that point.
23 Q   And at that time, is it still on its wheels and
24 upright?
25 A   Yes, sir.

38 (Pages 146 to 149)

GERARDO RAMIREZ                                                                    April 10, 2003

**Page 150**

1    Q    And Mr. Gonzalez -- where is Mr. Gonzales at this
2    point?
3    A    He is at the far corner by the door side area,
4    toward the end of the couch.
5    Q    Okay. So Mr. Gonzalez is on the side of the bed
6    between the -- the east wall and the side of the bed?
7    A    Yes. Right over here by the couch area.
8    Q    Okay.
9    A    Toward the end of the couch.
10   Q    So he is between the couch and the couch that is
11   marked as B?
12   A    Yes, sir.
13   Q    And he is trying to push the bed towards you?
14   A    Yes, sir.
15   Q    And during this time, did he continue to try and get
16   closer to you or was he -- let me ask you. He was trying to
17   push the bed towards you?
18   A    Yes, sir.
19   Q    Where along the bed was he located when he was
20   trying to do this?
21   A    On the other end.
22   Q    When you say the other end, can you be more
23   specific?
24   A    Yes. By the railing, but toward the other end of
25   the -- the bed area.

**Page 151**

1    Q    Toward the head of the bed?
2    A    Yes, towards the head of the bed.
3    Q    And you were at the foot of the bed?
4    A    Yes, sir.
5    Q    And you-all were, generally speaking, on opposite
6    sides of the bed lengthwise?
7    A    Yes, sir. Somewhat.
8    Q    And obviously at that end of the bed it would -- it
9    would be impossible for him to reach you?
10   A    No.
11   Q    No?
12   A    No. Because he was not exactly at the head of the
13   bed. He was on the corner side of the bed by the railing, by
14   the railing.
15   Q    Well, let me ask you. At that location while he was
16   pushing the bed towards you, was he still trying to get close
17   to you or was he just pushing the bed towards you?
18   A    He was still trying to get close to me.
19   Q    All right. And so you made a decision at that point
20   to put your ASP down?
21   A    Yes, sir.
22   Q    Where did you put it?
23   A    Alongside -- along my side. Just along my right
24   side, I believe.
25   Q    Okay. And did you put it on the ground --

**Page 152**

1    A    Yes, sir.
2    Q    -- or on some other object?
3    A    On the ground.
4    Q    And at that point, you took out your pepper spray?
5    A    Yes, sir.
6    Q    All right. And the pepper spray, did you tell him
7    you were going to use it at that point?
8    A    No, sir.
9    Q    Did you use it?
10   A    Yes, sir.
11   Q    Where did you spray?
12   A    Directly on the facial area of Mr. Gonzalez.
13   Q    Okay. Did you hit him in the face?
14   A    Yes, sir.
15   Q    Okay. How many times did you spray?
16   A    Twice.
17   Q    And did you hit him in the face both times?
18   A    Once on the -- the first time yes, I did strike him
19   full in the face. The second time, along the side, I believe,
20   the side. He turned.
21   Q    How long between the application of the pepper
22   spray?
23   A    I would say maybe more than a brief two seconds.
24   Q    What was his reaction to the pepper spray?
25   A    At first no change in his -- in his direction as far

**Page 153**

1    as, you know, stopping, complying. After a brief -- more
2    times, seconds -- a couple of seconds afterwards, he began
3    to -- the effects of the OC, the pepper spray, began to take
4    effect. He began to clench his eyes and try to rub his eyes
5    with his free hand and attempted to -- to just wipe it off.
6    And, at that point, he stated, "Okay. Okay. I give up. I
7    will stop. You know, just don't -- don't hit me no more. I
8    will get on the ground." And that was it.
9    Q    All right. During -- during the altercation where
10   -- at this point where he is at the -- towards the head of the
11   bed and you sprayed him with the pepper spray, from what you
12   told me, it sounds like that debilitated him for some period
13   of time.
14   A    Yes, sir.
15   Q    At that time, did you hear or have any conversation
16   with anyone, any other hospital personnel or security person?
17   A    No, sir.
18   Q    Do you remember anybody yelling in to you?
19   A    I could hear people in the -- in the background in
20   the hallway area stating, "The officer needs security."
21   Because during that whole time, I was calling out for security
22   and for assistance, attempting to get somebody's attention to
23   send me some security help. Around that time, when he was
24   sprayed, I could hear a nurse, or it could have been somebody,
25   one of the employees, in the hallway area telling somebody

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100              SAN ANTONIO, TEXAS 78230                      (800) 969-3027
                                                                        a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                      April 10, 2003

**Page 154**

1  else to call for security, that the officer needs security.
2      Q   Okay.  All right.  At Exhibit Number 15, page 49,
3  there is a physician's progress note.  And it lists here
4  9/19/00, time 0322.  It reads as follows:  Heard cry for help
5  coming from south side of hall.  Heard loud rattling, thumping
6  sounds, saw patient in 503-01 standing at the doorway yanking
7  on handcuff to the left hand attached to the bed.  Witnessed
8  by M. Lucio RN, M. Valdez, LVN, and L. Vega, LVN.  At this
9  time the officer yelled, "Get down.  Get down.  I sprayed
10  mace."  Do you recall making that statement?
11      A   No, I don't recall.
12      Q   Okay.  Is it possible that it happened and you just
13  don't remember?
14      A   It possibly could have happened, but I don't recall.
15      Q   Okay.  But in either case, you -- sitting here
16  today, you don't remember seeing or talking to anybody who was
17  outside?
18      A   No.  At that point I -- I wasn't in the -- the area
19  by the doorway.  And I had my full view on him better than
20  anybody else.  But I don't recall anybody coming toward the
21  doorway area where I could view them or see if anybody was
22  there.
23      Q   The next entry here is at 0324, two minutes later:
24  Security paged staff.  Loud banging sound heard.  Nurses came
25  back to nurses station for protection.

**Page 155**

1          Let me ask, you sprayed him twice with the pepper
2  spray and he said, "Okay.  Okay.  I will give up.  I will --"
3      A   He --
4      Q   -- I will sit down"?
5      A   "I will get on the ground."
6      Q   Get on the ground.  Okay.  And did he do that?
7      A   No.
8      Q   What happened at that point after he made that
9  statement?
10      A   At that point, I reholstered my pepper spray, or I
11  was trying to, and then he began pushing the bed once again on
12  top of me trying to get over as well, over the bed toward me.
13  And that's when I -- I dropped my pepper spray.  I don't know
14  exactly where.  And then reached again for my baton that was
15  on the floor.
16      Q   And did you get your baton?
17      A   Yes, sir.
18      Q   And then what did you do then?
19      A   As he continued to try to reach for me and climb
20  over the bed, I struck him several times.
21      Q   Where?  What area of the body?
22      A   The arm, same arm area.
23      Q   All right.  And how long did this -- how long did
24  this continue?
25      A   Maybe a small brief period, a window of a couple of

**Page 156**

1  seconds, anywhere from five to 10.  I am not sure.
2      Q   How much time had passed from the time you walked
3  over to the telephone and he first, as you say, reached for
4  you, until the point where you used the mace and -- excuse me
5  -- from there until the time that you had to use the ASP for
6  the second time?
7      A   A window of maybe two to three minutes.
8      Q   All right.  And after you begin to use your ASP the
9  second time, did he -- did he continue to try and push the bed
10  toward you?
11      A   I am sorry?
12      Q   Did he continue to try and push the bed towards you?
13      A   Can you restate the whole --
14      Q   Sure.
15      A   Say the question --
16      Q   After you dropped -- after you put the pepper spray
17  away or dropped it, whichever, and you picked up the ASP and
18  began striking him again, how long did that last?
19      A   I am not sure.  A few seconds after that.
20      Q   Now, at this point, are you in about the area where
21  you have drawn the B here on the diagram, Exhibit 16?
22      A   Yes, sir.  Yes, sir.  I am actually -- well, to tell
23  you truth, I am actually more -- I am being pushed off to the
24  -- toward the corner area of the room.
25      Q   Now, B is the couch that is there in the room.  Is

**Page 157**

1  that correct?
2      A   Yes, sir.
3      Q   Do you know the dimensions of the couch?
4      A   No, sir.
5      Q   And if you -- if you don't know the dimension, is it
6  correct that the bed that is on wheels to will be blocked
7  by the couch if you wheel the bed up to the couch?
8      A   I am sorry?
9      Q   If you wheel the bed up to the couch, the couch
10  blocks the bed.
11      A   I don't understand the question.
12          MR. GARZA:  Objection.  Form.
13          THE WITNESS:  I don't understand what you are
14  saying.
15      Q   (BY MR. BARRIENTOS) Is it correct that the -- the
16  couch would block the path of the bed that is on wheels if you
17  wheeled the bed over to the couch?
18      A   I don't understand the question.  I am trying to
19  focus.  I don't understand it.  I am sorry.
20      Q   There is a couch against the wall.
21      A   Okay.
22      Q   Correct?
23      A   Okay.
24      Q   We will look at it on the video in a minute, but I
25  want to see if you remember.  There is a couch against the

40 (Pages 154 to 157)

GERARDO RAMIREZ                                                                April 10, 2003

Page 158

1   wall.
2   A  Yes. Okay.
3   Q  It is of some width?
4   A  Yes, sir.
5   Q  Now, you understand or do you agree that the couch
6   and the bed cannot occupy the same space?
7   A  Yes.
8   Q  So that if you wheel the bed over to the couch, at
9   some point the bed or the wheels of the bed is going to bump
10  into the couch.
11  A  Oh, yes, sir.
12  Q  And will not make it all the way to the wall.
13  A  Yes, sir.
14  Q  And so the distance between the edge of the couch
15  and the wall is an area in which the bed cannot reach or
16  block?
17  A  Yes, sir.
18  Q  And that area is an area that is wide enough for a
19  person to pass through.
20      MR. GARZA: Objection. Form.
21      THE WITNESS: Yes, sir.
22  Q  (BY MR. BARRIENTOS) All right. How -- how long
23  is there anything that occurred during the second time that
24  you used the ASP that -- that caused you to stop using the
25  ASP?

Page 159

1   A  Yes.
2   Q  What happened?
3   A  Basically, when -- the bed at that point became
4   overturned. When he reached underneath it and grabbed it,
5   tossed it on its side. He looked at me and I looked at him.
6   I said -- I continued to give orders to get on the ground and
7   cease. And he refused.
8       Then he caught eye of the -- of the shackles. They
9   were across the room right by the bed, you know, where it was
10  overturned. And then he once again looked at me. I looked at
11  him. And I knew that he was going to go for the shackles.
12  So, basically, it was more of a, you know, at that point, I
13  had to go -- I knew I had to go and reach for those shackles
14  before he did. But I -- but I could not.
15  Q  All right.
16  A  So -- I am sorry. So at that point he began to --
17  after grabbing the shackles, he began to climb over the other
18  side of the bed and continued to lunge for me. I -- I
19  continued to put in a few strikes at that point on his upper
20  shoulders area -- shoulder area where the bicep is and
21  continued to give my final strikes. When I see that he was
22  getting closer and started to swing the shackles at me, I
23  immediately just dropped my baton and went to the corner of
24  the room to unholster my weapon, because that's when I started
25  feeling the blows.

Page 160

1   Q  Let me stop you right there. We will come back to
2   that point.
3       MR. GARZA: You tell me, just when an
4   opportunity avails itself, when you fell comfortable, if we
5   can take a break. We are going on about two hours. Whenever
6   you feel comfortable in your questioning.
7   Q  (BY MR. BARRIENTOS) I want to see if I can figure
8   out, when you said he turned the bed over?
9   A  Yes, sir.
10  Q  When he turned the bed over, which side of the bed
11  was he on?
12  A  He was on the -- he was still on that -- when he
13  turned the bed over, are you saying he -- at what point?
14  Q  Where was he? Which side of the bed was he on when
15  he turned the bed over?
16  A  He was on the same side, which was the left side of
17  the bed.
18  Q  He was on the same side of the bed to which his left
19  hand was cuffed?
20  A  Yes, sir.
21  Q  Okay. So if -- if you were Mr. Gonzalez and you had
22  been laying in the bed and the bed was this table in front of
23  us, your hand would have been handcuffed -- your left hand, if
24  I can see your left hand, please, would have been handcuffed
25  to the left side of the bed?

Page 161

1   A  Uh-huh.
2   Q  And so when he turned the bed over, he was on this
3   left side of the bed?
4   A  Yes, sir.
5   Q  And he turned it over towards him or away from him?
6   A  I believe it was away from him.
7   Q  So that the wheels of the bed would have been closer
8   to him and the mattress side of the bed would have been away
9   from him?
10  A  Yes, sir.
11  Q  All right. And when he did this, at that point, the
12  bed was no longer on its wheels. Is that correct?
13  A  No, sir. It was on its side.
14  Q  So it could not be moved in the same way that it had
15  been before because it was no longer on its wheels.
16  A  No, sir.
17  Q  Now, in order to move the bed, a person would have
18  to drag it.
19  A  Yes, sir.
20  Q  All right. Now, you mentioned a -- that there was a
21  set of shackles and that he noticed a set of shackles?
22  A  Yes, sir.
23  Q  And that you noticed them as well?
24  A  Yes, sir.
25  Q  It sounded like you were saying there was -- that

41 (Pages 158 to 161)

GERARDO RAMIREZ                                                                April 10, 2003

---

Page 162

1   there was kind of a race for the shackles.
2       A   Yes, sir.
3       Q   All right. So let me ask. See if I understand
4   correctly. You were are on the opposite side of the bed from
5   Mr. -- from Mr. Gonzalez. And when the bed -- when he turned
6   the bed over, did you remain in that area?
7       A   I am sorry?
8       Q   When he turned the bed over on its side, did you
9   remain in the same area at the opposite foot of the bed?
10      A   From this area over here?
11      Q   Yes.
12      A   No.
13      Q   Okay. Where did you go?
14      A   I went to this area.
15      Q   Okay.
16      A   Because at that point, the bed was facing this way.
17  It was facing on its side this way.
18      Q   Okay. I tell you what I want you to do. Instead of
19  -- I think really the tape -- you can show us on the tape.
20  But what I want to know is the path you took. We have the
21  path from A to A and then back to B. And then after this,
22  where you went.
23      A   Okay.
24      Q   If you can draw that.
25          MR. GARZA: What -- what is the timeframe,

---

Page 163

1   Counsel, that you are asking for?
2           MR. BARRIENTOS: This is after -- immediately
3   after the time that Mr. Gonzalez turns the bed over on its
4   side.
5           THE WITNESS: From here. From B to here.
6       Q   (BY MR. BARRIENTOS) Okay. Can you put a C there and
7   circle it for us?
8       A   (So done)
9       Q   Okay. And this was the area you went to, if I
10  understand correctly --
11      A   Yes.
12      Q   -- in an effort to go --
13      A   Try to.
14      Q   Try to get the shackles?
15      A   Yes. Because he was in that consistent area right
16  there. I tried to go around him.
17      Q   Okay. And can you draw in for us where the shackles
18  would have been. I don't know if you are an artist or not.
19  But if you just could draw two circles with a line between
20  them to indicate handcuffs or whatever -- or whatever symbol
21  you want to use. Well, just write in the world shackle. That
22  is fine.
23      A   Okay.
24      Q   Shackle. Okay. So this is the area you were trying
25  to get to by the sink?

---

Page 164

1       A   Yes, sir.
2       Q   And that's the area he was trying to get to?
3       A   Yes, sir.
4       Q   When he turned the bed over, was he on the side of
5   the bed -- I think I have already asked this. He is the side
6   of the bed where the wheels are?
7       A   Yes, sir.
8       Q   Okay. All right. And he went for the shackles at
9   the same time you did?
10      A   Yes, sir.
11          MR. BARRIENTOS: We can take a break now.
12          (Short break)
13      Q   (BY MR. BARRIENTOS) Officer Ramirez, I think when we
14  took -- before we took the break, we had gotten to the point
15  you were describing these events where Mr. Gonzalez had turned
16  the bed over on its side. Is that correct?
17      A   Yes, sir.
18      Q   And your testimony was at that point, you and he --
19  or you noticed at that point the set of shackles that were on
20  the counter near the sink on the opposite side of the room?
21      A   Yes, sir.
22      Q   Okay. And did you -- did I hear you testify that
23  you believed he was going to go for the shackles?
24      A   Yes, sir.
25      Q   What made you -- what did he do that made you

---

Page 165

1   believe that?
2       A   He looked at me and then, you know, he looked at the
3   shackles. I, in turn, just -- I had a feeling that he --
4   he -- that he was going to go for them. Then he -- within
5   that time frame when we looked at each other and he saw the
6   shackles, I knew what he was looking at. And within that
7   brief short period, he began to reach for them and that, you
8   know, pretty much told me that he was trying to grab them. He
9   extended his arm out, you know, his free hand, and tried to
10  reach for the shackles. He couldn't reach them at the time
11  because he was still, you know, with the bed, in a sense. And
12  he -- he was reaching for them, from what I recall. And
13  that's when I began going toward that bed area. And it was
14  sort of a race to reach them.
15      Q   All right. And you went from the area you marked as
16  spot B to about the area you marked as spot C?
17      A   Yes.
18      Q   At this time when you went from B to C, was Mr.
19  Gonzalez on the opposite side of the bed from you or on the
20  same side of the bed?
21      A   On the opposite. In other words, he was -- because,
22  see, the bed was in a different position, a different angle at
23  this point. And it was on its side this way.
24      Q   Okay.
25      A   At this point it was sideways, from where I sit, in

---

42 (Pages 162 to 165)

GERARDO RAMIREZ                                                                              April 10, 2003

Page 166

1    a sense. Just a little bit off from the sink area.
2    Q    All right. Let me ask this. If the bed was in a
3    different position than what it was in this diagram, were you
4    still on opposite sides of the bed?
5    A    Yes, sir.
6    Q    So the bed was between you and Mr. Gonzalez?
7    A    Yes, sir.
8    Q    And he was closer to the shackles than you were?
9    A    Yes, sir.
10   Q    And you made an effort at that point in time -- did
11   he actually go for the shackles and then you followed or did
12   you go first?
13   A    No. He went first, then I went, I followed.
14   Q    All right. And you said the first time he went for
15   the shackles he could not reach them?
16   A    No. I don't believe so. It sort of happened so
17   fast that, you know, it -- you know, he -- he went from point
18   A to point B. And I believe there was some trouble that he
19   had to -- to reach for them, but he was able to reach them
20   before I was.
21   Q    All right. Did you strike him after you saw him go
22   for the shackles, as you stated?
23   A    I don't believe I did. I don't recall.
24   Q    And at that point, you made a decision -- well, let
25   me ask. At that point when he was distracted and looked

Page 167

1    around for the shackles and went for the shackles, he was not
2    trying to get close to you. Is that correct?
3    A    After -- after the -- he grabbed --
4    Q    No, before he got the shackles. You said he noticed
5    the shackles and then he began to go for them?
6    A    Yes.
7    Q    Well, the shackles were on the opposite side of the
8    room from where you were. Is that correct?
9    A    Yes, sir.
10   Q    And so if he went for the shackles, there was some
11   period of time during which he actually was not coming towards
12   you but was going away from you.
13   A    Exactly.
14   Q    Is that correct? And you mentioned that he was not
15   able to reach the shackles on his first attempt. Do you know
16   how many attempts he made before he got to the shackles?
17   A    It may have been after the second reach he seemed to
18   obtain them.
19   Q    Did he have to drag the bed to get closer to the
20   scene to get the shackles?
21   A    I believe there was some point. To my knowledge, I
22   believe there was, but I can't recall too well.
23   Q    All right. And at that point where he began to
24   reach for the shackles, reach however many times he reached
25   for them, he had to -- he had to drag the bed, at that point

Page 168

1    he was actually, as I said, going away from you and not coming
2    towards you?
3    A    Uh-huh.
4    Q    Is that a yes?
5    A    Yes, sir.
6    Q    At that point, if had you chosen to do so, you could
7    have put more distance between himself and yourself?
8    A    Yes.
9    Q    In fact, if you had chosen, you could have, as we
10   discussed at the beginning, gotten out of room and closed the
11   door and held the door secure behind you?
12            MR. GARZA:  Objection. Form.
13            THE WITNESS:  I may have.
14   Q    (BY MR. BARRIENTOS) Excuse me?
15   A    I may have.
16   Q    That is something you could have done?
17   A    It was an option.
18   Q    It was possible for you to do. Is that correct?
19   A    Yes.
20   Q    And it was an option that was open to you?
21   A    Yes, sir.
22   Q    Now, at that point, you chose not to do that. Is
23   that correct?
24   A    Yes, sir.
25   Q    You chose to remain in the room with him?

Page 169

1    A    Yes, sir.
2    Q    At this point, Officer Ramirez, were you still
3    concerned that he was a threat to you?
4    A    Yes.
5    Q    Okay. At this point, your concern -- the concern
6    you expressed had earlier about him being a threat to himself,
7    was that still a concern to you at this point or was that no
8    longer a concern?
9    A    I am sorry. Can you repeat it?
10   Q    Earlier in your testimony, you indicated to me when
11   he first stood up and refused to obey your commands, you
12   believed that he was a threat to your safety?
13   A    Yes, sir.
14   Q    And I believe you told me that you also believed
15   that he was a threat to his own safety.
16   A    Yes, sir.
17   Q    Now, I want to ask you about the point here where he
18   goes away from you and decides to go for the shackles. At
19   this point, you still believe that he is a threat to you?
20   A    Yes, sir.
21   Q    Do you at this point, still believe that he is a
22   threat to himself?
23   A    In that part -- in that sense, no.
24   Q    Okay. So at this point, if you had chosen to leave
25   the room, the concern you expressed earlier about leaving him

43 (Pages 166 to 169)

GERARDO RAMIREZ                                                                    April 10, 2003

---

Page 170

1   in there by himself would no longer be applicable?
2       A   No.
3       Q   All right.  When the --
4       A   In a sense, because of the fact that at that point I
5   am starting to consider my own safety as opposed to his.  It
6   is no longer a factor in that sense.  It -- I started to worry
7   about mine more.
8       Q   All right.  So at this point, I guess you would not
9   have been concerned about his safety had he been -- had you
10  been able to -- strike that.  I am sorry.  Let me start over.
11      At this point where he goes for the shackles and is
12  going away from you, at this point where you could have gotten
13  out of the room, you would not have been concerned about
14  whether he was a threat to himself if he remained in the room
15  by himself?
16      A   No, sir.
17      Q   Okay.  All right.  And, at this point, he was -- did
18  you still consider him an escape threat?
19      A   Yes.
20      Q   Okay.  Given the fact that he was chained or
21  handcuffed to a 350 pound bed?
22      A   Yes, sir.
23      Q   On the fifth floor of the hospital?
24      A   Yes, sir.
25      Q   Is that the reason that you remained in the room?

---

Page 171

1       A   Yes, sir.
2       Q   To prevent his escape?
3       A   Yes, sir.
4       Q   All right.  You testified that he got to the
5   shackles.  Is that correct?
6       A   Yes, sir.
7       Q   After he reached the shackles, what happened then?
8       A   He climbed over the bed and then he continued on to
9   attempt to strike me.
10      Q   Okay.  Now, when you say he climbed over the bed,
11  earlier the bed was upright with the mattress on top, the way
12  it is when you lay down on the bed?
13      A   Yes, sir.
14      Q   You -- you indicated that he rolled over the top of
15  the bed.
16      A   Yes, sir.
17      Q   Once the bed was turned over, how did he get to the
18  other side?
19      A   He jumped and climbed over the side.
20      Q   He climbed over?
21      A   Yes, sir.
22      Q   Okay.  Can you demonstrate or explain for me how it
23  was that he climbed over?
24      A   He climbed over from this point of the bed and he
25  crossed over -- climbed over it toward me.

---

Page 172

1       THE COURT REPORTER:  I am sorry.  And he
2   climbed what?
3       THE WITNESS:  He climbed over and crossed over.
4       Q   (BY MR. BARRIENTOS)  When you say he climbed over
5   did he hop over the bed completely?  Did he turn his back to
6   you and lift one leg over --
7       A   Yes, sir.
8       Q   -- and then bring the other back?
9       A   Yes, sir.  That was the point.
10      Q   Okay.  Did he do this with ease or with some
11  difficulty?
12      A   With ease.
13      Q   Now, at some point in time there there is a period
14  where he climbing over the bed where he again has his back
15  to you center a second time?
16      A   Yes, sir.
17      Q   This would have been after he obtained the shackles?
18      A   Yes, sir.
19      Q   What did you do when you first saw that he was going
20  to obtain -- that he was going to get to the shackles before
21  you?
22      A   I began to continue to give verbal commands to stop,
23  get on the ground, continue to cease.  That was about all that
24  I could do at that time in my perception, you know.  I
25  continued to advise him to get on the ground.  He refused.

---

Page 173

1   And what I recall, he reached, crossed over, and then I
2   continued to give verbal commands to -- stop and cease, get
3   on the ground.  He continued to refuse.  And I believe -- I
4   believe he was struck once in the shoulder.
5       Q   With the ASP?
6       A   Yes.
7       Q   Okay.  So --
8       A   As he crossed over.
9       Q   All right.  And after he crossed over to the other
10  side of the bed, did you strike him anymore?
11      A   Yes, sir.
12      Q   How many more times?
13      A   I would say about three or four.
14      Q   What areas of the body?
15      A   Bicep area.
16      Q   When you say bicep area, which arm are you talking
17  about?
18      A   His free one, which was the right arm, the one with
19  the shackles.
20      Q   Did he strike you with the shackles?
21      A   No, sir.
22      Q   Do you know whether Mr. Gonzalez is left-handed or
23  right-handed?
24      A   No, I do not.
25      Q   How many -- the first time you were struck with the

---

44 (Pages 170 to 173)

GERARDO RAMIREZ                                                    April 10, 2003

---

**Page 174**

1  shackle -- well, let me ask. How many times were you struck
2  with the shackles?
3      A   I don't recall.
4      Q   Do you recall being hit -- the first time you were
5  hit?
6      A   In a sense, I do. But I just recall the -- feeling
7  the blow. But I don't -- there is no -- it happened so fast
8  that I could not perceive the time or remember --
9      Q   What area of the body were you struck?
10     A   I believe the upper part of the area of the
11  forehead.
12     Q   At that time, did you still have the ASP in your
13  hand?
14     A   Yes, sir.
15     Q   Okay. Do you remember any other blows -- blows
16  specifically besides the one you just mentioned?
17     A   After that, I remember feeling another blow toward
18  the -- this part of the facial area. And then I attempted to
19  block some of the -- and block some of the blows and dodge a
20  couple of the others, but I just continued to feel strikes
21  toward my facial area. And, in that sense, I turned around to
22  try to deflect the blows. And I could feel some on my -- on
23  my back.
24     Q   How long did this part of the altercation last where
25  he had the shackles and you had the ASP?

---

**Page 175**

1      A   I don't recall. I don't recall.
2      Q   All right. At some point, did you abandon the use
3  of your ASP?
4      A   Yes, sir.
5      Q   When was that?
6      A   When I -- when I turned around and to -- to have the
7  blows deflected from my facial area and I crouched to the, I
8  believe -- not crouched, but just went to the corner of the
9  room to guard myself, you know, from getting -- from not
10  getting struck. That's when I reached for my handgun.
11     Q   All right. And you said you went to the corner of
12  the room.
13     A   Yes, sir.
14     Q   I am going to ask you one more time with Exhibit
15  Number 16 if you can make another line to go from C to the
16  position where you were and put in D, put a D at that
17  location.
18     A   To the very corner or --
19     Q   To the place you were when you began -- when you
20  abandoned the use of your ASP and went for your handgun.
21     A   Okay.
22     Q   Okay. All right. Now, at this point, when you
23  arrived at that location, is it correct that you made a
24  decision, a conscious decision to use your handgun?
25     A   Yes, sir.

---

**Page 176**

1      Q   And let me ask you. Did you decide at that point to
2  take it out and use it or did you decide to take it out and
3  threaten to use it to see if that would stop Mr. Gonzalez?
4      A   To threaten to use it.
5      Q   All right. Tell me what you did exactly when you
6  got to that point.
7      A   I remember at that point I turned around and I
8  unholstered by weapon -- well, actually, I unholstered my
9  weapon and turned around. And then I pointed it at Mr.
10  Gonzalez and I advised him to get on the ground and stop and
11  cease what he was doing and drop the weapon, continuously
12  telling him drop the weapon. Mr. Gonzalez refused and
13  continued to try to strike me. I tried to turned around and
14  deflect the blows. I remember getting hit maybe one more
15  time. And I -- I ordered him to stay back and he would not.
16  At that point, Mr. Gonzalez attempted to strike me one more
17  time. And I -- I remember stepping back. And he was stating
18  "mata me, mata me." And I said, "I am not going to kill you."
19  I go, "Put it down. Drop your weapon. Put it down." I
20  continued to give verbal commands. And he raised his arm one
21  more time. I said, "Don't do it." And he lunged towards me.
22  And that's when I fired.
23     Q   Let me go back, go through that sequence. When you
24  took out your -- your handgun, did you point it at him?
25     A   Yes, sir, I did.

---

**Page 177**

1      Q   Now, at that point, you are at approximately this
2  area of D. Is that correct?
3      A   Yes, sir.
4      Q   Now, the bed and I know this -- I don't know that
5  this is the exact position that the bed was in at the time
6  that this occurred.
7      A   No, sir.
8      Q   All right. How was it different?
9      A   I believe it was about maybe right here, in this
10  sense. Can I draw it on --
11     Q   I tell you what, why don't we do this. Why don't
12  you draw the room -- I tell you what, let's see if we can get
13  another copy, but -- here is the question. What I really
14  wanted to ask you. Where, in relation to the bed, was Mr.
15  Gonzalez when this was going on?
16     A   Right here. By the -- where C is. The chair right
17  there. On the corner.
18     Q   Okay.
19     A   Okay. It was about right there, right next to the
20  chair. This chair was, I believe, maybe pushed out to the
21  side or -- I can't recall. But he would have been around this
22  area.
23     Q   All right. And that -- and the area you have
24  indicated is closer to the -- to the chair that is by the
25  telephone and the window area?

---

(210) 377-3027                     ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100              SAN ANTONIO, TEXAS 78230                  (800) 969-3027
                                                                    a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                                April 10, 2003

Page 178

1    A   Yes. But a little bit further over here from the
2  telephone area, from what I remember.
3    Q   All right. Now, would he have been on the side of
4  the bed where the mattress would have been? Understanding the
5  bed is on the side. Would he have been on the side where the
6  mattress was or on the side of the wheels of the bed?
7    A   Mattress.
8    Q   All right. So to correct it, then, the bed on its
9  side would have been between Mr. Gonzalez and the door to the
10  room?
11    A   Yes, sir.
12    Q   So that if you had moved towards the door of the
13  room and made the choice to either leave the room or go
14  towards the door, the bed was between you and -- would have
15  been between him and you?
16    A   Yes, sir.
17    Q   And he would have had to climb back over the bed or
18  get around it or something like that in order to get closer to
19  you?
20    A   Yes, sir.
21    Q   Okay. Now, at the point where you took your gun out
22  and pointed it at him and told him to stop, he said -- you
23  said he said something to you.
24    A   Yes.
25    Q   Tell me again what he said.

Page 179

1    A   "Mata me. Mata me."
2    Q   Okay. Which in Spanish -- and in English means
3  what?
4    A   "Kill me. Kill me."
5    Q   Kill me. This is a statement that Mr. Gonzalez was
6  making to you?
7    A   Yes, sir.
8    Q   Did he say anything else to you?
9    A   Not that I can recall.
10    Q   All right. All right. And you indicated that he
11  made that statement to you and then he continued to try and
12  strike you?
13    A   Yes, sir.
14    Q   How long was it between the time you drew your
15  weapon until the time you fired the first shot?
16    A   I would say more -- no more than a brief couple of
17  seconds. I can't give an exact amount of time.
18    Q   How many times did you tell him to stop or to get
19  back?
20    A   Numerous. I don't recall. It was just a continuous
21  number of times that I told him to -- to cease and stop and
22  get back. And at that point it was no longer -- it was just a
23  last final option that I was throwing forward that I could not
24  give you a specific number of times that I told him to get
25  back.

Page 180

1    Q   I understand. I understand. It was something that
2  happened very quickly.
3    A   Yes, sir.
4    Q   Let me ask you, when you decided, was there
5  something in particular that he did that made you decide to
6  fire the first shot?
7    A   Yes.
8    Q   What was that?
9    A   He came over the top with his arm in a striking
10  motion as if he was going to strike me again.
11    Q   Okay. Now, this was not -- this was -- if -- if he
12  had struck you on that occasion, that would not have been the
13  first time that he struck you?
14    A   No, sir.
15    Q   How many -- he had struck you some number of times
16  before?
17    A   Yes, sir.
18    Q   Was there any other weapon or any other item that he
19  had gotten ahold of in addition to the set of shackles?
20    A   No, sir. There was other -- there was other things
21  available that he may have been able to use, but that was the
22  primary weapon that he had.
23    Q   Okay. What other things would have been available
24  for him to use?
25    A   His I.V. It was nearby. It was attached.

Page 181

1    Q   The pole?
2    A   The pole. The needle. Anything that could have
3  been at his immediate reach to use. A chair. At that point
4  in time. I don't recall.
5    Q   But the only thing he had and that he went for and
6  had was the set of shackles?
7    A   Yes, sir.
8    Q   All right. When you -- when you fired the first
9  shot at him, did you -- did you take deliberate aim at any
10  particular part of his body?
11    A   Center mass.
12    Q   Okay. Did you consider firing a shot in any other
13  area of his body other than what you call and have shown the
14  jury as the center mass?
15    A   No, sir.
16    Q   Is the center mass of a person's body also is what
17  is known as the kill zone?
18    A   At times it is, yes.
19    Q   Okay. And that is because the infliction of a wound
20  from a firearm in that area of the body is likely to lead to
21  death.
22    A   Yes, sir.
23    Q   And if I remember your previous testimony, you were
24  not trained at all at the police academy about how to disable
25  someone without shooting into the kill zone?

46 (Pages 178 to 181)

GERARDO RAMIREZ                                                                April 10, 2003

---

Page 182

1    A    No, sir.
2    Q    And that did not enter or cross your mind or -- let
3    me strike that. I don't mean that in pejorative way. You did
4    not consider that at the time you took your weapon out.
5         MR. GARZA: Objection. Form.
6         THE WITNESS: No, sir.
7    Q    (BY MR. BARRIENTOS) Your course of action was once
8    you removed your weapon and decided to use it, you were going
9    to fire into the -- the center mass of his body?
10   A    Yes, sir.
11   Q    When you fired the first shot at Mr. Gonzalez, how
12   far away from you was he?
13   A    Let's say -- I am going to say maybe about maybe a
14   foot or two from what it seemed.
15   Q    A foot or two?
16   A    Maybe a foot or two, from what I recall.
17   Q    Do you know whether at that range there would have
18   been deposits of gunpowder on his body in addition to the
19   entry wound that is made by the bullet?
20   A    Yes. In that -- that area, I believe there would
21   be.
22   Q    Do you know whether in fact any of those were found?
23   A    No, sir. No, sir.
24   Q    Let ask when you. You fired the first shot. How
25   many shots did you -- did you -- sorry. Is it correct that

---

Page 183

1    all 16 rounds that you had in your handgun at the time were
2    used during this incident?
3    A    Yes, sir.
4    Q    Did you fire all of them at once?
5    A    No, sir.
6    Q    All right. Can you tell me in what sequence you
7    fired them?
8    A    There was a -- there was a set of four to five
9    rounds the first time. A brief pause, anywhere from maybe a
10   millisecond to a second. It seemed like a very fast time. I
11   can't recall. There was a brief pause. At that point, Mr.
12   Gonzalez lunged at me again and attempted to strike me. And
13   so I continued to follow through with another couple of shots,
14   which emptied my weapon.
15   Q    All right. You indicated the first, I guess,
16   sequence of rounds, shots, was four to five?
17   A    Yes, sir.
18   Q    And when you fired each of these shots, each of them
19   was a -- well, let me ask. Were any of them accidental
20   firings?
21   A    No, sir.
22   Q    Okay. So every round that was squeezed off was a
23   round that you made the decision and fully intended to -- to
24   make?
25   A    Yes, sir.

---

Page 184

1    Q    All right. Could you tell from sitting where you
2    were whether any of the first sequence of shots, the first
3    four to five rounds, struck Mr. Gonzalez?
4    A    At that point, no. I was not sure. I know that he
5    had been struck, but I am not sure exactly, you know, which
6    ones struck him.
7    Q    Okay. And Yeah, I am not trying to --
8    A    No.
9    Q    -- ask you or ask you to commit to me about which
10   rounds struck him. What I am trying to find out is do you --
11   do you know whether any of the first four to five rounds that
12   you fired hit him at all?
13   A    Yes, sir.
14   Q    Okay. Can you tell me, sitting here today, what
15   areas of his body you struck?
16   A    No. Just that they were in the center mass area.
17   Q    Okay. You would have known this because of what?
18   A    Because I observed that there was some blood. There
19   was some blood on his gown.
20   Q    He was wearing a hospital gown?
21   A    Yes, sir.
22   Q    And you noticed blood on the gown after the first
23   set of shots?
24   A    Yes, sir.
25   Q    How long did it take you to fire the first four to

---

Page 185

1    five shots?
2    A    I would say about maybe less than a second or two.
3    Q    Less than a second or two?
4    A    Yes, sir.
5    Q    Did any of the shots -- did Mr. Gonzalez say
6    anything as you fired those shots?
7    A    No, sir.
8    Q    Did he indicate to you that he was in pain?
9    A    I believe he was.
10   Q    Okay. What -- what is it that made you believe
11   that?
12   A    He just -- he would -- he would make noise like
13   grunts, like in a sense that he -- there was noise coming from
14   him in the form of pain like anybody who would make noise, you
15   know.
16   Q    All right. You said you squeezed off four to five
17   rounds, some of which hit him and that there was a brief
18   pause.
19   A    Yes, sir.
20   Q    Is that correct?
21   A    Yes, sir.
22   Q    When -- when the pause occurred and when you
23   finished the first set of rounds, where was Mr. Gonzalez? Was
24   he still standing in the same position?
25   A    No, sir.

---

47 (Pages 182 to 185)

GERARDO RAMIREZ                                                                      April 10, 2003

Page 186

1    Q    Where was he? Can you tell me?
2    A    He was just a little bit farther off. I would say
3    maybe less than half a foot from where he was. It hadn't
4    changed much --
5    Q    Okay.
6    A    -- from where he was.
7    Q    Okay. Did he move closer to you or farther away
8    from you or --
9    A    Farther away.
10   Q    He moved back?
11   A    Yes, sir.
12   Q    Did any of the shots that you fired in the first
13   four to five rounds knock him down?
14   A    No, sir.
15   Q    They knocked him back but not down?
16   A    Exactly.
17   Q    At this point, was he still on the mattress side of
18   the bed?
19   A    Yes, sir.
20   Q    And at this point, all right, he still would have
21   had to have gotten over the mattress of the bed in order to --
22   in order to prevent you from getting to the door.
23   A    Yes, sir.
24   Q    All right. You said there was a brief pause. How
25   long of a pause?

Page 187

1    A    Less than a millisecond of a pause or a second. It
2    was -- it was very.
3    Q    Okay.
4    A    Very fast.
5    Q    I don't know if I can measure a millisecond. A
6    second -- a second I can grasp.
7    A    It is just a form of terminology, like -- I mean, I
8    really can't put it in as far as seconds because it did happen
9    so fast. I just remember watching his arm come up and him
10   grit his teeth and then lunge at me. So it was a very short
11   period of time. But in that sense, I continued to perceive
12   the threat as -- as -- that he was going to come at me again.
13   Q    All right. So you fired the first four to five
14   rounds. He was knocked back.
15   A    Yes, sir.
16   Q    How long was this period of time? Was it from the
17   end of the first set of rounds that you fired until -- if I
18   understand your testimony, that he -- he -- he began to come
19   closer to you again? Is that what I understand you to say?
20   A    Yes, sir.
21   Q    Okay. How long a period of time was it from the
22   time you finished the first set of rounds until the time that
23   he began to come back towards you?
24   A    I can't recall after that.
25   Q    Okay. Are we talking seconds or a minute?

Page 188

1    A    Seconds. Seconds.
2    Q    All right. And did he come back towards you?
3    A    Yes, he did.
4    Q    What part of his body was facing you?
5    A    The full -- his full body.
6    Q    Full front part of his body?
7    A    Yes.
8    Q    And did you continue to fire at him?
9    A    Yes, after he rose his arm up.
10   Q    All right. And how many rounds did you squeeze off
11   in this next sequence?
12   A    I emptied by weapon.
13   Q    You emptied it. All right. So if you shot four to
14   five -- let's assume you shot five rounds from the first and
15   you still have eleven rounds left in your -- in your hand gun?
16   A    Okay.
17   Q    And you would have fired all of them. Correct?
18   A    Yes, sir.
19   Q    Okay. Now, with this second set of rounds, were
20   there any of them that were accidentally discharged?
21   A    No, sir.
22   Q    So every round that came out was a conscious
23   decision by you to squeeze the trigger and fire a separate
24   round?
25   A    Yes, sir.

Page 189

1    Q    What parts of Mr. Gonzalez' body did you aim for
2    during the second set?
3    A    Center mass.
4    Q    At any time during the first sequence of shots did
5    Mr. Gonzalez turn his back to you?
6    A    No, sir. It -- from what I believe, it wasn't a
7    full turn. There was a -- when you need to see when --
8    when -- when an object is struck by a round, there is a
9    turning motion. But, in his -- in his sense, he was being
10   held by a handcuff so it didn't allow his body to go to one
11   direction. I am not sure if he either moved to the side or
12   not. It causes them -- when an object is struck by a bullet,
13   it causes the body to spin or to, in a sense, turn. And
14   that's basically maybe what -- what happened.
15   Q    Okay. Well, you understand that there are -- there
16   are entry wounds in Mr. Gonzalez' back, do you not?
17   A    Now I do. Now I do.
18   Q    Well, that means -- what that means is or would you
19   agree what that means is that some of the rounds that were
20   fired entered in his back?
21   A    Yes, sir.
22   Q    Are you aware that there are at least two entry
23   wounds that are in -- in that -- that are very near to his
24   spine?
25        MR. GARZA: Objection. Form.

48 (Pages 186 to 189)

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX:(210) 344-6016
(800) 969-3027
a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                      April 10, 2003

Page 190

1    THE WITNESS: No. No, sir.
2    Q   (BY MR. BARRIENTOS) Okay. You didn't know that?
3    A   No, sir.
4    Q   Okay. Would you disagree with it if you saw some
5    photographs that show that?
6    A   No, sir.
7    Q   Did you at any time make a conscious decision when
8    you were consciously squeezing off the rounds to shoot Mr.
9    Gonzalez in the back?
10   A   No, sir.
11   Q   So your testimony here is if he had turned his back
12   you would have stopped firing?
13   A   Not in that sense, no.
14   Q   No?
15   A   No. Because the threat is still there.
16       (Short break)
17   Q   (BY MR. BARRIENTOS) All right. Officer Ramirez, I
18   think when we -- before we took a break, when we were talking
19   about the second set of shots you fired, they discharged all
20   of the -- all the ammunition from your weapon in the second
21   set?
22   A   Yes, sir.
23   Q   How long did it take you to fire those shots?
24   A   Anywhere from one to two.
25   Q   One to two?

Page 191

1    A   Seconds.
2    Q   Seconds.
3        THE COURT REPORTER: Will you speak up, please.
4        THE WITNESS: I am sorry.
5    Q   (BY MR. BARRIENTOS) Did you fire the rounds -- well,
6    let me ask you. Did you -- did you keep your eyes on Mr.
7    Gonzalez the entire time that you were firing the weapon?
8    A   To the best of my ability. There was pepper spray
9    in the air. There was blood in my eyes. It was a little
10   difficult at the time because of that factor.
11   Q   Okay. Difficult for you to see?
12   A   Yes. To some extent. It was starting to take
13   effect and neutralize the room and it was starting to spread.
14   Q   All right. So then you squeezed off those last 11
15   rounds one after the other?
16   A   Yes, sir.
17   Q   Without hesitation?
18   A   Yes, sir.
19   Q   And in -- in the span of a couple of seconds?
20   A   Yes, sir.
21   Q   Okay. And your testimony is that you did not --
22   well, let me ask you. During that span of time, would you
23   have been able to assess whether Mr. Gonzalez had stopped
24   coming towards you or if the threat had been removed?
25   A   No.

Page 192

1    Q   So your decision at that point was to fire and keep
2    firing until you had no more ammunition?
3    A   Yes, sir.
4    Q   So, effectively, you, by making that choice, were
5    precluding yourself from assessing whether the threat had been
6    removed?
7    A   I am sorry. I didn't understand.
8    Q   Yes. If you made a decision to fire all of the
9    rounds in your gun in that short a period of time, you
10   effectively had no opportunity or chance to assess whether the
11   threat had been removed until after you fired all of those
12   rounds.
13       MR. GARZA: Objection. Form.
14       THE WITNESS: I could not -- I could not make
15   that determination at that point because if the first few had
16   not taken effect, in that sense, I could not perceive that
17   fact or I could not perceive -- there was no way for me
18   knowing that at that point in time.
19   Q   (BY MR. BARRIENTOS) Officer Ramirez, when -- when
20   you were struck by Mr. Gonzalez, did that anger you?
21   A   Yes, it did.
22   Q   When he continued coming towards you, did that anger
23   you?
24   A   Yes, it did.
25   Q   And when you made the decision to begin firing the

Page 193

1    shots at him, were you still angry at him?
2    A   No, sir.
3    Q   When during the sequence of events did your anger
4    towards Mr. Gonzalez subside?
5    A   When the -- that -- that determination was made to
6    fire my weapon. At that point, it more -- it feared me more
7    than -- than actually made me angry. Fear -- fear took over
8    my anger or superseded my anger.
9    Q   All right. So you were still angry with him, you
10   were just more scared than angry?
11   A   Yes, sir.
12   Q   Well, let me ask you this, then, would it be fair to
13   say that, then, that to some extent your anger was a
14   motivation for your deciding to use your handgun and fire the
15   shots at him?
16       MR. GARZA: Objection. Form.
17       THE WITNESS: No, sir.
18   Q   (BY MR. BARRIENTOS) And that's your testimony under
19   oath, that it was not a motivating factor in any way in your
20   decision to shoot him?
21   A   Well, it is a broad question as far as that. I
22   mean, it -- it is there. It is definitely there, but it is
23   not a major factor. Fear was my motivation.
24   Q   You are sitting here telling me today under oath
25   that your anger at him played no part in your decision to fire

49 (Pages 190 to 193)

GERARDO RAMIREZ                                                        April 10, 2003

Page 194

1  those shots at him?
2    A    No.
3    Q    Okay.  Did your anger have any role in your decision
4  to continue firing at him after the first four to five shots?
5    A    No, sir.
6    Q    And your testimony here today is that all of those
7  shots, in your opinion, were necessary, that is, had to be
8  made in order to remove the threat that Mr. Gonzalez presented
9  to you at that time?
10    A    Yes, sir.
11    Q    Are you aware how many of the shots actually hit Mr.
12  Gonzalez?
13    A    No, sir.  At the -- at the time I didn't -- I
14  believe that I had struck with every round.  But at that
15  point -- after I -- it was not -- it was apparent that it is
16  not what happened.
17    Q    Okay.  Let me see if I understand your testimony.
18  At the time that you were shooting at him, you believed that
19  every round had hit him?
20    A    Yes, sir.
21    Q    So it is not a situation where you kept firing
22  because you thought that you had missed him several times and
23  had not yet been able to hit him?
24    A    No, sir.
25    Q    You knew that you had hit him?

Page 195

1    A    Yes, sir.
2    Q    And you knew that you had hit him more than once?
3    A    Yes, sir.
4    Q    And, in fact, you believe that you had hit him with
5  every shot?
6    A    Yes, sir.
7    Q    And you continued firing?
8    A    Yes, sir.
9    Q    The -- I am going to mark as Exhibit Number 17 the
10  autopsy report in this case.  Have you reviewed the autopsy
11  report in this case?
12    A    Me, sir?
13    Q    Yes, sir.
14    A    No, sir.
15    Q    All right.  I am going to give you a chance to -- to
16  look at this.  I am going -- I am going to read part --
17  portions of this and I am going to let you look at them if you
18  want to look at them to make sure that I am reading them
19  correctly.
20    A    That's fine.
21    Q    At page 2 of the -- excuse me, at page 1 of the
22  autopsy report there is a report.  And the first section is
23  titled Final Anatomic Diagnosis.  And paragraph one reads as
24  follows:  Multiple distant range gunshot wounds (at least 10)
25  with subsequent injuries of both lungs, thoracic aorta, liver,

Page 196

1  spleen, spinal cord, and fracture of the left femur.  Through
2  and through injuries of the greater mesentery of stomach and
3  ascending colon.
4       Then under the subparagraph, Final Summary reads as
5  follows:  This man died of multiple, at least 10, distant
6  gunshot wounds to various locations with the severest injuries
7  being those to the aorta and both lungs.  He subsequently
8  exsanguinated.  A total of 12 bullets were counted on x-rays.
9  And all but two were retrieved.
10       And then there is, at page 2, a section entitled
11  Evidence of Injury.  And has anyone ever discussed with you or
12  gone over with you the number of wounds or injuries that were
13  found on Mr. Gonzalez' body?
14    A    No, sir, they did not.
15    Q    Okay.  Let me go over these with you and ask you
16  some questions about them.  Number one, there is a gunshot
17  entrance wound seven and a half inches from top of the right
18  shoulder on the right side of the back.  Do you recall
19  shooting Mr. Gonzalez seven and a half inches from the top of
20  his right shoulder on the right side of his back?
21    A    No, sir.
22    Q    Injury number 2, there is a gunshot wound entrance
23  that is 13 inches down from the top of the shoulder on the
24  right side of the back.  Do you remember shooting Mr. Gonzalez
25  at a point 13 inches down from the top of his shoulder on the

Page 197

1  the right side of his back?
2    A    No, sir.
3    Q    Item number 3.  There is an entrance gunshot wound
4  10 inches down from the nape of the neck and one inch to the
5  right of the spine.  Do you remember shooting Mr. Gonzalez 10
6  inches down from the nape of his neck and one inch to the
7  right of his spine?
8    A    No, sir.  I do not.
9    Q    Number four.  There is a gunshot wound to the mid
10  portion of the back.  It is 11 inches down from the nape of
11  the neck.  Do you remember shooting Mr. Gonzalez 11 inches
12  down from the nape of the neck in the mid portion of his back?
13    A    No, sir.  I do not.
14    Q    Number five.  There is a through and through gunshot
15  wound to the fourth finger of the right hand.  The entrance is
16  present on the back of the finger and measures three quarter
17  inch by one quarter inch.  Let me ask you.  During this entire
18  sequence, do you recall Mr. Gonzalez ever putting his hands up
19  in a defensive manner?
20    A    Yes, sir.
21    Q    Are you familiar with -- when -- when I use the term
22  in a defensive manner or posture, what I am talking about?
23    A    Yes, sir.
24    Q    Can you demonstrate that for the jury?
25    A    Either to cover up or to move.

50 (Pages 194 to 197)

GERARDO RAMIREZ                                                                          April 10, 2003

Page 198

1    Q   Okay. Number six. There is a gunshot wound --
2  entrance wound to the right side of the chest 12 inches down
3  from the shoulder. I think you told us you do remember
4  shooting at the center mass of his body.
5    A   Yes, sir.
6    Q   Number seven. An entrance gunshot wound to the
7  right lower quadrant. That is the extent of the description
8  of the placement. Do you recall -- I don't know if you can
9  tell from this description where on his -- where on his body
10 that would be. I assume, my understanding, is it would be the
11 right lower quadrant of the front of his body.
12   A   I wouldn't be able to tell you.
13        THE COURT REPORTER: I am sorry.
14        THE WITNESS: I am sorry. I wouldn't -- I
15 wouldn't be able to tell you.
16   Q   (BY MR. BARRIENTOS) Okay. Then I won't ask you
17 about that.
18        Number eight. There is an entrance wound of the
19 left side of the chest three and a half inches down from the
20 left axilla, a wound to the left side of the chest. Do you
21 recall shooting him in the area of the left side of his chest?
22   A   Yes, sir.
23   Q   Number nine. There is an entrance gunshot wound to
24 the left side of the chest 11 inches down from the left
25 axilla. Do you remember shooting him on the left side of his

Page 199

1  chest approximately 11 inches down?
2    A   Yes, sir.
3    Q   Number 10. There is an entrance gunshot wound to
4  the left side of the chest 15 inches down from the left
5  axilla. Again, that is in the same approximate area. So that
6  would be consistent with where you remember shooting?
7    A   Yes, sir.
8    Q   Okay. Number 11. There is an entrance wound to the
9  left buttock measuring three eighths by three eighths inch,
10 five inches from midline. Do you remember shooting Mr.
11 Gonzalez in the area of his back, towards the bottom of his
12 back or the upper portion of his buttock?
13   A   No, sir.
14   Q   All right. Officer Ramirez, I think earlier you
15 were telling me that you believe that some of the effect that
16 a bullet has when it enters a human body is to spin that body
17 around?
18   A   Yes, sir. Or whichever -- an object.
19   Q   An object.
20   A   An object. It will cause it to spin.
21   Q   All right. And is it your contention or are you
22 telling me here that that would be the reason that some of the
23 entrance wounds that Mr. Gonzalez has are in his back?
24   A   To my knowledge, yes.
25   Q   Okay. Did you actually see that happen?

Page 200

1    A   I did see and I did observe when the rounds were
2  being fired that -- that it put the body in a partial spin or
3  an angle that would maybe have placed him on his side.
4    Q   All right.
5    A   At a side angle.
6    Q   Now, at this time, the entire time that this is
7  going on, Mr. Gonzalez' left hand is still handcuffed to the
8  rail of the bed?
9    A   Yes, sir.
10   Q   And the rail of the bed that he is handcuffed to is
11 the side of the bed that is on the up right side?
12   A   Yes, sir.
13   Q   In other words, he is not handcuffed down to part
14 that is against the floor?
15   A   No, sir.
16   Q   He is handcuffed to the part that is up high?
17   A   Yes, sir.
18   Q   And this would prevent him from spinning completely
19 around?
20   A   Yes, sir.
21   Q   In order to get all the way around, he would have to
22 make an effort to turn around?
23   A   Not -- well, there would be the fact where he would
24 be able to turn the opposite direction. You see, if there are
25 certain strikes on the body where -- let me see if I can

Page 201

1  explain this. When an object is being struck at different
2  points in the -- in the center mass area to take a person, as
3  per se, okay? When a person is being struck in the center
4  mass area, the body will shift or the person will shift
5  depending on where that momentum struck the person. The
6  momentum of the bullet will cause the body to spin in that
7  direction, I should say. Do you understand what I am trying
8  to say?
9    Q   I understand.
10   A   Okay. So it could have either put him in there.
11 Being that he did have more ability to shift to one side or
12 the other, it could have caused him to spin in a certain
13 direction. At that time it wasn't apparent to me that he may
14 have turned all the way around or given his back to me, but it
15 could have happened. I don't recall it -- it happening. I
16 did remember that, from what I recalled, that he was at one
17 point in the side angle, but not -- not to the extent of his
18 back.
19   Q   In either case, the -- the speed at which you fired
20 off those rounds, a couple of seconds for the first five --
21   A   Yes, sir.
22   Q   -- four or five, and a couple of seconds for the
23 last 11, really precluded you from determining whether he had
24 decided to stop his advance towards you.
25        MR. GARZA: Objection. Form.

51 (Pages 198 to 201)

GERARDO RAMIREZ                                                                April 10, 2003

**Page 202**

1    THE WITNESS: Yes.
2    Q   (BY MR. BARRIENTOS) There was not enough time for
3    you to assess in two seconds, is he stopping, is he backing
4    up, is he turning his back to me.
5    A   Yes.
6    Q   You are firing rounds continuously?
7    A   Yes, sir.
8    Q   I have some photographs, Mr. -- or, excuse me,
9    Officer Ramirez, I need to show you. They are not pleasant,
10   but I -- but I want to ask you about some of these. At page
11   30 from the autopsy -- or, excuse me. At page 31, 30 and 31,
12   there are a set of photographs from the autopsy of Mr.
13   Gonzalez' body. And I am not going to put these in the video,
14   but we will -- we will know what we are referring to from the
15   record.
16   A   Yes, sir.
17   Q   There are several entrance wounds here. Do you see
18   them?
19   A   Yes, sir.
20   Q   How many do you see?
21   A   Four. Well, you consider that an entrance wound.
22   Not if it's a -- it looks like an exit wound.
23   Q   All right. How many entrance wounds do you see?
24   A   Four.
25   Q   One, two, three, four. And I think this is -- this

**Page 203**

1    one down here is the one they talk about being in the lower
2    left back or lower back or the upper buttock?
3    A   Okay.
4    Q   Okay. One of these shots is here right next to the
5    spine.
6    A   Yes, sir.
7    Q   Now, is it your testimony that Mr. Gonzalez was able
8    to -- that the shot there that -- that is -- has an entrance
9    wound right next to the spine in the middle of his back is
10   a -- is a shot that you fired but that hit him there
11   accidentally or unintentionally?
12   A   Yes.
13   Q   You intended to fire the round --
14   A   Yes, sir.
15   Q   -- but you did not intend to hit him in the back?
16   A   Exactly.
17   Q   Okay. Can you explain how it was that that bullet
18   makes its way around to his back?
19   MR. GARZA: Objection. Form.
20   Q   (BY MR. BARRIENTOS) To the middle of his back.
21   MR. GARZA: Objection. Form.
22   THE WITNESS: Okay. That could have been when
23   I testified earlier that the body is put into a spinning type
24   motion, not completely around, but in a sense where it may
25   have put the person briefly in that position at the time.

**Page 204**

1    Q   (BY MR. BARRIENTOS) All right. After you have
2    finished firing all of those rounds, did Mr. Gonzalez say
3    anything to you?
4    A   No. He did not.
5    Q   He didn't say anything at all?
6    A   No, sir.
7    Q   What did you do immediately after you emptied your
8    gun?
9    A   I attempted to check him to see, you know, if, you
10   know, just to assess him to see if, you know, he was either
11   going to say anything or -- I just approached him and looked
12   him over.
13   Q   Did you touch him?
14   A   I believe I did.
15   Q   How did you move his body?
16   A   I reached for his neck to see if there was a pulse.
17   I called out to people in the hallway that were out there. I
18   advised them that there was a man down, that I needed a
19   doctor, I needed anybody, you know, just -- I called out for
20   somebody to help him out. Anybody. I informed them by
21   yelling that there was a man down, shots were fired, that I
22   needed security, I needed a doctor. And I didn't find a
23   pulse.
24   Q   Did you still have your gun in your hand when you
25   went to check him?

**Page 205**

1    A   Yes, I did.
2    Q   Did you reload your weapon?
3    A   No, sir, I did not.
4    Q   After you went to check him, what did you do then?
5    A   I walked backwards away from -- toward the phone
6    area. I placed my weapon on the window sill. And then I
7    picked up the phone and I believe I attempted to call for our
8    department or security at that time.
9    Q   Okay. You put the gun down on the window sill?
10   A   Yes, sir.
11   Q   And you called the La Feria Police Department?
12   A   Yes, sir. Yes, sir. I don't recall if it was -- I
13   had tried to call security at that time. I don't know why I
14   -- because there was nobody in the room at the time. No
15   security. No nurses. Nothing. Nobody that I could recall
16   in the room with me at the time. Nobody had entered at that
17   point. And then I -- I called the police department.
18   Q   Okay. When you called the police department, did
19   you call the dispatcher or did you call the office number?
20   A   Dispatcher -- well, it is the same number.
21   Q   Is it the same number?
22   A   Same number.
23   Q   Are those conversations with the dispatcher
24   recorded?
25   A   No, sir, they are not.

52 (Pages 202 to 205)

GERARDO RAMIREZ															April 10, 2003

**Page 206**

1   Q   All right. After -- sometime after that point, did
2  other security people arrive?
3   A   Yes, sir.
4   Q   Did you speak to any of them?
5   A   Yes, sir. Briefly.
6   Q   Did any of them indicate to you that they had been
7  present on the floor when the shooting occurred?
8   A   No, sir.
9   Q   Did you question or ask why none of them had arrived
10  prior to the time of the shooting?
11   A   No, sir. After that -- after seeing the officers
12  come in, security officers that were there, I basically just
13  -- it was a bit hazy, starting to become a little hazy after
14  that.
15   Q   Do you remember how many security officers -- Valley
16  Baptist Medical Center security officers you saw that night
17  after the incident?
18   A   No. The only ones that I remember are the one --
19  the two that came in, that came in to assess me and check Mr.
20  Gonzalez.
21   Q   Okay. And at the time Mr. Gonzalez -- after you had
22  emptied your gun, he was still handcuffed to the bed?
23   A   Yes, sir, he was.
24   Q   And did he fall and expire at that same location?
25   A   Yes, sir.

**Page 207**

1   Q   And he was still on the mattress side of the bed
2  with the bed between him and the door?
3   A   Yes, sir.
4   Q   Okay. Just give me a couple of seconds to look over
5  some notes. And, other than that, we may look at your
6  videotape tape because I have a couple of specific questions.
7   A   No problem.
8   MR. BARRIENTOS: And, actually, all I really
9  want to do is -- he has already talked about it. I just want
10  to be able to look at it with the -- with the tape in some
11  reference.
12   THE WITNESS: Yes, sir.
13   MR. BARRIENTOS: So that we can -- so that we
14  are clear. Make sure that he has had a fair opportunity to
15  look and see where he was at.
16   MR. GARZA: Sure. Can we go off record in the
17  meantime or --
18   MR. BARRIENTOS: Yes. Go off for a couple of
19  minutes.
20   (Off record discussion)
21   (Short break)
22   Q   (BY MR. BARRIENTOS) I have just a couple of other
23  questions before we look at the tape. Were you ever explained
24  -- well, there are -- there are a couple of things I want to
25  show you. I am sorry.

**Page 208**

1   Exhibits 11, 12 and 13 are some of the hospital
2  policies that were in effect at Valley Baptist Medical Center
3  at the time this occurred. And I don't know if you had a
4  chance to look at these yesterday. But have you ever seen any
5  of these documents?
6   A   No, sir, I have not.
7   Q   Okay. And I think you have already told us that no
8  one explained to you whether there were any restrictions or
9  guidelines or procedures for -- as far as restraints. Is that
10  correct?
11   A   Yes, sir.
12   Q   That were imposed by the hospital?
13   A   Yes, sir. None -- no were explained to me.
14   Q   In here at Exhibit Number 11, there is a section on
15  observation of a restraining patient. First of all, let me
16  ask. Was there a staff member in the room with Mr. Gonzalez
17  and you continuously?
18   MR. POPE: Objection. Form.
19   THE WITNESS: Describe continuously.
20   Q   (BY MR. BARRIENTOS) I mean who was there all the
21  time.
22   A   No, sir. No, sir.
23   Q   Can you tell me, from your recollection, how often
24  it was that staff members would come in for whatever purpose
25  they might have had?

**Page 209**

1   A   Not exactly. Every other hour or are so they would
2  come and check on him, monitor him.
3   Q   Let me ask you. Every -- you say every other hour
4  or every hour?
5   A   Every hour. Every hour there would be somebody that
6  would come by. I believe there was one occasion where it was
7  maybe skipped an hour or so.
8   Q   In any case, there was not another hospital staff
9  member or hospital personnel who was in there continuously as
10  you were?
11   A   Yes. Exactly.
12   Q   Okay. Exhibit Number 13 is something called the
13  Forensic Staff Information List. Have you ever seen this
14  document?
15   A   No, sir, not to my recollection.
16   Q   In this document it says that the medical -- medical
17  center defines the education provided to forensic staff. And
18  I am going to tell you included within the definition of
19  forensic staff are law enforcement officers. What I want to
20  ask you is did anyone give you any type of education or
21  instruction from the hospital when you arrived there?
22   A   No, sir.
23   Q   It says in this -- on this exhibit that forensic
24  staff is provided with information about appropriate behaviors
25  and expected responses to emergency procedures such as fire

(210) 377-3027				ESQUIRE DEPOSITIONS SERVICES				FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100			SAN ANTONIO, TEXAS 78230				(800) 969-3027
a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                    April 10, 2003

Page 210

1 alarms or other hospital emergencies. Did you receive any
2 such information?
3     A   No, sir.
4     Q   All right. It says also forensic staff will be
5 educated regarding the difference between restraining the
6 prisoner for medical or behavioral reasons as opposed to
7 administrative or legal reasons. Did anyone so instruct you?
8     A   No, sir, they didn't.
9     Q   There is a section in here entitled Law Enforcement
10 Personnel Weapons and Ammunition. The first sentence reads as
11 follows: Law enforcement personnel/guards who accompany
12 prisoners/patients to VBMC for hospitalization treatment and
13 who carry weapons shall follow the ammunition and weapons
14 caliber policy prescribed by VBMC.
15        Did anyone tell you that you were required to follow
16 some policy regarding weapons or caliber?
17    A   No, sir.
18    Q   Okay. The second sentence reads as follows: Large
19 caliber weapons are not permitted in VBMC for purpose of
20 protection when accompanying prisoner patients for
21 hospitalization. VBMC has a special caliber/load which has
22 been approved for use in security officers' weapons and also
23 for the use of outside agency guards or officers. This is a
24 .38 caliber 125 grain semi-wad cutter, which has been designed
25 for use by VBMC security department.

Page 211

1        Did anyone tell you that this was the caliber and/or
2 load which you were required to use?
3     A   No, sir.
4     Q   Is it the kind that you had in your weapon?
5     A   No, sir.
6     Q   Do you know the difference in terms of performance
7 between a .38 caliber 125 grain semi-wad cutter bullet and the
8 ones that were in your gun at the time?
9     A   Yes. Usually --
10       MR. POPE: Objection. Form.
11       THE WITNESS: Yes. Usually the wad cutter
12 itself, it doesn't vary too much in speed and power. But the
13 wad cutter is usually used for target practice. And the ones
14 that I use are for defensive or more law enforcement
15 applications.
16    Q   (BY MR. BARRIENTOS) This ammunition -- let me read
17 further: This ammunition has a slow burn of 800 feet per
18 second rate of velocity which is recommended for confined or
19 in-house use should a discharge become necessary or occurs.
20 This ammunition is available and will be used by VBMC
21 security. No high caliber automatics, shotguns or rifles are
22 permitted.
23        Did anyone inform you as to that requirement?
24    A   No, sir.
25    Q   The -- do you -- do you know whether any of the --

Page 212

1 the shots that you fired at Mr. Gonzales and where you missed
2 him went into any of the adjoining hospital rooms?
3     A   No, sir.
4     Q   No, you don't know or no, they didn't?
5     A   No, they did not. They did not inform me or did not
6 tell me, advise me.
7     Q   You don't know one way or another?
8     A   No, sir, I do not.
9        MR. BARRIENTOS: I think that's all the
10 questions I have, with the exception of a couple of things on
11 tape.
12       THE WITNESS: No problem, sir.
13       MR. BARRIENTOS: We will take a break to let
14 them get situated.
15       (Brief pause)
16    Q   (BY MR. BARRIENTOS) We are back on the record.
17 Officer Ramirez, there is -- there was a videotape
18 re-enactment which was -- we had previously marked in Chief
19 Garcia's deposition. Do you recall that?
20    A   Yes, sir.
21    Q   Okay. And I placed a copy of that tape in the
22 television. And I am going to start it in just a moment. And
23 I am going to stop it from time to time and ask you some
24 questions. And so the videographer and the record are clear,
25 Officer Ramirez, as the jury sees the videotape, is on the

Page 213

1 right side of the screen. And I am on the left side as the --
2 as the jury sees us. Okay? Oaky. And I am going to let this
3 play all the way through until we get to a point where I have
4 a question or you have an answer to respond.
5     A   Yes, sir.
6        (Videographer confers with Mr. Barrientos)
7        (Videotape continues and is stopped)
8     Q   (BY MR. BARRIENTOS) Let me stop right here.
9 Officer Ramirez, first of all, let me ask you. The room where
10 you all are in at this point, is this room 503 at Valley
11 Baptist Medical Center?
12    A   Yes, it is.
13    Q   Okay. So this re-enactment was done in the same
14 room?
15    A   Yes, sir.
16       (Videotape continues and is stopped)
17    Q   (BY MR. BARRIENTOS) Officer Ramirez, there I think
18 you informed -- who was the other gentleman who is in the
19 tape?
20    A   He is the investigator from the Harlingen Police
21 Department.
22    Q   What is his name?
23    A   I don't recall -- I don't recall his name.
24    Q   Okay. There in a portion of the tape you asked --
25 you told the investigator that you were informed that the

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                   (800) 969-3027
                                                                  a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                                    April 10, 2003

**Page 214**

1  shackles were to be used when he was -- when he needed to go
2  to the bathroom.
3      A   Yes, sir.
4      Q   And that you were to call security to come and
5  assist you when that was to be done?
6      A   Yes, sir.
7      Q   Who gave you that instruction?
8      A   My senior officer, Ysidro Delgado.
9      Q   The officer who you were relieving?
10     A   Yes, sir.
11     Q   Was he the only source of information?
12     A   Yes, sir.
13         (Videotape continues and is stopped)
14     Q   (BY MR. BARRIENTOS) Let me stop it right here.
15  Officer, why don't you take this pen that I have. The place
16  where you are sitting now, is this the place where you
17  testified earlier you were sitting when you and Mr. Gonzalez
18  heard the noise outside and he initially woke up?
19     A   Yes, sir.
20     Q   And immediately on the screen, and I know it is hard
21  to see with this fuzz here, but this object here on the left,
22  is this the door that -- the entrance to the room?
23     A   Yes, sir.
24     Q   All right. We see there is a handle here on this
25  side, there is also a handle on the other side.

**Page 215**

1      A   Yes, sir.
2      Q   All right. Let me continue.
3         (Videotape continues and is stopped)
4      Q   (BY MR. BARRIENTOS) All right. Now, there -- in
5  this videotape, as the investigator said, the door here is
6  closed --
7      A   Yes, sir.
8      Q   -- in the tape. At the time of the incident, this
9  door was open. Is that correct?
10     A   Yes, sir.
11         (Videotaped begins and is stopped)
12     Q   (BY MR. BARRIENTOS) Okay. In this part of the tape,
13  the officer who is here is portraying Mr. Gonzalez, he has got
14  his left hand shackled to the front end of this bed rail. Is
15  that correct?
16     A   Yes, sir.
17     Q   Is that where Mr. Gonzalez' hand was shackled?
18     A   Yes, sir.
19     Q   Okay.
20         (Videotape continues and is stopped)
21     Q   (BY MR. BARRIENTOS) Okay. You have gone through a
22  sequence here where he stood up and you asked him to sit down.
23     A   Yes, sir.
24     Q   And earlier you testified to the sequence of
25  events. So this is where the second point where he sat down

**Page 216**

1  and he is getting back up.
2      A   Yes, sir.
3         (Videotape continues and is stopped)
4      Q   (BY MR. BARRIENTOS) Okay. At this point, the second
5  time he stands up, this is when you give him the five seconds
6  to sit down?
7      A   Yes, sir.
8      Q   And he doesn't sit down after five seconds?
9      A   No, sir.
10     Q   And here in the tape you were beginning to go across
11  the room?
12     A   Yes, sir.
13     Q   And this is the point where you testified you
14  decided to go -- instead of going outside to look for
15  assistance and backup, did you go across the room to where the
16  telephone is?
17     A   Yes, sir.
18         (Videotape continues and is stopped)
19     Q   (BY MR. BARRIENTOS) Okay. One other question I am
20  sorry I didn't ask before. When you walk over here in this
21  path, you actually had to get closer to Mr. Gonzalez.
22     A   Yes, sir.
23     Q   And while he was still standing here, did he reach
24  out for you or attempt to grab you or strike you in any way?
25     A   No, sir.

**Page 217**

1         (Videotape continues and is stopped)
2      Q   (BY MR. BARRIENTOS) Okay. At this point, the
3  officer who is playing Mr. Gonzalez sat on the bed and rolled
4  across to the other side. Is this the area where you were
5  when you began telling him to get back?
6      A   Yes, sir.
7      Q   This is the area where Mr. Gonzalez was when he, you
8  said, reached towards you but could not actually touch you?
9      A   Yes.
10         (Videotape continues and is stopped)
11     Q   (BY MR. BARRIENTOS) Okay. This here in the tape
12  shows that you began hitting him with the ASP and telling him
13  to get back.
14     A   Yes, sir.
15     Q   And he actually got back.
16     A   Yes, sir.
17     Q   He rolled over back to the other side, the opposite
18  side of the bed so he was on the opposite of the bed from you?
19     A   Yes, sir.
20     Q   Okay. And up to that point, while he was reaching
21  towards you, he had not actually touched you?
22     A   No, sir.
23         (Videotape continues and is stopped)
24     Q   (BY MR. BARRIENTOS) Okay. Officer Ramirez, I
25  probably just didn't get to this when we were talking earlier.

55 (Pages 214 to 217)

GERARDO RAMIREZ                                                April 10, 2003

**Page 218**

1 But, at this point, Mr. Gonzalez was pulling the bed.
2   A  Yes, sir.
3   Q  And he was pulling it back towards this couch here
4 that is on the -- up against the wall?
5   A  Yes, sir.
6   Q  So at this point, he is actually between the couch
7 and the bed?
8   A  Yes, sir.
9   Q  And at this point, if you had chosen, you could have
10 gone around the bed and gone out the door.
11   A  It is a little longer than that. It covers the --
12 it will put me right in his area where he would have a chance
13 to grasp me.
14   Q  Well, let me ask this. At this point, he is trapped
15 between the bed and the couch. Is that correct?
16   A  Yes, sir. But there is also an opportunity to come
17 across and over, in that sense. That's why he was still, you
18 know, trying to grasp me.
19      MR. BARRIENTOS: Objection. Nonresponsive.
20   Q  (BY MR. BARRIENTOS) Is there -- is there any
21 obstruction or anything that would have blocked your path
22 between here and the door?
23   A  He would have.
24   Q  He would have. Okay. And you think he would have
25 been in a position to do that handcuffed to this side of the

**Page 219**

1 bed, the near side of the bed?
2   A  Yes, sir. He had a long reach.
3      (Videotape continues and is stopped)
4   Q  (BY MR. BARRIENTOS) All right. Earlier when you
5 testified -- you told me it was a point after you sprayed him
6 with the mace, he said that, "I give up. Stop. Don't hit
7 me." Is that correct?
8   A  Yes, sir.
9   Q  Is this the approximate position he was in when he
10 said that to you?
11   A  He was a little bit further down.
12   Q  Okay. Let me advance this a little bit.
13      (Videotape continues and is stopped)
14   Q  (BY MR. BARRIENTOS) Okay. Here would -- would -- I
15 don't know if you can hear it on tape. But you just described
16 you had sprayed him twice and you dropped the pepper spray and
17 you were going for your baton.
18   A  Yes, sir.
19   Q  And that this is the point where the officer in this
20 videotape is turning the bed over.
21   A  Yes, sir.
22   Q  And that's the point where Mr. Gonzalez --
23   A  Yes, sir.
24   Q  -- began to turn the bed over?
25   A  Yes, sir.

**Page 220**

1      (Videotape continues and is stopped)
2   Q  (BY MR. BARRIENTOS) All right. In the tape, the
3 officer here is going for the shackles.
4   A  Yes, sir.
5   Q  At this point. And, at this point, is this about
6 where you also attempt to go for the shackles?
7   A  Yes, sir.
8   Q  All right. And in a moment, I am going ask you to
9 tell me when to stop so you can show me what path you took.
10   A  Okay.
11      (Videotape continues and is stopped)
12   Q  (BY MR. BARRIENTOS) Okay. Let me go back here,
13 because I didn't see -- unless it is somewhere later in the
14 tape -- any indication here in the videotape where -- where
15 you talk about coming and going for the shackles yourself.
16   A  Okay. No, I did not. I did not.
17   Q  So let me -- let me come back and I will ask you.
18 We will clarify it.
19   A  Yes, sir.
20   Q  The part of your testimony where you told me you
21 went from here in this direction --
22   A  Yes, sir.
23   Q  -- towards the shackles, did that actually happen?
24   A  Yes, sir.
25   Q  Okay. Is it represented in this re-enactment?

**Page 221**

1   A  No, sir.
2   Q  Okay. Just an oversight?
3   A  Yes, sir.
4   Q  All right. All right. Now we are to the point
5 where you have the officer here as portraying Mr. Gonzalez
6 climbing over the bed. Is that correct?
7   A  Yes, sir.
8   Q  And is this the manner in which you claim Mr.
9 Gonzalez climbed over the bed?
10   A  Yes, sir.
11      (Videotape continues and is stopped)
12   Q  (BY MR. BARRIENTOS) Officer Gonzalez, I have another
13 -- excuse me. Officer Ramirez, I have another question. At
14 this point here, the -- the couch that is here in the bottom
15 of the screen --
16   A  Yes, sir.
17   Q  -- this is the position that Mr. Gonzalez would have
18 been in when he started to strike you with the chain.
19   A  Yes.
20   Q  The shackles. Did he ever hop back over to the
21 other side of the bed?
22   A  No, sir.
23   Q  Okay. Was there anything else that ob -- that
24 blocked your path between where you are standing now and the
25 door, which is on the other end of the couch?

56 (Pages 218 to 221)

GERARDO RAMIREZ                                                                    April 10, 2003

Page 222

1    A   No, sir.
2    Q   Okay. So when we talked earlier and you told me
3    that if you had chosen to leave the room at that time, you
4    could have done so.
5    A   Yes, sir. It was -- it wasn't apparent to me at
6    that time. At that time it was more of -- that was not the
7    focus of what I was looking for. I was just perceiving the
8    threat and the threat itself. Nothing else became apparent.
9         MR. BARRIENTOS: Objection. Nonresponsive.
10   Q   (BY MR. BARRIENTOS) Let me ask you. The question I
11   have is if you had chosen to leave at that point in time,
12   because the coach is here, he could not drag the bed over here
13   to block you.
14        MR. GARZA: Objection. Form.
15        THE WITNESS: Yes, sir.
16   Q   (BY MR. BARRIENTOS) There was nothing -- if you had
17   chosen to, blocking your path from coming here and going out
18   the door?
19   A   No, sir.
20   Q   In fact, that would have been a better position to
21   be in because then you would have put the bed between you and
22   him.
23        MR. GARZA: Objection. Form.
24        THE WITNESS: Yes.
25        (Videotape continues and is stopped)

Page 223

1    Q   (BY MR. BARRIENTOS) Okay. The only other question I
2    think I have about the tape is these shackles here that are
3    are on the ground --
4    A   Yes.
5    Q   -- that the officers had during this demonstration,
6    are these the shackles that were in the room at the time Mr.
7    Gonzalez was there?
8    A   I don't believe so.
9    Q   Okay.
10   A   I don't know.
11   Q   Okay. If they are not these shackles, are the
12   shackles that were there at the time of the same type, size?
13   A   Yes, sir.
14   Q   Okay. The same length, etc.?
15   A   Yes, sir.
16   Q   So if it is not these, it is a set just like these?
17   A   Yes, sir.
18   Q   Okay. I believe that's all the questions I have at
19   this time. Thank you. Yes, sir.
20        (Brief pause)
21   Q   (BY MR. BARRIENTOS) Officer Ramirez, do you believe
22   that -- strike that. I think I asked you early, but are
23   you -- but are you still of the opinion that if the hospital
24   had instructed you to restrain Mr. Gonzalez to some greater
25   degree that that would have prevented this situation?

Page 224

1    A   Yes, sir.
2         MR. POPE: Objection. Form.
3    Q   (BY MR. BARRIENTOS) If -- do you think that it would
4    have been a good idea for you to have that information when
5    you went in to guard Mr. Gonzalez?
6    A   Yes, sir.
7    Q   Do you believe that it was your responsibility to
8    determine what level of restraint to use on Mr. Gonzalez?
9         MR. GARZA: Objection. Form.
10        THE WITNESS: To some extent.
11   Q   (BY MR. BARRIENTOS) Okay. To what extent would tha[t]
12   be?
13   A   They were -- there was the -- the medical aspect of
14   it. He did have an I.V., you know. He was being treated
15   for -- and being checked by pa -- by doctors at the time. You
16   know, nurses would come in and check on him. So they needed
17   either a hand there to be, you know, with the I.V. itself.
18   And based on his behavior at the time, you know, he was not --
19   he did not appear violent or -- or it didn't -- it didn't --
20   it didn't appear necessary to -- to restrain him any further
21   due to his passive behavior at the time.
22   Q   It did not appear to you to be necessary --
23   A   No, sir.
24   Q   -- based on the behavior he had exhibited to you?
25   A   Exactly. Yes, sir.

Page 225

1    Q   Did you have at that time, though, the information
2    that we have discussed here regarding the psychological
3    evaluations or the previous history of medication or suicidal
4    ideations or any of those things?
5    A   No, sir.
6    Q   Do you think it would have been a good idea for
7    somebody to tell you that stuff?
8    A   Yes, sir.
9    Q   And do you feel that it was your responsibility to
10   have kept up with his psychological condition or status or his
11   medical condition or status or that information?
12   A   No, sir.
13        MR. POPE: Objection. Form.
14   Q   (BY MR. BARRIENTOS) Would that have changed the
15   manner in which you were (someone coughs) if you had had that
16   information?
17   A   I am sorry?
18   Q   Would that have changed the manner of your restraint
19   of Mr. Gonzalez if you had had that information?
20   A   Yes, sir.
21   Q   Okay. Officer Ramirez, I don't believe I have any
22   further questions at this time. I thank you for your
23   patience.
24        THE WITNESS: Thank you.
25        MR. BARRIENTOS: I pass the witness.

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                    FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                      (800) 969-3027
                                                                                 a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                                    April 10, 2003

Page 226

1    MR. STEIN: I don't have any questions at this
2 time.
3    MR. POPE: I do.
4    E X A M I N A T I O N
5    Q   (BY MR. POPE) Officer Ramirez, hi. My name is Bill
6 Pope. And I represent Valley Baptist Medical Center in this
7 case. I just have a few questions for you.
8    A   Yes, sir.
9    Q   Do you recollect Dr. -- or, excuse me, not doctor,
10 but Officer Delgado indicating to you when you took over the
11 custody of this particular patient, Mr. Gonzalez, that he was
12 "a mental case" or he was mental?
13    MR. GARZA: Objection. Form.
14    THE WITNESS: Yes, in a sense. He was -- his
15 behavior was a bit odd, but not in the sense that it would
16 pose a threat or a danger.
17    Q   (BY MR. POPE) Okay. Do you remember giving a
18 statement to the effect that Officer Delgado had indicated to
19 you that Mr. Gonzalez was "mental"?
20    A   Yes, sir.
21    Q   The words that you used?
22    A   Yes, sir.
23    Q   How did you interpret Officer Delgado indicating to
24 you that Mr. Gonzalez was "mental"?
25    A   Possibly mentally ill, in that sense. Not in the

Page 227

1 sense of a danger. But being that, you know, we do deal on
2 with people that have a mental illness on occasion, you know.
3 Nothing -- nothing to the extent of psychotic or a danger in
4 any sense.
5    Q   Now, had you been of the opinion or had you been
6 told that this patient was psychotic, specifically, how would
7 you have gone about doing what you did any differently?
8    A   Well, he would have been definitely restrained
9 further.
10    Q   How, exactly?
11    A   I would have used what was available to me at the
12 time, which was the leg shackles, my other sets of handcuffs,
13 or anything else that the Valley Baptist Medical Center would
14 have pretty much had on -- had with them.
15    Q   Okay. So your testimony here today is that if you
16 had known that this patient was psychotic, assuming that he
17 was, you would have restrained his other arm with another pair
18 of handcuffs. Is that right?
19    A   Yes, sir.
20    Q   And you would have restrained his feet with the
21 shackles?
22    A   Yes. If --
23    Q   At -- at all times?
24    A   -- if -- if the fact that it -- if it would have
25 been told to me that, you know, he -- he was prone to -- to

Page 228

1 violence, in a sense. Just because of the fact that he is
2 psychotic doesn't mean the sense that, you know, he is
3 violent, because there could be people with psychosis that
4 aren't violent under certain circumstances, medicated or so,
5 but -- that wouldn't pose a danger.
6    Q   So being psychotic alone or suspected of being
7 psychotic is not going to be enough to require all of these
8 different restraints?
9    A   No, sir.
10    MR. GARZA: Objection. Form.
11    Q   (BY MR. POPE) Is that right?
12    A   No, sir.
13    Q   What I said was right. Right?
14    A   Yes, sir.
15    Q   Okay, sir. All right. Is a large part of your
16 decision as to how much restraint this person is going to need
17 be largely based upon how the person acts?
18    MR. GARZA: Objection. Form.
19    THE WITNESS: Yes, sir.
20    Q   (BY MR. POPE) Okay. Consequently, you could have
21 someone who is psychotic and a mass murderer, theoretically,
22 and they could very quietly lie in the bed and not bother you
23 or anybody else and not require three sets of shackles.
24 Correct?
25    MR. GARZA: Objection. Form.

Page 229

1    THE WITNESS: True. Yes, sir.
2    Q   (BY MR. POPE) I would like to call your attention --
3 I don't know what exhibit number it is. It is the medical
4 record that you made reference to before.
5    MR. BARRIENTOS: The Valley Baptist Medical
6 record?
7    MR. POPE: Yes.
8    MR. BARRIENTOS: It is Exhibit 15.
9    MR. POPE: Exhibit 15. If you could hand that
10 to him just a second.
11    Q   (BY MR. POPE) You can go ahead and open that up,
12 Officer. And I would like to call your attention to page 49.
13 A reference was made to this previously in your questioning.
14    A   Yes, sir.
15    Q   Do you see page 49?
16    A   Yes, sir.
17    Q   At the top of that page, does it say Physicians
18 Progress Notes?
19    A   Yes, sir.
20    Q   All right. And -- and there is handwriting all the
21 way down to the bottom of the page.
22    A   Yes, sir.
23    Q   With various time entries. Do you see that?
24    A   Yes, sir.
25    Q   Okay. And it is signed, it looks like, M. Lucio, RN

58 (Pages 226 to 229)

GERARDO RAMIREZ                                                    April 10, 2003

## Page 230

1 at the bottom?
2    A   Yes, sir.
3    Q   Okay. And the date is 9/19/2000. Correct?
4    A   Yes, sir.
5    Q   And the first entry on this particular page is at
6 0322, which would be 3:22 in the morning. Correct?
7    A   Yes, sir.
8    Q   All right. And the notation here, apparently by
9 this nurse, M. Lucio, is: Heard cry for help. Coming from
10 south side of hall. Heard loud rattling thumping sound. Saw
11 patient in 503 standing at doorway yanking on handcuff to the
12 left hand attached to bed.
13       And it says here: Witnessed by M.Lucio, RN,
14 M.Valdez, LVN, and L.Vega, LVN.
15       At this time, the officer yelled "Get down. Get
16 down. I sprayed mace.
17       Does that sound like an accurate statement to you?
18    A   Yes, sir.
19    Q   All right. The next notation here is at 03:24,
20 which would be 3:24 in the morning. Correct?
21    A   Yes, sir.
22    Q   It says: Security paged stat, loud banging sound
23 heard, nurses come back to nurses station for protection.
24       Then it goes on, next entry is at 0325, which would
25 be 3:25 in the morning. Correct?

## Page 231

1    A   Yes, sir.
2    Q   It says: House supervisor Irma Aricio RN notified
3 and enroute. First Valley Baptist Medical Center officer
4 arrived at this time.
5       Now, let me ask you, officer, as far as the times
6 here are concerned, do you have any reason to argue with the
7 notations of these times?
8    A   No, sir. No, sir.
9    Q   And -- and I know you were asked questions before in
10 terms of compartmentalized things that happened. How long did
11 this take --
12    A   Yes, sir.
13    Q   How long did this take. And you mentioned -- you
14 gave your best estimates in terms of seconds or so forth.
15    A   Yes, sir.
16    Q   Let me just ask you. From the time that Mr.
17 Gonzalez first stood up --
18    A   Yes, sir.
19    Q   -- and you asked him to get back into bed, and he
20 complied, and then he got up again --
21    A   Yes, sir.
22    Q   -- until the last shot from your gun was fired,
23 during the whole timeframe, how long do you think this whole
24 thing took?
25    A   At the time, it -- it felt like a long time. And it

## Page 232

1 would -- it would be a great exaggeration to feel -- to state
2 that it was maybe anywhere from 15 to 20 minutes, but that's
3 what it felt like to me. It just felt a big extent of time
4 had lapsed. Because of the fact -- at the time of the
5 incident, time ranges from seconds to minutes to, you know,
6 longer. It just feels there is a great lapse in it. And some
7 things vary from seconds, others vary to minutes.
8    Q   Okay. All right. Well, let me ask you this. At
9 this time, can you tell us with any degree of accuracy how
10 long it took?
11    A   I cannot, no, sir.
12    Q   All right. It could be a short time. It could be a
13 long time. At the time you were undergoing this, it probably
14 felt like an eternity.
15    A   Yes, sir.
16    Q   But, obviously, it was not?
17    A   Of course not.
18    Q   Okay. But you can't testify of your personal
19 knowledge under oath how long it took.
20    A   No, sir. No, sir. Just speculation.
21    Q   Okay. The best you can say is it was at some point
22 around or after 3 a.m.
23    A   Yes, sir.
24    Q   Okay.
25    A   Yes.

## Page 233

1    Q   Did anyone at the police department there in La
2 Feria, other than what you have testified to today and the
3 conversations that you had, did anybody else ever have any
4 more of a detailed conversation with you concerning this
5 particular prisoner's background, either mental history,
6 medical history, or what had happened in terms of why he was
7 in custody to begin with?
8    A   No, sir. No, sir.
9    Q   Okay. Were you aware or at any time did you become
10 aware that he had been arraigned?
11    A   No, sir.
12    Q   Did you actually know what the charges against him
13 were?
14    A   I believe aggravated assault with -- against two of
15 the officers.
16    Q   Okay. Did you -- did you -- were you aware at that
17 time or did anyone in the police department indicate to you
18 that the charges against him were attempted capital murder?
19    A   No, sir. No, sir.
20    Q   Would that have made a difference to you had -- had
21 you been told that about how you dealt with this individual?
22    A   Yes, sir.
23    Q   Did Officer Delgado tell you not to let your guard
24 down, that he thought this gentleman was dangerous?
25    A   He stated to not let may guard down, but not in the

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                      (800) 969-3027
                                                                        a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                April 10, 2003

---

**Page 234**

1  sense of danger. Guard could mean several things. I took it
2  in the sense of don't -- don't -- don't let him -- how can I
3  put it into words? By not letting your guard down, don't let
4  him intimidate you or do not let him have -- have his way.
5  You know, have his own way, in that sense.
6    Q   Did -- did Officer Delgado ever indicate to you that
7  he felt Mr. Gonzalez was dangerous, using those words?
8    A   No, sir.
9    Q   When Mr. Gonzalez was initially brought into the
10 hospital and while he was being evaluated, before he went to
11 the -- well, actually, at the time he was taken from the
12 emergency room up to the floor, to the fifth floor room he was
13 in, were you aware that there were two police officers that
14 were with him?
15   A   No, sir.
16   Q   Did anybody at the police department ever indicate
17 to you that there was a feeling that two officers might be
18 needed to keep this gentleman in custody or to watch him?
19       MR. GARZA: Objection. Form.
20       THE WITNESS: No, sir.
21   Q   (BY MR. POPE) Are you aware why the number of
22 officers that were provided by La Feria changed from two to
23 one?
24       MR. GARZA: Objection. Form.
25       THE WITNESS: No, sir. No, sir.

**Page 235**

1    Q   (BY MR. POPE) Are you aware of any communications
2  that were made between the prisoner, Mr. Gonzalez' physician,
3  and the chief of police?
4    A   No, sir.
5    Q   No one ever passed that information to you? Or you
6  never became of any -- you never became aware of any
7  information concerning Mr. Gonzalez' condition that was passed
8  on to the department.
9    A   No, sir.
10   Q   And, as you testified earlier, any such information
11 was not passed on to you by anyone in the department.
12   A   No, sir.
13   Q   As far as your communications with the department,
14 and by department I mean police department, you were first
15 contacted by Tony Garcia?
16   A   Yes, sir.
17   Q   All right. And that was essentially -- the purpose
18 of that was to see whether you could accept the assignment.
19 Am I correct?
20   A   Yes. If I would -- if I would come in.
21   Q   Okay. All right. And then you had the conversation
22 with Officer Delgado, who you relieved?
23   A   Yes, sir.
24   Q   Do you remember having any conversations with
25 anybody in the department, the police department, other than

**Page 236**

1  those two individuals about your tasks or about the prisoner?
2    A   No, sir.
3    Q   And as far as any sort of interaction with hospital
4  security is concerned, you indicated that when you first got
5  to the hospital you were escorted by a security officer up to
6  the room.
7    A   Yes, sir.
8    Q   And then you may have had some additional
9  interaction with them when you requested a bathroom break and
10 they relieved you so you could go to bathroom.
11   A   Yes, sir.
12   Q   Okay. That's the only interaction you recollect
13 having with them.
14   A   Yes, sir.
15   Q   As far as any interaction that the other officers
16 had with them, in other words, Officer Delgado or anyone who
17 may have accompanied the prisoner into the hospital, you --
18 you have no knowledge of that?
19   A   No, sir.
20   Q   So -- all right. All right. When you went into the
21 hospital to take over the custody of this particular
22 individual, were you in your uniform?
23   A   Yes, sir.
24   Q   And when you are in your uniform, you would be
25 wearing your badge and an identification tag.

**Page 237**

1    A   Yes, sir.
2    Q   And you did receive information, when you went into
3  the hospital, that if security were needed, if the security
4  department or someone from the security department in the
5  hospital were needed, that the channel of communication would
6  be the telephone?
7    A   Yes, sir.
8    Q   They gave you, I guess, the extension to the
9  security department?
10   A   Yes.
11   Q   And at no point did you request that the location of
12 the phone be changed. Correct?
13   A   No, sir.
14   Q   That's correct?
15   A   Yes, sir, that's correct.
16   Q   As far as the type of restraints that were available
17 to you or that were being used, specifically handcuffs and
18 shackles, was there a key available to you at all times so
19 that if necessary those could be disengaged?
20   A   Yes, sir.
21   Q   You got to the hospital at about 3 o'clock or maybe
22 a little thereafter, approximately in the afternoon of
23 September the 18th. Correct?
24   A   Yes, sir.
25   Q   And you remained there the entire time until the

---

60 (Pages 234 to 237)

GERARDO RAMIREZ                                                                April 10, 2003

Page 238

1 incident actually occurred?
2    A  Yes, sir.
3    Q  All right. So you did not -- as far as relief is
4 concerned, the only -- the only time that you requested relief
5 was to go to the bathroom?
6    A  Yes, sir.
7    Q  Up until 3 a.m. or after 3 a.m., more or less, when
8 the series of events occurred that led to Mr. Gonzalez' death,
9 was there anything that he did or did not do that indicated to
10 you, again, just from observing him, not being a doctor or a
11 nurse, but just observing him, indicated to you that he had a
12 propensity for violence toward you?
13    A  No, sir.
14    Q  Did you see anything that indicated to you from your
15 observation, again, not being a doctor or a nurse, but just
16 observing this gentleman consistently during this timeframe
17 that indicated to you that he was a threat to other patients?
18    A  No, sir.
19    Q  Was there anything that you saw during the time that
20 you were observing him, from the time you got there until the
21 time of this incident, that indicated to you, again, not be
22 being a medical expert, but just based on your observation,
23 that he was a threat to the doctors or the nurses?
24    A  No, sir. No, sir.
25    Q  You indicated that you had had no specific training

Page 239

1 on custody of individuals within this sort of a setting, a
2 hospital-type setting. Correct?
3    A  Correct.
4    Q  All right. Despite the fact that you had had no
5 formal training in that particular area, was it your
6 understanding that -- that whether you were instructed in this
7 specifically or not, was it your understanding that your --
8 your duty was simply to make sure that Mr. Gonzalez didn't
9 escape?
10    A  Yes.
11    Q  Didn't hurt anybody else?
12    A  Yes, sir.
13    Q  And, to the extent you could, you would try to keep
14 him from hurting himself?
15    A  Exactly. Yes, sir.
16    Q  Was that what you believed -- whether you had formal
17 training in it or not, was that what you believed your
18 responsibility to be?
19    A  Yes, sir.
20    Q  Was that what you believed the extent of your entire
21 responsibility to be?
22    A  Yes, sir.
23    Q  Do you think you carried out that responsibility as
24 best you could?
25    A  Yes, sir. I do.

Page 240

1    Q  If -- if someone from the hospital had -- had told
2 you, "Officer, we don't think this patient needs any
3 restraint, we want you to take the handcuffs off of him,"
4 assuming he is only handcuffed one hand to the left side of
5 the bed," if -- if -- if the nurse walked in there and said,
6 "Take that off of him. He doesn't need a restraint," would
7 you have done it?
8    A  No, sir.
9    Q  If a doctor came in and said, "Take the handcuff off
10 of him. He doesn't need a restraint," would you have done it?
11    A  No, sir.
12    Q  If somebody had walked in, again, you knowing only
13 what you knew, this gentleman had not given you a problem, say
14 we are talking about, you know, you got there at 3 -- at 8
15 o'clock at night. Somebody walks in the room, they look like
16 they are dressed like a doctor or a nurse and they tell you,
17 "Put shackles on him and put the other set of handcuffs on
18 him. Get another set of handcuffs and put them on him," and
19 the man is just laying there looking at you, not doing
20 anything, would you have done it?
21        MR. GARZA: Objection. Form.
22        THE WITNESS: No, sir.
23    Q  (BY MR. POPE) Well, let me ask that question a
24 different way. We weren't there. You were. Based on Mr.
25 Gonzalez' behavior, the way he had treated you from the time

Page 241

1 you got there until, say, about 8 or 9 p.m., let's say
2 specifically 8 p.m., if someone had walked in the room,
3 someone from the -- that you would assume is from the
4 hospital, a doctor or a nurse and said, "Put another set of
5 handcuffs and put shackles on the man's legs," would you have
6 done it?
7        MR. GARZA: Objection. Form.
8        THE WITNESS: That would depend. That would
9 depend on the aspect. First I would ask them why would they
10 feel that he would need to be further restrained. And I would
11 try to obtain some kind of information based on why he wants
12 that done. And then I would also try to make contact with
13 security and see if, you know, that is viable or it can be
14 done.
15    Q  (BY MR. POPE) All right. You would not have done it
16 simply on someone's order to do it. At that point, based on
17 what you knew, you would have at least made an inquiry about
18 it to see why you were being asked to do this?
19    A  Yes, sir.
20    Q  Okay. And the reason you would have made inquiry
21 about it is because this gentleman had not displayed any
22 behavior up to that point that indicated to you that he needed
23 to be -- have three sets of restraints on him. Correct?
24    A  Exactly.
25        MR. GARZA: Objection.

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100         SAN ANTONIO, TEXAS 78230                 (800) 969-3027
                                                                    a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ                                                      April 10, 2003

Page 242

1    Q   (BY MR. POPE) Is that right?
2    A   Yes, sir.
3    Q   As far as -- as far as medications that are given
4  for -- for psychiatric conditions, psychoses, things like
5  that, that is not -- you have no knowledge of that.  Correct?
6    A   Vaguely.  Not really.
7    Q   Okay.  If -- if -- if -- if a doctor were to tell
8  you this patient is on such and such a medication, would --
9  just the name of the medication, would you have any knowledge
10 as to how that may or may not affect the patient?
11   A   No.  No.
12   Q   Insofar as how many security officers are at the
13 hospital at any one time or what their assigned areas of
14 responsibility would be, that is not something within your
15 knowledge.  Correct?
16   A   No, sir.
17   Q   When these events began to occur, when -- when Mr.
18 Gonzalez first was startled by -- or awakened by whatever it
19 was out in the hall, did you specifically make a note of the
20 time?
21   A   No, sir.
22   Q   Okay.  So the times you are giving us are your best
23 recollection?
24   A   Yes, sir.
25   Q   But they may not be exact.

Page 243

1    A   Exactly.  It is -- I remember -- the reason why I
2  remembered is because I had checked my time on my watch around
3  that timeframe.
4    Q   Okay.
5    A   Which was prior to the incident, of course.
6    Q   Even though, you know, we don't know the exact
7  timeframes you are talking about, would it -- and you did
8  indicate at the time it felt like an eternity to you --
9    A   Yes, sir.
10   Q   We know after the fact, do we not, that it didn't
11 take an eternity?
12   A   Yes, sir.
13   Q   Do you have any way of estimating, based on your
14 personal knowledge or recollection, of exactly how long it
15 took?  I mean, I don't want you to guess or speculate.  If --
16 if you can tell me, tell me.  But if -- if you don't know,
17 then just tell me you don't know.  I am asking if you know
18 exactly how long it took.
19   A   I don't know.  I don't know.
20   Q   You were shown some pictures by Mr. Barrientos with
21 regard to the wounds.  I think there were some photos that
22 were taken at autopsy.  Have you ever received any specific
23 training that would indicate to you how to assess entrance or
24 exit wounds?
25   A   No, sir.

Page 244

1        MR. POPE:  I think we will pass the witness at
2  this time.
3        MR. GARZA:  Can I borrow the microphone?
4        MR. POPE:  Sure.
5        E X A M I N A T I O N
6    Q   (BY MR. GARZA) Officer Ramirez, if the hospital had
7  decided for a medical reason to apply their own additional
8  restraints to Mr. Gonzalez, would you have interfered?
9    A   Of -- at the time I would verify why.  And then if
10 the reason to -- to further secure Mr. Gonzalez was apparent,
11 I would.  I would have allowed it.
12   Q   I am sorry?
13   A   I would have allowed it.
14   Q   And if they would have determined for a particular
15 medical reason or for something associated with Mr. Gonzalez'
16 treatment that they made a decision to apply additional
17 restraints on him for some reason, would you have been able to
18 interfere with this doctor's determination on -- on how to
19 care for this patient?
20   A   No.
21        MR. POPE:  Objection.  Form.
22        MR. GARZA:  Pass the witness.
23        E X A M I N A T I O N
24   Q   (BY MR. BARRIENTOS) Just a couple of questions,
25 Officer Ramirez, I forgot to ask you.  Were you paid for the

Page 245

1  time you spent at the hospital that evening?
2    A   No, sir.  I was not.
3    Q   It was in your reserve capacity?
4    A   Yes, sir.
5    Q   Okay.  But you were still within the course and
6  scope of your employment?
7    A   Yes, sir.
8    Q   In other words, you were performing police duties?
9    A   Yes, sir.
10   Q   Okay.  Regardless of -- of whose decision it was to
11 restrain or to what degree to restrain Mr. Gonzalez, do you
12 still agree that had he been more fully restrained this
13 incident would not have occurred?
14        MR. POPE:  Objection.  Form.
15        THE WITNESS:  Yes, sir.
16        MR. BARRIENTOS:  No further questions.
17        MR. POPE:  Nothing further.
18        MR. GARZA:  We reserve the rest of our
19 questions until time of trial.
20        (Deposition concludes at 5:05 p.m.)
21
22
23
24
25

(210) 377-3027                 ESQUIRE DEPOSITIONS SERVICES         FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100       SAN ANTONIO, TEXAS 78230             (800) 969-3027
                                                              a098a238-d256-4a3a-bc84-8dbd23f0c9f1

GERARDO RAMIREZ

April 10, 2003

---

**Page 246**

```
1
2        CHANGES AND SIGNATURE
         RE. CARRANZA VS. CITY OF LA FERIA
3     PAGE  LINE  CHANGE    REASON

4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11
12       I, GERARDO RAMIREZ, have read the foregoing
      deposition and hereby affix my signature that same is true and
13    correct, except as noted above.

14       GERARDO RAMIREZ, Witness
15
16    THE STATE OF TEXAS   )
      COUNTY OF _____ )
17       Before me, _____, on this day personally
      appeared GERARDO RAMIREZ, known to me (or proved to me under
18    oath or through _____) to be the person whose
      name is subscribed to the foregoing instrument and
19    acknowledged to me that he executed the same for the purpose
      and consideration therein expressed.
20
         Given under my hand and seal of office this _____
21    day of _____, 2003.
22
23       _____
         NOTARY PUBLIC IN AND FOR
24       THE STATE OF TEXAS
25
```

**Page 248**

```
1    Certified to by me this _____ day of _____, 2003.
2
     Costs: _____
3    Due and owing by Plaintiff
4
         _____
         KATHERINE J. BROOKBANK, Texas CSR 2060
5        Expiration Date: 12/31/03
         7800 IH-10 West, Suite 100
6        San Antonio, Texas  78230
         (210) 377-3027
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 247**

```
1         IN THE UNITED STATES DISTRICT COURT FOR THE
                  SOUTHERN DISTRICT OF TEXAS
2                     BROWNSVILLE DIVISION
3     MARY E. CARRANZA, ET AL,      *
            plaintiffs,  *
4                               *
      VS.               *  C. A. NO. B-02-180
5                               *
      CITY OF LA FERIA, TEXAS, ET AL, *
6           defendants  *
7     -------------------------------------------------
              REPORTER'S CERTIFICATION
8        VIDEOTAPED DEPOSITION OF GERARDO RAMIREZ
                    APRIL 11, 2003
9     -------------------------------------------------
10       I, KATHERINE J. BROOKBANK, Certified Shorthand Reporter
11    in and for the State of Texas, hereby certify to the
12    following:
13       That the witness, GERARDO RAMIREZ, was duly sworn by the
14    officer and that the transcript of the oral deposition is a
15    true record of the testimony given by the witness;
16       That the deposition transcript was submitted on
17    _____ to the witness or to the attorney for
18    witness for examination, signature, and return to me by
19    _____ ;
20       I further certify that I am neither counsel for, related
21    to, nor employed by any of the parties or attorneys in the
22    action in which this proceeding was taken, and further that I
23    am not financially or otherwise interested in the outcome of
24    the action.
25
```

**63 (Pages 246 to 248)**

GERARDO RAMIREZ

April 10, 2003

Page 249

**A**

abandon 175:2
abandoned 175:20
abate 136:16
ability 129:7 191:8
 201:11
able 45:20,24 57:14
 87:17 108:23 109:18
 109:24 120:24
 144:24 145:1 146:14
 146:18,20 147:3
 166:19 167:15
 170:10 180:21
 191:23 194:23
 198:12,15 200:24
 203:7 207:10 244:17
about 4:25 5:12,12
 6:11 9:12,13,14 12:5
 12:7,10,21,22 14:20
 14:23 15:7,15 17:13
 17:15 19:10 20:12
 23:18,18,24 24:16,19
 25:20 26:1,6 29:16
 29:22 32:25 33:9,23
 34:3,4 35:23 36:8
 37:2 40:23 41:1,18
 42:9,21 43:1 45:15
 45:15,15 48:21 51:1
 57:16 61:5,7 67:15
 67:15 68:24 69:10
 70:10,12 73:8 74:7
 75:6,25 76:2,3,22
 78:15,23,24,25 79:1
 79:2,3,3 81:20 83:25
 85:6 86:5 89:3 92:12
 92:16 94:7,18,18,22
 94:25 96:1,9 97:12
 97:15,20 98:13,23
 106:20 108:16 109:1
 109:1,7,17 111:10,10
 111:14,14 112:5
 113:19,20,21 114:8
 114:15,21,22 115:19
 115:21 116:8,12,17
 117:3,21 122:16
 124:13,13 127:9,9,12
 127:13 129:1,5,5,25
 130:18 131:8 134:3
 137:24 143:17,19
 144:1,2,3 146:4
 147:18 148:16
 149:11,18 156:20
 160:5 165:16 169:6
 169:17,25 170:7,9,13
 172:23 173:13,17
 177:9,19 181:24

182:13 184:9 185:2
 190:19 196:16
 197:22 198:17
 202:10 203:1 207:9
 209:24 220:5,15
 223:2 227:7 233:21
 236:1,1 237:21
 240:14 241:1,17,21
 243:7
above 246:12
above-styled 2:3
academy 16:2,3 18:6
 18:11,14,17,19,20,21
 19:1,7,10 20:23
 22:20 23:2,3,10,18
 23:23 24:2,9,20,21
 24:24 25:6,21 26:12
 26:15 28:24 29:4,23
 30:8 32:5 33:17
 34:10,18 35:4,13,23
 36:5,11 38:16,20
 40:11,14,22 42:16
 45:9,11 46:10 48:16
 48:16 49:4 59:4,5
 62:15 67:23,24 68:13
 68:14 181:24
accept 235:18
accessible 105:19
Accident 3:17
accidental 183:19
accidentally 147:21
 188:20 203:11
accompanied 236:17
accompany 210:11
accompanying 210:20
according 109:25
accuracy 62:10,11
 232:9
accurate 36:10 230:17
achieve 67:25
achieved 43:2
achievement 68:4
acknowledged 246:19
across 136:23,24 137:3
 138:8,10,12 159:9
 216:10,15,20 217:4
 218:17
Act 1:6,15
acting 91:14
action 1:14 63:3,5
 64:25 65:1,1,3,3,8,8
 65:13,14 66:1,15,16
 66:17 67:8 80:18
 126:2 131:13 147:21
 182:7 247:22,24
actions 26:6,7

acts 228:17
actually 10:1 28:9
 39:20 51:23 59:6
 61:15 64:20 70:25
 108:22 109:19 110:6
 121:11 126:2 140:9
 141:2 142:3 144:11
 146:10 149:6 156:22
 156:23 166:11
 167:11 168:1 176:8
 193:7 194:11 199:25
 207:8 216:21 217:8
 217:15,21 218:6
 220:23 233:12
 234:11 238:1
ADAMS 2:17
addition 58:5 180:19
 182:18
additional 236:8 244:7
 244:16
adds 65:15
adjoining 212:2
adjusted 67:7
administered 40:1
administration 8:25
 9:23 10:2 95:25
administrative 210:7
admission 18:21 100:8
admitted 23:4,7
advance 43:14,18
 44:12 143:14 201:24
 219:12
advancing 43:13,17
advise 80:15 172:25
 212:6
advised 71:4 104:18
 113:18 114:9 124:21
 126:8 132:18 176:10
 204:18
affect 36:12 242:10
affirmatively 107:24
 113:23 116:13
affix 246:12
after 4:17 8:19 10:23
 10:24 11:13,14,16
 12:5,7 15:22 16:8,8
 18:9 44:24 48:16
 52:11 54:19 55:16
 56:24 57:1,10,11
 59:4,4,5 60:21 61:2,3
 61:4 63:7 66:10,25
 67:1 68:6,25,25
 80:14 83:23 85:9
 91:10 106:14 107:11
 111:22,23,24 115:11
 116:15,20 117:24

118:20 119:20
 120:19 122:11
 123:22 125:6 136:16
 138:7 143:12,24
 146:23 147:8,9 153:1
 155:8 156:8,16,16,19
 159:17 162:21 163:2
 163:3 166:21 167:3,3
 167:17 171:7 172:17
 173:9 174:17 184:22
 187:24 188:9 191:15
 192:11 194:4,15
 204:1,7 205:4 206:1
 206:1,11,11,13,17,21
 216:8 219:5 232:22
 238:7 243:10
afternoon 67:11,12
 86:9 98:23 102:5
 113:21 237:22
afterwards 153:2
again 12:5 16:9 17:15
 18:13 75:6 84:11
 92:24 97:20 103:5
 113:2 124:10 132:10
 136:8 139:15 143:3
 147:10 155:11,14
 156:18 159:10
 172:14 178:25
 180:10 183:12
 187:12,19 199:5
 231:20 238:10,15,21
 240:12
against 72:22 157:20
 157:25 200:14 218:4
 233:12,14,18
age 78:19
agencies 48:18,19,19
 48:21 49:6,11 59:4
 75:8 111:4
agency 21:4,19 23:16
 45:9 59:23 60:3 82:9
 85:22 94:24 210:23
aggravated 233:14
aggressive 32:14
agree 30:13 37:7,10
 38:4,11 43:12 44:17
 46:2 47:4,23 126:25
 135:7 136:8 137:9,13
 158:5 189:19 245:12
ahead 19:18 21:15 62:9
 62:9 77:23 78:13
 106:18 229:11
ahold 146:1 180:19
aim 181:9 189:1
air 191:9
AL 247:3,5

Alamo 5:14 6:15 7:8,16
 21:4,7,8,13 48:22
alarms 210:1
Alberto 7:2,5
alert 46:21
allow 99:17 189:10
allowed 14:13 37:4
 59:11 90:24,25 129:6
 244:11,13
allows 63:18 110:10
Almost 149:20
alone 135:13 228:6
along 21:24 122:1,9,16
 122:21,24 150:19
 151:23,23 152:19
Alongside 147:17
 151:23
already 65:9 75:13
 129:20 130:21
 140:20 164:5 207:9
 208:7
altercation 126:24
 153:9 174:24
alternative 135:8 136:9
always 12:25
ALYSSA 1:4
American 10:12
ammunition 34:24 35:9
 90:24 92:1 190:20
 192:2 210:10,13
 211:16,17,20
amount 9:4 32:19
 179:17
Anatomic 195:23
and/or 6:18 15:4 31:6
 41:9 50:3 54:12
 68:15 100:16 109:15
 110:9 136:10 211:1
ANGEL 1:3
anger 192:20,22 193:3
 193:8,8,13,25 194:3
angle 149:20 165:22
 200:3,5 201:17
angry 193:1,7,9,10
ankle 123:1
ankles 33:16 123:1
another 29:11,14 54:25
 63:7 64:24 71:15
 72:10 75:14 80:13
 81:13,13,18 84:2
 92:25 97:2 101:2,18
 101:25 105:13
 108:17,21 143:6
 144:1 174:17 175:15
 177:13 183:13 209:8
 212:7 221:12,13

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 250

| | | | | |
|---|---|---|---|---|
| 227:17 240:18 241:4 | appeared 246:17 | 165:13,15,16 166:1 | aside 33:11 48:14 | assuming 227:16 240:4 |
| answer 4:22,23,24 33:3 | appears 121:13 | 173:15,16 174:9,10 | 90:16 | assurances 99:24 |
| 60:19 70:18 101:21 | applicable 170:1 | 174:18,21 175:7 | asked 21:16 70:13,17 | assure 99:17 |
| 102:7,11 213:4 | application 18:24 | 177:2,22,23,25 178:2 | 70:21 71:17 79:24 | as-needed 53:23,24 |
| answers 102:1,7 | 20:24 21:25 27:3 | 181:13,20 182:20 | 80:2 88:5 102:6 | attached 3:3 118:7 |
| Antonio 248:6 | 29:1 36:20,22,25 | 184:16 198:21 199:5 | 103:4 108:25 113:4 | 154:7 180:25 230:12 |
| anybody 84:25 85:19 | 38:9,11,13 44:7,14 | 199:11 201:2,4 205:6 | 115:3 117:1,10,19,20 | attacking 77:6 |
| 132:6,23 153:18 | 44:19,21 45:16,21 | 217:4,7 218:12 239:5 | 119:20 123:12,22,23 | attempt 77:14 140:2 |
| 154:16,20,20,21 | 64:12 67:4 152:21 | areas 28:11,13 39:4,19 | 124:18 133:19,20 | 145:8 167:15 171:9 |
| 185:14 204:19,20 | applications 30:23 | 39:22 40:24 144:4 | 164:5 213:24 215:22 | 216:24 220:6 |
| 228:23 233:3 234:16 | 211:15 | 173:14 184:15 | 223:22 231:9,19 | attempted 76:17 |
| 235:25 239:11 | applied 12:19 13:1,10 | 242:13 | 241:18 | 138:10 144:8,13 |
| anymore 173:10 | 32:6 37:12,20 38:1,4 | argue 231:6 | asking 40:18 102:14,15 | 153:5 174:18 176:16 |
| anyone 14:20,22 89:4 | 38:5 45:16 48:21,22 | Aricio 231:2 | 102:16 103:13 | 183:12 204:9 205:7 |
| 91:5 92:15 94:18 | 48:23 49:1,6,12 | arm 74:9 77:19 79:22 | 112:24 119:9 123:19 | 233:18 |
| 95:15,20,24 99:11,18 | 65:24 75:14 | 79:22 80:23,25,25 | 163:1 243:17 | attempting 102:25 |
| 99:24 100:24 103:8 | applies 121:12 | 83:14 84:11 93:5 | asleep 115:13,16 | 153:22 |
| 105:19 106:6 108:16 | apply 17:23 18:21,23 | 110:13,14 138:20 | 116:23 | attempts 167:16 |
| 153:16 196:11 | 23:15 32:9 42:3 | 142:20,21,22,24,25 | ASP 60:16 69:12,13,14 | attend 8:20 21:19 |
| 209:20 210:7,15 | 45:17 48:10 49:25 | 155:22,22 165:9 | 70:7,12,15 71:10,14 | 23:22 96:5 |
| 211:1,23 233:1,17 | 59:3 64:20 66:7 | 173:16,18 176:20 | 71:20 73:18 142:13 | attended 7:16 18:14 |
| 235:11 236:16 | 125:2 244:7,16 | 180:9 187:9 188:9 | 142:14 143:9 144:11 | 24:2 |
| anything 10:5 19:12 | approached 204:11 | 227:17 | 144:15,23 145:4,15 | attending 18:11 |
| 20:18 21:3 23:12 | appropriate 4:24 29:4 | arms 25:4 | 145:18 146:3,8,12,23 | attention 153:22 229:2 |
| 32:4 36:2,3,8 40:23 | 30:3 36:22 77:12 | around 2:24 33:16 | 147:4,7,8 148:6,24 | 229:12 |
| 42:9 46:21 67:16 | 209:24 | 43:18 44:12 55:20 | 151:20 156:5,8,17 | attorney 247:17 |
| 88:20 90:6 91:17 | approval 96:11 129:17 | 80:15,19 95:13 | 158:24,25 173:5 | attorneys 247:21 |
| 94:7,22,24 102:10 | approved 97:6 210:22 | 109:19 116:17,17,19 | 174:12,25 175:3,20 | Audio 2:23 |
| 111:14 112:7,20,24 | approximate 78:19 | 117:9,25 118:21 | 217:12 | August 8:1 19:8 49:5 |
| 116:8 118:24 119:6 | 199:5 219:9 | 119:24 126:16 | aspect 70:20 224:13 | auto 45:12 |
| 119:25,25 123:23 | approximately 115:15 | 153:23 163:16 167:1 | 241:9 | automatic 62:23 64:16 |
| 125:25 129:22,23 | 115:18 127:13,20 | 174:21 175:6 176:7,9 | assault 233:14 | 64:17 |
| 139:8,11,22 140:12 | 177:1 199:1 237:22 | 176:13 177:21 | assess 42:14 45:17 | automatics 211:21 |
| 140:14 141:6 158:23 | April 1:24 2:3 247:8 | 178:18 199:17 | 191:23 192:10 202:3 | autopsy 3:12,25 195:10 |
| 179:8 181:2 185:6 | Arcute 19:25 | 200:19,21,22 201:14 | 204:10 206:19 | 195:10,22 202:11,12 |
| 204:3,5,11 218:21 | area 8:23 12:25 24:10 | 203:18,24 218:10 | 243:23 | 243:22 |
| 221:23 227:13 238:9 | 27:22,23 30:19 38:25 | 232:22 243:2 | assessing 47:4 192:5 | available 2:24 93:12,14 |
| 238:14,19 240:20 | 39:9,9,18 41:7,8,18 | arraigned 233:10 | assessment 97:23 | 108:18 109:13 |
| anyway 120:13 | 41:21 48:19,22,25 | arrangement 24:1 | assigned 58:16 107:3 | 114:18 131:21 |
| anywhere 24:17 26:14 | 49:1 50:9 78:13 | arrest 30:20 37:11 79:8 | 242:13 | 144:22 146:1,24 |
| 32:22 33:7 53:12,15 | 81:25 82:21 84:19 | arrested 22:9,12 76:16 | assignment 13:20 | 180:21,23 211:20 |
| 53:16,19 57:12 64:9 | 105:23 106:19 | 76:20 95:18 | 235:18 | 227:11 237:16,18 |
| 83:6 156:1 183:9 | 114:22 116:18 122:4 | arresting 79:7 | assist 76:18 82:7,9 | avails 160:4 |
| 190:24 232:2 | 122:5,6,25 123:7,8 | arrests 74:24 76:1 | 129:19,24 214:5 | average 20:14 |
| aorta 195:25 196:7 | 123:17 128:15 129:5 | arrive 89:2 114:3 | assistance 74:20 75:9 | awake 114:24 115:24 |
| apart 57:5,17 | 130:13,20 131:5,24 | 135:16 206:2 | 76:14 81:22 88:15 | awakened 242:18 |
| apologize 45:2 | 132:6,17,18,21 | arrived 77:4 84:7 | 106:21 107:15 | aware 100:7 109:8 |
| apparent 43:6,7 46:22 | 140:13 142:25 143:2 | 89:20 91:10,13 92:16 | 131:14 132:12 133:9 | 111:6 189:22 194:11 |
| 47:1 104:9 194:15 | 143:6,6,7 144:5,6 | 93:1 107:6,13 135:5 | 133:20 135:5,16 | 233:9,10,16 234:13 |
| 201:13 222:5,8 | 148:14 149:17 150:3 | 175:23 206:9 209:21 | 153:22 216:15 | 234:21 235:1,6 |
| 244:10 | 150:7,25 152:12 | 231:4 | assisted 82:22,25 84:10 | away 78:9 102:7 |
| apparently 98:22 | 153:20,25 154:18,21 | arriving 111:1 | associated 16:22 | 130:10,15 141:5,20 |
| 103:15 230:8 | 155:21,22 156:20,24 | artist 163:18 | 244:15 | 156:17 161:5,6,8 |
| appear 32:18 224:19 | 158:15,18,18 159:20 | Arturo 5:18 | assume 22:1,8 29:20 | 167:12 168:1 169:18 |
| 224:20,22 | 159:20 162:6,9,10,14 | ascending 196:3 | 79:23 137:17 188:14 | 170:12 182:12 186:7 |
| Appearances 2:10 3:2 | 163:9,15,24 164:2 | ascertain 42:10 | 198:10 241:3 | 186:9 205:5 |

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

axilla 198:20,25 199:5
A-R-C-U-T-E 20:2
A-R-U 20:2
A-S-P 60:16 69:12
a.m 2:4 56:13 101:19
  102:23 115:23
  116:12,17,18 232:22
  238:7,7

――――――
           B
――――――
B 121:19 149:12,15
  150:11 156:21,25
  162:21 163:5 165:16
  165:18 166:18
back 15:25 19:9 21:8
  22:3 34:9 42:1 44:12
  49:3 63:2,6 65:7
  67:13 68:2 76:7 80:3
  80:16,19 81:2,4 84:9
  84:9 92:25 110:14,16
  117:12,22 118:23
  119:13,15,19,23
  123:25 124:6,14,18
  132:16,19,21 139:13
  141:4,4,12,14 143:13
  143:13 154:25 160:1
  162:21 172:5,8,14
  174:23 176:15,17,23
  178:17 179:19,22,25
  186:10,15 187:14,23
  188:2 189:5,16,20
  190:9,11 196:18,20
  196:24 197:1,10,12
  197:16 199:11,12,23
  201:14,18 202:4
  203:2,2,9,15,18,20
  212:16 216:1 217:5
  217:13,15,17 218:3
  220:12,17 221:20
  230:23 231:19
background 21:3,17,21
  22:21 50:1 153:19
  233:5
backing 202:3
backup 106:21 131:14
  136:11,25 216:15
backwards 205:5
bad 149:16
badge 236:25
ball 35:7,7
banging 154:24 230:22
Baptist 1:12,20 85:8
  86:6,16 88:5,15
  97:11 206:16 208:2
  213:11 226:6 227:13
  229:5 231:3

Barretta 58:20 63:1
  65:6 66:8 72:4 92:6
Barrientos 2:11 3:4,6
  4:4 5:11 12:4 67:11
  101:13,18 109:23
  110:4 121:7 127:2,5
  129:10 135:12 136:2
  136:14 142:2 143:17
  157:15 158:22 160:7
  163:2,6 164:11,13
  168:14 172:4 182:7
  190:2,17 191:5
  192:19 193:18
  198:16 202:2 203:20
  204:1 207:8,13,18,22
  208:20 211:16 212:9
  212:13,16 213:6,8,17
  214:14 215:4,12,21
  216:4,19 217:2,11,24
  218:19,20 219:4,14
  220:2,12 221:12
  222:9,10,16 223:1,21
  224:3,11 225:14,25
  229:5,8 243:20
  244:24 245:16
based 26:16 224:18,24
  228:17 238:22
  240:24 241:11,16
  243:13
basic 62:3 68:18 96:23
basically 12:24 14:7
  15:1 17:3 18:4,5 21:2
  21:10,20 22:16 26:20
  29:13 30:19 33:8,15
  33:21 36:23 38:24
  41:6,8 42:14 43:5,6
  43:10 46:19 52:22
  56:11 58:6 69:15
  71:6 74:6 82:1,2
  95:10 117:9 137:3
  145:23 159:3,12
  189:14 206:12
basics 9:21
basis 8:21 52:20,22
  53:23 54:17 57:16
bath 103:13 123:7
bathe 103:14 104:1
bathing 103:18
bathroom 104:13
  106:8 107:16 123:4,8
  214:2 236:9,10 238:5
baton 69:12,14,16,20
  70:25 71:2,7 73:20
  85:2 147:10,11,12
  155:14,16 159:23
  219:17

became 57:1 60:23
  135:22 144:20 159:3
  222:8 235:6,6
become 6:18 49:25,25
  66:12 84:4 206:13
  211:19 233:9
becomes 66:11
becoming 23:7 50:18
  77:22 80:22
bed 93:7,8,8 102:21
  109:19 117:12 118:3
  118:5,12,15,17,22,23
  118:23 119:15,19,24
  122:11,14 123:20,25
  124:7,8,14,17,18
  125:11,13 126:9,23
  127:8,14,17,21 128:6
  128:9 129:2,5,7
  132:9,16,18,19
  134:18,24 138:10,12
  138:14,15,16,23
  139:3,3,13 141:9
  142:4 148:10,12
  149:18 150:5,6,13,17
  150:19,25 151:1,2,3
  151:6,8,13,13,16,17
  153:11 154:7 155:11
  155:12,20 156:9,12
  157:6,7,9,10,16,17
  158:6,8,9,9,15 159:3
  159:9,18 160:8,10,10
  160:13,14,15,17,18
  160:22,22,25 161:2,3
  161:7,8,12,17 162:4
  162:5,6,8,9,16 163:3
  164:4,5,6,16 165:11
  165:13,19,20,22
  166:2,4,6 167:19,25
  170:21 171:8,10,11
  171:12,15,17,24
  172:5,14 173:10
  177:4,5,14 178:4,5,6
  178:8,14,17 186:18
  186:21 200:8,10,11
  206:22 207:1,2
  215:14 217:3,18,18
  218:1,7,10,15 219:1
  219:1,20,24 221:6,9
  221:21 222:12,21
  228:22 230:12
  231:19 240:5
bedpan 104:22
bedside 99:17 106:19
before 2:4 4:15 6:19
  13:17 19:10 22:1
  23:4,7,13 24:21,24

42:10 45:16 46:4,6
  48:12 59:2,3,5,6,10
  60:20 61:15 67:24
  68:23 73:17 80:15
  85:10 86:16 87:1,7
  87:13 95:15 96:16
  103:5 108:23 111:1,4
  113:4 115:1 117:2
  120:8 122:14 130:1
  132:13,24 142:16
  146:3,7 159:14
  161:15 164:14
  166:20 167:4,16
  172:20 180:16
  190:18 207:23
  216:20 229:4 231:9
  234:10 246:17
began 10:25 11:15,18
  13:17 14:5 19:1
  22:20 48:18 50:22
  51:2,4,7,23 53:2,5,8
  55:13,23 58:19 59:3
  59:6 60:13,20,21
  61:2 68:24 72:20
  76:14 78:12 84:5
  86:13 87:2 116:16,20
  116:22 118:21
  119:17 124:10
  126:17 131:22
  132:16 135:22,22
  141:9 142:4 144:19
  144:23 145:4,18
  147:10 149:9 153:2,3
  153:4 155:11 156:18
  159:16,17 165:7,13
  167:5,23 172:22
  175:19 187:18,23
  217:5,12 219:24
  242:17
begin 5:12 11:10 12:6
  52:3 53:3,6 145:15
  156:8 192:25 233:7
beginning 24:14 28:7
  116:18 168:10
  216:10
begins 215:11
Behalf 1:5
behavior 46:18,20,20
  46:25 47:1 224:18,21
  224:24 226:15
  240:25 241:22
behavioral 210:6
behaviors 209:24
behind 80:3,16,19 81:2
  81:3 84:9 168:11
being 4:17 23:4 37:17

43:13 75:13 88:4
  91:23 95:2,11 102:6
  103:3 105:13 127:11
  131:22 136:7 146:14
  156:23 169:6 174:4
  189:9 196:7 200:2
  201:1,3,11 203:1
  224:14,15 227:1
  228:6,6 234:10
  237:17 238:10,15,22
  241:18
believe 8:14,22 10:22
  12:8,16 13:3,6 19:5
  20:7 23:24 27:23
  30:7 32:19 36:6
  40:16 42:3 45:11
  49:5 50:7,7,10 51:4
  52:9 55:16,19 56:2,2
  56:8,23 59:3,16,21
  68:5 69:16 71:16
  76:12,15,25 78:20
  80:16 81:13,14,19,21
  82:4 83:21 84:2,6
  86:18 89:19 91:7,11
  95:11 100:14 102:5
  103:12 109:18
  110:13 113:18
  114:11,22 115:2,4
  119:22 120:15
  121:19 122:3 123:14
  130:16,20,21 131:9
  132:6 134:13 140:18
  142:9,22 143:1,8
  145:11 146:13,20
  151:24 152:19 161:6
  165:1 166:16,18,23
  167:21,22 169:14,19
  169:21 173:3,4
  174:10 175:8 177:9
  177:20 182:20 185:9
  185:10 189:6 194:14
  195:4 199:15 204:14
  205:7 209:6 223:8,18
  223:21 224:7 225:21
  233:14
believed 31:11 32:13
  54:20 55:3 146:17
  164:23 169:12,14
  194:18 239:16,17,20
belligerent 80:22 84:4
belong 94:1
belt 68:1,2,23 69:1
  105:15 146:6
Benito 17:21
beside 132:9
besides 30:22 83:20

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

GERARDO RAMIREZ

April 10, 2003

Page 252

84:13 91:5 110:24
141:6 174:16
**best** 82:19 191:8
231:14 232:21
239:24 242:22
**better** 5:3 154:19
222:20
**between** 29:17,19,24
34:24 35:15,18 36:3
41:20 51:17 58:9
59:4 62:22 65:1
72:19,19 108:13
114:21 126:1 137:14
144:16 150:6,10
152:21 158:14
163:19 166:6 168:7
178:9,14,15 179:14
207:2 210:5 211:7
218:6,15,22 221:24
222:21 235:2
**beyond** 30:9
**bicep** 143:2,7 144:5
159:20 173:15,16
**big** 47:25 83:5 232:3
**bigger** 49:11 136:3,3
**biggest** 41:9,21
**Bill** 226:5
**birth** 7:25
**bit** 5:12 23:17 26:21
65:16 67:14 72:14
78:23 85:6 104:25
112:5 129:25 135:23
147:18 166:1 178:1
186:2 206:13 219:11
219:12 226:15
**black** 68:23 69:1 146:6
**blankly** 103:3
**block** 157:16 158:16
174:19,19 222:13
**blocked** 157:6 218:21
221:24
**blocking** 222:17
**blocks** 157:10
**blood** 184:18,19,22
191:9
**blow** 63:2 174:7,17
**blows** 143:21 159:25
174:15,15,19,22
175:7 176:14
**blue** 123:16
**Boca** 2:7,7
**bodily** 29:7,11,17,17,24
29:24 40:17 146:18
146:21
**body** 34:1 35:10 41:8,9
41:16,18,21 77:19

122:11 144:4 155:21
173:14 174:9 181:10
181:13,16,20 182:9
182:18 184:15 188:4
188:5,6 189:1,10,13
196:13 198:4,9,11
199:16,16 200:2,25
201:4,6 202:13
203:23 204:15
**boots** 79:1
**born** 5:15,16
**borrow** 244:3
**both** 50:15 97:2 114:13
147:5,6,6 152:17
195:25 196:7
**bother** 228:22
**bottom** 63:12,14
199:11 221:14
229:21 230:1
**bought** 59:6 60:19
**Boulevard** 2:7
**Boulevarde** 2:21
**brakes** 128:18 129:2,6
**break** 67:10 106:7
160:5 164:11,12,14
190:16,18 207:21
212:13 236:9
**brief** 124:2 152:23
153:1 155:25 165:7
179:16 183:9,11
185:17 186:24
212:15 223:20
**briefed** 89:4 106:20
**briefly** 83:25 102:10,10
111:16,16 203:25
206:5
**bring** 172:8
**bringing** 63:6
**broad** 193:21
**Brookbank** 2:5 247:10
248:4
**brother** 7:2 25:11
**brothers** 6:24
**brought** 96:21,21
234:9
**Brownsville** 1:2 2:7,15
2:22 247:2
**bullet** 182:19 189:12
199:16 201:6 203:17
211:7
**bullets** 63:15 196:8
**bump** 158:9
**Buren** 2:18
**burn** 211:17
**business** 5:20 6:5 81:25
**businesses** 5:22

**buttock** 199:9,12 203:2
**button** 106:3
**buy** 59:2 60:13
**bypassed** 131:5
**B-02-180** 1:14 247:4
_____
**C**
**C** 122:2 163:6 165:16
165:18 175:15
177:16 247:4
**cadets** 24:2,5 30:7
**caliber** 25:5 34:16,17
92:7 210:14,16,19,24
211:1,7,21
**caliber/load** 210:21
**call** 24:3,18 31:12,17
31:22 54:7 86:12
88:9 91:18 106:22,25
114:4 115:11 125:21
126:1 129:11,16,18
131:14,14 132:22
133:17,22 136:24
154:1 181:13 205:7
205:13,19,19 214:4
229:2,12
**called** 12:19 30:20
53:23 76:18 82:7,7
88:10 95:12 104:21
107:20,21 114:12
132:5,5,5,7,11,21,25
133:20,21 204:17,19
205:11,17,18 209:12
**calling** 86:13 132:8
153:21
**calls** 114:13
**came** 35:5 48:24 60:9
60:10 82:21 86:6
93:16 94:3 98:23
100:25 106:14
138:10,12 154:24
180:9 188:22 206:19
206:19 240:9
**Cameron** 27:23 45:12
48:25
**cap** 127:9
**capacity** 1:12,20 55:14
245:3
**capital** 233:18
**Carancahua** 2:12
**care** 3:20 101:20
244:19
**CARRANZA** 1:2 246:2
247:3
**carried** 65:5 239:23
**carry** 14:15 210:13
**case** 33:14 77:11 100:4

106:6 125:6 154:15
195:10,11 201:19
209:8 226:7,12
**casing** 63:17
**Catholic** 6:15,16
**caught** 159:8
**cause** 2:3 135:20
146:18,20 199:20
201:6
**caused** 78:5 80:12
147:3 158:24 201:12
**causes** 63:5 66:11
189:12,13
**cease** 27:4 44:8 159:7
172:23 173:2 176:11
179:21
**ceased** 68:25
**ceases** 43:11
**CELIA** 1:7
**center** 1:13,20 2:15 6:6
6:7 41:8,14,19,20
86:6,17 88:6,16
97:11 130:14 172:15
181:11,14,16 182:9
184:16 189:3 198:4
201:2,3 206:16 208:2
209:17 213:11 226:6
227:13 231:3
**certain** 28:11 39:16
44:16 48:21 55:7
67:25 200:25 201:12
228:4
**certainly** 44:21 46:6
**certificate** 3:7 23:13
**certification** 59:10
61:16 247:7
**certified** 38:23,23,24
38:24 59:12,13 60:15
247:10 248:1
**certify** 247:11,20
**chain** 116:22 135:24
221:18
**chained** 170:20
**chair** 122:3,4 123:13
177:16,20,20,24
181:3
**chairs** 121:16
**chamber** 63:16,24 65:7
65:9
**chance** 4:8 30:1 120:24
192:10 195:15 208:4
218:12
**change** 56:16 91:17
104:16 114:5,6
152:25 246:3
**changed** 94:25 186:4

225:14,18 234:22
237:12
**Changes** 3:6 246:1
**channel** 237:5
**character** 32:17 61:21
**characteristics** 32:14
32:15 35:19,24,24
61:22
**charge** 92:19
**charges** 233:12,18
**check** 21:3,17,18,21
22:21 204:9,25 205:4
206:19 209:2 224:16
**checked** 224:15 243:2
**checking** 91:8
**chest** 198:2,19,20,21,24
199:1,4
**Chica** 2:7,21
**chief** 4:11,22 8:14
21:18 26:3 29:16
30:6 49:16,18,19
50:22 51:12 52:13
59:16,17 212:18
235:3
**children** 1:4 7:12
**choice** 135:8 178:13
192:4
**chose** 145:6 168:22,25
**chosen** 141:19,22
144:15,24 168:6,9
169:24 218:9 222:3
222:11,17
**Christi** 2:12
**church** 6:15,16
**circle** 123:17 148:19
163:7
**circles** 163:19
**circumstance** 30:3
**circumstances** 16:1
18:3,4 29:4 31:8
44:16,18 46:3 47:6
111:11 228:4
**city** 1:10,18 49:17,21
52:19 76:23,23 81:24
246:2 247:5
**CIVIL** 1:14
**claim** 221:8
**clarify** 26:2 220:18
**Clark** 2:17
**class** 10:7,8,9,14,18,20
24:13 28:3 36:7
**classes** 6:19 9:11 10:25
60:10
**classroom** 24:17,20
**cleaned** 103:15 104:6
**cleaning** 103:18

clear 4:25 22:3 29:20
  207:14 212:24
clench 153:4
clerical 16:16 17:3
Clerk 16:13
clients 16:21
climb 155:19 159:17
  178:17
climbed 171:8,10,19,20
  171:23,24,25 172:2,3
  172:4 221:9
climbing 172:14 221:6
clip 63:8,21
close 151:16,18 167:2
closed 168:10 215:6
closely 16:22
closer 9:23 48:18 85:7
  105:23,23 108:22
  112:6 137:3,10
  144:20,20 145:24
  150:16 159:22 161:7
  166:8 167:19 177:24
  178:18 186:7 187:19
  216:21
closest 140:16
clothed 98:11
coach 222:12
code 39:12,13,13,20
college 8:20 9:12,15,20
  15:19 20:11
colon 196:3
Colorado 8:15
combat 67:21 68:16,17
  146:5
combination 95:9,10
come 17:23 22:2 24:5,7
  28:12 38:22 53:24
  54:11,12 57:8,9 72:9
  88:5 92:15 95:25
  96:25 107:13 126:18
  126:18 144:20 160:1
  187:9,12,18,23 188:2
  206:12 208:24 209:2
  209:6 214:4 218:16
  220:17 224:16
  230:23 235:20
comfortable 160:4,6
coming 76:7 86:16 96:3
  96:5 97:22 98:5,25
  100:4 108:3 122:9,23
  154:5,20 167:11
  168:1 185:13 191:24
  192:22 220:15
  222:17 230:9
command 119:4,7
commands 30:23 73:14

80:14 112:17 125:4
  135:23 141:8 143:13
  169:11 172:22 173:2
  176:20
comment 99:25
commission 51:20
commissions 51:25
commit 184:9
communicate 112:11
communication 108:17
  237:5
communications 85:24
  88:11 235:1,13
company 13:4 14:1
compartmentalized
  231:10
compensated 51:22
compensation 52:22
complete 10:20 18:5
  38:20
completed 9:14 19:8
  57:11
completely 172:5
  200:18 203:24
completion 23:14
complications 10:19
complied 42:7,22 97:8
  123:25 231:20
comply 42:18 43:5 80:8
  80:17 81:7 83:4
  96:12 112:22 113:8
  124:15 125:7,20
  126:13 132:20
  141:17
complying 153:1
component 16:18
computerized 100:11
concentrate 41:7
concern 108:11 136:7
  169:5,5,7,8,25
concerned 169:3 170:9
  170:13 231:6 236:4
  238:4
concerning 233:4
  235:7
concludes 245:20
condition 47:9,11,20
  109:1,2 145:12
  225:10,11 235:7
conditions 242:4
confers 213:6
confined 211:18
confused 101:3
confusion 100:16 101:4
conscious 137:23
  175:24 188:22 190:7

consciously 190:8
Consequently 228:20
consider 47:6,8 146:4,6
  170:5,18 181:12
  182:4 202:21
consideration 43:23
  246:19
considered 146:9
consist 49:23
consisted 62:1 83:17
consistent 55:1 65:24
  163:15 199:6
consistently 238:16
consult 101:5,6
consults 100:12
contact 90:15 107:7,25
  112:2 145:25 241:12
contacted 235:15
contention 199:21
continuation 75:13
continue 17:5 57:1,25
  62:8 68:6 81:7 147:5
  149:8 150:15 155:24
  156:9,12 172:22,23
  188:8 194:4 215:2
continued 80:7 135:23
  141:8,8 143:14
  155:19 159:6,18,19
  159:21 171:8 172:25
  173:2,3 174:20
  176:13,20 179:11
  183:13 187:11
  192:22 195:7
continues 117:25 213:7
  213:16 214:13 215:3
  215:20 216:3,18
  217:1,10,23 219:3,13
  220:1,11 221:11
  222:25
continuous 80:14
  143:13 179:20
continuously 176:11
  202:6 208:17,19
  209:9
control 36:25 74:9
  77:19 145:8
conversation 99:20
  102:8,9,13 126:5
  137:11 153:15 233:4
  235:21
conversations 205:23
  233:3 235:24
convicted 22:17
copy 97:19 177:13
  212:21
cord 196:1

corner 108:9 121:22
  123:15 149:6,6 150:3
  151:13 156:24
  159:23 175:8,11,18
  177:17
Corpus 2:12
correct 4:12 26:22 27:2
  30:13 31:4,5,10,15
  37:21,22 42:7 50:23
  72:7 86:9 97:14
  103:16 110:21
  113:24 115:15 118:8
  121:8,14 127:18
  128:7 132:2 134:7
  141:23 142:6 157:1,6
  157:15,22 161:12
  164:16 167:2,8,14
  168:18,23 171:5
  175:23 177:2 178:8
  182:25 185:20
  188:17 208:10 215:9
  215:15 218:15 219:7
  221:6 228:24 230:3,6
  230:20,25 235:19
  237:12,14,15,23
  239:2,3 241:23 242:5
  242:15 246:12
correctional 26:7,12,13
correctly 15:8 18:13
  51:17 73:16 76:13
  102:19 138:19 162:4
  163:10 195:19
correspondingly 48:6
Costs 248:2
couch 121:19 150:4,7,9
  150:10,10 156:25
  157:3,7,9,9,16,17
  157:20,25 158:5,8,10
  158:14 218:3,6,15
  221:14,25
coughs 225:15
Council 15:24 16:10,12
  17:12 18:16,18
counsel 127:1 163:1
  247:20
counted 196:8
counter 94:1 122:25
  164:20
countertop 93:18
county 27:23 45:12
  48:25 75:9 84:3
  246:16
couple 12 19:9
  107:17 126:20 144:2
  153:2 155:25 174:20
  179:16 183:13

191:19 201:20,22
  207:4,6,18,22,24
  212:10 244:24
couples 6:18
course 23:14,19 24:9
  27:7,7 48:23 54:11
  60:14,15 68:20 70:24
  131:13 182:7 232:17
  243:5 245:5
courses 9:23 10:2
  19:11,15,19 20:11,13
  20:17 25:22 36:12
  71:5
court 1:1 2:8 4:24 5:6,9
  54:8 143:11 172:1
  191:3 198:13 247:1
courts 37:23
cover 28:10 197:25
covers 218:11
crime 22:12,15
criminal 10:3,4,5,6,14
  19:12 21:2,3,17,17
  21:20 39:16,20
Critical 3:20
cross 108:2 182:2
crossed 171:25 172:3
  173:1,8,9
crouched 175:7,8
cry 154:4 230:9
CSR 2:5 248:4
cuffed 160:19
cuffs 93:19
currently 27:16
curriculum 9:24 28:12
custody 31:2 32:2
  37:17 111:12 226:11
  233:7 234:18 236:21
  239:1
cut 99:6
cutter 210:24 211:7,11
  211:13
cylinder 63:4

          D
D 3:9 175:16,16 177:2
danger 32:23,23 36:24
  42:14 43:9,10 112:9
  135:14,20 137:24
  226:16 227:1,3 228:5
  234:1
dangerous 102:2
  233:24 234:7
darker 149:14
data 16:14,14
date 7:25 11:11,15
  34:20 51:4,6 54:8

72:8,20 230:3 248:5
day 2:3 24:6,7,8,11,12
28:16,19 53:13 56:11
56:18 57:10,15 58:4
67:14 86:13,18,19
87:1,13,18,20 88:1
89:11 95:15 112:7
114:24 246:17,21
248:1
daylight 87:23
days 23:22,25 53:18
57:8
deadly 28:25 29:5 30:4
36:16,20 44:21 45:25
46:7 73:7
deal 74:19 227:1
dealt 233:21
death 1:5,6,15,15 3:14
29:17,19 146:21
181:21 238:8
debilitated 153:12
Deceased 1:6,8,16
December 51:5 53:2,5
72:19
decide 46:7 80:9 94:11
176:1,2 180:5
decided 40:19 129:11
136:16 180:4 182:8
201:24 216:14 244:7
decides 169:18
deciding 46:4 48:10
92:19 193:14
decision 41:12 64:24
94:14 131:16 132:14
137:23 151:19
166:24 175:24,24
183:23 188:23 190:7
192:1,8,25 193:20,25
194:3 228:16 244:16
245:10
decrease 9:4
defendants 1:13,21
247:6
DEFENDANT(S) 2:16
defense 69:7 146:5
defensive 44:3 197:19
197:22 211:14
defines 209:17
definitely 5:5 39:3
45:22 47:12,22
193:22 227:8
definition 209:18
deflect 174:22 176:14
deflected 175:7
degree 45:24 48:3,6
73:10 100:16 101:4

109:9 223:25 232:9
245:11
degrees 9:1
delay 114:5,6,15,16
Delgado 89:7,8,10 91:3
91:6,9,13,19 92:3,12
94:4 101:10,14
112:11 214:8 226:10
226:18,23 233:23
234:6 235:22 236:16
Delgado's 93:21,21
deliberate 181:9
demonstrate 101:4
171:22 197:24
Demonstrates 100:15
demonstration 223:5
department 1:11 8:14
8:15 16:3 21:4,7,8,14
21:19 27:20 49:2
50:19,22 51:8,24
52:20 53:6 54:1
58:15 59:7,9,18
60:13 70:2 71:23
86:13 88:24 94:2,18
103:1 110:24 120:15
205:8,11,17,18
210:25 213:21 233:1
233:17 234:16 235:8
235:11,13,14,14,25
235:25 237:4,4,9
departure 16:1
depend 241:8,9
dependent 31:7
depending 24:10,11
26:18 28:21 31:20
32:17 33:4 43:19
56:7,18 57:7 64:25
65:4 69:16 201:5
depo 3:9
deposition 1:22 2:1 3:9
4:11,15 26:3 212:19
245:20 246:12 247:8
247:14,16
deposits 182:18
deputy 81:21 82:18
83:17 84:5,7,11
describe 74:4 208:19
described 108:8 146:14
149:2 219:15
describing 164:15
description 3:8 198:7,9
designed 37:12 210:24
desk 90:19,21
Despite 239:4
detailed 233:4
details 111:14

detained 37:17 88:14
detainee 34:8
detaining 34:7
Detention 79:9,9
determination 192:15
193:5 244:18
determine 41:25 224:8
determined 244:14
determining 201:23
Development 18:16,18
device 33:20,21 106:2
devoted 28:16
Diagnosis 195:23
diagonal 136:24
diagram 3:24 120:5,14
120:19 121:11,13
122:10 123:10
126:22 127:8 149:19
149:19 156:21 166:3
dialed 140:23
dialing 106:18 126:17
138:10 140:24
died 196:5
differ 26:16,18
difference 29:16 35:18
35:24 62:22 65:1
210:5 211:6 233:20
differences 35:14
different 28:11 30:15
31:12,13,17,22,23
35:9,15 46:15 62:4
62:13 64:20,21 70:24
71:3,6 76:1 95:5
100:11 110:6 149:20
165:22,22 166:3
177:8 201:1 228:8
240:24
differently 227:7
difficult 191:10,11
difficulty 81:15 84:3
113:14 172:11
dimension 127:10
157:5
dimensions 125:13
134:16 157:3
direct 40:24
directed 89:23 90:3
direction 81:3 83:4
152:25 189:11
200:24 201:7,13
220:21
directives 42:6,22
directly 36:12 152:12
director 6:14 17:17,20
21:22
disable 181:24

disagree 190:4
discharge 211:19
discharged 64:8 188:20
190:19
discontinued 147:8
discuss 98:12
discussed 42:2 44:11
84:14 168:10 196:11
225:2
discussion 29:16 126:4
207:20
discussions 98:13
127:14
disengaged 237:19
disorientation 100:16
101:4
disoriented 101:20
dispatcher 50:23 52:15
52:20,23 53:3,6
55:14,23,25 56:20,25
57:2,6,18,25 58:5
72:16 85:10 205:19
205:20,23
dispatchers 56:18
displayed 241:21
distance 62:4 130:17
144:16 158:14 168:7
distant 195:24 196:5
distinction 29:19,23
34:23,24 35:14 51:16
51:17 71:13
distinguishing 31:5
distracted 166:25
District 1:1,1 2:8 247:1
247:1
disturbance 76:13
116:12
disturbances 75:4
divide 73:4
DIVISION 1:2 247:2
doctor 50:13 97:22
99:20 100:2 204:19
204:22 226:9 238:10
238:15 240:9,16
241:4 242:7
doctors 92:15 98:9,11
99:2 224:15 238:23
doctor's 50:11 244:18
document 209:14,16
documents 38:19 58:22
86:11 90:8 208:5
dodge 174:19
Doe 146:5
doing 57:1 88:1 176:11
227:7 240:19
domestic 75:4

done 109:12 112:7
123:18 127:23
133:12 138:6 148:20
149:13 163:8 168:16
213:13 214:5 222:4
240:7,10,20 241:6,12
241:14,15
door 131:19 134:7,9,11
134:14,16,21,24
135:2,15 136:10
150:3 168:11,11
178:9,12,14 186:22
207:2 214:22 215:5,9
218:10,22 221:25
222:18
doorway 120:3 121:14
121:17 132:15,21
133:10 154:6,19,21
230:11
dot 138:3
dotted 138:4 149:9
double 65:1,3,8,13,14
66:15,16,17
down 64:13 112:20
147:20 151:20 154:9
154:9 155:4 171:12
176:19,19 186:13,15
196:23,25 197:4,6,10
197:12 198:2,19,24
199:1,4 200:13 203:1
204:18,21 205:9
215:22,25 216:6,8
219:11 229:21
230:15,16 233:24,25
234:3
dozed 116:3
Dr 50:7 97:25 98:4,22
99:4,14,25 226:9
drag 142:4 161:18
167:19,25 222:12
dragging 141:9
draw 126:22 127:9
149:8,12 162:24
163:17,19 177:10,12
Drawer 2:18
drawn 3:24 13:1
149:19 156:21
dressed 240:16
drew 179:14
drop 147:19,21 176:11
176:12,19
dropped 9:12 147:13
147:14,23 148:6
155:13 156:16,17
159:23 219:16
drops 43:25

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 255

| | | | | |
|---|---|---|---|---|
| due 9:13 224:21 248:3 | 198:18 | entitled 1:5 196:10 | every 37:5 57:14 63:5 | exists 42:15 43:6 |
| duly 2:2 4:2 247:13 | Eighteen 12:12 | 210:9 | 183:22 188:22 | exit 202:22 243:24 |
| duration 28:2,10 | eighths 199:9,9 | entrance 196:17,22 | 194:14,19 195:5 | exited 82:21 |
| during 4:11 14:9 15:8,9 | eight-hour 56:7 | 197:3,15 198:2,6,18 | 209:1,3,3,4,5,5 | expandable 69:12,14 |
| 15:13 17:4 19:7 54:1 | either 20:21 25:4 29:7 | 198:23 199:3,8,23 | everybody's 56:11 | 69:16 70:24 71:1,2,7 |
| 56:25 57:24 58:9 | 42:17 43:8 65:4 76:6 | 202:17,21,23 203:8 | everything 11:25 39:7 | expands 69:21 |
| 59:11 61:10,20 72:11 | 76:9 87:5,11 100:12 | 214:22 243:23 | 58:17 116:20 | expect 57:14 |
| 72:15,21 80:20 87:20 | 101:7 102:11 104:22 | entries 229:23 | Evidence 196:11 | expected 209:25 |
| 88:1 89:11 95:23 | 106:23 114:11 130:3 | entry 16:15 102:24 | evidenced 99:10 | experience 48:20 49:10 |
| 96:4 99:11 103:15 | 139:20 143:2 154:15 | 154:23 182:19 | exact 11:11 19:6 51:6 | 62:17 |
| 104:12,12 105:3,5,10 | 178:13 189:11 | 189:16,22 230:5,24 | 74:17 78:22 88:8 | expert 238:22 |
| 107:5,17 112:16,19 | 197:25 201:10,19 | equipment 14:2,4,17 | 130:17 143:15 177:5 | Expiration 248:5 |
| 112:23 113:4 115:24 | 204:10 224:17 233:5 | 15:10 17:8 33:11,20 | 179:17 242:25 243:6 | expire 206:24 |
| 132:8 139:8 142:10 | ejected 63:17 | 33:21 34:4,5 48:3 | exactly 6:21,23 33:25 | explain 62:24 65:19 |
| 144:10,14 147:21,21 | ejects 63:16 | 60:12 146:24 | 37:25 52:2 64:18 | 69:12 90:11 171:22 |
| 150:15 153:9,9,21 | elbow 81:2 | error 71:12,17 | 66:6,8,19 67:19 | 201:1 203:17 |
| 158:23 167:11 183:2 | elements 39:16 | escape 136:10 170:18 | 131:2 137:21 151:12 | explained 207:23 208:8 |
| 189:2,4 191:22 193:3 | eleven 188:15 | 171:2 239:9 | 155:14 167:13 176:5 | 208:13 |
| 197:17 223:5 231:23 | emergencies 210:1 | escaping 95:9 | 184:5 186:16 203:16 | explanation 136:6 |
| 238:16,19 | emergency 106:2,24 | escorted 89:21 95:15 | 209:1,11 224:25 | expressed 169:6,25 |
| duties 57:6 245:8 | 108:12,14 209:25 | 236:5 | 227:10 239:15 | 246:19 |
| duty 34:20 46:2 82:9 | 234:12 | escorting 90:4,6 | 241:24 243:1,14,18 | exsanguinated 196:8 |
| 114:9 130:23 239:8 | employed 247:21 | essentially 52:1 70:23 | exaggeration 232:1 | extend 69:19,20 130:15 |
| | employees 153:25 | 235:17 | exam 50:8,9 | 138:25 |
| | employers 50:1 | ESTATE 1:8 | examination 3:4,5,5,6 | extended 165:9 |
| _____ E _____ | employment 245:6 | estimate 55:2 | 21:1 22:22,24 23:3,6 | extension 237:8 |
| E 1:2 2:18 4:3 226:4 | emptied 183:14 188:12 | estimates 231:14 | 50:3,6 247:18 | extent 31:7 191:12 |
| 244:5,23 247:3 | 188:13 204:7 206:22 | estimating 243:13 | examinations 23:9 | 193:13 198:7 201:17 |
| each 24:6,7 28:16,19 | end 9:23 28:8 51:5 | ET 247:3,5 | 50:15 | 224:10,11 227:3 |
| 64:19,23 76:3 84:16 | 73:12 130:18,20 | etc 223:14 | example 9:22 31:10 | 232:3 239:13,20 |
| 97:3 165:5 183:18,18 | 148:19 150:4,9,21,22 | eternity 232:14 243:8 | 33:14 34:7 35:2,18 | extreme 32:18 |
| earlier 42:2 169:6,10 | 150:24 151:8 187:17 | 243:11 | 37:8,15 45:19 47:8 | eye 91:16 133:14 159:8 |
| 169:25 171:11 | 215:14 221:25 | evaluated 234:10 | 47:23 54:7 105:22 | eyes 153:4,4 191:6,9 |
| 199:14 203:23 | ended 87:2 | evaluations 225:3 | 108:21 140:14 | |
| 214:17 215:24 | enforcement 16:18 | even 32:6,7 37:10,16 | examples 42:25 | _____ F _____ |
| 217:25 219:4 222:2 | 17:2 19:12,20 35:16 | 48:3 54:6 120:18 | except 22:5 246:12 | face 152:13,17,19 |
| 235:10 | 110:23 111:3 209:19 | 137:2,20,24 243:6 | exception 212:10 | facial 152:12 174:18,21 |
| early 98:25 223:22 | 210:9,11 211:14 | evening 87:6 103:12 | excess 128:6 | 175:7 |
| ease 172:10,12 | engage 72:21 73:6 | 104:12 112:8,16,19 | excessive 37:8 | facility 24:5 26:7 32:2 |
| easier 33:2 73:5 | 102:9 | 113:4 114:12 245:1 | exclude 107:10 | facing 122:17,18,22 |
| east 123:14 149:6 | engaged 73:2 102:14 | event 70:6 | excuse 71:2 72:4,19 | 162:16,17 188:4 |
| 150:6 | 109:17 | events 112:8 113:5 | 103:2 134:21 156:4 | fact 9:9 13:17 42:2 |
| Economic 6:6,7 | English 66:2 179:2 | 116:22 149:1 164:15 | 168:14 195:21 202:8 | 49:16 54:10 104:18 |
| edge 158:14 | enough 83:18 158:18 | 193:3 215:25 238:8 | 202:11 221:13 226:9 | 114:7 128:2,5 135:12 |
| Eduardo 2:20 3:5 | 202:2 228:7 | 242:17 | executed 246:19 | 135:19 145:7 168:9 |
| educated 35:14 210:5 | enroute 231:3 | eventually 55:11 | exhibit 97:10,18 98:21 | 170:4,20 182:22 |
| education 6:15 13:14 | ensued 84:10 | ever 4:14 6:9 8:16 | 100:10 120:4,16 | 192:17 195:4 200:23 |
| 14:22 15:15 209:17 | enter 121:17 182:2 | 20:17 22:9,12,17 | 121:7 126:20 154:2 | 222:20 227:24 228:1 |
| 209:20 | entered 23:2 189:20 | 24:22,24 25:6 67:7 | 156:21 175:14 195:9 | 232:4 239:4 243:10 |
| effect 35:8 68:19 78:9 | 205:16 | 67:15 70:9 72:12,21 | 208:14 209:12,23 | factor 135:21 170:6 |
| 153:4 191:13 192:16 | entering 24:21 | 78:3 95:15,20 100:7 | 229:3,8,9 | 191:13 193:19,23 |
| 199:15 208:22 222:2 | enters 199:16 | 101:23 144:6 196:11 | exhibited 31:21 32:14 | factors 44:18 |
| effectively 192:4,10 | entire 15:9,13 28:10 | 197:18 207:23 208:4 | 47:13 224:24 | faded 123:6 |
| effects 153:3 | 105:6 115:24 191:7 | 209:13 221:20 233:3 | Exhibits 2:24 3:8,9 | fades 123:7 |
| effort 163:12 166:10 | 197:17 200:6 237:25 | 234:6,16 235:5 | 208:1 | fail 39:25 81:7 |
| 200:22 | 239:20 | 243:22 | existence 13:5 | failed 39:4 79:24 80:4 |
| eight 24:11 57:12,19,20 | | | | |

GERARDO RAMIREZ

April 10, 2003

Page 256

132:20 147:9
**failing** 83:4
**fair** 69:4 193:12 207:14
**fairly** 55:7
**faith** 55:10
**fall** 44:11 206:24
**falls** 43:25
**familiar** 197:21
**families** 112:3
**family** 25:10 76:15,16
76:19
**far** 16:14 17:1 46:16,20
61:23 73:2,12 78:9
82:6 96:17,22,23
130:10 150:3 152:25
182:12 187:8 193:21
208:9 231:5 235:13
236:3,15 237:16
238:3 242:3,3
**farther** 186:2,7,9
**fashion** 83:15
**fast** 64:7 166:17 174:7
183:10 187:4,9
**faster** 58:23 63:19 82:2
**father** 5:20 6:9 25:3,9
**father's** 6:5 25:11
**favor** 9:12 147:4
**favorable** 50:14
**fear** 40:17 131:24
193:7,7,23
**feared** 29:8 193:6
**fearful** 99:5
**February** 52:10 55:16
55:18 58:3,9 72:19
**feel** 57:9 75:20 77:12
78:10 104:20 112:9
124:23,25 125:2
136:3 160:6 174:20
174:22 225:9 232:1
241:10
**feeling** 159:25 165:3
174:6,17 234:17
**feels** 232:6
**feet** 83:6 117:14 122:18
122:18 132:18
211:17 227:20
**fell** 28:9 115:13,16
160:4
**felony** 22:10
**felt** 72:13 73:6 80:17
125:7 135:2,21
136:20 231:25 232:3
232:3,14 234:7 243:8
**female** 83:8
**femur** 196:1
Feria 1:10,11,18 48:25

49:1,14,16 50:18,22
51:2,7,24 52:19 53:6
54:1 58:15 59:7,9,24
60:4,13,20 61:2 70:2
71:22 72:20 76:24
86:12 110:24 205:11
233:2 234:22 246:2
247:5
**Fernando** 8:6
**few** 45:14 117:3 120:14
132:17 156:19
159:19 192:15 226:7
**FGC** 102:23
**field** 12:25 17:1 24:18
**Fifteen** 63:23
**fifth** 137:20 170:23
234:12
**fighting** 84:5
**figure** 35:22 160:7
**file** 16:14
**final** 159:21 179:23
195:23 196:4
**financially** 247:23
**find** 5:12 26:17 28:15
46:24 50:12 60:1
114:8 184:10 204:22
**fine** 18:4 60:7 127:2
163:22 195:20
**finger** 65:24 197:15,16
**finished** 185:23 187:22
204:2
**fire** 25:19 35:25 40:25
40:25 41:6,25 42:10
42:17 45:5 63:18
64:11,13,19,23 65:8
65:25 67:5 180:6
182:9 183:4 184:25
188:8,23 190:23
191:5 192:1,8 193:6
193:14,25 203:13
209:25
**firearm** 14:11 24:22
34:11 85:4 181:20
**fired** 24:25 25:7 63:6
176:22 179:15 181:8
182:11,24 183:7,18
184:12 185:6 186:12
187:13,17 188:17
189:20 190:19
192:11 200:2 201:19
203:10 204:21 212:1
231:22
**firing** 42:17 62:24
65:22 66:10 181:12
190:12 191:7 192:2
192:25 194:4,21

195:7 202:6 204:2
**firings** 183:20
**FIRM** 2:11
**first** 5:13 9:20 13:20
19:25 23:19 27:6
40:25 48:22 49:15
50:21,24 51:2 58:15
66:9,10,21,23,24,25
67:1 76:7,10,22 78:2
78:2 81:16 85:8 86:6
88:4,24 90:1,16 91:3
93:17 100:19 107:13
112:23 116:11,12
120:6 126:20 132:11
140:24 143:1,18
148:18 152:18,25
156:3 166:12,13,14
167:15 169:11
172:19 173:25 174:4
179:15 180:6,13
181:8 182:11,24
183:9,15 184:2,2,11
184:22,25 185:23
186:12 187:13,17,22
188:14 189:4 192:15
194:4 195:22 201:20
208:15 210:10 213:9
230:5 231:3,17
235:14 236:4 241:9
242:18
**fit** 134:24
**fits** 134:18,21,21,23
**five** 23:24,25 69:2 83:6
83:6 91:11 124:4
126:8,10 144:2,3
156:1 183:8,16 184:3
184:11 185:1,16
186:13 187:13
188:14,14 194:4
197:14 199:10
201:20,22 216:5,8
**flashlight** 14:7 60:14
**floor** 107:3 128:15
130:14,23,25 131:1,2
137:20 155:15
170:23 200:14 206:7
234:12,12
**focus** 157:19 222:7
**folks** 5:19
**follow** 183:13 210:13
210:15
**followed** 97:5 166:11
166:13
**following** 247:12
**follows** 4:2 102:25
154:4 195:24 196:5

210:11,18
**foot** 151:3 162:9
182:14,15,16 186:3
**football** 13:22
**force** 25:23 26:1,15,16
26:23,24 27:4,7,12
27:25 28:3,12,17,23
28:25 29:5 30:4
36:16,20,21,21,22,25
37:4,5,8,12,16,20
38:1,4,6,9,11,13
39:23 40:9 42:3 44:7
44:14,19,22 45:1,13
45:16,17,21,24,25
46:4,7 48:10 66:7,18
67:5 68:20 72:13,22
73:2,7,7,10 74:13
75:12,13,13,19,21
77:12 78:3,5,5 83:12
125:2,5
**forearm** 143:2
**forego** 76:1
**foregoing** 246:11,18
**forehead** 174:11
**forensic** 3:21 209:13,17
209:19,23 210:4
**forgot** 67:14 244:25
**form** 70:25 74:13 77:8
101:12,17 108:17
109:21 110:2 119:7
129:8 135:10,18
136:12 141:25
157:12 158:20
168:12 182:5 185:14
187:7 189:25 192:13
193:16 201:25
203:19,21 208:18
211:10 222:14,23
224:2,9 225:13
226:13 228:10,18,25
234:19,24 240:21
241:7 244:21 245:14
**formal** 239:5,16
**forth** 84:9 96:21,22
231:14
**Forty** 55:24
**forward** 63:7 69:21
76:7 179:23
**found** 114:17 182:22
196:13
**four** 53:12,14,20 57:12
57:19,20 69:2 124:13
173:13 183:8,16
184:3,11,25 185:16
186:13 187:13
188:13 194:4 197:9

201:22 202:21,24,25
**fourth** 197:15
**fracture** 196:1
**frame** 116:17 165:5
**free** 37:7,11 38:8 77:17
77:21 153:5 165:9
173:18
**Friend** 1:3
**from** 2:4 5:13,14 7:17
7:20 8:8,13 10:21
11:5,17 12:5 14:8,8
14:19,22 16:1 19:10
20:7,8 24:11 27:22
27:23 28:20 32:22
33:7,11 34:17 37:8
37:11 38:8,18 49:4
49:24 53:12,16,19
56:11,16 57:6,11,12
57:17 58:3 60:19
62:4,12,14 64:8,9
65:8 66:25 68:25
69:6 71:17 73:11,14
75:4 76:6 77:22 83:5
83:6 85:18 86:11,12
89:13,15 90:14,15,16
91:12 92:11 95:7,8,8
95:24 96:8,9,11,25
97:11 98:22 100:14
101:19,23 102:19,23
103:12 107:6,8 110:6
110:24 111:3 113:1,6
114:13 116:10
117:14 124:4 125:23
127:25 130:10,15
132:3,19,23 134:4,14
136:15,20 141:20
145:10,20 146:5
153:11 154:5 156:1,2
156:5 161:5,6,9
162:4,5,10,21 163:5
163:5 165:12,15,18
165:19,25 166:1,17
167:8,12 168:1
169:18 170:12
171:24 175:7,9,9,15
178:1,2 181:20
182:12,14,16 183:9
184:1 185:13 186:3,6
186:8,22 187:16,21
188:14 189:6 190:20
190:24 192:5 196:17
196:19,23,25 197:4,6
197:10,12 198:3,9,19
198:24 199:4,10
200:18 201:16,23
202:11,12,14 205:5

GERARDO RAMIREZ

April 10, 2003

Page 257

208:23 209:21
212:23 213:20
217:18 220:21
222:17 230:9 231:16
231:22 232:2,5,7
234:11,22 237:4
238:10,14,20 239:14
240:1,25 241:3,3
**front** 90:19 132:18
160:22 188:6 198:11
215:14
**full** 18:11 21:3 51:15
64:15,17 115:1
152:19 154:19 188:5
188:5,6 189:7
**fully** 62:23 97:1 109:23
183:23 245:12
**full-time** 8:20 9:17
51:20 54:2 57:2 58:5
**function** 104:10
**further** 104:19 109:17
124:22 125:21 126:4
129:13,17,20 130:1
131:25 141:20 178:1
211:17 219:11
224:20 225:22 227:9
241:10 244:10
245:16,17 247:20,22
**fuzz** 214:21

_____ G _____

**G** 3:24
**game** 13:22
**games** 13:23
**Garcia** 3:9 4:22 29:16
30:6 50:22 51:12
52:13 85:24 235:15
**Garcia's** 4:11 26:3
212:19
**Garza** 2:20 3:5 126:25
129:8 135:10,18
136:12 141:25
157:12 158:20 160:3
162:25 168:12 182:5
189:25 192:13
193:16 201:25
203:19,21 207:16
222:14,23 224:9
226:13 228:10,18,25
234:19,24 240:21
241:7,25 244:3,6,22
245:18
**gather** 60:19
**gauge** 25:4 34:14
**gave** 126:10 214:7
231:14 237:8

**general** 36:22
**generally** 74:4 151:5
**gentleman** 213:18
233:24 234:18
238:16 240:13
241:21
**Gerardo** 1:11,19,23 2:1
3:4 4:1,6 246:11,14
246:17 247:8,13
**gesture** 79:8
**getting** 11:24 83:4
112:5 136:1 144:20
147:25 159:22 175:9
175:10 176:14
186:22 216:1
**give** 9:10 11:16 22:1
55:2,5 57:13 64:7
90:8,21,23 91:17,18
92:15 95:25 108:4
114:18 126:8 141:8
144:1 153:6 155:2
159:6,21 172:22
173:2 176:20 179:17
179:24 195:15 207:4
209:20 216:5 219:6
**given** 4:14 13:14 23:13
25:22 30:17,25 34:6
34:18 36:15 41:1,24
42:25 49:12,13,15
58:16 70:10 94:17
96:23 103:13 111:10
135:12 145:12
170:20 201:14
240:13 242:3 246:20
247:15
**gives** 65:10 99:9 102:7
**giving** 226:17 242:22
**go** 7:14 9:5 10:11 15:25
18:7 19:9,18 21:8,9
21:16,18 22:22,24
23:7,15 24:5,7 25:3
33:16 34:8 42:1
48:16 49:3 50:5 60:8
62:9,9 63:6 67:13
75:24 77:23 78:13
80:12 82:9 88:24,25
94:21 95:12 104:13
104:20 106:7,17
107:15 117:12,22
118:22,25 119:2,3,9
119:11,13,14,15,18
119:18,19 120:19
123:12,20,23 124:10
124:18 130:1 131:5
131:16,19 132:14,14
136:17 137:23 138:4

147:3 148:18 159:11
159:13,13 162:13
163:12,16 164:23
165:4 166:11,12,21
167:5 169:18 175:15
176:19,23,23 178:13
189:10 196:15
207:16,18 214:1
216:10,14,15 220:6
220:12 229:11
236:10 238:5
**goes** 169:18 170:11
230:24
**going** 9:3,5 15:18 24:24
25:6 26:20 32:24,25
40:10 45:4 47:24
48:3 54:16,20 55:6
55:11 76:2,7 80:17
82:8 87:19 99:15
104:19,24 113:18
114:4,6,15,15,16
115:7,9 117:13
119:13,18 120:2,4,12
120:13,13,20 122:1
125:20,25 126:1
140:6 142:17 145:7
146:7 148:17 152:7
158:9 159:11 160:5
164:23 165:4,13
167:12 168:1 170:12
172:19,20 175:14
176:18 177:15
180:10 182:8,13
187:12 195:9,15,16
195:16,17 200:7
202:13 204:11
209:18 212:22,23
213:2 216:14 219:17
220:3,8,15 222:17
228:7,16
**gone** 30:8 132:13
196:12 215:21
218:10,10 227:7
**Gonzales** 150:1 212:1
**Gonzalez** 1:3,4,4,6,7,8
1:14,16 8:6 49:19
89:11 91:6,21 92:16
92:20 93:1,20 94:4
94:12,21 96:5,10
97:12,19,25 98:4,6
98:13,22,23 99:4,7,9
99:14,25 100:13
102:8,14 103:9,18
107:7 108:23 109:1
109:18 110:18 111:8
111:11,15,19,20

112:7,13 115:13
116:7,15 122:11,15
122:18 123:11
124:23 125:19,24
126:23 127:15,25
128:10 131:9 132:16
135:2,13 136:15,20
138:9 139:6 142:14
143:9 144:11 145:11
145:20 146:13
148:12 150:1,5
152:12 160:21 162:5
163:3 164:15 165:19
166:6 173:22 176:3
176:10,12,16 177:15
178:9 179:5 182:11
183:12 184:3 185:5
185:23 189:1,5,16
190:9 191:7,23
192:20 193:4 194:8
194:12 196:13,19,24
197:5,11,18 199:11
199:23 200:7 202:13
203:7 204:2 206:20
206:21 208:16
214:17 215:13,17
216:21 217:3,7 218:1
219:22 221:5,9,12,17
223:7,24 224:5,8
225:19 226:11,19,24
231:17 234:7,9 235:2
235:7 238:8 239:8
240:25 242:18 244:8
244:10,15 245:11
**good** 4:4 24:16 67:11
67:12 224:4 225:6
**gotten** 87:17 98:19
127:17 141:23
164:14 168:10
170:12 180:19
186:21
**gown** 184:19,20,22
**GPA** 20:9
**grab** 139:20,21 145:22
145:22 146:15 165:8
216:24
**grabbed** 145:24 159:4
167:3
**grabbing** 159:17
**grade** 20:14 38:22
**graduate** 7:17,19 49:4
**graduated** 11:5,13,17
19:10 20:8 69:6
**graduation** 11:19 12:5
**GRAHAM** 2:17
**grain** 210:24 211:7

**Grand** 3:11
**Grande** 18:16,18
**grant** 6:3
**grappling** 74:6
**grasp** 187:6 218:13,18
**grasping** 69:20
**graveyard** 87:9,10,16
**great** 232:1,6
**greater** 48:6 109:9
196:2 223:24
**greatly** 110:9
**grit** 187:10
**ground** 43:25 44:11
82:20 84:12 147:13
151:25 152:3 153:8
155:5,6 159:6 172:23
172:25 173:3 176:10
223:3
**grunts** 185:13
**guard** 13:11,21,25
14:14 17:6 32:8
89:11 94:21 95:3,4,5
95:6 106:13 175:9
224:5 233:23,25
234:1,3
**guarded** 95:20
**guarding** 88:15 101:22
105:20
**guards** 14:16 89:19
106:11 210:23
**Guerra** 2:7,20
**guess** 4:18 5:21 6:17
23:13 24:2,13 28:15
40:25 45:2 60:2 85:9
87:5 96:4 170:8
183:15 237:8 243:15
**guessing** 77:9
**guidelines** 208:9
**gun** 24:25 40:20 90:24
178:21 188:15 192:9
204:8,24 205:9
206:22 211:8 231:22
**gunpowder** 182:18
**gunshot** 195:24 196:6
196:16,22 197:3,9,14
198:1,6,23 199:3
**GUSTAVO** 1:3,6,8,14
1:16

_____ H _____

**half** 15:7,22 186:3
196:17,19 198:19
**halfway** 9:24
**hall** 130:18,20 154:5
230:10 242:19
**hallucinations** 99:10

(210) 377-3027
7800 IH-10 WEST, SUITE 100
ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230
FAX(210) 344-6016
(800) 969-3027

hallway 116:21 117:11
 130:20 132:6,25
 133:9,17 153:20,25
 204:17
hand 77:17,21 91:23,24
 102:20 103:1,15
 104:1,3,6,10 110:15
 110:16 118:4,7,13,18
 138:20,22 139:2,20
 139:22 140:21 153:5
 154:7 160:19,23,23
 160:24 165:9 174:13
 188:15 197:15 200:7
 204:24 215:14,17
 224:17 229:9 230:12
 240:4 246:20
handcuff 93:4 102:20
 119:17 154:7 189:10
 230:11 240:9
handcuffed 84:12 93:6
 102:25 118:5,18
 125:11 138:22 139:2
 157:6 160:23,24
 170:21 200:7,10,13
 200:16 206:22
 218:25 240:4
handcuffs 14:7 15:11
 30:10,21 33:7,8,12
 33:16 60:14 79:15,22
 81:9 93:19 94:5 97:2
 105:8,9 109:15
 129:23 163:20
 227:12,18 237:17
 240:3,17,18 241:5
handgun 25:7,9,12
 34:19 40:3,4,10,11
 40:15,15 92:1 175:10
 175:20,24 176:24
 183:1 193:14
handguns 35:15
handle 45:20,24 69:20
 134:11 214:24,25
hands 16:19 44:3 68:19
 80:3,16,19 84:8 97:2
 148:1,4 197:18
hands-on 24:18
handwriting 149:16
 229:20
handwritten 98:22
hand-to-hand 67:20,21
 68:16,17 146:5
happen 17:15 116:20
 125:25 148:3 187:8
 199:25 220:23
happened 34:21 58:4
 80:12 82:2 84:1 90:1

97:4,4 99:25 117:24
 124:5,9 126:7 138:7
 154:12,14 155:8
 159:2 166:16 171:7
 174:7 180:2 189:14
 194:16 201:15
 231:10 233:6
happening 42:1 82:10
 104:4 201:15
happens 113:1,3
hard 11:24 214:20
harder 66:3
Harlingen 2:19 3:15,16
 16:10 18:17,20
 120:15 213:20
harm 29:7,11,17,17
 40:17
harming 95:7,8
having 4:2 11:24 36:18
 84:3 99:20 104:25
 117:14 127:14 132:4
 235:24 236:13
hazy 206:13,13
head 74:7 107:24
 113:23 116:13 144:7
 151:1,2,12 153:10
health 94:25
hear 12:22 17:15 48:24
 70:19 82:17 99:6
 153:15,19,24 164:22
 219:15
heard 26:5 116:21
 132:6 154:4,5,24
 214:18 230:9,10,23
hearing 104:25 117:15
heavier 65:10 66:3,10
 66:17
heavy 65:22
held 51:25 59:22
 134:14 168:11
 189:10
help 108:23 129:18
 132:3,8,8,25 153:23
 154:4 204:20 230:9
helping 16:14
helps 5:21 6:17
her 19:25 20:1
hereto 2:9 3:3
hesitation 191:17
Hey 17:22
hi 226:5
Hidalgo 48:24
high 7:9,14,15,16,17,19
 8:19 10:24 11:2,5,12
 11:17 12:5 13:23
 19:11,12 20:4,4,8

69:6,9 200:16 211:21
higher 31:19,20 48:2
 84:23
him 17:19 26:5 60:2
 77:20 78:6,9,12,14
 78:14 79:6,8 80:15
 80:15,19 82:22,22
 83:13,18 88:15,22
 91:8,16,18 93:22,24
 94:24 95:3,5,6,7,7,8
 95:13 97:7 99:17
 100:4,18 101:22,22
 102:14,15,16 105:3
 110:6,10 112:17,20
 112:23,24,24 113:4,6
 113:11 115:25 117:1
 117:4,11,22 119:1,2
 119:3,9,11,13,23,25
 123:12,19,22,23
 124:10,18,21,22
 125:21,25 126:1,8,8
 126:10 129:18,24
 131:23 132:4,18
 133:14,14 137:4,10
 137:11,13 139:3,8
 141:4,7,12,14,20
 142:16,16,17,19
 143:1,3 144:6,11,15
 144:16,23 145:4,8,18
 145:25 146:2,7 147:7
 147:22 151:9 152:6
 152:13,17,18 153:11
 153:12 154:19 155:1
 155:20 156:18 159:5
 159:11 161:5,5,6,8,9
 163:16 166:21,21
 168:25 169:6,25
 170:18 172:25
 173:10 176:10,12,15
 176:24 178:15,22,22
 179:18,21,24 180:24
 181:9 184:6,10,12
 185:14,17 186:13,15
 187:9 188:8 193:1,1
 193:9,15,20,25 194:1
 194:4,18,19,22,23,25
 195:2,4 198:21,25
 200:3,18 201:10,12
 203:10,15 204:9,10
 204:11,12,13,20,25
 205:4 207:2 209:2,2
 212:2 215:22 216:5
 217:5,12,12 219:5,16
 222:22 224:16,20
 229:10 231:19
 233:12,18 234:2,4,4

234:14,18 238:10,11
 238:20 239:14 240:3
 240:6,10,17,18,18
 241:23 244:17
himself 32:23 50:13
 84:5 99:18 102:25
 103:14,18,19 104:1,6
 109:19 131:25
 135:20 136:1,4,5
 145:9 168:7 169:6,22
 170:1,14,15 239:14
hired 12:20 13:2,11,13
 49:2,13 50:21 51:8
 54:16,16 59:5
history 21:3,17,17,21
 22:2 49:24 82:14
 225:3 233:5,6
hit 140:7 143:3 145:18
 152:13,17 153:7
 174:4,5 176:14
 184:12 185:17
 194:11,19,23,25
 195:2,4 203:10,15
 219:6
hitting 144:23 217:12
hold 64:13 79:22 80:25
 135:2 138:20 145:22
 145:22
holding 79:22 148:10
holds 33:24 44:3 51:19
 63:22,24 68:18,19
 69:21 74:6
home 21:15 48:19
homicide 88:18 110:19
 111:7,20
hooked 128:6
hop 172:5 221:20
hospital 32:8 88:25
 89:1,13,16,21 90:11
 90:15,16,25 92:14,21
 93:8 95:16,20,25
 96:3,9,12,25 97:20
 107:8 108:9 111:1
 116:10 130:1,13,25
 131:6 132:3 134:4,18
 134:24 153:16
 170:23 184:20 208:1
 208:12 209:8,9,21
 210:1 212:2 223:23
 234:10 236:3,5,17,21
 237:3,5,21 240:1
 241:4 242:13 244:6
 245:1
hospitalization 210:12
 210:21
hospital-type 239:2

hour 28:20 56:23 209:1
 209:3,4,5,5,7
hours 4:18 9:11,14
 24:8 53:10,17 55:22
 56:10,24,24 57:12,16
 57:18,20 85:12 86:24
 87:3,23 96:4 160:5
House 231:2
housing 5:24
huh-uh 4:23
human 35:10 199:16
hunting 25:3,4
hurt 77:15 99:17 136:1
 239:11
hurting 239:14
hustle 21:10,10

I

idea 9:10 11:16 64:7
 144:1 224:4 225:6
ideations 225:4
identification 236:25
identity 111:19
IH-10 248:5
ill 226:25
illness 31:16 227:2
imagine 72:16
immediate 121:16
 181:3
immediately 10:24
 53:3 84:12 116:20,25
 159:23 163:2 204:7
 214:20
Immigration 15:24
 16:10,12 17:5,12
imminent 40:17
immobility 137:8
impact 69:15 73:12
 141:10 142:10
implying 46:18
imposed 208:12
impossible 151:9
impression 99:9
inappropriate 38:2,5
 38:13
inch 127:9 197:4,6,17
 197:17 199:9
inches 196:17,19,23,25
 197:4,6,10,11 198:2
 198:19,24 199:1,4,10
incidences 83:20
incident 3:13 52:11
 58:1,10 66:13 70:10
 70:22 72:2,20 73:23
 74:16,18,21 76:12
 78:4 81:20 82:3,4

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 259

83:22 85:7 87:1
95:24 107:6 112:6
122:12 125:3 183:2
206:17 215:8 232:5
238:1,21 243:5
245:13
**incidents** 116:16
**include** 31:1 32:21
52:17
**included** 97:13 209:18
**including** 35:10 58:1
**income** 5:23
**incorrect** 71:12
**indeed** 38:19
**indefinite** 115:9
**INDEX** 3:1
**indicate** 44:13 54:19
71:9 91:19,25 101:14
114:14 163:20 185:8
206:6 233:17 234:6
234:16 243:8,23
**indicated** 109:4 169:10
171:14 177:24
179:10 183:15
226:18 236:4 238:9
238:11,14,17,21,25
241:22
**indicates** 101:3,20
**indicating** 70:9 226:10
226:23
**indication** 31:11,21
44:1,4 116:11 220:14
**indications** 44:7
**individual** 29:6 31:7
43:5,13,17,25 44:3,6
44:10 62:4 72:13,22
81:15 82:18,19 83:3
84:4,8 233:21 236:22
**Individually** 1:2,7,12
1:14,19
**individuals** 45:8 75:1
76:15 77:11 236:1
239:1
**inflicting** 38:12
**infliction** 181:19
**inform** 211:23 212:5
**information** 3:21 47:16
50:1 90:8 91:12
92:11,16 94:17 96:16
96:21,23,25 98:18
100:24 101:7,9,15,23
102:2 108:4 109:16
111:10 114:20 115:6
209:13,24 210:2
214:11 224:4 225:1
225:11,16,19 235:5,7

235:10 237:2 241:11
**informed** 13:13 103:8
204:20 213:18,25
**inhibited** 129:7
**initial** 132:8
**initially** 79:23 106:13
111:11,15 148:24
214:18 234:9
**initials** 100:15 102:6
**initiated** 109:8
**initiative** 54:12
**injure** 131:25
**injured** 30:17 131:25
**injuries** 195:25 196:2,6
196:12
**injury** 29:19,24,24
37:16,19 146:18,21
196:11,22
**inquiry** 241:17,20
**INS** 16:19
**inside** 134:18
**insight(sic)** 71:17
**Insofar** 242:12
**inspection** 128:25
129:1
**instance** 2:2 81:16
**instances** 75:18
**instead** 147:4 162:18
216:14
**instruct** 132:16 210:7
**instructed** 223:24
239:6
**instruction** 14:19 34:6
41:24 43:1 45:5
90:21,23 96:1,8,9
106:24 108:5 209:21
214:7
**instructions** 97:5,8
**instructor** 27:14,24
45:4 59:22 71:4
**instructors** 44:25
**instrument** 246:18
**intake** 90:18,20
**intend** 147:19 203:15
**intended** 183:23
203:13
**intent** 38:2
**interaction** 236:3,9,12
236:15
**interested** 17:23
247:23
**interfere** 76:17 244:18
**interfered** 244:8
**interim** 61:10
**International** 2:21
**interpret** 226:23

**interrupt** 6:1 62:6
**Intervenor** 1:16 2:13
**interview** 49:13,15,23
50:2
**intimidate** 234:4
**intoxicated** 84:5
**Investigation** 3:16
**investigator** 70:17,21
71:17 213:20,25
215:5
**involved** 73:13 74:21
74:24 75:1 81:14
**involving** 76:12
**in-house** 211:19
**irate** 135:23
**Irma** 5:18 231:2
**irrational** 101:3
**item** 100:11 120:8
121:21 122:2,2,24
180:18 197:3
**items** 33:17 120:22
121:13
**IV** 110:11 138:17
**I.V** 91:23 118:7,12
180:25 224:14,17

---

**J**
**J** 2:4,14 247:10 248:4
**Javier** 4:6
**JERRY** 1:11,19
**job** 12:17 16:6 49:7
**Joe** 45:7
**joined** 70:2 71:22
**Joseph** 2:11 3:4,6
**JR** 1:4
**Juan** 7:15 45:7 48:22
**judges** 37:24
**jumped** 171:19
**juries** 37:24
**jury** 3:11 41:18 62:21
62:24 64:7 65:19
69:13 181:14 197:24
212:25 213:2
**just** 6:18 8:22 12:24
14:9 17:3,15 21:16
22:8 26:21 29:13
35:7 36:21 44:11
45:4 47:2,3 49:13
62:3 69:19 71:3,6,13
74:9,14 78:7,7,11
81:24 83:14,25 84:14
89:24 90:3 91:14,16
92:12 96:23 99:6
100:1 103:3 104:24
117:9,11 118:22,25
119:24 123:16 127:2

127:6 132:17 133:23
139:21 143:23 145:7
151:17,23 153:5,7
154:12 159:23 160:3
163:19,21 165:3
166:1 174:6,16,20
175:8 179:20,22
184:16 185:12 186:2
187:7,9 193:10
204:10,11,19 206:12
207:4,9,22 212:22
217:25 219:15 221:2
222:7 223:16 226:7
228:1 229:10 231:16
232:3,6,20 238:10,11
238:15,22 240:19
242:9 243:17 244:24
**justice** 10:3,4,5,6,14
19:12

---

**K**
**Katherine** 2:4 247:10
248:4
**keep** 17:8 42:17 91:16
95:6,7 133:14 191:6
192:1 234:18 239:13
**kept** 51:12 194:21
225:10
**key** 237:18
**kicking** 75:22 110:9
**kill** 41:10 100:18
101:22 102:25
176:18 179:4,4,5
181:17,25
**kind** 51:1 53:23 55:10
67:19 77:9 81:3 82:1
92:3,5 123:6 125:14
138:3 162:1 211:4
241:11
**knew** 159:11,13 165:6
194:25 195:2 240:13
241:17
**knock** 186:13
**knocked** 186:15 187:14
**knock-knock** 60:16
70:24
**know** 5:22 9:20,21,22
12:23,25 16:14 17:16
17:19 20:3,6,11
22:15 27:18,18,20,22
32:6 36:19,24 39:24
40:13 41:1 43:8,22
45:2,8,13 54:5,8 55:6
55:6 57:9,10 62:21
68:19,20 69:9 71:5
76:18 77:17,17 78:1

78:9,10,13 82:8,14
84:10 85:15,19 86:15
87:3,10,16 88:8 91:8
91:15,16 92:3 94:14
95:11 96:10,17,18,19
96:22,24 97:25 98:4
99:2 101:9 102:12
107:2 108:20,24
111:17 112:2 113:2
114:13,19,23 117:10
117:12 118:22 119:7
125:13 127:3,6 128:9
128:12,14,17,20
130:5,22,25 131:3,7
131:25 134:9,16,18
134:23 135:21,25
140:13 148:19,21
153:1,7 155:13 157:3
157:5 159:9,12
162:20 163:18 165:2
165:8,9,11 166:17,17
167:15 172:24
173:22 175:9 177:4,4
182:17,22 184:4,5,11
185:15 187:5 190:2
198:8 202:14 204:9
204:10,10,19 205:13
208:3 211:6,25 212:4
212:7 214:20 218:18
219:15 223:10
224:14,16,17,18
227:1,2,25 228:2
229:3 231:9 232:5
233:12 234:5 240:14
241:13 243:6,6,10,16
243:17,17,19,19
**knowing** 192:18 240:12
**knowledge** 39:13,15
109:4 167:21 199:24
232:19 236:18 242:5
242:9,15 243:14
**known** 109:7 181:17
184:17 227:16
246:17
**Kwan** 67:20 68:22
146:5

---

**L**
**L** 81:3 154:8
**La** 1:10,10,18 48:25
49:1,13,16 50:18,21
51:2,7,24 52:19 53:5
54:1 58:15 59:7,9,24
60:4,13,20 61:2 70:2
71:22 72:20 76:24
86:12 110:24 205:11

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 260

233:1 234:22 246:2
247:5
**lapse** 232:6
**lapsed** 232:4
**large** 210:18 228:15
**largely** 228:17
**last** 8:14 28:4,8 40:7
74:15 76:6 99:14,19
112:8 113:5 156:18
174:24 179:23
191:14 201:23
231:22
**late** 86:13
**later** 12:19 50:13
109:25 154:23
220:13
**LAUREN** 1:4
**law** 2:11,14 16:18
19:11,20 35:15 39:21
110:23 111:3 209:19
210:9,11 211:14
**laws** 36:12
**lay** 171:12
**laying** 160:22 240:19
**lead** 35:7 181:20
**leaning** 69:21
**learn** 46:15 62:12
111:18,19
**learned** 15:4 33:15
35:20 45:15
**least** 39:19 69:5 116:11
189:22 195:24 196:5
241:17
**leave** 9:13 18:3 55:1,25
69:9 78:13 101:22
131:20,23,24 132:4
135:1 144:24 145:1
169:24 178:13 222:3
222:11
**leaving** 16:8 136:10
169:25
**led** 238:8
**left** 11:2 16:6 18:1
48:16 69:9 93:5
105:12 118:4,16
121:16 138:20,20
154:7 160:16,18,23
160:24,25 161:3
188:15 196:1 198:19
198:20,20,21,24,24
198:25 199:4,4,9
200:7 203:2 213:1
214:21 215:14
230:12 240:4
**lefthand** 127:18

**left-handed** 173:22
**leg** 33:15 77:21 93:15
93:17,25 94:9 97:2
105:2,16 110:5
129:22 172:6 227:12
**legal** 210:7
**legend** 121:10,12
**legs** 144:9 241:5
**length** 69:17 223:14
**lengths** 62:4
**lengthwise** 151:6
**less** 47:3 48:3 73:7
110:10 185:2,3 186:3
187:1 238:7
**lesser** 45:24 48:7
**lesson** 24:10 36:7
**lessons** 28:13
**let** 4:14 5:11,11 12:4,4
15:25,25 17:14 18:7
19:9 21:8 22:8 23:17
26:1,1,1,2,21 27:6
29:2,2,15 32:12 34:8
34:8 37:2 39:1 42:1
42:20 44:24 48:15
49:3 50:25 54:15
57:24 61:1 67:13
68:24 73:4,4,4 76:22
78:16 79:23 84:21
85:6 86:5,5 88:3
92:25 95:22 96:7
97:19 98:3 99:6
101:13 105:24
111:17 112:5,23
113:1,16 114:19
116:23 118:25 119:2
119:3,7,9,11,14,17
119:18 120:5,5,12
123:12,16,19,23
124:10,18 125:1
126:19 127:8 129:25
132:7 137:22,22
140:11 143:17 146:3
147:18 150:16
151:15 155:1 160:1
162:3 166:2,24
170:10 174:1 176:1
176:23 180:4 182:2
182:24 183:19 191:6
191:22 193:12
194:17 195:17
196:15 197:17
200:25 208:15 209:3
211:16 212:13 213:2
213:8,9 214:14 215:2
218:14 219:12
220:12,17,17 222:10

231:5,16 232:8
233:23,25 234:2,3,4
240:23
**Letters** 3:22
**letting** 234:3
**let's** 29:6 32:18 48:15
50:25 65:21 121:7
177:12 182:13
188:14 241:1
**level** 31:13,17,19,23
32:15 48:3 67:25
68:4 73:10 80:13
84:23 92:19 94:11,18
96:9 224:8
**LFPD** 3:10
**lie** 228:22
**life** 29:9,13
**lift** 172:6
**lighter** 66:1,12 67:1
**lightly** 36:6
**like** 5:25 6:3,19 10:5
19:12 20:18,21 21:1
22:6 23:12 25:13
36:3 54:9,14 56:1
67:17 68:1,20 69:17
73:1 77:14 81:3 88:7
91:8 92:15 98:11
100:11 106:3,8
109:13 112:20 115:6
153:12 161:25
178:18 183:10
185:12,13,14 187:7
202:22 223:16 229:2
229:12,25 230:17
231:25 232:3,14
240:15,16 242:4
243:8
**likely** 181:20
**limit** 26:24 55:5
**limited** 102:18
**limits** 36:15 76:23
81:25
**line** 138:4 149:9 163:19
175:15 246:3
**List** 3:21 209:13
**lists** 154:3
**little** 5:12 7:2 12:7
23:17 26:21 29:2,16
65:16 67:14 72:14
78:23 82:2 85:6
91:14 104:25,25
112:5 117:13,14
129:25 135:22
147:18 149:14 166:1
178:1 186:2 191:9
206:13 218:11

219:11,12 237:22
**liver** 195:25
**lives** 8:9
**living** 7:5
**load** 35:2,7 211:2
**loading** 63:7
**located** 13:7 18:15
122:7 123:2 126:17
150:19
**location** 79:17 84:7
122:10 149:12
151:15 175:17,23
206:24 237:11
**locations** 196:6
**lock** 74:7,8 80:23,24,25
83:14,14 84:11,11
129:6
**locked** 134:9
**locks** 74:9,9 128:18
129:2
**long** 11:16 12:5 15:6
17:11 23:19 28:4,19
55:2 75:25 77:20
91:9 114:16,23
116:15 124:3 127:9
152:21 155:23,23
156:18 158:22
174:24 179:14
184:25 186:25
187:16,21 190:23
219:2 231:10,13,23
231:25 232:10,13,19
243:14,18
**longer** 42:14 43:6,9
45:11 85:21 144:21
145:9 161:12,15
169:8 170:1,6 179:22
218:11 232:6
**look** 48:17 55:5 58:22
99:15 117:25 120:5
120:25 121:7 157:24
195:16,17,18 207:4,5
207:10,15,23 208:4
216:14 240:15
**looked** 85:16 98:11
117:9 119:24 128:15
159:5,5,10,10 165:2
165:2,5 166:25
204:11
**looking** 6:18 12:24
16:2 38:18 48:18,20
48:21 49:7,8 118:21
118:21,22 165:6
222:7 240:19
**looks** 100:11 202:22
229:25

**lot** 9:21 16:13,21 48:19
113:2
**loud** 154:5,24 230:10
230:22
**low** 5:23
**lower** 18:16,18 31:20
144:8 198:7,11 203:1
203:2
**Lucio** 154:8 229:25
230:9
**Luis** 7:2,5
**Lunch** 67:10
**lunge** 159:18 187:10
**lunged** 176:21 183:12
**lungs** 195:25 196:7
**LVN** 154:8,8 230:14,14
**L.L.P** 2:17
**L.Vega** 230:14

———————
**M**
**M** 4:3 154:8,8 226:4
229:25 230:9 244:5
244:23
**mace** 14:11 73:21
84:25 147:12 154:10
156:4 219:6 230:16
**machine** 2:6
**made** 6:19 41:12 75:20
77:12 79:8 99:24,25
100:7,12 109:8 111:6
112:8,13,23 120:2,15
131:16 132:14 135:8
151:19 155:8 164:25
164:25 166:10,24
167:16 175:23
178:13 179:11 180:5
182:19 183:23
185:10 192:8,25
193:5,7 194:8 229:4
229:13 233:20 235:2
241:17,20 244:16
**magazine** 63:9,10,12
**mainly** 106:22
**maintenance** 16:13
**major** 8:23 193:23
**make** 39:16 64:15 66:8
91:16 94:15 108:16
112:16,17 128:25
133:11 137:23
139:24 158:12
175:15 183:24
185:12,14 190:7
192:14 195:18
200:22 207:14 239:8
241:12 242:19
**makes** 65:9 203:18

(210) 377-3027
7800 IH-10 WEST, SUITE 100
ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230
FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 261

making 80:20 112:24
  127:4 154:10 179:6
  192:4
Male 83:8,9
maliciously 38:5
man 196:5 204:18,21
  240:19
manager 49:17,21
maneuver 109:19
  138:19
manner 65:11 104:17
  110:5 197:19,22
  221:8 225:15,18
Manual 3:10
manually 65:6
many 9:11,11 18:23
  19:15 23:22 24:8,13
  25:18 40:25 53:10,18
  55:22 57:4,4,16,16
  63:22 68:22 72:24
  73:5 75:25,25,25
  87:3 124:12 134:2
  141:13 143:8 152:15
  167:16,24 173:12,25
  174:1 179:18 180:15
  182:25 188:10
  194:11 202:20,23
  206:15 242:12
man's 241:5
March 72:4,5
mark 97:10 120:4,13
  127:7 195:9
marked 3:9 97:18
  120:14 122:2,5 123:7
  148:18 150:11
  165:15,16 212:18
markedly 62:13
marker 126:21
marriage 6:17
married 6:18,20 7:10
Martin 114:11
Martinez 45:6,11
MARY 1:2 247:3
mass 41:8,14,19,20
  181:11,14,16 182:9
  184:16 189:3 198:4
  201:2,4 228:21
mata 176:18,18 179:1,1
material 2:24,24
math 20:18,20,21
matter 64:9
MATTHEW 1:3
mattress 161:8 171:11
  178:4,6,7 186:17,21
  207:1
maximum 32:19

may 32:7,14 35:15
  36:19 43:21 44:2,5
  45:19,20,23 46:22
  61:7 78:10 85:21
  86:22,22 87:6 91:7
  98:18 112:6 115:3,10
  149:14 167:17
  168:13,15 180:21
  201:13 203:24 207:5
  233:25 236:8,17
  242:10,10,25
maybe 9:24 17:13,22
  24:11 25:20 28:15,20
  53:19 56:16 57:12
  68:24 71:16 73:5,8,8
  79:1,3,5 83:6,7 85:18
  85:18 90:18 107:19
  113:19 114:22,22
  115:19 117:3 120:20
  127:8 134:3 135:21
  135:25 136:1 138:3
  152:23 155:25 156:7
  176:14 177:9,20
  182:13,13,16 183:9
  185:2 186:3 189:14
  200:3 209:7 232:2
  237:21
ma'am 121:6
McAllen 5:16 13:9,9
  20:4 50:7
mean 5:25,25 6:3 20:2
  26:2 46:15 53:25
  60:16 62:6 87:23
  91:15 95:5,5,6
  134:21 139:19 182:3
  187:7 193:22 208:20
  228:2 234:1 235:14
  243:15
means 65:20 66:2,3
  179:2 189:18,18,19
measure 187:5
measures 197:16
measuring 199:9
mechanics 30:20
mechanism 36:1 62:24
  63:2,3 65:5 129:4
medical 1:13,20 3:20
  3:23 22:21,24 23:3
  32:2 86:6,16 88:5,16
  97:11,11,13,19 98:2
  98:5 109:1 206:16
  208:2 209:16,16
  210:6 213:11 224:13
  225:11 226:6 227:13
  229:3,5 231:3 233:6
  238:22 244:7,15

medicated 228:4
medication 225:3
  242:8,9
medications 100:7
  242:3
meet 4:8 89:13,15,18
member 208:16 209:9
members 41:17 76:15
  76:16,19 112:3
  208:24
Memorial 7:9,16,21
  20:4
memory 97:15
men 47:8
mental 31:16 32:23
  47:11 226:12,12,19
  226:24 227:2 233:5
mentally 33:1 226:25
mentioned 30:6 51:12
  52:13,18 90:17 93:25
  101:5 161:20 167:14
  174:16 231:13
mere 74:14
merely 37:20 38:11
mesentery 196:2
met 89:22
metal 69:15
method 2:6
microphone 244:3
mid 86:13 197:9,12
middle 7:8,8 122:19,22
  130:19 149:2 203:9
  203:20
midline 199:10
mid-morning 88:7,9
might 20:14 26:6,7,17
  30:2 31:12,17 32:1,5
  32:6,21 35:10 36:12
  43:20 76:1 126:2
  146:17,18,20 208:25
  234:17
millimeter 34:19 35:13
  58:20 60:7,18,24
  61:11,21 62:13,20,25
  63:1,21 64:3,4,8,10
  92:8
millisecond 183:10
  187:1,5
mind 38:2 41:17
  129:20 182:2
mine 170:7
minimal 68:20
minimum 56:23
minor 1:4 22:16
minute 157:24 187:25
minutes 28:20 91:11

120:14 154:23 156:7
  207:19 232:2,5,7
missed 194:22 212:1
mistaken 23:24
ML 103:12
MMC 100:15 101:19
  102:17
mobility 102:18
mode 65:8,13 66:1
model 25:14,15 58:20
  66:8 92:6
moment 34:3 212:22
  220:8
momentum 201:5,6
monitor 209:2
month 18:25 19:3,5,6
  51:5 57:20 61:7,8
monthly 57:16
months 12:8 17:13 18:1
  18:10 23:21 28:7,7
  55:8,8 58:9 61:6
moral 22:12,15
more 9:5 16:16 29:2
  40:18 45:14 47:2
  63:18 66:7,18 72:14
  74:8 76:16 77:2,3
  78:8 97:1 98:8
  104:20 109:23
  113:11 117:14 119:7
  119:23 136:5 144:1,2
  144:2,16 149:2,4
  150:22 152:23 153:1
  153:7 156:23 159:12
  168:7 170:7 173:12
  175:14 176:14,16,21
  179:16,16 192:2
  193:6,6,10 195:2
  201:11 211:14 222:6
  233:4 238:7 245:12
morning 4:4 86:13 87:2
  87:22,23,23,24
  100:14,20 101:6
  103:5 116:8 230:6,20
  230:25
Moss 45:6
most 49:6,8 125:5
  144:3
mostly 24:19,20 25:3
  74:19 144:5
mother 6:11,13
motion 69:20 180:10
  189:9 203:24
motivating 193:19
motivation 193:14,23
move 129:7 141:4,4,5
  161:17 186:7 197:25

204:15
moved 108:20 128:10
  132:19 141:20 144:9
  149:2 161:14 178:12
  186:10 189:11
movement 79:18
  109:14 110:9,10
moving 142:7,8
much 9:10,25 24:17
  56:22 57:5,14 67:4
  81:15 82:5 98:10
  113:9 125:14 127:12
  137:3 156:2 165:8
  186:4 211:12 227:14
  228:16
multiple 64:14 195:24
  196:5
MUNIZ 1:7
murder 88:14 233:18
murderer 228:21
myself 29:7,14 36:24
  49:24 78:11 83:17
  132:17 145:9 175:9
M.Lucio 230:13
M.Valdez 230:14

_____
      N

N 2:12 4:3,3 226:4,4
  244:5,5,23,23
name 4:5,6 6:5 18:14
  19:21,24,25 20:1
  27:9,11 50:11 71:3,6
  89:20 213:22,23
  226:5 242:9 246:18
names 5:17 7:1 19:19
nap 116:2
nape 197:4,6,10,12
nature 75:3
near 48:19 131:1
  164:20 189:23 219:1
nearby 104:22 105:23
  180:25
necessary 36:25 125:2
  194:7 211:19 224:20
  224:22 237:19
neck 197:4,6,11,12
  204:16
need 4:23 11:21 41:1
  45:17 60:7 77:5,18
  77:18,23 97:6 104:13
  106:23 119:18 133:3
  133:21,23 149:14
  189:7 202:9 228:16
  240:6,10 241:16
needed 40:16 48:25
  54:9,12,13 74:12

GERARDO RAMIREZ

April 10, 2003

Page 262

75:20 80:10 88:14
104:21 106:6,7,17,21
108:14 129:11,13,13
129:17,18 132:19
204:18,19,22,22
214:1 224:16 234:18
237:3,5 241:22
**needing** 74:19
**needle** 181:2
**needs** 97:1 101:22
153:20 154:1 240:2
**neither** 96:14 247:20
**neutralize** 191:13
**neutralized** 43:7
**never** 35:5,5 73:17,20
105:2 112:19 114:3
235:6,6
**news** 94:25
**next** 1:3 15:23 55:8,8
57:10 81:20 124:5
126:15 130:19
131:20 139:3 154:23
177:19 188:11 203:4
203:9 230:19,24
**night** 14:11 87:1,2,6
113:22 115:1,1
206:16 240:15
**nine** 60:7 198:23
**Nineteen** 12:14,15
**nobody** 132:22 205:14
205:15,16
**nods** 107:24 113:23
116:13
**noise** 116:20 117:10,17
117:21 185:12,13,14
214:18
**none** 73:13 108:19
206:9 208:13
**Nonresponsive** 218:19
222:9
**non-profit** 5:23
**non-reserve** 52:4
**norm** 46:25
**normal** 46:19,20 62:2
**normally** 75:8
**north** 121:22 122:23
**NOTARY** 246:23
**notation** 102:17 230:8
230:19
**notations** 231:7
**note** 2:24 98:22 99:14
99:19 100:14 101:2
101:19,25 102:23,24
103:11,25 154:3
242:19
**noted** 71:14 246:12

**notes** 100:11 116:10,11
207:5 229:18
**nothing** 17:1 50:17
91:15 112:20 117:23
205:15 222:8,16
227:3,3 245:17
**notice** 3:9 128:17
**noticed** 116:12 161:21
161:23 164:19 167:4
184:22
**notified** 88:5 104:21
231:2
**notify** 94:24 106:18
114:17 124:21 126:9
**number** 41:25 42:9
97:18 106:18 109:1
120:4,16 126:20
143:15 154:2 175:15
179:21,24 180:15
195:9 196:12,16,22
197:3,9,14 198:1,6
198:18,23 199:3,8
205:19,20,21,22
208:14 209:12 229:3
234:21
**numbered** 2:3
**numbers** 140:24
**numerous** 141:15
143:23,25 179:20
**nurse** 91:7 104:22
153:24 230:9 238:11
238:15 240:5,16
241:4
**nurses** 92:15 98:10
100:12 130:10,14,19
154:24,25 205:15
224:16 230:23,23
238:23
**N/A** 3:3

---

## O

**O** 2:18 4:3 226:4 244:5
244:23
**Oaky** 213:2
**oath** 193:19,24 232:19
246:18
**ob** 221:23
**obey** 169:11
**object** 121:24 140:16
152:2 189:8,12
199:18,19,20 201:1
214:21
**Objection** 101:12,17
109:21 110:2 129:8
135:10,18 136:12
141:25 157:12

158:20 168:12 182:5
189:25 192:13
193:16 201:25
203:19,21 208:18
211:10 218:19 222:9
222:14,23 224:2,9
225:13 226:13
228:10,18,25 234:19
234:24 240:21 241:7
241:25 244:21
245:14
**objective** 37:13 43:2
**objectives** 39:5,25
**obliterate** 126:21
**observation** 208:15
238:15,22
**observe** 200:1
**observed** 15:2 26:24
115:13 140:24
184:18
**observing** 238:10,11,16
238:20
**obstruction** 218:21
**obtain** 21:17 37:12
39:5 50:14 59:10
167:18 172:20
241:11
**obtained** 172:17
**obviously** 95:12 98:11
114:1 129:4 134:23
151:8 232:16
**OC** 73:21 153:3
**occasion** 72:12 73:17
73:20 79:20 83:22
91:8 148:4 180:12
209:6 227:2
**occasions** 74:1,11 75:7
75:11 76:21 84:21
**occupy** 158:6
**occur** 72:16 76:23
81:23 94:25 116:22
124:12 242:17
**occurred** 56:1 58:10
66:14 73:24 74:15
76:11,19 81:24 85:10
95:24 109:20,25
112:7 113:4 117:2
122:12,14 148:15
158:23 177:6 185:22
206:7 208:3 238:1,8
245:13
**occurring** 142:7
**occurs** 211:19
**odd** 91:15 226:15
**off** 9:12 49:13 54:9,13
56:11,18 57:7,8

64:11,23,24 86:18,19
87:17 116:3 127:17
148:10 153:5 156:23
166:1 183:22 185:16
186:2 188:10 190:8
191:14 201:20
207:16,18,20 240:3,6
240:9
**offense** 3:15 22:16,17
22:18 75:3
**offenses** 39:16
**offers** 49:8
**office** 2:6 205:19
246:20
**officer** 1:11,18 4:6,8
5:13 6:9 8:11,16 11:9
19:9 24:21 26:6,7,17
27:17 28:22 36:13,24
37:4 38:5 40:10 43:8
43:14,17,22 44:7,13
44:14,18 45:1,14,20
45:23 46:2,10 47:5,6
47:16 48:8,11,15
50:1,18 51:10,13,13
51:15,18,18,19,20
52:4,18,21,24 53:8
53:11 54:7,13,14,17
55:1 57:1,5,17 58:7
63:18 67:11 69:23
72:12,18,22 75:14
76:13 77:1 82:7,9,25
83:5 89:5,8,10 90:5
90:17,20 91:3,5,9,12
91:19 92:3,12,18
93:21 94:4 95:10,11
95:16 100:17 101:10
101:14,21 105:19
107:2,12 108:25
110:17 112:11 114:9
114:12,13 149:19
153:20 154:1,9
164:13 169:2 190:17
192:19 199:14 202:9
212:17,25 213:9,17
214:8,9,15 215:13
217:3,24 219:19
220:3 221:5,12,13
223:21 225:21 226:5
226:10,18,23 229:12
230:15 231:3,5
233:23 234:6 235:22
236:5,16 240:2 244:6
244:25 247:14
**officers** 8:3 26:11,12,13
26:25 27:2 34:25
36:16 48:20,24 49:8

54:1,2,2,8 74:19 75:9
77:3 81:14 84:22
100:22 106:4 107:13
206:11,12,15,16
209:19 210:22,23
223:5 233:15 234:13
234:17,22 236:15
242:12
**officer's** 42:6
**OFFICES** 2:14
**Official** 1:12,19
**officials** 89:13 90:14,15
110:23 111:3
**often** 208:23
**Oh** 158:11
**okay** 4:17,21 5:17 6:2,9
6:22 7:3,10,17,19,24
8:2,7,23 9:1,3,8,10
9:14 10:13,20,23,23
11:2,8,12,15,20 12:4
12:9,11,13,17,21
13:2,5,25 14:4,13
16:8,20,25 17:18,20
17:22 18:9,20 20:1,3
20:6,11,17,23 21:8
21:13,23 22:8 23:12
23:17 24:1 25:15,21
27:16 28:19,22 29:19
30:6,15,17 31:21
32:7 33:14 34:6
35:21 36:18 39:25
40:18 41:4,22 42:16
42:25 43:11,22 45:3
45:14,19 46:12 47:8
48:14 49:6 50:5,8,14
50:17 51:7,12,16,23
52:6,13,25 53:2,25
54:5,14 55:2,25
56:16,19 57:4,24
58:3,18,25 59:6,24
60:17 62:5,7,12,20
63:8 64:6 65:2 66:2
67:13,25 68:3,6,12
68:14 69:2,4 71:8,19
72:6,11,24 73:9 74:1
74:4,7 75:11,18,24
76:5,6,9,10 77:4,24
78:15 79:4 80:2,9,12
80:20 81:1,20,23
82:11,23 83:3,23,25
84:2,13,21 85:6,16
87:19 88:3,17,20
89:10,22 90:5 91:17
91:19 93:12,19,25
94:14 95:4 96:7
97:17,18,22 98:8,12

| | | | | |
|---|---|---|---|---|
| 98:21,24 99:23 100:4 | 225:21 226:17 | 227:5 | 165:21 171:18 172:8 | 170:10 171:8,10,14 |
| 100:10,24 103:25 | 227:15 228:15,20 | **Opportunities** 6:6,7 | 173:9 174:15 180:18 | 171:17,19,20,23,24 |
| 104:24 105:8 106:12 | 229:25 230:3 232:8 | **opportunity** 25:19 | 180:18,20,20,23 | 171:25,25 172:3,3,4 |
| 106:20 107:10,17 | 232:18,21,24 233:9 | 160:4 192:10 207:14 | 181:12,13 191:15 | 172:5,6,14 173:1,8,9 |
| 108:3,25 110:17 | 233:16 235:21 | 218:16 | 200:13 201:12 206:2 | 178:1,17 180:9 |
| 112:5,13,19 114:1,3 | 236:12 241:20 242:7 | **opposed** 170:5 210:6 | 207:5,22 209:1,3 | 186:21 193:7 196:12 |
| 114:8,19 115:5 116:2 | 242:22 243:4 245:5 | **opposite** 108:12 138:22 | 210:1 213:18 214:25 | 196:15 204:12 207:4 |
| 116:23 117:4,13,17 | 245:10 | 139:2 151:5 162:4,9 | 216:19 217:4,17 | 217:17 218:17 |
| 120:4,23,24 122:1,9 | **old** 7:24 12:9 | 164:20 165:19,21 | 221:21,25 223:1 | 219:20,24 221:6,9,20 |
| 122:23 123:4,10,16 | **once** 4:21 21:24,24 | 166:4 167:7 200:24 | 227:12,17 233:2 | 222:12 226:10 |
| 123:19,22 124:1,3,5 | 27:3 43:10 84:11 | 217:17,18 | 235:25 236:15,16 | 236:21 |
| 124:12,17 125:1,10 | 145:25 147:10 | **option** 77:20 144:21 | 238:17 240:17 245:8 | **oversight** 221:2 |
| 126:7,10,19 127:13 | 152:18 155:11 | 147:9 168:17,20 | **others** 29:9 48:8 84:6 | **overturned** 159:4,10 |
| 127:17,20,24 128:17 | 159:10 171:17 173:4 | 179:23 | 174:20 232:7 | **owing** 248:3 |
| 129:20 130:5 132:2,7 | 182:7 183:4 195:2 | **options** 30:22 | **otherwise** 36:16 70:9 | **own** 5:20 7:3 14:3,5 |
| 132:13,24 133:11,13 | **one** 9:17 10:7,8 18:24 | **oral** 1:22 2:1 247:14 | 247:23 | 15:4 35:20 58:17 |
| 133:22 134:14 135:7 | 20:12 21:6 33:3 | **order** 13:15 41:25 60:2 | **out** 5:12,22 8:8,9,11 | 169:15 170:5 234:5 |
| 136:2,19 137:9,17,22 | 43:22 49:16 51:1 | 64:19 65:25 75:12 | 9:18,19,19 23:25 | 244:7 |
| 138:2,12,16 139:22 | 54:8 63:24 64:9 65:9 | 77:19,22 80:7 95:25 | 26:8 28:15 35:22 | **owned** 24:22 25:9 |
| 140:20 141:1,11,16 | 69:11 70:13 71:13,14 | 147:23 148:6 161:17 | 38:22 46:25 48:20 | **owner** 13:4 |
| 141:22 142:23 | 76:6,7,10,12,16,20 | 178:18 186:21,22 | 56:8 75:10 82:7,7 | **o'clock** 89:3 97:21,22 |
| 143:25 145:10,19 | 77:2,3 81:1,14 82:23 | 194:8 200:21 241:16 | 91:15 93:23 96:4,5 | 114:21,22 115:19,21 |
| 146:10 147:7,11,16 | 87:16 89:19 91:23 | **ordered** 101:5,6 141:4 | 100:16 109:18 114:8 | 115:22 237:21 |
| 148:12,17 149:8,11 | 93:4 97:3 98:8 | 141:12 176:15 | 116:21 122:17,18 | 240:15 |
| 149:17,21 150:5,8 | 100:22 101:6 106:11 | **orders** 42:18 80:17 | 123:6,7 124:17 | |
| 151:25 152:13,15 | 106:15 108:8 113:11 | 113:8 159:6 | 130:15 132:5,5,5,7,8 | _____ |
| 153:6,6 154:2,12,15 | 119:23 120:9 132:3 | **ordinary** 91:15 | 132:11,14,21,25 | **P** |
| 155:2,2,6 157:21,23 | 135:13 147:9 153:25 | **organization** 5:23 | 133:8,17,21,22 | |
| 158:2 160:21 162:13 | 172:6 173:18,18 | **original** 123:20 | 137:15 139:20,24 | **P** 2:18 |
| 162:15,18,23 163:6,9 | 174:16 175:14 | **originally** 137:4 | 140:4 141:23 142:10 | **pa** 224:15 |
| 163:17,23,24 164:8 | 176:14,16,20 189:10 | **other** 5:21 14:16,23 | 145:2,17 147:12,20 | **page** 3:1,8 98:21 |
| 164:22 165:24 169:5 | 190:24,25 191:15 | 15:10 17:6 20:13,24 | 147:24,25 152:4 | 100:10 102:4,4,17 |
| 169:24 170:17,20 | 195:23 196:16 197:4 | 20:25 22:17 28:6,13 | 153:21 160:8 165:9 | 154:2 195:21,21 |
| 171:10,22 172:10 | 197:6,17 201:11,16 | 28:13,14 29:10,10,14 | 168:10 170:13 176:2 | 196:10 202:10,11 |
| 173:7 174:15 175:21 | 202:25 203:1,1,4 | 30:22 33:6,10,19 | 176:2,24 177:20 | 229:12,15,17,21 |
| 175:22 177:18,19 | 206:18 208:8 209:6 | 48:21 54:8 56:18 | 178:21 182:4 184:10 | 230:5 246:3 |
| 178:21 179:2 180:11 | 212:7 216:19 234:23 | 60:12 63:3 68:9,13 | 188:22 204:17,17,19 | **paged** 154:24 230:22 |
| 180:23 181:12,19 | 235:5 240:4 242:13 | 69:11 74:19 75:8,9 | 204:20 216:24 | **paid** 51:21 52:20,23 |
| 183:22 184:7,14,17 | **ones** 76:3 143:18 184:6 | 76:14 81:15 82:8 | 218:10 222:17 | 54:2,2 55:14 56:19 |
| 185:10 186:5,7 187:3 | 206:18 211:8,13 | 83:20 84:13,22 90:5 | 239:23 242:19 | 56:22 244:25 |
| 187:21,25 188:16,19 | **only** 4:21 14:15 15:10 | 90:8,14,15 91:22,24 | **outcome** 247:23 | **pain** 37:16,19 38:12 |
| 189:15 190:2,4 | 15:14 18:24 23:15 | 92:11,12,15 93:10,12 | **outside** 81:24 117:17 | 185:8,14 |
| 191:11,21 194:3,17 | 27:24 66:20,23,24 | 94:8,17,25 95:7,8,13 | 117:19 132:23 | **pair** 33:15 227:17 |
| 196:15 198:1,16 | 73:13 77:1 81:11 | 99:2 100:12,22 102:9 | 134:11,14 135:15 | **Palm** 2:15 59:17,17 |
| 199:8,25 201:3,10 | 91:23 92:7 102:20 | 104:14 105:19 106:3 | 136:9 154:17 210:23 | **Pan** 10:12 |
| 203:3,4,17,22 205:9 | 137:14 140:15,15 | 106:22 107:13,25,25 | 214:18 216:14 | **panic** 106:2 |
| 205:18 206:21 207:4 | 181:5 206:18 214:11 | 108:3,4,7,7 109:15 | **over** 9:18 48:24 107:20 | **paper** 12:22 |
| 208:7 209:12 210:18 | 223:1 236:12 238:4,4 | 110:23 111:4 113:8 | 122:23 125:16 127:4 | **paperwork** 90:9 |
| 212:21 213:2,13,24 | 240:4,12 | 114:13 119:24 | 131:16 132:13 | **paragraph** 195:23 |
| 215:12,19,21 216:4 | **open** 17:15 54:21 55:7 | 126:16 128:25 | 137:23,25 139:5,6,9 | **paranoia** 99:10 |
| 216:19 217:2,11,20 | 84:19 137:18 168:20 | 129:25 130:3,22 | 139:13 150:7 155:12 | **paranoid** 99:5 100:5 |
| 217:24 218:24 | 215:9 229:11 | 131:4,21 132:3 134:4 | 155:12,20 156:3 | **parents** 5:17 |
| 219:12,14 220:10,12 | **opening** 12:22 17:22 | 143:21 144:6 146:1 | 157:17 158:8 159:17 | **part** 25:22 26:10,22 |
| 220:16,25 221:2,23 | **operate** 58:13 | 146:24 147:19,23 | 160:8,10,13,15 161:2 | 27:7 28:3 41:9 50:2 |
| 222:2 223:1,9,11,14 | **operates** 63:8 | 150:21,22,24 152:2 | 161:5 162:6,8,10 | 71:12 77:19 99:4,14 |
| 223:18 224:11 | **opinion** 194:7 223:23 | 153:16 159:17 165:5 | 163:3 164:4,16 | 102:24 169:23 |
| | | | | 174:10,18,24 181:10 |
| | | | | 188:4,6 193:25 |

GERARDO RAMIREZ

April 10, 2003

Page 264

195:16 200:13,16
215:12 220:20
228:15
**partial** 145:12 200:2
**partially** 47:24 48:4
128:3
**particular** 25:15 38:25
64:6 77:11 112:17
180:5 181:10 226:11
230:5 233:5 236:21
239:5 244:14
**parties** 247:21
**parts** 28:13 129:25
189:1
**party** 81:13
**part-time** 8:20,22,22
**pass** 117:1 158:19
225:25 244:1,22
**passed** 39:7 156:2
235:5,7,11
**passive** 119:6,7 224:21
**past** 48:15 50:1 114:1
**path** 137:3 138:4
148:18 157:16
162:20,21 216:21
218:21 220:9 221:24
222:17
**patience** 225:23
**patient** 99:5,16 100:5
101:3,20 102:1,7,25
103:2,13,15 108:13
130:3 154:6 208:15
226:11 227:6,16
230:11 240:2 242:8
242:10 244:19
**patients** 130:5 210:20
238:17
**patrol** 51:9,10,18,18
52:4,18 54:2 58:11
**patrolman** 59:21,22
**pause** 183:9,11 185:18
185:22 186:24,25
187:1 212:15 223:20
**pay** 54:21 85:18
**PD** 59:24 72:20
**peace** 26:24 27:17
49:25
**Pedro** 13:3
**pejorative** 182:3
**pen** 123:16 127:9
133:11 138:3 214:15
**Pena** 17:21 50:7
**penal** 39:12,13,13
**people** 16:23 24:13
33:6 84:16 95:7,8,13
96:3 98:10 100:12

110:24 114:13
153:19 204:17 206:2
227:2 228:3
**pepper** 60:15 147:2,4
147:10,12,20,24,25
148:7 149:10 152:4,6
152:21,24 153:3,11
155:1,10,13 156:16
191:8 219:16
**per** 23:22 24:8 57:20
57:21,22,23 201:3
211:17
**perceive** 145:20 174:8
187:11 192:16,17
**perceived** 125:23
127:25 136:15,16,19
140:16 145:10
**perceiving** 222:7
**percent** 24:19
**perception** 172:24
**performance** 211:6
**performing** 245:8
**perhaps** 12:23 31:12
31:23 33:2 35:18
39:18 97:2 116:3
**period** 28:8,16,19
54:20,23 61:5,10
75:25 85:7 87:24
124:2 132:9 142:10
153:12 155:25 165:7
167:11 172:13
187:11,16,21 192:9
**permitted** 210:19
211:22
**person** 29:8,10,12,14
29:14 31:21 32:2,13
32:16,17 33:5 37:7
37:10,11,15 38:8
46:16,18,20 47:5,9
47:11,19,23,25 48:2
48:4 51:24,25 66:25
77:6 78:4,15,17 79:2
79:6,10 80:20 81:6
81:11 82:23 83:5
85:23 88:17 90:1
95:18 97:1 101:2,25
102:6 106:10,16
107:11 111:19
140:15 153:16
158:19 161:17 201:2
201:3,4,5 203:25
228:16,17 246:18
**personal** 1:7 232:18
243:14
**personally** 246:17
**personnel** 89:15,22

92:14 96:3 107:7
108:1 131:4,21 132:3
134:4 153:16 209:9
210:10
**personnel/guards**
210:11
**persons** 31:2 77:6
**person's** 47:17,19
95:13 112:3 181:16
**Pharr** 48:23
**Phillip** 2:14,14 49:22
49:22
**phone** 107:20 108:8,20
122:7 126:17 132:14
132:23,24 137:25
138:5,9 148:22 205:5
205:7 237:12
**photographs** 190:5
202:8,12
**photos** 243:21
**physical** 21:1 30:23
33:24 47:9,19 50:3,8
50:9 73:11,15 74:2,5
74:13,14 75:19 78:3
78:5 79:17 81:12
83:12 84:23 125:5
**physically** 76:3 79:11
80:18 109:25
**physician** 235:2
**physicians** 99:3 229:17
**physician's** 154:3
**pick** 47:3
**picked** 4:18 111:15
156:17 205:7
**pictures** 243:20
**pistol** 25:13 34:19
35:19 63:3
**place** 18:14 30:21
65:23 69:22 72:8
80:3,15,19 82:6
103:15 105:5,13,16
105:18 109:9 127:10
129:5 142:6 175:19
214:15,16
**placed** 76:20 81:9
84:12 110:11,12
132:17 147:13 200:3
205:6 212:21
**placement** 120:22
198:8
**placing** 110:8
**plain** 36:21
**Plaintiff** 2:2 248:3
**plaintiffs** 1:9 247:3
**PLAINTIFF(S)** 2:10
**plan** 24:11

**play** 28:13 35:5 144:20
213:3
**played** 193:25
**playing** 217:3
**Plaza** 2:21
**pleasant** 202:9
**please** 4:4 5:7 62:8
121:3 133:3 143:11
160:24 191:3
**point** 9:4 14:25 15:4
36:9 44:8,15 52:3
55:13 68:25 70:13
73:14 80:9,16 83:18
95:24 100:1,2,3
104:9 112:14 114:23
123:24 124:21,23
125:1,4,24 127:24
128:9 129:11 131:9
136:2 140:11,21
141:16,19,22 142:9,9
144:17,18,18,19
145:3,14,15,17
146:17 149:22 150:2
151:19 152:4,7 153:6
153:10 154:18 155:8
155:10 156:4,20
158:9 159:3,12,16,19
160:2,13 161:11
162:16 164:14,18,19
165:23,25 166:10,17
166:18,24,25 167:21
167:23,25 168:6,22
169:2,5,7,17,19,21
169:24 170:4,8,11,12
170:17 171:24 172:9
172:13 175:2,22
176:1,6,7,16,24
177:1 178:21 179:22
181:3 183:11 184:4
186:17,20 192:1,15
192:18 193:6 194:15
196:25 201:17
205:17 206:1 213:3
213:10 215:25 216:4
216:13 217:2,20
218:1,6,9,14 219:5
219:19,22 220:5,5
221:4,14 222:11
232:21 237:11
241:16,22
**pointed** 127:6 176:9
178:22
**points** 28:11 72:25
201:2
**pole** 181:1,2
**police** 1:11 6:9 8:2,11

8:15,16,25 9:22 10:2
10:2 16:2 18:16,19
18:20 21:4,7,8,13,18
23:2,22 24:2,21,24
25:6 26:11,15 27:2
28:24 29:3,23 30:8
32:5 33:17 34:10,18
34:25 35:4 36:5,11
36:13,16 37:4,13,17
38:5,16,20 42:16
44:17 46:9,10 48:15
49:1,16,18,25 50:18
50:18,22 51:7,19,24
52:19 53:6 54:1 57:1
58:15 59:7,9,17,17
60:13 62:14 70:2
71:22 72:22 86:12
88:24 94:2,18 95:16
99:16 103:1 105:19
110:24 120:15
181:24 205:11,17,18
213:20 233:1,17
234:13,16 235:3,14
235:25 245:8
**policies** 208:2
**policy** 3:10 96:17
210:14,16
**Pope** 2:17 3:5 101:12
101:17 109:21 110:2
208:18 211:10 224:2
225:13 226:3,5,6,17
228:11,20 229:2,7,9
229:11 234:21 235:1
240:23 241:15 242:1
244:1,4,21 245:14,17
**portion** 108:21 197:10
197:12 199:12
213:24
**portions** 195:17
221:5
**portraying** 215:13
**pose** 77:16 226:16
228:5
**posed** 36:24 145:9
**position** 13:10,11 16:16
17:15 51:8 54:21
59:20,22 74:12
123:20 126:22
132:20 133:13
137:14 139:5 149:18
165:22 166:3 175:16
177:5 185:24 203:25
218:25 219:9 221:17
222:20
**possession** 105:9
**possibility** 30:2

GERARDO RAMIREZ

April 10, 2003

Page 265

possible 71:16,16 87:6
  98:8 154:12 168:18
possibly 11:19 12:7
  78:23 113:19 125:4
  129:22 154:14
  226:25
posture 44:4 197:22
potential 47:17
pound 170:21
pounds 79:2 125:17
  128:6
power 211:12
practice 211:13
precluded 201:23
precluding 192:5
prepare 13:15
prescribed 210:14
presence 30:23 73:11
  73:14 74:14
present 2:23 44:18
  197:16 206:7
presented 36:7 46:3
  75:20 80:15 146:13
  194:8
presents 47:5 48:7
press 66:3
pressure 64:21 65:24
pretty 29:20 39:24 82:5
  98:10 113:9 165:8
  227:14
prevent 77:18,22 95:8
  171:2 186:22 200:18
prevented 50:17
  223:25
preventing 136:10
previous 60:19 65:14
  70:14 181:23 225:3
previously 212:18
  229:13
primarily 52:14
primary 41:8 180:22
prior 25:6 48:10 67:24
  73:23 74:15 79:10,12
  84:17 100:8 111:22
  111:25 112:8 126:23
  132:18 206:10 243:5
prisoner 34:8 210:6,20
  235:2 236:1,17
prisoners/patients
  210:12
prisoner's 233:5
probably 4:18 22:5
  50:12 58:23 101:7
  217:25 232:13
problem 5:1,8 12:1,3
  105:1 117:15 207:7

212:12 240:13
procedure 2:8 3:10
  4:19 32:1 39:20
  96:18
procedures 32:1 90:11
  208:9 209:25
proceeding 247:22
process 20:25 50:2
processing 16:14,23
produced 2:1
Productions 2:23
professional 98:5
professor 10:16
proficiency 68:1
proficient 69:7,8
program 19:8 28:10
progress 102:24 154:3
  229:18
prone 227:25
propensity 238:12
proper 29:4 32:1,15
proposal 5:21
protect 78:11 105:8
protection 29:13
  154:25 210:20
  230:23
Protective 3:20
proved 246:17
provide 21:16,20
  129:23
provided 14:1 38:19
  85:17 104:22 109:16
  209:17,24 234:22
provisions 2:9
proximity 137:3
PSJA 7:15
psychiatric 242:4
psychological 23:6
  31:16 50:3,5 97:23
  101:6 109:2 225:2,10
psychologically 33:1
psychoses 242:4
psychosis 228:3
psychotic 99:10 100:5
  227:3,6,16 228:2,6,7
  228:21
psycho-social 102:24
public 84:19 246:23
pull 63:5 65:6,10,23,23
  66:1,3,5,10,18,18
pulled 141:10
pulling 218:1,3
pulse 204:16,23
punishing 37:21
Punishment 37:23
purchase 58:21

purchased 14:3,5,24
  15:16 58:17,18
purpose 37:20 38:2,12
  95:1 104:14 208:24
  210:19 235:17
  246:19
pursuant 1:15 2:8
pursue 16:2
push 78:12 148:10
  150:13,17 156:9,12
pushed 156:23 177:20
pushing 78:8 148:12
  151:16,17 155:11
put 29:8 73:1 80:23
  84:8 91:23 96:22
  105:13,16,18 123:17
  127:20 129:6 135:14
  135:22 137:6,9,13,13
  144:16 145:24
  147:20 148:18
  151:20,22,25 156:16
  159:19 163:6 168:7
  175:16,16 176:19,19
  187:8 200:2 201:10
  202:13 203:23,25
  205:9 218:12 222:21
  234:3 240:17,17,18
  241:4,5
putting 197:18
P.C 2:14
p.m 2:4 56:13,14 241:1
  241:2 245:20

_____ Q _____

quadrant 198:7,11
qualification 59:10
  60:17 61:18,20 62:1
  62:2,3,10,12 69:23
  70:1,4,12
qualified 59:19 60:18
  60:23 61:2,11 62:20
  64:3 70:6,15 71:7,10
  71:14,20 72:3,4
qualify 60:2,6,20
quarter 197:16,17
question 5:4 10:1 23:1
  42:24 54:5 69:11
  70:20 71:18 92:25
  102:11 156:15
  157:11,18 177:13
  193:21 206:9 213:4
  216:19 221:13
  222:10 223:1 240:23
questioning 160:6
  229:13
questions 26:5 45:15

76:22 101:21 102:1,6
  102:15,15,16 103:3
  196:16 207:6,23
  212:10,24 223:18
  225:22 226:1,7 231:9
  244:24 245:16,19
quickly 180:2
quietly 228:22
Quintanilla 11:7,8 12:6
  12:17 13:3,7,21,25
  14:5,10,14,16,20,23
  15:6,9,14,19,22 16:1
  16:9 17:6,9
quite 149:20
quoted 2:24,24
quotes 2:24

_____ R _____

race 162:1 165:14
radio 12:22 105:25
rail 93:7 102:21 200:8
  200:10 215:14
railing 150:24 151:13
  151:14
raised 176:20
Ramirez 1:11,19,23 2:1
  3:4,24 4:1,7,8 5:13
  5:18 7:2 19:9 24:21
  28:22 45:14 48:15
  54:15 67:11 92:18
  108:25 110:17
  164:13 169:2 190:17
  192:19 199:14 202:9
  212:17,25 213:9,17
  217:24 221:13
  223:21 225:21 226:5
  244:6,25 246:11,14
  246:17 247:8,13
range 24:10 73:11
  182:17 195:24
ranged 49:24 75:4
ranges 232:5
ranging 73:14
rank 38:22 45:2
rapidity 35:25
rate 63:19 211:18
rated 40:4
rather 63:4 77:9 92:7
  105:13
rating 40:7,7 64:4,7
rattling 154:5 230:10
Ray 8:15 27:15,16 45:6
RE 246:2
reach 137:6 138:10
  141:9 151:9 155:19
  158:15 159:13 165:7

165:10,10,14 166:15
  166:19,19 167:15,17
  167:24,24 181:3
  216:23 219:2
reached 138:9 139:15
  139:16,17,18,20,24
  140:4,12 141:1 142:3
  145:25 155:14 156:3
  159:4 167:24 171:7
  173:1 175:10 204:16
  217:8
reaching 140:13,16,25
  165:12 217:20
reaction 152:24
read 12:21 86:11 99:15
  115:11 116:10
  195:16 211:16
  246:11
reading 20:18 195:18
reads 102:24 154:4
  195:23 196:4 210:10
  210:18
reality 100:17
really 9:21 11:21 82:5
  162:19 177:13 187:8
  201:23 207:8 242:6
reason 105:12 131:19
  135:1 145:6 148:6
  170:25 199:22 231:6
  241:20 243:1 244:7
  244:10,15,17 246:3
reasonable 44:17
  135:16 136:8
reasons 20:13 210:6,7
recall 10:17 11:11 19:6
  19:25 20:16 28:1
  29:22 36:8,18 40:8,8
  49:5 50:12,13 51:5
  58:24 59:23 64:5,5,6
  70:9 72:25 74:17,18
  74:22 75:1,3 76:13
  77:2 82:5 83:11
  85:15 87:4 88:4,4,8
  89:20 100:2 102:2
  103:18 113:5,12,13
  119:25 120:11 122:2
  122:5 130:4,8,9,12
  130:12 133:2 138:1
  141:15 142:18
  143:10,10,15 154:10
  154:11,14,20 165:12
  166:23 167:22 173:1
  174:3,4,6 175:1,1
  177:21 179:9,20
  181:4 182:16 183:11
  187:24 196:18

(210) 377-3027
7800 IH-10 WEST, SUITE 100
ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230
FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 266

197:18 198:8,21
201:15 205:12,15
212:19 213:23,23
**recalled** 201:16
**receive** 9:1 13:17 14:19
14:22 15:14 31:25
34:11 35:8,12 68:4
69:23 96:8 101:23
210:1 237:2
**received** 26:14,22 30:7
30:9 31:4 32:9 61:16
67:16 68:23 86:12
88:9 96:9 101:15
114:13 132:22
243:22
**receiving** 69:1 102:2
113:5 115:5
**recertification** 72:9
**recognize** 42:21 43:1
46:10
**recognizing** 46:13,15
**recollect** 226:9 236:12
**recollection** 30:15
97:15 208:23 209:15
242:23 243:14
**recommended** 211:18
**record** 2:9 22:9 116:10
202:15 207:16,20
212:16,24 229:4,6
247:15
**recorded** 205:24
**records** 3:23 85:17,18
97:11,19
**Recover** 1:5
**reduces** 110:9
**reference** 98:2 207:11
229:4,13
**references** 97:14
**referring** 202:14
**refuse** 81:7 135:23
173:3
**refused** 79:25 80:4,5
159:7 169:11 172:25
176:12
**Refuses** 103:2
**refusing** 83:3 84:8
101:21 102:1
**regard** 28:22,24 34:10
40:9 41:5 43:4 47:1
60:17 72:2 90:21,23
243:21
**regarding** 16:23 84:3
91:20,25 210:5,16
225:2
**Regardless** 245:10
**regards** 46:13 81:21

**regular** 52:4 53:25
54:6
**reholstered** 155:10
**related** 247:20
**relation** 131:1 177:14
**relatives** 8:2
**relief** 106:7,24 114:3
238:3,4
**relieve** 108:3
**relieved** 106:17 113:17
113:19 115:7 235:22
236:10
**relieving** 214:9
**religious** 6:15
**reload** 205:2
**rely** 15:1
**remain** 91:9 93:22 94:5
105:5 124:1,3 142:6
162:6,9 168:25
**remained** 93:24 170:14
170:25 237:25
**remedial** 20:17
**remember** 10:13,16,18
11:15 18:25 19:3,4
19:19,21 20:8,14
25:25 26:10 27:13
30:10 50:9 60:23
61:1 78:16,16,19,22
82:25 86:23 87:5,18
87:20 97:22 98:3,3,5
98:25 99:20 100:1,4
104:3 110:12 112:24
113:10 127:11
130:17 143:18,18,21
153:18 154:13,16
157:25 174:8,15,17
176:7,14,17 178:2
181:23 187:9 196:24
197:5,11 198:3,25
199:6,10 201:16
206:15,18 226:17
235:24 243:1
**remembered** 243:2
**Remington** 34:14
**remotely** 32:4
**removal** 43:16
**remove** 48:11 194:8
**removed** 27:3 42:6,23
43:10,13 44:1,4
182:8 191:24 192:6
192:11
**removing** 43:2
**renewed** 70:4
**repeat** 23:1 40:12
111:13 169:9
**repeated** 64:11

**rephrase** 5:3 92:22
**reply** 70:22
**report** 3:12,13,14,15
195:10,11,22,22
**reported** 2:5 70:16
**reporter** 2:24 4:24 5:6
5:9 11:21,24 12:2
121:2,5 143:11 172:1
191:3 198:13 247:10
**Reporter's** 3:7 247:7
**reports** 50:15 115:12
**represent** 226:6
**Representative** 1:8
**represented** 220:25
**represents** 120:21
**request** 21:19 119:4
124:15 125:7,20
237:11
**requested** 76:13 107:14
236:9 238:4
**requesting** 81:22
**requests** 112:16,22
113:8,14 120:2
**require** 59:9 66:17
67:4 96:18,19 108:22
148:1,3 228:7,23
**required** 21:2 22:2
23:9,12,15 50:2
51:25 62:2 72:13
73:6 77:21 81:11
96:11 210:15 211:2
**requirement** 211:23
**requirements** 91:20
**requires** 64:23
**requiring** 75:9
**reserve** 50:24,24 51:13
51:13,15,18,19 52:18
52:21,24 53:8,10
54:7,17 57:1,5,17
58:6 72:12,18 245:3
245:18
**reside** 16:23
**resign** 18:7
**resigned** 16:4 18:8
**resistance** 113:6
**resisting** 75:22 83:3
**resort** 84:22
**respect** 16:20
**respond** 70:14 77:1
103:2 119:1 213:4
**responded** 84:6 119:20
**responding** 113:14
**response** 4:25 28:5
70:19,19 80:6 88:22
114:25 124:20
132:23 141:3

**responses** 209:25
**responsibility** 224:7
225:9 239:18,21,23
242:14
**rest** 67:14 245:18
**restate** 156:13
**restrain** 76:3 78:3,14
79:21 124:22 125:21
129:18 223:24
224:20 245:11,11
**restrained** 47:20,21,24
47:24 48:2,4 79:11
79:11 93:1 94:5,9
96:1 97:1,7 103:24
104:3,19,21 109:24
110:6,7 128:3,5
129:14 137:7 227:8
227:17,20 241:10
245:12
**restraining** 94:7
129:24 208:15 210:5
**restraint** 30:9 31:1,1,6
31:13,17,19,23 32:15
32:19 33:7,11,11,20
48:7 73:15 74:2,5,5
74:13,14 75:19 81:12
84:23 92:20 93:10
94:11,19 96:10,19,20
96:24 102:20 103:20
103:22,23 104:17
109:9,17 129:17
135:25 224:8 225:18
228:16 240:3,6,10
**restraints** 3:19,20 14:7
14:20,23 15:11,15
30:18,22,23 33:6
68:18,19 73:11 91:21
93:12 97:3 105:16
129:21 145:12 208:9
228:8 237:16 241:23
244:8,17
**restrict** 79:18 109:14
110:8
**restrictions** 91:25
208:8
**restroom** 94:9 104:20
**Resurrection** 6:16
**retire** 8:13
**retired** 8:12,12 20:7
**retrieved** 196:9
**return** 247:18
**reviewed** 195:10
**revolver** 25:16 34:14
34:16 35:6,19 36:4
63:4 65:22,22
**revolvers** 62:22

**re-enactment** 3:18
113:3 212:18 213:13
220:25
**rifle** 25:4
**rifles** 211:21
**right** 5:11 6:24 8:19
13:10 15:8,18 16:11
17:25 18:9,13,25
19:21 23:17 28:2,22
30:6 32:12 34:6,18
36:11 37:7,10,11
38:8,18 41:24 44:24
48:14 50:21 51:23
52:3 53:2 55:13 56:3
57:24 60:12 61:20
72:11 73:16 74:11
75:6 79:20 80:23
81:16,18 83:12 85:6
88:3,23 91:9 92:11
93:5,16 94:3 95:22
96:16 97:10 101:18
102:7,17 103:11
104:6,9 105:2,24
106:19 110:13,14,15
110:16 111:17
112:22 113:16
114:14 115:5,5,11
116:7 117:4,12 118:2
118:4,7,12,13 119:20
120:1,18,24 121:10
121:11 122:4,7,16,17
123:1,13,13 124:9,14
125:6,19,23,24
126:10 127:24
129:10 130:19,21
131:8,20 135:1 136:6
136:14 137:3,22
138:2,7,13,14,15
139:6,18 140:11
141:1,6,13 142:2,13
142:22,24,25 143:3
144:14 146:12,23
147:18,25 148:16
149:11,17 150:7
151:19,23 152:6
153:9 154:2 155:23
156:8 158:22 159:9
159:15 160:1 161:11
161:20 162:3 163:15
164:8 165:15 166:2
166:14,21 167:23
170:3,8,17 171:4
173:9,18 175:2,11,22
176:5 177:8,9,16,16
177:19,19,23 178:3,8
179:10,10 181:8

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 267

183:6,15 184:1
185:16 186:20,24
187:13 188:2,10,13
190:17 191:14 193:9
195:15 196:17,18,20
196:20,24 197:1,5,7
197:15 198:2,7,11
199:14,21 200:4,11
202:23 203:4,9 204:1
206:1 210:4 213:1,8
214:14,24 215:2,4
218:12 219:4 220:2,8
221:4,4 227:18
228:11,13,13,15
229:20 230:8,19
232:8,12 235:17,21
236:20,20 238:3
239:4 241:15 242:1
right-handed 173:23
Rio 18:16,18
rises 48:12
risk 103:9 110:10
RN 154:8 229:25
230:13 231:2
role 194:3
rolled 139:13 171:14
217:3,17
rollers 128:16,18
room 89:21 90:4,6 91:4
93:16 96:5 106:13,15
107:5,11,12,23 108:7
108:9,12,21,22
117:19 120:21 121:8
121:17,22 122:10,19
122:22,24 126:16,18
127:3 130:10 131:20
134:7,19,23 135:2,14
135:15 136:9,10,24
136:24 137:15 138:8
140:13 141:24
144:24 145:1 148:14
149:2,7 156:24,25
159:9,24 164:20
167:8 168:10,25
169:25 170:13,14,25
175:9,12 177:12
178:10,13,13 191:13
205:14,16 208:16
213:9,10,14 214:22
216:11,15 222:3
223:6 234:12,12
236:6 240:15 241:2
rooms 130:3,6,14 212:2
Rosa 49:1
rose 188:9
rotated 54:6

rotation 53:22,25
round 35:7,7 63:6,7,17
64:20,23,24 65:7,25
66:9,10 92:7 183:22
183:23 188:22,24
189:8 194:14,19
203:13
rounds 63:18,22 64:1,8
64:11,11 67:5 183:1
183:9,16 184:3,10,11
185:17,23 186:15
187:14,17,22 188:10
188:14,15,19 189:19
190:8 191:5,15 192:9
192:12 200:1 201:20
202:6 204:2
rub 153:4
rules 91:20
run 90:1

_____ S _____

safety 29:9,9 125:8
136:21 169:12,15
170:5,9
same 11:19 12:8 71:1,3
71:4,5 72:2 83:15,15
83:21,22 89:10 101:2
101:2,25,25 105:5
116:17 124:8,8,13
133:15,22 142:6
143:6,6 155:22 158:6
160:16,18 161:14
162:9 164:9 165:20
185:24 199:5 205:20
205:21,22 206:24
213:13 223:12,14
246:12,19
San 7:15 48:22 248:6
Santa 49:1
sat 215:25 217:3
saw 72:3 154:6 165:5
166:21 172:19 190:4
206:16 230:10
238:19
saying 11:25 77:10
96:8 99:5 119:25
157:14 160:13
161:25
says 99:16 103:13,25
209:16,23 210:4
230:13,22 231:2
scale 120:21 126:25
scared 193:10
scenarios 30:21
scene 167:20
schedule 53:21 54:6

114:5
Scheduling 86:3,4
school 7:8,9,9,14,15,16
7:17,19 8:19 9:3,5
10:11,24 11:3,6,12
11:17 12:5 13:23
15:19 19:11,13 20:4
20:4,8 50:1 69:6,9
schooling 18:5
scope 245:6
Scott 2:17
screen 213:1 214:20
221:15
screening 20:25
se 201:3
seal 246:20
seat 41:22 132:20
seated 123:11
second 119:21 124:17
125:6 147:9,9 152:19
156:6,9 158:23
167:17 172:15
183:10 185:2,3 187:1
187:6,6 188:19 189:2
190:19,20 210:18
211:18 215:25 216:4
229:10
seconds 64:9 117:3
124:4 126:8,11
152:23 153:2,2 156:1
156:19 179:17 187:8
187:25 188:1,1 191:1
191:2,19 201:20,22
202:3 207:4 216:5,8
231:14 232:5,7
section 195:22 196:10
208:14 210:9
secure 168:11 244:10
security 11:7,8,9 12:6
12:18 13:7,11,21,21
13:25 14:1,6,10,13
14:14,16,17,20,23
15:6,10,14,20,23
16:1,9 17:6,6,9 31:1
31:6 32:1 89:15,19
89:21,22 90:2,5,16
90:20 106:11,12,18
106:22,23 107:2,7,12
107:13 108:1 124:22
125:21 126:9,17
129:11,16 130:22
131:4,21 132:4,22
133:3,4,21,23 153:16
153:20,21,23 154:1,1
154:24 204:22 205:8
205:13,15 206:2,12

206:15,16 210:22,25
211:21 214:4 230:22
236:4,5 237:3,3,4,9
241:13 242:12
see 12:4 52:25 68:24
81:1 82:17 117:4
127:8 129:1 131:20
132:15 133:3 134:4
154:21 157:25
159:21 160:7,24
162:3 165:22 176:3
177:12 189:7 191:11
194:17 199:25 200:1
200:24,25 202:17,20
202:23 204:9,10,16
207:15 214:21,24
220:13 229:15,23
235:18 238:14
241:13,18
seeing 154:16 206:11
seem 46:25
seemed 113:13 167:17
182:14 183:10
Seems 100:16
seen 58:21 71:8 72:7
120:8 208:4 209:13
sees 212:25 213:2
segments 69:18,19
Segura 114:11
self 29:13 69:7 146:5
self-defense 67:16 68:9
68:15
self-loading 63:3
semester 9:17 10:13
semi-automatic 25:16
25:17 35:19 36:4
62:23 63:1,2 92:9
semi-wad 210:24 211:7
send 16:22 153:23
senior 89:5 214:8
sense 32:22 51:20 63:4
69:8 71:2 75:22
76:16,18 77:8,15,16
78:11,11 107:14
124:25,25 135:25
137:7 139:21 141:10
165:11 166:1 169:23
170:4,6 174:6,21
177:10 185:13
187:11 189:9,13
190:13 192:16
203:24 218:17
226:14,15,25 227:1,4
228:1,2 234:1,2,5
sensitivity 35:25
sent 94:21

sentence 210:10,18
separate 57:5,17
188:23
separately 32:24
September 58:3,10
73:17 86:7,16 100:13
100:19 101:19 102:5
102:18,23 103:11
237:23
sequence 149:1 176:23
183:6,16 184:2
188:11 189:4 193:3
197:18 215:22,24
series 238:8
serious 29:17,24
146:21
service 17:6 35:16
services 52:1 58:6
set 60:10 66:14 97:2,10
112:8 113:5 116:15
116:15 161:21,21
164:19 180:19 181:6
183:8 184:23 185:23
187:17,22 188:19
189:2 190:19,21
202:12 223:16
240:17,18 241:4
sets 227:12 228:23
241:23
setting 26:17,19 65:12
239:1,2
setup 130:13
set-ups 6:17
seven 58:9 196:17,19
198:6
several 4:17 36:19
48:18 49:6 61:5,6
72:25 76:14 98:7,8
143:14,16 155:20
194:22 202:17 234:1
severest 196:6
shackle 163:21,24
174:1
shackled 215:14,17
shackles 33:15 93:15
93:17,25 94:9 105:2
105:12 109:14 110:5
110:8 123:2 129:23
159:8,11,13,17,22
161:21,21 162:1
163:14,17 164:8,19
164:23 165:3,6,10
166:8,11,15,22 167:1
167:1,4,5,7,10,15,16
167:20,24 169:18

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 268

170:11 171:5,7
172:17,20 173:19,20
174:2,25 180:19
181:6 214:1 220:3,6
220:15,23 221:20
223:2,6,11,12 227:12
227:21 228:23
237:18 240:17 241:5
shaking 119:17
shape 70:25
share 98:18 99:11
100:24
shared 101:6,9
Sharyland 13:22
sheet 72:3
shift 53:21 56:3,6,7,9
57:11 84:9 85:14,20
86:24 87:9,10,12,17
99:1 201:4,4,11
shifting 75:22 78:7
shoot 40:23,23 41:9,13
62:4 190:8 193:20
shooting 111:4 126:24
181:25 194:18
196:19,24 197:5,11
198:4,21,25 199:6,10
206:7,10
short 108:3 164:12
165:7 187:10 190:16
192:9 207:21 232:12
shorter 28:8
shorthand 2:6 247:10
shorthanded 114:7
shortly 61:2
shot 66:21,23,24,25
67:1 179:15 180:6
181:9,12 182:11,24
188:13,14 195:5
203:8,10 231:22
shotgun 34:15
shotguns 211:21
shots 64:14 66:21
182:25 183:13,16,18
184:2,23 185:1,5,6
186:12 189:4 190:19
190:23 193:1,15
194:1,4,7,11 203:4
204:21 212:1
shoulder 159:20 173:4
196:18,20,23,25
198:3
shoulders 41:20 159:20
shove 78:12
show 54:11,12 142:25
149:9 162:19 190:5
202:9 207:25 220:9

showing 41:17
shown 181:13 243:20
shows 217:12
shut 134:14 135:2
136:9
shutting 135:15
sibling 7:3
sick 54:9,13
side 108:12 118:3,4,12
118:15,16,17,21
121:10 122:1,16,23
123:14 124:7,8
126:16 127:18,21
130:3 138:13,14,15
138:16,23 139:2
150:3,5,6 151:13,23
151:24 152:19,20
154:5 159:5,18
160:10,14,16,16,18
160:25 161:3,8,13
162:4,8,17 163:4
164:4,5,16,20 165:19
165:20,23 167:7
171:18,19 173:10
177:21 178:3,5,6,9
186:17 189:11
196:18,20,24 197:1
198:2,19,20,21,24,25
199:4 200:3,5,11,11
201:11,17 207:1
213:1,1 214:25,25
217:4,17,18 218:25
219:1 221:21 230:10
240:4
sides 151:6 166:4
sideways 165:25
sign 43:12,16
signature 3:6 246:1,12
247:18
signed 229:25
signs 47:3
sill 122:6 205:6,9
similar 32:4,9 62:18
70:25 92:6 127:10
simply 38:23 53:22
54:7 64:13 239:8
241:16
since 68:10 75:24 76:1
single 65:1,3,7,25
66:11,15
sink 122:25 163:25
164:20 166:1
sir 4:5,6,10,13 5:1 7:13
15:12,17,21 17:7,10
17:24 18:22 19:14
21:2,12 22:4,11,14

22:19 23:5,5,8,11,15
24:4,15,23 25:1,8,8
25:24 26:4 27:1,5,8
27:10,21 29:18,25,25
30:5,12,16 31:3,9,14
31:18,24 32:3,11
33:13,18 34:12,22
35:1 36:17 37:6,9,14
37:18,22 38:3,7,10
38:14,21 39:6,8,10
39:14,17 40:2,6 41:3
42:8,19 43:15,24
44:20,23 45:18,22
46:1,5,11 47:7,10,12
47:18 48:9 49:11,20
50:4,16,20 53:7,9
54:4,18,22 55:12
56:5,21 57:3 58:2,8
58:12,14,17 59:8,25
60:22,25 61:19,24,25
61:25 63:13,16,20,25
64:2,15 66:4 67:3,6,9
67:12,18 68:2,8,11
69:25 70:3,5,8,16
71:24 72:1,23 73:19
73:22,25 74:3 75:8
76:25 78:18 80:11
81:17,19 82:24 83:2
83:19 84:18,20 85:1
85:3,5,11,13 86:8,10
86:14 87:25 88:2,19
88:21 89:9,12,14,17
90:7,10,13,18,18,22
91:1 92:2,10,13,17
93:2,9,11,13 94:6,8
94:13,16 95:17,19,21
96:2,6 97:9,9,24 98:1
98:14,17,20 99:8,13
99:22 100:6,9,21,23
101:1,8,11,16,24
102:3,22 103:10,17
104:2,5,8,11,15
105:1,4,7,11,14,17
106:1,5,9 107:1,4,22
108:2,6,10 109:3,6
109:11 110:22,25
111:2,5,9 112:4,10
112:12,15 114:2
115:14,17 116:1,4,6
116:24 117:6,18
118:11,14,19 120:7
120:10 121:9,15,18
121:20,23 122:8,13
122:20 123:3,5,9,21
124:16,19 125:9,12
125:15,22 126:3,6,12

127:16,19 128:1,4,8
128:11,19 129:3,9,12
129:15 130:2,7,24
131:10,15,18 133:1
133:16,18,24 134:6,8
134:15,25 136:13,22
137:1,5,12,19 138:18
138:24 139:1,4,7,10
139:12,14,23 140:1,3
140:5,8,19,22 141:18
142:1,5,12 143:4,12
143:20 145:5 146:11
146:19,22,25 148:2,5
148:8,13,23,25
149:12,25 150:12,14
150:18 151:4,7,21
152:1,5,8,10,14
153:14,17 155:17
156:22,22 157:2,4
158:4,11,13,17,21
160:9,20 161:4,10,13
161:16,19,22,24
162:2 164:1,3,7,10
164:17,21,24 166:5,7
166:9 167:9 168:5,21
168:24 169:1,4,13,16
169:20 170:16,22,24
171:1,3,6,13,16,21
172:7,9,16,18 173:11
173:21 174:14 175:4
175:13,25 176:25
177:3,7 178:11,16,20
179:7,13 180:3,14,17
180:20 181:7,15,22
182:1,6,10,23,23
183:3,5,17,21,25
184:13,21,24 185:4,7
185:19,21,25 186:11
186:14,19,23 187:15
187:20 188:18,21,25
189:6,21 190:1,3,6
190:10,22 191:16,18
191:20 192:3 193:2
193:11,17 194:5,10
194:13,20,24 195:1,3
195:6,8,12,13,14
196:14,21 197:2,8,13
197:20,23 198:5,22
199:2,7,13,18 200:9
200:12,15,17,20
201:21 202:7,16,19
203:6,14 204:6 205:3
205:10,12,12,25
206:3,5,8,11,13
207:3,12 208:6,11,13
208:22,22 209:15,22

210:3,8,17 211:3,5
211:24 212:3,8,12,20
213:5,15 214:3,6,10
214:12,19,23 215:1,7
215:10,16,18,23
216:2,7,9,12,17,22
216:25 217:6,14,16
217:19,22 218:2,5,8
218:16 219:2,8,18,21
219:23,25 220:4,7,19
220:22,24 221:1,3,7
221:10,16,22 222:1,5
222:15,19 223:13,15
223:17,19 224:1,6,23
224:25 225:5,8,12,20
226:8,20,22 227:19
228:9,12,14,15,19
229:1,14,16,19,22,24
230:2,4,7,18,21
231:1,8,8,12,15,18
231:21 232:11,15,20
232:20,23 233:8,8,11
233:19,19,22 234:8
234:15,20,25,25
235:4,9,12,16,23
236:2,7,11,14,19,23
237:1,7,13,15,20,24
238:2,6,13,18,24,24
239:12,15,19,22,25
240:8,11,22 241:19
242:2,16,21,24 243:9
243:12,25 245:2,4,7
245:9,15
sisters 6:24
sit 112:20 155:4 165:25
215:22 216:6,8
sitting 117:14 123:13
128:20 132:15,17
154:15 184:1,14
193:24 214:16,17
situated 212:14
situation 15:1 26:18
29:8 31:20 32:10,12
37:1,5 40:9,13,15,19
41:2,12 43:19 45:20
45:24 46:14,16 47:5
48:11 73:6,14 76:17
77:6,11 82:10 84:13
95:11 131:22 145:8
194:21 223:25
situations 25:25 26:16
29:10 45:19,23 73:1
84:16
six 23:21,25 28:6,7
55:8 198:1
six-month 19:8

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 269

size 78:21,22 79:2
120:21 223:12
skipped 209:7
sleep 87:3,18 115:1
117:22
sleeping 87:18
slept 87:20
slide 63:6,7 65:6
slides 69:17
slightly 102:18
slow 211:17
small 25:4 155:25
Smith 34:14 35:3
soap 103:14
some 9:4 10:19 11:16
16:14 26:5 30:1,2
31:7,11,16,21 36:23
37:13 44:4 46:21,23
46:23,24 48:14 49:10
52:3 54:19 57:8,13
58:22 59:1,3 61:3,4
64:7 67:15 76:14,18
76:22 79:8 80:9
81:11 82:10 84:3
86:11 87:24 88:14
95:9 97:12,14 98:2
99:25 104:10 105:12
106:7,23,24 107:14
115:11 117:1 131:19
132:25 133:4 135:1
137:8 142:9 145:6
146:18 148:6 152:2
153:12,23 158:3,9
166:18 167:10,21
172:10,13 174:19,19
174:22 175:2 180:15
184:18,19 185:17
189:19 190:4 191:12
193:13 196:16
199:15,22 202:8,10
207:5,10 208:1
210:16 212:23
223:24 224:10 232:6
232:21 236:8 241:11
243:20,21 244:17
somebody 29:6 54:12
61:23 89:25 95:12
98:25 114:17 117:11
132:22 153:24,25
204:20 209:5 225:7
240:12,15
somebody's 153:22
someone 12:23 17:16
25:10 32:8,13,25
33:1,2 38:12 75:12
76:4 78:3 86:12

89:23 94:15 96:25
100:15 106:14 126:1
181:25 225:15
228:21 237:4 240:1
241:2,3
someone's 33:16
241:16
something 5:2 35:20
37:23 46:19 54:9
55:7,11 56:1 68:1
79:24 80:10 106:3,8
117:1 127:10 132:1
138:4 168:16 178:18
178:23 180:1,5
209:12 242:14
244:15
sometime 19:5,7 51:4
52:9 55:16 86:9 88:7
88:9 111:18 114:21
206:1
sometimes 9:22 59:4
81:2
somewhat 4:20 62:19
81:5,5 142:8 151:7
somewhere 59:22 71:8
81:24 220:13
sorry 5:25 7:8 11:21,23
16:8 19:2,17,18 20:2
20:16 21:6 22:23
40:12 42:24 44:9
45:7,7 53:4 58:24
60:16 62:5 70:18,20
92:22 103:21 109:22
111:13 115:20
117:16,16 118:11
132:10 133:7 138:1,1
144:25 145:3,16
149:16 156:11 157:8
157:19 159:16 162:7
169:9 170:10 172:1
182:25 191:4 192:7
198:13,14 207:25
216:20 225:17
244:12
sort 48:14 165:14
166:16 236:3 239:17
sound 154:24 230:10
230:17,22
sounded 161:25
sounds 54:14 115:6
153:12 154:6
source 101:23 214:11
south 7:15 15:24 16:10
16:11 17:4,11 121:22
154:5 230:10
SOUTHERN 1:1 247:1

space 158:6
span 191:19,22
Spanish 179:2
speak 5:6 11:22 21:18
90:14 98:5 104:24
117:13 121:2 133:25
143:11 191:3 206:4
speaking 100:2 151:5
special 210:21
specific 29:3 40:18
72:14 74:8 102:10
114:18 116:19 120:9
143:21 144:1 150:23
179:24 207:6 238:25
243:22
specifically 32:25 35:6
36:7 68:14 74:22
78:5 79:21 89:23
98:4 112:25 139:19
174:16 227:6 237:17
239:7 241:2 242:19
specify 73:2
speculate 243:15
speculation 232:20
speed 62:11 64:4
201:19 211:12
spell 20:1
spend 9:5 57:16
spent 9:5 24:17,20 57:5
57:14 63:17 245:1
spin 189:13 199:16,20
200:2 201:6,12
spinal 196:1
spine 189:24 197:5,7
203:5,9
spinning 200:18 203:23
spite 128:2,5 136:23
137:24
spleen 196:1
spoke 98:23
sponsor 21:10,11
sponsoring 21:4
sponsorship 21:19 22:2
spot 165:16,16
spray 60:15 73:23
147:2,4,10,12,20,24
147:25 148:7 149:10
152:4,6,11,15,22,24
153:3,11 155:2,10,13
156:16 191:8 219:16
sprayed 153:11,24
154:9 155:1 219:5,16
230:16
spread 9:18,19,19
191:13
spring 19:7 63:12,14

square 121:21
squeeze 64:11,21,24
188:10,23
squeezed 183:22
185:16 191:14
squeezes 64:12
squeezing 190:8
stack 63:14
staff 3:21 92:14 95:25
96:9 154:24 208:16
208:24 209:8,13,17
209:19,24 210:4
stand 118:12,15 131:22
standard 39:24
standing 41:17 89:11
120:3 132:9 154:6
185:24 216:23
221:24 230:11
stands 216:5
stares 103:3
start 5:22 9:20 28:6,7
76:10 116:25 135:25
136:1 170:10 212:22
started 51:3 56:8
135:24 137:11
148:24 159:22,24
170:6 221:18
starting 5:22 170:5
191:12,13 206:13
startled 242:18
stat 230:22
state 2:5 8:8,9,11,16
62:2 124:11 232:1
246:15,24 247:11
stated 2:9 88:7,13
91:22 104:19 106:17
153:6 166:22 233:25
statement 70:14 71:8,9
71:13 154:10 155:9
179:5,11 226:18
230:17
statements 70:10 113:2
115:12
states 1:1 2:8 16:24
100:15 102:1 247:1
stating 100:17 101:21
133:21 153:20
176:17
station 130:11,14,19
154:25 230:23
status 68:1 225:10,11
stay 24:5 57:10 107:17
115:9 132:19 176:15
stayed 107:5 114:1
Stein 2:14,14 226:1
step 136:9 143:13,13

stepping 135:14 176:17
stick 14:11 73:20
still 9:3 11:12 13:5
15:18 20:3 45:9 58:4
105:9 125:10 137:7,7
149:23 151:16,18
160:12 165:11 166:4
169:2,7,19,21 170:18
174:12 185:24
186:17,20 188:15
190:15 193:1,9 200:7
204:24 206:22 207:1
216:23 218:17
223:23 245:5,12
Stipulations 3:3
stomach 196:2
stood 118:1,2,17,20
124:6 169:11 215:22
231:17
stop 5:3 43:8 44:12,14
44:19,21 81:22,23
82:4 83:23 84:2
136:16 153:7 158:24
160:1 172:22 173:2
176:3,10 178:22
179:18,21 201:24
212:23 213:8 214:14
219:6 220:9
stopped 42:23 190:12
191:23 213:7,16
214:13 215:3,11,20
216:3,18 217:1,10,23
219:3,13 220:1,11
221:11 222:25
stopping 153:1 202:3
stops 42:17 43:14,18
75:5
story 82:6
straight 49:13 88:25
89:1
strange 91:14
street 26:8
strict 99:16 103:1
strike 31:5 34:8 35:10
42:1 77:17 78:7,10
139:25 140:7 142:13
142:17,19 143:7
144:6,8 145:22
146:14 152:18
166:21 170:10 171:9
173:10,20 176:13,16
179:12 180:10 182:3
183:12 216:24
221:18 223:22
strikes 68:20,20 143:15
144:19 159:19,21

GERARDO RAMIREZ

April 10, 2003

Page 270

174:20 200:25
striking 78:8 145:4
  147:7 156:18 180:9
strong 39:19
strongest 39:9
struck 142:16 143:1,8
  143:22 144:4 145:23
  155:20 173:4,25
  174:1,9 175:10
  180:12,13,15 184:3,5
  184:6,10,15 189:8,12
  192:20 194:14 201:1
  201:3,5
struggle 77:15 84:10
struggling 75:23 76:19
  82:18 84:7
stubs 85:18
student 7:6,7
study 8:23 23:14,19
  39:22
stuff 68:20 135:24
  225:7
subdue 74:9 75:12,15
  75:16,17 77:5,13,18
  77:19,22 78:6,14
  81:6 82:19 83:13,18
  144:11,15 145:8
  146:7
subdued 84:17
subduing 82:22
subject 27:25 31:10,11
  31:15,16 40:23 42:10
  42:17,21,22 47:9,11
  48:7 74:10 77:5,19
  88:13
subjected 37:15,19
subjects 39:2 77:5
submitted 21:21,24
  247:16
subparagraph 196:4
subscribed 246:18
subsequent 67:5
  111:18 195:25
subsequently 196:7
subside 193:4
succeeding 66:21
successfully 38:20
sudden 118:1
sufficient 81:6,8
suggestion 108:16
suggestions 112:23
suicidal 31:22 225:3
suicide 33:2 103:9
Suite 2:12,21 248:5
Summary 196:4
summon 106:3 108:23

summoned 132:3
Sunny 49:22
superiors 96:11
superseded 193:8
supervisor 231:2
supplied 33:8
suppose 15:11 21:9
  72:3
supposed 92:20 94:4,11
  94:15,22 98:16 111:7
  113:17,21
sure 48:23 87:16 91:16
  92:23 115:6 116:5
  139:25 156:1,14,19
  184:4,5 189:11
  195:18 207:14,16
  239:8 244:4
surprised 125:16
surrounding 47:6
surveillance 99:16
  103:1
suspect 30:21 34:7
  77:14 88:14,18 95:18
  110:18 111:8
suspected 111:20,21
  228:6
suspicious 46:18,20
suspiciously 103:3
swing 56:9 139:25
  159:22
swinging 147:22
switch 93:22
sworn 2:2 4:2 247:13
symbol 121:14 163:20

_____
            T
_____

T 4:3 226:4 244:5,23
table 121:25 160:22
Tae 67:20 68:22 146:5
tag 236:25
take 6:19 8:20 9:21
  10:2 14:8 19:15
  20:17 26:6,8 32:24
  43:23 76:6 80:18
  120:5 123:16 137:2
  153:3 160:5 164:11
  176:2,2 181:9 184:25
  190:23 191:12 201:2
  212:13 214:15
  231:11,13 236:21
  240:3,6,9 243:11
taken 2:2 9:11 19:11
  70:22 71:9 91:2,3
  111:11 126:2 192:16
  234:11 243:22
  247:22

taking 10:25 55:10
  100:8
talk 19:10 89:23
  110:23 111:3 203:1
  220:15
talked 20:12 109:17
  207:9 222:2
talking 33:23 34:3,4
  41:18 51:1 52:18
  61:5 62:5 74:7 75:6
  75:25 76:2 78:15
  132:9 144:1,2 154:16
  173:16 187:25
  190:18 197:22
  217:25 240:14 243:7
taller 78:23
tape 120:14 162:19,19
  207:6,10,23 212:11
  212:21 213:19,24
  215:8,12 216:10
  217:11 219:15 220:2
  220:14 223:2
target 35:6,9 36:3
  40:24 211:13
task 45:13
tasks 236:1
taught 26:15,21 27:7
  28:24 29:3 30:1
  34:23 35:23 36:19,19
  36:21 37:2,3 38:15
  39:2 40:10,14 41:5,7
  42:9,13,20,21 43:4
  43:10 46:9,9,12 47:2
  68:13,15
TCLEOSE 62:3
teach 40:22
teacher 19:21,24 27:13
teaching 20:7
technique 33:11
techniques 30:9 33:21
  33:23,23 74:6 146:7
teeth 187:10
Tele 2:23
telephone 106:19,25
  108:12,13,17 131:17
  136:17,24 138:8
  139:9 140:14,20
  148:18 156:3 177:25
  178:2 216:16 237:6
telephones 108:7
television 81:1 212:22
tell 4:5,21 7:1 23:19
  26:14 28:23 41:4
  46:12 51:1,16 54:16
  54:19 57:4,14,15
  58:18,23 62:1 73:10

76:2 77:9,10 78:2,4
  79:6 81:20 82:1,13
  83:5,25 85:8,17,19
  88:4,12,20,22 94:4,7
  95:1 106:6,16 114:4
  115:15,18 116:14
  117:7 120:12,20
  123:10 126:7 127:5
  130:18 139:19 140:6
  141:7,13 142:16
  148:17 149:3,5,14
  152:6 156:22 160:3
  162:18 176:5 177:11
  177:12 178:25
  179:18 183:6 184:1
  184:14 186:1 198:9
  198:12,15 208:23
  209:18 210:15 211:1
  212:6 220:9 225:7
  232:9 233:23 240:16
  242:7 243:16,16,17
telling 82:5,9 99:24
  100:5 119:11 136:19
  153:25 176:12
  193:24 199:15,22
  217:5,12
tendency 47:13
term 41:13 51:12
  197:21
terminology 187:7
terms 29:4 35:25 36:20
  36:22 40:4,11 62:10
  67:7 68:15 211:6
  231:10,14 233:6
Terry 59:14,15
tested 39:1
testified 4:2 102:19
  171:4 203:23 214:17
  215:24 216:13 219:5
  233:2 235:10
testify 164:22 232:18
testimony 26:11 30:10
  65:15 71:19 109:25
  141:16 164:18
  169:10 181:23
  187:18 190:11
  191:21 193:18 194:6
  194:17 203:7 220:20
  227:15 247:15
tests 39:25
Texas 1:1,6,10,15,18
  2:5,7,12,15,19,22
  5:14 8:17 10:12
  15:24 16:10,11 17:4
  17:11 39:13,21
  246:15,24 247:1,5,11

248:4,6
thank 5:9 12:2 41:23
  121:5 223:19 225:22
  225:24
theft 45:12
their 7:1 27:3 43:14,18
  44:3,12,13,14,19,21
  52:1 54:3 78:19
  79:18 80:3,3 81:2,2,3
  81:4 97:8 129:17
  242:13 244:7
themselves 33:5,5,6
themselves(sic) 26:17
theoretically 228:7
thing 4:21 43:22 49:15
  71:5 72:2 73:13 92:7
  99:19 112:17 125:14
  135:16 181:5 231:24
things 20:18 22:5 33:24
  36:20 38:15 39:15
  44:6,10,13 46:15
  95:6 97:12 99:5
  109:1,5,7,8,24 113:3
  113:6 126:20 180:20
  180:23 207:24
  212:10 225:4 231:10
  232:7 234:1 242:4
think 22:20 25:18 26:5
  33:14 41:13 42:2
  44:25 58:21 72:3,7
  77:3 78:1 86:11
  108:8,25 115:11
  119:22,24 121:12
  122:10 123:6 137:24
  146:4 162:19 164:5
  164:13 190:18 198:3
  199:14 202:25 208:7
  212:9 213:17 218:24
  223:2,22 224:3 225:6
  231:23 239:23 240:2
  243:21 244:1
third 29:7 80:16 83:21
  123:22
thoracic 195:25
though 32:6,7 49:7
  54:6 120:18 137:2
  225:1 243:6
thought 31:15 32:13
  74:12 129:16 145:21
  194:22 233:24
threat 27:3 32:19 33:2
  33:5 36:23 42:4,23
  43:2,6,7,10,13,16
  44:1,4 46:10,13,14
  46:15,22,23 47:2,5
  47:25 48:4,7,12

GERARDO RAMIREZ

April 10, 2003

Page 271

| | | | | |
|---|---|---|---|---|
| 77:16 124:24 125:8 | 92:18 93:10,20 94:10 | 25:18,20,20 40:25 | 148:12 149:2 150:13 | 131:25 144:11 146:7 |
| 125:23 127:25 131:9 | 95:23 96:14,15 97:20 | 41:25 42:9 72:24 | 150:17 151:2,16,17 | 146:10 150:15 153:4 |
| 135:3 136:3,3,15,16 | 99:11 100:20 101:3 | 73:5,8,9 97:3 103:24 | 153:10 156:12 161:5 | 155:19 156:9,12 |
| 136:20,20,23 145:9 | 101:25 103:16 | 107:17 124:12 134:2 | 167:11 168:2 176:21 | 163:13,14 174:22 |
| 145:10,20 146:13 | 104:12 105:3,6,10 | 141:13 143:8 152:15 | 178:12,14 187:23 | 176:13 179:11 |
| 169:3,6,12,15,19,22 | 107:3,5,6,6,10 108:4 | 152:17 153:2 155:20 | 188:2 191:24 192:22 | 239:13 241:11,12 |
| 170:14,18 187:12 | 109:9 112:6 113:11 | 167:24 173:12 174:1 | 193:4 199:11 201:24 | **trying** 5:12 8:24 28:15 |
| 190:15 191:24 192:5 | 114:1,18,22 115:16 | 179:18,21,24 180:15 | 217:8,21 218:3 | 35:22 42:21 78:9,11 |
| 192:11 194:8 222:8,8 | 115:18,24 116:2,17 | 181:18 194:22 | 220:23 | 78:12,13 82:19 84:9 |
| 226:16 238:17,23 | 116:19,19 117:1 | 227:23 231:5,7 | **Tower** 2:18 | 96:20 100:17 101:22 |
| **threaten** 29:7 176:3,4 | 118:24 119:21,22,23 | 237:18 242:22 | **town** 21:15 | 148:10 150:13,16,20 |
| **threatening** 29:11 | 120:1 123:11,19,22 | **titled** 195:23 | **traffic** 22:5,18 39:21 | 151:16,18 155:11,12 |
| **threats** 80:21 112:13 | 124:13,17 125:6,11 | **today** 36:9 128:20 | 75:4,5 81:22,23 82:4 | 157:18 163:24 164:2 |
| **three** 17:13,25 18:9 | 126:1,23 129:21 | 154:16 184:14 | 83:23 84:2 | 165:8 167:2 184:7,10 |
| 25:20,20 53:19 55:8 | 131:13,24 132:11,15 | 193:24 194:6 227:15 | **train** 35:13 61:23 | 201:7 218:18 |
| 69:17 73:8,9 75:7 | 133:15 135:4,9,20,23 | 233:2 | **trained** 14:15 25:22 | **tugging** 135:24 |
| 76:2 84:14 124:13,13 | 139:8 140:6 142:10 | **told** 14:9 17:22 20:12 | 26:1,13,23 27:3 | **turn** 44:12 80:15,18 |
| 134:3 156:7 173:13 | 143:1 144:10,14,23 | 44:25 50:22 60:6,7 | 29:23 30:21 31:6 | 165:3 172:5 189:5,7 |
| 197:16 198:19 199:9 | 145:4,13 149:23 | 79:23 88:17 92:12 | 32:7 33:10,16,19 | 189:13 200:22,24 |
| 199:9 202:25 228:23 | 150:15 152:18,19 | 94:22 96:13 97:1,6 | 34:13 35:4,14,17 | 219:24 |
| 241:23 | 153:13,15,21,23 | 103:14 104:1 106:10 | 41:11,13 42:3,16 | **turned** 43:17 152:20 |
| **Three-hour** 10:9 | 154:4,9 156:2,2,5,6,9 | 106:20 110:17 | 61:21 62:14 181:24 | 160:8,10,13,15 161:2 |
| **throat** 99:6 | 158:23 163:3 164:9 | 111:14 117:10,22 | **training** 13:14 14:19 | 161:5 162:5,8 164:4 |
| **through** 9:24 22:22,25 | 165:5,10,18 166:10 | 119:13,25 125:16,19 | 14:22 15:15 19:1 | 164:15 171:17 |
| 23:7 28:9 58:1 60:3 | 166:14 167:11 | 125:24 126:1 127:24 | 24:12,18,18 25:22 | 174:21 175:6 176:7,9 |
| 60:18 67:13 82:2 | 172:13,15,24 173:25 | 130:21 133:23 142:9 | 26:14,22 28:3,17 | 176:13 190:11 |
| 112:7 120:19 131:5 | 174:4,8,12 175:14 | 143:19 153:12 165:8 | 30:9,17,19,25 31:4 | 201:14 |
| 134:21,24 149:1 | 176:15,17,21 177:5 | 169:14 178:22 | 31:25 32:8 34:10,11 | **turning** 65:7 189:9 |
| 158:19 176:23 | 179:14,15,17 180:13 | 179:21,24 198:3 | 34:19 35:8,12,23 | 202:4 219:20 |
| 183:13 196:1,2 | 181:4 182:4 183:1,9 | 208:7 213:25 219:5 | 36:15 38:20,25 39:4 | **turns** 63:5 163:3 |
| 197:14,14 213:3 | 183:10 187:11,16,21 | 220:20 222:2 227:6 | 40:3,5,22 41:1 45:9 | **turpitude** 22:13,15 |
| 215:21 246:18 | 187:22,22 189:4 | 227:25 233:21 240:1 | 48:15 67:15,16,16 | **Twenty-four** 8:1 |
| **throwing** 179:23 | 190:7 191:7,10,22 | **Tomas** 98:22 | 68:6,9,22 70:23 71:3 | **twice** 107:19 152:16 |
| **thumping** 154:5 230:10 | 192:9,18 194:9,13,18 | **tone** 119:4 133:6 | 146:4,6,7 238:25 | 155:1 219:16 |
| **tie** 28:14 | 200:6,6 201:13 202:2 | **Tony** 85:24 235:15 | 239:5,17 243:23 | **twist** 81:2 |
| **time** 9:4,5,6,11 11:9,24 | 203:25 205:8,13,14 | **top** 131:1,1,2 155:12 | **transcript** 247:14,16 | **two** 17:13,25 18:9 |
| 12:9 13:3,8 14:9 15:9 | 205:16 206:10,21 | 171:11,14 180:9 | **trapped** 218:14 | 19:16,16 39:20 49:16 |
| 15:13 17:4 18:12 | 208:3,21 211:8 | 196:17,19,23,25 | **treated** 224:14 240:25 | 61:7,8 64:9 73:8,9 |
| 24:17,19 27:18,20 | 212:23,23 215:8 | 229:17 | **treatment** 210:12 | 75:6 76:2 83:20 85:9 |
| 28:8,11,11,16 30:8 | 216:5 222:3,6,6,11 | **topic** 28:21 | 244:16 | 117:14 124:4 134:3 |
| 32:18 45:12 48:20 | 223:6,12,19 224:15 | **tossed** 159:5 | **trial** 245:19 | 140:24 143:18,23 |
| 49:18 51:15 52:17,21 | 224:18,21 225:1,22 | **total** 64:1 143:8 144:3 | **tried** 78:10 139:20 | 148:1,3 152:23 |
| 52:21 54:1,9,13,20 | 226:2 227:12 229:23 | 196:8 | 163:16 165:9 176:13 | 154:23 156:7 160:5 |
| 54:23 55:1,20 56:4 | 230:15 231:4,16,25 | **touch** 100:17 140:9 | 205:13 | 163:19 182:14,15,16 |
| 56:22 57:5,7,8,9,14 | 231:25 232:3,4,5,9 | 141:2 142:3 144:11 | **trigger** 35:25 63:5 | 185:2,3 189:22 |
| 57:24 58:1,6 59:1,3 | 232:12,13,13 233:9 | 204:13 217:8 | 64:12,13,21 65:10,18 | 190:24,25 196:9 |
| 59:19 60:9,9 61:3,4 | 233:17 234:11 | **touched** 36:6 217:21 | 65:19,23,23,25 66:1 | 202:3,25 206:19 |
| 61:10 66:13 68:5,7 | 237:25 238:4,19,20 | **toward** 51:5 79:8 88:9 | 66:3,5,12,17,18 67:2 | 233:14 234:13,17,22 |
| 68:10 69:6,9 70:1,6 | 238:21 240:25 | 114:21 122:22 132:5 | 67:8 188:23 | 236:1 |
| 70:13,21 71:22,25 | 242:13,20 243:2,8 | 140:25 141:9 149:4,6 | **trouble** 82:20 104:25 | **type** 13:1,1,14 14:10 |
| 72:11,15,21 73:23 | 244:2,9 245:1,19 | 150:4,9,24 151:1 | 113:13 166:18 | 20:24,25 22:21,24 |
| 74:15,17,20 75:25 | **timeframe** 55:1 59:5 | 154:20 155:12 | **true** 37:3,6 66:20 229:1 | 23:3,6 25:12,14 31:5 |
| 78:2 79:10 80:17,20 | 162:25 231:23 | 156:10,24 165:13 | 246:12 247:15 | 31:12,23 33:6,10,19 |
| 82:8 84:17 85:7,20 | 238:16 243:3 | 171:25 174:17,21 | **truth** 156:23 | 34:20 35:2 36:23 |
| 85:25 86:15 87:11,24 | **timeframes** 243:7 | 205:5 238:12 | **try** 5:3 40:24 42:10 | 38:9 41:1 46:21,23 |
| 88:8 89:2,5 91:13 | **times** 16:19 18:23 | **towards** 140:4 141:1 | 50:12 67:13 82:13 | 46:23,24 64:10,12 |

GERARDO RAMIREZ

April 10, 2003

Page 272

65:2 70:24 71:14
75:18,19 81:12 82:10
83:10,22 96:19,19
106:2,24 122:3
203:23 209:20
223:12 237:16
**typed** 100:11
**types** 25:2 35:9,15

**U**

**Uhm** 86:1
**uh-huh** 4:22 10:10
51:11 52:16 53:1
55:21 56:14 60:5
61:17 82:16 83:24
88:19 103:7 110:20
118:6,9 120:17 121:4
161:1 168:3
**ultimately** 124:14
**unable** 103:2
**unattended** 131:23
**uncle** 8:6 25:11
**uncooperative** 101:20
**under** 1:6 18:3 37:11
44:18 99:16 103:1
111:11 193:18,24
196:4 228:4 232:19
246:17,20
**undergo** 20:24,25 23:4
**undergoing** 232:13
**underneath** 159:4
**understand** 5:2 15:8
29:20 35:21 38:18
41:11 42:24 51:17
62:22 65:14 66:13
70:18 73:16 78:1
79:6 95:1 96:12
97:13 102:19 125:10
136:6 138:19 139:25
157:11,13,18,19
158:5 162:3 163:10
180:1,1 187:18,19
189:15 192:7 194:17
201:7,9
**understanding** 92:19
94:10 95:14 113:14
178:4 198:10 239:6,7
**understands** 62:21
**unemployed** 18:11
**unholster** 159:24
**unholstered** 176:8,8
**uniform** 15:11 90:2
236:22,24
**unintentionally** 203:11
**unit** 58:13 82:21
**United** 1:1 2:8 16:24

247:1
**units** 75:9
**unless** 220:13
**unnecessary** 37:16
**unpaid** 52:23
**unrestrained** 47:25
84:17 103:14 104:1,7
104:10
**unstable** 31:16 33:1,1
**until** 9:23 28:8 42:3,14
42:17 57:10 58:3
60:21 72:20 95:23
97:6 107:6 113:21
135:5 156:4,5 179:15
187:17,22 192:2,11
213:3 231:22 237:25
238:7,20 241:1
245:19
**updated** 70:4
**upper** 143:2,7 144:5
159:19 174:10
199:12 203:2
**upright** 149:24 171:11
**upset** 136:1
**upward** 81:3
**urinal** 104:23
**usage** 40:5
**use** 14:20,23 15:15
25:22 26:1,14,16,22
26:24 27:7,12,25
28:3,10,12,17,23,24
30:3,10,17,20,22
33:6,10,17,19 34:1
34:19 35:6 36:16
37:4,4 39:23 40:9,10
40:14,16,20 41:12,18
45:1 46:4,7 48:10
58:16 59:11 60:18,23
61:11 65:11 69:14
71:4,7,20 72:13,21
73:2,7,10,18,21 74:1
74:13 75:12,12,19,21
77:12 78:3,5 83:13
84:25 105:2,15
108:14 125:2 129:21
131:16 132:14
136:17,24 137:25
138:4,8 139:9 146:23
147:1,3,5,8 148:3,18
148:22,24 149:9
152:7,9 156:5,8
163:21 175:2,20,24
176:2,3,4 180:21,24
181:3 182:8 193:14
197:21 210:22,23,25
211:2,14,19 224:8

**used** 2:24 6:14 25:2
31:6 32:16 34:24
35:3,15 36:4 41:13
61:15 63:22 66:14
73:10,13 74:5 80:23
91:21 110:5 132:23
132:24 156:4 158:24
183:2 211:13,20
214:1 226:21 227:11
237:17
**using** 29:5 34:20 40:11
45:24 51:12 66:25
70:15 84:11 144:10
144:14 145:15 146:3
146:4,6,12,23 158:24
234:7
**usually** 18:5 28:12
40:17 47:2 53:12
54:25 66:9 77:14
211:9,11,13
**utility** 105:15
**utilize** 94:8 107:15
129:22 146:2 147:10
**utilized** 32:20 71:1
73:13 83:14 109:13
109:14 147:6
**utilizes** 92:7
**utilizing** 79:22 91:22
**U-T-E** 20:3

**V**

**vague** 102:7
**Vaguely** 242:6
**Valdez** 154:8
**validate** 2:24
**Valley** 1:12,20 27:22
59:17,17 85:8 86:6
86:16 88:5,15 97:11
206:15 208:2 213:10
226:6 227:13 229:5
231:3
**Van** 2:18
**varied** 34:17 53:12,15
54:10,10 56:7,11
145:23
**varies** 46:14 65:21
**various** 120:22 196:6
229:23
**vary** 33:4,7 57:7,11
211:12 232:7,7
**Vasquez** 45:7,7,13
**VBMC** 3:23 210:12,14
210:19,21,25 211:20
**Vega** 154:8
**velocity** 211:18
**verbal** 30:22 80:21

125:4 141:8 172:22
173:2 176:20
**verify** 244:9
**versus** 24:17 26:7
35:19
**very** 9:25 65:22 70:25
119:6 175:18 180:2
183:10 187:2,4,10
189:23 228:22
**viable** 241:13
**victim** 111:6
**video** 2:23 3:17,18
157:24 202:13
**videographer** 212:24
213:6
**videotape** 41:16 120:14
207:6 212:17,25
213:7,16 214:13
215:3,5,20 216:3,18
217:1,10,23 219:3,13
219:20 220:1,11,14
221:11 222:25
**Videotaped** 1:22
215:11 247:8
**view** 154:19,21
**Village** 2:15
**Vinson** 59:14,15 60:2
**violations** 22:5
**violence** 47:14,17
228:1 238:12
**violent** 31:12 32:14,18
32:25 47:1 224:19
228:3,4
**visual** 128:25
**voice** 119:4,6
**volunteer** 52:20
**volunteering** 52:1 58:6
**vs** 1:9,17 246:2 247:4
**vulgar** 80:22

**W**

**wad** 211:11,13
**waistline** 41:21
**wait** 97:6
**waiting** 135:15 136:11
**wakes** 117:4
**walk** 216:20
**walked** 106:13,15
107:11,11 138:8
156:2 205:5 240:5,12
241:2
**walking** 110:9 139:9
**walks** 240:15
**wall** 122:1,9,16,21,24
123:14 150:6 157:20
158:1,12,15 218:4

**want** 26:13 29:22 40:13
45:14 49:25 75:24
76:7 78:1 82:13,14
97:10,12,15 99:23
104:20 107:10
116:14 120:19
126:19,19,21 127:3
131:8,14,23,23,24
136:7 139:24 157:25
160:7 162:18,20
163:21 169:17
195:18 202:10 207:9
207:9,24 209:19
240:3 243:15
**wanted** 16:23 60:6
69:11 102:13 129:21
141:19 177:14
**wants** 241:11
**warm** 103:13
**warnings** 80:14
**wasn't** 59:24 80:17
102:10 132:15,17
154:18 189:6 201:13
222:5
**watch** 94:24 95:12
120:13 133:14
234:18 243:2
**watching** 187:9
**water** 103:14 106:7
**WATTS** 2:11
**way** 30:2 31:17 37:12
51:22 60:1 65:5 71:1
79:11 85:16 101:13
109:19 110:6 127:6
133:22 137:14
158:12 161:14
162:16,17 165:23
171:11 182:3 192:17
193:19 200:21
201:14 203:18 212:7
213:3 216:24 229:21
234:4,5 240:24,25
243:13
**weakest** 39:19
**weapon** 14:10 25:5,19
41:6,12 58:16 59:10
59:20 61:10,22 62:13
62:25 63:2 64:10,13
64:19 65:2,12,21
66:1,9,10,14 67:1,7
69:15,24 83:10 92:3
92:9 141:10 142:11
159:24 176:8,9,11,12
176:19 179:15
180:18,22 182:4,8
183:14 188:12

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX (210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 273

| | | | | |
|---|---|---|---|---|
| 190:20 191:7 193:6 | 212:2 220:21 224:5 | 142:16 143:14,16,23 | **width** 158:3 | 56:3,24 72:12,15 |
| 205:2,6 211:4 | 234:10 236:20 237:2 | 144:4,10,14 148:14 | **Willette** 2:6,20 | 86:15,21,23,24 87:6 |
| **weapons** 14:17 34:13 | **were** 2:24 5:15 8:24 | 148:21 149:9 151:3,5 | **William** 2:17 3:5 | **working** 9:6 11:2,5,9 |
| 36:4 62:14,17,23,23 | 11:2,5,12 13:11,13 | 152:7 159:9 160:21 | **wind** 17:14 | 11:10,16,18 12:6 |
| 73:12 90:21 146:1 | 14:1,13,15,16 15:18 | 161:25 162:4 163:24 | **window** 108:9 122:6,6 | 13:18,22 14:5 15:19 |
| 210:10,13,13,16,19 | 15:19,25 16:22 18:7 | 164:15,19 166:3,8 | 137:17 155:25 156:7 | 16:23 17:9 50:23 |
| 210:22 | 19:16,19 23:9,10,12 | 167:7,8 169:2 173:25 | 177:25 205:6,9 | 51:2,23 52:3,14,18 |
| **wearing** 184:20 236:25 | 24:13 25:21,25 26:2 | 174:1,4,9 175:16,19 | **wipe** 153:5 | 53:5 55:14,22 57:17 |
| **week** 23:22,25 53:10,18 | 26:20,23 28:24 29:3 | 181:23 182:8,22 | **Wisdom** 27:15,16 45:1 | 58:5,19 59:7 60:13 |
| 55:22 56:8,17,17,25 | 29:23 30:1,17,25 | 183:1,19 184:2,16 | 45:1,4,6 | 60:20,21 61:2 72:18 |
| 57:15,20,21,22,23 | 31:6,22 33:10,16,19 | 188:19,20 189:19 | **withdraw** 10:21 20:12 | 80:10 85:10,12,14,20 |
| 85:9,9,10 | 34:6,7,13,18,20,20 | 190:8,18 191:7 192:4 | **withdrawn** 103:2 | **works** 5:20,23 6:14,16 |
| **weekly** 57:15 | 34:23 35:3,13 36:4 | 192:20 193:1,9,10 | **withdrew** 10:22 | 62:24 85:21 |
| **weeks** 61:5 85:9 | 36:15,21 37:2,3,3 | 194:7,18 196:8,9,12 | **witness** 2:1 5:8,10 | **world** 163:21 |
| **weigh** 46:3 | 38:15,15 39:4,18,19 | 199:15 200:1 204:17 | 11:23 12:1,3 107:24 | **worry** 170:6 |
| **weighs** 125:14,16 128:6 | 40:1,4,10,15,24 41:1 | 204:21 206:12 | 109:22 110:3 116:13 | **wouldn't** 27:18 87:17 |
| **weight** 65:16,17 75:23 | 41:4 42:2,13,25 43:4 | 207:23 208:2,8,12,13 | 121:4,6 127:4 129:9 | 125:7 131:2,7 198:12 |
| 78:7 84:9 | 44:25,25 46:9,12 | 209:10 210:15 211:2 | 135:11,19 136:13 | 198:14,15 228:5 |
| **well** 21:15 23:17 29:2 | 48:19,25 49:7,8,12 | 211:8 213:25 214:1,4 | 142:1 143:12 157:13 | **wound** 181:19 182:19 |
| 30:24 32:12 33:7,10 | 49:12,13 50:2,21 | 214:9,17 216:10 | 158:21 163:5 168:13 | 196:17,22 197:3,9,15 |
| 37:2 39:1,24 42:20 | 51:8 52:17 53:21,22 | 217:4,25 219:17 | 172:3 182:6 190:1 | 198:1,2,6,18,20,23 |
| 44:24 45:6 54:15 | 53:22 54:5,6,16,16 | 223:6,12 224:13 | 191:4 192:14 193:17 | 199:3,8 202:21,22 |
| 60:9 72:3,9 76:20 | 54:20 55:10,11,14,22 | 225:15 231:9 232:13 | 198:14 202:1 203:22 | 203:9 |
| 82:13 83:22 84:8 | 56:19,22 58:4,5,16 | 233:9,13,16,18 | 207:12 208:19 | **wounds** 189:16,23 |
| 86:5 95:13 96:25 | 58:16 59:11 60:9,18 | 234:13,13,14,22 | 211:11 212:12 | 195:24 196:6,12 |
| 98:2 101:13 113:1 | 61:1,11,21 62:14,18 | 235:2,14 236:5,22 | 222:15,24 224:10 | 199:23 202:17,23 |
| 114:1 115:5 116:23 | 66:25 68:3,14 70:6 | 237:3,5,16,17 238:20 | 225:24,25 226:14 | 243:21,24 |
| 117:7,11 120:12 | 70:15 71:4,9,14,19 | 239:6 240:24 241:18 | 228:19 229:1 234:20 | **wrestling** 82:20 |
| 121:11 125:1 132:2 | 72:16,18,25 73:1,6 | 242:7 243:20,21,22 | 234:25 240:22 241:8 | **wrist** 74:7,9 80:24 81:3 |
| 135:21 136:2,7 | 73:13 74:1,12,24,25 | 244:25 245:5,8 | 244:1,22 245:15 | 83:14 84:11 |
| 137:22 140:11 | 75:1,8,9,10,11,20,24 | **weren't** 79:15,17 | 246:14 247:13,15,17 | **write** 97:13 163:21 |
| 143:17 147:18 | 76:18 77:1,6,14 79:7 | 240:24 | 247:18 | **writes** 99:4,14,19 |
| 151:15 155:12 | 79:7,11 82:20 84:3 | **Wesson** 34:14 35:3 | **Witnessed** 154:7 | **writing** 5:21 6:3 20:18 |
| 156:22 161:23 | 84:16,19 85:10,12,14 | **west** 2:18 122:1,9,16 | 230:13 | **Wrongful** 1:6,15 |
| 163:21 166:24 167:7 | 85:20 87:3 88:1 89:4 | 248:5 | **woke** 87:24 115:18 | **wrongly** 70:16 |
| 167:22 174:1 176:8 | 89:23 91:2,3,20,21 | **wheel** 157:7,9 158:8 | 116:7,15,21,25 117:5 | |
| 183:19 189:15,18 | 91:22 93:12,14,17,19 | **wheeled** 157:17 | 117:7,17 214:18 | **X** |
| 191:5,22 193:12,21 | 94:1,15,17,21,22,22 | **wheels** 129:1,6 149:23 | **word** 41:19 | **X** 4:3 127:4,7,20 |
| 200:23 202:21 | 95:6,7,8,23 96:3,4,10 | 157:16 158:9 161:7 | **words** 28:6 46:24 63:3 | 133:11 226:4 244:5 |
| 205:20 207:24 | 96:12 97:8 98:10,15 | 161:12,15 164:6 | 96:23 102:9 147:19 | 244:23 |
| 218:14 227:8 232:8 | 99:2,12,21 100:7,12 | 178:6 | 165:21 200:13 | **x-rays** 196:8 |
| 234:11 240:23 | 100:20,20 103:16 | **whereabouts** 45:13 | 226:21 234:3,7 | |
| **well-being** 95:13 | 104:12 105:3,6,12,13 | **whichever** 156:17 | 236:16 245:8 | **Y** |
| **went** 7:15 12:19,24 | 106:20 107:3,11 | 199:18 | **work** 9:12,13 10:2,19 | **Yama** 25:13 |
| 16:9 18:10 20:23 | 108:7,23 110:17 | **while** 4:22 11:12 15:19 | 12:24 13:1,15 14:2 | **yanking** 154:6 230:11 |
| 21:15 25:21 48:20 | 111:4,6,10,14 112:9 | 17:8 23:9 72:16,18 | 15:6,23 16:9,13,21 | **yeah** 9:16 13:24 17:24 |
| 60:18 90:18 91:2 | 112:9 113:3,16,17,21 | 88:8 92:20 99:20 | 17:1,2,5,11 20:13 | 25:11 40:13 52:12 |
| 98:15 107:20 123:25 | 114:7 115:6,7,24,24 | 111:4 120:20 142:7 | 24:17,20 36:13 45:10 | 53:17 54:13 61:9 |
| 126:16 132:21,23,24 | 120:1,2 122:11 | 146:12 147:12 | 48:17 51:21 52:19 | 69:3 82:13 87:14 |
| 136:23 137:25 138:9 | 123:11,17 125:13,20 | 151:15 216:23 | 53:10 54:3,21 55:15 | 117:23 127:2 145:5 |
| 147:8 148:21 159:23 | 125:24,25 126:1 | 217:20 234:10 | 56:19 57:1,25 58:11 | 145:17 184:7 |
| 162:14,22 163:9 | 127:14 128:17,23 | **whole** 82:14 95:23 | 59:11 61:15 63:22 | **year** 7:22 10:13 11:19 |
| 164:8 165:15,18 | 129:1,4 130:5,8 | 153:21 156:13 | 87:10 113:21 | 12:8 15:7,7,22,22 |
| 166:13,13,14,17 | 131:21 132:8 133:7,8 | 231:23,23 | **worked** 12:23 14:9 | 18:25 19:3,4 55:8 |
| 167:1,10 175:8,11,20 | 133:8,8,13,13 134:5 | **Who(sic)** 19:24 | 15:9,13 16:19 17:4 | 68:3,3 72:10 |
| 181:5 204:25 205:4 | 137:4,10 139:9 142:7 | **wide** 158:18 | 17:16,25 53:21,22 | **years** 49:10 68:22 69:2 |

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

GERARDO RAMIREZ

April 10, 2003

Page 274

**yell** 133:7,25
**yelled** 134:1 154:9
  230:15
**yelling** 133:8,8 153:18
  204:21
**yellow** 126:21
**yesterday** 4:9,18 26:2
  29:15 30:11 52:13
  208:4
**you-all** 26:14 93:22
  126:4 151:5
**Ysidra** 89:7
**Ysidro** 214:8

**Z**
**zone** 181:17,25

**$**
**$5.60** 56:23

**0**
**0232** 100:13
**0243** 102:18
**03:24** 230:19
**0322** 154:4 230:6
**0324** 154:23
**0325** 230:24
**0523** 102:23

**1**
**1** 3:9 19:20 195:21
**1-14** 3:9
**1:53** 102:5
**10** 1:24 3:18 53:13,16
  144:2 156:1 195:24
  196:5 197:4,5 199:3
**10th** 2:3
**10:30** 2:4
**10:45** 114:22
**100** 248:5
**11** 3:19 56:14,14 68:24
  87:11 113:19,21
  114:21,21,22 191:14
  197:10,11 198:24
  199:1,8 201:23 208:1
  208:14 247:8
**12** 3:20 9:13,14,14
  24:11 25:4 34:14
  53:16 68:25 96:4
  196:8 198:2 208:1
**12/31/03** 248:5
**120** 3:24
**125** 210:24 211:7
**13** 3:21 53:13,17
  196:23,25 208:1
  209:12

**1353** 102:5
**14** 3:22
**14(sic)** 97:18
**14-A** 2:15
**1400** 2:12
**1429** 2:18
**15** 3:23 28:20 98:21
  154:2 199:4 229:8,9
  232:2
**150** 79:5
**16** 3:24 64:1,7 68:5
  120:4,16 121:7
  126:20 156:21
  175:15 183:1
**17** 3:25 68:5 195:9
**17th** 86:21,23,24 87:2
  87:15
**175** 79:1
**18** 12:10
**18th** 86:6,16 87:3,20
  100:13,19 101:19
  102:4,18,23 103:12
  237:23
**19** 69:10 72:4
**19th** 58:4 73:17
**1911** 25:13
**195** 3:25
**1978** 8:1
**1999** 53:3,5 72:19

**2**
**2** 3:2,10 19:20 195:21
  196:10,22
**2:32** 100:14,19
**2:43** 101:19 102:18
**20** 24:16 122:5 232:2
**20s** 78:20
**2000** 55:17,18 58:3,4,9
  58:10 72:5 73:17
**2001** 52:10
**2003** 1:24 2:4 246:21
  247:8 248:1
**2020** 103:12
**2060** 248:4
**210** 248:6
**22** 25:5
**222** 2:18
**226** 3:5
**24** 98:21
**244** 3:5,6
**246** 3:6
**247** 3:7

**3**
**3** 3:11 56:12,13,14
  87:11,11 89:3 97:21

**97:22** 113:20 115:19
  115:21,22 116:8,17
  116:17,18 197:3
  232:22 237:21 238:7
  238:7 240:14
**3:22** 116:12 230:6
**3:24** 230:20
**3:25** 230:25
**3:30** 113:20,20
**30** 24:16 202:11,11
**300** 125:17 128:6
**31** 202:11,11
**350** 170:21
**3505** 2:7,21
**357** 34:17
**377-3027** 248:6
**38** 34:17 210:24 211:7

**4**
**4** 3:4,12
**4:15** 98:23
**40** 56:24 57:17 85:12
  92:7
**45** 25:13,13
**45th** 8:1
**460** 2:21
**49** 154:2 229:12,15

**5**
**5** 3:13
**5'3** 83:7
**5'5** 79:3,5
**5'9** 79:1
**5:05** 245:20
**5:23** 102:23
**503** 91:4 121:8 130:3
  130:10,18 213:10
  230:11
**503-01** 154:6
**555** 2:12

**6**
**6** 3:14
**6:00** 2:4

**7**
**7** 3:15 56:12,13,15
  87:11
**71** 100:10
**76** 102:4
**77** 102:4
**7800** 248:5
**78230** 248:6
**78478** 2:12
**78520** 2:15
**78521** 2:7,22

**78551** 2:19
**79** 102:17

**8**
**8** 3:16 87:23 240:14
  241:1,2
**8:20** 103:12
**80** 24:19
**800** 211:17
**83** 81:25

**9**
**9** 3:17 34:19 35:13
  58:20 60:7,18,24
  61:11,12,20 62:13,20
  62:24 63:1,21 64:3,4
  64:8,10 87:23 92:8
  241:1
**9/19/00** 154:4
**9/19/2000** 230:3
**92F** 92:6
**92FS** 58:20
**96** 92:6
**98** 3:23 7:23 11:19 12:8
**99** 19:5,6 49:5 51:5

(210) 377-3027
7800 IH-10 WEST, SUITE 100

**ESQUIRE DEPOSITIONS SERVICES**
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

Exhibit
"C"

BLAKE HUBBARD                                              April 29, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| MARY E. CARRANZA, Individually * | |
| and as Next Friend of ANGEL * | |
| MATTHEW GONZALEZ, GUSTAVO * | |
| GONZALEZ, JR., and ALYSSA * | |
| LAUREN GONZALEZ, Minor Children * | |
| and on Behalf of All of Those * | |
| Entitled to Recover for Death of * | |
| GUSTAVO GONZALEZ, Deceased Under * | |
| the Texas Wrongful Death Act, * | |
| and CELIA MUNIZ GONZALEZ, * | |
| Individually and as Personal * | |
| Representative of the ESTATE OF * | |
| GUSTAVO GONZALEZ, Deceased, * | |

                         Plaintiffs,    *
vs.                                     *
                                        *
CITY OF LA FERIA, TEXAS, LA             *
FERIA POLICE DEPARTMENT, OFFICER *
GERARDO "JERRY" RAMIREZ,                *
Individually and in his Official *
Capacity; and VALLEY BAPTIST           *
MEDICAL CENTER,                         *
                   Defendants,          *
                                        *    CIVIL ACTION NO. B-02-180
GUSTAVO GONZALEZ, Individually   *
Pursuant to the Texas Wrongful   *
Death Act for the Death of       *
GUSTAVO GONZALEZ, Deceased,       *
                   Intervenor,          *
                                        *
vs.                                     *
                                        *
CITY OF LA FERIA, TEXAS, OFFICER *
GERARDO "JERRY" RAMIREZ,                *
Individually and in his Official *
Capacity; and VALLEY BAPTIST           *
MEDICAL CENTER,                         *
                   Defendants.          *
**********************************************************

VIDEOTAPED ORAL DEPOSITION OF
BLAKE HUBBARD
APRIL 29, 2003
**********************************************************

BLAKE HUBBARD                                                                    April 29, 2003

Page 2

1      ORAL DEPOSITION OF BLAKE HUBBARD, produced as a witness
2   at the instance of the Plaintiff and duly sworn, was taken in
3   the above-styled and numbered cause on the 29th day of April
4   2003, from 2:05 p.m. to 6:40 p.m., before Katherine J.
5   Brookbank, CSR in and for the State of Texas, reported by
6   method of machine shorthand, at the office of Adams & Graham,
7   222 E. Van Buren, Harlingen, Texas, 78550, pursuant to the
8   United States District Court Procedure and the provisions
9   stated on the record hereto.
10                APPEARANCES
    FOR THE PLAINTIFF(S)
11     Mr. Joseph Barrientos
       THE WATTS LAW FIRM
12     555 N. Carancahua, Suite 1400
       Corpus Christi, Texas  78478
13
    FOR THE INTERVENOR
14     Mr. Phillip Stein
       THE LAW OFFICES OF PHILLIP J. STEIN, P.C.
15     14-A Palm Village Center
       Brownsville, Texas 78520
16
    FOR THE DEFENDANT(S)
17     Mr. William Pope
       ADAMS & GRAHAM, L.L.P.
18     222 E. Van Buren, West Tower
       P. O. Drawer 1429
19     Harlingen, Texas  78551
20     Mr. Eduardo Garza
       WILLETTE & GUERRA
21     International Plaza, Suite 460
       3505 Boca Chica Boulevard
22     Brownsville, Texas 78521
23  ALSO PRESENT:  Tele Video and Audio Productions
       Cecila Gonzalez
24     Denise Jackson, Claims Manager, VBMC
25

Page 3

1                    INDEX
2                         PAGE
3   Appearances --------------------------------- 2
4   Stipulations (Attached hereto) ---------------- N/A
5   BLAKE HUBBARD
6      Examination by Mr. Joseph Barrientos --------- 4
       Examination by Mr. Eduardo Garza -------------- 131
7      Examination by Mr. Joseph Barrientos --------- 155
       Examination by Mr. Eduardo Garza ------------- 168
8
    Changes and Signature ----------------------- 169
9
    Reporter's Certificate ------------------- 170
10
                  EXHIBITS
11  NO. DESCRIPTION              PAGE
12  18 - VBMC security department documents      100
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                  BLAKE HUBBARD,
2        having been duly sworn, testified as follows:
3               E X A M I N A T I O N
4      Q   (BY MR. BARRIENTOS) Good afternoon.  Please tell us
5   your name, sir?
6      A   Blake Hubbard.
7      Q   Mr. Hubbard, my name is Joseph Barrientos.  I am a
8   lawyer from Corpus Christi and I am here today to take your
9   deposition in a case called Carranza versus Valley Baptist
10  Medical Center and the City of La Feria.  Do you understand
11  that?
12     A   Yes, I do.
13     Q   Okay.  Have you -- well, let me ask first of all.
14  What is your current occupation?
15     A   I am a master black belt for Valley Baptist Health
16  System.
17     Q   What does that person do in that position?
18     A   I mentor and teach -- I mentor.  I mentor -- I teach
19  project managers under our Six Sigma Initiative and mentor
20  their projects as well as manage projects of my own.
21     Q   And how long have you held that position?
22     A   About two months.
23     Q   Prior to that, how were you employed?
24     A   I was the director of security for Valley Baptist
25  Medical Center.

Page 5

1      Q   All right.  Do you -- do you understand -- strike
2   that.  Let me start again.  Your deposition is being taken
3   today pursuant to a notice that we sent some time ago and to
4   which counsel has -- has lodged some objections to.  But
5   before we get into the details of that, I want to make sure
6   that -- that what we both understand is -- do you understand
7   that you are here today to speak on behalf of Valley Baptist
8   Medical Center as opposed to Mr. Hubbard individually?
9      A   Yes.
10     Q   Have you had a chance to review the deposition
11  notice that was sent to Valley Baptist Medical Center?
12     A   I don't recall seeing the actual notice.  I know it
13  exists.  I talked about it with Mr. Pope.
14     Q   I am going to mark a copy of this, you know, just to
15  show you.  But let me ask, first of all, have you ever given a
16  deposition before?
17     A   Yes, I have.
18     Q   Okay.  Several times?  Once or twice?
19     A   Four or five times.
20     Q   Okay.  Have you given depositions in the capacity as
21  the chief of security and head of security for Valley Baptist
22  Medical Center other than this one?
23     A   No.  No.  This is -- would be the first one as a
24  representative of Valley Baptist.
25     Q   Okay.  That was going to be my next question.  Have

2 (Pages 2 to 5)

BLAKE HUBBARD                                                                                    April 29, 2003

Page 6

1    you given any other depositions as a representative -- as a
2    corporate representative for Valley Baptist Medical Center?
3        A    No, I have not.
4        Q    Have you given any other depositions in matters
5    regarding security or restraint of -- of patients?
6        A    No.
7        Q    Can you tell me, and I don't -- I don't -- I am not
8    necessarily interested in the details of the other cases in
9    which you have been deposed, but can you give me a general
10   idea of what the other cases were about?
11       A    They were cases related to my previous career in law
12   enforcement.
13       Q    Okay.  Well, that's probably a good place to go back
14   a little bit and ask you, can you -- can you tell me -- well,
15   did -- did -- do you have a CV or resume?
16       A    I do not.
17       Q    Okay.  Can you just kind of tell me in a summary
18   fashion what your work experience has been in the field of law
19   enforcement?
20       A    I have been employed either a full-time or part-time
21   capacity in law enforcement since 1994.
22       Q    Okay.  And what was your first job in the field of
23   law enforcement?
24       A    As a police officer of the city of Grand Prairie,
25   Texas.

Page 7

1        Q    And how long did you work there?
2        A    Four years.
3        Q    Okay.  And then in about 1998, where did you go
4    then?
5        A    I moved from Grand Prairie to Harlingen.
6        Q    Okay.  What occasioned your move?
7        A    I began working for Valley Baptist Medical Center.
8        Q    And what position did you initially take with Valley
9    Baptist Medical Center?
10       A    Program Development Manager with our general
11   services department in the support services area.
12       Q    Okay.  Did you have any other law enforcement
13   besides the Grand Prairie -- Grand Prairie Police Department?
14       A    I have been in reserve law enforcement since '98.
15       Q    Since '98.  Okay.  After leaving.
16       A    After leaving Grand Prairie.
17       Q    Okay.  And who have you been a relief reserve
18   officer for, for what agencies?
19       A    The town of Palm Valley, Texas and the Cameron
20   County Sheriff's Office.
21       Q    How about before working for the Grand Prairie --
22   Grand Prairie Police Department?
23       A    No.  That was my first position in law enforcement.
24       Q    When you left Grand Prairie, what was your last rank
25   or position?

Page 8

1        A    Patrol officer.
2        Q    Have you ever testified as an expert in the field of
3    use of force?
4        A    No.
5        Q    Okay.  Mr. Hubbard, I believe I think you told me
6    your initial position with Valley Baptist was as a program
7    development manager in the general services area.
8        A    Area.
9        Q    Okay.  Can you give me a brief rundown of what your
10   -- because I understand from the previous answer that your
11   position changed during the time that you have been there.
12   Can you kind of give me a -- in your own words, kind of a
13   synopsis of different positions you have held, if there was
14   more than one?
15       A    As a program development manager, I reported
16   directly to the vice-president of general services.  General
17   services encompassed several departments that are -- would be
18   termed support, maintenance, housekeeping, security,
19   construction, biomedical engineering, kind of ancillary
20   departments that support the -- the care departments.  I did
21   projects for that vice-president, various projects.
22       Q    So it would be fair to say that the -- that the area
23   of security, of which I guess you were later head of, was
24   subsumed within the position that you initially had when you
25   first started?  It was included within that?

Page 9

1        A    I didn't have any responsibility for it, but it was
2    included in the areas that I worked within.
3        Q    Okay.  Fine.  And I think I interrupted you.  At
4    some point did your position change?
5        A    In -- I believe it was November of '99, I assumed
6    the directorship of the security department.
7        Q    Okay.  By the way, how -- how did you come to move
8    from Grand Prairie down to the Valley?
9        A    Harlingen is home for me.
10       Q    Is it?  Okay.
11       A    And my wife.  And so we had been looking for a
12   opportunity to come home.
13       Q    Come back home.  Okay.  In 1999, when you became
14   director of security, what occasioned that move or how -- how
15   did that come about?
16       A    The person who has the director previous to me had
17   taken another position in the hospital, opening up the
18   directorship.  I had an interest in that area and applied for
19   and received the position.
20       Q    All right.  And in -- that was November of 1999.
21   And until what date or approximate day did you occupy that
22   position?
23       A    That would be February of this year, roughly.
24       Q    All right.  And I am not sure if I'm clear in your
25   earlier answer.  Did you leave the hospital, employment of the

3 (Pages 6 to 9)

BLAKE HUBBARD                                                                                  April 29, 2003

**Page 10**

1 hospital, or did you simply leave that particular position
2 within the hospital?
3    A It was just -- it was within -- changed positions
4 within the medical center. I have been an employee of Valley
5 Baptist Health System since '98.
6    Q Okay. All right. And what occasioned the most
7 recent change and to what position?
8    A About a year ago, when we had a new CEO who came in,
9 took over the health system, he brought in a program called
10 Six Sigma, which is a process improvement, quality
11 initiative. And he looked for candidates who wanted to be
12 involved in it. I was interested in doing so. I did it on a
13 part-time basis for several months. And then as the position
14 and the role is growing, they created some full-time
15 positions. I applied for and received one of those.
16    Q Okay. Has there been a replacement or was there a
17 replacement named to your previous position as director of
18 security?
19    A No. Currently there is a -- my assistant director
20 is running the department on an interim basis.
21    Q Okay. Who is that person?
22    A Robert Zimmerman.
23    Q How long had Mr. Zimmerman been there as your
24 assistant?
25    A He was the assistant director when I became the

**Page 11**

1 director. So the entire time I was the director, he was my
2 assistant. But he has been with the hospital for many years.
3    Q I guess, maybe for lack of better terms, he is the
4 acting -- the acting director?
5    A For lack of a better term.
6    Q Okay.
7    A The department is in some transition right now, so
8 no major decisions have been made about it.
9    Q Okay. Let me ask you, and -- and -- so, if this
10 will help, I would like to ask you about the time period
11 regarding this incident. And, of course, I am talking about
12 the incident regarding the September, I believe it is the 19th
13 of 2000, in that time period. First of all, how many -- how
14 many people worked for the security division, if you will, of
15 Valley Baptist Medical Center?
16    A At that time?
17    Q Yes, sir.
18    A I would say in the range of 35 to 40.
19    Q Okay. Has that number changed significantly to
20 date?
21    A It is lower than that now.
22    Q Okay. And this -- let me make sure that I
23 understand. Are the people who work in the security division
24 of the Valley Baptist Medical Center actually employees of the
25 hospital or is it a contract agency?

**Page 12**

1    A They are employees of the hospital.
2    Q Of the 35 or so that were employed in September of
3 2000, can you tell me roughly how many would have been
4 administrative personnel and how many would have been security
5 personnel that did the actual security work?
6    A Can I ask you what you mean by administrative?
7    Q Sure. How many -- of those -- of those employees,
8 the 35 or so, how many actually came in and performed security
9 services versus people who did things such as scheduling,
10 things other than coming in and, I guess, doing the actual
11 security service work?
12    A I hope this answers your question to what I think
13 you are getting at, is that of the 35 to 40, we probably had
14 20 to 25 who were actually security officers.
15    Q Okay.
16    A The rest were -- the rest were either myself as the
17 manager, supervisors or dispatchers.
18    Q All right.
19    A And a property clerk and valet attendants.
20    Q Let me ask, in order to become a security officer
21 for Valley Baptist Medical Center in September of 2000, were
22 there any job requirements that the applicants were required
23 to fulfill or training requirements?
24    A We require our officers to have a valid driver's
25 license, a high school education, and the appropriate level of

**Page 13**

1 training as required by the Texas Commission on Private
2 Security.
3    Q Do you require them to be certified?
4    A Some.
5    Q Okay.
6    A We have different rolls. We have both commission
7 and noncommission. And so the ones who fill the role of
8 commission do have to have that level of certification from
9 the Texas Commission on Private Security.
10    Q All right. And, during that time period, can you
11 tell me -- well, first of all, structurally, was there a
12 division or a specific number of commissioned versus
13 noncommissioned positions or did that -- did that kind of vary
14 depending upon the circumstances?
15    A You mean in the department as a whole?
16    Q Yes. In the department as a whole.
17    A All right. At that time, we were probably roughly
18 60/40 commissioned. Sixty percent of the officers would have
19 been commissioned, 40 were noncommissioned. I don't recall
20 the exact numbers.
21    Q And let me ask, was that by design or was it -- was
22 there a preference for commissioned officers or to get
23 officers commissioned once they begin, or was there -- was
24 there an actual design behind that or is it just kind of how
25 it wound up?

4 (Pages 10 to 13)

BLAKE HUBBARD                                                                April 29, 2003

Page 14

1    A   It -- it was designed because we had some positions
2  that we did not post armed officers at and some that we did,
3  so we had a mix of officers in the different capacities.
4    Q   How many officers, and if that is a correct term, I
5  was going to say that earlier, but I didn't want to assume.
6  The correct term is officers that you use?
7    A   Correct.
8    Q   What were the staffing requirements that were
9  established by Valley Baptist Medical Center that would have
10 been in effect at that time for security personnel at the
11 hospital?
12   A   How many per shift?
13   Q   Yes, sir.
14   A   We should have had six officers on shift.
15   Q   All right.  And so at any given time in a 24-hour
16 period, there -- there should be six officers scheduled and
17 working?
18   A   Correct.  And the difference would be during the
19 day, we have more support and administrative personnel.  The
20 valets are here during daytime hours.  So we have more
21 security personnel during the day than we do at night.
22   Q   Okay.
23   A   We don't run valet service at night.
24   Q   All right.  Well, let me ask.  Let me see if I can
25 make sure I understand, then.  In terms of the actual security

Page 15

1  personnel, that is people who provide security to the patients
2  and/or employees or visitors at the hospital, the staffing
3  called for six officers around the clock.  And at certain
4  times of the day because -- 8 to 5, when most people work,
5  there would be -- there happened to be more people around, but
6  the staffing requirements actually call for six officers?
7    A   Our -- our target was always at six, a minimum of
8  six officers.
9    Q   Okay.  And these particular split between the
10 commissioned versus non-commissioned.
11         (Interruption for Cecila Gonzalez to enter)
12         MR. BARRIENTOS:  Hello.
13         MS. GONZALEZ:  I am sorry.
14         MR. BARRIENTOS:  That's all right.  Just go
15 ahead and have a seat.
16   Q   (BY MR. BARRIENTOS) I am sorry.  Okay.  The goal
17 was -- well, let me ask you.  Was the goal six officers or was
18 there a requirement for six officers?
19   A   It was a target.  We didn't have a set minimum
20 staffing requirement.
21   Q   All right.  Any particular target for commissioned
22 versus non-commissioned officers within that six?
23   A   Not particularly.  We would -- our retirement center
24 has an officer stationed full-time and that is more often than
25 not a non-commissioned officer.  And the commissioned officers

Page 16

1  would work at the hospital itself.
2    Q   All right.  Now, the officers on a -- let's say you
3  have a shaft -- a shift that is fully staffed with six
4  officers.  Did the practice -- was the practice at the time to
5  assign those people to specific areas of the hospital or -- or
6  would their placement change depending upon need?
7    A   Yes.  We would do both.  We have assigned posts and
8  parole zones.  And, also, if there was a specific need, we
9  would assign.  If we had, like, a particular set of
10 circumstances that we thought required a full-time officer, we
11 might assign one to that, which might not be a standard post.
12 Like our emergency department is a fixed post.  There is
13 always an officer assigned to the emergency department.
14   Q   Let me ask you this.  Can you run down for me or
15 list for me the -- the standard posts, where in the hospital
16 those --
17   A   Our retirement center, outside patrol, the emergency
18 department, and then the remainder would be assigned to areas
19 within the medical center.
20   Q   Would those assignments change perhaps from shift to
21 shift or day-to-day?
22   A   Yes.
23   Q   Were those kind of maybe floaters for --
24   A   They would -- they were the ones who moved about the
25 hospital answering service requests.

Page 17

1    Q   All right.  Are these -- are the fixed posts or
2  positions, are those requirements?  Are those practices set
3  out in writing anywhere or is that something that is just a
4  matter of practice or custom within your department?
5    A   A matter of practice.
6    Q   Okay.  You mentioned that -- the other officers --
7  the other three who were not at fixed posts would be free to
8  answer service calls or requests as they came in.  Can you
9  tell me, were there any criteria or were there any
10 circumstances that usually necessitated officers being
11 assigned to a particular place where there was not an
12 otherwise fixed location for them to -- to patrol?
13   A   When -- when those occurrences happened, we usually
14 evaluated it on a case-by-case situation.  We didn't have a
15 set of written criteria that would establish a fixed guard at
16 a particular place.
17   Q   Well, based on the experience that you had when you
18 were there, can you give me some examples of events or
19 circumstances that would -- that would call where you would be
20 called upon to make that decision, that is send an officer to
21 a particular place or location within the hospital?
22   A   To make sure I am clear, are you -- are you asking,
23 like, in the past a certain set of circumstances where I
24 assigned an officer --
25   Q   Sure.

5 (Pages 14 to 17)

BLAKE HUBBARD

April 29, 2003

Page 18

1    A  -- to a specific unit or something?
2    Q  Sure.
3    A  At one time, we had an employee in our Human
4  Resources department who had been -- whose husband was
5  involved in law enforcement as an undercover narcotics agent.
6  And his cover had been blown and threats were made against the
7  -- him and his family.  And she had actually been assaulted.
8  And so we assigned an officer to her work area during the time
9  period before the threat was diminished.  That would be a
10  recent example.
11    Q  So without, I guess, maybe getting in to specifics
12  of each and every case, would it be fair to say that some
13  indication of a -- of a heightened security risk or safety
14  risk would be a set of circumstances where you would be called
15  upon to perhaps put an officer in an area where they are not
16  otherwise normally in a fixed patrol area?
17    A  Yeah.  I think so.
18    Q  Okay.  And, again, this is something that -- if I
19  understand your testimony, this is not set forth in writing in
20  any document, policy, set of instructions, memos, anything
21  like that?
22    A  No.
23    Q  Okay.  Was this something, then, that you took it
24  upon -- is this something that when you came into this
25  position was an already established practice or was this

Page 19

1  something that you established once you arrived there?
2    A  I was -- it was an established practice.
3    Q  All right.  Let me go back, because I wanted to
4  ask you another question about the -- about the shift.
5  Assuming there are six officers on staff, that it is a fully
6  staffed shift, who is -- what is the hierarchy or the chain of
7  command that is in place at -- at any given time when those
8  people are on duty?
9    A  We would have a department supervisor on the shift.
10  He would be one of the -- usually one of the officers
11  assigned to one of the rove -- the roving units that can move
12  about.  In the absence of a department supervisor, we would
13  assign usually one of the more senior officers to be an acting
14  supervisor for the shift.  In the absence of administrative
15  security personnel, that -- we have a house supervisor who
16  supervises the hospital.  And they can use that person as
17  well.
18    Q  Okay.  Now, the house supervisor is not actually
19  within the security --
20    A  No.
21    Q  -- division.  Does the house supervisor, then, have
22  authority over security personnel in the absence of someone,
23  say, like yourself?
24    A  They have authority to -- to make decisions for the
25  hospital as necessary.  Typically related to security, if a

Page 20

1  decision needed to be made off duty -- if it was very
2  emergent, like an incident, a disaster recall, or something
3  like that, the house supervisor might make that call.  But if
4  it was specific to security, they would usually call me at
5  home.
6    Q  And that's what I meant.  For example, if you were
7  out of town or unavailable for some particular reason and
8  something came up at a -- at a time other than regular
9  business hours and you are not available, they would go to the
10  house supervisor.
11    A  If --
12    Q  They could go to the house supervisor?
13    A  They could go to the house supervisor.  It would be
14  primarily for security purposes if no one else was available.
15  If they could not locate somebody, another supervisor here,
16  administrative personnel responsible for security.
17    Q  Okay.  Anyone else in the chain of command other
18  than the officers that you -- you have mentioned yourself, the
19  house supervisor?  In other words, were there any other
20  intermediate levels of management who security personnel could
21  go to for instruction or assignment in your absence?
22    A  Mr. Zimmerman, the assistant director I spoke of
23  earlier.
24    Q  Anyone else in the department outside security such
25  as the house supervisor?

Page 21

1    A  They could go to the vice-president that I would --
2  that I had reported to if -- in my absence.
3    Q  Okay.  And who would that person have been at that
4  time?
5    A  At that time, it was Robert Haggarty.
6    Q  As a practical matter, Mr. Hubbard, would -- I know
7  we have talked about who -- other people that security
8  personnel could have gone to.  Did that -- did that ever in
9  your experience actually have to happen or were you or one o
10  these other people usually available?
11    A  I was usually available.
12    Q  Okay.  So, if I understand correctly, then you and
13  or Mr. Zimmerman, or the house supervisor -- did I ask that
14  person's name.  I don't think I did.  Who would have been the
15  house supervisor at the time in September of 2000, if you
16  remember?
17    A  Was it Stella?  I believe it was Estella Maricio.  I
18  would probably have to go back and check to verify that.  But
19  I believe she was the supervisor.
20    Q  Yeah.  I won't -- I won't hold you to it.  But --
21  all right.  Okay.  So, if I understand correctly, yourself,
22  Mr. Zimmerman, the house supervisor, perhaps Ms. Maricio,
23  perhaps someone else, and the vice-president, Mr. Haggarty,
24  were all people who would have been able to direct security
25  personnel on behalf of the hospital.  Direct them in terms of

6 (Pages 18 to 21)

BLAKE HUBBARD                    .                                April 29, 2003

**Page 22**

1  assignment.
2  A  Well, not necessarily -- I mean, Mr. Haggarty and
3  Ms. Maricio would not probably have gotten involved in terms
4  of assignment. If they would be in a situation, you know,
5  some sort of an emergency situation where further higher
6  guidance was needed, they might seek those. If there was a --
7  in terms of an assignment that would -- that would stop at
8  probably Mr. Zimmerman and myself.
9  Q  Okay. All right. So in an emergency situation or
10 the situation where you or Mr. Zimmerman were not available
11 immediately, then these people could be looked to for
12 guidance?
13 A  Sure.
14 Q  Okay. Normally, I could see they would want to go
15 to you or Mr. Zimmerman because you are familiar with the
16 security procedures and, you know, the things that are
17 directly related to it.
18 A  That's correct.
19 Q  All right. All right. The -- all right. In
20 terms -- and, Mr. Hubbard, I am going to ask you to tell me,
21 because, quite honestly, I am not familiar with the
22 certification that -- that -- the security -- excuse me --
23 with the training security officers who were working for the
24 hospital at that time would have gone through. So let me ask
25 you. Let me ask you this. Is there or was there in place at

**Page 23**

1  the time a set of procedures or guidelines with regard to
2  prisoner patients or patients who happen to be in custody of a
3  law enforcement agency?
4  A  Can you repeat that?
5  Q  Sure. I tell you what. Let me just try and ask a
6  better question. Was there a policy in place at the time by
7  the Valley Baptist Medical Center with regard to the security
8  of patients who happened to be in the custody of law
9  enforcement agencies?
10 A  There was not one specific to security of what we
11 call forensic patients, which are the patients in the custody
12 of law enforcement. There is a policy that deals with the
13 interaction between the forensic staff and the hospital. I
14 don't -- it spoke to several issues, not specifically just to
15 security of a patient.
16 Q  Well, let me -- let me show you -- I don't know if
17 you have copies of these or not. In the last deposition that
18 we took in this case we marked as Exhibits 11, 12, and 13,
19 some documentation that was provided by -- by the hospital's
20 counsel. And what I want to ask you is can you take a moment
21 to look at those and then we will -- we will proceed from
22 there.
23    (Brief pause)
24 Q  Have you had a chance to review them?
25 A  Yes, I am familiar.

**Page 24**

1  Q  Let me ask you. I was provided that by counsel for
2  the hospital. And the question -- the first question I have
3  is A, are you familiar with these documents?
4  A  Yes, I am.
5  Q  Now, the second question I have, are these three
6  documents the entirety of any written procedures that deal
7  with the -- with forensic personnel as -- as they relate to
8  the Valley Baptist Medical Center?
9  A  Yes.
10 Q  So there are -- then I understand, there are no
11 other written policies or procedures that apply, which dictate
12 or offer any kind of guidance, as to how forensic personnel
13 are required to conduct themselves or what they are allowed to
14 do and not do at the hospital?
15 A  None that I am aware. None that I am aware of.
16 Q  Okay. All right. Well, let's -- let's -- let's
17 come back and talk for a minute about -- about this particular
18 issue. First, to your knowledge, was there any written
19 agreement or understanding between Valley Baptist Medical
20 Center and any law enforcement agency? And I mean a specific
21 agreement between the hospital and any law enforcement agency
22 regarding care of in-custody patients?
23 A  Not to my knowledge.
24 Q  Was it the practice of the -- of the hospital at the
25 time to take patients who happen to be in custody of law

**Page 25**

1  enforcement personnel the same as they would any other patien
2  or were are there certain criteria that had to be met before a
3  patient of that category could be admitted?
4  A  We will -- we will provide service to any patient.
5  Q  All right. With -- now, with regard to a patient
6  who comes in in the custody of a law enforcement agency, wha
7  is the policy or procedure? And you can refer to those
8  documents if they assist you. And if there is something that
9  is not within there, if you would just let me know that it is
10 a practice rather than a written procedure. What is the
11 policy or procedure that is -- the procedure that is supposed
12 to occur when a patient comes to the hospital who is in the
13 custody of law enforcement, a law enforcement agency?
14 A  I -- I would speak to, I guess, the procedure that
15 the security department would follow.
16 Q  Sure.
17 A  And we would make contact with the custodial officer
18 and try -- and provide them with information about their
19 presence in the hospital. It is an educational effort to give
20 them information that they may need while in our medical
21 center.
22 Q  All right.
23 A  Such as fire alarms, what to do if there is a fire
24 alarm, things like that.
25 Q  All right. Is there some type of written

7 (Pages 22 to 25)

BLAKE HUBBARD                                                                          April 29, 2003

Page 26

1  information or communication that is given to forensic
2  personnel who have to stay at the hospital for any appreciable
3  length of time?
4      A   We would give them this information --
5      Q   Okay.
6      A   -- or attempt to do so.
7      Q   And that would be Exhibit Number --
8      A   It looks like 13.
9      Q   Thirteen. Okay. Let me ask this. In -- in
10 addition to actually giving something like Exhibit 13 to the
11 forensic personnel who are going to have to stay in the
12 hospital, does the hospital or its security department make
13 any effort to obtain information about the in-custody patient,
14 the prisoner patient who is being admitted?
15     A   We obtain some basic information, name, the custody,
16 the agency in which -- which has them in custody, and what
17 their charge is or alleged charge or offense, alleged offense.
18     Q   All right. So you get the name of the patient, the
19 name of the law enforcement agency, and the offense for which
20 they are either being charged or being held?
21     A   Correct.
22     Q   Okay. Any other information that security
23 department seeks to obtain at that point in time?
24     A   No.
25     Q   Okay.

Page 27

1      A   Not as a standard practice.
2      Q   All right. And so that is not set out anywhere in
3  writing. That is basically the practice that is either
4  developed while you were there or was in place when you came
5  into that position?
6      A   Correct.
7      Q   All right. Now, what is done with that information?
8      A   It is recorded in a log to make the officers on
9  shift aware of the patient -- of the presence of the forensic
10 patient and forensic staff member.
11     Q   Okay. So when you say to -- put into a log to make
12 the officer aware, are you talking about the outside agency
13 law enforcement officer or the security officer, the hospital
14 security officer?
15     A   The security officer. And, actually, it is not a
16 log. It is a dry erase board where we just log current
17 forensic patients and their location.
18     Q   Okay. What is the reason for -- I can understand
19 the reason for taking the name. You need to know who is being
20 admitted to your facility. And I can understand the reason
21 for taking the name for the law enforcement agency so you know
22 what outside personnel are in the hospital. What is the
23 reason for taking the information about the charge which is
24 pending or under which they are being held?
25     A   Our preference is that the agency, the custodial

Page 28

1  agency stay, maintain a presence with the forensic patient.
2  Some custodial agencies do not like to do that. They don't --
3  they claim usually it is manpower issues, that they don't have
4  enough manpower. We ask the level of offense because we
5  will -- are more forceful in our request if it is a felony,
6  the higher level offenses.
7      Q   All right. Now, was there a -- do I understand,
8  then, from your answer, then, there is a difference as to the
9  level of security depending upon what the person is -- is
10 being held for?
11     A   There is a difference in -- in our preference as
12 to -- we don't maintain custody of a prisoner. We are not a
13 law enforcement agency, so we don't have any authority to
14 maintain custody of someone who is under arrest. And so if
15 the person is a high level offense or is, you know, under
16 arrest or in custody for high level offense, we would ask the
17 custodial agency to maintain that relationship, that custodial
18 relationship, the responsibility for that patient.
19     Q   If the agency is either unwilling or unable to do
20 that, does the hospital then keep them as a patient or does it
21 seek to have them get -- get care elsewhere?
22     A   No. We will provide care to anybody who needs it.
23     Q   Okay. If in the absence of an agency -- a law
24 enforcement agency that can have its own officer there, then
25 will the hospital then provide the security?

Page 29

1      A   We provide security as we would any other time. We
2  don't maintain any type of custodial relationship.
3      Q   Okay. Let me ask this. If -- if the -- if the
4  charge for which the patient is being held is a felony or what
5  you described as a serious matter, does the -- does that make
6  a difference as to the level of security that is provided by
7  the hospital's own security department? Does it involve any
8  change in procedure if you have someone there for, say,
9  robbery as opposed to DWI or you, know, PI, or something like
10 that?
11     A   Potentially. We would maybe round more frequently
12 on the floor, depending on the case, the set of circumstances
13 surrounding them, that patient.
14     Q   Let me ask you. Would -- would we should the security
15 department, would you -- would you or someone in your stead in
16 the security department have had the discretion to assign an
17 officer to a particular area of the hospital based upon an
18 in-custody patient being in the hospital? Is that something
19 that the hospital gave you the authority and the power to do?
20     A   Certainly.
21     Q   And so it would be within either maybe your
22 discretion or the discretion of one of the other people who
23 we -- who we mentioned earlier in our kind of hierarchy, it
24 would be within their discretion to assign an officer to a
25 specific area of the hospital if -- if they believed the need

8 (Pages 26 to 29)

BLAKE HUBBARD                                                                April 29, 2003

**Page 30**

1  was -- was there?
2     A   Yes.
3     Q   All right.
4     A   The limitation there would be on overtime.  All
5  overtime decisions had to go through me.
6     Q   Okay.  And I think I understand what that means.
7  But, why don't you --
8     A   Time and a half.  I mean, that's a budgetary issue.
9  One of my responsibilities is to manage a departmental
10  budget.  And so one of the ways I did that was to keep control
11  of overtime.
12     Q   Okay.  So if an officer had enough hours -- is that
13  by the day or by the week?
14     A   It is beyond 40 hours in one week, one pay period.
15     Q   So if an officer has -- approaches 40 hours, then
16  the preference would be to get another officer who hadn't met
17  that yet to come in and take on these duties?
18     A   That's correct.
19     Q   Okay.  So let me go back for a second, because I
20  kind of lost my place here.  The -- when deciding to assign --
21  if you or someone in your stead had determined that they
22  needed to assign a particular officer to a -- an area of the
23  hospital for some type of heightened security concern, they
24  have the authority to do that.  The only constraint would be
25  when a particular officer hits 40 hours or over, does that

**Page 31**

1  authority end or what happens?
2     A   The supervisors -- we empower the supervisors to
3  make the decisions that they need to make to provide security
4  to the hospital.  If they need to consult as to, you know,
5  change -- altering the staffing assignments or incurring
6  overtime or additional costs, then they would consult with
7  myself, with me, typically.
8     Q   But let me ask this.  Is it the situation where if
9  you had that type of a heightened security concern or
10  situation and an officer is assigned to that area of the
11  hospital where they otherwise wouldn't be specifically
12  assigned, if that officer comes up to 40 hours, at 40 hours is
13  he going -- he or she going to be told to go home or to clock
14  off and so that their presence there will end or are they
15  going to be allowed to stay there until you can get somebody
16  who isn't going go to be in the overtime there to take the
17  place?
18     A   If we made a decision that the situation was such
19  that it needed a full-time officer there, we would not end the
20  duty just because they were going to go beyond 40 hours.  We
21  would probably seek to limit that by bringing another officer
22  in who is not yet to their 40 hour limit.
23     Q   Okay.  All right.  So I think I understand.  While
24  -- while budget is a concern, and you-all would try and
25  schedule accordingly, your department had the authority to

**Page 32**

1  assign an officer to a specific area of the hospital for
2  heightened security concerns?
3     A   Correct.
4     Q   Had -- to your knowledge or during the time that you
5  had been there in the position of director of security, did --
6  did the Valley Baptist Medical Center take in or treat
7  patients who were accused of or being held for felony
8  offenses?
9     A   Yes.
10     Q   And would this have included felony offenses
11  involving violence?
12     A   Yes.
13     Q   During the time that you have been there, was it --
14  did the hospital on any occasion assign an officer to a
15  particular area of the hospital where a person of that
16  category would have been housed or treated?
17     A   No.
18     Q   All right.  That did not happen at all from the time
19  you took the position of director of security until the time
20  you left?  I am not questioning -- I am not --
21     A   No, I am trying to answer your question for you.
22  What I want to say is I guess we would typically make
23  additional rounds.  If -- if we knew that we had a high level
24  felony prisoner or a potentially violent offense, someone who
25  is in custody for a violent offense, we would usually just

**Page 33**

1  make rounds.  I would not -- I don't recall an incident where
2  I assigned an officer to that -- a unit like that full-time.
3  We would just give specific instructions to the officers on
4  duty to try to round more frequently through that unit.
5     Q   Okay.  So sitting here today -- I am sorry.  Go
6  ahead?
7     A   I was going to say.  Typically, those people --
8  people who are charged with those types of offense are in jail
9  for that will come with their own guard.  So we -- the
10  relationship there, the custodial relationship is intact.  And
11  so -- that's -- violent offenses, it is pretty much a rule,
12  they will not -- none of the agencies in our area will leave a
13  violent prisoner unattended in our hospital.
14     Q   Okay.  I guess the question I have is if you have
15  a -- a violent or potentially violent patient who is being
16  held by a -- by a law enforcement agency, if I understand you
17  answer, during the time that you served in that capacity, the
18  hospital, to your knowledge, never assigned its security
19  personnel specifically to guard or watch a prisoner/patient
20  specifically?
21     A   Not to specifically guard a patient, no.
22     Q   You may do things maybe perhaps, as you mentioned,
23  increased the rounds in that area of the hospital, checking
24  with the law enforcement officer who happens to be there.
25     A   Right.

9 (Pages 30 to 33)

BLAKE HUBBARD                                                                    April 29, 2003

Page 34

1    Q   Or perhaps relieve them?
2    A   I was going to say that the only time we might have
3  done that would be to relieve an officer, we would do. If an
4  officer needed to go get a cup of coffee or go to the rest
5  room, we would give him, you know, 10 or 15 minutes to run
6  down the hall to do that.
7    Q   Okay. And -- all right. And I think I understand.
8  While the hospital had the authority to do that, in actual
9  practice that really didn't occur, at least during the time
10  that you were there, because of a lot -- you -- if I
11  understand what you are telling me, you are saying the
12  hospital relied upon the law enforcement agency that had them
13  in custody?
14    A   That's correct.
15    Q   All right. The -- there is, I think, in one of the
16  documents, perhaps it is 13, some indication that the -- the
17  weapons and ammunition that were allowed to be used by law
18  enforcement agencies in the hospital, outside agencies, were
19  subject to approval by the hospital. Is that correct?
20    A   There is a mention of that in that document.
21    Q   Okay. And without having it in front of me, I think
22  it mentioned, for example, the load that is permitted to be
23  used with firearms in the hospital being of specific type
24  caliber and grain and that type of thing. And there is also
25  some indications as to the type of weapon that is allowed to

Page 35

1  be used. Is that correct?
2    A   That is correct.
3    Q   And it is correct that the hospital has, basically,
4  the -- the power to approve or not approve what weapons and/or
5  ammunition is brought into the hospital for purposes of -- of
6  guarding patients who happen to be in the custody of law
7  enforcement?
8    A   That is -- that is incorrect. The hospital really
9  doesn't have that authority.
10    Q   All right. What -- if you will pass me 13.
11    A   (So done)
12    Q   Okay. In Exhibit 13, in item F -- and the reason I
13  mention that -- the reason I asked you the earlier questions
14  is when I read that paragraph, I understand it to mean that
15  the -- that the law enforcement agencies and their personnel
16  will, uses the word shall comply with the requirements that
17  are set out in that paragraph. And in the paragraph, when I
18  read it, it tells me that you can use this type of load. And
19  it doesn't specify what type of weapon you can use. I think
20  it more accurately specifies what type of weapons you cannot
21  use. Is that correct?
22    A   That's what is written.
23    Q   Okay. I gather from your testimony then the actual
24  practice is something different?
25    A   The way it is written, though, constructed with good

Page 36

1  intent, it is -- is unenforceable. It is -- it is not a
2  policy that the hospital sought to enforce or mandate upon law
3  enforcement agencies.
4    Q   Okay. Is there some portion -- and I think I
5  understand that. Is that true as to the entire paragraph F in
6  that portion of the policy or is it as to some
7  specific subpart of the policy? For example, would they
8  enforce it as to load but not as to weapon or --
9    A   It would -- essentially the entire paragraph is not
10  enforceable.
11    Q   Okay. When you say not enforceable, let me ask --
12  go back. Am I correct in my understanding, from your earlier
13  testimony, that the policy -- the hospital did not actively
14  enforce this policy, subpart F of Exhibit 14 -- 13?
15    A   Subpart F -- paragraph F we did not actively enforce
16  or attempt to.
17    Q   Okay. And then I take it, from your testimony, that
18  even if the hospital had chosen to enforce it, your position
19  or the hospital's position is that it is unenforceable?
20    A   That is correct.
21    Q   What is the basis for that statement?
22    A   In working with law enforcement agencies, we found
23  that many of them have their own particular policies that
24  dictate the type of weapons they will carry and when they will
25  carry and maybe when not. Some -- some -- I think it is

Page 37

1  different among agencies. But the agencies will dictate to
2  their officers what type of weapons. And the officers are not
3  going to violate their departmental policy to comply with
4  ours. We are not a governmental agency and really have no
5  authority over these officers who are given authority by the
6  state of Texas to carry weapons. And so in their capacity as
7  a police officer, they are allowed to carry their weapons
8  as -- when they are discharging their duties and actually
9  otherwise. And so we did not seek to ask the police
10  officers -- or we had actually adapted not to do that because
11  it -- in the few times when it was attempted, it led to
12  conflict.
13        And we -- our goal is to take care of the patients.
14  The officers have to be there to maintain that custody
15  relationship. And so we wanted to make sure that we did not
16  have a conflict in providing patient care. And so we did not
17  seek to enforce that paragraph. It just was not practical or
18  realistic.
19    Q   Let me -- let me go back to a couple of questions I
20  probably should have asked before we got into that. But what
21  is the reason or the rationale behind paragraph F?
22    A   I don't know if I am the best person to speak to
23  that. I didn't author that policy.
24    Q   I understand. I don't -- whether you agree or don't
25  agree with it or think it is the best policy I understand may

10 (Pages 34 to 37)

BLAKE HUBBARD                                                                           April 29, 2003

Page 38

1 be a different question. But can you -- can you tell me or do
2 you know what the rationale behind that policy is?
3    A  My understanding is that -- the idea was that in an
4 environment such as a hospital where the majority of
5 everything is inside and it is highly populated that a lower
6 speed, lower caliber ammunition would be preferable, because
7 if you did have an event where a firearm was discharged, it
8 would be less likely to penetrate a wall.
9    Q  And perhaps cause danger to somebody in another room
10 or close by?
11    A  That's correct.
12    Q  And it is my understanding the hospital did not
13 actively enforce that policy at the time that this incident
14 occurred.
15    A  That is correct.
16    Q  And still to this day?
17    A  Still to this day.  That -- in that form that that
18 policy does not exist anymore.
19    Q  Okay.  As the -- as the -- is that portion of the --
20 of the -- I don't know if that came out of a procedure manual
21 or what.  Has that part of it been amended or something,
22 deleted, if you know?
23    A  I know that the entire policy has been revised.
24    Q  Okay.
25    A  It was revised as a part of an effort of a

Page 39

1 performance improvement committee that addressed forensic
2 patient issues.
3    Q  Okay.  When -- when would that revision have
4 occurred?
5    A  Subsequent to this event.
6    Q  Okay.  Was this event what precipitated that change?
7    A  The event precipitated the -- the formation of the
8 committee to investigate the event and possible improvement
9 opportunities.
10    Q  Does the -- I am sorry.  I keep wanting to say the
11 word committee.  Maybe that is --
12    A  Committee is correct.
13    Q  Committee.  What was the name of the committee?
14    A  It was a CQI committee, forensic patient CQI.
15    Q  And is the committee still in existence today?
16    A  No.
17    Q  Okay.  Before it was disbanded, do you know who the
18 members of the committee were?
19        MR. POPE:  Don't answer that question.
20        MR. BARRIENTOS:  You are instructing him to?
21        MR. POPE:  Yes.
22        MR. BARRIENTOS:  May I ask the nature of the
23 privilege asserted, which I assume is being asserted?
24        MR. POPE:  We -- we are asserting the privilege
25 that is available pursuant to the health and safety code

Page 40

1 relevant to medical quality improvement committee issues.  CQI
2 is a portion of the quality improvement.  So I am not going to
3 let him answer any questions concerning the deliberations --
4        MR. BARRIENTOS:  Identify?
5        MR. POPE:  -- or identity or things of that
6 nature of the committee.
7        MR. BARRIENTOS:  Okay.  I need to ask a series
8 of questions in case we need to take it to the judge.
9        So he is going to make some objections or may
10 make some objections at some point.  And if he tells you not
11 to answer, you need to do what he says.  Then I guess we will
12 just take them one at a time.
13    Q  (BY MR. BARRIENTOS)  All right.  The -- the revisions
14 which were, I guess -- there were -- do I understand you
15 correctly, there were revisions to the forensic patient
16 policies which resulted from the formation of this committee?
17        MR. POPE:  Don't answer that question.
18    Q  (BY MR. BARRIENTOS)  Did the revisions -- I
19 understanding my previous question had to do specifically with
20 paragraph F and firearms, and loads, ammunition, things like
21 that, were the changes that occurred with regard to forensic
22 patients limited to use of firearms and ammunition or were
23 they more extensive than specific changes to that specific
24 issue?
25        MR. POPE:  Don't answer the question.

Page 41

1    Q  (BY MR. BARRIENTOS)  The changes which occurred, can
2 you tell me what elements of patient care were affected or
3 sought to be affected by whatever the changes were that were
4 made?
5        MR. POPE:  Don't answer that question.
6    Q  (BY MR. BARRIENTOS)  Did any of the changes that
7 were made have to do with or were they related to the issue of
8 restraints of forensic patients?
9        MR. POPE:  Don't answer the question.
10        MR. BARRIENTOS:  And I -- and I assume this is
11 the same privilege asserted throughout?
12        MR. POPE:  Yes.  Well, some of them are just --
13 obviously, I don't want work product of the committee
14 impliedly or otherwise to be -- to be disclosed.  I mean,
15 absent us taking it before the court.
16        MR. BARRIENTOS:  Okay.
17        MR. POPE:  The other objection I have is just a
18 form objection as to subsequent remedial measures.  But I
19 don't really --
20        MR. BARRIENTOS:  I understand.
21        MR. POPE:  But my -- my -- my main objection is
22 to privilege.
23        MR. BARRIENTOS:  Okay.
24    Q  (BY MR. BARRIENTOS)  Let me -- let me go back to
25 Exhibit 13.  I don't want to ask anymore questions about the

11 (Pages 38 to 41)

BLAKE HUBBARD                                                              April 29, 2003

---

**Page 42**

1  committee for right now.
2      A   Okay.
3      Q   I just want to go back to 13.
4      A   Okay.
5      Q   Are there any other portions of Exhibit 13 that were
6  not actually enforced by the hospital at the time this
7  incident took place in September of 2000?  And that is a
8  little unfair.  I am sorry.  Because there are several pages
9  there.  If you want to take a moment to review it.  And I
10  probably just highlighted anywhere that I care about, if that
11  helps you.
12      A   Sure.  I tell you what, the cover sheet of the
13  policy has a place for our signature.  We did not enforce --
14  we did not force officers to sign it if they objected to
15  signing.
16      Q   Let me ask you for, example -- I am sorry.  I didn't
17  mean to interrupt --
18      A   Section E on portable mobile radios.  Our -- our
19  general -- we have a general prohibition against the use of
20  two-way radios.  We did not always enforce that in terms of
21  law enforcement or toward EMS, fire personnel that in the
22  course of their duty are required to carry a radio.
23      Q   All right.
24      A   I think that's it.
25      Q   Okay.  May I take a look at that for just a moment?

---

**Page 43**

1  Mr. Hubbard, I want to talk to you for a minute about item
2  Roman Numeral IC, which is in the second page entitled
3  Administrative Restraint as Required by the Medical Center or
4  Law Enforcement Agency.  And -- and let me ask you this, to
5  begin with.  Whose responsibility was it to determine whether
6  restraints should be used upon a patient?
7      A   That is a big question.  It really is going to
8  depend on the reasons for the need for the restraint, why the
9  restraint would be needed.  If it is a restraint for medical
10  purposes, then those decisions are made by medical personnel.
11      Q   All right.
12      A   If it is a restraint because somebody is under
13  arrest or otherwise in custody, then that would be decided
14  upon by the custodial agency, the agency or officer with the
15  authority to -- to effect the arrest or maintain that
16  custodial relationship.
17      Q   Okay.  Let me try and -- let me -- let me ask you.
18  Can you tell me or give me examples of which -- under which it
19  would be determined that a restraint was needed for medical
20  purposes as opposed to forensic purposes?
21          MR. POPE:  Objection.  Form.
22      Q   (BY MR. BARRIENTOS)  Under your security policy --
23  let me -- let me make -- let me preface this question.  I am
24  not asking you -- I know you are not a doctor and so I am not
25  asking you to -- to -- to testify in terms of -- or give

---

**Page 44**

1  medical opinion.  But I assume that as director of security,
2  your security officers might have to know if -- if a patient
3  needed to be restrained for medical reasons, there are --
4  there are situations where you might not have a law
5  enforcement officer present because they may not be under
6  arrest.  Is that correct?
7      A   That's correct.
8      Q   So am I correct in assuming that the security
9  personnel would have to at least be familiar with the
10  circumstances under which a patient would be restrained or
11  come to be restrained in the hospital for medical reasons?
12      A   The security personnel, if they were to assist in
13  the application of restraints --
14      Q   Yes.
15      A   -- would follow the orders of the usually the
16  attending physician or it would be like a charge nurse,
17  someone who is in charge of the care of that patient.  I would
18  -- I'm sure that some -- we could say that we are familiar
19  with some circumstances based just on the experience of having
20  been asked by a physician to apply restraints or assist with
21  the application of restraints.
22      Q   Okay.  Based on that experience, can you tell me or
23  give me some examples of situations in which a patient might
24  be restrained other than for forensic reasons or
25  administrative reasons, I guess is the term that is used in

---

**Page 45**

1  the document?
2      A   A typical example would be a patient that is maybe
3  trying to harm themselves, so they are restrained for medical
4  reasons to prevent that or to allow the administration of --
5  like an IV of a patient that continuously removes the IV.
6  They might be restrained to prevent that.  Maybe a wandering
7  patient who is not aware of their circumstances, doesn't have
8  all of their -- their faculties, I guess, is not able to -- is
9  able to wander, placing themselves in danger.  A physician
10  might order a restraint for those purposes.
11      Q   So -- and, again, there is probably countless
12  reasons which a physician or some other healthcare
13  professional might determine that restraints are necessarily
14  or warranted.  And security's job is not to make that decision
15  as to what those circumstances are.  But if I understand what
16  are telling me, it sounds like if a patient is perhaps a
17  danger to themselves or someone else?
18      A   You asked me for a circumstance when that happened.
19  I have seen personally a physician order restraints in a
20  circumstance to protect the safety of the patient because the
21  patient was a danger to himself.
22      Q   Okay.
23      A   Those decisions are, you know, solely made by the
24  medical staff, medical care individuals.
25      Q   Let me ask this.  I believe that same document

---

12 (Pages 42 to 45)

BLAKE HUBBARD                                                                   April 29, 2003

**Page 46**

1  specifies that any restraints that -- that -- that are to be
2  used are subject to the approval of the hospital. Is that a
3  portion of the policy that was actively enforced at the time?
4      A   No, not actively enforced. What we would ask is
5  that if it was a set of handcuffs or leg shackles, if there
6  was not a -- we typically would not allow a patient to remain
7  unattended in shackles. We would add -- if they -- if it was
8  the -- the agency's intent to leave the patient there
9  unattended, we would ask them to remove the shackles. So if
10 the forensic officer stayed with the patient, it would be the
11 responsibility of that officer to maintain any restraint, use
12 of handcuffs or shackles as they deemed appropriate and
13 necessary.
14     Q   Let me go back and -- I probably should have asked
15 for you to be a little more specific. If the -- in a
16 non-forensic situation where a patient is perhaps -- it is
17 possible they may harm themselves and it is determined that
18 restraints are needed by a doctor or nurse or some other
19 qualified individual, the question I have is it -- is it
20 correct that the hospital maintains the discretion as to the
21 type of restraint and the level of restraint?
22     A   Those -- those are decided by the physician who
23 would order the restraints. He would order not only that the
24 restraints would be applied but dictate the type.
25     Q   All right.

**Page 47**

1      A   And we have certain types of restraints that are
2  available in the medical center.
3      Q   Okay. And -- now -- and if I understand the policy,
4  what it says is that can be a doctor? Correct?
5      A   That's my understanding.
6      Q   And it doesn't specify as to whether it is a staff
7  physician or a physician with privileges at the hospital?
8  It just says generally doctor. Is that correct?
9      A   I would have to reread the policy to -- to tell you
10 what it specifically says.
11     Q   All right.
12     A   We she would not -- I don't believe we would act
13 upon orders of a doctor that didn't have privileges at the
14 medical center.
15     Q   Oh, obviously. They would have to have some
16 authority to act there. It could also -- I am sorry.
17     A   It would have to be a member of our medical staff.
18     Q   Or a nurse, perhaps?
19     A   Well, I haven't read -- it has been a while since I
20 have read the policy. I believe that the policy does allow a
21 nurse to order -- a primary nurse to order restraints subject
22 to the approval of the physician. The restraints can be
23 applied, but they -- there is a --
24     Q   Time period?
25     A   -- time period in which it must -- the approval of

**Page 48**

1  the attending physician must be obtained.
2      Q   Okay. And -- now, let me -- let me ask this. As
3  a -- as a practical matter, when restraints were used in a
4  non-forensic setting, and again, pursuant to this policy, the
5  hospital determines what restraints are appropriate, which
6  ones can be used and cannot be used. For example, in that
7  policy, it specifically says -- mentions handcuffs and/or
8  ankle -- leg shackles maybe. Not ankle shackles.
9      A   I believe the policy that mentions that refers
10 specifically to forensic staff not to non-forensic patients.
11 So this policy that mentions shackles and handcuffs would no
12 apply to a non-forensic patient. They would fall under a
13 nursing policy that deals with restraints.
14     Q   Okay. Let me ask this -- in -- in -- without
15 specifying handcuffs. Is it correct that -- that the hospital
16 staff, either doctor or nurse, could order the restraint,
17 restraints for a patient in a non-forensic situation? Is that
18 correct?
19     A   It is correct.
20     Q   Okay. And those restraints could -- could be of
21 different types. For example, could be a chemical restraint
22 in the form of a sedative.
23     A   Correct.
24     Q   Could be a physical restraint in the form of --
25 maybe handcuff is not the right word to use. But -- and I am

**Page 49**

1  not sure if I know the terminology, but a patient could be
2  restrained, that is, their extremities, in some manner that
3  does not place them in any further danger of injury.
4      A   Correct.
5      Q   And that type of restraint would include partial
6  restraint. That is, it could be of one or -- or more portions
7  of their body.
8      A   Correct.
9      Q   Or it could be full restraints. It could be more
10 than one extremity or their entire body.
11     A   Correct.
12     Q   And those are things that were -- let me, you know,
13 that from time to time had to be employed in certain
14 circumstances.
15     A   That's correct.
16     Q   And the decision about what level of restraint to be
17 used in those situations was one made by either the hospital
18 or hospital staff?
19     A   If it was a medical decision, yes.
20     Q   Correct. Medical. Now, in determining what level
21 of restraint should be used with a particular patient, while I
22 understand you did not make those type of determinations, are
23 you familiar with what information or what data was considered
24 or analyzed in coming to that decision?
25         MR. GARZA: Objection.

13 (Pages 46 to 49)

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES                 FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                   (800) 969-3027

7ba3a3f1-ffd9-4a8b-a584-489da2454b6c

BLAKE HUBBARD                                                                  April 29, 2003

Page 50

1        MR. POPE: Objection. Form.
2        Q   (BY MR. BARRIENTOS) I am sorry. I couldn't hear
3   you.
4        A   No. I am not familiar with the decisions that the
5   medical staff would make in determining that necessity.
6        Q   Do know whether there is a set of written criteria
7   that would assist the medical staff in making that
8   determination, that is the level of restraint that should be
9   used?
10       A   Beyond this policy, no. I am not aware of anything
11  that would allow -- I don't believe. No, I don't think there
12  is anything beyond that. We have -- we have this nursing
13  policy. That is all I am familiar with.
14       Q   Okay. Is there a particular portion there that you
15  are referring to, a particular paragraph?
16       A   No, not -- no. I just know that we have a policy
17  that is a -- deals with the -- it is a nursing policy that
18  kind of governs the use of restraint from a medical clinical
19  standpoint.
20       Q   All right. Let me -- I am looking at what was
21  marked as Exhibit 11 in the previous deposition. All right.
22  Mr. Hubbard, Exhibit Number 11, it is titled Restraints. And
23  let me ask. Are you the person with the most knowledge of --
24  of that document and what is set forth in it or is there
25  someone or a position at the hospital where a person would be

Page 51

1   better informed as to the details of -- of the restraint
2   policy? And the reason I am asking, because you are -- I
3   understand in terms of security the areas that -- that you
4   have knowledge of. But it sounds like what you are telling me
5   is in terms of who decides what restraints are appropriate,
6   that that is not within perhaps your --
7        A   That's correct. A clinical restraint is not
8   something that the security department decides.
9        Q   Okay. Are you able to tell me, sitting here today,
10  then, whether, for example, in -- in this case, Mr. Gonzalez
11  was -- I think we agreed he was restrained at the time this
12  happened. If you will assume that. I don't know if you knew
13  that or not. But he was --
14       A   He was handcuffed to the bed with one wrist.
15       Q   Okay. Do you know or are you able to tell me one
16  way or the other whether his restraint was pursuant to a
17  medical restraint or order of restraint or forensic or both?
18       A   The handcuff was applied by -- to my knowledge, was
19  applied by the police officer in charge of his custody. I am
20  not aware of any other restraints that were ordered for that.
21       Q   It is possible, is it not, that a patient could be
22  restrained pursuant to both forensic and medical requirement?
23       A   That's correct.
24       Q   And that happened?
25       A   Possibly.

Page 52

1        Q   Is it correct that that has happened at other times
2   previous to this incident at Valley Baptist Medical Center?
3        A   That's correct.
4        Q   In those situations where there was joint, I guess,
5   agreement in terms of need for restraint by both a forensic
6   agency and the hospital, can you tell me, if you know, who or
7   which of those entities, that is the forensic -- the outside
8   forensic entity or the hospital, had the final say on the type
9   of restraint and the level of restraint to be used?
10       A   I don't know how to answer that question simply. I
11  think the -- it would be more of a kind of a partnership. It
12  is a situational-type decision. You would base on the
13  circumstances of what is going on at that time. But we -- we
14  would typically maintain that the -- whatever is best in the
15  best interest of the patient would supersede other needs, such
16  as a forensic restraint.
17           An example is a -- I know of a patient that came in
18  with an injured arm. The forensic agency wanted to keep
19  handcuffs on this individual. The physician felt that the
20  handcuffs would further injure the arm, so the handcuffs were
21  removed. So we are -- our interests are -- would be the best
22  interests of the patient.
23       Q   All right. In the situation where there are both
24  forensic and medical interests in having a patient restrained,
25  and if I understand your testimony, the testimony of the

Page 53

1   hospital, it is -- it is the hospital that has -- that makes
2   the final determination as to what the level of restraint,
3   type and level of restraint is going to be.
4        MR. POPE: Objection. Form.
5        THE WITNESS: I would say it is -- it is -- in
6   the circumstances I am aware of it is something that is
7   usually jointly agreed upon. We have never -- I have never
8   encountered a law enforcement agency that would be so
9   insistent that their restraints be applied that they would
10  interfere with the care of the patient. So there -- they -- I
11  mean, they typically -- the reason they brought the patient to
12  the hospital is because he is in need of some type of care
13  and they are there to provide that as we are.
14       Q   (BY MR. BARRIENTOS) I understand as a practical
15  matter that there is -- is bound to be, I mean, I would hope
16  that there is going to be some level of exchange of
17  information and cooperation to try and meet the needs of both
18  the law enforcement agency and the hospital for the patient's
19  needs.
20       A   Correct.
21       Q   I understand as a practical matter that you are
22  telling me that's what normally happens. But what I am trying
23  to find out is it sounds like what you -- what you described
24  to me is that it is the hospital that has the ultimate either
25  responsibility or authority to finally decide what -- whether

14 (Pages 50 to 53)

BLAKE HUBBARD                                                                April 29, 2003

Page 54

1   restraints should be used and what level should be used.
2            MR. POPE: Objection. Form.
3            THE WITNESS: I guess I would say -- I know
4   what you want me to say, is that yes, we are the final
5   authority. And I don't know if we have the authority to do
6   that. We would do whatever is in our power to make sure that
7   we have met our obligations to provide the best patient care
8   that we can.
9   Q    And -- and --
10  A    And if that means asking an agency to remove their
11  restraints, then we would do that. And we commonly do.
12  Q    Or -- or if it meant --
13  A    Restraining further.
14  Q    Restraining further.
15  A    Then we would. Yes.
16  Q    Or using a different type of restraint.
17  A    Absolutely.
18  Q    Then -- and, again, I don't know mean that in any
19  kind of sinister way. I am just trying to find out what the
20  actual -- what the actual practice was.
21  A    Most of those decisions would fall to medical
22  staff. And so that's why I can't speak to it very well,
23  because the decisions are made for medical reasons.
24  Q    I understand.
25  A    And not necessary always for security reasons. So

Page 55

1   if the physician deemed something is more appropriate or less
2   appropriate, then we would follow the instructions of our
3   medical staff in providing patient care.
4   Q    All right. And so in a situation where there is
5   both forensic interests in having a restraint and perhaps a
6   medical interest in having a restraint, is there some
7   mechanism that -- that was in place at the time that insured
8   that -- that those two interests or those two bodies of
9   interest got together and exchanged whatever information they
10  needed to exchange?
11  A    The mechanism there would be the communication
12  between the forensic officer and the medical staff.
13  Q    Okay. Is there any way in which that was formally
14  documented? Is there some kind of form where some kind of
15  report is made or some kind of log sheet where that kind of
16  thing is -- is exchanged?
17  A    Other than what may be documented in the medical
18  record, no. I mean --
19  Q    Well, the medical record, though, is not available
20  to the -- to the law enforcement personnel. Is that correct?
21  A    No. But a physician or a nurse who discusses issues
22  may document that discussion. Or if there is an -- a certain
23  action taken, they may document it.
24  Q    Okay.
25  A    I am not saying they will every time.

Page 56

1   Q    Okay.
2   A    But I know I have seen occurrences where a nurse
3   will document a conversation with a law enforcement, maybe
4   some information a law enforcement agency passed on to the
5   nursing staff. And they will document so it will then be
6   passed on to the attending physician.
7   Q    Okay. And I guess what I was trying to understand.
8   I think I understand that. So -- but, in this exchange of
9   information that is supposed to take place, the law
10  enforcement personnel or agency is not entitled to the
11  information in the medical record from the -- from the
12  individual patient. Is that correct?
13  A    No. We do not disclose medical information to
14  the --
15  Q    That's private and confidential.
16  A    That's correct.
17  Q    If it is disclosed, that would be a violation of the
18  law?
19  A    That's correct. We maintain patient
20  confidentiality.
21  Q    Now, entries that are made into the medical record
22  or the nurse's notes or the physician's progress notes, or
23  whatever else winds up in the medical record, is available to
24  the hospital and the medical staff because it is part of their
25  work.

Page 57

1   A    Certainly.
2   Q    It is their job to know what is in there?
3   A    Yes. Generally speaking, yes.
4   Q    And so while I am sure that the hospital and
5   security department did, you know, all they could to -- to
6   exchange that information, by virtue of that relationship, the
7   hospital is going to necessarily wind up in a position where
8   it is going to have more information in terms of the medical
9   condition of the -- of the patient than the law enforcement
10  agency is going to have.
11  A    Most -- most likely the medical staff, the physician
12  and the nurses, would have access to the medical record
13  related to the patient they were caring for.
14  Q    Okay. If there is a -- based on that information,
15  if -- if medical staff determines that some level of restraint
16  is called for, is that information shared with the security
17  department? Is it -- is it necessarily shared with them?
18  A    Sometimes. No. I wouldn't say it is necessarily.
19  In some circumstances, based on the judgement of the physician
20  he will -- he or she would share information that they deemed
21  appropriate with the security department. If -- generally
22  speaking, I -- based on circumstances that I know have
23  happened, is a physician would contact the security department
24  if he believed that there was some sort of imminent danger
25  where there was an immediate response needed from the security

15 (Pages 54 to 57)

Page 58

1   department. But not all patients that are restrained by order
2   of a physician are reported to security department. Not all
3   application of restraints involve the security department. In
4   fact, probably the majority do not.
5       Q   Okay. Is there some kind of threshold that usually
6   gets it to that level where it is reported to the security
7   department?
8       A   That would be, you know, probably an independent
9   judgment made by the physician or the care staff immediately
10  involved.
11      Q   Okay. Well, let me -- let me ask this. In -- in --
12  let's say that you have a situation such as this one with Mr.
13  Gonzalez where he is brought in and he is held for a -- for
14  what is alleged to be a serious offense, crime of violence.
15      A   Uh-huh.
16      Q   There is information upon his admission that he has
17  a wound that is self-inflicted. There is information upon or
18  shortly after admission that he may have suicidal ideation,
19  information upon admission that he is uncooperative or
20  belligerent, information upon admission that he perhaps
21  suffers from some psychoses, and that they are suspect in a --
22  in a violent offense, would -- based on your experience, would
23  that be the kind -- type of information that ought to be
24  shared with the security department?
25          MR. POPE: Objection. I am going to instruct

Page 59

1   the witness not to answer that.
2           MR. BARRIENTOS: May I ask the nature of the
3   specific instruction?
4           MR. POPE: The nature of the instruction is
5   that that calls for a medical conclusion. And I am just not
6   going to -- I don't think it would be fair to allow him to
7   speculate on that sort of an issue as the question is
8   propounded.
9       Q   (BY MR. BARRIENTOS) Well, let me -- let me change it
10  from a speculative question to a factual one. Do you know in
11  this case whether your security personnel was advised as to
12  the specific details that the hospital obtained when Mr.
13  Gonzalez was admitted to the hospital late in the evening of
14  September the 17th?
15      A   We were made aware of his presence. We were made
16  aware of the allegations against him, the charges, I guess,
17  why he was in custody of the La Feria Police Department. We
18  were made aware that he had a wound that needed some -- that
19  was, I guess, allegedly self-inflicted that needed some
20  medical care. And I was aware -- we were made aware that he
21  has -- had been seen by one of our psychiatrists.
22      Q   Okay.
23      A   But we were not made aware of his specific diagnosis
24  or his specific conditions.
25      Q   Okay. And this was on his admission or was this --

Page 60

1   was this throughout the -- the course of his stay there?
2       A   Upon his admission to the -- through the ER to the
3   unit.
4       Q   Okay.
5       A   That he was admitted to.
6       Q   Let me show you what I have marked. This is a copy
7   of Exhibit 15, which is a medical record from Valley Baptist
8   Medical Center. Have you ever reviewed the medical record in
9   this case?
10      A   No, I have not.
11      Q   Okay. Then the answer that you just gave me about
12  what information the security department had or was given when
13  Mr. Gonzalez was admitted, where did you obtain that
14  information?
15      A   We obtained it when he presented to the hospital in
16  the custody of La Feria Police Department.
17      Q   Okay. Were you there personally or -- or --
18      A   Not when he presented. I was -- I did personally
19  visit his room once he was admitted to the floor.
20      Q   Okay. All right. Well, then let me ask you.
21  What -- what would have been the source of the information you
22  just gave us? That is what he was being held for, his medical
23  condition, I guess you mentioned an injury or a wound.
24      A   The La Feria Police Department.
25      Q   Okay.

Page 61

1       A   The -- the wound I was made aware of -- it was
2   obvious when I visited him that he had had an injury. The
3   fact that he had been seen by several physicians was made --
4   was given to me by one of the attending nurses.
5       Q   Okay. And you were told, if I understand correctly,
6   that -- by one of the attending nurses that he had either seen
7   or was going to see or was going to undergo a psych
8   evaluation?
9       A   I was told he had seen a psychiatrist. In fact, Mr.
10  Gonzalez gave me the card of the psychiatrist that he had
11  seen.
12      Q   Do you recall who that was, which doctor?
13      A   Dr. Thomas Gonzalez.
14      Q   Do you remember when this would have been, the day
15  or the time?
16      A   It was in the mid-afternoon, late afternoon of --
17      Q   The 18th?
18      A   -- the 18th.
19      Q   Okay. All right, then. So, did you talk with Dr.
20  -- Dr. Gonzalez at all?
21      A   No, I did not.
22      Q   Were you -- were you provided with any information
23  from his progress notes or his interview with Mr. Gonzalez,
24  the patient?
25      A   No.

16 (Pages 58 to 61)

BLAKE HUBBARD                                                                                      April 29, 2003

Page 62

1    Q   Were you made aware -- to your knowledge, did the
2  hospital, the medical staff perform any type of evaluation,
3  their own evaluation, as to the propriety or need for
4  restraints?
5    A   Not -- not to my knowledge.
6    Q   Okay. In the other situations that you talked to me
7  about where you would have both law enforcement and the
8  hospital, one, agree that restraints needed to be used, is
9  there -- is that usually -- is that information usually
10  imparted to your department?
11    A   Yes -- yes and no. Sometimes it is. Sometimes it
12  is not.
13    Q   Given the information that you had about Mr.
14  Gonzalez, is that something that -- I didn't see in the
15  medical record where that had taken place. Is that something
16  you would have expected to have been done given the
17  information that -- that was available at that point about Mr.
18  Gonzalez' individual situation, that is what he was being held
19  for, his medical history, his psychological history, his
20  behavior?
21    A   I didn't really know anything about his medical
22  history or his behavior or psychological history. I don't
23  know that if I would know -- I am really qualified to know
24  what to expect a psychiatrist to do when he evaluates a
25  patient.

Page 63

1    Q   Okay. Well, that's fair. Suffice it to say, then,
2  whatever information was known or not known to the medical
3  staff, your department and the security department at Valley
4  Baptist Medical Center did not give any specific information
5  from the hospital regarding the hospital's determination as to
6  the need for the restraint.
7    A   No.
8    Q   Other than the individual medical personnel who
9  would have been on duty at that time, is there any
10  administrative person at the hospital that you are aware of
11  who would be able to discuss whether that was done or whether
12  it was necessary to do so, that is to do that type of
13  evaluation, in terms of restraints, other than -- and I know
14  there was several doctors and nurses. But is there anyone in
15  administrative -- in an administrative position who is able to
16  speak to that, to that issue?
17    A   I don't know of anyone. It would be the -- that
18  is -- for a clinical, that would be the decision of the
19  doctors that evaluated Mr. Gonzalez.
20    Q   Okay. And --
21    A   I probably -- typically, I would think, because he
22  was in the custody of a law enforcement agency that that was
23  not much of a consideration. He was already in custody and
24  being restrained by handcuffs. So I don't know that it was
25  evaluated to see if further restraint was necessary.

Page 64

1    Q   Well --
2    A   He was being guarded by a police officer.
3    Q   The restraint used by the -- by the law enforcement
4  agency, though, is based upon their knowledge of whatever the
5  forensic body of information is. Correct?
6    A   Correct.
7    Q   They are, by design, not going to have access to
8  whatever the medical body of information is. Is that correct?
9        MR. POPE: Objection. Form.
10        THE WITNESS: The -- the medical chart -- the
11  medical information would not be typically shared with the --
12  with the law enforcement officer. The patient's medical
13  condition is confidential and is typically not shared without
14  -- outsiders.
15    Q   It -- it could be shared with medical personnel
16  and/or the security department as hospital staff if --
17    A   If there was a need. I mean, the security
18  department, I would not go into a patient's medical record
19  unless there was a strong legitimate need for that, for me to
20  do that.
21    Q   Sure. And I understand that. And I think what I am
22  trying to make sure that I understand is the hospital has
23  information that, by design, is not going to be available to
24  the law enforcement agency. And so I guess the question I
25  have for you is would you -- would you expect that that

Page 65

1  information is going to be shared with security staff if it
2  presents a security risk or a security issue?
3        MR. POPE: Objection. Form. Don't -- don't --
4  don't answer the question as propounded. You want to know the
5  basis?
6        MR. BARRIENTOS: Sure.
7        MR. POPE: I don't think it is intelligible,
8  Joe, the way it came out. There are several references --
9        MR. BARRIENTOS: I don't -- let me -- let me --
10  let me try it again. Fair enough.
11    Q   (BY MR. BARRIENTOS) Do you know whether the hospital
12  staff is supposed to let you-all know if a patient presents a
13  security risk by their own assessment?
14    A   If in their judgment it is necessary, they do.
15    Q   If -- if in their judgment he presents -- a patient
16  presents a security risk, they are supposed to let you-all
17  know.
18    A   I don't know that it is written in a -- in a policy
19  somewhere that says you are supposed to do this. But they --
20  when there is a judgment of a security risk, they do let us
21  know.
22    Q   Yeah, I understand. If -- if it is not written in
23  the policy, because I didn't -- I didn't see that anywhere.
24    A   I don't --
25    Q   But as a -- as a practical and as a common-sense

17 (Pages 62 to 65)

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 1H-10 WEST, SUITE 100          SAN ANTONIO, TEXAS 78230                  (800) 969-3027
                                                                            7ba3a3f1-ffd9-4a8b-a584-489da2454b6c

BLAKE HUBBARD                                                              April 29, 2003

Page 66

1  matter, if -- if medical personnel is able to determine, if
2  they have enough information to determine that a patient
3  presents a security risk, they ought to let the security
4  department know.
5      A   Sure.  My preference would be that I be informed of
6  any type of security risk.  That was always --
7      Q   Well --
8      A   That's my job, so. . .
9      Q   How can you -- how can you -- how can you and
10  your -- your employees in that department address a security
11  risk if you are not told about it?
12     A   That's correct.  And we would ask -- we have always
13  asked the employees throughout the medical center if they are
14  aware of a risk to inform us.
15     Q   Okay.  And if that information is not imparted to
16  your department, then you are not adequately prepared to
17  address it.
18     A   Obviously, the more information you have, the better
19  decisions you can make.
20     Q   Okay.  And the decision on whether to impart that
21  information or when to impart it is made by hospital staff.
22         MR. POPE:  Objection.  Form.
23         THE WITNESS:  Typically made by more like the
24  medical staff.
25     Q   (BY MR. BARRIENTOS) Now, as a security director, are

Page 67

1  you made aware through either training or interaction with
2  medical personnel or other hospital staff about whether there
3  existed any criteria to determine whether a patient was a
4  security risk?
5      A   I am not aware of any specific criteria that is used
6  to judge a person against.
7      Q   In terms of practical experience, that is experience
8  you had actually in performing your work, were there -- if
9  there were no written criteria, based upon your experience,
10  can you tell me or -- as to what your experience has showed
11  you, if any, about what types of -- what type of criteria,
12  what type of conditions, behavior, whatever -- however --
13  whatever you may -- may call it, based upon your experience,
14  can you tell me about anything specific that would call for
15  the application of restraints by the hospital by its own
16  analysis?
17         MR. POPE:  Objection.  Can I ask a question?
18  You are asking from totally the security standpoint.
19         MR. BARRIENTOS:  Uh-huh.
20         MR. POPE:  You are not asking him anything
21  medical?
22         MR. BARRIENTOS:  No.  I am -- yeah.  And let me
23  -- it is a bad -- it is a bad, bad question.  Let me go back.
24     Q   (BY MR. BARRIENTOS) I don't want you to give me any
25  medical opinions.  What I want to know is based -- based upon

Page 68

1  your experience as a security director, director of security,
2  upon the experience you had while actually working there, what
3  kinds of things, if any, did you learn would warrant the
4  application of restraints or the order of application of
5  restraints by medical personnel?
6      A   I am not -- I will maybe ask you to ask the question
7  again.  Because what I am hearing you asking me what -- from
8  security standpoint, what did the -- did I see the doctors
9  do.  And I am not comfortable speaking as to what a doctor's
10  decision is.
11     Q   Yeah.  I am not -- I don't want you to tell me --
12     A   Because you asked me what would a medical personnel
13  order restraints.  They have their specific training.  They
14  are medical -- they are doctors.  They are physicians.  And
15  they -- I am not going to speak to or judge a decision of a
16  physician.  I am not qualified to do that.
17     Q   I understand.  I am not asking you to give a medical
18  opinion.  But you -- you have as director of security -- well,
19  let me ask this way.  Have you ever before this -- before, up
20  to or including this incident, had you ever received any
21  directives from medical personnel regarding the application of
22  restraints to a patient at that hospital?
23     A   The directive that my department would receive is
24  that if a -- if asked to assist with the application of
25  restraints as ordered by a physician, we would do so.  And so

Page 69

1  we would -- we would sometimes assist typically with patients
2  that were more belligerent.  Some patients will willingly go
3  into restraints, others would not.
4      Q   And that's kind of the things I am asking you.  I
5  mean, I don't want to make it more complicated than it is.
6  Based on what actually happened there, what kind of patients
7  would usually get restraint orders from the medical personnel?
8  What types of either behaviors did they exhibit?  What --
9      A   When my -- the security department became
10  involved -- I told -- like I said before, probably the
11  majority of restraint applications occur without our
12  involvement from a clinical standpoint.  But if we were asked
13  to assist, it was typically a patient who was being combative
14  or very belligerent or openly threatening to the
15  medical staff, to the nurses on the floor.
16     Q   What about patients who had exhibited, in your
17  experience, that also apply or for patients who had exhibited
18  some indication that they were a danger to themselves or
19  suicidal?
20     A   Again, if -- when we were involved, it was typically
21  they were actually probably actively trying to harm
22  themselves.  And we would be involved because at that point
23  they were too belligerent to be restrained peacefully by the
24  nursing staff.
25     Q   There is -- there is a specific reference, oh, gosh,

18 (Pages 66 to 69)

BLAKE HUBBARD															April 29, 2003

Page 70

1  let me see. In Exhibit 11 on page 2, Section VIII B, there is
2  a definition of something called a primary behavioral care
3  patient. Are you familiar with that term?
4      A  No.
5      Q  Okay. If you can take look at it.
6      A  Okay.
7      Q  Before looking at that just now, are you -- were you
8  familiar with that term?
9      A  Not exactly as it is stated.
10     Q  Okay. Was there some other term or --
11     A  Usually we call them psychiatric patients.
12     Q  Were -- was the security department informed
13  when there were psychiatric patients admitted?
14     A  Not always.
15     Q  Okay. You were only informed if they happened to be
16  a security risk of some kind?
17     A  Yes. Typically we don't admit psychiatric patients.
18  If they are just there for a psychiatric. We don't have a
19  psychiatric unit. They would be committed or sent to another
20  psychiatric care facility. If we have a patient that has a
21  psychiatric issue, they would be typically admitted for
22  whatever their medical complaints would be.
23     Q  All right. Do you know in this case whether Mr.
24  Gonzalez, the patient, had been admitted as a psychological
25  patient or a patient with a psychological component?

Page 71

1      A  My knowledge of that is that he did see a
2  psychiatrist, so I would assume that there -- I had assumed
3  that there was a -- some sort of psychiatric need.
4      Q  Okay. Let me see this here. There are two other
5  definitions. I hate to be handing this back and forth but I
6  didn't bring an extra copy so we will have to do that. There
7  -- there are two types of observation described or defined in
8  here. One is called close observation. The other is called
9  one-to-one observation. Did -- are you familiar with those
10  determines or with those practices?
11     A  Yes. I am familiar with the practices.
12     Q  Okay. Now, these actually direct -- it appears from
13  this that they direct nursing staff activity and not security
14  staff activity.
15     A  That's correct.
16     Q  Are you familiar with them because of your general
17  work with the hospital or are you familiar with them because
18  this observation had to be coordinated in some manner with the
19  security personnel?
20     A  I am -- I am familiar with it just because I work at
21  the hospital. I know that there are often patients that are
22  assigned -- we usually them patient sitters, someone who will
23  be in the room all the time because of the level of care
24  needed for that patient.
25     Q  Okay. Do you know whether Mr. Gonzalez, patient,

Page 72

1  was admitted as either a patient who required close
2  observation or one-to-one observation?
3      A  I don't have any knowledge of his admission details.
4      Q  All right. Item number IX there that is subtitled
5  Indications and Contraindications.
6      A  Yes.
7      Q  Is it your understanding that section addresses the
8  circumstances under which a patient could be restrained?
9      A  It does seem to lay out some circumstances that
10  would lead to the justification for a restraint order.
11     Q  Okay. And if I read that, they are disjunctive,
12  that is you can -- if the patient falls within one of those
13  three, I think there are three there, then -- then there would
14  be grounds for -- for an order of restraint from the doctor
15  from the medical staff?
16     A  Correct.
17     Q  One of those is with -- is whether a patient is a
18  danger to themselves or others.
19     A  Correct.
20     Q  Okay. In the instant -- in -- in the event that
21  that occurs, is the security department necessarily notified?
22     A  I can only speak to the times that we have been
23  notified. Again, I know that a lot -- I just -- from my
24  general knowledge of working at the hospital, I know a lot of
25  restraints are applied without our involvement and so I

Page 73

1  certainly don't know the reasons behind those restraints, that
2  application of restraints. And so I don't know if -- if a
3  decision is made based on that and they just -- and then the
4  -- the restraint eliminates that factor so they don't notify
5  us at all. I wouldn't know. I know that in the times the
6  security department is called upon to assist it is often
7  because of a patient is believed to be dangerous to himself or
8  others. And so they have asked for our assistance.
9      Q  In this particular instance with Mr. Gonzalez, and I
10  know you have already told us what information you had, I
11  guess the security department had, with regard to Mr.
12  Gonzalez, did you-all get a request for any special security
13  for that area of the hospital or for Mr. Gonzalez, the
14  patient, during his stay?
15     A  There was no specific request.
16     Q  Had there been one, I take it, then, that your
17  department would have been perfectly able to comply with
18  whatever request was made?
19     A  If it -- if it was deemed necessary that -- we were
20  aware of his presence. Nobody called us specifically and
21  said, "We want you to do this or this because he is here." We
22  were aware that he was here and in the custody of the La Feria
23  Police Department. And we evaluated his presence.
24     Q  Well, for example, if -- if a doctor or a nurse,
25  whoever the qualified medical staff were at the time, if they

19 (Pages 70 to 73)

BLAKE HUBBARD																		April 29, 2003

**Page 74**

1 had asked for additional restraints, that could have been
2 provided and your department could have assisted with that.
3    A   Sure.
4    Q   If they had asked for additional personnel to guard
5 or to at least be in the immediate area or on the floor where
6 Mr. Gonzalez was located, your department could have provided
7 that.
8    A   Sure.
9    Q   If -- and what you are telling me is, if I
10 understand correctly, no such request was ever made to your
11 department?
12    A   Not to my knowledge.
13    Q   Mr. Hubbard, can you tell me how many other -- I am
14 sure Valley Baptist treats lots of people, but on a yearly
15 basis, do you have any indications as to how many patients
16 come in that are forensic patients?
17    A   I don't have the exact number available off the top
18 of my head.
19    Q   Is there -- is there any way to determine that other
20 than going to the individual's medical record?  Is there a
21 list that is kept of them when that -- when that occurs?
22    A   We -- we keep a record of our activity regarding
23 forensic patients.  And we -- at the request of the
24 environment of care committee, which is a performance
25 improvement committee, so I don't -- so those statistics are

**Page 75**

1 reported through that committee.
2    Q   Okay.  And is that a standing committee that is
3 still in existence?
4    A   Yes.
5    Q   And the name again?  I am sorry.
6    A   Environment of Care.
7    Q   Well, let me ask, just on your experience, can you
8 tell me, if you know, how many -- in a yearly or monthly
9 basis, how many forensic patients are treated who are being
10 held for serious criminal allegations?
11       MR. POPE:  Objection.  Form.  I just want to
12 clarify one thing.  You are not asking him anything relative
13 to the committee.  You are just asking him --
14       MR. BARRIENTOS:  Based on his -- yeah, if he
15 remembers.
16    Q   (BY MR. BARRIENTOS) If you remember.  I don't know
17 if you know or not.
18    A   I don't know that I can provide an accurate guess on
19 that.  And, again, it would depend on what you say serious
20 is.
21    Q   Well, like --
22    A   I can tell you that we have a forensic patient in
23 our hospital almost daily.
24    Q   Let me ask this.  In this particular case, when Mr.
25 Gonzalez was brought in, I think -- were you made aware that

**Page 76**

1 he had -- that -- not the arrest -- the charge or one of the
2 things he was being investigated for was a homicide case?
3    A   I was made aware that he was a suspect in one,
4 possibly two murders.
5    Q   Were you made aware that the officers who
6 transported him were filing complaints for attempted capital
7 murder against those officers?
8    A   Yes.  I was aware that the certain circumstances of
9 his arrest were violent.
10    Q   Okay.  And the -- how often was it in your
11 experience when patients would come in held for those -- and,
12 again, understand at this point they are just allegations.
13    A   Certainly.
14    Q   They are accusations.  You can't tell at that point
15 whether they are true or not.  But given that information, how
16 many other patients would, in your experience, have been at
17 Valley Baptist Medical in any given period of time?  Did that
18 happen all the time?  Was it a daily occurrence?
19    A   A patient with the charge or allegation of murder
20 was a -- was rare.  I can think of Mr. Gonzalez and one other
21 that comes to mind in the time that I was in the security
22 department where we had a person under arrest with that
23 allegation or suspicion.
24    Q   And on those occasions when someone came in and the
25 accusations were as serious as that, was there no -- in the

**Page 77**

1 other -- on -- in the other instance, was there ever any
2 request for additional heightened security in that area of the
3 hospital where that patient was being treated?
4    A   We -- in those circumstances, both cases that I
5 recall, the custodial agency provided a full-time guard to
6 provide the additional security that is necessary to that --
7 having that patient, to provide not only security for the
8 patient but then possibly to others in the area.
9    Q   Okay.
10    A   And so our response would have been to work with
11 that agency or to make additional rounds to check with him, to
12 make sure to do the things that we talked about earlier like
13 providing a bathroom break or a coffee break or stuff like
14 that.
15    Q   So the other situation was basically the same as --
16 as what we had in this one.  There was no request for
17 additional manpower at that location near that location.
18    A   That's correct.
19    Q   Is there a set of circumstances that you know of
20 that would -- well, let me go back.  Let me ask another
21 question.  Did you have to wait for a request, a medical
22 request, medical personnel for additional restraint or
23 additional security in order to provide additional security or
24 were you as director of security empowered to place someone
25 there if you thought they needed to be there?

20 (Pages 74 to 77)

BLAKE HUBBARD                                                      April 29, 2003

**Page 78**

1    A  If I felt it was necessary, I had the authority to
2  do so.
3    Q  So --
4    A  To place -- to place, like, an additional guard.  I
5  did not have the authority to order a patient restrained.
6    Q  I -- I understand that.  Now I am asking more
7  about -- about the -- the level of security.  If -- in this
8  case, if -- if you had felt it was necessary, you had the
9  discretion to assign an officer either to that area, to that
10  floor.  Is that correct?
11    A  Correct.
12    Q  Or to that room, even?
13    A  Correct.
14    Q  And if I understand your testimony, you did not do
15  that in this case?
16    A  I did not.  No.
17    Q  And the one other case where you had that you can
18  remember where there was a person who was under the accusation
19  for homicide in the hospital, that was not done in the other
20  case either.
21    A  No.
22    Q  Okay.  If -- has there ever been a situation where
23  you did determine that it was necessary to have a guard or a
24  security officer in a specific area of the hospital with
25  regard to a patient?  I know you kind of gave me the example

**Page 79**

1  of the employee whose officer -- whose husband was a police
2  officer.  Other than that.  I am talking about where you have
3  a patient who is -- who is in custody of some law enforcement
4  --
5    A  Yes.
6    Q  Has there ever been a case?
7    A  Yes.
8    Q  What -- what -- what were the allegations in that
9  case?
10    A  They were not a forensic patient.  They were a
11  patient.  One -- several -- several occurrences have been
12  crime victims where there was a very real threat of continued
13  violence against the person who was a patient in our medical
14  center.  Another circumstance was a -- a governmental
15  informant from South America who in transit to another
16  location had a heart -- heart problem and was in our hospital
17  at the request of the governmental agency, was doing the
18  transport, we assigned some additional security.  We assigned
19  security when we have had VIPs, high level political
20  officials, people like that that have been in our hospital.
21    Q  Celebrities, maybe.  Something like that?
22    A  Celebrities, such like that.
23    Q  Okay.
24    A  We had a relative of a particularly violent federal
25  fugitive and the marshal's office advised us that the fugitive

**Page 80**

1  had allegedly escaped from the penal institution to visit his
2  mother in the hospital.  So we provided security for the floor
3  during that time.
4    Q  All right.  And if I -- I don't know if I have asked
5  you this yet.  But do I take it, then, that based upon the
6  knowledge that you had at the time that as a director of
7  security you determined at the time that additional
8  security -- hospital security at that location either on the
9  floor or in the room was not necessary at that time?
10    A  With relation to Mr. Gonzalez?
11    Q  Yes.
12    A  I did not believe additional security beyond the
13  rounds being made to maybe provide support or assistance to
14  the officer assigned to guard Mr. Gonzalez.  The additional
15  security that was necessary was being provided by the La Feria
16  Police Department.
17    Q  What were -- you talk about the additional rounds.
18  What -- what were the -- what was the round schedule for the
19  fifth floor in September of 2000 at that -- at the time that
20  Mr. Gonzalez was there?
21    A  We don't have a typical schedule, in which I say, if
22  a security officer has to visit certain places at certain
23  times.  But when we do have a forensic patient, I ask them to
24  try to stop by, if call load permitting, once per hour.  And
25  in the case of Mr. Gonzalez, I asked the officers to try to do

**Page 81**

1  two per hour if -- if their call load permitted.
2    Q  Okay.  Do you know whether they were actually able
3  to do that?  Or is there something -- some record of that?
4    A  No.  I know they made periodic rounds through --
5  throughout the unit during the shift.  But I don't know
6  exactly how many or what times.  We didn't -- we were not
7  computerized at the time.  We did not -- were not able to keep
8  those types of records.
9    Q  Was -- and -- and the question I asked earlier about
10  your determination that -- that additional personnel at that
11  location was not necessary, because I want to be obviously
12  fair in -- when I ask this, was that an actual analysis that
13  you went through and made a conscious decision or was it "I
14  didn't get a request for additional security so I am not going
15  to send any"?
16    A  It was a conscious decision that I made.  I visited
17  the patient, spoke with the La Feria police officers, spoke
18  with my own officers who are involved when he -- when he
19  arrived at the hospital.  And actually visited with Mr.
20  Gonzalez and felt like the -- the presence of a La Feria
21  police officer was adequate.
22    Q  Did you -- did you also -- you may have mentioned
23  this to me earlier.  Did you also visit with any of the
24  medical personnel who were taking care of him during that
25  time?

21 (Pages 78 to 81)

BLAKE HUBBARD                                                                April 29, 2003

**Page 82**

1    A  I spoke to a nurse who had -- or a nurse spoke to me
2  when I arrived on the unit that had told me that Dr. Gonzalez
3  had been in there to see him.  And that he was also, I
4  believe, a patient of Dr. Lawler, who was -- was attending to
5  the medical injury.
6    Q  Did you have a chance to speak with either of those
7  doctors?
8    A  I did not.
9    Q  Did you have a chance to review any of the notes or
10  any of the progress notes they had made or anything like that?
11    A  I did not look in the chart.
12    Q  Okay.
13       (Short break)
14    Q  (BY MR. BARRIENTOS) Mr. Hubbard, before I forget,
15  going back, there was a series of questions to which counsel
16  objected and I think instructed you not to answer having to do
17  with committee deliberations.  I want to talk to you about
18  that but I don't want to ask you to divulge any committee
19  deliberations.  What I want to ask you is is there a new
20  policy that is in effect now for -- for the hospital with
21  regard to restraints and/or forensic issues?
22       MR. POPE:  Objection.  Form.
23       THE WITNESS:  I don't know if the restraint
24  policies.  These are nursing clinical policies.  So I don't
25  know if they have been revised since 2 -- the year 2000.

**Page 83**

1    Q  Okay.
2    A  There is a revised forensic staff information list
3  and policy.
4    Q  All right.  And that would be?
5    A  Revised since this.  There is one that is more
6  current than this one.
7    Q  And that is Exhibit 13 that you are --
8    A  That's correct.  Exhibit 13.
9    Q  Well, there is a newer edition of Exhibit 13.
10    A  Yes.
11    Q  If I understand previously that this came about
12  after this incident?
13    A  Correct.
14    Q  Okay.  That is currently in effect?
15    A  Correct.
16    Q  And as to the other exhibits, 11 and 12, you are not
17  aware -- you can't tell me one way or another whether those
18  procedures were modified?
19    A  Not -- not -- no.  Not without going to a policy
20  book which I don't have.
21    Q  Okay.
22    A  If there has been a more recent revision.
23    Q  Do you know, Mr. Hubbard, if at page 4 of Exhibit 13
24  there is a subsection entitled Monitoring and Reassessment --
25  there is a document that is called a restraint

**Page 84**

1  assessment/reassessment flow sheet.  Are you familiar with the
2  document?
3    A  I know that it exists.
4    Q  Do you know whether one was maintained for Mr.
5  Gonzalez?
6    A  I do not.
7    Q  Are you familiar with a document titled Care and
8  Observation Record?
9    A  I am not familiar with that document.
10    Q  Are you familiar with a document entitled The
11  Initial Assessment Restraint Application?
12    A  Not specifically.
13    Q  Okay.  At page 5 of Exhibit 13 there is a subsection
14  titled Staff Competency and Training.  VII A reads as
15  follows:  Staff initiating, maintaining or terminating the use
16  of restraints shall receive specific training related to, and
17  then there is a laundry list of things.  Would you take a look
18  at that?  Did your -- is that part of the training that
19  security personnel underwent?
20    A  This would probably be specific to the nursing staff
21  on the floors.
22    Q  Okay.
23    A  The direct care staff.
24    Q  So I take it that means no, your security personnel
25  would not have been trained in that -- in that area?

**Page 85**

1    A  No.
2    Q  Okay.
3    A  I believe that that policy really only applies to
4  when clinical restraints are applied.  It wouldn't have
5  forensic -- forensic patients and forensic restraints, I
6  believe, are excluded from that policy.
7    Q  Well, that's what I was to going ask you about, too,
8  before I put this aside.  Because that is -- it seems to
9  exclude forensic from -- from this policy.  And so let ask
10  you, what is your understanding of the -- in this situation
11  where we have Mr. Gonzalez who comes in in the custody of a
12  law enforcement agency, is he subject to this -- to this
13  policy or not?
14    A  To my knowledge, he -- there was no form of medical
15  restraint ordered for Mr. Gonzalez, so I don't believe he
16  would be subject to that policy.  I am not aware of a clinical
17  restraint that was placed on Mr. Gonzalez.
18    Q  Are you -- are you able to discuss whether one
19  should have been put on him as head of security?  Not as a
20  doctor, as head of security.
21    A  No.  That would be -- the application of a restraint
22  would be a medical decision.
23    Q  And, again, I think you have told me or if I
24  understand correctly, there is no administrative person who is
25  able to speak to that issue.  I would need to go and talk to

22 (Pages 82 to 85)

BLAKE HUBBARD                                                                          April 29, 2003

**Page 86**

1  the individuals who were actually administering his care, the
2  doctors and/or nurses who were administering his care.
3      A   My best -- the best person I would refer you to on
4  that would be, I guess, the physicians that were caring as to
5  their decisions to or not to use a medical type of restraint
6  of any type.
7      Q   Further you mention there are situations where both
8  the hospital and the law enforcement agencies would both, I
9  guess, call for or impose a restraint.  How did that work
10  if -- if a forensic patient is excluded under this policy?
11      A   That policy -- it is my understanding is it applies
12  specifically to the clinical restraints.  Let's say a
13  physician ordered a vest-type restraint that we have available
14  at the hospital, that -- that policy would come into effect at
15  that point.  But if a forensic patient was only wearing a
16  handcuff, that is a forensic restraint and that policy does
17  not -- excludes those types of restraints.
18      Q   Okay.  Earlier when we were talking, you told me
19  there were situations where both the hospital and the law
20  enforcement agency both impose restraints or it is agreed that
21  restraints needed to be imposed.  And what I am wondering is
22  how did that come about if -- if this is an exclusion within
23  the policy, under what set of circumstances did that come
24  about?
25      A   When -- I guess when we said agreed, maybe it was a

**Page 87**

1  little misleading.  What I would say is there would be
2  circumstances that would call for both.  There is a forensic
3  issue.  The person is under arrest so he is, therefore,
4  wearing a set of handcuffs or something subject to his arrest
5  status.  There would also be an issue where because of his
6  clinical needs that a clinical restraint would be applied.  So
7  both circumstances can exist at the same time.
8      Q   Okay.  So, then, help me understand.  Does that mean
9  that the policy -- that this exclusion is applicable unless
10  the hospital decides in addition to law enforcement -- law
11  enforcement agency that a clinical restraint is needed?
12      A   I -- I would think so.  I think what it is saying is
13  the things that have to happen when a clinical restraint, like
14  the assessments and reassessments.  Hospital restraints of
15  patients, they are -- they are required to provide -- and I
16  don't remember the time frame, but periodic assessments of the
17  patient to make sure that he is not suffering -- suffering
18  anything negative due to the restraint.  Those things would
19  not apply for a forensic restraint.  So if a patient is
20  wearing handcuffs because they were placed there by a law
21  enforcement officer, we are not bound to do the periodic
22  assessments that we would if we placed the restraints there.
23      Q   Okay.  Does the hospital, then, in that situation,
24  where there is a forensic restraint applied, is it your
25  testimony or the hospital's testimony that the hospital then

**Page 88**

1  abdicates its ability or its authority to -- to approve the
2  type or level of restraint?
3      A   No.  We would not.  When we say approve the level of
4  restraint, we are going to -- if the patient is wearing a
5  forensic restraint and that interferes with the patient's
6  medical condition or care, then we are going to ask that it be
7  removed.  And so that is where we say we would approve whether
8  or not he could wear a forensic restraint, because we would
9  not allow a patient -- one of our patients to wear some -- a
10  restraint that would interfere with his care or condition.
11  And so if -- if a patient -- if a law enforcement agency wants
12  to restrain a patient in such a manner that we believe would
13  interfere with care, then we would not approve that restraint.
14      Q   Okay.  Would it also be correct that if -- if a
15  restraint was insufficient to prevent a patient from
16  interfering with their own care that the hospital would --
17  could impose a different type of or different level of
18  restraint?
19      A   I think, you know, it would be speculation, I mean,
20  if a physician or somebody felt that he saw circumstances
21  where additional restraint was needed, he would order it.
22  But, again, that is a medical decision.
23      Q   All right.  For example, if you have a patient who
24  is partially restrained but during the course of his stay
25  pulls out an IV, that would be an example of a patient who is

**Page 89**

1  restrained perhaps to prevent flight but not restrained in the
2  manner that would prevent him from interfering with his own
3  care.
4      A   Probably.
5      Q   In -- in that case, it would probably be a situation
6  where the hospital certainly has the power or the authority to
7  impose a different type of or different level of restraint.
8      A   It would -- any decision like that, I guess, would
9  be subsequent after the event.  We would have no way of
10  predicting that a patient might pull his IV out.  We don't --
11          MR. GARZA:  Object.
12          THE WITNESS:  Because, otherwise, we would have
13  to restrain every patient because they could pull their IV
14  out.
15      Q   (BY MR. BARRIENTOS)  Correct.  Obviously.  And it
16  wouldn't make sense otherwise.  But, in a situation where you
17  have someone who has demonstrated, demonstrated an ability and
18  -- and -- and a willingness to interfere with their own care,
19  that is the circumstance under which the hospital should
20  certainly take that and impose either a different type of or
21  different level of restraint.
22      A   I think that is going to be a judgment made by the
23  medical staff.
24      Q   Does that mean yes or no?
25      A   If it --

23 (Pages 86 to 89)

**BLAKE HUBBARD**                                                   April 29, 2003

---

Page 90

1          MR. POPE: Objection. Form.
2          THE WITNESS: If it was necessary -- and I
3 don't want -- I am not comfortable speaking to what the
4 medical staff might or might not do.
5     Q   (BY MR. BARRIENTOS) Well, I understand. But I am
6 asking this because earlier you gave me the example of a
7 patient --
8     A   Sure.
9     Q   -- pulling out his IV.
10    A   Sure. That is a common occurrence. What I would
11 say is if -- if it became necessary to restrain a patient to
12 prevent them because the treatment being administered through
13 an IV was -- was necessary to their well-being, then a
14 restraint to prevent that action might occur.
15    Q   And would it also be correct that if a patient was
16 unable to interfere with their own care, and the example you
17 used was -- you used was pulling out an IV. By the same
18 token, if they were a danger to themselves, would that also be
19 a manner in which they could affect their care?
20    A   I think we are talking about medical judgments here.
21 I am not qualified and necessarily to judge a patient whether
22 or not they are a danger to themselves or others. I would
23 think, yes, if you have a patient who has exhibited a tendency
24 to harm themselves, then there is a potential that they might
25 try to harm themselves further. But that potential can't be

Page 91

1 -- I am not qualified to assess that potential. That's --
2 that's the duty of a physician.
3     Q   I -- I understand. And I -- and I -- and I don't --
4 you are right. It is probably not fair to talk about
5 potential or maybe not in terms of the security department. I
6 am asking --
7     A   We can sit here and speculate all day about things
8 that could happen.
9     Q   Well, I want to ask you about things that did
10 happen. What did happen is this gentleman got brought in and
11 the hospital staff was told he had self-inflicted wounds.
12 Correct?
13    A   Correct.
14    Q   They were told that he had expressed suicidal
15 ideations. Correct?
16    A   Correct.
17    Q   They were told that he had a history of psychoses.
18 Is that correct?
19    A   I understand that. I wasn't -- yes, I know that
20 had -- did happen subsequent to the fact. I know it happened.
21    Q   Well, those were things, I mean, that were
22 demonstrated.
23    A   Some of them.
24    Q   Those things actually happened during the course of
25 the stay. There was -- and I don't -- I don't -- I assume you

Page 92

1 have not reviewed his medical records.
2     A   I have not.
3     Q   But they are -- they are -- I am going to ask you to
4 assume with me that there are instances where he pulled his
5 own IV out.
6     A   Okay.
7     Q   If we assume that is truthful, that would be another
8 indication that a different -- a different type of or level of
9 restraint should have been considered.
10         MR. POPE: Objection. Form.
11         THE WITNESS: I would say that, yeah, possibly
12 considered. Patients pull their IVs out very frequently for a
13 multitude of reasons.
14    Q   (BY MR. BARRIENTOS) All right. And, again, I am
15 sorry. I guess I stopped a little short there. We also know
16 that he was -- he was brought in under suspicion of violent
17 offenses.
18    A   Yes.
19    Q   And so you have got someone who has exhibited or at
20 least who is under suspicion and has been arrested for
21 possible violent offenses, who has exhibited some willingness
22 and indication that they are willing to do violence to
23 themselves. Correct?
24    A   Correct.
25    Q   Who has a -- either a known or an apparent

Page 93

1 psychological disorder or problem. Correct?
2         MR. POPE: Objection. Form.
3     Q   (BY MR. BARRIENTOS) And I am not asking you to tell
4 me what the problem was. I am asking -- I mean, you tell me.
5 When he came in --
6     A   I know --
7         THE COURT REPORTER: Wait, wait. You-all are
8 starting to talk on top of each other. Thank you.
9     Q   (BY MR. BARRIENTOS) Let me -- let me -- let me
10 start over and I will -- and I will give you full opportunity
11 to answer.
12         I am just trying to -- trying to establish what it
13 is was made known to the hospital and -- and the security
14 department, because, you know, the security department may not
15 have been made aware of all the things that the other staff
16 are made aware of. And that's what I am trying to figure out
17 here. Is it correct that the security department knew that
18 when he was brought in he was suspected of violent -- violent
19 acts?
20    A   That's correct.
21    Q   Is it correct that when he came in it had been
22 demonstrated, and it was in the medical record, that he had
23 exhibited a willingness to do violence or harm to himself?
24         MR. POPE: Objection. Form.
25         THE WITNESS: We were aware that he had an

24 (Pages 90 to 93)

BLAKE HUBBARD                                                        April 29, 2003

Page 94

1  injury that was alleged to be self-inflicted.
2      Q   (BY MR. BARRIENTOS) Self-inflicted. That he had
3  expressed some indication that he was suicidal. And if I am
4  wrong, just tell me -- just tell me, "No, I don't remember
5  that."
6      A   I don't know that I recall at the time I was told
7  that he was suicidal. I think I believe that I learned that
8  his suicidal ideations were after the incident occurred. I do
9  know that at the time of -- when I was -- when I visited his
10 room, I was aware that he had been seen by a psychiatrist.
11     Q   Were you aware that he was combative, that he was
12 described as combative -- combative on admission?
13     A   I was aware that he was combative. It was reported
14 by the La Feria Police Department, who had him in custody,
15 that he was combative during the arrest process. I was aware
16 that he had exhibited some combative behavior in the emergency
17 room as he had come into the hospital. But at the time when I
18 visited, he was not combative and had not been for a period of
19 time.
20     Q   Okay. He wasn't personally with you. But if that
21 is indicated somewhere else in the medical record, that would
22 be information that was known to the medical staff?
23     A   Known to the medical staff, correct.
24     Q   Okay. Were you aware that his behavior had also
25 been described as schizophrenic?

Page 95

1      A   No.
2      Q   Do you know -- when it -- do you know whether any of
3  the nursing or hospital staff asked for Mr. Gonzalez to be
4  restrained or for the restraints to be maintained on him once
5  he was admitted into the hospital?
6      A   I am not aware of any such request.
7      Q   Okay. May I see that last one there?
8      A   Certainly.
9      Q   Thank you. Okay. At Exhibit 13, the last page,
10 Roman Numeral II B, it says medical restraint -- restraint
11 and/or seclusion. Do you know or can you tell me whether that
12 provision of the -- and this is the one that is applicable to
13 the security department. Is that correct? Exhibit 13.
14     A   Correct.
15     Q   Do you know whether that particular paragraph that I
16 just mentioned to you on restraint or seclusion remained
17 intact after this incident with Mr. Gonzalez or was that
18 one -- did that one undergo some change as well?
19     A   Probably -- it is probably very similar if not
20 exact. I -- I couldn't state without getting out a copy of
21 the current policy to compare.
22     Q   Okay.
23     A   There is -- there is a talk -- there is something
24 similar -- very similar to that paragraph that talks about the
25 restraints, seclusion.

Page 96

1      Q   Okay. Well I tell you what -- and I don't --
2  probably not productive to ask you to tell me what it is from
3  memory. But there is a sentence in here that says should
4  restraint or seclusion become necessary at the request of the
5  attending physician, this will be done in accordance with the
6  VBMC policy according to restraint policy currently in effect
7  by VMBC. This may be in addition to or in concert with
8  restraining devices used by outside agency guards.
9      Q   Has the wording has changed, is -- is the substance
10 of that, of Article II B, still in existence and in effect?
11     A   I -- I believe that in substance it is still.
12     Q   Okay. Can you tell me and here, if you can, can
13 reconcile this provision with the exclusion that is in Exhibit
14 Number 11, because what -- if 13 -- and I am not the smartest
15 guy in the world, but what 13 seems to say to me is if
16 restraint is necessary, it has to be done in accordance with
17 the hospital policy and can be done in addition to or in
18 concert with restraining devices used by outside agencies.
19         And 11 seems like it wants to say the hospital will
20 dictate what restraints are applied and how unless it is a
21 forensic patient. And this one seems to be say it can be
22 something different. Is it -- am I reading them correctly or
23 are they in conflict, or is there a way to reconcile them that
24 was the practice of the hospital?
25         MR. POPE: Objection. Form.

Page 97

1         THE WITNESS: Well, you know, I didn't author
2  that, so I don't know exactly what was behind the author's
3  intentions when he wrote it. But what I think he -- that we
4  are trying to get at is that if a restraint becomes necessary,
5  the hospital won't apply a restraint really at the request --
6  we won't restrain a patient at the request of a forensic
7  officer I think is what we are trying to get at here, is that
8  -- so if the forensic officer says, "In my opinion I need --
9  this patient needs to be restrained," and we don't agree, then
10 we are not going to. We will only restrain in accordance with
11 our own guidelines, which will be the guidelines there. If it
12 is necessary for a medical or a clinical purpose ordered by a
13 physician who has made the appropriate, you know, evaluation
14 within the confines there, I guess, danger to himself, or any
15 others that were listed. And so -- but it also opens up that
16 we may -- we may make that decision to do so even though you
17 have handcuffed him as a forensic officer. Our decisions are
18 going to be sort of, you know, may occur separately or
19 independent or may occur at the same time.
20     Q   Okay.
21     A   As I stated earlier, they are not necessarily
22 mutually exclusive. You can have both or neither.
23     Q   Okay. I understand.
24     A   Okay.
25     Q   I think -- I think I understand.

25 (Pages 94 to 97)

BLAKE HUBBARD                                                                                                          April 29, 2003

Page 98

1      A   That's my best effort to reconcile those two.
2      Q   Okay. And what I am asking is, because you are here
3  speaking for the hospital, what I really want to know is what
4  the hospital's -- how those are reconciled or what the
5  hospital's practice was in terms of reconciling them. And if
6  -- if -- do I understand that it is as --
7      A   -- separate.
8      Q   -- you have just stated?
9      A   Yeah. A clinical -- a clinical restraint is
10  separate from a forensic restraint.
11      Q   Okay.
12      A   They -- they are not the same thing. We won't
13  restrain for -- for forensic purposes. We won't -- if a guard
14  says, "I want to restrain this patient but I want to use your
15  restraints and not mine," we are not -- unless we feel it is
16  medically necessary, we will not restrain.
17      Q   Okay. And I think I understand. Regardless of
18  whether it is a medical restraint or forensic restraint, the
19  hospital has the ultimate say on what the restraint will be
20  and what the level of restraint is going to be. Is that
21  correct?
22          MR. POPE: Objection. Form.
23          THE WITNESS: I think we will take the position
24  that we have the ultimate say in what is best for that
25  patient's care when they are in our facility.

Page 99

1      Q   (BY MR. BARRIENTOS) Correct. And by implication
2  that includes the type of restraint -- whether the restraint,
3  the type of restraint and the level of restraint?
4      A   I think so.
5          MR. POPE: Objection. Form.
6      Q   (BY MR. BARRIENTOS) All right. I am going to give
7  you -- because I want to try and go through kind of quick,
8  this is a copy of Exhibit 15, which is the medical record.
9  And I know you are not a medical doctor. I am not going to
10  ask you medical opinions. What I want to ask you is
11  whether -- first of all, does the security department maintain
12  a separate file or separate record from the -- I assume that
13  the security department doesn't maintain any type of patient
14  record. Does the security department maintain any type of
15  paperwork or documentation as to their rounds or their
16  activities on a particular shift?
17      A   At the time --
18      Q   Maybe that is what you-all provided me here.
19      A   That -- that would be what we provided. At the time
20  of this incident, our practice was to document in what we
21  called -- then called a miscellaneous report. It would be if
22  a circumstance sort of outside the ordinary rounding of a
23  security officer occurred, he would make a written record of
24  what that was.
25      Q   Okay. And earlier today -- and I haven't marked

Page 100

1  these yet. I will do so in just a little bit. But I was
2  handed a series of documents by counsel is -- let me go ahead
3  and mark this as Exhibit -- that last one I gave you is 15?
4  Let me make this one --
5          MR. BARRIENTOS: Is that right?
6          THE COURT REPORTER: No.
7          MR. BARRIENTOS: We are passed that.
8          THE COURT REPORTER: You are passed that. I
9  think you are up to 18.
10      Q   (BY MR. BARRIENTOS) Okay. I am going to mark this
11  as Exhibit Number 18. And this is just a series of documents
12  that were given to me earlier today. And you mentioned that
13  the practice at the time was to keep a -- a record of the
14  activities on the shift. Did the documents that are included
15  in Exhibit 18, is that what you are talking about or was it
16  something other than that?
17      A   No. This is what I was talking about. This would
18  be the -- at the time we had a security department
19  miscellaneous report. And it would be for the particular
20  officer or officers to document something that would be beyond
21  their normal scope.
22      Q   Okay.
23      A   They didn't necessarily document all the doors they
24  unlocked or traffic they directed or things like that. But
25  something that would be beyond their normal scope of duties,

Page 101

1  they would document that.
2      Q   Okay. Earlier you had talked about in this case,
3  rather than assigning a guard to this particular floor or
4  room, you -- your instruction was at that time to alter
5  their -- their rounds. If I have misstated that, I apologize.
6  But can you tell me, actually, what -- what it was you
7  actually did or told those security personnel for that shift?
8      A   I asked them to make more frequent rounds or to
9  actually make that unit a specific target of their rounds. We
10  did -- we don't have a prescribed route that the officers are
11  to follow. They make rounds throughout the building as their
12  call load will dictate, allow. I did ask them to make a
13  special effort, even in the face of maybe a heavy call load,
14  to make frequent rounds. And I said that I would like to see
15  at least two an hour.
16      Q   Two an hour?
17      A   Two per hour.
18      Q   Okay.
19      A   Check in with the forensic officer and the nursing
20  staff to make sure that everything is all right, did they need
21  any help.
22      Q   Okay. And you did that based upon -- well, let me
23  ask. Why did you do that?
24      A   Predominantly to assure -- provide assurance and
25  comfort to our staff.

26 (Pages 98 to 101)

BLAKE HUBBARD                                                                                          April 29, 2003

Page 102

1    Q    And the -- the -- the basis upon which you made that
2    decision was -- was what?
3    A    The fact that they had a forensic patient on their
4    floor that was alleged to have committed by -- some violent
5    acts, they had a police officer on the floor.  All of those
6    things tend to raise the anxiety level of our staff.  My job
7    is to provide them with a safe and secure environment.  And so
8    I would -- usually would assure the staff to see our security
9    officers round through their unit on a frequent basis.  They
10   seem to have more of a trust, I think, for our guys, the
11   people they are used to and they know than they do for maybe
12   an outside police agency, which is somebody they don't know,
13   a stranger in their unit.
14   Q    Would this have been any different for the shift
15   that included the time that this incident occurred, which is
16   about 3 -- between 3 and 3:30 in the morning?  In other words,
17   8 to 5 you have got lots of other people at the hospital.
18   There is lots more personnel.  Was the instruction the same to
19   each of the shifts or was it different for the night and/or
20   what I will call the graveyard?
21   A    It was -- it was intended to carry through --
22   through the night shift.
23   Q    Okay.
24   A    There are few less people, but the call volume tends
25   to go way down too.

Page 103

1    Q    Okay.  So at -- at the time that -- that this
2    occurred, and based upon the information that you -- and --
3    and here I am asking you personally, you personally received,
4    you made a decision to -- to have these folks check on a more
5    frequent basis if -- if their other duties allowed?
6    A    Uh-huh.
7    Q    Is that yes?
8    A    Yes, that's correct.
9    Q    Okay.  And was that done because you -- was that
10   done as a general procedure or was it done because you noted
11   or determined that there existed some heightened security
12   threat may be too strong a word, but heightened security risk
13   specific to this patient in this area or was -- is this a
14   matter of routine that you would have done in any case with a
15   forensic patient?
16   A    Increase the number of rounds is a matter -- is a
17   routine response to whenever we have what I call more of an
18   increased security need as opposed to a threat.  I didn't feel
19   that there was a significant threat at the time.  What
20   threat -- what risk or threat, as you put it, might have been
21   there was mitigated by the fact that we had a full-time police
22   officer assigned to the prisoner.  What I -- my response to
23   that to have a little bit greater security presence there was
24   mostly to assure our staff and make sure that they felt
25   comfortable in their environment and then could, therefore, do

Page 104

1    their job in caring for patients.
2    Q    Did you -- were you debriefed by any of your
3    security personnel at the -- at the end of the shifts with
4    regard to Mr. Gonzalez?
5    A    What do you mean by debriefed at the end of the
6    shift?
7    Q    Well, I mean, did -- did -- did you ask them to go
8    and try and report or check in on a more frequent basis, did
9    you ask them to report whatever they saw or noted at the end
10   of their shift to either you or to the superior?
11   A    I am sure --
12   Q    Mr. Zimmerman, perhaps?
13   A    When I left for the day after visiting and issuing
14   the instructions I did, I asked to be, as I always -- as
15   my practice is, if something occurs, please call me any time.
16   Q    All right.  Mr. Hubbard, will you please turn in
17   that Exhibit Number 15 to, I believe it is going to be page
18   19, the bottom right-hand corner.  It says Psychiatric
19   Consultation.  Are you able to find the page?
20   A    Yes.
21        MR. POPE:  Let me see that.  Okay.
22   Q    (BY MR. BARRIENTOS) This is -- the psychiatric
23   consultation done by Mr. Thomas Gonzalez on September the
24   18th.  And I don't know that it is noted on this document,
25   but I think, from looking at the other notes, the progress

Page 105

1    notes or nurse's notes, it is indicated in here that he came
2    in to see Mr. Gonzalez at sometime between 4 and 5 on the
3    afternoon of the 18th.  And what I want to ask you, you
4    mentioned talking to a nurse.  Do you remember if it was about
5    this time or subsequent to this time or before this time?
6    A    It would have been probably closer to 5, if that's
7    when this -- it was after his visit.  It was immediately prior
8    to me leaving for the day.  It was one of the last things I
9    had done that day.
10   Q    You already told me, you did not talk to Dr.
11   Gonzalez.  What -- if you did not talk to him, were you
12   made -- were you or anyone in your department made aware of
13   his -- of his findings in the consultation?
14   A    To my knowledge, I was not made -- no, I was -- I
15   was personally aware of Dr. Gonzalez' findings.  And, to my
16   knowledge, no one in the security department was made aware of
17   that.  We were -- as I stated before, we were aware that Dr.
18   Gonzalez had been to see the patient.
19   Q    On page 24 of that same document, just right behind
20   the typewritten report, there is a physician's progress notes,
21   which are noted -- I think where I got this from, September
22   18th, 2000, 4:15 p.m., psychiatry dictated.  And there is a
23   passage in here from Dr. Gonzalez where he describes the
24   patient as guarded, paranoid and fearful.  Did you note that
25   or were you -- did you do a -- strike that.  You said you had

27 (Pages 102 to 105)

BLAKE HUBBARD                                                                April 29, 2003

Page 106

1  some personal contact with Mr. Gonzalez sometime during --
2      A   That's correct.
3      Q   -- his stay there. Did you spend enough time with
4  him to make any type of determination of your own as to what
5  his mental or physical or psychological status was?
6          MR. POPE: Don't answer that question.
7          MR. BARRIENTOS: Basis?
8          MR. POPE: The basis is you are asking him now
9  for a medical diagnosis. I am not going to let him -- I am
10 not going to let him opine on those issues. I don't think it
11 is fair to the witness.
12         MR. BARRIENTOS: Let me -- let me -- let me try
13 and meet the objection then.
14     Q   (BY MR. BARRIENTOS) I don't want to ask you for a
15 medical opinion in terms of -- I don't expect you to be able
16 to give me a diagnosis or tell me that you recognize different
17 types of psychological conditions. Maybe I should -- better
18 state the question this way. When you saw Mr. Gonzalez, what
19 if anything, did you observe about -- about his person or his
20 demeanor? And you can describe that -- you can use layman's
21 terms if you wish. If anything. Maybe -- you may not
22 remember. I don't -- I don't know.
23     A   He was conscious, communicative, calm. He was
24 handcuffed to the bed in the custody of a police officer.
25     Q   Do you recall, sitting here today, any conversation

Page 107

1  you may have either had with him or heard him make?
2      A   My recollection is I just kind of asked him how he
3  was doing. He said he was okay. He indicated to me that he
4  had seen Dr. Gonzalez and showed me a business card. I think
5  I said something to him, "That's good." That Dr. Gonzalez was
6  a good man. And asked him if he needed anything. He said he
7  was hungry, at which point I conferred with the officer and
8  left.
9      Q   At page 25, Dr. Gonzalez notes at one instance the
10 patient blurted out, "Can I just cut my throat?" And further
11 states his impression the patient is psychotic, as evidenced
12 by paranoia, ideas of reference, auditory hallucinations,
13 internal stimulations, etc.
14         Were -- were -- were any of these observations made
15 by Dr. Gonzalez communicated to you or to your department?
16     A   No.
17     Q   Had you known of them, would that have made any
18 difference as to the level of security that you would have
19 determined was appropriate for this patient?
20         MR. POPE: Objection. Form.
21         THE WITNESS: It is kind of hard to say. I
22 don't think so. I think I would have the same assurance that
23 I see that Dr. Gonzalez noted, that he was in constant police
24 supervision and that would probably have been adequate.
25     Q   (BY MR. BARRIENTOS) Okay. So let me make sure

Page 108

1  understand it. And I am not -- I am not asking you to give me
2  a medical opinion. But if I understand your previous
3  testimony as the director of security, you had the independent
4  authority to assign people to areas of the hospital or to
5  floors or rooms if you felt that that was necessary or
6  appropriate?
7      A   That's correct.
8      Q   And so while the decision to restrain someone,
9  whether to restrain them, what type of restraint, and what
10 level of restraint would not be a decision that you would make
11 or your department would make, the decision about how much
12 security to provide was something that -- that you or your
13 department would make?
14     A   Correct.
15     Q   And you could do that based upon information that
16 was made available to you with or without a doctor's order?
17     A   Correct.
18     Q   So, for example, if -- if information about a -- a
19 patient's psychological condition was made available to you,
20 and if you decided, "I think we need somebody else there to
21 help out," you could have done that without a doctor's
22 permission or a doctor's authority?
23     A   That is correct.
24     Q   In fact, it is correct you could have done it even
25 if a doctor hadn't wanted you to do it. Correct?

Page 109

1      A   That's correct.
2      Q   All right. Now, in this instance, this information
3  that is in here wasn't made available for you to consider?
4      A   It was not.
5      Q   Now, sitting here today, are you telling me that had
6  it been made known to you it would not have made a difference
7  to you, the level of security that you would have thought
8  appropriate for that -- for this patient?
9          MR. POPE: Objection. Form.
10     Q   (BY MR. BARRIENTOS) If you can answer.
11     A   I don't know how to answer that, because, in
12 hindsight, I know a lot more now than I knew then. I know
13 what eventually happened. And if it -- knowing -- if I had
14 had that level of foresight that I could see into the future
15 to know that would have happened, I would have certainly done
16 anything possible to prevent it. But, no, I mean if a doctor
17 -- if someone had said this patient is psychotic, I am not a
18 medical person. I am not even sure what psychotic means. So
19 I would have had to go seek a further consult from a physician
20 to explain those terms. I know it, you know, probably has
21 some sort of layman's interpretation of what that means. But
22 I don't know what it means as a medical diagnosis.
23     Q   Okay. Well, the last sentence of this doctor's
24 note, page 25, reads as follows, if you want to look on with
25 me, share reading it, it says: Patient or Pt, I assume that

28 (Pages 106 to 109)

BLAKE HUBBARD                                                                April 29, 2003

Page 110

1  is patient, under strict police surveillance there at his
2  bedside and they assure me that they will not allow him to
3  hurt himself or anyone else.
4        An indication in a medical record of that nature, is
5  that an indication to you, as -- would it have been an
6  indication to you as head of security that this person might
7  present a threat to themselves or to someone else?
8        MR. POPE: Objection. Form.
9        THE WITNESS: What that statement indicates to
10  me is that Dr. Gonzalez had confidence in the police
11  department to provide an appropriate level of supervision.
12     Q  (BY MR. BARRIENTOS) Correct. He was there --
13     A  As did I.
14     Q  He was there. Obviously he notes that they are
15  there at his bedside constantly. And we know in hindsight
16  that unfortunately Dr. Gonzalez was not correct. But what I
17  am asking you is in order for him to put that in, at some
18  point does this indicate to you that he has to come to a
19  conclusion that this man was a danger to himself or others?
20        MR. GARZA: Objection. Form.
21        MR. POPE: Objection. Form. And don't answer
22  the question.
23     Q  (BY MR. BARRIENTOS) Well, let me ask this. Had you
24  had this information that is included in the last sentence,
25  would that have made any difference as to the level of

Page 111

1  security that you would have provided at that time?
2     A  I think that sentence confirms to me that the
3  judgment that I -- the confidence I placed in the police
4  officer was the same confidence that Dr. Gonzalez had.
5     Q  And I am not fussing at you. I am just trying to
6  find out whether it would have made a difference.
7     A  I --
8     Q  Because I gather from your answer --
9        THE COURT REPORTER: I can't get two at the
10  same time.
11        MR. BARRIENTOS: I apologize.
12        MR. POPE: If you can just answer his question
13  in the affirmative or the negative. I mean, if you can.
14     Q  (BY MR. BARRIENTOS) I gather --
15        MR. POPE If you can. Can you answer it? Are
16  we through with the question or do you want him to answer the
17  question?
18     Q  (BY MR. BARRIENTOS) Do you -- do you remember the
19  question?
20     A  I am going to ask you to restate the question.
21     Q  Okay. And we will try it again. I gather from your
22  response that the answer is no, this would not have made any
23  difference in the level of security that your department would
24  have provided with regard to this patient.
25     A  I don't believe that it would have made a

Page 112

1  difference.
2     Q  Okay. Do I take it from your response that you also
3  believe that at the time that this incident occurred that Mr.
4  Gonzalez was not a threat to himself or others?
5        MR. POPE: Objection. Form.
6     Q  (BY MR. BARRIENTOS) If were -- if you were -- let me
7  try and clarify that. If you are saying that it would not
8  have made a difference in the level of security you would have
9  provided, do I understand that to also mean that you believe
10  he was not a threat to himself or others?
11        MR. POPE: From the security standpoint?
12        MR. BARRIENTOS: From the security standpoint.
13        THE WITNESS: I am going to say from a security
14  standpoint, I believe that the threat was mitigated by the
15  presence of a full-time police officer.
16     Q  (BY MR. BARRIENTOS) Okay. And I -- I understand and
17  appreciate that response. What I -- but I am not asking you
18  whether you thought the threat was mitigated. I am asking you
19  whether you thought he was a threat to himself or others. Do
20  you see the distinction in the question I am asking?
21     A  I think you are asking me to make a judgment that I
22  don't know I had the information. I wasn't present during his
23  arrest. I didn't see any of his acticians(sic). I know that
24  the stories that the police offiers told me that he was
25  capable, allegedly capable of a significant amount of

Page 113

1  violence. So, yes, he was a threat based on those
2  allegations. In my presence, he did not do anything that
3  would have led me to believe that he was a threat. And
4  whatever potential threat was there was mitigated by the fact
5  that he had a full -- a police officer assigned to him full
6  time. He had a police officer standing at his bedside the
7  entire time that he was in the hospital.
8     Q  And I understand that you believe the threat was
9  mitigated. But what -- what I am trying to figure out is
10  whether you believed that -- that he was -- he constituted a
11  threat to himself or others.
12     A  At the -- at the immediate time when I was there, I
13  don't believe he was a threat.
14     Q  Okay.
15     A  Whatever threat -- potential threat was there was
16  eliminated by the presence of a police officer with the
17  handcuff, any threat that I saw. Obviously, in hindsight, we
18  know that his threat level -- he was capable of escalating
19  that up to -- to a different level than we expected. So --
20     Q  I am sorry.
21     A  Go ahead.
22     Q  You prefaced your answer by saying that at the time,
23  in terms of your personal contact with him, he did not appear
24  to be a threat.
25     A  No, he did not.

29 (Pages 110 to 113)

BLAKE HUBBARD                                                                            April 29, 2003

**Page 114**

1    Q   Okay. Now, in terms of making security decisions,
2    is -- as director of security, are you going to rely only on
3    the observation that you personally make or are you going to,
4    in other words, ignore other information that is made
5    available to you?
6    A   No. I did not ignore the other information. I did
7    take into account the information provided to me by the police
8    -- La Feria Police Department, my own officer's observations
9    when he came through the ER, my own contact with him. I took
10   all of the information I had into account and believed that
11   whatever potential threat may be there wsa mitigated by the
12   fact that he had a full-time guard. He was in a secluded and
13   restrained environment away from other patients. He was in
14   the back corner, farthest away from other parts of the floor
15   as possible. And I thought that the appropriate precautions
16   had been taken.
17   Q   All right. If -- let me ask you some specific
18   questions about this particular setup with the officer who
19   remained with Mr. Gonzalez. It was on the fifth floor?
20   A   Yes.
21   Q   Is that the top floor of the hospital?
22   A   No.
23   Q   What --
24   A   It is the sixth floor.
25   Q   Sixth floor. Okay.

**Page 115**

1    A   In that tower.
2    Q   Is -- is there, to your knowledge, or was there a
3    specific area or areas of the hospital where forensic patients
4    would be housed?
5    A   No. They are housed where it is more -- where they
6    receive the most appropriate care.
7    Q   Depending upon what their injuries are?
8    A   That's correct.
9    Q   Okay. Is there -- in terms of the assistance that
10   the security department might be called upon to -- to provide,
11   if the officer has -- forensic officer has an emergency, like
12   the one that occurred in this case, how are they supposed to
13   summon the security personnel for assistance?
14   A   They have -- they can either ask the floor staff to
15   summon security for them or we -- when we discover -- we meet
16   the officers and team with them, we will give them our phone
17   number, the departmental phone number. And so they can use
18   the telephone to contact us directly if they would so choose.
19   Q   Okay. And in terms of contacting the security
20   personnel, I assume, because I haven't seen it myself, and you
21   have to tell me, there is a -- an office in the hospital with
22   a person with a phone in it and if you pick up and call the
23   security number it rings to that desk.
24   A   That's correct.
25   Q   And there is a -- is there a person there who is

**Page 116**

1    manning that 24 hours a day?
2    A   That's correct.
3    Q   Okay. If -- is there an overhead paging system in
4    the hospital?
5    A   There is.
6    Q   Is it used to summon security personnel?
7    A   Not typically.
8    Q   Okay. Was it in this instance?
9    A   No.
10   Q   Is there some reason why that would not have
11   occurred?
12   A   There -- because there is more expedient means to
13   contact the security via -- the telephone would be more
14   expedient. It is more reliable in that you get a person on
15   the other end. If you just something over the overhead pager
16   there is certainly potential that it is not heard. There are
17   places in the medical center where there are not speakers.
18   Q   For Officer Ramirez, who was in this room, with this
19   -- with this particular individual, so if he wanted to summon
20   someone for help, security officer, he could go pick up the
21   telephone and call them?
22   A   Correct.
23   Q   Do you know in this room where the telephone was
24   situated?
25   A   On a table beside the bed. I believe it was sort of

**Page 117**

1    in the corner by the window between the window and the bed.
2    Hard to explain. If you had a layout of the room I could show
3    you where I believe it was typically set up.
4    Q   I think there is a diagram somewhere in here. But
5    let me ask you. Would it -- would it be fair to say that the
6    hospital(sic) was in one corner of the room, Mr. Gonzalez, the
7    patient's bed was in the middle of the room, roughly. And
8    Officer Ramirez was near the door, which in the roughly
9    opposite corner?
10   A   When you said hospital, I think you meant telephone.
11   Q   Yes. Telephone.
12   A   The telephone was in the corner probably opposite
13   from the door to the entrance to the room with the -- with the
14   patient bed in between.
15   Q   So in order to get to the -- to get to the hospital
16   -- in order to get to the telephone and call security, the
17   forensic officer, whoever that happens to be, has to actually
18   go towards the subject patient.
19   A   No. Actually, he could step out of the room and use
20   the phone that is in the hall.
21   Q   I see.
22   A   There is a wall phone mounted just -- I don't know,
23   15 feet away from that patient room. There are -- we have
24   phones mounted in all of the hallways and all of the patient
25   units for the nurses to use or anybody who is in -- in the

(210) 377-3027                ESQUIRE DEPOSITIONS SERVICES           FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100        SAN ANTONIO, TEXAS 78230              (800) 969-3027

7ba3a3f1-ffd9-4a8b-a584-489da2454b6c

BLAKE HUBBARD                                                                April 29, 2003

Page 118

1  unit can use the hallway phones.
2     Q   Do you know whether any of the officers who were
3  standing guard were oriented to the availability of phones
4  other than the ones in the room?
5     A   I don't know that specifically.  It -- it is a
6  typical point that the security officers are asked to point
7  out, but I don't -- can't speak to Officer Ramirez
8  specifically.  I was not the one who oriented.
9     Q   The other choice the officer might have, if he
10 chose -- if he did not go to use the phone either in the
11 corner of the room or outside in the hallway, would be to
12 leave the room and go look for security personnel.  That might
13 be one -- one other option
14    A   Yes.
15    Q   It might not be the --
16    A   Not the best option.
17    Q   Not the wisest one.  But that is something they
18 could do?
19    A   Yes.  Certainly.
20    Q   And they could -- I think the other thing you
21 mentioned was call the hospital personnel and ask them to
22 summon security?
23    A   Certainly.  Any staff on the floor would be aware
24 how to contact security people.
25    Q   Any other ways other than those three that we have

Page 119

1  enumerated?
2     A   At that time, that would be only ways.
3     Q   Do you know whether Officer Ramirez was allowed to
4  keep his radio?
5     A   I do believe he had a radio.
6        THE COURT REPORTER:  Let me just turn my paper
7  over.
8        MR. BARRIENTOS:  Sure.
9        THE COURT REPORTER:  Thank you.
10    Q   (BY MR. BARRIENTOS)  Mr. Hubbard, I was looking
11 through some of the hospital records.  And there are a lot of
12 initials.  I assume these stand for individuals.  At page 82,
13 for example.
14    A   Okay.
15    Q   There is an individual -- there is an entry dated
16 September 18th, 10:55 -- and let ask you, I assume that that
17 is military time.  Is that correct?
18    A   I believe.  I would assume so as well.
19    Q   So that would be 10:55, about 11:00 in the morning?
20 There is an entry there and there are two initials, RG.  Do
21 you know who that is?
22    A   If you look at the bottom of the page, it says RG,
23 Rebecca Gallego, LSW, which is a licensed social worker.
24    Q   Okay.  Do you know whether that person is still
25 employed at Valley Baptist Medical Center?

Page 120

1     A   I have no idea.
2     Q   Okay.  There is an entry in -- in that paragraph,
3  the third sentence from the bottom, that reads:  Possible
4  death/suicidal attempt is predicted in terms of patient's
5  girlfriend reported missing as well.  Patient is in stable
6  condition.  And SS will continue to follow him for
7  developments.
8        Did -- is social services a -- Ms. Gallegos'
9  department, would you-all have received information from --
10 from them as well?  I mean --
11    A   Not -- not as a matter of practice.  No.
12    Q   If you can give me just a minute, I may be just
13 about done.
14    A   Okay.
15       MR. BARRIENTOS:  Give me one second.
16       (Brief pause)
17    Q   (BY MR. BARRIENTOS) Mr. Hubbard, at Exhibit Number
18 13, I think in the language there is a -- a reference that the
19 hospital defines the education to be provided to forensic
20 staff.  Is that still the -- the policy or practice at the
21 hospital?  And I think that in the top, the very first
22 paragraph.
23    A   Yeah, I see that.  I guess I am not sure exactly
24 what that sentence means.  We -- we are required -- the
25 standard that -- that provides the foundation for this

Page 121

1  activity is a joint commission standard that is very -- that
2  just basically says the hospital will educate forensic -- the
3  staff.  And so it is a single statement.  And so, basically,
4  it gives us a lot of latitude in defining what -- what
5  information we are going to provide to them.  And there --
6  there is a variety of things that are provided.  I have been
7  to hospitals that provide literally nothing to them.  We have
8  chosen to provide a -- or try to provide a more comprehensive
9  set of information that we think would be helpful to them as
10 they are present in our medical center.
11    Q   Okay.  So -- and the question I have is -- is
12 that -- that was the practice at the time that this incident
13 occurred?
14    A   That's correct.
15    Q   Is it still the practice?
16    A   Yes.  We still -- we still have created a list of
17 information we feel is pertinent or important to -- may be
18 important to them.
19    Q   What does the -- does the current policy that is now
20 in effect contain any procedures that you believe would have
21 prevented an incident like this from occurring?
22       MR. POPE:  Objection.  Form.
23       THE WITNESS:  No.
24    Q   (BY MR. BARRIENTOS) The -- do you believe that
25 additional restraints, had they been used on Mr. Gonzalez,

31 (Pages 118 to 121)

BLAKE HUBBARD                                                              April 29, 2003

Page 122

1 would have prevented this incident from occurring?
2        MR. POPE: Objection. Form.
3        THE WITNESS: In hindsight, sure. You could
4 say if he was restrained more fully and not capable of getting
5 out of bed, it would not have probably occurred. So, in
6 hindsight -- but I think at the -- I don't know that it is a
7 fair question because at the time I am sure everybody did
8 their best to make the best judgments they could and -- and
9 acted accordingly.
10       Q   What is the basis for that statement?
11       A   Just my experience at the hospital and people who
12 work there, I know that they all daily exhibit heroic efforts
13 to provide care to people. And I know Dr. Gonzalez and I
14 respect him as a physician and know that he would make the
15 best decisions that he could. He is very passionate about his
16 work. And I think if anybody thought there was something they
17 could have done that would have provided a better -- better
18 care, then it would have been done.
19       Q   Do you feel as director of security that Mr.
20 Gonzalez should have been more fully restrained given the
21 information that was known to the hospital, not to you just
22 personally, but to the hospital about his individual
23 circumstances?
24       MR. POPE: Objection. Form.
25       THE WITNESS: No. I -- as far as the -- I

Page 123

1 think the -- I am not going to speak to the medical decisions
2 that were made about any type of clinical restraint.
3        Q   Well --
4        A   When I looked at the security standpoint, and I
5 thought that the security precautions that were in place were
6 appropriate. I do -- knowing some information that I know
7 now, I think maybe some other decisions could have been made.
8 I know that the police department had more information about
9 the patient's condition than I -- even I did. And so they
10 made the decisions that they made. And I think everybody
11 probably made the best decision -- thought they had made the
12 best decisions they could at the time.
13       MR. GARZA: Objection. Nonresponsive.
14       Q   (BY MR. BARRIENTOS) What additional information do
15 you believe was held by the -- you say the police department,
16 I assume you mean the La Feria Police Department?
17       A   Correct. The La Feria Police Department.
18       Q   What additional information is it that you believe
19 that they have -- that they had at the time?
20       A   It is my understanding that Dr. Gonzalez and that
21 the then chief of the police -- the La Feria Police
22 Department, Bobby Gonzalez, had had a conversation regarding
23 this patient.
24       Q   Okay.
25       A   I mean, I don't know what -- I don't know what that

Page 124

1 was. I was not privy to that information.
2        Q   Okay. You don't know what the conver -- what the --
3 what the nature of the substance of the conversation was, but
4 --
5        A   I have since seen a report that indicates that
6 conversation occurred.
7        Q   All right. And what infor -- specifically, what
8 information is it that you believe that the La Feria Police
9 Department had that -- that makes you believe that they should
10 have or could have done something differently than what they
11 did?
12       A   Based on the report I saw that was authored by, I
13 believe, Chief Gonzalez, I believe he had some more specific
14 information as to the patient's medical condition that I did
15 not have. So I am assuming that that information was conveyed
16 to their officers and that they used that information in the
17 decisions that they made. That is a big assumption. I don't
18 know any of that to be --
19       Q   Okay. It sounds to me what you are telling me is
20 that officer -- or, excuse me, Chief -- then Chief Gonzalez
21 and Dr. Thomas Gonzalez --
22       A   Gonzalez.
23       Q   -- had a conversation where there was some history
24 about Mr. Gustavo Gonzalez' long and well documented history
25 of mental illness?

Page 125

1        A   I can't speak to whether it was long or well
2 documented. I know they had a conversation about Dr.
3 Gonzalez' impressions of -- of Mr. -- patient Gonzalez.
4        Q   Okay. And this conversation would have taken place
5 while Mr. Gustavo Gonzalez was still alive?
6        A   I assume so.
7        Q   And so, then, this would have been information that
8 Chief -- Police Chief Gonzalez would have had and Dr. Gonzalez
9 would have also had.
10       MR. GARZA: Objection. Form.
11       THE WITNESS: I believe so. Based on the
12 report I saw. All I know is that -- what I am trying to get
13 at is I think the parties involved used the information that
14 they had to make the best decisions. You asked me if I had
15 all of this information that is now out there could we have
16 made better decisions. I am not going to Monday morning
17 quarterback.
18       Q   (BY MR. BARRIENTOS) Well, no -- I -- I am asking --
19 I don't know if that's what I asked. But -- it may have
20 sounded like it at the time. That's fair enough.
21       What I think I want to know is whether -- whether
22 you believe that he should have been more fully restrained
23 than he was at the time given the information that was known
24 at the time. And so if I implied some different question I --
25 I understand what I am asking now is given the information

32 (Pages 122 to 125)

BLAKE HUBBARD                                                    April 29, 2003

**Page 126**

1 that was had at the time that Mr. Gonzalez was actually there
2 in the hospital, do you believe as director of security that
3 he should have been more fully restrained?
4    MR. POPE: Objection. Asked and answered.
5    THE WITNESS: I believe the appropriate
6 restraint met security measures with regards to forensic
7 restraint and presence of police officers and security rounds
8 were taken. I believe appropriate security measures were in
9 place.
10   Q   (BY MR. BARRIENTOS) And that is based upon what?
11 The result that actually occurred in this case?
12   MR. POPE: Objection. Form.
13   THE WITNESS: Based upon the information
14 that was -- that we had that I think we made the appropriate
15 decisions. Obviously the result that occurred was tragic.
16 But I don't think that -- I would not say that the result that
17 occurred was the -- was necessarily the result of negligent or
18 security. I am not going to -- what I am saying is -- how can
19 I say it. The result did not occur because there was
20 something we did not do.
21   Q   (BY MR. BARRIENTOS) So, then, this event could
22 happen again, same circumstances, same facts, and your opinion
23 would still be the same? Is that what I understand?
24   A   I am going to ask you to restate that question.
25   Q   Sure.

**Page 127**

1    A   So I can see what -- try to get at what I think you
2 are trying to ask me.
3    Q   If your testimony is, and I think I understand it,
4 under the circumstances, based on what was known at the time,
5 you believe that the hospital staff did all they could -- did
6 what they were required to do with regard to security. First
7 of all, is that -- is that -- am I correct? Is that your
8 testimony or your belief?
9    A   It is my belief that we did all that we could and
10 all that was appropriate based on the circumstances and
11 information that we had.
12   Q   Okay. That situation happens today, do I take it
13 from your testimony that the hospital is going to follow the
14 exact same procedures and that -- and that it did in -- in the
15 previous incident with Mr. Gonzalez?
16   A   I am going to say we would probably follow very
17 similar procedures and that we have had instances since the --
18 Mr. Gonzalez being a patient at our facility that were
19 similar, not exact, similar that we had potentially violent
20 forensic patients in our facility and we reacted very much the
21 same in that we placed our confidence in the police officers
22 who were guarding them. We provided support to them and
23 provided comfort for our staff so that they could provide the
24 necessary medical care.
25   MR. POPE: Object to responsiveness.

**Page 128**

1    Q   (BY MR. BARRIENTOS) If the -- if it had been
2 determined to use additional restraints for Mr. Gonzalez at
3 the time -- I think you have already told me that was -- that
4 that was feasible. There were -- there were other restraints
5 that could have been used or higher degree of restraint that
6 could have been used. Is that correct?
7    MR. POPE: Objection. Form.
8    THE WITNESS: That's a medical decision.
9    Q   (BY MR. BARRIENTOS) No. No. I am sorry. Let me
10 -- I am not asking you to tell me whether they should have
11 been used. I am asking if -- assuming a doctor or some
12 medical professional had decided this gentleman needs to be
13 restrained and needs to be restrained more fully than -- than
14 -- than have one extremity restrained, is it correct that
15 there were other forms of restraint that could have been used
16 to more fully restrain him at that time?
17   A   Yes.
18   Q   And can you tell me what other forms of restraint
19 there would have been available to more fully restrain him at
20 the time?
21   A   Restraints available through the hospital?
22   Q   Yes, sir.
23   A   Or through the police?
24   Q   First, through the hospital.
25   A   We have arm and leg restraints that will restrain

**Page 129**

1 the arms and legs down to the bed. We have a vest that goes
2 around the upper torso of the patient's body and restrains the
3 torso to the bed.
4    Q   All right. Let me -- any others other than the arm
5 and leg restraints and the torso restraint?
6    A   That is all I am familiar with.
7    Q   Okay. Now, first of all, let me go back to arm and
8 leg restraints. Are these --
9    A   At the direction of -- I am sorry. I don't mean to
10 interrupt. But at the direction of the physician, there are,
11 in some cases, sedatives used to calm -- chemically calm down
12 a patient.
13   Q   Okay. Do you know -- I know you are not a doctor,
14 and so if you can't answer this, just tell me you can't. Do
15 you know whether the psychotropic medication that would have
16 been prescribed by Dr. Gonzalez is included among the chemical
17 restraints?
18   A   I don't know what medicines would --
19   Q   Okay.
20   A   -- be included in that or what he may have
21 prescribed.
22   Q   Fair enough. On the hand and leg restraints or arm
23 and leg restraints, were these also handcuffs of the type that
24 where most people are familiar, the metal type that go around
25 the wrist and the ankles or is it some other type of

33 (Pages 126 to 129)

BLAKE HUBBARD                                                                      April 29, 2003

Page 130

1  restraint?
2      A    They are a very heavily padded leather restraint
3  that wraps around either the wrist or the ankle.  And there is
4  a -- actually, a padded foam that goes inside of that with the
5  leaded -- leather -- it is leather on the outside.  I don't
6  know, probably some sort of fake sheep skin-looking stuff on
7  the inside, that goes around and has quite a bit of padding.
8  And so then they buckle to the patient's wrists or ankles and
9  then are strapped to the bed.
10     Q    So it doesn't -- it is not the metal to skin type of
11 things we see when someone is arrested and taken into
12 custody.
13     A    No.
14     Q    It is -- it is more comfortable and perhaps is -- is
15 better for the patient not being able to hurt themselves or
16 something like that.  Is that correct?
17     A    Correct.
18     Q    But they are secure?
19     A    Yes.
20     Q    And those are available, readily available at the
21 hospital if a medical decision is made to use them?
22     A    That's correct.
23     Q    The -- the torso restraint that you described.  I
24 keep getting this picture of what I call a straitjacket.  Is
25 it something different than that?

Page 131

1      A    It is a straitjacket without sleeves.  It is like a
2  sleeveless shirt that has straps on the back that will hold
3  the -- restrain the patient to the bed.  It mainly will keep
4  them from sitting up.
5      Q    Okay.
6      A    Keep them in a prone position.
7      Q    And that, again, is something that is readily
8  available at the hospital should there be a decision made by
9  medical personnel --
10     A    Correct.
11     Q    -- that it is appropriate.
12         MR. BARRIENTOS:  Mr. Hubbard, you have been
13 very, very patient.  I thank you for your time.  And I pass
14 the witness.
15         MR. GARZA:  Can we go off the record for a
16 moment.
17         (Short break)
18         E X A M I N A T I O N
19     Q    (BY MR. GARZA) Mr. Hubbard, my name is Eddie Garza.
20 My firm represents Officer Ramirez and the city of La Feria.
21 You and I have never met before today.  Right?
22     A    No.
23     Q    I apologize in advance.  I am going to be asking you
24 questions that may seem a little spotty because I am going to
25 be jumping from -- from one issue to another.  But I just want

Page 132

1  to go through things, hopefully, that have not been covered
2  yet.  I am not trying to rehash over the same ground we have
3  already been over, but I may inadvertently get into some areas
4  that may have been partially covered previously.  Okay?
5      A    Okay.
6      Q    You used to work as a police officer.  Correct?
7      A    Correct.
8      Q    How many years was that?
9      A    Four years full-time, and about five years as a
10 reserve.
11     Q    Do you -- are you -- is your TCLEOSE certification
12 still current?
13     A    It is.
14     Q    Are you certified to carry a weapon?
15     A    I am.
16     Q    Do you carry a weapon?
17     A    No.
18     Q    How many hours a week do you put in currently as a
19 police officer?
20     A    Currently, I am not doing any.  I am injured.  I
21 have a back injury that prevents me from doing that.
22     Q    How did you sustain your injury?
23     A    I don't remember.  It is cumulative.  The doctor
24 says it is a cumulative injury.  I have a ruptured disc.
25     Q    It was not because of an arrest of something of that

Page 133

1  effect?
2      A    No.
3      Q    Do you feel qualified to render expert opinions on
4  the use of force of police officers?
5      A    No.
6      Q    You did not witness any of the events that occurred
7  -- scratch that.  You did not witness the altercation between
8  Officer Ramirez and Mr. Gonzalez.  Correct?
9      A    I did not.
10     Q    None of the security personnel at Valley Baptist
11 actually witnessed the altercation itself.  Correct?
12     A    That's correct.
13     Q    Did any of the personnel witness Officer Ramirez
14 discharging his side arm?
15     A    No.
16     Q    Do you have any criticisms of Officer Ramirez'
17 actions on the day of the incident?
18         MR. POPE:  Objection.  Form.
19         THE WITNESS:  I do not.
20     Q    (BY MR. GARZA) Do you have any criticisms of any
21 actions by the La Feria Police Department associated with the
22 custody of Mr. Gonzalez?
23         MR. POPE:  Objection.  Form.
24         THE WITNESS:  I do not.
25     Q    (BY MR. GARZA) Do you know if anyone at Valley

34 (Pages 130 to 133)

BLAKE HUBBARD                                                                April 29, 2003

Page 134

1 Baptist Medical Center has any criticisms of Officer Ramirez'
2 actions?
3          MR. POPE: Objection. Form.
4          THE WITNESS: I do not.
5      Q    (BY MR. GARZA) Do you know if any of your security
6 personnel have expressed criticisms to you about any of
7 Officer Ramirez' actions on the day of this incident?
8      A    I have not heard any. No.
9      Q    Given what you know about the circumstances leading
10 up to this incident and the actions of Mr. Ramirez, do you
11 believe he acted appropriately?
12         MR. POPE: Objection. Form.
13         THE WITNESS: Can you ask it again?
14         MR. GARZA: Sure.
15     Q    (BY MR. GARZA) Given what you know about the
16 circumstances leading up to this altercation and to the
17 actions taken by Officer Ramirez, do you believe he acted
18 appropriately under the circumstances that he was faced with?
19         MR. POPE: Objection. Form.
20         THE WITNESS: As my opinion as an individual?
21         MR. GARZA: Yes, sir.
22         THE WITNESS: I believe that he did.
23     Q    (BY MR. GARZA) Is it a fair statement -- and if you
24 know the answers to these questions, then I would like to hear
25 a response. If you don't know the answer to one of my

Page 135

1 questions, feel free to let me know that. And I didn't ask
2 you this before or make this notation, but if you don't
3 understand one of my questions, I ask that you please ask me
4 to rephrase it, explain it, clarify it, anything to make you
5 understand before you answer. Okay?
6      A    Sure.
7      Q    Have you understood all of my questions so far other
8 than the ones you asked me to clarify for you?
9      A    Yes.
10     Q    Is it fair to say that all the doctors and
11 psychiatrists who treat patients at Valley Baptist have to be
12 approved by some Valley Baptist staff or board or something to
13 that effect?
14         MR. POPE: Objection. Form.
15         THE WITNESS: I am going to ask you to restate
16 it.
17     Q    (BY MR. GARZA) Sure. The doctors and psychiatrists
18 who treat patients at Valley Baptist, they have to be approved
19 by Valley Baptist Medical Center before they can treat
20 patients there. Correct?
21         MR. POPE: Objection. Form. I am going to
22 instruct the witness not to answer that question.
23         MR. GARZA: What is the basis for the
24 objections.
25         MR. POPE: The basis for the objection this

Page 136

1 witness does not have knowledge as to credentialing policies
2 and procedures at the hospital. And I think it would be
3 unfair to ask him that particular question. It would also
4 potentially mislead the finder of fact if he is supposed to
5 have substantive knowledge about that. That is the basis for
6 the objection.
7          MR. GARZA: I understand, Counsel.
8      Q    (BY MR. GARZA) And my question to you is posed to
9 see if you do know the answer to the question. If you don't
10 know, feel free to explain that to me. Okay?
11     A    Okay.
12     Q    I don't want to be asking you about stuff you don't
13 know. I just want to know what you do know. So if you don't
14 know about it, just let me know.
15     A    I will say I know they go through a credentialing
16 process to become a member of our medical staff.
17     Q    Is anyone other than medical staff doctors and
18 psychiatrists allowed to make medical assessments on patients
19 at Valley Baptist Medical Center?
20         MR. POPE: Could you ask that again?
21         MR. GARZA: Sure.
22         THE WITNESS: That's what I was going to ask.
23         MR. GARZA: I will be happy to ask it again.
24     Q    (BY MR. GARZA) Anyone other than medical staff,
25 doctors or psychologists allowed to make medical assessments

Page 137

1 about patients at Valley Baptist Medical Center?
2      A    I am not sure I know how to answer that. We -- we
3 have nurses that do triage assessments and things like that.
4 So --
5      Q    And I consider nurses to be part of the medical
6 staff or employees of the Valley Baptist Medical Center other
7 than custodial employees or, I would imagine, security
8 personnel.
9      A    There are certain times when nurses will do an
10 assessment of a patient. ER triage is one of the most common
11 places.
12     Q    So you have nurses, medical staff, doctors, and
13 psychiatrists who are allowed to make medical assessments on
14 patients at Valley Baptist Medical Center. Correct?
15     A    Generally, I would say yes.
16     Q    Are there any other personnel other than those I
17 just mentioned that would be allowed by Valley Baptist Medical
18 Center to make medical assessments about their patients?
19     A    No.
20     Q    With respect to decisions on medical treatment to
21 the patients, those are also decisions that are the
22 responsibility of the doctors, staff, nurses, and
23 psychologists that are working there at the Valley Baptist
24 Medical Center. Correct?
25         MR. POPE: Objection. Form.

35 (Pages 134 to 137)

BLAKE HUBBARD                                                                April 29, 2003

Page 138

1       THE WITNESS: Can you ask it again?
2       MR. GARZA: Sure.
3    Q   (BY MR. GARZA) Decisions made with respect to
4  medical treatment of patients are left up to doctors,
5  psychologists, psychiatrists, nurses, and medical staff of the
6  Valley Baptist Medical Center. Is that correct?
7       MR. POPE: Objection. Don't answer that
8  question as it is propounded. And you want the basis?
9       MR. GARZA: Well, I can go one by one if you
10  don't like the compound nature of it.
11       MR. POPE: Well --
12       MR. GARZA: I was just trying to speed things
13  along by getting it in one sentence.
14       MR. POPE: Well, my objection really is more as
15  to him speaking as to the scope of medical treatment and who
16  is allowed to do it and not. That's -- I am going to instruct
17  him not to answer that because it is not his area. I think we
18  are going far afield.
19    Q   (BY MR. GARZA) Does Valley Baptist Medical Center
20  allow non-Valley Baptist Medical staff or employed physicians
21  to make medical decisions about their patients?
22    A   All right. That's a loaded question, so I am going
23  to ask you to -- there are a lot of issues there. Valley
24  Baptist doesn't employ physicians.
25    Q   Can a police officer or a law enforcement agency in

Page 139

1  the Rio Grande Valley -- will he be allowed to make a medical
2  assessment or a medical decision about a patient at Valley
3  Baptist Medical Center?
4    A   No.
5    Q   Do you personally know what information was provided
6  to Officer Ramirez about Mr. Gonzalez prior to the incident
7  made the basis of this lawsuit?
8    A   I do not know.
9    Q   Does any of your security staff have personal
10  knowledge of what Officer Ramirez knew prior -- about Mr.
11  Gonzalez prior to the incident?
12       MR. POPE: Objection. Form.
13    Q   (BY MR. GARZA) If you know.
14    A   I don't -- I don't know.
15    Q   Have any of your security staff communicated to you
16  any information that was passed on to them from Officer
17  Ramirez?
18    A   I don't recall.
19    Q   Could you please describe for me the conversation
20  you had with Officer Ramirez on the day of the incident?
21    A   I did not speak with Officer Ramirez until the
22  morning after the shooting.
23    Q   What did you-all talk about?
24    A   I asked him if he was okay. I talked about his --
25  the injuries he sustained.

Page 140

1    Q   Do you remember what injuries he sustained?
2    A   I believe there were some facial injuries. I don't
3  know exactly what the amount.
4    Q   Do you know how he sustained them?
5    A   I know how he -- he -- I know what -- how he told me
6  he received them.
7    Q   What did he tell you?
8    A   That he was assaulted by Mr. Gonzalez with the --
9  with a pair of shackles.
10    Q   Did he discuss anything else with you?
11    A   Not at that time.
12    Q   How many other conversations did you have with him?
13    A   I had contact with him several times during the
14  course of Harlingen Police -- the investigation conducted by
15  the Harlingen Police Department. They conducted a reenactment
16  and some different things like that where they came back to
17  the medical center to do that. At that time, I was involved
18  with the Harlingen Police Department as a by-stander, just
19  escorting them, providing them assistance as they needed it.
20  And Officer Ramirez was present during a couple of those
21  times.
22    Q   Did you speak to him about this incident or any of
23  the circumstances leading up to the incident during any of
24  those occasions?
25    A   I spoke to him about the incident regarding of --

Page 141

1  you know, offering him some emotional support.
2    Q   What did you tell him?
3    A   I spoke to him about what -- some of the feelings
4  that he may have had regarding shooting somebody, were okay to
5  have those feelings. And that I knew from experience that you
6  could get through them.
7    Q   Had you ever had an occasion where you had to
8  discharge your weapon in your line of duty?
9    A   Yes.
10    Q   Did you-all discuss the incident at all other than
11  what you have told me here today?
12    A   No.
13    Q   Did you ever speak with Chief Gonzalez about this
14  incident?
15    A   I spoke to him briefly immediately following the
16  accident. He responded to the scene.
17    Q   And what did you-all talk about?
18    A   Mainly about the condition of Officer Ramirez.
19    Q   Did you discuss any information about Mr. Gonzalez
20  himself?
21    A   The patient?
22    Q   Patient Gonzalez.
23    A   No.
24    Q   The restraint policy that has been discussed here
25  today that was attached as, I believe, Exhibit 13, it is

36 (Pages 138 to 141)

BLAKE HUBBARD                                                                                    April 29, 2003

Page 142

1  labeled Restraints on top of it. I am not sure what exhibit
2  number it is.
3      A   Eleven.
4      Q   Eleven. Okay. That policy, from what I understand,
5  that you have been telling us here today, applies only to
6  situations where a restraint has been applied by the hospital
7  staff. Is that correct? Or the doctors associated with the
8  treatment of a patient.
9      A   It would apply when -- to restraints applied at the
10 order of a physician.
11     Q   In other words, this restraint policy is not
12 followed with respect to restraints that are forensic?
13     A   No. In fact, it does not apply to forensic
14 restraints.
15     Q   So if an officer handcuffs a patient to a bed rail
16 for custodial purposes, that is not something that the medical
17 center staff or doctors would be monitoring pursuant to this
18 restraint policy marked as Exhibit 11. Is that correct?
19     A   That's correct.
20     Q   Do you know if anyone at Valley Baptist ever made a
21 determination about whether or not additional straints --
22 additional restraints were not needed?
23     A   Can you ask that again?
24     Q   Sure. Do you know if anybody at Valley Baptist
25 Medical Center, the staff, or doctors, or nurses made a

Page 143

1  determination that additional restraints would not be needed?
2      A   I don't know of a specific decision.
3      Q   Did anyone at Valley Baptist Medical Center voice
4  any objections to the use of handcuffs by Officer -- by the
5  officers from the La Feria Police Department?
6      A   I don't know of any objections to the use of the
7  handcuffs.
8      Q   Was the use of handcuffs in this situation on Mr.
9  Gonzalez approved by Valley Baptist Medical Center?
10     A   I don't know that we had a -- I don't know that we
11 had a dog in that fight. I guess it -- it was the forensic
12 decision to handcuff him to the bed.
13     Q   If a doctor or a psychologist had deemed that
14 restraint unwarranted, unnecessary, they could have ordered
15 that that restraint be removed. Correct?
16     A   I think it would have been more of a request. They
17 would have asked them to remove and explain what the reasons
18 were that they needed to have it removed for medical purposes
19 or care purposes, would be the typical way that goes down --
20 that happens.
21     Q   If a conflict were to occur between a custodial
22 officer and a medical physician at Valley Baptist Medical
23 Center about removing a restraint to where the hospital staff
24 wants to remove it for medical reasons and the officer does
25 not, does the hospital have that authority to remove that even

Page 144

1  over and above the officer's objections?
2      A   I don't know -- I don't know that I can answer that.
3  The circumstances never occurred, so I have never had occasion
4  to research what level of authority we would have to override
5  a decision by a police officer.
6      Q   In your years working at Valley Baptist, you have
7  never experienced an officer who refused to comply with the
8  doctor's orders. Correct?
9      A   Correct.
10     Q   Do you know if Officer Ramirez ever refused to
11 comply with any requests or orders by a doctor or a physician
12 at Valley Baptist Medical Center?
13     A   To my knowledge, he did not.
14     Q   When this policy -- the restraint policy marked as
15 Exhibit 11 talks about clinical justification, is that
16 something that doctors or psychologists are better suited to
17 determine or is that something within your knowledge?
18     A   That is a medical issue, a physician issue.
19     Q   Does Valley Baptist have any employees that they
20 consider to be part of a forensic staff or is that strictly
21 when they -- when the term forensic staff is used in these
22 policies it means outside personnel who are guarding a
23 prisoner or a suspect in a crime?
24     A   It applies to outside guards or officers who are
25 guarding a patient, a prisoner patient.

Page 145

1      Q   Back in the year 2000, was the security staff
2  required to go over the non-clinical information subjects in
3  the forensic staff information list with any officer who was
4  guarding a arrestee or suspect?
5      A   They were required to make an attempt to do so
6  subject to the willingness of the officer.
7      Q   Do you know if that was -- that discussion regarding
8  the forensic staff information list ever took place between
9  one of your security personnel and Officer Ramirez?
10     A   I don't. I don't have any knowledge of whether it
11 did or did not.
12     Q   Okay. To your knowledge, was Officer Ramirez
13 cooperative in addressing whatever concerns you-all may have
14 brought to his attention or whatever policies or procedures
15 you wished for him to follow?
16     A   To my knowledge. I did not hear any complaints that
17 he was otherwise.
18     Q   And based on what you know about this incident,
19 Officer Ramirez certainly didn't violate any of your -- Valley
20 Baptist Medical Center's policies. Correct?
21     A   No, he did not.
22     Q   Ruben Ruiz is one of your security officers or was
23 one of your security officers.
24     A   He is.
25     Q   Is he still employed with Valley Baptist?

                                                                      37 (Pages 142 to 145)

BLAKE HUBBARD                                                                    April 29, 2003

Page 146

1    A   He is.
2    Q   Was he commissioned or non-commissioned?
3    A   He is a commissioned security officer.
4    Q   So he carried a side arm?
5    A   He does.
6    Q   Did he have a radio back in 2000?
7    A   He did.
8    Q   Did all of your security personnel have radios?
9    A   Yes, they all do.
10   Q   Do you know if Officer Ramirez was allowed to use
11   his personal radio on the day of the incident?
12   A   My recollection is that he did this have his
13   department issued radio.
14   Q   Do you know whether he was instructed whether or not
15   he could use it?
16   A   I don't know.
17   Q   Are the radios used by security staff of a different
18   frequency than those used by the law enforcement personnel
19   here in the Valley?
20   A   We are on the same radio system as the Harlingen
21   Police Department.  It is a different frequent -- a different
22   radio system than I -- than what I understand La Feria Police
23   Department has.
24   Q   So the radio that Officer Ramirez had would not have
25   been able to communicate directly with any of your security

Page 147

1    personnel.  Correct?
2    A   It would not, no.
3    Q   Did -- did Valley Baptist issue any officer from the
4    city of La Feria a radio that would allow them to contact
5    security personnel if necessary?
6    A   No.
7    Q   Is there any particular policy associated with
8    assigning that kind of radio out to an outside police
9    department official?
10   A   No.
11   Q   Officer Irene Garza, does she still work with you?
12   A   She does.
13   Q   Was she commissioned?
14   A   She is.
15   Q   Was she commissioned in 2000?
16   A   Yes.
17   Q   Did she also have a sidearm at the time?
18   A   Yes.
19   Q   Is Sherry Gonzalez an officer?
20   A   No.
21   Q   What was her title?
22   A   Monitor technician.
23   Q   Is she equivalent to a -- like a dispatch officer?
24   A   Correct.
25   Q   So someone who is back at the desk monitoring calls

Page 148

1    for security?
2    A   Correct.
3    Q   And Ms. Gonzalez would get a call and then, I guess,
4    dispatch out to whatever security personnel was supposed to
5    attend to the call being made?
6    A   Correct.
7    Q   Who is Lisa Rodriguez?
8    A   I don't know.
9    Q   She is not one of the officers?
10   A   No.
11   Q   Is there an officer named -- is it Nuell?
12   A   J. Nuell.
13   Q   Nuell.  Was he an officer at the time?
14   A   Yes.
15   Q   Was he commissioned or non-commissioned?
16   A   Commissioned.
17   Q   So he also had a sidearm at the time?
18   A   Correct.
19   Q   Were these sidearms that these commissioned officers
20   had in 2000 issued by Valley Baptist Medical Center?
21   A   No.
22   Q   They were personally owned by each of the officers?
23   A   Correct.
24   Q   Were they all of the same type?
25   A   They were all of the -- they were all revolvers,

Page 149

1    either .38 or .357 caliber of a reputable make.
2    Q   That is something that Valley Baptist, I would
3    imagine, screened before they were allowed to carry it on
4    premises?
5    A   Correct.
6    Q   What other equipment did your security guard
7    personnel carry on their person other than a sidearm?
8    A   A radio and handcuffs, typically.
9    Q   Was that the extent of the security equipment that
10   they maintained?
11   A   Yes.  Some -- some of them carried a flashlight on
12   their belt.
13   Q   Were the handcuffs that your security personnel
14   carried similar to the ones that were in use on patient
15   Gonzalez on the day of the incident?
16   A   I assume so.  They were standard police-style
17   handcuffs.  I don't know what brand or make were being used on
18   Officer(sic) Gonzalez.
19   Q   Pretty similar in size?
20   A   Handcuffs are pretty standard.
21   Q   I apologize if I am kind of jumping through my notes
22   here and trying to get to my issues.
23       All security personnel from Valley Baptist that
24   arrived on the scene arrived after the altercation occurred
25   between Officer Ramirez and Mr. Gonzalez.  Correct?

38 (Pages 146 to 149)

BLAKE HUBBARD

April 29, 2003

Page 150

1   A   That's correct.
2   Q   Were any of the security officers involved or,
3   rather, that were working at the time of the incident trained
4   on guarding suspects or prisoners who were patients at the
5   hospital?
6   A   We don't guard prisoners.
7   Q   Did they ever undertake any type of training courses
8   on that issue, do you know?
9   A   When we receive a new officer, they are oriented as
10  to what our forensic staff policy is and whether or not -- the
11  circumstances in which we will stand by with a prisoner
12  patient to relieve an officer and such.
13  Q   And those issues with respect to the year 2000 would
14  be set out in the policies that you discussed today. Correct?
15  A   I don't know that any of the policies here would
16  describe the training, the orientation process that an officer
17  receives.
18  Q   Is that just a customary thing you-all do as far as
19  trying to get them familiar with the circumstances and in what
20  to do?
21  A   That's correct.
22  Q   One of the policies that was attached in this
23  Exhibit to a prior deposition that I think is before you here
24  today indicates that police officers are not to be using their
25  personal radios while on premises. Was that policy in effect

Page 151

1   in the year 2000?
2   A   That's correct. We do have a policy that prohibits
3   the use of two-way radios in the medical center.
4   Q   And there is a reason that that policy existed back
5   then. Do you know what it is?
6   A   The radio frequency that radios transmit has the
7   potential to interfere with certain types of medical
8   equipment.
9   Q   So the radio that Officer Ramirez was carrying could
10  potentially interfere with medical equipment that was treating
11  other patients in your hospital. Is that correct?
12  A   Potentially.
13  Q   Do you know if he was advised whether or not he
14  could use his radio, his personal radio?
15  A   I don't know.
16  Q   Did anyone from dispatch actually receive a call
17  from him from the room, room 503, I think it was?
18  A   To my knowledge, the call came from a member of the
19  unit staff.
20  Q   Do you know if Officer Ramirez was ever successfully
21  able to dial the security number from the phone in the room?
22  A   I don't believe that he did.
23  Q   Is Dr. Thomas Gonzalez a staff doctor employed by
24  the hospital or is he an independent contractor?
25      MR. POPE:  Don't answer that question.

Page 152

1   Q   (BY MR. GARZA) Does Valley Baptist Medical Center
2   employ doctors?
3      MR. POPE:  Don't answer the question either.
4   Q   (BY MR. GARZA) Do your security personnel have the
5   authority to detain suspects?
6   A   In -- in certain circumstances, yes.
7   Q   What would be an example of that type of
8   circumstance?
9   A   It would be the circumstances described by the Texas
10  Penal Code that allows, like Chapter 9, which allows for the
11  -- taking -- use of force or taking custody. Those types of
12  things. If there is an offense committed in their view,
13  breach of the peace.
14  Q   And if in that's the type situation, they are
15  entitled to use their restraints that they have provided to
16  them or potentially their -- their weapons if necessary, I
17  would imagine. Is that correct?
18  A   That they can use the -- they can use force as
19  described by Chapter 9 of the Penal Code.
20  Q   Okay. Earlier you were -- you were discussing the
21  issue of the potential threat that Mr. Gonzalez may have posed
22  on the day of the incident. Plaintiff's counsel was asking
23  you some questions about that. Do you recall that?
24  A   Yes.
25  Q   Is it -- is it true to say that it was unforeseeable

Page 153

1   that Mr. Gonzalez would rise to the threat level that he did
2   on the day of the incident?
3   A   I believe it was unforeseeable.
4   Q   Do you know what Officer -- what security officer
5   oriented Officer Ramirez?
6   A   I do not.
7   Q   You talked about a report that you had seen that was
8   authored by the former Chief Gonzalez. Correct?
9   A   Correct.
10  Q   When did you see that report?
11  A   Last week, when --
12  Q   You -- let me stop you just in case. I don't want
13  you to advise me of any conversations you may have had with
14  your counsel. But I am entitled to know about any documents
15  you may have reviewed in preparation for your deposition
16  today. So that's what I am asking about.
17  A   Okay.
18  Q   If you have seen -- I am assuming you saw this
19  report in preparation for your deposition here today?
20  A   That's correct.
21  Q   Do you have a copy of this report with you?
22  A   I do not.
23  Q   Did you see this report today?
24  A   No.
25      MR. GARZA:  Can we go off record?

39 (Pages 150 to 153)

BLAKE HUBBARD                                                                                    April 29, 2003

**Page 154**

1       (Short break)
2       Q   (BY MR. GARZA) Mr. Hubbard, I am going to hand you
3    something what was marked as Exhibit 6 to the deposition of --
4    to current chief of La Feria.  The title page says Custodial
5    Death Report Prepared by La Feria Police Department.  I am
6    going to refer you to the page -- pages that on the bottom are
7    marked Celia Gonzalez, 1306 that is 00318 through 130600328.
8    Is this the document you were talking about that -- you can
9    take it, sir.  Is that the document that you were talking
10   about that you reviewed in preparation for your deposition?
11      A   I apologize.  I didn't see the report in its -- at
12   all.  I am looking for the particular page that I -- I believe
13   that I saw.
14      Q   Okay.  Is that the format of the document that you
15   were referring to it?
16      A   It looks similar.
17         MR. POPE:  Would you like me to hasten things,
18   Counsel, by assisting the witness?
19         MR. GARZA:  Sure.
20         THE WITNESS:  Yes, this is -- this is what I
21   saw in preparation.
22      Q   (BY MR. GARZA) Mr. Hubbard, would you just identify
23   the pages that you saw by reading just the last six digits to
24   the numbers on the bottom right corner of the pages?
25      A   Beginning on 000323, ending on 000324.

**Page 155**

1       Q   Do you know if you reviewed any other part of that
2    custodial death document, or was that the extent of your
3    review?
4       A   I believe that was the extent.
5          MR. GARZA:  Thank you very much.  I pass the
6    witness.
7          E X A M I N A T I O N
8       Q   (BY MR. BARRIENTOS) Mr. Hubbard, there is a couple
9    of things I want to ask you about the notice, what --
10   actually, it is about what you reviewed or looked at.  In the
11   notice there is -- there is a series of areas of issues we
12   were going to cover today that we went over.  And then there
13   is another section that asks you to bring documents that are
14   related to those issues that are set forth.  One of them has
15   to do with other incidents involving use of force by law
16   enforcement -- law enforcement personnel upon patients at
17   Valley Baptist Medical Center.  And counsel for the hospital
18   has lodged some objections to that.  So I don't -- what I want
19   to ask you is -- I don't want you to tell me conversations
20   that you have had with him or anything like that, but what I
21   am asking is are there -- if such an incident occurs is it
22   documented by the security department?  If there is -- if
23   there is a forensic patient, a patient with -- with forensic
24   personnel who is accompanying him and if there is a use of
25   force is that use of force documented anywhere by the hospital

**Page 156**

1    security department?
2       A   If the incident is -- if security has knowledge of
3    the incident, yes, it would be documented.
4       Q   Is it -- well, do you know, as head of the security
5    department, whether it is required to be disclosed to the
6    hospital if it does occur?
7       A   If a law enforcement officer was -- had to use force
8    against one of its prisoners in custody?
9       Q   Yes.
10      A   No -- no requirement that would force them to
11   declose -- disclose that to us.
12      Q   All right.  So if -- if it is not required to be
13   disclosed, is it -- I take it, then, it may or may not be
14   depending upon what the circumstances are?
15      A   Ask that again.
16      Q   I guess -- does that mean that it may or may not be
17   recorded by the security department?
18      A   I -- I guess that is possible.
19      Q   Okay.  For example, if the use of force involves
20   some injury to the patient or to the officer, then somebody
21   at the hospital is probably going to find out about it
22   because they are going to have to treat somebody.  Right?
23      A   Correct.
24      Q   In that case, it would be known at least to the
25   hospital and perhaps to the security department.  Is that

**Page 157**

1    correct?
2       A   Correct.
3       Q   Are you aware personally as the head of security --
4    as past head of the security department, during your tenure
5    there, whether there were other incidents of uses of force by
6    forensic personnel that had been documented by the hospital
7    and/or more specifically, the security department?
8          MR. POPE:  Subject to my objection, I will let
9    him respond.
10         THE WITNESS:  I am not aware of any.
11      Q   (BY MR. BARRIENTOS) Okay.  Is there a place within
12   the hospital where such information would be recorded or
13   documented if it exists?  In other words, is that going to be
14   in the security department or is that going to be in some
15   other part of the hospital?
16      A   The security -- it's going to be in the security
17   department.  We keep a -- we keep a record of our incidents,
18   incident reports or miscellaneous reports that the security
19   officers complete.
20      Q   How were those -- are those cater -- categorized by
21   year, by --
22      A   Month and year.
23      Q   Month and year.  How far back do they go?
24      A   I think we have probably about two years worth.
25      Q   Okay.  And are those readily available if you or

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES           FAX(210) 344-6016
7800 III-10 WEST, SUITE 100         SAN ANTONIO, TEXAS 78230              (800) 969-3027
                                                                    7ba3a3f1-ffd9-4a8b-a584-489da2454b6c

BLAKE HUBBARD                                                                        April 29, 2003

Page 158

1  someone in your department requires them?
2     A   At the time of the incident, we weren't
3  computerized, so I have boxes of handwritten reports. The
4  boxes are readily available. Finding a specific incident is
5  not. Within the last year or so we have become computerized
6  and that makes it much easier to search records.
7     Q   So then how far -- to -- to what date or back to
8  what date do the paper documents go, if you are able to tell
9  me?
10    A   Not more than a year or two, maybe two years.
11    Q   Okay. Two years from today or two years from when
12 this incident occurred or --
13    A   Probably two years from today.
14    Q   Back to about --
15    A   2001.
16    Q   Is there a place where it is documented if the -- if
17 a restraint is ordered, a medical restraint is ordered?
18    A   Probably -- I am not intimately familiar with the
19 procedure, but there should be -- all medical records should
20 be documented on a chart.
21    Q   Okay. And, yeah, I was going to say that. Other
22 than the patient's individual chart, which I don't expect to
23 be -- I would be able to find anyway. I mean by the -- by the
24 security department or some other place in the hospital.
25    A   If we are asked to assist with the application of

Page 159

1  restraint, the officer will write a miscellaneous report
2  documenting his activity.
3     Q   That -- yeah, that's what I was more -- more curious
4  about. If the -- if the security department is asked to
5  assist in either the placement or removal of a restraint
6  device, then your department makes a record of that?
7     A   Correct.
8     Q   So, for example, if -- if medical personnel
9  determines that it is medically necessary or reasonable or
10 warranted that a restraint be applied to a patient and you-all
11 are asked to help in some way, that is documented?
12    A   Correct.
13    Q   And those documents, where are those maintained and
14 in whose custody are they?
15    A   They are in the custody of the security department.
16    Q   And are those, likewise, in paper form or computer
17 form or both?
18    A   The recent ones would be computerized. The more
19 than a year or so ago are going to be in the paper format
20 similar to the reports that you have.
21    Q   Without giving me specific details as to any
22 particular patient, can you tell us what information is
23 generally kept on that -- on that form? In other words, are
24 -- is it simply recorded that -- that the officer assisted
25 with the application or removal of a restraint device, or is

Page 160

1  it more detailed than that?
2     A   It would be slightly more detailed. We would have
3  the name, the name of the patient, the location, which room,
4  the medical personnel who requested the assistance.
5     Q   Okay. Is there an explanation, brief or some
6  indication as to the reason for the application of the
7  restraint?
8     A   The reason we would document would be as ordered by
9  a physician.
10    Q   Okay. But in your document, is there -- is there
11 going to be more than that or is that generally what you --
12 all you do --
13    A   We would generally do that. We would not probably
14 have speaking to the actual condition of the patient. We
15 would -- that is a medical --
16    Q   Okay.
17    A   -- assessment.
18    Q   Okay. All right. I believe, if I heard you respond
19 earlier to a question by counsel for the city and for Officer
20 Ramirez, was that you did not believe that -- that Mr.
21 Gonzalez, patient Gustavo Gonzalez, you did not believe that
22 his actions were forseeable. Did I --
23    A   That's correct.
24    Q   Am I correct? And that is your position personally,
25 your position, or the hospital's position, to make sure I

Page 161

1  understand which -- in what capacity you were answering in?
2     A   I would think that would be my position personally.
3     Q   So you are not indicating -- were not indicating by
4  that answer as to whether his actions were foreseeable by
5  anyone other than yourself?
6     A   I believe I took the question as that he was asking
7  my -- if I believed personally it was foreseeable.
8     Q   Okay. And that would be something you believed
9  based upon the information you would have had at the time or
10 given what you have learned since then?
11    A   Both.
12    Q   Okay. Have you -- have you -- other than the
13 records we looked at here today, have you reviewed his
14 medical chart?
15    A   I have not.
16    Q   So sitting here today, you can't tell me what
17 references are in the medical chart?
18    A   No.
19    Q   And other than, I guess, when we look specifically,
20 for example, Dr. Gonzalez' report or his progress notes, you
21 hadn't looked at or been able to look at any of his
22 observations or findings?
23    A   No.
24    Q   And have you had occasion to look at -- I guess it
25 would be Exhibit -- Exhibit Number 8, which is fairly

41 (Pages 158 to 161)

(210) 377-3027                    ESQUIRE DEPOSITIONS SERVICES              FAX(210) 344-6016
7800 IH-10 WEST, SUITE 100           SAN ANTONIO, TEXAS 78230                    (800) 969-3027
                                                                        7ba3a3f1-ffd9-4a8b-a584-489da2454b6c

BLAKE HUBBARD                                                                                       April 29, 2003

---

**Page 162**

1  voluminous. But this is the Harlingen Police Department which
2  was provided to -- it says defense counsel, but I believe that
3  would be the city's lawyers, city and Officer Ramirez'
4  lawyers. These would be statements from the officers who were
5  actually guarding Mr. Gonzalez during his stay. Have you seen
6  what those have to say?
7      A   I -- I have seen a -- I know that I have seen a
8  couple of the statements from the Harlingen Police
9  Department's Investigation. I cannot say that I have seen all
10  of them. I have not seen the investigation in -- in total.
11     Q   Well, let me -- let me ask you, then. Were you
12  aware that in a statement by Juan Antonio Garcia, who works
13  for the city of La Feria as a dispatcher, that he received a
14  call at 11 a.m. on September the 18th from Officer Delgado who
15  was at that time guarding Mr. Gonzalez or Mr. Delgado called
16  and requested a second officer respond to his location because
17  he did not feel safe by himself with the prisoner?
18     A   I was not aware of that.
19     Q   If you had been made aware of that, would that have
20  changed -- changed your opinion as to whether Mr. Gonzalez'
21  behavior was foreseeable?
22     A   I would have probably wanted to know the
23  circumstances that made Officer Delgado not feel safe.
24     Q   Did you know that during that same morning Chief
25  Roberto Gonzalez of the La Feria Police Department advised

---

**Page 163**

1  Mr. Garcia, his dispatcher, to contact the Harlingen Police
2  Department and request their assistance in watching the
3  suspect until Officer Ramirez' backup officer could arrive at
4  the Valley Baptist Medical Center?
5      A   I was not aware of that.
6      Q   Okay. Would that have changed your opinion?
7      A   No.
8          (Brief pause to change videotape.)
9      Q   (BY MR. BARRIENTOS) Mr. Hubbard, were you aware in
10  the sworn statement taken from Officer Martin Segura of the La
11  Feria Police Department, one of the officers who guarded Mr.
12  Gonzalez in the early morning of the 18th, that at
13  approximately 9:15 that morning when he was relieved by
14  Officer Delgado of La Feria Police Department that he told him
15  several times never to keep his guard off of Gonzalez and that
16  he was just waiting for an opportunity of some sort? Were you
17  aware of that?
18     A   I was not.
19     Q   Were you aware that in a statement, sworn statement
20  from Officer Ysidro Delgado from the La Feria Police
21  Department that when he took over he also says that Officer
22  Segura told him to be very careful with Mr. Gonzalez and to
23  not let his guard down with Mr. Gonzalez? Were you aware of
24  that?
25     A   I was not.

---

**Page 164**

1      Q   Were you aware that the officers in their statements
2  all indicate that Mr. Gonzalez constantly throughout his stay
3  tried to get them to loosen or take off his restraints?
4      A   I was -- I was not aware that it was a constant
5  nature.
6      Q   Were you aware that Officer Delgado spoke to Dr.
7  Thomas Gonzalez, who advised him that the patient needed to be
8  committed and that the patient was psychotic?
9      A   I was not aware that the officer had spoken with Dr.
10  Gonzalez.
11     Q   Were you aware in the medical record noted by the
12  medical personnel at the hospital that Mr. Gonzalez, the
13  patient, made -- let me find this here, because I want to make
14  sure I don't misstate them. That the patient was
15  uncooperative and belligerent?
16     A   I am not aware of anything that was in the medical
17  record. As I stated earlier, I did not review it.
18     Q   Were you aware that as early as 11:15 on September
19  17th that the patient, Mr. Gonzalez, stated that he had tried
20  to kill himself with a knife?
21     A   I was not aware of that specific statement.
22     Q   Were you aware that on September 18th at
23  approximately 2:32 in the morning that he seemed to be out of
24  touch with reality and that he stated that the officer who was
25  guarding him was trying to kill him and all of us?

---

**Page 165**

1      A   I am not aware of that.
2      Q   Or at 2:43 in the morning of September 18th, that he
3  again reported to MMC, I am not sure who that is, that the
4  officer guarding him was trying to kill him and that he needed
5  to leave? And that he also stated that it was dangerous?
6      A   I am not aware of those specific statements.
7      Q   Were you aware that at 5:23 on that same morning
8  that it was noted by one of the hospital personnel that Mr.
9  Gonzalez had tried to kill himself, that he was withdrawn and
10  refused to respond to questions and stared blankly and
11  suspiciously when being asked questions?
12     A   I was not aware of that notation.
13     Q   And I think I know from discussing with you you were
14  not aware of Dr. Gonzalez' evaluation that took place on the
15  afternoon of the 18th?
16     A   I was not aware.
17     Q   And, in spite of all of those references in the
18  medical record and the police statements, which were taken
19  after this incident, which you were not aware of, you are here
20  today and your testimony is that you did not believe that this
21  incident was in anyway foreseeable?
22     A   I do not believe the incident was foreseeable.
23     Q   And you believe that everyone concerned acted
24  appropriately and did everything they could given the
25  knowledge they had at the time?

---

42 (Pages 162 to 165)

BLAKE HUBBARD                                                April 29, 2003

---

**Page 166**

1    A   I do.
2    Q   Would your opinion be the same if one of the shots
3  that Officer Ramirez had fired had gone through the wall and
4  hit a patient in the next room?
5        MR. GARZA: Objection. Form.
6        MR. POPE: Objection. Yes. Don't answer that
7  question.
8        MR. BARRIENTOS: What is the basis?
9        MR. POPE: The basis is that it is hypothetical
10 and argumentative and has no basis in fact in this case. I am
11 not going to let him answer.
12   Q   (BY MR. BARRIENTOS) If the situation were that a
13 shot had gone through the wall and hit somebody else, would
14 your opinion be the same?
15       MR. POPE: Don't answer that question on the
16 same basis.
17       MR. GARZA: Objection. Form.
18   Q   (BY MR. BARRIENTOS) Do you know whether there were
19 patients in the adjoining rooms?
20   A   There were.
21   Q   Were they also forensic patients?
22   A   They were not.
23   Q   They were regular patients who just happened to be
24 on the same floor with him?
25   A   Correct.

---

**Page 167**

1    Q   And I take it, then, Mr. Gonzalez was not segregated
2  in any kind of way because of his status, as you earlier
3  explained to me?
4    A   He was placed in the room furthest, in the corner,
5  which is a room that is actually set back from the other
6  rooms, so the other rooms are actually not immediately -- they
7  are adjacent, but they are not immediate -- they don't
8  necessarily share a wall in that they are offset. And so he
9  was placed back in that room because of his status of a
10 forensic patient, further away. So he was the furthest away
11 from the remainder -- the remainder of the patient population
12 as -- as feasible.
13   Q   If he were going to leave or -- leave or escape
14 maybe is another word to use, was he at a point as far away as
15 you-all could get him from the exit, from the elevator, or the
16 stairwell, or that kind of thing?
17   A   There is a fire exit there but it is locked, so he
18 could not get out unless there was a fire alarm. Otherwise,
19 he would have to pass through the remainder of the unit to
20 have left the -- to have left the area.
21       MR. BARRIENTOS: I think, other than certifying
22 the last question, which I will ask the reporter to do, about
23 if the shot had gone through and hit someone in another room
24 and I understand the instruction, so I would like to certify
25 that question -- other than that, I appreciate your time, Mr.

---

**Page 168**

1  Hubbard. You have been very patient.
2        MR. GARZA: Mr. Hubbard, very briefly.
3        E X A M I N A T I O N
4    Q   (BY MR. GARZA) You observed Mr. Gonzalez -- patient
5  Gonzalez prior to the incident.
6    A   Correct.
7    Q   And you spoke with Mr. Gonzalez prior to the
8  incident.
9    A   Correct.
10   Q   You saw him when he was in the hospital room where
11 the incident occurred prior to the incident. Correct?
12   A   Correct.
13   Q   And have you based your testimony today based on
14 what you have seen and heard prior to this incident occurring?
15   A   Yes.
16       MR. GARZA: Thank you. We reserve the rest of
17 our questions until the time of trial.
18       MR. POPE: Anything else? We reserve our
19 questions until the time of trial.
20       THE REPORTER: Mr. Stein, do you want anything
21 on the record, reserve questions or anything?
22       MR. STEIN: Reserve questions.
23       (Deposition concludes at 6:40 p.m.)
24
25

---

**Page 169**

1        CHANGES AND SIGNATURE
2   RE: CARRANZA VS. CITY OF LA FERIA
3   PAGE   LINE   CHANGE        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
      I, BLAKE HUBBARD, have read the foregoing deposition
12  and hereby affix my signature that same is true and correct,
    except as noted above.
13
14       BLAKE HUBBARD, Witness
15
    THE STATE OF TEXAS   )
16  COUNTY OF _____  )
17    Before me, _____, on this day personally
    appeared BLAKE HUBBARD, known to me (or proved to me under
18  oath or through _____) to be the person whose
    name is subscribed to the foregoing instrument and
19  acknowledged to me that he executed the same for the purpose
    and consideration therein expressed.
20
    Given under my hand and seal of office this _____
21  day of _____, 2003.
22
23
      NOTARY PUBLIC IN AND FOR
24    THE STATE OF TEXAS
25

---

43 (Pages 166 to 169)

Page 170

```
 1          IN THE UNITED STATES DISTRICT COURT FOR THE
                    SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION
 3   MARY E. CARRANZA, ET AL,    *
                plaintiffs,  *
 4                            *
     VS.                      *   C. A. NO. B-02-180
 5                            *
     CITY OF LA FERIA, TEXAS, ET AL, *
 6           defendants   *
 7   ------------------------------------------------
               REPORTER'S CERTIFICATION
 8      VIDEOTAPED DEPOSITION OF BLAKE HUBBARD
                    APRIL 29, 2003
 9   ------------------------------------------------
10       I, KATHERINE J. BROOKBANK, Certified Shorthand Reporter
11   in and for the State of Texas, hereby certify to the
12   following:
13       That the witness, BLAKE HUBBARD, was duly sworn by the
14   officer and that the transcript of the oral deposition is a
15   true record of the testimony given by the witness;
16       That the deposition transcript was submitted on
17   _____ to the witness or to the attorney for
18   witness for examination, signature, and return to me by
19   _____;
20       I further certify that I am neither counsel for, related
21   to, nor employed by any of the parties or attorneys in the
22   action in which this proceeding was taken, and further that I
23   am not financially or otherwise interested in the outcome of
24   the action.
25
```

Page 171

```
 1       Certified to by me this _____ day of _____, 2003.
 2
     Costs: _____
 3   Due and owing by Plaintiff
 4   _____
             KATHERINE J. BROOKBANK, Texas CSR 2060
 5           Expiration Date: 12/31/04
             7800 IH-10 West, Suite 100
 6           San Antonio, Texas  78230
             (210) 377-3027
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BLAKE HUBBARD

April 29, 2003

Page 172

**A**

abdicates 88:1
ability 88:1 89:17
able 21:24 45:8,9 51:9
  51:15 63:11,15 66:1
  73:17 81:2,7 85:18
  85:25 104:19 106:15
  130:15 146:25
  151:21 158:8,23
  161:21
about 4:22 5:13 6:10
  7:3,21 9:15 10:8 11:8
  11:10,11 16:24 19:4
  19:4,12 21:7 24:17
  24:17 25:18 26:13
  27:12,23 41:25 42:10
  43:1 49:16 60:11
  62:7,13,17,21 66:11
  67:2,11,14 69:16
  77:12 78:7,7 79:2
  80:17 81:9 82:17
  83:11 85:7 86:22,24
  90:20 91:4,7,9 95:24
  100:15,17 101:2
  102:16 105:4 106:19
  106:19 108:11,18
  114:18 119:19
  120:13 122:15,22
  123:2,8 124:24 125:2
  132:9 134:6,9,15
  136:5,12,14 137:1,18
  138:21 139:2,6,10,23
  139:24 140:22,25
  141:3,13,17,18,19
  142:21 143:23
  144:15 145:18
  152:23 153:7,14,16
  154:8,10 155:9,10
  156:21 157:24
  158:14 159:4 167:22
above 144:1 169:12
above-styled 2:3
absence 19:12,14,22
  20:21 21:2 28:23
absent 41:15
Absolutely 54:17
access 57:12 64:7
accident 141:16
accompanying 155:24
accordance 96:5,16
  97:10
according 96:6
accordingly 31:25
  122:9
account 114:7,10
accurate 75:18

accurately 35:20
accusation 78:18
accusations 76:14,25
accused 32:7
acknowledged 169:19
act 1:6,15 47:12,16
  165:23
acted 122:9 134:11,17
  165:23
acticians(sic) 112:23
acting 11:4,4 19:13
action 1:14 55:23 90:14
  170:22,24
actions 133:17,21
  134:2,7,10,17 160:22
  161:4
actively 36:13,15 38:13
  46:3,4 69:21
activities 99:16 100:14
activity 71:13,14 74:22
  121:1 159:2
acts 93:19 102:5
actual 5:12 12:5,10
  13:24 14:25 34:8
  35:23 54:20,20 81:12
  160:14
actually 11:24 12:8,14
  15:6 18:7 19:18 21:9
  26:10 27:15 37:8,10
  42:6 67:8 68:2 69:6
  69:21 71:12 81:2,19
  86:1 91:24 101:6,7,9
  117:17,19 126:1,11
  130:4 133:11 151:16
  155:10 162:5 167:5,6
Adams 2:6,17
adapted 37:10
add 46:7
addition 26:10 87:10
  96:7,17
additional 31:6 32:23
  74:1,4 77:2,6,11,17
  77:22,23,23 78:4
  79:18 80:7,12,14,17
  81:10,14 88:21
  121:25 123:14,18
  128:2 142:21,22
  143:1
address 66:10,17
addressed 39:1
addresses 72:7
addressing 145:13
adequate 81:21 107:24
adequately 66:16
adjacent 167:7
adjoining 166:19
administered 90:12

administering 86:1,2
administration 45:4
administrative 12:4,6
  14:19 19:14 20:16
  43:3 44:25 63:10,15
  63:15 85:24
admission 58:16,18,19
  58:20 59:25 60:2
  72:3 94:12
admit 70:17
admitted 25:3 26:14
  27:20 59:13 60:15,13
  60:19 70:13,21,24
  72:1 95:5
advance 131:23
advise 153:13
advised 59:11 79:25
  151:13 162:25 164:7
affect 90:19
affected 41:2,3
affirmative 111:13
affix 169:12
afield 138:18
after 7:15,16 58:18
  83:12 89:9 94:8
  95:17 104:13 105:7
  139:22 149:24
  165:19
afternoon 4:4 61:16
  105:3 165:15
again 5:2 18:18 45:11
  48:4 54:18 65:10
  68:7 69:20 72:23
  75:5,19 76:12 85:23
  88:22 92:14 111:21
  126:22 131:7 134:13
  136:20,23 138:1
  142:23 156:15 165:3
against 18:6 42:19
  59:16 67:6 76:7
  79:13 156:8
agencies 7:18 23:9 28:2
  33:12 34:18,18 35:15
  36:3,22 37:1,1 86:8
  96:18
agency 11:25 23:3
  24:20,21 25:6,13
  26:16,19 27:12,21,25
  28:1,13,17,19,23,24
  33:16 34:12 37:4
  43:4,14,14 52:6,18
  53:8,18 54:10 56:4
  56:10 57:10 63:22
  64:4,24 77:5,11
  79:17 85:12 86:20
  87:11 88:11 96:8

  102:12 138:25
agency's 46:8
agent 18:5
ago 5:3 10:8 159:19
agree 37:24,25 62:8
  97:9
agreed 51:11 53:7
  86:20,25
agreement 24:19,21
  52:5
ahead 15:15 33:6 100:2
  113:21
AL 170:3,5
alarm 25:24 167:18
alarms 25:23
alive 125:5
allegation 76:19,23
allegations 59:16 75:10
  76:12 79:8 113:2
alleged 26:17,17 58:14
  94:1 102:4
allegedly 59:19 80:1
  112:25
allow 45:4 46:6 47:20
  50:11 59:6 88:9
  101:12 110:2 138:20
  147:4
allowed 24:13 31:15
  34:17,25 37:7 103:5
  119:3 136:18,25
  137:13,17 138:16
  139:1 146:10 149:3
allows 152:10,10
almost 75:23
along 138:13
already 18:25 63:23
  73:10 105:10 128:3
  132:3
alter 101:4
altercation 133:7,11
  134:16 149:24
altering 31:5
always 15:7 16:13
  42:20 54:25 66:6,12
  70:14 104:14
ALYSSA 1:4
amended 38:21
America 79:15
ammunition 34:17 35:5
  38:6 40:20,22
among 37:1 129:16
amount 112:25 140:3
analysis 67:16 81:12
analyzed 49:24
ancillary 8:19
and/or 15:2 35:4 48:7

  64:16 82:21 86:2
  95:11 102:19 157:7
ANGEL 1:3
ankle 48:8,8 130:3
ankles 129:25 130:8
another 9:17 19:4
  20:15 30:16 31:21
  38:9 70:19 77:20
  79:14,15 83:17 92:7
  131:25 155:13
  167:14,23
answer 8:10 9:25 17:8
  28:8 32:21 33:17
  39:19 40:3,11,17,25
  41:5,9 52:10 59:1
  60:11 65:4 82:16
  93:11 106:6 109:10
  109:11 110:21 111:8
  111:12,15,16,22
  113:22 129:14
  134:25 135:5,22
  136:9 137:2 138:7,17
  142:2 151:25 152:3
  161:4 166:6,11,15
answered 126:4
answering 16:25 161:1
answers 12:12 134:24
Antonio 162:12 171:6
anxiety 102:6
anybody 28:22 117:25
  122:16 142:24
anymore 38:18 41:25
anyone 20:17,24 63:14
  63:17 105:12 110:3
  133:25 136:17,24
  142:20 143:3 151:16
  161:5
anything 18:20 50:10
  50:12 62:21 67:14,20
  75:12 82:10 87:18
  106:19,21 107:6
  109:16 113:2 135:4
  140:10 155:20
  164:16 168:18,20,21
anyway 158:23 165:21
anywhere 17:3 27:2
  42:10 65:23 155:25
apologize 101:5 111:11
  131:23 149:21
  154:11
apparent 92:25
appear 113:23
Appearances 2:10 3:3
appeared 169:17
appears 71:12
applicable 87:9 95:12

BLAKE HUBBARD

April 29, 2003

Page 173

applicants 12:22
application 44:13,21
  58:3 67:15 68:4,4,21
  68:24 73:2 84:11
  85:21 158:25 159:25
  160:6
applications 69:11
applied 9:18 10:15
  46:24 47:23 51:18,19
  53:9 72:25 85:4 87:6
  87:24 96:20 142:6,9
  159:10
applies 85:3 86:11
  142:5 144:24
apply 24:11 44:20
  48:12 69:17 87:19
  97:5 142:9,13
appreciable 26:2
appreciate 112:17
  167:25
approaches 30:15
appropriate 12:25
  46:12 48:5 51:5 55:1
  55:2 57:21 97:13
  107:19 108:6 109:8
  110:11 114:15 115:6
  123:6 126:5,8,14
  127:10 131:11
appropriately 134:11
  134:18 165:24
approval 34:19 46:2
  47:22,25
approve 35:4,4 88:1,3
  88:7,13
approved 135:12,18
  143:9
approximate 9:21
approximately 163:13
  164:23
April 1:24 2:3 170:8
area 7:11 8:7,8,22 9:18
  18:8,15,16 29:17,25
  30:22 31:10 32:1,15
  33:12,23 73:13 74:5
  77:2,8 78:9,24 84:25
  103:13 115:3 138:17
  167:20
areas 9:2 16:5,18 51:3
  108:4 115:3 132:3
  155:11
argumentative 166:10
arm 52:18,20 128:25
  129:4,7,22 133:14
  146:4
armed 14:2
arms 129:1

around 15:3,5 129:2,24
  130:3,7
arrest 28:14,16 43:13
  43:15 44:6 76:1,9,22
  87:3,4 94:15 112:23
  132:25
arrested 92:20 130:11
arrestee 145:4
arrive 163:3
arrived 19:1 81:19
  82:2 149:24,24
Article 96:10
aside 85:8
asked 35:13 37:20
  44:20 45:18 46:14
  66:13 68:12,24 69:12
  73:8 74:1,4 80:4,25
  81:9 95:3 101:8
  104:14 107:2,6 118:6
  125:14,19 126:4
  135:8 139:24 143:17
  158:25 159:4,11
  165:11
asking 17:22 43:24,25
  51:2 54:10 67:18,20
  68:7,17 69:4 75:12
  75:13 78:6 90:6 91:6
  93:3,4 98:2 103:3
  106:8 108:1 110:17
  112:17,18,20,21
  125:18,25 128:10,11
  131:23 136:12
  152:22 153:16
  155:21 161:6
asks 155:13
assaulted 18:7 140:8
asserted 39:23,23
  41:11
asserting 39:24
assess 91:1
assessment 65:13 84:11
  137:10 139:2 160:17
assessments 87:14,16
  87:22 136:18,25
  137:3,13,18
assessment/reassess...
  84:1
assign 16:5,9,11 19:13
  29:16,24 30:20,22
  32:1,14 78:9 108:4
assigned 16:7,13,18
  17:11,24 18:8 19:11
  31:10,12 33:2,18
  71:22 79:18,18 80:14
  103:22 113:5
assigning 101:3 147:8

assignment 20:21 22:1
  22:4,7
assignments 16:20 31:5
assist 25:8 44:12,20
  50:7 68:24 69:1,13
  73:6 158:25 159:5
assistance 73:8 80:13
  115:9,13 140:19
  160:4 163:2
assistant 10:19,24,25
  11:2 20:22
assisted 74:2 159:24
assisting 154:18
associated 133:21
  142:7 147:7
assume 14:5 39:23
  41:10 44:1 51:12
  71:2 91:25 92:4,7
  99:12 109:25 115:20
  119:12,16,18 123:16
  125:6 149:16
assumed 9:5 71:2
assuming 19:5 44:8
  124:15 128:11
  153:18
assumption 124:17
assurance 101:24
  107:22
assure 101:24 102:8
  103:24 110:2
attached 3:4 141:25
  150:22
attempt 26:6 36:16
  120:4 145:5
attempted 37:11 76:6
attend 148:5
attendants 12:19
attending 44:16 48:1
  56:6 61:4,6 82:4 96:5
attention 145:14
attorney 170:17
attorneys 170:21
Audio 2:23
auditory 107:12
author 37:23 97:1
authored 124:12 153:8
authority 19:22,24
  28:13 29:19 30:24
  31:1,25 34:8 35:9
  37:5,5 43:15 47:16
  53:25 54:5,5 78:1,5
  88:1 89:6 108:4,22
  143:25 144:4 152:5
author's 97:2
availability 118:3
available 20:9,14 21:10

21:11 22:10 39:25
  47:2 55:19 56:23
  62:17 64:23 74:17
  86:13 108:16,19
  109:3 114:5 128:19
  128:21 130:20,20
  131:8 157:25 158:4
aware 24:15,15 27:9,12
  45:7 50:10 51:20
  53:6 59:15,16,18,20
  59:20,23 61:1 62:1
  63:10 66:14 67:1,5
  73:20,22 75:25 76:3
  76:5,8 83:17 85:16
  93:15,16,25 94:10,11
  94:13,15,24 95:6
  105:12,15,16,17
  118:23 157:3,10
  162:12,18,19 163:5,9
  163:17,19,23 164:1,4
  164:6,9,11,16,18,21
  164:22 165:1,6,7,12
  165:14,16,19
away 114:13,14 117:23
  167:10,10,14
a.m 162:14

_____
        B
_____

B 70:1 95:10 96:10
back 6:13 9:13 19:3
  21:18 24:17 30:19
  36:12 37:19 41:24
  42:3 46:14 67:23
  71:5 77:20 82:15
  114:14 129:7 131:2
  132:21 140:16 145:1
  146:6 147:25 151:4
  157:23 158:7,14
  167:5,9
backup 163:3
bad 67:23,23,23
Baptist 1:12,20 4:9,15
  4:24 5:7,11,21,24 6:2
  7:7,9 8:6 10:5 11:15
  11:24 12:21 14:9
  23:7 24:8,19 32:6
  52:2 60:7 63:4 74:14
  76:17 119:25 133:10
  134:1 135:11,12,18
  135:19 136:19 137:1
  137:6,14,17,23 138:6
  138:19,20,24 139:3
  142:20,24 143:3,9,22
  144:6,12,19 145:20
  145:25 147:3 148:20
  149:2,23 152:1

155:17 163:4
Barrientos 2:11 3:6,7
  4:4,7 15:12,14,16
  39:20,22 40:4,7,13
  40:18 41:1,6,10,16
  41:20,23,24 43:22
  50:2 53:14 59:2,9
  65:6,9,11 66:25
  67:19,22,24 75:14,16
  82:14 89:15 90:5
  92:14 93:3,9 94:2
  99:1,6 100:5,7,10
  104:22 106:7,12,14
  107:25 109:10
  110:12,23 111:11,14
  111:18 112:6,12,16
  119:8,10 120:15,17
  121:24 123:14
  125:18 126:10,21
  128:1,9 131:12 155:8
  157:11 163:9 166:8
  166:12,18 167:21
base 52:12
based 17:17 29:17
  .44:19,22 57:14,19,22
  58:22 64:4 67:9,13
  67:25,25 69:6 73:3
  75:14 80:5 101:22
  103:2 108:15 113:1
  124:12 125:11
  126:10,13 127:4,10
  145:18 161:9 168:13
  168:13
basic 26:15
basically 27:3 35:3
  77:15 121:2,3
basis 10:13,20 36:21
  65:5 74:15 75:9
  102:1,9 103:5 104:8
  106:7,8 122:10
  135:23,25 136:5
  138:8 139:7 166:8,9
  166:10,16
bathroom 77:13
became 9:13 10:25
  69:9 90:11
become 12:20 96:4
  136:16 158:5
becomes 97:4
bed 51:14 106:24
  116:25 117:1,7,14
  122:5 129:1,3 130:9
  131:3 142:15 143:12
bedside 110:2,15 113:6
before 2:4 5:5,16 7:21
  18:9 25:2 37:20

BLAKE HUBBARD

April 29, 2003

Page 174

39:17 41:15 68:19,19
69:10 70:7 82:14
85:8 105:5,17 131:21
135:2,5,19 149:3
150:23 169:17
began 7:7
begin 13:23 43:5
Beginning 154:25
behalf 1:5 5:7 21:25
behavior 62:20,22
67:12 94:16,24
162:21
behavioral 70:2
behaviors 69:8
behind 13:24 37:21
38:2 73:1 97:2
105:19
being 5:2 17:10 26:14
26:20,20 27:19,24
28:10 29:4,18 32:7
33:15 34:23 39:23
60:22 62:18 63:24
64:2 69:13 75:9 76:2
77:3 80:13,15 90:12
127:18 130:15 148:5
149:17 165:11
belief 127:8,9
believe 8:5 9:5 11:12
21:17,19 45:25 47:12
47:20 48:9 50:11
80:12 82:4 85:3,6,15
88:12 94:7 96:11
104:17 111:25 112:3
112:9,14 113:3,8,13
116:25 117:3 119:5
119:18 121:20,24
123:15,18 124:8,9,13
124:13 125:11,22
126:2,5,8 127:5
134:11,17,22 140:2
141:25 151:22 153:3
154:12 155:4 160:18
160:20,21 161:6
162:2 165:20,22,23
believed 29:25 57:24
73:7 113:10 114:10
161:7,8
belligerent 58:20 69:2
69:14,23 164:15
belt 4:15 149:12
beside 116:25
besides 7:13
best 37:22,25 52:14,15
52:21 54:7 86:3,3
98:1,24 118:16 122:8
122:8,15 123:11,12

125:14
better 11:3,5 23:6 51:1
66:18 106:17 122:17
122:17 125:16
130:15 144:16
between 15:9 23:13
24:19,21 55:12
102:16 105:2 117:1
117:14 133:7 143:21
145:8 149:25
beyond 30:14 31:20
50:10,12 80:12
100:20,25
big 43:7 124:17
biomedical 8:19
bit 6:14 100:1 103:23
130:7
black 4:15
Blake 1:23 2:1 3:5 4:1
4:6 169:11,14,17
170:8,13
blankly 165:10
blown 18:6
blurted 107:10
board 27:16 135:12
Bobby 123:22
Boca 2:21
bodies 55:8
body 49:7,10 64:5,8
129:2
book 83:20
both 5:6 13:6 16:7
51:17,22 52:5,23
53:17 55:5 62:7 77:4
86:7,8,19,20 87:2,7
97:22 159:17 161:11
bottom 104:18 119:22
120:3 154:6,24
Boulevard 2:21
bound 53:15 87:21
boxes 158:3,4
brand 149:17
breach 152:13
break 77:13,13 82:13
131:17 154:1
brief 8:9 23:23 120:16
160:5 163:8
briefly 141:15 168:2
bring 71:6 155:13
bringing 31:21
Brookbank 2:5 170:10
171:4
brought 10:9 35:5
53:11 58:13 75:25
91:10 92:16 93:18
145:14

Brownsville 1:2 2:15
2:22 170:2
buckle 130:8
budget 30:10 31:24
budgetary 30:8
building 101:11
Buren 2:7,18
business 20:9 107:4
by-stander 140:18
B-02-180 1:14 170:4

_____C_____

C 170:4
caliber 34:24 38:6
149:1
call 15:6 17:19 20:3,4
23:11 67:13,14 70:11
80:24 81:1 86:9 87:2
101:12,13 102:20,24
103:17 104:15
115:22 116:21
117:16 118:21
130:24 148:3,5
151:16,18 162:14
called 4:9 10:9 15:3
17:20 18:14 57:16
70:2 71:8,8 73:6,20
83:25 99:21,21
115:10 162:15
calls 17:8 59:5 147:25
calm 106:23 129:11,11
came 10:8 12:8 17:8
18:24 20:8 27:4
38:20 52:17 65:8
76:24 83:11 93:5,21
105:1 114:9 140:16
151:18
Cameron 7:19
candidates 10:11
capable 112:25,25
113:18 122:4
capacities 14:3
capacity 1:12,20 5:20
6:21 33:17 37:6
161:1
capital 76:6
Carancahua 2:12
card 61:10 107:4
care 8:20 24:22 28:21
28:22 37:13,16 41:2
42:10 44:17 45:24
53:10,12 54:7 55:3
58:9 59:20 70:2,20
71:23 74:24 75:6
81:24 84:7,23 86:1,2
88:6,10,13,16 89:3

89:18 90:16,19 98:25
115:6 122:13,18
127:24 143:19
career 6:11
careful 163:22
caring 57:13 86:4
104:1
Carranza 1:2 4:9 169:2
170:3
carried 146:4 149:11
149:14
carry 36:24,25 37:6,7
42:22 102:21 132:14
132:16 149:3,7
carrying 151:9
case 4:9 18:12 23:18
29:12 40:8 51:10
59:11 60:9 70:23
75:24 76:2 78:8,15
78:17,20 79:6,9
80:25 89:5 101:2
103:14 115:12
126:11 153:12
156:24 166:10
cases 6:8,10,11 77:4
129:11
case-by-case 17:14
categorized 157:20
category 25:3 32:16
cater 157:20
cause 2:3 38:9
Cecila 2:23 15:11
Celebrities 79:21,22
Celia 1:7 154:7
center 1:13,20 2:15
4:10,25 5:8,11,22 6:2
7:7,9 10:4 11:15,24
12:21 14:9 15:23
16:17,19 23:7 24:8
24:20 25:21 32:6
43:3 47:2,14 52:2
60:8 63:4 66:13
79:14 116:17 119:25
121:10 134:1 135:19
136:19 137:1,6,14,18
137:24 138:6,19
139:3 140:17 142:17
142:25 143:3,9,23
144:12 148:20 151:3
152:1 155:17 163:4
Center's 145:20
CEO 10:8
certain 15:3 17:23 25:2
47:1 49:13 55:22
76:8 80:22,22 137:9
151:7 152:6

certainly 29:20 57:1
73:1 76:13 89:6,20
95:8 109:15 116:16
118:19,23 145:19
156:18
Certificate 3:9
certification 13:8 22:22
132:11 170:7
certified 13:3 132:14
170:10 171:1
certify 167:24 170:11
170:20
certifying 167:21
chain 19:6 20:17
chance 5:10 23:24 82:6
82:9
change 9:4 10:7 16:6
16:20 29:8 31:5 39:6
59:9 95:18 163:8
169:3
changed 8:11 10:3
11:19 96:9 162:20,20
163:6
changes 3:8 40:21,23
41:1,3,6 169:1
Chapter 152:10,19
charge 26:17,17 27:23
29:4 44:16,17 51:19
76:1,19
charged 26:20 33:8
charges 59:16
chart 64:10 82:11
158:20,22 161:14,17
check 21:18 77:11
101:19 103:4 104:8
checking 33:23
chemical 48:21 129:16
chemically 129:11
Chica 2:21
chief 5:21 123:21
124:13,20,20 125:8,8
141:13 153:8 154:4
162:24
Children 1:4
choice 118:9
choose 115:18
chose 118:10
chosen 36:18 121:8
Christi 2:12 4:8
circumstance 45:18,20
79:14 89:19 99:22
152:8
circumstances 13:14
16:10 17:10,19,23
18:14 29:12 44:10,19
45:7,15 49:14 52:13

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

53:6 57:19,22 72:8,9
76:8 77:4,19 86:23
87:2,7 88:20 122:23
126:22 127:4,10
134:9,16,18 140:23
144:3 150:11,19
152:6,9 156:14
162:23
city 1:10,18 4:10 6:24
131:20 147:4 160:19
162:3,13 169:2 170:5
city's 162:3
CIVIL 1:14
claim 28:3
Claims 2:24
clarify 75:12 112:7
135:4,8
clear 9:24 17:22
clerk 12:19
clinical 50:18 51:7
63:18 69:12 82:24
85:4,16 86:12 87:6,6
87:11,13 97:12 98:9
98:9 123:2 144:15
clock 15:3 31:13
close 38:10 71:8 72:1
closer 105:6
code 39:25 152:10,19
coffee 34:4 77:13
combative 69:13 94:11
94:12,12,13,15,16,18
come 9:7,12,13,15
24:17 30:17 33:9
44:11 74:16 76:11
86:14,22,23 94:17
110:18
comes 25:6,12 31:12
76:21 85:11
comfort 101:25 127:23
comfortable 68:9 90:3
103:25 130:14
coming 12:10 49:24
command 19:7 20:17
commission 13:1,6,8,9
121:1
commissioned 13:12,18
13:19,22,23 15:10,21
15:25 146:2,3 147:13
147:15 148:15,16,19
committed 70:19 102:4
152:12 164:8
committee 39:1,8,11,12
39:13,13,14,15,18
40:1,6,16 41:13 42:1
74:24,25 75:1,2,13
82:17,18

common 90:10 137:10
commonly 54:11
common-sense 65:25
communicate 146:25
communicated 107:15
139:15
communication 26:1
55:11
communicative 106:23
compare 95:21
Competency 84:14
complaints 70:22 76:6
145:16
complete 157:19
complicated 69:5
comply 35:16 37:3
73:17 144:7,11
component 70:25
compound 138:10
comprehensive 121:8
computer 159:16
computerized 81:7
158:3,5 159:18
concern 30:23 31:9,24
concerned 165:23
concerning 40:3
concerns 32:2 145:13
concert 96:7,18
concludes 168:23
conclusion 59:5 110:19
condition 57:9 60:23
64:13 88:6,10 108:19
120:6 123:9 124:14
141:18 160:14
conditions 59:24 67:12
106:17
conduct 24:13
conducted 140:14,15
conferred 107:7
confidence 110:10
111:3,4 127:21
confidential 56:15
64:13
confidentiality 56:20
confines 97:14
confirms 111:2
conflict 37:12,16 96:23
143:21
conscious 81:13,16
106:23
consider 109:3 137:5
144:20
consideration 63:23
169:19
considered 49:23 92:9
92:12

constant 107:23 164:4
constantly 110:15
164:2
constituted 113:10
constraint 30:24
constructed 35:25
construction 8:19
consult 31:4,6 109:19
consultation 104:19,23
105:13
contact 25:17 57:23
106:1 113:23 114:9
115:18 116:13
118:24 140:13 147:4
163:1
contacting 115:19
contain 121:20
continue 120:6
continued 79:12
continuously 45:5
contract 11:25
contractor 151:24
Contraindications 72:5
control 30:10
conver 124:2
conversation 56:3
106:25 123:22 124:3
124:6,23 125:2,4
139:19
conversations 140:12
153:13 155:19
conveyed 124:15
cooperation 53:17
cooperative 145:13
coordinated 71:18
copies 23:17
copy 5:14 60:6 71:6
95:20 99:8 153:21
corner 104:18 114:14
117:1,6,9,12 118:11
154:24 167:4
corporate 6:2
Corpus 2:12 4:8
correct 14:4,6,7,18
22:18 26:21 27:6
30:18 32:3 34:14,19
35:1,2,3,21 36:12,20
38:11,15 39:12 44:6
44:7,8 46:20 47:4,8
48:15,18,19,23 49:4
49:8,11,15,20 51:7
51:23 52:1,3 53:20
55:20 56:12,16,19
64:5,6,8 66:12 71:15
72:16,19 77:18 78:10
78:11,13 83:8,13,15

88:14 89:15 90:15
91:12,13,15,16,18
92:23,24 93:1,17,20
93:21 94:23 95:13,14
98:21 99:1 103:8
106:2 108:7,14,17,23
108:24,25 109:1
110:12,16 115:8,24
116:2,22 119:17
121:14 123:17 127:7
128:6,14 130:16,17
130:22 131:10 132:6
132:7 133:8,11,12
135:20 137:14,24
138:6 142:7,18,19
143:15 144:8,9
145:20 147:1,24
148:2,6,18,23 149:5
149:25 150:1,14,21
151:2,11 152:17
153:8,9,20 156:23
157:1,2 159:7,12
160:23,24 166:25
168:6,9,11,12 169:12
correctly 21:12,21
40:15 61:5 74:10
85:24 96:22
costs 31:6 171:2
counsel 5:4 23:20 24:1
82:15 100:2 136:7
152:22 153:14
154:18 155:17
160:19 162:2 170:20
countless 45:11
County 7:20 169:16
couple 37:19 140:20
155:8 162:8
course 11:11 42:22
60:1 88:24 91:24
140:14
courses 150:7
court 1:1 2:8 41:15
93:7 100:6,8 111:9
119:6,9 170:1
cover 18:6 42:12
155:12
covered 132:1,4
CQI 39:14,14 40:1
created 10:14 121:16
credentialing 136:1,15
crime 58:14 79:12
144:23
criminal 75:10
criteria 17:9,15 25:2
50:6 67:3,5,9,11
criticisms 133:16,20

134:1,6
CSR 2:5 171:4
cumulative 132:23,24
cup 34:4
curious 159:3
current 4:14 27:16
83:6 95:21 121:19
132:12 154:4
currently 10:19 83:14
96:6 132:18,20
custodial 25:17 27:25
28:2,17,19 29:2
33:10 43:14,16 77:5
137:7 142:16 143:21
154:4 155:2
custody 23:2,8,11
24:25 25:6,13 26:15
26:16 28:12,14,16
32:25 34:13 35:6
37:14 43:13 51:19
59:17 60:16 63:22,23
73:22 79:3 85:11
94:14 106:24 130:12
133:22 152:11 156:8
159:14,15
custom 17:4
customary 150:18
cut 107:10
CV 6:15

**D**

daily 75:23 76:18
122:12
danger 38:9 45:9,17,21
49:3 57:24 69:18
72:18 90:18,22 97:14
110:19
dangerous 73:7 165:5
data 49:23
date 9:21 11:20 158:7,8
171:5
dated 119:15
day 2:3 9:21 14:19,21
15:4 30:13 38:16,17
61:14 91:7 104:13
105:8,9 116:1 133:17
134:7 139:20 146:11
149:15 152:22 153:2
169:17,21 171:1
daytime 14:20
day-to-day 16:21
deal 24:6
deals 23:12 48:13
50:17
death 1:5,6,15,15 154:5
155:2

death/suicidal 120:4
debriefed 104:2,5
Deceased 1:6,8,16
decide 53:25
decided 43:13 46:22
108:20 128:12
decides 51:5,8 87:10
deciding 30:20
decision 17:20 20:1
31:18 45:14 49:16,19
49:24 52:12 63:18
66:20 68:10,15 73:3
81:13,16 85:22 88:22
89:8 97:16 102:2
103:4 108:8,10,11
123:11 128:8 130:21
131:8 139:2 143:2,12
144:5
decisions 11:8 19:24
30:5 31:3 43:10
45:23 50:4 54:21,23
66:19 86:5 97:17
114:1 122:15 123:1,7
123:10,12 124:17
125:14,16 126:15
137:20,21 138:3,21
declose 156:11
deemed 46:12 55:1
57:20 73:19 143:13
defendants 1:13,21
170:6
DEFENDANT(S) 2:16
defense 162:2
defined 71:7
defines 120:19
defining 121:4
definition 70:2
definitions 71:5
degree 128:5
deleted 38:22
Delgado 162:14,15,23
163:14,20 164:6
deliberations 40:3
82:17,19
demeanor 106:20
demonstrated 89:17,17
91:22 93:22
Denise 2:24
department 1:11 3:12
7:11,13,22 9:6 10:20
11:7 13:15,16 16:12
16:13,18 17:4 18:4
19:9,12 20:24 25:15
26:12,23 29:7,15,16
31:25 51:8 57:5,17
57:21,23 58:1,2,3,7

58:24 59:17 60:12,16
60:24 62:10 63:3,3
64:16,18 66:4,10,16
68:23 69:9 70:12
72:21 73:6,11,17,23
74:2,6,11 76:22
80:16 91:5 93:14,14
93:17 94:14 95:13
99:11,13,14 100:18
105:12,16 107:15
108:11,13 110:11
111:23 114:8 115:10
120:9 123:8,15,16,17
123:22 124:9 133:21
140:15,18 143:5
146:13,21,23 147:9
154:5 155:22 156:1,5
156:17,25 157:4,7,14
157:17 158:1,24
159:4,6,15 162:1,25
163:2,11,14,21
departmental 30:9
37:3 115:17
departments 8:17,20
8:20
Department's 162:9
depend 43:8 75:19
depending 13:14 16:6
28:9 29:12 115:7
156:14
deposed 6:9
deposition 1:22 2:1 4:9
5:2,10,16 23:17
50:21 150:23 153:15
153:19 154:3,10
168:23 169:11 170:8
170:14,16
depositions 5:20 6:1,4
describe 106:20 139:19
150:16
described 29:5 53:23
71:7 94:12,25 130:23
152:9,19
describes 105:23
DESCRIPTION 3:11
design 13:21,24 64:7
64:23
designed 14:1
desk 115:23 147:25
detailed 160:1,2
details 5:5 6:8 51:1
59:12 72:3 159:21
detain 152:5
determination 50:8
53:2 63:5 81:10
106:4 142:21 143:1

determinations 49:22
determine 43:5 45:13
66:1,2 67:3 74:19
78:23 144:17
determined 30:21
43:19 46:17 80:7
103:11 107:19 128:2
determines 48:5 57:15
71:10 159:9
determining 49:20 50:5
developed 27:4
development 7:10 8:7
8:15
developments 120:7
device 159:6,25
devices 96:8,18
diagnosis 59:23 106:9
106:16 109:22
diagram 117:4
dial 151:21
dictate 24:11 36:24
37:1 46:24 96:20
101:12
dictated 105:22
difference 14:18 28:8
28:11 29:6 107:18
109:6 110:25 111:6
111:23 112:1,8
different 8:13 13:6
14:3 35:24 37:1 38:1
48:21 54:16 88:17,17
89:7,7,20,21 92:8,8
96:22 102:14,19
106:16 113:19
125:24 130:25
140:16 146:17,21,21
differently 124:10
digits 154:23
diminished 18:9
direct 21:24,25 71:12
71:13 84:23
directed 100:24
direction 129:9,10
directive 68:23
directives 68:21
directly 8:16 22:17
115:18 146:25
director 4:24 9:14,16
10:17,19,25 11:1,1,4
20:22 32:5,19 44:1
66:25 68:1,1,18
77:24 80:6 108:3
114:2 122:19 126:2
directorship 9:6,18
disaster 20:2
disbanded 39:17

disc 132:24
discharge 141:8
discharged 38:7
discharging 37:8
133:14
disclose 56:13 156:11
disclosed 41:14 56:17
156:5,13
disclosure 115:15
discretion 29:16,22,22
29:24 46:20 78:9
discuss 63:11 85:18
140:10 141:10,19
discussed 141:24
150:14
discusses 55:21
discussing 152:20
165:13
discussion 55:22 145:7
disjunctive 72:11
disorder 93:1
dispatch 147:23 148:4
151:16
dispatcher 162:13
163:1
dispatchers 12:17
distinction 112:20
District 1:1,1 2:8 170:1
170:1
division 1:2 11:14,23
13:12 19:21 170:2
divulge 82:18
doctor 43:24 46:18
47:4,8,13 48:16
61:12 72:14 73:24
85:20 99:9 108:25
109:16 128:11
129:13 132:23
143:13 144:11
151:23
doctors 63:14,19 68:8
68:14 82:7 86:2
135:10,17 136:17,25
137:12,22 138:4
142:7,17,25 144:16
152:2
doctor's 68:9 108:16
108:21,22 109:23
144:8
document 18:20 34:20
45:1,25 50:24 55:22
55:23 56:3,5 83:25
84:2,7,9,10 99:20
100:20,23 101:1
104:24 105:19 154:8
154:9,14 155:2 160:8

160:10
documentation 23:19
99:15
documented 55:14,17
124:24 125:2 155:22
155:25 156:3 157:6
157:13 158:16,20
159:11
documenting 159:2
documents 3:12 24:3,6
25:8 34:16 100:2,11
100:14 153:14
155:13 158:8 159:13
dog 143:11
doing 10:12 12:10
79:17 107:3 132:20
132:21
done 27:7 34:3 35:11
62:16 63:11 78:19
96:5,16,17 103:9,10
103:10,14 104:23
105:9 108:21,24
109:15 120:13
122:17,18 124:10
door 117:8,13
doors 100:23
down 9:8 16:14 34:6
102:25 129:1,11
143:19 163:23
Dr 61:13,19,20 82:2,4
105:10,15,17,23
107:4,5,9,15,23
110:10,16 111:4
122:13 123:20
124:21 125:2,8
129:16 151:23
161:20 164:6,9
165:14
Drawer 2:18
driver's 12:24
dry 27:16
due 87:18 171:3
duly 2:2 4:2 170:13
during 8:11 13:10
14:18,20,21 18:8
32:4,13 33:17 34:9
73:14 80:3 81:5,24
88:24 91:24 94:15
106:1 112:22 140:13
140:20,23 157:4
162:5,24
duties 30:17 37:8
100:25 103:5
duty 19:8 20:1 31:20
33:4 42:22 63:9 91:2
141:8

**DWI** 29:9

**E**

E 1:2 2:7,18 4:3 42:18
131:18 155:7 168:3
170:3
each 18:12 93:8 102:19
148:22
earlier 9:25 14:5 20:23
29:23 35:13 36:12
77:12 81:9,23 86:18
90:6 97:21 99:25
100:12 101:2 152:20
160:19 164:17 167:2
early 163:12 164:18
easier 158:6
Eddie 131:19
edition 83:9
Eduardo 2:20 3:6,7
educate 121:2
education 12:25 120:19
educational 25:19
effect 14:10 43:15
82:20 83:14 86:14
96:6,10 121:20 133:1
135:13 150:25
effort 25:19 26:13
38:25 98:1 101:13
efforts 122:12
either 6:20 12:16 26:20
27:3 28:19 29:21
48:16 49:17 53:24
61:6 67:1 69:8 72:1
78:9,20 80:8 82:6
89:20 92:25 104:10
107:1 115:14 118:10
130:3 149:1 152:3
159:5
elements 41:2
elevator 167:15
Eleven 142:3,4
eliminated 113:16
eliminates 73:4
elsewhere 28:21
emergency 16:12,13,17
22:5,9 94:16 115:11
emergent 20:2
emotional 141:1
employ 138:24 152:2
employed 4:23 6:20
12:2 49:13 119:25
138:20 145:25
151:23 170:21
employee 10:4 18:3
79:1
employees 11:24 12:1,7

15:2 66:10,13 137:6
137:7 144:19
employment 9:25
empower 31:2
empowered 77:24
EMS 42:21
encompassed 8:17
encountered 53:8
end 31:1,14,19 104:3,5
104:9 116:15
ending 154:25
enforce 36:2,8,14,15,18
37:17 38:13 42:13,20
enforceable 36:10,11
enforced 42:6 46:3,4
enforcement 6:12,19
6:21,23 7:12,14,23
18:5 23:3,9,12 24:20
24:21 25:1,6,13,13
26:19 27:13,21 28:13
28:24 33:16,24 34:12
34:18 35:7,15 36:3
36:22 42:21 43:4
44:5 53:8,18 55:20
56:3,4,10 57:9 62:7
63:22 64:3,12,24
79:3 85:12 86:8,20
87:10,11,21 88:11
138:25 146:18
155:16,16 156:7
engineering 8:19
enough 28:4 30:12
65:10 66:2 106:3
125:20 129:22
enter 15:11
entire 11:1 36:5,9
38:23 49:10 113:7
entirety 24:6
entities 52:7
entitled 1:5 43:2 56:10
83:24 84:10 152:15
153:14
entity 52:8
entrance 117:13
entries 56:21
entry 119:15,20 120:2
enumerated 119:1
environment 38:4
74:24 75:6 102:7
103:25 114:13
equipment 149:6,9
151:8,10
equivalent 147:23
ER 60:2 114:9 137:10
erase 27:16
escalating 113:18

escape 167:13
escaped 80:1
escorting 140:19
essentially 36:9
establish 17:15 93:12
established 14:9 18:25
19:1,2
ESTATE 1:8
Estella 21:17
ET 170:3,5
etc 107:13
evaluated 17:14 63:19
63:25 73:23
evaluates 62:24
evaluation 61:8 62:2,3
63:13 97:13 165:14
even 36:18 78:12 97:16
101:13 108:24
109:18 123:9 143:25
evening 59:13
event 38:7 39:5,6,7,8
72:20 89:9 126:21
events 17:18 133:6
eventually 109:13
ever 5:15 8:2 21:8 60:8
68:19,20 74:10 77:1
78:22 79:6 141:7,13
142:20 144:10 145:8
150:7 151:20
every 18:12 55:25
89:13
everybody 122:7
123:10
everyone 165:23
everything 38:5 101:20
165:24
evidenced 107:11
exact 13:20 74:17
95:20 127:14,19
exactly 70:9 81:6 97:2
120:23 140:3
examination 3:6,6,7,7
170:18
example 18:10 20:6
34:22 36:7 42:16
45:2 48:6,21 51:10
52:17 73:24 78:25
88:23,25 90:6,16
108:18 119:13 152:7
156:19 159:8 161:20
examples 17:18 43:18
44:23
except 169:12
exchange 53:16 55:10
56:8 57:6
exchanged 55:9,16

exclude 85:9
excluded 85:6 86:10
excludes 86:17
exclusion 86:22 87:9
96:13
exclusive 97:22
excuse 22:22 124:20
executed 169:19
exhibit 26:7,10 35:12
36:14 41:25 42:5
50:21,22 60:7 69:8
70:1 83:7,8,9,23
84:13 95:9,13 96:13
99:8 100:3,11,15
104:17 120:17
122:12 141:25 142:1
142:18 144:15
150:23 154:3 161:25
161:25
exhibited 69:16,17
90:23 92:19,21 93:23
94:16
exhibits 3:10 23:18
83:16
exist 38:18 87:7
existed 67:3 103:11
151:4
existence 39:15 75:3
96:10
exists 5:13 84:3 157:13
exit 167:15,17
expect 62:24 64:25
106:15 158:22
expected 62:16 113:19
expedient 116:12,14
experience 6:18 17:17
21:9 44:19,22 58:22
67:7,7,9,10,13 68:1,2
69:17 75:7 76:11,16
122:11 141:5
experienced 144:7
expert 8:2 133:3
Expiration 171:5
explain 109:20 117:2
135:4 136:10 143:17
explained 167:3
explanation 160:5
expressed 91:14 94:3
134:6 169:19
extensive 40:23
extent 149:9 155:2,4
extra 71:6
extremities 49:2
extremity 49:10 128:14

**F**

F 35:12 36:5,14,15,15
37:21 40:20
face 101:13
faced 134:18
facial 140:2
facility 27:20 70:20
98:25 127:18,20
fact 58:4 61:3,9 91:20
102:3 103:21 108:24
113:4 114:12 136:4
142:13 166:10
factor 73:4
facts 126:22
factual 59:10
faculties 45:8
fair 8:22 18:12 59:6
63:1 65:10 81:12
91:4 106:11 117:5
122:7 125:20 129:22
134:23 135:10
fairly 161:25
fake 130:6
fall 48:12 54:21
falls 72:12
familiar 22:15,21 23:25
24:3 44:9,18 49:23
50:4,13 70:3,8 71:9
71:11,16,17,20 84:1
84:7,9,10 129:6,24
150:19 158:18
family 18:7
far 122:25 135:7
138:18 150:18
157:23 158:7 167:14
farthest 114:14
fashion 6:18
fearful 105:24
feasible 128:4 167:12
February 9:23
federal 79:24
feel 98:15 103:18
121:17 122:19 133:3
135:1 136:10 162:17
162:23
feelings 141:3,5
feet 117:23
felony 28:5 29:4 32:7
32:10,24
felt 52:19 78:1,8 81:20
88:20 103:24 108:5
Feria 1:10,11,18 4:10
59:17 60:16,24 73:22
80:15 81:17,20 94:14
114:8 123:16,17,21
124:8 131:20 133:21
143:5 146:22 147:4

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 178

154:4,5 162:13,25
163:11,14,20 169:2
170:5
few 37:11 102:24
field 6:18,22 8:2
fifth 80:19 114:19
fight 143:11
figure 93:16 113:9
file 99:12
filing 76:6
fill 13:7
final 52:8 53:2 54:4
finally 53:25
financially 170:23
find 53:23 54:19
104:19 111:6 156:21
158:23 164:13
finder 136:4
Finding 158:4
findings 105:13,15
161:22
Fine 9:3
fire 25:23,23 42:21
167:17,18
firearm 38:7
firearms 34:23 40:20
40:22
fired 166:3
firm 2:11 131:20
first 4:13 5:15,23 6:22
7:23 8:25 11:13
13:11 24:2,18 99:11
120:21 127:6 128:24
129:7
five 5:19 132:9
fixed 16:12 17:1,7,12
17:15 18:16
flashlight 149:11
flight 89:1
floaters 16:23
floor 29:12 60:19 69:15
74:5 78:10 80:2,9,19
101:3 102:4,5 114:14
114:19,21,24,25
115:14 118:23
166:24
floors 84:21 108:5
flow 84:1
foam 130:4
folks 103:4
follow 25:15 44:15 55:2
101:11 120:6 127:13
127:16 145:15
followed 142:12
following 141:15
170:12

follows 4:2 84:15
109:24
force 8:3 42:14 133:4
152:11,18 155:15,25
155:25 156:7,10,19
157:5
forceful 28:5
foregoing 169:11,18
forensic 23:11,13 24:7
24:12 26:1,11 27:9
27:10,17 28:1 39:1
39:14 40:15,21 41:8
43:20 44:24 46:10
48:10 51:17,22 52:5
52:7,8,16,18,24 55:5
55:12 64:5 74:16,23
75:9,22 79:10 80:23
82:21 83:2 85:5,5,5,9
86:10,15,16 87:2,19
87:24 88:5,8 96:21
97:6,8,17 98:10,13
98:18 101:19 102:3
103:15 115:3,11
117:17 120:19 121:2
126:6 127:20 142:12
142:13 143:11
144:20,21 145:3,8
150:10 155:23,23
157:6 166:21 167:10
foreseeable 161:4,7
162:21 165:21,22
foresight 109:14
forget 82:14
form 38:17 41:18 43:21
48:22,24 50:1 53:4
54:2 55:14 64:9 65:3
66:22 75:11 82:22
85:14 90:1 92:10
93:2,24 96:25 98:22
99:5 107:20 109:9
110:8,20,21 112:5
121:22 122:2,24
125:10 126:12 128:7
133:18,23 134:3,12
134:19 135:14,21
137:25 139:12
159:16,17,23 166:5
166:17
formally 55:13
format 154:14 159:19
formation 39:7 40:16
former 153:8
forms 128:15,18
forseeable 166:22
forth 18:19 50:24 71:5
155:14

found 36:22
foundation 120:25
Four 5:19 7:2 132:9
frame 87:16
free 17:7 135:1 136:10
frequency 146:18
151:6
frequent 101:8,14
102:9 103:5 104:8
146:21
frequently 29:11 33:4
92:12
Friend 1:3
from 2:4 4:8 7:5 8:10
9:8 13:8 16:20 23:21
28:8 32:18 35:23
36:12,17 40:16 49:13
50:18 56:11,11 57:25
58:21 59:10 60:7
61:23 63:5 67:18
68:7,21 69:7,12
71:12 72:14,15,23
79:15 80:1 85:6,9,9
88:15 89:2 96:2
98:10 99:12 104:25
105:21,23 109:19
111:8,21 112:2,11,12
112:13 114:13,14
117:13,23 120:3,9,10
121:21 122:1 127:13
131:4,25,25 132:21
139:16 141:5 142:4
143:5 147:3 149:23
151:16,17,17,18,21
158:1,11,13 162:4,8
162:14 163:10,20,20
165:13 167:5,11,15
167:15
front 34:21
fugitive 79:25,25
fulfill 12:23
full 49:9 93:10 113:5,5
fully 16:3 19:5 122:4
122:20 125:22 126:3
128:13,16,19
full-time 6:20 10:14
15:24 16:10 31:19
33:2 77:5 103:21
112:15 114:12 132:9
further 22:5 49:3 52:20
54:13,14 63:25 86:7
90:25 107:10 109:19
167:10 170:20,22
furthest 167:4,10
fussing 111:5
future 109:14

**G**

Gallego 119:23
Gallegos 120:8
Garcia 162:12 163:1
Garza 2:20 3:6,7 49:25
89:11 110:20 123:13
125:10 131:15,19,19
133:20,25 134:5,14
134:15,21,23 135:17
135:23 136:7,8,21,23
136:24 138:2,3,9,12
138:19 139:13
147:11 152:1,4
153:25 154:2,19,22
155:5 166:5,17 168:2
168:4,16
gather 35:23 111:8,14
111:21
gave 29:19 60:11,22
61:10 78:25 90:6
100:3
general 6:9 7:10 8:7,16
8:16 42:19,19 71:16
72:24 103:10
generally 47:8 57:3,21
137:15 159:23
160:11,13
gentleman 91:10
128:12
GERARDO 1:11,19
gets 58:6
getting 12:13 18:11
95:20 122:4 130:24
138:13
girlfriend 120:5
give 6:9 8:9,12 17:18
25:19 26:4 33:3 34:5
43:18,25 44:23 63:4
67:24 68:17 93:10
99:6 106:16 108:1
115:16 120:12,15
given 5:15,20 6:1,4
14:15 19:7 26:1 37:5
60:12 61:4 62:13,16
76:15,17 100:12
122:20 125:23,25
134:9,15 161:10
165:24 169:20
170:15
gives 121:4
giving 26:10 159:21
go 6:13 7:3 15:14 19:3
20:9,12,13,21 21:1
21:18 22:14 30:5,19
31:13,16,20 33:5
34:4,4 36:12 37:19

41:24 42:3 46:14
64:18 67:23 69:2
77:20 85:25 99:7
100:2 102:25 104:7
109:19 113:21
116:20 117:18
118:10,12 129:7,24
131:15 132:1 136:15
138:9 145:2 153:25
157:23 158:8
goal 15:16,17 37:13
goes 129:1 130:4,7
143:19
going 5:14,25 14:5
22:20 26:11 31:13,13
31:15,16,20 33:7
34:2 37:3 40:2,9 43:7
52:13 53:3,16 57:7,8
57:10 58:25 59:6
61:7,7 64:7,23 65:1
68:15 74:20 81:14
82:15 83:19 85:7
88:4,6 89:22 92:3
97:10,18 98:20 99:6
99:9 100:10 104:17
106:9,10 111:20
112:13 114:2,3 121:5
123:1 125:16 126:18
126:24 127:13,16
131:23,24 135:15,21
136:22 138:16,18,22
154:2,6 155:12
156:21,22 157:13,14
157:16 158:21
159:19 166:11
166:11 167:13
gone 21:8 22:24 166:3
166:13 167:23
Gonzalez 1:3,4,4,6,7,8
1:14,16 2:23 15:11
15:13 51:10 58:13
59:13 60:13 61:10,13
61:20,23 62:14,18
63:19 70:24 71:25
73:9,12,13 74:6
75:25 76:20 80:10,14
80:20,25 81:20 82:2
84:5 85:11,15,17
95:3,17 104:4,23
105:2,11,15,18,23
106:1,18 107:4,5,9
107:15,23 110:10,16
111:4 112:4 114:19
117:6 121:25 122:13
122:20 123:20,22
124:13,20,21,22,24

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

125:3,3,5,8,8 126:1
127:15,18 128:2
129:16 133:8,22
139:6,11 140:8
141:13,19,22 143:9
147:19 148:3 149:15
149:18,25 151:23
152:21 153:1,8 154:7
160:21,21 161:20
162:5,15,20,25
163:12,15,22,23
164:2,7,10,12,19
165:9,14 167:1 168:4
168:5,7
**good** 4:4 6:13 35:25
107:5,6
**gosh** 69:25
**gotten** 22:3
**governmental** 37:4
79:14,17
**governs** 50:18
**Graham** 2:6,17
**grain** 34:24
**Grand** 6:24 7:5,13,13
7:16,21,22,24 9:8
**Grande** 139:1
**graveyard** 102:20
**greater** 103:23
**ground** 132:2
**grounds** 72:14
**growing** 10:14
**guard** 17:15 33:9,19,21
74:4 77:5 78:4,23
80:14 98:13 101:3
114:12 118:3 149:6
150:6 163:15,23
163:11
**guarded** 64:2 105:24
163:11
**guarding** 35:6 127:22
144:22,25 145:4
150:4 162:5,15
164:25 165:4
**guards** 96:8 144:24
**GUERRA** 2:20
**guess** 8:23 11:3 12:10
18:11 25:14 32:22
33:14 40:11,14 44:25
45:8 52:4 54:3 56:7
59:16,19 60:23 64:24
73:11 75:18 86:4,9
86:25 89:8 92:15
97:14 120:23 143:11
148:3 156:16,18
161:19,24
**guidance** 22:6,12 24:12
**guidelines** 23:1 97:11

97:11
**Gustavo** 1:3,6,8,14,16
124:24 125:5 160:21
**guy** 96:15
**guys** 102:10

――――――― **H** ―――――――

**Haggarty** 21:5,23 22:2
**half** 30:8
**hall** 34:6 117:20
**hallucinations** 107:12
**hallway** 118:1,11
**hallways** 117:24
**hand** 129:22 154:2
169:20
**handcuff** 48:25 51:18
86:16 113:17 143:12
**handcuffed** 51:14
97:17 106:24
**handcuffs** 46:5,12 48:7
48:11,15 52:19,20,20
63:24 87:4,20 129:23
142:15 143:4,7,8
149:8,13,17,20
**handed** 100:2
**handing** 71:5
**handwritten** 158:3
**happen** 21:9 23:2
24:25 32:18 35:6
76:18 87:13 91:8,10
91:10,20 126:22
**happened** 15:5 17:13
23:8 45:18 51:12,24
52:1 57:23 69:6
70:15 91:20,24
109:13,15 166:23
**happens** 31:1 33:24
53:22 117:17 127:12
143:20
**happy** 136:23
**hard** 107:21 117:2
**Harlingen** 2:7,19 7:5
9:9 140:14,15,18
146:20 162:1,8 163:1
**harm** 45:3 46:17 69:21
90:24,25 93:23
**hasten** 154:17
**hate** 71:5
**having** 4:2 34:21 44:19
52:24 55:5,6 77:7
82:16
**head** 5:21 8:23 74:18
85:19,20 110:6 156:4
157:3,4
**health** 4:15 10:5,9
39:25

**healthcare** 45:12
**hear** 50:2 134:24
145:16
**heard** 107:1 116:16
134:8 160:18 168:14
**hearing** 68:7
**heart** 79:16,16
**heavily** 130:2
**heavy** 101:13
**heightened** 18:13 30:23
31:9 32:2 77:2
103:11,12
**held** 4:21 8:13 26:20
27:24 28:10 29:4
32:7 33:16 58:13
60:22 62:18 75:10
76:11 123:15
**Hello** 15:12
**help** 11:10 87:8 96:12
101:21 108:21
116:20 159:11
**helpful** 121:9
**helps** 42:11
**her** 18:8 147:21
**hereto** 2:9 3:4
**heroic** 122:12
**hierarchy** 19:6 29:23
**high** 12:25 28:15,16
32:23 79:19
**higher** 22:5 28:6 128:5
**highlighted** 42:10
**highly** 38:5
**him** 18:7 34:5 39:20
40:3 59:6,16 61:2
67:20 75:12,13 76:6
77:11 81:24 82:3
85:19 89:2 94:14
95:4 97:17 105:11
106:4,8,9,10 107:1,1
107:2,5,6 110:2,17
111:16 113:5,23
114:9 120:6 122:14
128:16,19 136:3
138:15,17 139:24
140:12,13,22,25
141:1,2,3,15 143:12
145:15 151:17
155:20,24 157:9
163:14,22 164:7,25
164:25 165:4,4
166:11,24 167:15
168:10
**himself** 45:21 73:7
93:23 97:14 110:3,19
112:4,10,19 113:11
141:20 162:17

164:20 165:9
**hindsight** 109:12
110:15 113:17 122:3
122:6
**history** 62:19,19,22,22
91:17 124:23,24
**hit** 166:4,13 167:23
**hits** 30:25
**hold** 21:13 59:12
**home** 9:9,12,13 20:5
31:13
**homicide** 76:2 78:19
**honestly** 22:21
**hope** 12:12 53:15
**hopefully** 132:1
**hospital** 9:17,25 10:1,2
11:2,25 12:1 14:11
15:2 16:1,5,15,25
17:21 19:16,25 21:25
22:24 23:13 24:2,14
24:21,24 25:12,19
26:2,12,12 27:13,22
28:20,25 29:17,18,19
29:25 30:23 31:4,11
32:1,14,15 33:13,18
33:23 34:8,12,18,19
34:23 35:3,5,8 36:2
36:13,18 38:4,12
42:6 44:11 46:2,20
47:7 48:5,15 49:17
49:18 50:25 52:6,8
53:1,1,12,18,24
56:24 57:4,7 59:12
59:13 60:15 62:2,8
63:5,10 64:16,22
65:11 66:21 67:2,15
68:22 71:17,21 72:24
73:13 75:23 77:3
78:19,24 79:16,20
80:2,8 81:19 82:20
86:8,14,19 87:10,14
87:23,25 88:16 89:6
89:19 91:11 93:13
94:17 95:3,5 96:17
96:19,24 97:5 98:3
98:19 102:17 108:4
113:7 114:21 115:3
115:21 116:4 117:10
117:15 118:21
119:11 120:19,21
121:2 122:11,21,22
126:2 127:5,13
128:21,24 130:21
131:8 136:2 142:6
143:23,25 150:5
151:11,24 155:17,25

156:6,21,25 157:6,12
157:15 158:24
164:12 165:8 168:10
**hospitals** 121:7
**hospital's** 23:19 29:7
36:19 63:5 87:25
98:4,5 160:25
**hospital(sic)** 117:6
**hostile** 69:14
**hour** 31:22 80:24 81:1
101:15,16,17
**hours** 14:20 20:9 30:12
30:14,15,25 31:12,12
31:20 116:1 132:18
**house** 19:15,18,21 20:3
20:10,12,13,19,25
21:13,15,22
**housed** 32:16 115:4,5
**housekeeping** 8:18
**Hubbard** 1:23 2:1 3:5
4:1,6,7 5:8 8:5 21:6
22:20 43:1 50:22
74:13 82:14 83:23
104:16 119:10
120:17 131:12,19
154:2,22 155:8 163:9
168:1,2 169:11,14,17
170:8,13
**Human** 18:3
**hungry** 107:7
**hurt** 110:3 130:15
**husband** 18:4 79:1
**hypothetical** 166:9

――――――― **I** ―――――――

**IC** 43:2
**idea** 6:10 38:3 120:1
**ideas** 107:12
**ideation** 58:18
**ideations** 91:15 94:8
**identify** 40:4 154:22
**identity** 40:5
**ignore** 114:4,6
**IH-10** 171:5
**II** 95:10 96:10
**illness** 124:25
**imagine** 137:7 149:3
152:17
**immediate** 57:25 74:5
113:12 167:7
**immediately** 22:11
58:9 105:7 141:15
167:6
**imminent** 57:24
**impart** 66:20,21
**imparted** 62:10 66:15

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 180

implication 99:1
implied 125:24
impliedly 41:14
important 121:17,18
impose 86:9,20 88:17
89:7,20
imposed 86:21
impression 107:11
impressions 125:3
improvement 10:10
39:1,8 40:1,2 74:25
inadvertently 132:3
incident 11:11,12 20:2
33:1 38:13 42:7 52:2
68:20 83:12 94:8
95:17 99:20 102:15
112:3 121:12,21
122:1 127:15 133:17
134:7,10 139:6,11,20
140:22,23,25 141:10
141:14 145:18
146:11 149:15 150:3
152:22 153:2 155:21
156:2,3 157:18 158:2
158:4,12 165:19,21
165:22 168:5,8,11,11
168:14
incidents 155:15 157:5
157:17
include 49:5
included 8:25 9:2 32:10
100:14 102:15
110:24 129:16,20
includes 99:2
including 68:20
incorrect 35:8
Increase 103:16
increased 33:23 103:18
incurring 31:5
independent 58:8
97:19 108:3 151:24
INDEX 3:1
indicate 110:18 164:2
indicated 94:21 105:1
107:3
indicates 110:9 124:5
150:24
indicating 161:3,3
indication 18:13 34:16
69:18 92:8,22 94:3
110:4,5,6 160:6
indications 34:25 72:5
74:15
individual 46:19 52:19
56:12 62:18 63:8
116:19 119:15

122:22 134:20
158:22
individually 1:2,7,12
1:14,19 5:8
individuals 45:24 86:1
119:12
individual's 74:20
infor 124:7
inform 66:14
informant 79:15
information 25:18,20
26:1,4,13,15,22 27:7
27:23 49:23 53:17
55:9 56:4,9,11,13
57:6,8,14,16,20
58:16,17,19,20,23
60:12,14,21 61:22
62:9,13,17 63:2,4
64:5,8,11,23 65:1
66:2,15,18,21 73:10
76:15 83:2 94:22
103:2 108:15,18
109:2 110:24 112:22
114:4,6,7,10 120:9
121:5,9,17 122:21
123:6,8,14,18 124:1
124:8,14,15,16 125:7
125:13,15,23,25
126:13 127:11 139:5
139:16 141:19 145:2
145:3,8 157:12
159:22 161:9
informed 51:1 66:5
70:12,15
initial 8:6 84:11
initially 7:8 8:24
initials 119:12,20
initiating 84:15
initiative 4:19 10:11
injure 52:20
injured 52:18 132:20
injuries 115:7 139:25
140:1,2
injury 49:3 60:23 61:2
82:5 94:1 132:21,22
132:24 156:20
inside 38:5 130:4,7
insistent 53:9
instance 2:2 73:9 77:1
107:9 109:2 116:8
instances 92:4 127:17
instant 72:20
institution 80:1
instruct 58:25 135:22
138:16
instructed 82:16

146:14
instructing 39:20
instruction 20:21 59:3
59:4 101:4 102:18
167:24
instructions 18:20 33:3
55:2 104:14
instrument 169:18
insufficient 88:15
insured 55:7
intact 33:10 95:17
intelligible 65:7
intended 102:21
intent 36:1 46:8
intentions 97:3
interaction 23:13 67:1
55:6,9
interested 6:8 10:12
170:23
interests 52:21,22,24
55:5,8
interfere 53:10 88:10
88:13 89:18 90:16
151:7,10
interferes 88:5
interfering 88:16 89:2
interim 10:20
intermediate 20:20
internal 107:13
International 2:21
interpretation 109:21
interrupt 42:17 129:10
interrupted 9:3
Interruption 15:11
Intervenor 1:16 2:13
interview 61:23
intimately 158:18
investigate 39:8
investigated 76:2
investigation 140:14
162:9,10
involve 29:7 58:3
involved 10:12 18:5
22:3 58:10 69:10,20
69:22 81:18 125:13
140:17 150:2
involvement 69:12
72:25
involves 156:19
involving 32:11 155:15
in-custody 24:22 26:13
29:18
Irene 147:11
issue 24:18 30:8 40:24
41:7 59:7 63:16 65:2

70:21 85:25 87:3,5
131:25 144:18,18
147:3 150:8 152:21
issued 146:13 148:20
issues 23:14 28:3 39:2
40:1 55:21 82:21
106:10 138:23
149:22 150:13
155:11,14
issuing 104:13
item 35:12 43:1 72:4
IV 45:5,5 88:25 89:10
89:13 90:9,13,17
92:5
IVs 92:12
IX 72:4

_____ J _____

J 2:4,14 148:12 170:10
171:4
Jackson 2:24
jail 33:8
JERRY 1:11,19
Job 6:22 12:22 45:14
57:2 66:8 102:6
104:1
Joe 65:8
Joint 52:4 121:1
jointly 53:7
Joseph 2:11 3:6,7 4:7
JR 1:4
Juan 162:12
judge 40:8 67:6 68:15
90:21
judgement 57:19
judgment 58:9 65:14
65:15,20 89:22 111:3
112:21
judgments 90:20 122:8
jumping 131:25 149:21
just 5:14 6:17 10:3
13:24 15:14 17:3
23:5,14 25:9 27:16
31:20 32:25 33:3
37:17 40:12 41:12,17
42:3,10,25 44:19
47:8 50:16 54:19
59:5 60:11,22 70:7
70:18 71:20 72:23
73:3 75:7,11,13
76:12 93:12 94:4,4
95:16 98:8 100:1,11
105:19 107:2,10
111:5,12 116:15
117:22 119:6 120:12
120:12 121:2 122:11

122:21 129:14
131:25 136:13,14
137:17 138:12
140:18 150:18
153:12 154:22,23
163:16 166:23
justification 72:10
144:15

_____ K _____

Katherine 2:4 170:10
171:4
keep 28:20 30:10 39:10
52:18 74:22 81:7
100:13 119:4 130:24
131:3,6 157:17,17
163:15
kept 74:21 159:23
kill 164:20,25 165:4,9
kind 6:17 8:12,12,19
13:13,24 16:23 24:12
29:23 30:20 50:18
52:11 54:19 55:14,14
55:15,15 58:5,23
69:4,6 70:16 78:25
99:7 107:2,21 147:8
149:21 167:2,16
kinds 68:10
knew 32:23 51:12
93:17 109:12 139:10
141:5
knife 164:20
know 5:12,14 21:6 22:4
22:16 23:16 25:9
27:19,21 28:15 29:9
31:4 34:5 37:22 38:2
38:20,22,23 39:17
43:24 44:2 45:23
49:1,12 50:6,16
51:12,15 52:6,10,13
54:3,5,18 56:2 57:2,5
57:22 58:8 59:10
62:21,23,23,23 63:13
63:17,24 65:4,11,12
65:17,18,21 66:4
67:25 70:23 71:21,25
72:23,24 73:1,2,5,5
73:10 75:8,16,17,18
77:19 78:25 80:4
81:2,4,5 82:23,25
83:23 84:3,4 88:19
91:19,20 92:15 93:6
93:14 94:6,9 95:2,2
95:11,15 97:1,2,13
97:18 98:3 99:9
102:11,12 104:24

106:22 109:11,12,12
109:15,20,20,22
110:15 112:22,23
113:18 116:23
117:22 118:2,5 119:3
119:21,24 122:6,12
122:13,14 123:6,8,25
123:25 124:2,18
125:2,12,19,21
129:13,13,15,18
130:6 133:25 134:5,9
134:15,24,25 135:1
136:9,10,13,13,13,14
136:14,15 137:2
139:5,8,13,14 140:3
140:4,5,5 141:1
142:20,24 143:2,6,10
143:10 144:2,2,10
145:7,18 146:10,14
146:16 148:8 149:17
150:8,15 151:5,13,15
151:20 153:4,14
155:1 156:4 162:7,22
162:24 165:13
166:18
**knowing** 109:13 123:6
**knowledge** 24:18,23
32:4 33:18 50:23
51:4,18 62:1,5 64:4
71:1 72:3,24 74:12
80:6 85:14 105:14,16
115:2 136:1,5 139:10
144:13,17 145:10,12
145:16 151:18 156:2
165:25
**known** 63:2,2 92:25
93:13 94:22,23
107:17 109:6 122:21
125:23 127:4 156:24
169:17

**L**

**La** 1:10,10,18 4:10
59:17 60:16,24 73:22
80:15 81:17,20 94:14
114:8 123:16,17,21
124:8 131:20 133:21
143:5 146:22 147:4
154:4,5 162:13,25
163:10,14,20 169:2
170:5
**labeled** 142:1
**lack** 11:3,5
**language** 120:18
**last** 7:24 23:17 95:7,9
100:3 105:8 109:23

110:24 153:11
154:23 158:5 167:22
**late** 59:13 61:16
**later** 8:23
**latitude** 121:4
**laundry** 84:17
**LAUREN** 1:4
**law** 2:11,14 6:11,18,21
6:23 7:12,14,23 18:5
23:3,8,12 24:20,21
24:25 25:6,13,13
26:19 27:13,21 28:13
28:23 33:16,24 34:12
34:17 35:6,15 36:2
36:22 42:21 43:4
44:4 53:8,18 55:20
56:3,4,9,18 57:9 62:7
63:22 64:3,12,24
79:3 85:12 86:8,19
87:10,10,20 88:11
138:25 146:18
155:15,16 156:7
**Lawler** 82:4
**lawsuit** 139:7
**lawyer** 4:8
**lawyers** 162:3,4
**lay** 72:9
**layman's** 106:20
109:21
**layout** 117:2
**lead** 72:10
**leaded** 130:5
**leading** 134:9,16
140:23
**learn** 68:3
**learned** 94:7 161:10
**least** 34:9 44:9 74:5
92:20 101:15 156:24
**leather** 130:2,5,5
**leave** 9:25 10:1 33:12
46:8 118:12 165:5
167:13,13
**leaving** 7:15,16 105:8
**led** 37:11 113:3
**left** 7:24 32:20 104:13
107:8 138:4 167:20
167:20
**leg** 46:5 48:8 128:25
129:5,8,22,23
**legitimate** 64:19
**legs** 129:1
**length** 26:3
**less** 38:8 55:1 102:24
**let** 4:13 5:2,15 11:9,22
12:20 13:21 14:24,24
15:17 16:14 19:3

22:24,25 23:5,16,16
24:1 25:9 26:9 29:3
29:14 30:19 31:8
36:11 37:19,19 40:3
41:24,24 42:16 43:4
43:17,17,17,23,23,23
45:25 46:14 48:2,2
48:14 49:12 50:20,23
58:11,11 59:9,9 60:6
60:20 65:9,9,10,12
65:16,20 66:3 67:22
67:23 68:19 70:1
71:4 75:7,24 77:20
77:20 85:9 93:9,9,9
100:2,4 101:22
104:21 106:9,10,12
106:12,12 107:25
110:23 112:6 114:17
117:5 119:6,16 128:9
129:4,7 135:1 136:14
153:12 157:8 162:11
162:11 163:23
164:13 166:11
**let's** 16:2 24:16,16,16
58:12 86:12
**level** 12:25 13:8 28:4,6
28:9,15,16 29:6
32:23 46:21 49:16,20
50:8 52:9 53:2,3,16
54:1 57:15 58:6
71:23 78:7 79:19
88:2,3,17 89:7,21
92:8 98:20 99:3
102:6 107:18 108:10
109:7,14 110:11,25
111:23 112:8 113:18
113:19 144:4 153:1
**levels** 20:20
**license** 12:25
**licensed** 119:23
**like** 11:10 16:9,12
17:23 18:21 19:23
20:2,3 25:24 26:8,10
28:2 29:9 33:2 40:20
44:16 45:5,16 51:4
53:23 66:23 69:10
75:21 77:12,13 78:4
79:20,21,22 81:20
82:10 87:13 89:8
96:19 100:24 101:14
115:11 121:21
125:20 130:16 131:1
134:24 137:3 138:10
140:16 147:23
152:10 154:17
155:20 167:24

**likely** 38:8 57:11
**likewise** 159:16
**limit** 31:21,22
**limitation** 30:4
**limited** 40:22
**line** 141:8 169:3
**Lisa** 148:7
**list** 16:15 74:21 83:2
84:17 121:9,16 145:3
145:8
**listed** 97:15
**literally** 121:7
**little** 6:14 42:8 46:15
87:1 92:15 100:1
103:23 131:24
**load** 34:22 35:18 36:8
80:24 81:1 101:12,13
**loaded** 138:22
**loads** 40:20
**locate** 20:15
**located** 74:6
**location** 17:12,21 27:17
77:17,17 79:16 80:8
81:11 160:3 162:16
**locked** 167:17
**lodged** 5:4 155:18
**log** 27:8,11,16,16 55:15
**long** 4:21 7:1 10:23
124:24 125:1
**look** 23:21 42:25 70:5
82:11 84:17 109:24
118:12 119:22
161:19,21,24
**looked** 10:11 22:11
123:4 155:10 161:13
161:21
**looking** 9:11 50:20
70:7 104:25 119:10
154:12
**looks** 26:8 154:16
**loosen** 164:3
**lost** 30:20
**lot** 34:10 72:23,24
109:12 119:11 121:4
138:23
**lots** 74:14 102:17,18
**lower** 11:21 38:5,6
**LSW** 119:23
**L.L.P** 2:17

**M**

**M** 4:3 131:18 155:7
168:3
**machine** 2:6
**made** 11:8 18:6 20:1
31:18 41:4,7 43:10

45:23 49:17 54:23
55:15 56:21 58:9
59:15,15,18,20,23
61:1,3 62:1 66:21,23
67:1 73:3,18 74:10
75:25 76:3,5 80:13
81:4,13,16 82:10
89:22 93:13,15,16
97:13 102:1 103:4
105:12,12,14,16
107:14,17 108:16,19
109:3,6,6 110:25
111:6,22,25 112:8
114:4 123:2,7,10,10
123:11,11 124:17
125:16 126:14
130:21 131:8 138:3
139:7 142:20,25
148:5 162:19,23
164:13
**main** 41:21
**mainly** 131:3 141:18
**maintain** 28:1,12,14,17
29:2 37:14 43:15
46:11 52:14 56:19
99:11,13,14
**maintained** 84:4 95:4
149:10 159:13
**maintaining** 84:15
**maintains** 46:20
**maintenance** 8:18
**major** 11:8
**majority** 38:4 58:4
69:11
**make** 5:5 11:22 14:25
17:20,22 19:24 20:3
25:17 26:12 27:8,11
29:5 31:3,3 32:22
33:1 37:15 40:9,10
43:23 45:14 49:22
50:5 54:6 64:22
66:19 69:5 77:11,12
87:17 89:16 97:16
99:23 100:4 101:8,9
101:11,12,14,20
103:24 106:4 107:1
107:25 108:10,11,13
112:21 114:3 122:8
122:14 125:14 135:2
135:4 136:18,25
137:13,18 138:21
139:1 145:5 149:1,17
160:25 164:13
**makes** 53:1 124:9
158:6 159:6
**making** 50:7 114:1

BLAKE HUBBARD

April 29, 2003

Page 182

man 107:6 110:19
manage 4:20 30:9
management 20:20
manager 2:24 7:10 8:7
  8:15 12:17
managers 4:19
mandate 36:2
manner 49:2 71:18
  88:12 89:2 90:19
manning 116:1
manpower 28:3,4
  77:17
manual 38:20
many 11:2,13,14 12:3,4
  12:7,8 14:4,12 36:23
  74:13,15 75:8,9
  76:16 81:6 132:8,18
  140:12
Maricio 21:17,22 22:3
mark 5:14 100:3,10
marked 23:18 50:21
  60:6 99:25 142:18
  144:14 154:3,7
marshal's 79:25
Martin 163:10
MARY 1:2 170:3
master 4:15
matter 17:4,5 21:6 29:5
  48:3 53:15,21 66:1
  103:14,16 120:11
matters 6:4
MATTHEW 1:3
may 25:20 33:22 37:25
  39:22 40:9 42:25
  44:5 46:17 55:17,22
  55:23 58:18 59:2
  67:13,13 81:22 93:14
  95:7 96:7 97:16,16
  97:18,19 103:12
  106:21 107:1 114:11
  120:12 121:17
  125:19 129:20
  131:24 132:3,4 141:4
  145:13 152:21
  153:13,15 156:13,13
  156:16,16
maybe 11:3 16:23
  18:11 29:11,21 33:22
  36:25 39:11 45:2,6
  48:8,25 56:3 68:6
  79:21 80:13 86:25
  91:5 99:18 101:13
  102:11 106:17,21
  123:7 158:10 167:14
mean 12:6 13:15 22:2
  24:20 30:8 35:14

41:14 42:17 53:11,15
  54:18 55:18 64:17
  69:5 87:8 88:19
  89:24 91:21 93:4
  104:5,7 109:16
  111:13 112:9 120:10
  123:16,25 129:9
  156:16 158:23
means 30:6 54:10
  84:24 109:18,21,22
  116:12 120:24
  144:22
meant 20:6 54:12
  117:10
measures 41:18 126:6
  126:8
mechanism 55:7,11
medical 1:13,20 4:10
  4:25 5:8,11,22 6:2
  7:7,9 10:4 11:15,24
  12:21 14:9 16:19
  23:7 24:8,19 25:20
  32:6 40:1 43:3,9,10
  43:19 44:1,3,11 45:3
  45:24,24 47:2,14,17
  49:19,20 50:5,7,18
  51:17,22 52:2,24
  54:21,23 55:3,6,12
  55:17,19 56:11,13,21
  56:23,24 57:8,11,12
  57:15 59:5,20 60:7,8
  60:8,22 62:2,15,19
  62:21 63:2,4,8 64:8
  64:10,11,12,15,18
  66:1,13,24 67:2,21
  67:25 68:5,12,14,17
  68:21 69:7,15 70:22
  72:15 73:25 74:20
  76:17 77:21,22 79:13
  81:24 82:5 85:14,22
  86:5 88:6,22 89:23
  90:4,20 92:1 93:22
  94:21,22,23 95:10
  97:12 98:18 99:8,9
  99:10 106:9,15 108:2
  109:18,22 110:4
  116:17 119:25
  121:10 123:1 124:14
  127:24 128:8,12
  130:21 131:9 134:1
  135:19 136:16,17,18
  136:19,24,25 137:1,5
  137:6,12,13,14,17,18
  137:20,24 138:4,5,6
  138:15,19,20,21
  139:1,2,3 140:17

142:16,25 143:3,9,18
  143:22,22,24 144:12
  144:18 145:20
  148:20 151:3,7,10
  152:1 155:17 158:17
  158:19 159:8 160:4
  160:15 161:14,17
  163:4 164:11,12,16
  165:18
medically 98:16 159:9
medication 129:15
medicines 129:18
meet 53:17 106:13
  115:15
member 27:10 47:17
  136:16 151:18
members 39:18
memory 96:3
memos 18:20
mental 106:5 124:25
mention 34:20 35:13
  86:7
mentioned 17:6 20:18
  29:23 33:22 34:22
  60:23 81:22 95:16
  100:12 105:4 118:21
  137:17
mentions 48:7,9,11
mentor 4:18,18,18,19
met 25:2 30:16 54:7
  126:6 131:21
metal 129:24 130:10
method 2:6
middle 117:7
mid-afternoon 61:16
might 16:11,11 20:3
  22:6 34:2 44:2,4,23
  45:6,10,13 89:10
  90:4,4,14,24 103:20
  110:6 115:10 118:9
  118:12,15
military 119:17
mind 71:14
mine 98:15
minimum 15:7,19
Minor 1:4
minute 24:17 43:1
  120:12
minutes 34:5
miscellaneous 99:21
  100:19 157:18 159:1
mislead 136:4
misleading 87:1
missing 120:5
misstate 164:14
misstated 101:5

mitigated 103:21
  112:14,18 113:4,9
  114:11
mix 14:3
MMC 165:3
mobile 42:18
modified 83:18
moment 23:20 42:9,25
  131:16
Monday 125:16
Monitor 147:22
monitoring 83:24
  142:17 147:25
Month 157:22,23
monthly 75:8
months 4:22 10:13
more 8:14 14:19,20
  15:5,24 19:13 28:5
  29:11 33:4 35:20
  40:23 46:15 49:6,9
  52:11 55:1 57:8
  66:18,23 69:2,5 78:6
  83:5,22 101:8 102:10
  102:18 103:4,17
  104:8 109:12 115:5
  116:12,13,14 121:8
  122:4,20 123:8
  124:13 125:22 126:3
  128:13,16,19 130:14
  138:14 143:16 157:7
  158:10 159:3,3,18
  160:1,2,11
morning 102:16 119:19
  125:16 139:22
  162:24 163:12,13
  164:23 165:2,7
most 10:6 15:4 50:23
  54:21 57:11,11 115:6
  129:24 137:10
mostly 103:24
mother 80:2
mounted 117:22,24
move 7:6 9:7,14 19:11
moved 7:5 16:24
much 33:11 63:23
  108:11 127:20 155:5
  158:6
multitude 92:13
MUNIZ 1:7
murder 76:7,19
murders 76:4
must 47:25 48:1
mutually 97:22
myself 12:16 22:8 31:7
  115:20

N
N 2:12 4:3,3 131:18,18
  155:7,7 168:3,3
name 4:5,7 21:14 26:15
  26:18,19 27:19,21
  39:13 75:5 131:19
  160:3,3 169:18
named 10:17 148:11
narcotics 18:17
nature 39:22 40:6 59:2
  59:4 110:4 124:3
  138:10 164:5
near 77:17 117:8
necessarily 6:8 22:2
  45:13 57:7,17,18
  72:21 90:21 97:21
  100:23 126:17 167:8
necessary 19:25 46:13
  54:25 63:12,25 65:14
  73:19 77:6 78:1,8,23
  80:9,15 81:11 90:2
  90:11,13 96:4,16
  97:4,12 98:16 108:5
  127:24 147:5 152:16
  159:9
necessitated 17:10
necessity 50:5
need 16:6,8 25:20
  27:19 29:25 31:3,4
  40:7,8,11 43:8 52:5
  53:12 62:3 63:6
  64:17,19 71:3 85:25
  97:8 101:20 103:18
  108:20
needed 20:1 22:6 30:22
  31:19 34:4 43:9,19
  44:3 46:18 55:10
  57:25 59:18,19 62:8
  71:24 77:25 86:21
  87:11 88:21 107:6
  140:19 142:22 143:1
  143:18 164:7 165:4
needs 28:22 52:15
  53:17,19 87:6 97:9
  128:12,13
negative 87:18 111:13
negligent 126:17
neither 97:22 170:20
never 33:18 53:7,7
  131:21 144:3,3,7
  163:15
new 10:8 82:19 150:9
newer 83:9
next 1:3 5:25 166:4
night 14:21,23 102:19
  102:22

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 183

**Nobody** 73:20
**noncommission** 13:7
**noncommissioned**
  13:13,19
**none** 24:15,15 33:12
  133:10
**Nonresponsive** 123:13
**non-clinical** 145:2
**non-commissioned**
  15:10,22,25 146:2
  148:15
**non-forensic** 46:16
  48:4,10,12,17
**non-Valley** 138:20
**normal** 100:21,25
**normally** 18:16 22:14
  53:22
**NOTARY** 169:23
**notation** 135:2 165:12
**note** 105:24 109:24
**noted** 103:10 104:9,24
  105:21 107:23
  164:11 165:8 169:12
**notes** 56:22,22 61:23
  82:9,10 104:25 105:1
  105:1,20 107:9
  110:14 149:21
  161:20
**nothing** 121:7
**notice** 5:3,11,12 155:9
  155:11
**notified** 72:21,23
**notify** 73:4
**November** 9:5,20
**Nuell** 148:11,12,13
**number** 11:19 13:12
  26:7 50:22 72:4
  74:17 96:14 100:11
  103:16 104:17
  115:17,17,23 120:17
  142:2 151:21 161:25
**numbered** 2:3
**numbers** 13:20 154:24
**Numeral** 43:2 95:10
**nurse** 44:16 46:18
  47:18,21,21 48:16
  55:21 56:2 73:24
  82:1,1 105:4
**nurses** 57:12 61:4,6
  63:14 69:15 86:2
  117:25 137:3,5,9,12
  137:22 138:5 142:25
**nurse's** 56:22 105:1
**nursing** 48:13 50:12,17
  56:5 69:24 71:13
  82:24 84:20 95:3

  101:19
**N/A** 3:4

_____

**O**

**O** 2:18 4:3 131:18
  155:7 168:3
**oath** 169:18
**Object** 89:11 127:25
**objected** 42:14 82:16
**objection** 41:17,18,21
  43:21 49:25 50:1
  53:4 54:2 58:25 64:9
  65:3 66:22 67:17
  75:11 82:22 90:1
  92:10 93:2,24 96:25
  98:22 99:5 106:13
  107:20 109:9 110:8
  110:20,21 112:5
  121:22 122:2,24
  123:13 125:10 126:4
  126:12 128:7 133:18
  133:23 134:3,12,19
  135:14,21,25 136:6
  137:25 138:7,14
  139:12 157:8 166:5,6
  166:17
**objections** 5:4 40:9,10
  135:24 143:4,6 144:1
  155:18
**obligations** 54:7
**observation** 71:7,8,9
  71:18 72:2,2 84:8
  114:3
**observations** 107:14
  114:8 161:22
**observe** 106:19
**observed** 168:4
**obtain** 26:13,15,23
  60:13
**obtained** 48:1 59:12
  60:15
**obvious** 61:2
**obviously** 41:13 47:15
  66:18 81:11 89:15
  110:14 113:17
  126:15
**occasion** 32:14 141:7
  144:3 161:24
**occasioned** 7:6 9:14
  10:6
**occasions** 76:24 140:24
**occupation** 4:14
**occupy** 9:21
**occur** 25:12 34:9 69:11
  90:14 97:18,19
  126:19 143:21 156:6

**occurred** 38:14 39:4
  40:21 41:1 94:8
  99:23 102:15 103:2
  112:3 115:12 116:11
  121:13 122:5 124:6
  126:11,15,17 133:6
  144:3 149:24 158:12
  168:11
**occurrence** 76:18
  90:10
**occurrences** 17:13 56:2
  79:11
**occurring** 121:21 122:1
  168:14
**occurs** 72:21 74:21
  104:15 155:21
**off** 20:1 31:14 74:17
  131:15 153:25
  163:15 164:3
**offense** 26:17,17,19
  28:4,15,16 32:24,25
  33:8 58:14,22 152:12
**offenses** 28:6 32:8,10
  33:11 92:17,21
**offer** 24:12
**offering** 141:1
**office** 2:6 7:20 79:25
  115:21 169:20
**officer** 1:11,18 6:24
  7:18 8:1 12:20 15:24
  15:25 16:10,13 17:20
  17:24 18:8,15 25:17
  27:12,13,13,14,15
  28:24 29:17,24 30:12
  30:15,16,22,25 31:10
  31:12,19,21 32:1,14
  33:2,24 34:3,4 37:7
  43:14 44:5 46:10,11
  51:19 55:12 64:2,12
  78:9,24 79:1,2 80:14
  80:22 81:21 87:21
  97:7,8,17 99:23
  100:20 101:19 102:5
  103:22 106:24 107:7
  111:4 112:15 113:5,6
  113:16 114:18
  115:11,11 116:18,20
  117:8,17 118:7,9
  119:3 124:20 131:20
  132:6,19 133:8,13,16
  134:1,7,17 138:25
  139:6,10,16,20,21
  140:20 141:18
  142:15 143:4,22,24
  144:5,7,10 145:3,6,9
  145:12,19 146:3,10

  146:24 147:3,11,19
  147:23 148:11,13
  149:25 150:9,12,16
  151:9,20 153:4,4,5
  156:7,20 159:1,24
  160:19 162:3,14,16
  162:23 163:3,3,10,14
  163:20,21 164:6,9,24
  165:4 166:3 170:14
**officers** 12:14,24 13:18
  13:22,23 14:2,3,4,6
  14:14,16 15:3,6,8,17
  15:18,22,25 16:2,4
  17:6,10 19:5,10,13
  20:18 22:23 27:8
  33:3 37:2,2,5,10,14
  42:14 44:2 76:5,7
  80:25 81:17,18
  100:20 101:10 102:9
  115:16 118:2,6
  124:16 126:7 127:21
  133:4 143:5 144:24
  145:22,23 148:9,19
  148:22 150:2,24
  157:19 162:4 163:11
  164:1
**officer's** 114:8 144:1
**Officer(sic)** 149:18
**OFFICES** 2:14
**official** 11:12 147:9
**officials** 79:20
**offiers** 112:24
**offset** 167:8
**often** 15:24 71:21 73:6
  76:10
**oh** 47:15 69:25
**okay** 4:13 5:18,20,25
  6:13,17,22 7:3,6,12
  7:15,17 8:5,9 9:3,7
  9:10,13 10:6,16,21
  11:6,9,19,22 12:15
  13:5 14:22 15:9,16
  17:6 18:18,23 19:18
  20:17 21:3,12,20,21
  22:9,14 24:16 26:5,9
  26:22,25 27:11,18
  28:23 29:3 30:6,12
  30:19 31:23 33:5,14
  34:7,21 35:12,23
  36:4,11,17 38:19,24
  39:3,6,17 40:7 41:16
  41:23 42:2,4,25
  43:17 44:22 45:22
  47:3 48:2,14,20
  50:14 51:9,15 55:13
  55:24 56:1,7 57:14

  58:5,11 59:22,25
  60:4,11,17,20,25
  61:5,19 62:6 63:1,20
  66:15,20 70:5,6,10
  70:12,15 71:4,12,25
  72:11,20 75:2 76:10
  77:9 78:22 79:23
  81:2 82:12 83:1,14
  83:21 84:13,22 85:2
  86:18 87:8,23 88:14
  92:6 94:20,24 95:7,9
  95:22 96:1,12 97:20
  97:23,24 98:2,11,17
  99:25 100:10,22
  101:2,18,22 102:23
  103:1,9 104:21 107:3
  107:25 109:23
  111:21 112:2,16
  113:14 114:1,25
  115:9,19 116:3,8
  119:14,24 120:2,14
  121:11 123:24 124:2
  124:19 125:4 127:12
  129:7,13,19 131:5
  132:4,5 135:5 136:10
  136:11 139:24 141:4
  142:4 145:12 152:20
  153:17 154:14
  156:19 157:11,25
  158:11,21 160:5,10
  160:16,18 161:8,12
  163:6
**once** 5:18 13:23 19:1
  60:19 80:24 95:4
**one** 5:22,23 8:14 10:15
  16:11 18:3 19:10,10
  19:11,13 20:14 21:9
  23:10 29:22 30:9,10
  30:14,14 34:15 40:12
  49:6,10,17 51:14,15
  58:12 59:10,21 61:4
  61:6 62:8 71:8 72:12
  72:17 73:16 75:12
  76:1,3,20 77:16
  78:17 79:11 83:5,6
  83:17 84:4 85:18
  88:9 95:7,12,18,18
  96:21 100:3,4 105:8
  105:16 107:9 115:12
  117:6 118:8,13,13,17
  120:15 128:14
  131:25 134:25 135:3
  137:10 138:9,9,13
  145:9,22,23 148:9
  150:22 155:14 156:8
  163:11 165:8 166:2

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 184

ones 13:7 16:24 48:6
  118:4 135:8 149:14
  159:18
one-to-one 71:9 72:2
only 30:24 34:2 46:23
  70:15 72:22 77:7
  85:3 86:15 97:10
  114:2 119:2 142:5
opening 9:17
openly 69:14
opens 97:15
opine 106:10
opinion 44:1 68:18
  97:8 106:15 108:2
  126:22 134:20
  162:20 163:6 166:2
  166:14
opinions 67:25 99:10
  133:3
opportunities 39:9
opportunity 9:12 93:10
  163:16
opposed 5:8 29:9 43:20
  103:18
opposite 117:9,12
option 118:13,16
oral 1:22 2:1 170:14
order 12:20 45:10,19
  46:23,23 47:21,21
  48:16 51:17 58:1
  68:4,13 72:10,14
  77:23 78:5 88:21
  108:16 110:17
  117:15,16 142:10
ordered 51:20 68:25
  85:15 86:13 97:12
  143:14 158:17,17
  160:8
orders 44:15 47:13
  69:7 144:8,11
ordinary 99:22
orientation 150:16
oriented 118:3,8 150:9
  153:5
other 5:22 6:1,4,8,10
  7:12 12:10 17:6,7
  20:8,17,19,19 21:7
  21:10 24:11 25:1
  26:22 29:1,22 41:17
  42:5 44:24 45:12
  46:18 51:16,20 52:1
  52:15 55:17 62:6
  63:8,13 67:2 70:10
  71:4,8 74:13,19
  76:16,20 77:1,1,15
  78:17,19 79:2 83:16

93:8,15 100:16
  102:16,17 103:5
  104:25 114:4,4,6,13
  114:14 116:15 118:4
  118:9,13,20,25,25
  123:7 128:4,15,18
  129:4,25 135:7
  136:17,24 137:6,16
  137:16 140:12
  141:10 142:11 149:6
  149:7 151:11 155:1
  155:15 157:5,13,15
  158:21,24 159:23
  161:5,12,19 167:5,6
  167:21,25
others 69:3 72:18 73:8
  77:8 90:22 97:15
  110:19 112:4,10,19
  113:11 129:4
otherwise 17:12 18:16
  31:11 37:9 41:14
  43:13 89:12,16
  145:17 167:18
  170:23
ought 58:23 66:3
out 17:3 20:7 27:2
  35:17 38:20 53:23
  54:19 65:8 72:9
  88:25 89:10,14 90:9
  90:17 92:5,12 93:16
  95:20 107:10 108:21
  111:6 113:9 117:19
  118:7 122:5 125:15
  147:8 148:4 150:14
  156:21 164:23
  167:18
outcome 170:23
outside 16:17 20:24
  27:12,22 34:18 52:7
  96:8,18 99:22 102:12
  118:11 130:5 144:22
  144:24 147:8
outsiders 64:14
over 10:9 19:22 30:25
  37:5 93:10 116:15
  119:7 132:2,3 144:1
  145:2 155:12 163:21
overhead 116:3,15
override 144:4
overtime 30:4,5,11
  31:6,16
owing 171:3
own 4:20 8:12 28:24
  29:7 33:9 36:23 62:3
  65:13 67:15 81:18
  88:16 89:2,18 90:16

92:5 97:11 106:4
  114:8,9
owned 148:22

**P**

P 2:18
padded 130:2,4
padding 130:7
page 3:2,11 43:2 70:1
  83:23 84:13 95:9
  104:17,19 105:19
  107:9 109:24 119:12
  119:22 154:4,6,12
  169:3
pager 116:15
pages 42:8 154:6,23,24
paging 116:3
pair 140:9
Palm 2:15 7:19
paper 119:6 158:8
  159:16,19
paperwork 99:15
paragraph 35:14,17,17
  36:5,9,15 37:17,21
  40:20 50:15 95:15,24
  120:2,22
paranoia 107:12
paranoid 105:24
parole 16:8
part 38:21,25 56:24
  84:18 137:5 144:20
  155:1 157:15
partial 49:5
partially 88:24 132:4
particular 10:1 15:9,21
  16:9 17:11,16,21
  20:7 24:17 29:17
  30:22,25 32:15 36:23
  49:21 50:14,15 73:9
  75:24 95:15 99:16
  100:19 101:3 114:18
  116:19 136:3 147:7
  154:12 159:22
particularly 15:23
  79:24
parties 125:13 170:21
partnership 52:11
parts 114:14
part-time 6:20 10:13
pass 35:10 131:13
  155:5 167:19
passage 105:23
passed 56:4,6 100:7,8
  139:16
passionate 122:15
past 17:23 157:4

patient 23:15 25:1,3,4
  25:5,12 26:13,14,18
  27:9,10 28:1,18,20
  29:4,13,18 33:15,21
  37:16 39:2,14 40:15
  41:2 43:6 44:2,10,17
  44:23 45:2,5,7,16,20
  45:21 46:6,8,10,16
  48:12,17 49:1,21
  51:21 52:15,17,22,24
  53:10,11 54:7 55:3
  56:12,19 57:9,13
  61:24 62:25 65:12,15
  66:2 67:3 68:22
  69:13 70:3,20,24,25
  70:25 71:22,24,25
  72:1,8,12,17 73:7,14
  75:22 76:19 77:3,7,8
  78:5,25 79:3,10,11
  79:13 80:23 81:17
  82:4 86:10,15 87:17
  87:19 88:4,9,11,12
  88:15,23,25 89:10,13
  90:7,11,15,21,23
  96:21 97:6,9 98:14
  99:13 102:3 103:13
  103:15 105:18,24
  107:10,11,19 109:8
  109:17,25 110:1
  111:24 117:14,18,23
  117:24 120:5 123:23
  125:3 127:18 129:12
  130:15 131:3,13
  137:10 139:2 141:21
  141:22 142:8,15
  144:25,25 149:14
  150:12 155:23,23
  156:20 159:10,22
  160:3,14,21 164:7,8
  164:13,14,19 166:4
  167:10,11 168:1,4
patients 6:5 15:1 23:2,2
  23:8,11,11 24:22,25
  27:17 32:7 35:6
  37:13 40:22 41:8
  48:10 58:1 69:1,2,6
  69:16,17 70:11,13,17
  71:21 74:15,16,23
  75:9 76:11,16 85:5
  87:15 88:9 92:12
  104:1 114:13 115:3
  127:20 135:11,18,20
  136:18 137:1,14,18
  137:21 138:4,21
  150:4 151:11 155:16
  166:19,21,23

patient's 53:18 64:12
  64:18 88:5 98:25
  108:19 117:7 120:4
  123:9 124:14 129:2
  130:8 158:22
patrol 8:1 16:17 17:12
  18:16
pause 23:23 120:16
  163:8
pay 30:14
peace 152:13
peacefully 69:23
penal 80:1 152:10,19
pending 27:24
penetrate 38:8
people 11:14,23 12:9
  15:1,4,5 16:5 19:8
  21:7,10,24 22:11
  29:22 33:7,8 74:14
  79:20 102:11,17,24
  108:4 118:24 122:11
  122:13 129:24
per 14:12 80:24 81:1
  101:17
percent 13:18
perfectly 73:17
perform 62:2
performance 39:1
  74:24
performed 12:8
performing 67:8
perhaps 16:20 18:15
  21:22,23 33:22 34:1
  34:16 38:9 45:16
  46:16 47:18 51:6
  55:5 58:20 89:1
  104:12 130:14
  156:25
period 11:10,13 13:10
  14:16 18:9 30:14
  47:24,25 76:17 94:18
periodic 81:4 87:16,21
permission 108:22
permitted 34:22 81:1
permitting 80:24
person 4:17 9:16 10:21
  19:16 21:3 28:9,15
  32:15 37:22 50:23,25
  63:10 67:6 76:22
  78:18 79:13 85:24
  86:3 87:3 106:19
  109:18 110:6 115:22
  115:25 116:14
  119:24 149:7 169:18
personal 1:7 106:1
  113:23 139:9 146:11

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

150:25 151:14
personally 45:19 60:17
60:18 94:20 103:3,3
105:15 114:3 122:22
139:5 148:22 157:3
160:24 161:2,7
169:17
personnel 12:4,5 14:10
14:19,21 15:1 19:15
19:22 20:16,20 21:8
21:25 24:7,12 25:1
26:2,11 27:22 33:19
35:15 42:21 43:10
44:9,12 55:20 56:10
59:11 63:8 64:15
66:1 67:2 68:5,12,21
69:7 71:19 74:4
77:22 81:10,24 84:19
84:24 101:7 102:18
103:3 115:13,20
116:6 118:12,21
131:9 133:10,13
134:6 137:8,16
144:22 145:9 146:8
146:18 147:1,5 148:4
149:7,13,23 152:4
155:16,24 157:6
159:8 160:4 164:12
165:8
person's 21:14
pertinent 121:17
Phillip 2:14,14
phone 115:16,17,22
117:20,22 118:10
151:21
phones 117:24 118:1,3
physical 48:24 106:5
physician 44:16,20
45:9,12,19 46:22
47:7,7,22 48:1 52:19
55:1,21 56:6 57:11
57:19,23 58:2,9
68:16,25 86:13 88:20
91:2 96:5 97:13
109:19 122:14
129:10 142:10
143:22 144:11,18
160:9
physicians 61:3 68:14
86:4 138:20,24
physician's 56:22
105:20
PI 29:9
pick 115:22 116:20
picture 130:24
place 6:13 17:11,16,21

19:7 22:25 23:6 27:4
30:20 31:17 42:7,13
49:3 55:7 56:9 62:15
77:24 78:4,4 123:5
125:4 126:9 145:8
157:11 158:16,24
165:14
placed 85:17 87:20,22
111:3 127:21 167:4,9
placement 16:6 159:5
places 80:22 116:17
137:11
placing 45:9
Plaintiff 2:2 171:3
plaintiffs 1:9 170:3
Plaintiff's 152:22
PLAINTIFF(S) 2:10
Plaza 2:21
please 4:4 104:15,16
135:3 139:19
point 9:4 26:23 40:10
62:17 69:22 76:12,14
86:15 107:7 110:18
118:6,6 167:14
police 1:11 6:24 7:13
7:22 37:7,9 51:19
59:17 60:16,24 64:2
73:23 79:1 80:16
81:17,21 94:14 102:5
102:12 103:21
106:24 107:23 110:1
110:10 111:3 112:15
112:24 113:5,6,16
114:7,8 123:8,15,16
123:17,21,21 124:8
125:8 126:7 127:21
128:23 132:6,19
133:4,21 138:25
140:14,15,18 143:5
144:5 146:21,22
147:8 150:24 154:5
162:1,8,25 163:1,11
163:14,20 165:18
police-style 149:16
policies 24:11 36:23
40:16 82:24,24 136:1
144:22 145:14,20
150:14,15,22
policy 18:20 23:6,12
25:7,11 36:2,6,7,13
36:14 37:3,23,25
38:2,13,18,23 42:13
43:22 46:3 47:3,9,20
47:20 48:4,7,9,11,13
50:10,13,16,17 51:2
65:18,23 82:20 83:3

83:19 85:3,6,9,13,16
86:10,11,14,16,23
87:9 95:21 96:6,6,17
120:20 121:19
141:24 142:4,11,18
144:14,14 147:7
150:10,25 151:2,4
political 79:19
Pope 2:17 5:13 39:19
39:21,24 40:5,17,25
41:5,9,12,17,21
43:21 50:1 53:4 54:2
58:25 59:4 64:9 65:3
65:7 66:22 67:17,20
75:11 82:22 90:1
92:10 93:2,24 96:25
98:22 99:5 104:21
106:6,8 107:20 109:9
110:8,21 111:12,15
112:5,11 121:22
122:2,24 126:4,12
127:25 128:7 133:18
133:23 134:3,12,19
135:14,21,25 136:20
137:25 138:7,11,14
139:12 151:25 152:3
154:17 157:8 166:6,9
166:15 168:18
populated 38:5
population 167:11
portable 42:18
portion 36:4,6 38:19
40:2 46:3 50:14
portions 42:5 49:6
posed 136:8 152:21
position 4:17,21 7:8,23
7:25 8:6,11,24 9:4,17
9:19,22 10:1,7,13,17
18:25 27:5 32:5,19
36:18,19 50:25 57:7
63:15 98:23 131:6
160:24,25,25 161:2
positions 8:13 10:3,15
13:13 14:1 17:2
possible 39:8 46:17
51:21 92:21 109:16
114:15 120:3 156:18
possibly 51:25 76:4
77:8 92:11
post 14:2 16:11,12
posts 16:7,15 17:1,7
potential 90:24,25 91:1
91:5 113:4,15 114:11
116:16 151:7 152:21
potentially 29:11 32:24
33:15 127:19 136:4

151:10,12 152:16
power 29:19 35:4 54:6
89:6
practical 21:6 37:17
48:3 53:14,21 65:25
67:7
practice 16:4,4 17:4,5
18:25 19:2 24:24
25:10 27:1,3 34:9
35:24 54:20 96:24
98:5 99:20 100:13
104:15 120:11,20
121:12,15
practices 17:2 71:10,11
Prairie 6:24 7:5,13,13
7:16,21,22,24 9:8
precautions 114:15
123:5
precipitated 39:6,7
predicted 120:4
predicting 89:10
Predominantly 101:24
preface 43:23
prefaced 113:22
preferable 38:6
preference 13:22 27:25
28:11 30:16 66:5
premises 149:4 150:25
preparation 153:15,19
154:10,21
prepared 66:16 154:5
prescribed 101:10
129:16,21
presence 25:19 27:9
28:1 31:14 59:15
73:20,23 81:20
103:23 112:15 113:2
113:16 126:7
present 2:23 44:5
110:7 112:22 121:10
140:20
presented 60:15,18
presents 65:2,12,15,16
66:3
pretty 33:11 149:19,20
prevent 45:4,6 88:15
89:1,2 90:12,14
109:16
prevented 121:21
122:1
prevents 132:21
previous 6:11 8:10
9:16 10:17 40:19
50:21 52:2 108:2
127:15
previously 83:11 132:4

primarily 20:14
primary 47:21 70:2
prior 4:23 105:7 139:6
139:10,11 150:23
168:5,7,11,14
prisoner 23:2 26:14
28:12 32:24 33:13
103:22 144:23,25
150:11 162:17
prisoners 150:4,6
156:8
prisoner/patient 33:19
private 13:1,9 56:15
privilege 39:23,24
41:11,22
privileges 47:7,13
privy 124:1
probably 6:13 12:13
13:17 21:18 22:3,8
31:21 37:20 42:10
45:11 46:14 58:4,8
63:21 69:10,21 84:20
89:4,5 91:4 95:19,19
96:2 105:6 107:24
109:20 117:12 122:5
123:11 127:16 130:6
156:21 157:24
158:13,18 160:13
162:22
problem 79:16 93:1,4
procedure 2:8 25:7,10
25:11,11,14 29:8
38:20 103:10 158:19
procedures 22:16 23:1
24:6,11 83:18 121:20
127:14,17 136:2
145:14
proceed 23:21
proceeding 170:22
process 10:10 94:15
136:16 150:16
produced 2:1
product 41:13
Productions 2:23
productive 96:2
professional 45:13
128:12
program 7:10 8:6,15
10:9
progress 56:22 61:23
82:10 104:25 105:20
161:20
prohibition 42:19
prohibits 151:2
project 4:19
projects 4:20,20 8:21

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 186

8:21
prone 131:6
property 12:19
propounded 59:8 65:4
138:8
propriety 62:3
protect 45:20
proved 169:17
provide 15:1 25:4,18
28:22,25 29:1 31:3
53:13 54:7 75:18
77:6,7,23 80:13
87:15 101:24 102:7
108:12 110:11
115:10 121:5,7,8,8
122:13 127:23
provided 23:19 24:1
29:6 61:22 74:2,6
77:5 80:2,15 99:18
99:19 111:1,24 112:9
114:7 120:19 121:6
122:17 127:22,23
139:5 152:15 162:2
provides 120:25
providing 37:16 55:3
77:13 140:19
provision 95:12 96:13
provisions 2:8
psych 61:7
psychiatric 70:11,13
70:17,18,19,20,21
71:3 104:18,22
psychiatrist 61:9,10
62:24 71:2 94:10
psychiatrists 59:21
135:11,17 136:18
137:13 138:5
psychiatry 105:22
psychological 62:19,22
70:24,25 93:1 106:5
106:17 108:19
psychologist 143:13
psychologists 136:25
137:23 138:5 144:16
psychoses 58:21 91:17
psychotic 107:11
109:17,18 164:8
psychotropic 129:15
Pt 109:25
PUBLIC 169:23
pull 89:10,13 92:12
pulled 92:4
pulling 90:9,17
pulls 88:25
purpose 97:12 169:19
purposes 20:14 35:5

43:10,20,20 45:10
98:13 142:16 143:18
143:19
pursuant 1:15 2:7 5:3
39:25 48:4 51:16,22
142:17
put 18:15 27:11 85:8
85:19 103:20 110:17
132:18
P.C 2:14
p.m 2:4,4 105:22
168:23

_____
Q
qualified 46:19 62:23
68:16 73:25 90:21
91:1 133:3
quality 10:10 40:1,2
quarterback 125:17
question 5:25 12:12
19:4 23:6 24:2,2,5
32:21 33:14 38:1
39:19 40:17,19,25
41:5,9 43:7,23 46:19
52:10 59:7,10 64:24
65:4 67:17,23 68:6
77:21 81:9 106:6,18
110:22 111:12,16,17
111:19,20 112:20
121:11 122:7 125:24
126:24 135:22 136:3
136:8,9 138:8,22
151:25 152:3 160:19
161:6 166:7,15
167:22,25
questioning 32:20
questions 35:13 37:19
40:3,8 41:25 82:15
114:18 131:24
134:24 135:1,3,7
152:23 165:10,11
168:17,19,21,22
quick 99:7
quite 22:21 130:7

_____
R
radio 42:22 119:4,5
146:6,11,13,20,22,24
147:4,8 149:8 151:6
151:9,14,14
radios 42:18,20 146:8
146:17 150:25 151:3
151:6
rail 142:15
raise 102:6
Ramirez 1:11,19

116:18 117:8 118:7
119:3 131:20 133:8
133:13,16 134:1,7,10
134:17 139:6,10,17
139:20,21 140:20
141:18 144:10 145:9
145:12,19 146:10,24
149:25 151:9,20
153:5 160:20 162:3
163:3 166:3
range 11:18
rank 7:24
rare 76:20
rather 25:10 101:3
150:3
rationale 37:21 38:2
RE 169:2
reacted 127:20
read 35:14,18 47:19,20
72:11 169:11
readily 130:20 131:7
157:25 158:4
reading 96:22 109:25
154:23
reads 84:14 109:24
120:3
real 79:12
realistic 37:18
reality 164:24
really 34:9 35:8 37:4
41:19 43:7 62:21,23
85:3 97:5 98:3
138:14
reason 20:7 27:18,19
27:20,23 35:12,13
37:21 51:2 53:11
116:10 151:4 160:6,8
169:3
reasonable 159:9
reasons 43:8 44:3,11
44:24,25 45:4,12
54:23,25 73:1 92:13
143:17,24
Reassessment 83:24
reassessments 87:14
Rebecca 119:23
recall 5:12 13:19 20:2
33:1 61:12 77:5 94:6
106:25 139:18
152:23
receive 68:23 84:16
115:6 150:9 151:16
received 9:19 10:15
68:20 103:3 120:9
140:6 162:13
receives 150:17

recent 10:7 18:10
83:22 159:18
recognize 106:16
recollection 107:2
146:12
reconcile 96:13,23 98:1
reconciled 98:4
reconciling 98:5
record 2:9 55:18,19
56:11,21,23 57:12
60:7,8 62:15 64:18
74:20,22 81:3 84:8
93:22 94:21 99:8,12
99:14,23 100:13
110:4 131:15 153:25
157:17 159:6 164:11
164:17 165:18
168:21 170:15
recorded 27:8 156:17
157:12 159:24
records 81:8 92:1
119:11 158:6,19
161:13
Recover 1:5
reenactment 140:15
refer 25:7 86:3 154:6
reference 69:25 107:12
120:18
references 65:8 161:17
165:17
referring 50:15 154:15
refers 48:9
refused 144:7,10
165:10
regard 23:1,7 25:5
40:21 73:11 78:25
82:21 104:4 111:24
127:6
regarding 6:5 11:11,12
24:22 63:5 68:21
74:22,123:22 140:25
141:4 145:7
Regardless 98:17
regards 126:6
regular 20:8 166:23
rehash 132:2
relate 24:7
related 6:11 19:25
22:17 41:7 57:13
84:16 155:14 170:20
relation 80:10
relationship 28:17,18
29:2 33:10,10 37:15
43:16 57:6
relative 75:12 79:24
relevant 40:1

reliable 116:14
relied 34:12
relief 7:17
relieve 34:1,3 150:12
relieved 163:13
rely 114:2
remain 46:6
remainder 16:18
167:11,11,19
remained 95:16 114:19
remedial 41:18
remember 21:16 61:14
75:16 78:18 87:16
94:4 105:4 106:22
111:18 132:23 140:1
remembers 75:15
removal 159:5,25
remove 46:9 54:10
143:17,24,25
removed 52:21 88:7
143:15,18
removes 45:5
removing 143:22
render 133:3
repeat 23:4
rephrase 135:4
replacement 10:16,17
report 55:15 99:21
100:19 104:8,9
105:20 124:5,12
125:12 153:7,10,19
153:21,23 154:5,11
159:1 161:20
reported 2:5 8:15 21:2
58:2,6 75:1 94:13
120:5 165:3
reporter 93:7 100:6,8
111:9 119:6,9 167:22
168:20 170:10
Reporter's 3:9 170:7
reports 157:18,18
158:3 159:20
representative 1:8 5:24
6:1,2
represents 131:20
reputable 149:1
request 28:5 73:12,15
73:18 74:10,23 77:2
77:16,21,22 79:17
81:14 95:6 96:4 97:5
97:6 143:16 163:2
requested 160:4 162:16
requests 16:25 17:8
144:11
require 12:24 13:3
required 12:22 13:1

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 187

16:10 24:13 42:22
43:3 72:1 87:15
120:24 127:6 145:2,5
156:5,12
**requirement** 15:18,20
51:22 156:10
**requirements** 12:22,23
14:8 15:6 17:2 35:16
**requires** 158:1
**reread** 47:9
**research** 144:4
**reserve** 7:14,17 132:10
168:16,18,21,22
**Resources** 18:4
**respect** 122:14 137:20
138:3 142:12 150:13
**respond** 157:9 160:18
162:16 165:10
**responded** 141:16
**response** 57:25 77:10
103:17,22 111:22
112:2,17 134:25
**responsibilities** 30:9
**responsibility** 9:1
28:18 43:5 46:11
53:25 137:22
**responsible** 20:16
**responsiveness** 127:25
**rest** 12:16,16 34:4
168:16
**restate** 111:20 126:24
135:15
**restrain** 88:12 89:13
90:11 97:6,10 98:13
98:14,16 108:8,9
128:16,19,25 131:3
**restrained** 44:3,10,11
44:24 45:3,6 49:2
51:11,22 52:24 58:1
63:24 69:23 72:8
78:5 88:24 89:1,1
95:4 97:9 114:13
122:4,20 125:22
126:3 128:13,13,14
**restraining** 54:13,14
96:8,18
**restrains** 129:2
**restraint** 6:5 43:3,8,9,9
43:12,19 45:10 46:11
46:21,21 48:16,21,24
49:5,6,16,21 50:8,18
51:1,7,16,17,17 52:5
52:9,9,16 53:2,3
54:16 55:5,6 57:15
63:6,25 64:3 69:7,11
72:10,14 73:4 77:22

82:23 83:25 84:11
85:15,17,21 86:5,9
86:13,16 87:6,11,13
87:18,19,24 88:2,4,5
88:8,10,13,15,18,21
89:7,21 90:14 92:9
95:10,10,16 96:4,6
96:16 97:4,5 98:9,10
98:18,18,19,20 99:2
99:2,3,3 108:9,10
123:2 126:6,7 128:5
128:15,18 129:5
130:1,2,23 141:24
142:6,11,18 143:14
143:15,23 144:14
158:17,17 159:1,5,10
159:25 160:7
**restraints** 41:8 43:6
44:13,20,21 45:13,19
46:1,18,23,24 47:1
47:21,22 48:3,5,13
48:17,20 49:9 50:22
51:5,20 53:9 54:1,11
58:3 62:4,8 63:13
67:15 68:4,5,13,22
68:25 69:3 72:25
73:1,2 74:1 82:21
84:16 85:4,5 86:12
86:17,20,21 87:14,22
95:4,25 96:20 98:15
121:25 128:2,4,21,25
129:5,8,17,22,23
142:1,9,12,14,22
143:1 152:15 164:3
**result** 126:11,15,16,17
126:19
**resulted** 40:16
**resume** 6:15
**retirement** 15:23 16:17
**return** 170:18
**review** 5:10 23:24 42:9
82:9 155:3 164:17
**reviewed** 60:8 92:1
153:15 154:10 155:1
155:10 161:13
**revised** 38:23,25 82:25
83:2,5
**revision** 39:3 83:22
**revisions** 40:13,15,18
**revolvers** 148:25
**RG** 119:20,22
**right** 5:1 9:20,24 10:6
11:7 12:18 13:10,17
14:15,24 15:14,21
16:2 17:1 19:3 21:21
22:9,19,19,19 24:16

25:5,22,25 26:18
27:2,7 28:7 30:3
31:23 32:18 33:25
34:7,15 35:10 40:13
42:1,23 43:11 46:25
47:11 48:25 50:20,21
52:23 55:4 60:20
61:19 70:23 72:4
80:4 83:4 88:23 91:4
92:14 99:6 100:5
101:20 104:16
105:19 109:2 114:17
124:7 129:4 131:21
138:22 154:24
156:12,22 160:18
**right-hand** 104:18
**rings** 115:23
**Rio** 139:1
**rise** 153:1
**risk** 18:13,14 65:2,13
65:16,20 66:3,6,11
66:14 67:4 70:16
103:12,20
**robbery** 29:9
**Robert** 10:22 21:5
**Roberto** 162:25
**Rodriguez** 148:7
**role** 10:14 13:7
**rolls** 13:6
**Roman** 43:2 95:10
**room** 34:5 38:9 60:19
71:23 78:12 80:9
94:10,17 101:4
116:18,23 117:2,6,7
117:13,19,23 118:4
118:11,12 151:17,17
151:21 160:3 166:4
167:4,5,9,23 168:10
**rooms** 108:5 166:19
167:6,6
**roughly** 9:23 12:3
13:17 117:7,8
**round** 29:11 33:4 80:18
102:9
**rounding** 99:22
**rounds** 32:23 33:1,23
77:11 80:13,17 81:4
99:15 101:5,8,9,11
101:14 103:16 126:7
**route** 101:10
**routine** 103:14,17
**rove** 19:11
**roving** 19:11
**Ruben** 145:22
**Ruiz** 145:22
**rule** 33:11

**run** 14:23 16:14 34:5
**rundown** 8:9
**running** 10:20
**ruptured** 132:24

---
**S**
---

**safe** 102:7 162:17,23
**safety** 18:13 39:25
45:20
**same** 25:1 41:11 45:25
77:15 87:7 90:17
97:19 98:12 102:18
105:19 107:22 111:4
111:10 126:22,22,23
127:14,21 132:2
146:20 148:24
162:24 165:7 166:2
166:14,16,24 169:12
169:19
**San** 171:6
**saw** 88:20 104:9 106:18
113:17 124:12
125:12 153:18
154:13,21,23 168:10
**saying** 34:11 55:25
87:12 112:7 113:22
126:18
**says** 40:11 47:4,8,10
48:7 65:19 95:10
96:3 97:8 98:14
104:18 109:25
119:22 121:2 132:24
154:4 162:2 163:21
**scene** 141:16 149:24
**schedule** 31:25 80:18
80:21
**scheduled** 14:16
**scheduling** 12:9
**schizophrenic** 94:25
**school** 12:25
**scope** 100:21,25 138:15
**scratch** 133:7
**screened** 149:3
**seal** 169:20
**search** 158:6
**seat** 15:15
**secluded** 114:12
**seclusion** 95:11,16,25
96:4
**second** 24:5 30:19 43:2
120:15 162:16
**section** 42:18 70:1 72:7
155:13
**secure** 102:7 130:18
**security** 3:12 4:24 5:21
5:21 6:5 8:18,23 9:6

9:14 10:18 11:14,23
12:4,5,8,11,14,20
13:2,9 14:10,21,25
15:1 18:13 19:15,19
19:22,25 20:4,14,16
20:20,24 21:7,24
22:16,22,23 23:7,10
23:15 25:15 26:12,22
27:13,14,15 28:9,25
29:1,6,7,14,16 30:23
31:3,9 32:2,5,19
33:18 43:22 44:1,2,8
44:12 51:3,8 54:25
57:5,16,21,23,25
58:2,3,6,24 59:11
60:12 63:3 64:16,17
65:1,2,2,13,16,20
66:3,3,6,10,25 67:4
67:18 68:1,1,8,18
69:9 70:12,16 71:13
71:19 72:21 73:6,11
73:12 76:21 77:2,6,7
77:23,23,24 78:7,24
79:18,19 80:2,7,8,8
80:12,15,22 81:14
84:19,24 85:19,20
91:5 93:13,14,17
95:13 99:11,13,14,23
100:18 101:7 102:8
103:11,12,18,23
104:3 105:16 107:18
108:3,12 109:7 110:6
111:1,23 112:8,11,12
112:13 114:1,2
115:10,13,15,19,23
116:6,13,20 117:16
118:6,12,22,24
122:19 123:4,5 126:2
126:6,7,8,18 127:6
133:10 134:5 137:7
139:9,15 145:1,9,22
145:23 146:3,8,17,25
147:5 148:1,4 149:6
149:9,13,23 150:2
151:21 152:4 153:4
155:22 156:1,2,4,17
156:25 157:3,4,7,14
157:16,18,18 158:24
159:4,15
**security's** 45:14
**sedative** 48:22
**sedatives** 129:11
**see** 14:24 22:14 61:7
62:14 63:25 65:23
68:8 70:1 71:1,4 82:3
95:7 101:14 102:8

---

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 188

104:21 105:2,18
107:23 109:14
112:20,23 117:21
120:23 127:1 130:11
136:9 153:10,23
154:11
seeing 5:12
seek 22:6 28:21 31:21
37:9,17 109:19
seeks 26:23
seem 72:9 102:10
131:24
seemed 164:23
seems 85:8 96:15,19,21
seen 45:19 56:2 59:21
61:3,6,9,11 94:10
107:4 115:20 124:5
153:7,18 162:5,7,7,9
162:10 168:14
segregated 167:1
Segura 163:10,22
self-inflicted 58:17
59:19 91:11 94:1,2
send 17:20 81:15
senior 19:13
sense 89:16
sent 5:3,11 70:19
sentence 96:3 109:23
110:24 111:2 120:3
120:24 138:13
separate 98:7,10 99:12
99:12
separately 97:18
September 11:12 12:2
12:21 21:15 42:7
59:14 80:19 104:23
105:21 119:16
162:14 164:18,22
165:2
series 40:7 82:15 100:2
100:11 155:11
serious 29:5 58:14
75:10,19 76:25
served 33:17
service 12:11 14:23
16:25 17:8 25:4
services 7:11,11 8:7,16
8:17 12:9 120:8
set 15:19 16:9 17:2,15
17:23 18:14,19,20
23:1 27:2 29:12
35:17 46:5 50:6,24
77:19 86:23 87:4
117:3 150:14 155:14
167:5
setting 48:4

setup 114:18
several 5:18 8:17 10:13
23:14 42:8 61:3
63:14 65:8 79:11,11
140:13 163:15
shackles 46:5,7,9,12
48:8,8,11 140:9
shaft 16:3
share 57:20 109:25
167:8
shared 57:16,17 58:24
64:11,13,15 65:1
sheep 130:6
sheet 42:12 55:15 84:1
Sheriff's 7:20
Sherry 147:19
shift 14:12,14 16:3,20
16:21 19:4,6,9,14
27:9 81:5 99:16
100:14 101:7 102:14
102:22 104:6,10
shifts 102:19 104:3
shirt 131:2
shooting 139:22 141:4
short 82:13 92:15
131:17 154:1
shorthand 2:6 170:10
shortly 58:18
shot 166:13 167:23
shots 166:2
show 5:15 23:16 60:6
117:2
showed 67:10 107:4
side 133:14 146:4
sidearm 147:17 148:17
149:7
sidearms 148:19
Sigma 4:19 10:10
sign 42:14
signature 3:8 42:13
169:1,12 170:18
significant 103:19
112:25
significantly 11:19
signing 42:15
similar 95:19,24,24
127:17,19,19 149:14
149:19 154:16
159:20
simply 10:1 52:10
159:24
since 6:21 7:14,15 10:5
47:19 82:25 83:5
124:5 127:17 161:10
single 121:3
sinister 54:19

sir 4:5 11:17 14:13
128:22 134:21 154:9
sit 91:7
sitters 71:22
sitting 33:5 51:9
106:25 109:5 131:4
161:16
situated 116:24
situation 17:14 22:4,5
22:9,10 31:8,10,18
46:16 48:17 52:23
55:4 58:12 62:18
77:15 78:22 85:10
87:23 89:5,16 127:12
143:8 152:14 166:12
situational-type 52:12
situations 44:4,23
49:17 52:4 62:6 86:7
86:19 142:6
six 4:19 10:10 14:14,16
15:3,6,7,8,17,18,22
16:3 19:5 154:23
sixth 114:24,25
Sixty 13:18
size 149:19
skin 130:10
skin-looking 130:6
sleeveless 131:2
sleeves 131:1
slightly 160:2
smartest 96:14
social 119:23 120:8
solely 45:23
some 5:3,4 9:4 10:14
11:7 13:4 14:1,2
17:18 18:12 20:7
22:5 23:19 25:25
26:15 28:2 30:23
34:16,25 36:4,6,25
36:25 40:9,10,10
41:12 44:18,19,23
45:12 46:18 47:15
49:2 53:12,16 55:6
55:14,14,15 56:4
57:15,19,24 58:5,21
59:18,19 69:2,18
70:10,16 71:3,18
72:9 79:3,18 81:3
88:9 91:23 92:21
94:3,16 95:18 102:4
103:11 106:1 109:21
110:17 114:17
116:10 119:11 123:6
123:7 124:13,23
125:24 128:11
129:11,25 130:6

132:3 135:12 140:2
140:16 141:1,3
149:11,11 152:23
155:18 156:20
157:14 158:24
159:11 160:5 163:16
somebody 20:15 31:15
38:9 43:12 88:20
102:12 108:20 141:4
156:20,22 166:13
someone 19:22 21:23
28:14 29:8,15 30:21
32:24 44:17 45:17
50:25 71:22 76:24
77:24 89:17 92:19
108:8 109:17 110:7
116:20 130:11
147:25 158:1 167:23
something 17:3 18:1,18
18:23,24 19:1 20:2,8
25:8 26:10 29:9,18
35:24 38:21 51:8
53:6 55:1 62:14,15
70:2 79:21 81:3 87:4
95:23 96:22 100:16
100:20,25 104:15
107:5 108:12 116:15
118:17 122:16
124:10 126:20
130:16,25 131:7
132:25 135:12
142:16 144:16,17
149:2 154:3 161:8
sometime 105:2 106:1
sometimes 57:18 62:11
62:11 69:1
somewhere 65:19
94:21 117:4
sorry 15:13,16 33:5
39:10 42:8,16 47:16
50:2 75:5 92:15
113:20 128:9 129:9
sort 22:5 57:24 59:7
71:3 97:18 99:22
109:21 116:25 130:6
163:16
sought 36:2 41:3
sounded 125:20
sounds 45:16 51:4
53:23 124:19
source 60:21
South 79:15
SOUTHERN 1:1 170:1
speak 5:7 25:14 37:22
54:22 63:16 68:15
72:22 82:6 85:25

118:7 123:1 125:1
139:21 140:22
141:13
speakers 116:17
speaking 57:3,22 68:9
90:3 98:3 138:15
160:14
special 73:12 101:13
specific 13:12 16:5,8
18:1 20:4 23:10
24:20 29:25 32:1
33:3 34:23 36:7
40:23,23 46:15 59:3
59:12,23,24 63:4
67:5,14 68:13 69:25
73:15 78:24 84:16,20
101:9 103:13 114:17
115:3 124:13 143:2
158:4 159:21 164:21
165:6
specifically 23:14
31:11 33:19,20,21
40:19 47:10 48:7,10
73:20 84:12 86:12
118:5,8 124:7 157:7
161:19
specifics 18:11
specifies 35:20 46:1
specify 35:19 47:6
specifying 48:15
speculate 59:7 91:7
speculation 88:19
speculative 59:10
speed 38:6 138:12
spend 106:3
spite 165:17
split 15:9
spoke 20:22 23:14
81:17,17 82:1,1
140:25 141:3,15
164:6 168:7
spoken 164:9
spotty 131:24
SS 120:6
stable 120:5
staff 19:5 23:13 27:10
45:24 47:6,17 48:10
48:16 49:18 50:5,7
54:22 55:3,12 56:5
56:24 57:11,15 58:9
62:2 63:3 64:16 65:1
65:12 66:21,24 67:2
69:15,24 71:13,14
72:15 73:25 83:2
84:14,15,20,23 89:23
90:4 91:11 93:15

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

BLAKE HUBBARD

April 29, 2003

Page 189

94:22,23 95:3 101:20
101:25 102:6,8
103:24 115:14
118:23 120:20 121:3
127:5,23 135:12
136:16,17,24 137:6
137:12,22 138:5,20
139:9,15 142:7,17,25
143:23 144:20,21
145:1,3,8 146:17
150:10 151:19,23
**staffed** 16:3 19:6
**staffing** 14:8 15:2,6,20
31:5
**stairwell** 167:16
**stand** 119:12 150:11
**standard** 16:11,15 27:1
120:25 121:1 149:16
149:20
**standing** 75:2 113:6
118:3
**standpoint** 50:19 67:18
68:8 69:12 112:11,12
112:14 123:4
**stared** 165:10
**start** 5:2 93:10
**started** 8:25
**starting** 93:8
**state** 2:5 37:6 95:20
106:18 169:15,24
170:11
**stated** 2:9 70:9 97:21
98:8 105:17 164:17
164:19,24 165:5
**statement** 36:21 110:9
121:3 122:10 134:23
162:12 163:10,19,19
164:21
**statements** 162:4,8
164:1 165:6,18
**states** 1:1 2:8 107:11
170:1
**stationed** 15:24
**statistics** 74:25
**status** 87:5 106:5 167:2
167:9
**stay** 26:2,11 28:1 31:15
60:1 73:14 88:24
91:25 106:3 162:5
164:2
**stayed** 46:10
**stead** 29:15 30:21
**Stein** 2:14,14 168:20,22
**Stella** 21:17
**step** 117:19
**still** 38:16,17 39:15

75:3 96:10,11 119:24
120:20 121:15,16,16
125:5 126:23 132:12
145:25 147:11
**stimulations** 107:13
**Stipulations** 3:4
**stop** 22:7 80:24 153:12
**stopped** 92:15
**stories** 112:24
**straints** 142:21
**straitjacket** 130:24
131:1
**stranger** 102:13
**strapped** 130:9
**straps** 131:2
**strict** 110:1
**strictly** 144:20
**strike** 5:1 105:25
**strong** 64:19 103:12
**structurally** 13:11
**stuff** 77:13 130:6
136:12
**subject** 34:19 46:2
47:21 85:12,16 87:4
117:18 145:6 157:8
**subjects** 145:2
**submitted** 170:16
**subpart** 36:7,14,15
**subscribed** 169:18
**subsection** 83:24 84:13
**subsequent** 39:5 41:18
89:9 91:20 105:5
**substance** 96:9,11
124:3
**substantive** 136:5
**subsumed** 8:24
**subtitled** 72:4
**successfully** 151:20
**suffering** 87:17,17
**suffers** 58:21
**Suffice** 63:1
**suicidal** 58:18 69:19
91:14 94:3,7,8
**Suite** 2:12,21 171:5
**suited** 144:16
**summary** 6:17,4
**summon** 115:13,15
116:6,19 118:22
**superior** 104:10
**supersede** 52:15
**supervises** 19:16
**supervision** 107:24
110:11
**supervisor** 19:9,12,14
19:15,18,21 20:3,10
20:12,13,15,19,25

21:13,15,19,22
**supervisors** 12:17 31:2
31:2
**support** 7:11 8:18,20
14:19 80:13 127:22
141:1
**supposed** 25:11 56:9
65:12,16,19 115:12
136:4 148:4
**sure** 5:5 9:24 11:22
12:7 14:25 17:22,25
18:2 22:13 23:5
25:16 37:15 42:12
44:18 49:1 54:6 57:4
64:21,22 65:6 66:5
74:3,8,14 77:12
87:17 90:8,10 101:20
103:24 104:11
107:25 109:18 119:8
120:23 122:3,7
126:25 134:14 135:6
135:17 136:21 137:2
138:2 142:1,24
154:19 160:25
164:14 165:3
**surrounding** 29:13
**surveillance** 110:1
**suspect** 58:21 76:3
144:23 145:4 163:3
**suspected** 93:18
**suspects** 150:4 152:5
**suspicion** 76:23 92:16
92:20
**suspiciously** 165:11
**sustain** 132:22
**sustained** 139:25 140:1
140:4
**sworn** 2:4 2:4 163:10
163:19 170:13
**synopsis** 8:13
**system** 4:16 10:5,9
116:3 146:20,22

_____

**T**

T 4:3 131:18 155:7
168:3
**table** 116:25
**take** 4:8 7:8 23:20
24:25 30:17 31:16
32:6 36:17 37:13
40:8,12 42:9,25 56:9
70:5 73:16 80:5
84:17,24 89:20 98:23
112:2 114:7 127:12
154:9 156:13 164:3
167:1

taken 2:2 5:2 9:17
55:23 62:15 114:16
125:4 126:8 130:11
134:17 163:10
165:18 170:22
**taking** 27:19,21,23
41:15 81:24 152:11
152:11
**talk** 24:17 43:1 61:19
80:17 82:17 85:25
91:4 93:8 95:23
105:10,11 139:23
141:17
**talked** 5:13 21:7 62:6
77:12 101:2 139:24
153:7
**talking** 11:11 27:12
79:2 86:18 90:20
100:15,17 105:4
154:8,9
**talks** 95:24 144:15
**target** 15:7,19,21 101:9
**TCLEOSE** 132:11
**teach** 4:18,18
**team** 115:16
**technician** 147:22
**Tele** 2:13
**telephone** 115:18
116:13,21,23 117:10
117:11,12,16
**tell** 4:4 6:7,14,17 12:3
13:11 17:9 22:20
23:5 38:1 41:2 42:12
43:18 44:22 47:9
51:9,15 52:6 67:10
67:14 68:11 74:13
75:8,22 76:14 83:17
93:3,4 94:4,4 95:11
96:1,2,12 101:6
106:16 115:21
128:10,18 129:14
140:7 141:2 155:19
158:8 159:22 161:16
**telling** 34:11 45:16
51:4 53:22 74:9
109:5 124:19 142:5
**tells** 35:18 40:10
**tend** 102:6
**tendency** 90:23
**tends** 102:24
**tenure** 157:4
**term** 11:5 14:4,6 44:25
70:3,8,10 144:21
**termed** 8:18
**terminating** 84:15
**terminology** 49:1

terms 11:3 14:25 21:25
22:3,7,20 42:20
43:25 51:3,5 52:5
57:8 63:13 67:7 91:5
98:5 106:15,21
109:20 113:23 114:1
115:9,19 120:4
**testified** 4:2 8:2
**testify** 43:25
**testimony** 18:19 35:23
36:13,17 52:25,25
78:14 87:25,25 108:3
127:3,8,13 165:20
168:13 170:15
**Texas** 1:1,6,10,15,18
2:5,7,12,15,19,22
6:25 7:19 13:1,9 37:6
152:9 169:15,24
170:1,5,11 171:4,6
**thank** 93:8 95:9 119:9
131:13 155:5 168:16
**their** 4:20 16:6 25:18
26:17 27:17 29:24
31:14,22 33:9 35:15
36:23 37:2,3,6,7,8
42:22 45:7,8,8 49:2,7
49:10 53:9 54:10
56:24 57:2 62:3 64:4
65:13,14,15 68:13
70:22 81:1 86:5
88:16 89:13,18 90:13
90:16,19 92:12 99:15
99:15 100:21,25
101:5,5,9,11 102:3,9
102:13 103:5,25
104:1,10 115:7 122:8
124:16 137:18
138:21 149:7,12
150:24 152:12,15,16
152:16 163:2 164:1
**themselves** 24:13 45:3
45:9,17 46:17 69:18
69:22 72:18 90:18,22
90:24,25 92:23 110:7
130:15
**thing** 34:24 55:16
75:12 98:12 118:20
150:18 167:16
**things** 12:9,10 22:16
25:24 33:22 40:5,20
49:12 68:3 69:4 76:2
77:12 84:17 87:13,18
91:7,9,21,24 93:15
100:24 102:6 105:8
121:6 130:11 132:1
137:3 138:12 140:16

BLAKE HUBBARD

April 29, 2003

Page 190

152:12 154:17 155:9
**think** 8:5 9:3 12:12
  18:17 21:14 30:6
  31:23 34:7,15,21
  35:19 36:4,25 37:25
  42:24 50:11 51:11
  52:11 56:8 59:6
  63:21 64:21 65:7
  72:13 75:25 76:20
  82:16 85:23 87:12,12
  88:19 89:22 90:20,23
  94:7 97:3,7,25,25
  98:17,23 99:4 100:9
  102:10 104:25
  105:21 106:10 107:4
  107:22,22 108:20
  111:2 112:21 117:4
  117:10 118:20
  120:18,21 121:9
  122:6,16 123:1,7,10
  125:13,21 126:14,16
  127:1,3 128:3 136:2
  138:17 143:16
  150:23 151:17
  157:24 161:2 165:13
  167:21
**third** 120:3
**Thirteen** 26:9
**Thomas** 61:13 104:23
  124:21 151:23 164:7
**though** 35:25 55:19
  64:4 97:16
**thought** 16:10 77:25
  109:7 112:18,19
  114:15 122:16 123:5
  123:11
**threat** 18:9 79:12
  103:12,18,19,20,20
  110:7 112:4,10,14,18
  112:19 113:1,3,4,8
  113:11,13,15,15,17
  113:18,24 114:11
  152:21 153:1
**threatening** 69:14
**threats** 18:6
**three** 17:7 24:5 72:13
  72:13 118:25
**threshold** 58:5
**throat** 107:10
**through** 22:24 30:5
  33:4 60:2 67:1 75:1
  81:4,13 90:12 99:7
  102:9,21,22 111:16
  114:9 119:11 128:21
  128:23,24 132:1
  136:15 141:6 149:21

154:7 166:3,13
  167:19,23 169:18
**throughout** 41:11 60:1
  66:13 81:5 101:11
  164:2
**time** 5:3 8:11 11:1,10
  11:13,16 13:10,17
  14:10,15 16:4 18:3,8
  19:7 20:8 21:4,5,15
  22:24 23:1,6 24:25
  26:3,23 29:1 30:8
  32:4,13,18,19 33:17
  34:2,9 38:13 40:12
  42:6 46:3 47:24,25
  49:13,13 51:11 52:13
  55:7,25 61:15 63:9
  71:23 73:25 76:17,18
  76:21 80:3,6,7,9,19
  81:7,25 87:7,16 94:6
  94:9,17,19 97:19
  99:17,19 100:13,18
  101:4 102:15 103:1
  103:19 104:15 105:5
  105:5,5 106:3 111:1
  111:10 112:3 113:6,7
  113:12,22 119:2,17
  121:12 122:7 123:12
  123:19 125:20,23,24
  126:1 127:4 128:3,16
  128:20 131:13
  140:11,17 147:17
  148:13,17 150:3
  158:2 161:9 162:15
  165:25 167:25
  168:17,19
**times** 5:18,19 15:4
  37:11 52:1 72:22
  73:5 80:23 81:6
  137:9 140:13,21
  163:15
**title** 147:21 154:4
**titled** 50:22 84:7,14
**today** 4:8 5:3,7 33:5
  39:15 51:9 99:25
  100:12 106:25 109:5
  127:12 131:21
  141:11,25 142:5
  150:14,24 153:16,19
  153:23 155:12
  158:11,13 161:13,16
  165:20 168:13
**together** 55:9
**token** 90:18
**told** 8:5 31:13 61:5,9
  66:11 69:10 73:10
  82:2 85:23 86:18

91:11,14,17 94:6
  101:7 105:10 112:24
  128:3 140:5 141:11
  163:14,22
**top** 74:17 93:8 114:21
  120:21 142:1
**torso** 129:2,3,5 130:23
**total** 162:10
**totally** 67:18
**touch** 164:24
**toward** 42:21
**towards** 117:18
**tower** 2:18 115:1
**town** 7:19 20:7
**traffic** 100:24
**tragic** 126:15
**trained** 84:25 150:3
**training** 12:23 13:1
  22:23 67:1 68:13
  84:14,16,18 150:7,16
**transcript** 170:14,16
**transit** 79:15
**transition** 11:7
**transmit** 151:6
**transport** 79:18
**transported** 76:6
**treat** 32:6 135:11,18,19
  156:22
**treated** 32:16 75:9 77:3
**treating** 151:10
**treatment** 90:12
  137:20 138:4,15
  142:8
**treats** 74:14
**triage** 137:3,10
**trial** 168:17,19
**tried** 164:3,19 165:9
**true** 36:5 76:15 152:25
  169:12 170:15
**trust** 102:10
**truthful** 92:7
**try** 23:5 25:18 31:24
  33:4 43:17 53:17
  65:10 80:24,25 90:25
  99:7 104:8 106:12
  111:21 112:7 121:8
  127:1
**trying** 32:21 45:3 53:22
  54:19 56:7 64:22
  69:21 93:12,12,16
  97:4,7 111:5 113:9
  125:12 127:2 132:2
  138:12 150:19
  164:25 165:4
**turn** 104:16 119:6
**twice** 5:18

two 4:22 55:8,8 71:4,7
  76:4 81:1 98:1
  101:15,16,17 111:9
  119:20 157:24
  158:10,10,11,11,13
**two-way** 42:20 151:3
**type** 25:25 29:2 30:23
  31:9 34:23,24,25
  35:18,19,20 36:24
  37:2 46:21,24 49:5
  49:22 52:8 53:3,12
  54:16 58:23 62:2
  63:12 66:6 67:11,12
  86:5,6 88:2,17 89:7
  89:20 92:8 99:2,3,13
  99:14 106:4 108:9
  123:2 129:23,24,25
  130:10 148:24 150:7
  152:7,14
**types** 33:8 47:1 48:21
  67:11 69:8 71:7 81:8
  86:17 106:17 151:7
  152:11
**typewritten** 105:20
**typical** 45:2 80:21
  118:6 143:19
**typically** 19:25 31:7
  32:22 33:7 46:6
  52:14 53:11 63:21
  64:11,13 66:23 69:1
  69:13,20 70:17,21
  116:7 117:3 149:8

**U**

**Uh-huh** 58:15 67:19
  103:6
**ultimate** 53:24 98:19
  98:24
**unable** 28:19 90:16
**unattended** 33:13 46:7
  46:9
**unavailable** 20:7
**uncooperative** 58:19
  164:15
**under** 1:6 4:19 27:24
  28:14,15 43:12,18,22
  44:5,10 48:12 72:8
  76:22 78:18 86:10,23
  87:3 89:19 92:16,20
  110:1 127:4 134:18
  169:17,20
**undercover** 18:5
**undergo** 61:7 95:18
**understand** 4:10 5:1,6
  5:6 8:10 11:23 14:25
  18:19 21:12,21 24:10

27:18,20 28:7 30:6
  31:23 33:16 34:7,11
  35:14 36:5 37:24,25
  40:14 41:20 45:15
  47:3 49:22 51:3
  52:25 53:14,21 54:24
  56:7,8 61:5 64:21,22
  65:22 68:17 74:10
  76:12 78:6,14 83:11
  85:24 87:8 90:5 91:3
  91:19 97:23,25 98:6
  98:17 108:1,2 112:9
  112:16 113:8 125:25
  126:23 127:3 135:3,5
  136:7 142:4 146:22
  161:1 167:24
**understanding** 24:19
  36:12 38:3,12 40:19
  47:5 72:7 85:10
  86:11 123:20
**understood** 135:7
**undertake** 150:7
**underwent** 84:19
**unenforceable** 36:1,19
**unfair** 42:8 136:3
**unforeseeable** 152:25
  153:3
**unfortunately** 110:16
**unit** 18:1 33:2,4 60:3
  70:19 81:5 82:2
  101:9 102:9,13 118:1
  151:19 167:19
**United** 1:1 2:8 170:1
**units** 19:11 117:25
**unless** 64:19 87:9 96:20
  98:15 167:18
**unlocked** 100:24
**unnecessary** 143:14
**until** 9:21 31:15 32:19
  139:21 163:3 168:17
  168:19
**unwarranted** 143:14
**unwilling** 28:19
**upper** 129:2
**use** 8:3 14:6 19:16
  35:18,19,21 40:22
  42:19 46:11 48:25
  50:18 84:15 86:5
  98:14 106:20 115:17
  117:19,25 118:1,10
  128:2 130:21 133:4
  143:4,6,8 146:10,15
  149:14 151:3,14
  152:11,15,18,18
  155:15,24,25 156:7
  156:19 167:14

**ESQUIRE DEPOSITIONS SERVICES**
**SAN ANTONIO, TEXAS 78230**

BLAKE HUBBARD

April 29, 2003

Page 191

used 34:17,23 35:1
  43:6 44:25 46:2 48:3
  48:6,6 49:17,21 50:9
  52:9 54:1,1 62:8 64:3
  67:5 90:17,17 96:8
  96:18 102:11 116:6
  121:25 124:16
  125:13 128:5,6,11,15
  129:11 132:6 144:21
  146:17,18 149:17
uses 35:16 157:7
using 54:16 150:24
usually 17:10,13 19:10
  19:13 20:4 21:10,11
  28:3 32:25 44:15
  53:7 58:5 62:9,9 69:7
  70:11 71:22 102:8

                V

valet 12:19 14:23
valets 14:20
valid 12:24
Valley 1:12,20 4:9,15
  4:24 5:7,11,21,24 6:2
  7:7,8,19 8:6 9:8 10:4
  11:15,24 12:21 14:9
  23:7 24:8,19 32:6
  52:2 60:7 63:3 74:14
  76:17 119:25 133:10
  133:25 135:11,12,18
  135:19 136:19 137:1
  137:6,14,17,23 138:6
  138:19,23 139:1,2
  142:20,24 143:3,9,22
  144:6,12,19 145:19
  145:25 146:19 147:3
  148:20 149:2,23
  152:1 155:17 163:4
Van 2:7,18
variety 121:6
various 8:21
vary 13:13
VBMC 2:24 3:12 96:6
verify 21:18
versus 4:9 12:9 13:12
  15:10,22
very 20:1 54:22 69:14
  79:12 92:12 95:19,24
  120:21 121:1 122:15
  127:16,20 130:2
  131:13,13 155:5
  163:22 168:1,2
vest 129:1
vest-type 86:13
via 116:13
vice-president 8:16,21

21:1,23
victims 79:12
Video 2:23
videotape 163:8
VIDEOTAPED 1:22
  170:8
view 152:12
VII 84:14
VIII 70:1
Village 2:15
violate 37:3 145:19
violation 56:17
violence 32:11 58:14
  79:13 92:22 93:23
  113:1
violent 32:24,25 33:11
  33:13,15,15 58:22
  76:9 79:24 92:16,21
  93:18,18 102:4
  127:19
VIPs 79:19
virtue 57:6
visit 60:19 80:1,22
  81:23 105:7
visited 61:2 81:16,19
  94:9,18
visiting 104:13
visitors 15:2
VMBC 96:7
voice 143:3
volume 102:24
voluminous 162:1
vs 1:9,17 169:2 170:4

                W

wait 77:21 93:7,7
waiting 163:16
wall 38:8 117:22 166:3
  166:13 167:8
wander 45:9
wandering 45:6
want 5:5 14:5 22:14
  23:20 32:22 41:13,25
  42:3,9 43:1 54:4 65:4
  67:24,25 68:11 69:5
  73:21 75:11 81:11
  82:17,18,19 90:3
  91:9 98:3,14,14 99:7
  99:10 105:3 106:14
  109:24 111:16
  125:21 131:25
  136:12,13 138:8
  153:12 155:9,18,19
  164:13 168:20
wanted 10:11 19:3
  37:15 52:18 108:25

116:19 162:22
wanting 39:10
wants 88:11 96:19
  143:24
warrant 68:3
warranted 45:14
  159:10
wasn't 91:19 94:20
  109:3 112:22
watch 33:19
watching 163:2
WATTS 2:11
way 9:7 35:25 51:16
  54:19 55:13 65:8
  68:19 74:19 83:17
  89:9 96:23 102:25
  106:18 143:19
  159:11 167:2
ways 30:10 118:25
  119:2
weapon 34:25 35:19
  36:8 132:14,16 141:8
weapons 34:17 35:4,20
  36:24 37:2,6,7
  152:16
wear 88:8,9
wearing 86:15 87:4,20
  88:4
week 30:13,14 132:18
  153:11
well 4:13,20 6:13,14
  13:11 14:24 15:17
  17:17 19:17 22:2
  23:16 24:16 41:12
  47:19 54:22 55:19
  58:11 59:9 60:20
  63:1 64:1 66:7 68:18
  73:24 75:7,21 77:20
  83:9 85:7 90:5 91:9
  91:21 95:18 96:1
  97:1 101:22 104:7
  109:23 110:23
  119:18 120:5,10
  123:3 124:24 125:1
  125:18 138:9,11,14
  156:4 162:11
well-being 90:13
went 81:13 155:12
were 4:23 6:10,11 8:23
  12:2,14,16,16,21,22
  13:17,19 14:8,8
  16:23,24 17:7,9,9,18
  18:6 20:6,19 21:9,24
  22:10,23 25:2 27:4
  31:20 32:7 34:10,17
  34:18 39:18 40:14,14

40:15,21,22 41:2,3,3
  41:7,7 42:5 44:12
  48:3 49:12 51:20
  52:20 57:13 59:15,15
  59:18,20,23 60:17
  61:5,22,22 62:1 67:8
  67:9 69:2,12,18,20
  69:21,23 70:7,12,13
  70:15 73:19,22,25
  75:25 76:5,6,9,25
  77:24 79:8,10,10
  80:17,18 81:2,6,7,24
  83:18 86:1,2,4,18,19
  87:20 90:18 91:14,17
  91:21,21 93:25 94:8
  94:11,24 97:15
  100:12 104:2 105:11
  105:12,17,17,25
  107:14,14,14 112:6,6
  118:2,3 123:2,5,5
  126:8,8 127:6,18,22
  128:4,4,15 129:23
  140:2 141:4 142:22
  143:18,21 145:5
  148:19,22,24,25,25
  149:3,13,14,16,17
  150:2,3,4 152:20,20
  154:8,9,15 155:12
  157:5,20 160:22
  161:1,3,4 162:4,11
  163:9,16,19,23 164:1
  164:6,11,18,22 165:7
  165:13,18,19 166:12
  166:18,20,21,22,23
  167:13
weren't 158:2
West 2:18 171:5
while 25:20 27:4 31:23
  31:24 34:8 47:19
  49:21 57:4 68:2
  108:8 125:5 150:25
whole 13:15,16
wife 9:11
WILLETTE 2:20
William 2:17
willing 92:22
willingly 69:2
willingness 89:18 92:21
  93:23 145:6
wind 57:7
window 117:1,1
winds 56:23
wisest 118:17
wish 106:21
wished 145:15
withdrawn 165:9

witness 2:1 53:5 54:3
  59:1 64:10 66:23
  82:23 89:12 90:2
  92:11 93:25 97:1
  98:23 106:11 107:21
  110:9 112:13 121:23
  122:3,25 125:11
  126:5,13 128:8
  131:14 133:6,7,13,19
  133:24 134:4,13,20
  134:22 135:15,22
  136:1,22 138:1
  154:18,20 155:6
  157:10 169:14
  170:13,15,17,18
witnessed 133:11
wondering 86:21
word 35:16 39:11
  48:25 103:12 167:14
wording 96:9
words 8:12 20:19
  102:16 114:4 142:11
  157:13 159:23
work 6:18 7:1 11:23
  12:5,11 15:4 16:1
  18:8 41:13 56:25
  67:8 71:17,20 77:10
  86:9 122:12,16 132:6
  147:11
worked 9:2 11:14
worker 119:23
working 7:7,21 14:17
  22:23 36:22 68:2
  72:24 137:23 144:6
  150:3
works 162:12
world 96:15
worth 157:24
wouldn't 31:11 57:18
  73:5 85:4 89:16
wound 13:25 58:17
  59:18 60:23 61:1
wounds 91:11
wraps 130:3
wrist 51:14 129:25
  130:3
wrists 130:8
write 159:1
writing 17:3 18:19 27:3
written 17:15 24:6,11
  24:18 25:10,25 35:22
  35:25 50:6 65:18,22
  67:9 99:23
wrong 94:4
Wrongful 1:6,15
wrote 97:3

(210) 377-3027
7800 IH-10 WEST, SUITE 100

ESQUIRE DEPOSITIONS SERVICES
SAN ANTONIO, TEXAS 78230

FAX(210) 344-6016
(800) 969-3027

**BLAKE HUBBARD**

wsa 114:11

**X**

X 4:3 131:18 155:7
  168:3

**Y**

yeah 18:17 65:22 67:22
  68:11 75:14 92:11
  98:9 120:23 158:21
  159:3
year 9:23 10:8 82:25
  145:1 150:13 151:1
  157:21,22,23 158:5
  158:10 159:19
yearly 74:14 75:8
years 7:2 11:2 132:8,9
  132:9 144:6 157:24
  158:10,11,11,13
you-all 31:24 65:12,16
  73:12 93:7 99:18
  120:9 139:23 141:10
  141:17 145:13
  150:18 159:10
  167:15
Ysidro 163:20

**Z**

Zimmerman 10:22,23
  20:22 21:13,22 22:8
  22:10,15 104:12
zones 16:8

**0**

000323 154:25
000324 154:25
00318 154:7

**1**

10 34:5
10:55 119:16,19
100 3:12 171:5
11 23:18 50:21,22 70:1
  83:16 96:14,19
  142:18 144:15
  162:14
11:00 119:19
11:15 164:18
12 23:18 83:16
12/31/04 171:5
13 23:18 26:8,10 34:16
  35:10,12 36:14 41:25
  42:3,5 83:7,8,9,23
  84:13 95:9,13 96:14
  96:15 120:18 141:25
1306 154:7

130600328 154:7
131 3:6
14 36:14
14-A 2:15
1400 2:12
1429 2:18
15 34:5 60:7 99:8 100:3
  104:17 117:23
155 3:7
168 3:7
169 3:8
17th 59:14 164:19
170 3:9
18 3:12 100:9,11,15
18th 61:17,18 104:24
  105:3,22 119:16
  162:14 163:12
  164:22 165:2,15
19 104:18
19th 11:12
1994 6:21
1998 7:3
1999 9:13,20

**2**

2 3:3 70:1 82:25
2:05 2:4
2:32 164:23
2:43 165:2
20 12:14
2000 11:13 12:3,21
  21:15 42:7 80:19
  82:25 105:22 145:1
  146:6 147:15 148:20
  150:13 151:1
2001 158:15
2003 1:24 2:4 169:21
  170:8 171:1
2060 171:4
210 171:6
222 2:7,18
24 105:19 116:1
24-hour 14:15
25 12:14 107:9 109:24
29 1:24 170:8
29th 2:3

**3**

3 102:16,16
3:30 102:16
35 11:18 12:2,8,13
3505 2:21
357 149:1
377-3027 171:6
38 149:1

**4**

4 3:6 83:23 105:2
4:15 105:22
40 11:18 12:13 13:19
  30:14,15,25 31:12,12
  31:20,22
460 2:21

**5**

5 15:4 84:13 102:17
  105:2,6
5:23 165:7
503 151:17
555 2:12

**6**

6 154:3
6:40 2:4 168:23
60/40 13:18

**7**

7800 171:5
78230 171:6
78478 2:12
78520 2:15
78521 2:22
78550 2:7
78551 2:19

**8**

8 15:4 102:17 161:25
82 119:12

**9**

9 152:10,19
9:15 163:13
98 7:14,15 10:5
99 9:5